**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **Caption in Compliance with D.N.J. LBR 9004-1(b)** | **BROWN RUDNICK LLP** |
| | David J. Molton, Esq. |
| **GENOVA BURNS LLC** | Jeffrey L. Jonas, Esq. |
| Daniel M. Stolz, Esq. | Michael S. Winograd, Esq. |
| Donald W. Clarke, Esq. | Eric R. Goodman, Esq. |
| dstolz@genovaburns.com | dmolton@brownrudnick.com |
| dclarke@genovaburns.com | jjonas@brownrudnick.com |
| 110 Allen Road, Suite 304 | mwinograd@brownrudnick.com |
| Basking Ridge, NJ  07920 | egoodman@brownrudnick.com |
| Tel: (973) 467-2700 | Seven Times Square |
| Fax: (973) 467-8126 | New York, NY  10036 |
| *Local Counsel to the Official Committee of Talc Claimants* | Tel: (212) 209-4800 |
| | Fax: (212) 209-4801 |
| | and |
| | Sunni P. Beville, Esq. |
| | sbeville@brownrudnick.com |
| | One Financial Center |
| | Boston, MA  02111 |
| | Tel: (617) 856-8200 |
| | Fax: (617) 856-8201 |
| | *Co-Counsel for the Official Committee of Talc Claimants* |
| **MASSEY & GAIL LLP** | **OTTERBOURG P.C.** |
| Jonathan S. Massey, Esq. | Melanie L. Cyganowski, Esq. |
| Bret Vallacher, Esq. | Adam C. Silverstein, Esq. |
| jmassey@masseygail.com | Jennifer S. Feeney, Esq. |
| bvallacher@masseygail.com | David A. Castleman, Esq. |
| 1000 Maine Ave. SW, Suite 450 | mcyganowski@otterbourg.com |
| Washington, DC  20024 | asilverstein@otterbourg.com |
| Tel: (202) 652-4511 | jfeeney@otterbourg.com |
| Fax: (312) 379-0467 | dcastleman@otterbourg.com |
| *Special Counsel for the Official Committee of Talc Claimants* | 230 Park Avenue |
| | New York, NY  10169 |
| | Tel: (212) 661-9100 |
| | Fax: (212) 682-6104 |
| | *Co-Counsel for the Official Committee of Talc Claimants* |

| In re: | Chapter 11 |
| **LTL MANAGEMENT LLC,** [1] | Case No. 23-12825 (MBK) |
| Debtor. | Honorable Michael B. Kaplan |

**THE OFFICIAL COMMITTEE OF TALC CLAIMANTS' PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION TO DISMISS THE SECOND BANKRUPTCY PETITION OF LTL MANAGEMENT LLC**

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

# TABLE OF CONTENTS

Page

INTRODUCTION AND SUMMARY ................................................................................1

PROCEDURAL HISTORY ...........................................................................................13

    I.     LTL 1.0 ............................................................................................................13

    II.    LTL 2.0 ............................................................................................................16

    III.   Motions to Dismiss .........................................................................................18

    IV.  Hearing of June 27–30, 2023 ........................................................................19

           A.     Fact Witnesses – Live Testimony ........................................................20

           B.     Additional Fact Witnesses ...................................................................22

           C.     Expert Witnesses...................................................................................23

FINDINGS OF FACT ...................................................................................................26

    I.     J&J'S TALC LIABILITIES ............................................................................26

           A.     J&J and Its Talc Business ....................................................................27

           B.     Alleged Torts Caused by J&J Cosmetic Talc Products .........................29

           C.     J&J's Independent Talc Liability...........................................................32

           D.     1979 Transfer Agreement ....................................................................34

    II.    J&J'S FINANCIAL RESPONSIBILITY FOR TALC LITIGATION
         BEFORE OCTOBER 2021...........................................................................38

    III.   J&J'S 2021 CORPORATE RESTRUCTURING.................................................40

           A.     Project Diamond and Project Plato Operate Contemporaneously ...........40

           B.     The Divisional Merger of Old JJCI into LTL and New JJCI ...................41

           C.     2021 Funding Agreement .....................................................................43

           D.     LTL Is Created as a Shell Company Solely to Manage J&J Talc
                  Liabilities ...........................................................................................50

    IV.  J&J'S 2022–23 CORPORATE RESTRUCTURING.........................................51

           A.     Consumer Health Business Spinoff.......................................................51

B.    J&J Directs the Termination of the 2021 Funding Agreement..................52

C.    2023 Funding Agreement and J&J Support Agreement...........................61

V.    LTL WAS NOT IN FINANCIAL DISTRESS WHEN IT FILED ITS
SECOND BANKRUPTCY ...................................................................................63

A.    Assets Available to LTL As of Its April 4, 2023 Filing ..........................65

1.    Cash...............................................................................................66

2.    Dividends ......................................................................................67

3.    Equity Interests ............................................................................68

4.    Other Sources of Cashflow within the J&J "Integrated Cash
Ecosystem" ...................................................................................70

B.    LTL's Talc Liabilities ..............................................................................71

C.    Expert Analyses of LTL's Assets and Liabilities ....................................76

D.    Unfiled And Non-Compensable Claims ...................................................81

VI.    THE ABILITY OF THE TORT SYSTEM TO RESOLVE TALC CLAIMS,
INCLUDING FUTURE CLAIMS.........................................................................87

CONCLUSIONS OF LAW ..............................................................................................92

I.    STATUTORY FRAMEWORK AND LEGAL STANDARD ..............................92

II.    LTL WAS NOT IN IMMEDIATE FINANCIAL DISTRESS AT THE TIME
OF FILING ...........................................................................................................94

A.    LTL's Post Hoc Rationales for Financial Distress Are Legally
Insufficient ...............................................................................................94

B.    LTL Fails to Meet the Third Circuit's Standard for Financial
Distress.......................................................................................................95

1.    Legal Standard for Financial Distress............................................95

2.    LTL Acknowledges Its Solvency...................................................97

3.    LTL's Own Evidence Shows It Can Pay Its Debts As They
Come Due ......................................................................................97

4.    LTL Has Failed to Show Any *Immediate* Financial Distress ........99

5.      LTL Did Not Assume J&J's Talc Liabilities ...............................103

III.    EVEN IF LTL WERE FINANCIALLY DISTRESSED, CONTRIVED
        FINANCIAL DISTRESS CANNOT PROVIDE A GOOD FAITH BASIS
        FOR A BANKRUPTCY FILING ........................................................105

        A.      The Contrived Appearance of Financial Distress Cannot Establish
                Good Faith ..............................................................................105

        B.      LTL's Assertions of Financial Distress Establish the Elements of
                Fraudulent Conveyance ............................................................109

        C.      The Debtor's Arguments for Good Faith Are Flawed ............................112

                1.      Resolving Mass Tort Liability, By Itself, Is Not a Valid
                        Reorganizational Purpose ............................................112

                2.      The "Void" or "Voidable" Argument Lacks Merit.....................113

                3.      LTL's Proposed Plan Cannot Negate Its Bad Faith.....................120

IV.     ADDITIONAL, INDEPENDENT REASONS REQUIRE DISMISSAL FOR
        LACK OF GOOD FAITH .................................................................121

V.      THE NARROW SECTION 1112(B)(2) EXCEPTION DOES NOT APPLY
        HERE ..........................................................................................124

VI.     THE STAY ORDER SHOULD BE DISSOLVED ...........................................130

CONCLUSION.....................................................................................130

# TABLE OF AUTHORITIES

## Cases

*Acumed LLC v. Advanced Surgical Servs., Inc.*,
  561 F.3d 199 (3d Cir. 2009) .......................................................................... 103

*A-Leet Leasing Corp. v. Kingshead Corp.*,
  375 A.2d 1028 (N.J. Super. Ct. App. Div. 1977) .......................................... 118

*Barber Asphalt Corp. v. La Fera Grecco Contracting Co.*,
  116 F.2d 211 (3d Cir. 1940) ............................................................................ 92

*Barden v. Brenntag North America*,
  No. MID-1809-17AS (ACV), Dkt. 9736 (D.N.J. May 7, 2019) ...................... 33

*Bartenwerfer v. Buckey*,
  143 S.Ct. 665 (2023) ..................................................................................... 106

*Basin Elec. Power Co-op. v. Midwest Processing Co.*,
  769 F.2d 483 (8th Cir. 1985) ........................................................................ 121

*Berckeley Inv. Grp., Ltd. v. Colkitt*,
  455 F.3d 195 (3d Cir. 2006) .......................................................................... 119

*Bestwall LLC v. Official Committee of Asbestos Claimants (In re Bestwall LLC)*,
  71 F.4th 168 (4th Cir. 2023) ........................................................................... 94

*Bouton v. Litton Indus., Inc.*,
  423 F.2d 643 (3d Cir. 1970) .......................................................................... 104

*Brenner v. Little Red School House, Ltd.*,
  274 S.E.2d 206 (N.C. 1981) .......................................................... 113, 115, 116

*Brown v. Third Nat'l Bank (In re Sherman)*,
  67 F.3d 1348 (8th Cir. 1995) ........................................................................ 110

*Campbell v. Boston Scientific Corp.*,
  882 F.3d 70 (4th Cir. 2018) .......................................................................... 102

*Caper Corp. v. Wells Fargo Bank, N.A.*,
  578 F. App'x 276 (4th Cir. 2014) ................................................................. 114

*Carl v. Johnson & Johnson*,
  237 A.3d 308 (N.J. Super Ct. App. Div. 2020),
  *cert denied*, 244 A.3d 270 (N.J. 2021) ......................................................... 32

*Clifford v. River Bend Plantation, Inc.*,
  323 S.E.2d 23 (N.C. 1984) ........................................................................... 118

*Congoleum Corp. v. Pergamen (In re Congoleum Corp.)*,
  Adv. No. 05-06245, 2007 WL 4571086 (D.N.J. Dec. 28, 2007) ............ 115, 116

*Czyzewski v. Jevic Holding Corp.*,
  580 U.S. at 451 (2017) .................................................................................. 123

*Danise v. Saxon Mortg. Servs. Inc.*,
   738 F. App'x 47 (3d Cir. 2018) ..................................................................... 115

*Di Pierro v. Taddeo (In re Taddeo)*,
   685 F.2d 24 (2d Cir. 1982) ......................................................................... 125

*F.D.I.C. v. Anchor Props.*,
   13 F.3d 27 (1st Cir. 1994) ........................................................................... 110

*Fairfield Harbour Prop. Owners Ass'n, Inc. v. Midsouth Golf, LLC*,
   715 S.E.2d 273 (N.C. App. 2011) ............................................................... 116

*Faulconer v. Wysong and Miles Co.*,
   574 S.E.2d 688 (N.C. App. 2002) ............................................................... 114

*Firestone Tire & Rubber Co. v. Bruch*,
   489 U.S. 101 (1989) ................................................................................... 109

*First Union Corp. v. Suntrust Banks, Inc.*,
   No. 01-CVS-100075, 2001 WL 1885686 (Sup. Ct. N.C. Aug. 10, 2001) ..................... 109

*Gallatin Fuels, Inc. v Westchester Fire Ins. Co.*,
   No. CIV.A. 02-2116, 2006 WL 2289789 (W.D. Pa. Jan. 13, 2006) ............................ 119

*Gen. Elec. Cap. Corp. v. Charleston*,
   No. CIV. A. 88-6132, 1989 WL 63213 (E.D. Pa. June 12, 1989),
   *aff'd*, 898 F.2d 140 (3d Cir. 1990) ............................................................. 118

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ................................................................................... 103

*Golden Triangle #3, LLC v. RMP-Mallard Pointe, LLC*,
   No. 19 CVS 13580, 2022 WL 3048320, (Sup. Ct. N.C. Aug. 2, 2022) ....................... 115

*Green v. Howard Family Tr. Dated Aug. 21, 1998 (In re Green)*,
   No. BAP NV-15-1349-KILDO, 2016 WL 6699311 (9th Cir. BAP Nov. 9, 2016) ........ 124

*Hackel v. F.D.I.C.*,
   858 F. Supp. 289 (D. Mass. 1994) ............................................................... 119

*Horan v. Dilbet, Inc.*,
   No. CIV. A. 12-2273, 2015 WL 5054856 (D.N.J. Aug. 26, 2015) ............................ 103

*In re 15375 Mem'l Corp. v. BEPCO, L.P.*,
   589 F.3d 605 (3d Cir. 2009) ................................................................. passim

*In re A.H. Robins Co., Inc.*,
   89 B.R. 555 (E.D. Va. 1988) ..................................................................... 2, 95

*In re Aearo Techs. LLC*,
   No. 22-02890-JJG-11, 2023 WL 3938436 (Bankr. S.D. Ind.
   June 9, 2023) .................................................................... 96, 122, 123, 124

*In re Allen*,
   300 B.R. 105 (Bankr. D.D.C. 2003) ............................................................ 121

*In re City of Phila. Litig.*,
   158 F.3d 711 (3d Cir. 1998)........................................................................ 92

*In re Combustion Eng'g, Inc.*,
   391 F.3d 190 (3d Cir. 2005)............................................................... 116, 129

*In re Congoleum Corp.*,
   627 B.R. 62 (Bankr. D.N.J. 2021) .............................................................. 115

*In re Forum Health*,
   451 B.R. 780 (Bankr. N.D. Ohio 2011) ...................................................... 126

*In re Hinesley Family Ltd. P'ship No. 1*,
   460 B.R. 547 (Bankr. D. Mont. 2011) ........................................................ 124

*In re Imerys Talc America*,
   Case No. 19-10289 (Bankr. D. Del. 2019) ............................................. 28, 31

*In re Imerys*,
   No. 19-mc-103 (MN), 2019 WL 3253366–7 (D. Del. July 19, 2019)............................. 31

*In re Insilco Techs., Inc.*,
   480 F.3d 212 (3d Cir. 2007)........................................................................ 108

*In re Integrated Telecom Express, Inc.*,
   384 F.3d 108 (3d. Cir. 2004)........................................................ 93, 112, 120

*In re Johns-Manville Corp.*,
   36 B.R. 727 (Bankr. S.D.N.Y. 1984) ............................................................. 2

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices &
   Prods. Liability Litig.*,
   220 F. Supp. 3d 1356 (J.P.M.L. 2016)........................................................ 30

*In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices &
   Prods. Liability Litig.*,
   509 F. Supp. 3d 116 (D.N.J. 2020) ........................................................ 31, 86

*In re Keith*,
   No. 10-61722-11, 2010 WL 3835003 (Bankr. D. Mont. Sept. 29, 2010)...................... 124

*In re LTL Mgmt.*,
   58 F.4th 738 ................................................................................................ 52

*In re LTL Mgmt., LLC*,
   64 F.4th 84 (3d Cir. 2023) ................................................................. passim

*In re LTL Mgmt., LLC*,
   No. 22-2003 (3d Cir. Sept. 19, 2022) ......................................................... 47

*In re Marvel Ent. Grp., Inc.*,
   140 F.3d 463 (3d Cir. 1998)........................................................................ 108

*In re Orbit Petroleum, Inc.*,
   395 B.R. 145 (Bankr. D.N.M. 2008) ........................................................... 128

*In re Paddock Enters., LLC*,
  No. 20-10028 (LSS), (2022 WL 1746652, (Bankr. D. Del. May 31, 2022).................. 101

*In re Rent-A-Wreck of America, Inc*.,
  580 B.R. 364 (Bankr. D. Del. 2018) ............................................................. 95

*In re Sentinel Mgmt. Grp., Inc.*,
  728 F.3d 660 (7th Cir. 2013) ....................................................................... 110

*In re SGL Carbon*,
  200 F.3d 154 (3ʳᵈ Cir. 1999) .................................................................. passim

*In re South Beach Sec., Inc*.,
  606 F.3d 366 (7th Cir. 2010) ....................................................................... 106

*Ingham v. Johnson & Johnson*,
  608 S.W.3d 663 (Mo. App. 2020),
  *cert. denied*, 141 S. Ct. 2716 (2021)...................................................... 34, 39

*Jackson v. Associated Scaffolding & Equip. Co.*,
  568 S.E.2d 666 (N.C. App. 2002).................................................................. 119

*Johnson & Johnson v. Aetna Cas. & Sur. Co*.,
  667 A.2d 1087 (N.J. Sup. Ct. App. Div. 1995)............................................... 104

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp*.,
  337 F.3d 314 (3d Cir. 2003)....................................................................... 115

*Leavitt v. Johnson & Johnson*,
  No. A157572/A159021, 2021 WL 3418410, (Cal. Ct. App. Aug. 5, 2021)................... 34

*Lithuanian Com. Corp. v. Sara Lee Hosiery*,
  179 F.R.D. 450 (D.N.J. 1998)....................................................................... 103

*LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint
  (In re LTL Mgmt., LLC)*,
  58 F.4th 738 (3d Cir. 2023) ......................................................................... 15

*Marrama v. Citizens Bank of Mass.*,
  549 U.S. 365 (2007)................................................................................. 105

*Midlantic Nat'l Bank v. DeSeno (In re DeSeno)*,
  17 F.3d 642 (3d Cir. 1994)......................................................................... 125

*Moody v. Sec. Pac. Bus. Credit, Inc.*,
  971 F.2d 1056 (3d Cir. 1992)....................................................................... 111

*Moran v. Davita, Inc.*,
  No. 06 Civ. 5620 (JAP), 2008 WL 4447093 (D.N.J. Sept. 26, 2008) ...................... 119

*Moss v. First Premier Bank*,
  No. 2:13-cv-05438, 2020 WL 5231320 (E.D.N.Y. Sept. 2, 2020)............................ 119

*Nayak v. Herbison*,
  No. 1:14-CV-02211, 2015 WL 11605255 (M.D. Pa. May 26, 2015)........................... 102

*Olson v. Brenntag North America*,
    No. 190328/2017 (GL)................................................................................................... 33

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
    848 F.2d 414 (3d Cir. 1988).......................................................................................... 115

*Orsatti v. N.J. State Police*,
    71 F.3d 480 (3d Cir.1995)............................................................................................. 103

*Owens Corning v. Credit Suisse First Boston*,
    322 B.R. 719 (D. Del. 2005).......................................................................................... 101

*Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.)*,
    849 F.2d 1393 (11th Cir. 1988) .............................................................................. 120, 121

*Ritchie Cap. Mgmt., LLC v. Stoebner*,
    779 F.3d 857 (8th Cir. 2015) ......................................................................................... 110

*Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
    81 F.3d 355 (3d Cir. 1996)............................................................................................ 115

*Sprafka v. DePuy Orthapedics, Inc.*,
    No. 22-331 (DWF/DTS), 2022 WL 17414477 (D. Minn. Dec. 5, 2022) ...................... 102

*Stewart Title Guaranty Co. v. Kesler (In re Kesler)*,
    No. 12-12716 (MBK), 2013 WL 653089 (Bankr. D.N.J. Feb. 21, 2013)....................... 115

*Stranton v. New*,
    283 U.S. 318 (1931)....................................................................................................... 123

*Struble v. N.J. Brewery Emps.' Welfare Tr. Fund*,
    732 F.2d 325 (3d Cir. 1984)........................................................................................... 109

*The Currituck Assocs. v. Hollowell*,
    601 S.E.2d 256 (N.C. Ct. App.)..................................................................................... 115

*TRW Inc. v. Andrews*,
    534 U.S. 19, 31 (2001)................................................................................................... 127

*Tucker v. Charter Med. Corp.*,
    299 S.E.2d 800 (N.C. App. 1983)................................................................................... 118

*Union County Utilities Auth. v. Bergen Cnty. Utilities Auth.*,
    995 F. Supp. 506 (D.N.J. 1998) ..................................................................................... 117

*United Steelworkers of Am., AFL-CIO-CLC v. N. Star Steel Co., Inc.*,
    5 F.3d 39 (3d Cir. 1993)................................................................................................. 128

**Statutes**

11 U.S.C. § 363 ............................................................................................................... 123

11 U.S.C. § 365 ............................................................................................................... 125

11 U.S.C. § 524 .......................................................................................... 10, 11, 89, 126

11 U.S.C. § 548 ........................................................................................................ 110, 111

11 U.S.C. § 1110 ...................................................................................................... 125

11 U.S.C. § 1112 ................................................................................................... passim

11 U.S.C. § 1129 ...................................................................................................... 129

11 U.S.C. § 1168 ...................................................................................................... 125

11 U.S.C. § 1322 ...................................................................................................... 125

28 U.S.C. § 157 .................................................................................................... 31, 92

28 U.S.C. § 175 .......................................................................................................... 31

28 U.S.C. § 1334 ................................................................................................... 31, 92

N.J. Rev. Stat. 25:2-29 (2021) ................................................................................... 66

N.J. Stat. Ann. § 14A:5–28 (West 2021) ................................................................. 103

N.J. Stat. Ann. § 25:2-25 (West 2021) ..................................................................... 111

**Codes**

T.B.O.C. §§ 10.0001 ................................................................................................. 40

**Other Authorities**

5 COLLIER ON BANKRUPTCY ¶ 548.04 ...................................................................... 110

Donna Larsen Holleran, BANKRUPTCY CODE MANUAL § 548:18 (May 2023 update) .............. 110

H.R. 128, Asbestos Compensation Act of 2000, 106th Cong., 2d Sess. (2000) .......................... 127

Hon. Eduardo C. Robreno, "The Federal Asbestos Product Liability Multidistrict Litigation
(MDL-875): Black Hole or New Paradigm?,"
23 Widener L.J. 97, 100 (2013) ................................................................................. 89

Hon. Eldon E. Fallon. "Common Benefit Fees in Multidistrict Litigation,"
74 La. L. Rev. 371, 376 (2014) .................................................................................. 88

Pub. L. 109-8, § 442(a), 119 Stat. 115 (2005) .......................................................... 127

Pub. L. 111-327, 124 Stat. 3561 (2010) ................................................................... 127

The Official Committee of Talc Claimants ("TCC") in the above captioned case, by and through its undersigned counsel, hereby submits these Proposed Findings of Fact and Conclusions of Law in Support of Its Motion to Dismiss the second bankruptcy petition ("LTL 2.0") of LTL Management, LLC (the "Debtor" or "LTL"), pursuant to Section 1112(b)(1) of the Bankruptcy Code, 11 U.S.C. § 1112(b)(1), and Rule 9011 of the Bankruptcy Rules.

## INTRODUCTION AND SUMMARY

1.      With the world watching, LTL has been given every opportunity to make its case in this Court and, twice now, it has utterly failed to meet its burden for showing good faith, including financial distress, established by the Third Circuit in *In re LTL Mgmt., LLC*, 64 F.4th 84 (3d Cir. 2023).  The evidence in LTL's most recent bankruptcy case leaves no doubt that J&J's continued efforts to manufacture a bankruptcy case as a tort litigation tactic remain unsuccessful. In brief, the Proposed Findings of Fact and Conclusions of Law establish:

2.      On January 30, 2023, the Third Circuit ordered LTL 1.0 dismissed for lack of financial distress.  It cautioned that removal of the 2021 Funding Agreement would subject LTL to a fraudulent transfer claim.  *LTL Mgmt.*, 64 F.4th at 109 n.18.  So, LTL attempted—unsuccessfully—to play both sides by terminating the 2021 Funding Agreement and replacing it with a new 2023 Funding Agreement that it contends now leaves LTL in financial distress.  LTL's latest machinations remain unsuccessful and epitomize bad faith.

3.      As an initial matter, the pretextual excuse LTL uses to justify these latest machinations itself gives rise to a dispositive gating issue that alone requires dismissal of this case. Specifically, LTL insists that the Third Circuit's decision "frustrated the purpose" of the 2021 Funding Agreement and thus rendered it "void or voidable."  But that argument is precluded by the terms of the Agreement itself, which expressly provide that it applies outside bankruptcy.  In

addition, LTL is judicially estopped from offering this pretext in light of its repeated representations to this Court (and the Third Circuit, which expressly raised the issue during oral argument) that the 2021 Funding Agreement would apply outside bankruptcy, including ***even in the event of dismissal of the bankruptcy.***

4.      Further, LTL has never answered the decisive point that, even if there were a frustration of purpose (and there plainly was not), voiding the 2021 Funding Agreement would result in voiding the "single integrated transaction" (in LTL's words)[2] of which the Agreement was an integral part. If the 2021 transaction is void, then any liabilities assigned to LTL as part of that transaction would go back to J&J (or to Kenvue), and this bankruptcy must be dismissed because LTL (with no talc liabilities) faces no financial distress.

5.      In any event, LTL's machinations (even if treated as legitimate) fail to create financial distress. The Third Circuit requires that the Debtor's financial distress be "immediate," "imminent," and "apparent"; a mere "attenuated possibility" of a future filing is insufficient. *LTL Mgmt.*, 64 F.4th at 102, 108. The Court of Appeals referred to "businesses teetering on the verge of a fatal financial plummet", *id.* at 103, and drew comparisons to *In re Johns-Manville Corp.*, 36 B.R. 727, 730 (Bankr. S.D.N.Y. 1984), where the debtor faced "urgency," including "forced liquidation of key business segments," and *In re A.H. Robins Co., Inc.*, 89 B.R. 555, 558 (E.D. Va. 1988), which "had only $5 million in unrestricted funds" and was unable to borrow. *LTL Mgmt.*, 64 F.4th at 103–04. The Third Circuit did not treat such "urgen[t]" circumstances as ***merely one illustrative type*** of financial distress that would warrant bankruptcy. *Id.* at 104. Rather, it treated them as an ***essential precondition*** for a bankruptcy filing, warning that "[r]isks associated

---

[2] Dkt. 614, at 50 (Debtor's Omnibus Objection to Motions to Dismiss Chapter 11 Case (the "Debtor's Objection")).

with premature filing may be particularly relevant in the context of a mass tort bankruptcy" and explaining that further litigation in the tort system would help, not hinder, LTL's reorganization. *Id.* at 103; *see id.* at n.14.   In addition, the Third Circuit opined that "testing the nature and **immediacy** of a debtor's financial troubles" is "necessary because bankruptcy significantly disrupts creditors' existing claims against the debtor." *Id.* at 103 (emphasis added).   The Third Circuit thus made clear that LTL bears the burden of proving immediate, imminent, and apparent financial distress.

6.    LTL cannot meet the Third Circuit's financial distress standard.  ██████████

████████████████████████[3]  LTL's president, Mr. Wuesthoff, testified that both LTL and Holdco, the obligor under the 2023 Funding Agreement, "had the capacity to pay their debts as they became due for the foreseeable future[.]"[4]  He added that, at the time of the second bankruptcy filing, LTL was solvent, able to pay its bills, able to meet its liabilities, and had sufficient liquidity to meet its obligations.[5]    LTL's chief financial officer, Mr. Dickinson, acknowledged that, "after the restructuring, LTL was able to meet its [foreseeable] liabilities as they came due."[6]  LTL's chief legal officer, Mr. Kim, similarly acknowledged that LTL had "the capability to pay their debts as they became due for the foreseeable future[.]"[7] ██████████

████████████████████████████████████████████████

---

[3] ████████████████████████████████████████████

[4] TCC Tr. Ex. 1077 ¶ 26 (MTD Direct Declaration of Robert Wuesthoff ("Wuesthoff Decl.")).

[5] June 27, 2023 Hearing Tr., at 71:1–14.

[6] June 27, 2023 Hearing Tr., at 134:19–21 ("[Question, Moishe Maimon] Okay. And on April 4th, after the restructuring, LTL was able to meet its liabilities as they came due, true?  [Answer, Mr. Dickinson] The foreseeable liabilities, correct.").

[7] TCC Tr. Ex. 1073 ¶ 44 (Direct Declaration of John K. Kim ("Kim Decl. II")).

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████[8]

     7.     LTL's own numbers and expert testimony confirm as much. ████████████

███████████████████████████████████████████████

████████████ ██ [9] ████████████████████████ [10] █

██████████████████████[11] ████████████████████

██████████████████████████[12] █████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████[13]

     8.     On the liability side, the Third Circuit found that LTL's "continuing run rate was

between $10 million to $20 million per month." *LTL Mgmt.*, 64 F.4th at 94. In addition, LTL

asserts that it incurs "$2 million to $5 million" in costs per trial,[14] and Mr. Wuesthoff testified (and

---



[8] June 29, 2023 PM Hearing Tr., at 44:18–23; *see also* ███████████████████████████
████████████

[9] ████████████████████████████████████████████
June 28, 2023 Hearing Tr., at 160:15–21.

[10] ████████████████████████

[11] █

[12] ████████████ ; *see* ████████████████████

[13] ██████████████████████████

[14] Dkt. 614, at 40.

LTL's counsel argued) that LTL could not realistically try more than 10 cases per year.[15]  LTL's

expert Dr. Mullin admitted that despite a "litigate all" strategy from 2013–19, LTL never tried

more than approximately ten cases per year.[16]  Thus, at a maximum, if talc claims were returned

to the tort system, LTL would face no more than $290 million in costs per year ($240 million plus

$50 million, even assuming *arguendo* that those costs were additive).

9.      LTL's own evidence disproves any assertion of "immediate," "imminent," or

"apparent" financial distress.  At the historical run-rate, ***existing*** cash on hand of more than $1.3

billion would cover nearly ***4.5 years*** of talc-related litigation, even with ***no*** additional Holdco

dividend revenue, ***no*** borrowing by Holdco, and ***no*** liquidation of any Holdco assets.  In fact, as

of the April 4, 2023 bankruptcy date, LTL's board believed Holdco would be receiving an even

larger dividend in June 2023,[17] giving LTL a right of access to cash that would cover over ***7.5***

***years*** of defense costs at the historical run rate and making any allegation of LTL's financial

distress even weaker.

10.      According to LTL's own witnesses, Holdco's assets are more than sufficient to

cover aggregate talc costs. Mr. Kim conceded as much in his direct testimony: "in no event, was

the dollar-value of the costs to defend and resolve talc claims in the tort system believed to

approach the $29 billion asset value of Holdco."[18]  Mr. Kim testified that the overall magnitude of

---

[15]    TCC Tr. Ex. 1006, at 180:7–11 (*In re LTL Management, LLC*, No. 21-30589 (MBK) (the "*LTL 1.0 Bankruptcy Proceeding*"), Dkt. 1481 (Bankr. D.N.J. Feb. 15, 2022) ("Feb. 14, 2022 Hearing Tr.")); *see also* TCC Tr. Ex. 1011, at 33:8–11 (*LTL 1.0 Bankruptcy Proceeding*, No. 21-30589 (MBK), Dkt. 1553 (Bankr. D.N.J. Feb. 22, 2022) ("Feb. 18, 2022 Hearing Tr.")) (Mr. Gordon representing to this Court that 10 cases per year was the maximum).

[16]    June 29, 2023 PM Hearing Tr., at 94:18–15; *see also id.*, at 98:7–99:11.

[17]    June 27, 2023 Hearing Tr., at 66:24–67:8, 69:3–6 (indicating LTL board believed as of April 2 that Holdco would receive $1.8 billion dividend in June 2023).

[18]    TCC Tr. Ex. 1073 ¶ 44 (Kim Decl. II).

the talc liabilities was in the $8 billion to $10 billion range but was unable to provide further

detail.[19]  Mr. Wuestoff testified several times that the value of the talc liabilities was not more than

$8.9 billion.[20]  Mr. Dickinson testified that the 2023 restructuring did not impair LTL's ability to

fund its talc liabilities:[21]  "There was nothing different."[22]  If there "was nothing different," then

the Third Circuit's prior decision mandates dismissal—again.



11. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆[23] ▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆[24] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆▆▆▆▆▆[25]—more than enough to cover even Dr. Mullin's worst-case

estimate (which liabilities, moreover, would take decades to accumulate).  And the Third Circuit

made clear that the only determinative financial distress is LTL's, not Holdco's.  64 F.4th at 105.

---

[19] June 27, 2023 Hearing Tr., at 185:7–25.

[20] *See, e.g.*, *id.*, at 58:13–16 ("[Question, Jeffrey L. Jonas]: Sir, you don't believe, LTL doesn't believe that it's talc liabilities exceed $8.9 billion, right? [Answer, Mr. Wuestoff]: At this point, nothing that we see would indicate that it's more."); *id.*, at 72:20–24 (Wuestoff, testifying that the data point of the PSA was the key estimate of the talc liabilities when deciding whether or not to file the second bankruptcy).

[21] *Id.*, at 134:22–135:6.

[22] *Id.*, at 131:6–13.

[23] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆; *see also* June 29, 2023 PM Hearing Tr., at 82:7–83:19, 154:13–16.

[24] ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆; *see also* June 29, 2023 PM Hearing Tr., at 83:3–5.

[25] ▆▆▆▆▆▆▆▆▆▆▆; *see* ▆▆▆▆▆▆▆▆▆▆

Indeed, the Third Circuit specifically allowed for the possibility that "a draw on the payment right [might require] a forced liquidation of New Consumer"—Holdco's former name. *Id*. at 107.

12. 

[26] Setting aside the upwardly-biased flaws in those estimates, they fail to establish financial distress, even if taken at face value.

[27]

In all events, making even slight adjustments to those estimates (i) to make them consistent with what LTL has stated in the past (*e.g.*, 10 trials per year and $3.5 million cost per trial), (ii) to account for a 2022 dividend that was diverted from Holdco, and (iii) to assume the liquidation of only 10% of Holdco's asset value, would render LTL's ability to cover those three-year estimated liabilities a near certainty.[28]

[29]

13. LTL has pointed to a supposed increase in the volume of talc claims, but additional talc cases are not a new development. The original 2021 bankruptcy filing included all current and future talc claims. The Third Circuit was aware that there would be additional cases in the

---



[26]

[27]

[28] TCC Tr. Ex. 1112, at 29 (Rebuttal Expert Report of Saul E. Burian ("Burian Rebuttal Report")).

[29] ; June 29, 2023 PM Hearing Tr., at 83:20-84:10.

future and accounted for them in its reasoning. *LTL Mgmt.*, 64 F.4th at 102, 108. ████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████[30]

Moreover, those known unfiled claims are largely unverified and appear to include thousands of

claims that are unsupported by scientific evidence and would be non-compensable in the tort

system.  They cannot save LTL from its lack of immediate financial distress.

14.    LTL's arguments for financial distress fail for an independent reason: they are

contrived and wholly a product of LTL's and J&J's own machinations.  A highly solvent non-

debtor parent's attempt to manufacture the appearance of financial distress in a subsidiary as a

pretext for bankruptcy, solely to benefit the parent, is not good faith.  LTL (acting to advance J&J's

interests, not its own) walked away from the 2021 Funding Agreement, which the Third Circuit

described as a $61.5 billion "ATM" to pay talc claims outside bankruptcy.  64 F.4th at 109–10.

LTL surrendered its rights under the 2021 Funding Agreement, with no attempt to negotiate with

J&J, even though the Third Circuit warned in footnote 18 of its opinion that such a surrender could

be challenged as a fraudulent transfer.  LTL planned the non-ordinary-course transaction (and the

board approved it on April 2, 2023) while LTL 1.0 was still pending, and while LTL still owed

fiduciary duties to preserve corporate assets for the benefit of creditors.  There was no disclosure

to the U.S. Trustee, the TCC, or this Court.

15.    LTL's attempt to create the appearance of financial distress by pointing to other

factors within J&J's control—such as supposed uncertainty as to whether J&J would (i) deprive

Holdco of sufficient cash flows to meet its obligations to LTL under the new 2023 replacement

Funding Agreement, (ii) refuse to permit Holdco to borrow from LTL's internal bank (lending that

---

[30] ████████████████████████████████████████ ; June 29, 2023 PM Hearing Tr., at 82:11–13.

routinely occurs as part of J&J's "integrated cash-flow ecosystem"), or (iii) halt or divert dividends from J&J subsidiaries that otherwise would flow to Holdco in the ordinary course—underscore the contrived nature of the asserted financial distress in this case. ██████████████████

████████████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████[31]

16.     LTL 2.0 continues to present in stark relief questions the Third Circuit identified but did not need to resolve in the first case, such as whether LTL's bankruptcy filing was in bad faith as an improper litigation tactic, 64 F.4th at 110 n.19; whether LTL's ostensible assumption of talc liabilities under a 1979 agreement was legally ineffective, *id.* at 108 n.16; and whether any "divisional merger to excise the liability and stigma of a product gone bad contradicts the principles and purposes of the Bankruptcy Code." *Id.* at 111.  LTL's second bankruptcy filing, like its first, "has no valid bankruptcy purpose." *Id.* at 110 n.19.  LTL remains a "shell company" that has no "need to reorganize." *Id.*

17.     As the Third Circuit observed, filing for bankruptcy "to change the forum of litigation where there is no financial distress" raises "the specter of 'abuse which must be guarded against to protect the integrity of the bankruptcy system.' " *Id.* at 110 n.19 (quoting *In re SGL Carbon*, 200 F.3d 154, 169 (3rd Cir. 1999)).  LTL's bankruptcies were filed to obtain a litigation advantage over talc claimants and to hamstring their lawyers' ability to try cases or negotiate an arms-length resolution.  As LTL's expert Ms. Birnbaum testified, the tort system was "a better forum" for LTL until the MDL court rendered its *Daubert* decision.[32]  Faced with the loss of its dispositive motion, and with claimants' unwillingness to resolve cases for the value proposed by

---

[31] June 29, 2023 PM Hearing Tr., at 44:18–23; *see also* ████████████████████████

[32] June 29, 2023 AM Hearing Tr., at 65:16–24.

J&J, LTL turned to bankruptcy to leverage a resolution on its terms. ███████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████[33]
███████████████████████████████████████████████████

18.    Further, the structure of LTL's bankruptcy—loading LTL up with talc liabilities and putting it, alone, in bankruptcy, while J&J and its consumer business (the actual wrongdoers) continue to operate outside bankruptcy free of judicial supervision and creditor protections—defies the Bankruptcy Code's "principles and purposes." 64 F.4th at 111.  The spin-off of the consumer business to Kenvue, which culminated in a lucrative IPO benefitting equity holders, highlights how J&J's divisive merger has circumvented the structural protections of the Code, by depriving this Court of the control and supervision of the very business that generated the talc liabilities at issue, and depriving creditors of the equity to which they would otherwise be entitled under 11 U.S.C. § 524(g).  J&J is using this case improperly to enjoy all the benefits of bankruptcy with none of the burdens.

19.    Section 1112(b)(2) of the Bankruptcy Code—which is a narrow exception to the otherwise mandatory obligation to dismiss for cause under Section 1112(b)(1)—is not applicable here.  No prior case has ever applied Section 1112(b)(2) to excuse the absence of good faith and financial distress.  LTL and the AHC ask this Court to be the first. Until now, courts have limited Section 1112(b)(2) to mistakes such as failing to file timely operating reports or to pay post-petition taxes or fees, not failure to comply with the fundamental requirements of good faith and financial distress, which are basic "gateway" or eligibility requirements of bankruptcy.  *LTL Mgmt.*, 64 F.4th at 102.  Debtor asks this Court to adopt an unprecedented extension of the

---

[33] ██████████████████████████████████████████████

statute in the face of the Third Circuit's decision, which has already held that Section 1112(b)(2) is unavailable in this case because there is no reasonable justification for lack of good faith and financial distress, because such deficiencies cannot be cured after the fact, and because there are no "unusual circumstances" here within the meaning of Section 1112(b)(2). *See id.* at 110.

20.    LTL is wrong in arguing that the Third Circuit's prior rejection of Section 1112(b)(2) can be distinguished because LTL supposedly now has claimant support for its plan.  Confirmability of a plan is a separate requirement of the statute, in Section 1112(b)(2)(A). It does not provide a reasonable justification for—and it does not cure—the absence of good faith and financial distress.  LTL's approach of allowing the confirmability of a plan to excuse good faith would, in effect, read the good faith requirement out of the law.  Further, as part of its Section 1112(b)(2) holding, the Third Circuit rejected the argument that "the interests of current tort creditors" and the need to protect "future tort claimants outside of bankruptcy" could provide a basis for invoking Section 1112(b)(2).  *Id.* at 110.  Thus, the Third Circuit has already rejected LTL's justifications for invoking Section 1112(b)(2).

21.    While this Court made clear that it was not intending to hold a policy seminar on the relative merits of resolving mass torts via the MDL and bankruptcy systems,[34] the Court was provided with helpful expert testimony on the tort system's ability to resolve present and future products liability claims.  When the Court asked Professor Theodore Rave ("Professor Rave"), the TCC's expert on the MDL process, about the structural mechanisms available to address future claimants, Professor Rave explained that a subclass with separate counsel (much like an FCR under Section 524(g)) could be created to represent the interests of future claimants in a settlement class action and that the key issue of notice would be the same under a class settlement or bankruptcy

---

[34] June 27, 2023 Hearing Tr., at 16:18–17:6.

trust.[35]  Moreover, even without a settlement class action addressing future claims, future talc

claims could be resolved through other forms of settlement programs or simply by the continued

filing (and then settlement) of individual claims against J&J.  Debtor's own expert Ms. Birnbaum

acknowledged that 99% of all federal products liability cases are resolved without trial.[36]  Unlike

in cases where there is a limited pot that might be depleted before future claimants' injuries arise,

here there is no evidence that J&J—one of the wealthiest corporations in the world—will go out

of business.  The interests of both current and future claimants can be protected outside bankruptcy.

22.    The Court has also raised the question about who might "pursue the claims for the

possible loss in funding value[.]"[37]  Creditors are of course always free to pursue state-law

fraudulent transfer, successor liability, and veil-piercing causes of actions in their own individual

cases, if such causes of action were ever to become necessary to satisfy a judgment.  In any event,

it would be perverse to allow a Debtor to manufacture financial distress via fraudulent transfers

and then seek to justify bankruptcy relief based upon the need to recover those very assets.

23.    The Third Circuit lauded this Court's "commendable effort to resolve a

more-than-thorny problem," but refused to allow that effort to excuse lack of good faith and

financial distress.  *LTL Mgmt.*, 64 F.4th at 111.  The Third Circuit also held that LTL's filing was

not permissible even if it would "create[] the best of all possible worlds for it and the talc

claimants."  *Id*.  The benefits of bankruptcy "cannot displace the rule that resort to Chapter 11 is

appropriate only for entities facing financial distress. This safeguard ensures that claimants' pre-

---

[35] June 29, 2023 AM Hearing Tr., at 26:3–30:14.

[36] June 29, 2023 AM Hearing Tr., at 75:15–17.

[37] *In re LTL Mgmt., LLC*, Case No. 23-12825 (MBK) ("*LTL 2.0 Bankruptcy Proceeding*"), Dkt. 263 (Bankr. D.N.J. Apr. 21, 2023) ("Apr. 18, 2023 Hearing Tr.")), at 8:23–9:5; *see also LTL 2.0 Bankruptcy Proceeding*, Dkt. 537 (Bankr. D.N.J. May 17, 2023), at 45:1–6.

bankruptcy remedies—here, the chance to prove to a jury of their peers injuries claimed to be caused by a consumer product—are disrupted only when necessary." *Id.*  The Third Circuit's decision compels dismissal of this case.

## PROCEDURAL HISTORY

### I.   LTL 1.0

24.   On October 14, 2021, LTL commenced LTL 1.0 by filing a voluntary petition for chapter 11 relief in the Western District of North Carolina (the "North Carolina Court").

25.   On October 18, 2021, LTL filed an Emergency Motion to Enforce the Automatic Stay Against Talc Claimants Who Seek to Pursue Their Claims Against the Debtor and Its Non-Debtor Affiliates,[38] which the North Carolina Court denied at the first-day hearing.[39]  The North Carolina Court advised the Debtor to file an adversary proceeding, explaining that the rulings in prior Texas two-step cases "are untested decisions that have not been up on appeal as yet and this is an untested stratagem that the debtor has undertaken[.]"[40]

26.   On October 21, 2021, LTL commenced an adversary proceeding in the North Carolina Court and moved for a preliminary injunction and temporary restraining order.  On October 22, 2021, the North Carolina Court held a TRO hearing and again denied a stay, with the exception of claims against LTL itself and Old JJCI.  The North Carolina Court opined: "I'm not going any further. . . .  [T]he evidence presented today gives me grave concerns that these may be

---

[38] *LTL 1.0 Bankruptcy Proceeding*, No. 21-30589 (MBK), Dkt. 44 (Bankr. D.N.J. Oct. 18, 2021).

[39] TCC Tr. Ex. 603.024, at 138:14–21 (*LTL 1.0 Bankruptcy Proceeding*, No. 21-30589 (JCW), Dkt. 178 (Bankr. W.D.N.C. Oct. 23, 2021)).

[40] *Id.*, at 136:9–15.

independent liabilities of the Johnson & Johnson Company that were not subject to the divisional

merger and thus not brought into this bankruptcy case, not liabilities of the debtor."[41]

27.     The North Carolina Court held a hearing on the preliminary injunction motion on

November 4–5, 2021 (the "North Carolina Hearing").  After indicating that it would transfer venue

to this Court, the North Carolina Court entered a short-term, 60-day preliminary injunction to

prevent this case from being transferred to this Court "on fire."[42]

28.     The next day, on November 16, 2021, the North Carolina Court entered an order

transferring LTL's bankruptcy case to this Court.[43]  The North Carolina Court found that LTL's

assets were "all created to effectuate a bankruptcy filing and have no other business purpose."[44]

29.     Shortly after the venue transfer, LTL filed a motion with this Court seeking to

extend the 60-day injunction imposed by the NC PI Order ("Supplemental PI Motion").[45]  That

motion was opposed by the Official Committee of Talc Claimants in place at the time.

30.     That Committee, along with multiple other talc claimant groups, also filed motions

to dismiss LTL 1.0 for cause pursuant to Section 1112(b) (collectively, "LTL 1.0 Dismissal

---

[41] TCC Tr. Ex. 601.005, at 159:4–9 (*LTL 1.0 Bankruptcy Proceeding*, No. 21-30589 (JCW), Dkts. 173–77 (Bankr. W.D.N.C. Oct. 22, 2021) ("Oct. 22, 2021 Hearing Tr.")).

[42] *See LTL Management LLC v. Those Parties Listed on Appendix A to the Complaint*, No. 21-3032 (MBK) (the "*LTL 1.0 Adversary Bankruptcy Proceeding*"), Dkt. 102 (Bankr. D.N.J. Nov. 15, 2021) ("NC PI Order"); *see also* TCC Tr. Ex. 603.013, at 143:12–18 (*LTL 1.0 Bankruptcy Proceeding*, No. 21-30589 (JCW), Dkt. 391 (Bankr. W.D.N.C. Nov. 12, 2021)).

[43] *See LTL 1.0 Bankruptcy Proceeding*, No. 21-30589 (JCW), Dkt. 416 (Bankr. W.D.N.C. Nov. 16, 2021).

[44] *Id.*, at 9.

[45] *See LTL 1.0 Adversary Bankruptcy Proceeding*, No. 21-30589 (MBK), Dkt. 128 (Bankr. D.N.J. Dec. 8, 2021) ("Supplemental PI Motion").

Motions").[46]   The Court held a combined hearing on the Supplemental PI Motion and LTL 1.0

Dismissal Motions on February 14–18, 2022 ("First MTD Trial").  On March 2, 2022, this Court

entered orders, respectively, granting Supplemental PI Motion ("LTL 1.0 PI Order"),[47] and

denying the LTL 1.0 Dismissal Motions ("LTL 1.0 MTD Order"),[48] which were timely appealed

and certified for direct appeal to the Third Circuit Court of Appeals.

31.    On January 30, 2023, the Third Circuit issued an opinion reversing the LTL 1.0

MTD Order and thereby mooting the appeal of the LTL 1.0 PI Order.  *LTL Mgmt., LLC v. Those*

*Parties Listed on Appendix A to Complaint (In re LTL Mgmt., LLC)*, 58 F.4th 738 (3d Cir. 2023).

The Third Circuit "start[ed] and stay[ed] with good faith," holding that LTL was not in financial

distress and that "[g]ood intentions," such as the desire to "comprehensively resolve litigation,"

"do not suffice alone." *Id.* at 746.  The Third Circuit also rejected the narrow exception of Section

1112(b)(2) as a basis for avoiding dismissal.  *Id.* at 763.

32.    On March 30, 2023, the Third Circuit issued an amended opinion clarifying that

this Court's prior findings of financial distress were "clearly erroneous" and that this Court

"abused its discretion in denying the motions to dismiss." *LTL Mgmt.*, 64 F.4th at 108, 111.  The

Third Circuit also amended its opinion to emphasize "the theme LTL proclaimed in this case from

day one: it can pay current and future talc claimants in full." *Id*. at 109.

---

[46] *LTL 1.0 Bankruptcy Proceeding*, No. 21-30589 (MBK), Dkt. 632 (Bankr. D.N.J. Dec. 1, 2021); *see LTL 1.0 Bankruptcy Proceeding*, No. 21-30589 (MBK), Dkt. 766 (Bankr. D.N.J. Dec. 9, 2021); *LTL 1.0 Bankruptcy Proceeding*, No. 21-30589 (MBK), Dkt. 1003 (Bankr. D.N.J. Dec. 29, 2021).

[47] *LTL 1.0 Bankruptcy Proceeding*, No. 21-30589 (MBK), Dkt. 1603 (Bankr. D.N.J. Mar. 2, 2022).

[48] *LTL 1.0 Adversary Bankruptcy Proceeding*, No. 21-3032 (MBK), Dkt. 187 (Bankr. D.N.J. Mar. 4, 2022).

33.     The Third Circuit denied LTL's subsequent request for rehearing en banc and motion to stay the mandate pending the filing of a petition for certiorari with the U.S. Supreme Court.  No judge voted in favor of either request.

34.     On March 31, 2023, the Third Circuit issued a certified judgment remanding the case to this Court with the instruction to dismiss LTL's petition.[49]  This Court entered an order dismissing LTL 1.0 and vacating the LTL 1.0 PI Order on April 4, 2023 at 1:49 pm.[50]

## II.    LTL 2.0

35.     On April 4, 2023, at 4:00 pm, just two hours and eleven minutes after the Debtor's first bankruptcy was dismissed, the Debtor filed the instant petition seeking bankruptcy relief for the second time.[51]  The Debtor also filed an adversary complaint ("PI Complaint") against talc claimants, moving for both a temporary restraining order and for a preliminary injunction.[52]

36.     On April 5, 2023, the Court entered an *ex parte* temporary restraining order that prohibited and enjoined talc-related lawsuits against four affiliates of the Debtor for a period of twenty-eight (28) days ("TRO") and scheduled a hearing on a preliminary injunction for April 18, 2023.[53]

37.     On April 18, 2023, the Court held a hearing on the Debtor's request for preliminary injunction ("Preliminary Injunction Hearing").  On April 20, 2023, the Court issued a bench

---

[49] *In re LTL Mgmt., LLC*, No. 22-2003, ECF No. 181 (3d Cir. Mar. 31, 2023).

[50] *LTL 1.0 Bankruptcy Proceeding*, No. 21-30589 (MBK), Dkt. 3938 (Bankr. D.N.J. Apr. 4, 2023).

[51] *See generally In re LTL Mgmt., LLC*, Case No. 23-12825 (MBK) ("*LTL 2.0 Bankruptcy Proceeding*").

[52] *See LTL Management LLC v. Those Parties Listed on Appendix A to the Complaint*, No. 23-01092 (MBK) (the "*LTL 2.0 Adversary Bankruptcy Proceeding*"), Dkt. 2 (Bankr. D.N.J. Apr. 4, 2023).

[53] *LTL 2.0 Adversary Bankruptcy Proceeding*, Dkt. 9 ¶ 2 (Bankr. D.N.J. Apr. 5, 2023).

decision granting the Debtor's request,[54] and, on April 25, 2023, entered an order in accordance

with its decision ("PI Order").  The PI Order dissolved the TRO and enjoined the commencement

or continuation of any trial or appellate practice with respect to talc-claims against certain protected

parties identified on Exhibit B to the PI Complaint, through and including June 15, 2023.[55]

      38.    On April 27, 2023, the Court issued a written decision clarifying and supplementing

its April 20 bench ruling.[56]  The April 27 decision also denied the request of certain talc claimants,

made at the April 11, 2023 first day hearing in LTL 2.0, for the Court to exercise its *sua sponte*

authority to dismiss this case for cause pursuant to Section 1112(b)(1).  The Court opined that the

record raised "more questions regarding financial distress and good faith than [] answer[s.]"[57]  The

Court noted an apparent increase in the number of claims against the Debtor since the

commencement of the first bankruptcy in October 2021, but found "[i]t is uncertain whether these

new claims are supportable[,]" because "the parties offered only speculation . . . as to viability" of

the claims.[58]  The Court noted the reduction in potential funding available to the Debtor as a result

of the termination of the 2021 Funding Agreement, and observed that "the reduction certainly

appears to be manufactured by the Debtor, Holdco, and J&J in direct response to the Third Circuit's

ruling."[59]  The Court cited "the potentially 'largest intentional fraudulent transfer in United States

---

[54] *LTL 2.0 Adversary Bankruptcy Proceeding*, Dkt. 82 (Bankr. D.N.J. Apr. 21, 2023).

[55] *LTL 2.0 Adversary Bankruptcy Proceeding*, Dkt. 91 (Bankr. D.N.J. Apr. 25, 2023).

[56] *LTL 2.0 Adversary Bankruptcy Proceeding*, Dkt. 94 (Bankr. D.N.J. Apr. 27, 2023).

[57] *Id*., at 18.

[58] *Id*.

[59] *Id.*

history,'" explained that it was "troubled" and "skeptical" of Debtor's position, and acknowledged "[u]ndoubtedly, Debtor has an uphill battle."[60]

39.    After a hearing on June 13, 2023, the Court extended the preliminary injunction on the terms set forth in the PI Order through August 22, 2023. On June 27, 2023, the Court issued a bench decision granting the Debtor's request to modify the protected parties covered by the recently extended injunction to include non-debtor affiliates Janssen Pharmaceuticals, Inc. and Kenvue Inc.[61] On July 14, 2023, the Court issued a written order memorializing its bench ruling.[62]

## III.    Motions to Dismiss

40.    Before the Court are several motions to dismiss the Debtor's second bankruptcy petition pursuant to Section 1112(b) (collectively, the "Dismissal Motions"), filed by the following parties: (i) the TCC (Dkt. 286); (ii) the Ad Hoc Group of Mesothelioma Claimants ("Meso Ad Hoc") (Dkt. 335); (iii) Paul Crouch (Dkt. 346); (iv) the Ad Hoc Committee of States Holding Consumer Protection Claims ("States Ad Hoc") (Dk. No. 350); (v) law firms on behalf of various mesothelioma claimants (Dkt. 352); (vi) Maune Raichle Hartley French & Mudd, LLC ("MRHFM") (Dkt. 358); (vii) the Office of the United States Trustee (the "U.S. Trustee") (Dkt. 379); (viii) Arnold & Itkin LLP ("A&I") (Dkt. 384); (ix) certain claimants represented by the Barnes Law Group (Dkt. 473); and (x) the States of New Mexico and Mississippi ("NM & MS") (Dkt. 480) (collectively, the "Movants").

---

[60] *Id.*, at 18, 20, 23 (citation omitted).

[61] *See LTL 2.0 Adversary Bankruptcy Proceeding*, Dkts. 197–98 (Bankr. D.N.J. June 27, 2023).

[62] *See LTL 2.0 Adversary Bankruptcy Proceeding*, Dkt. 203 (Bankr. D.N.J. July 14, 2023).

41.    There were two objections filed in response to the Dismissal Motions—the *Debtor's Objection* (Dkt. 614) and *Omnibus Objection of the Ad Hoc Committee of Supporting Counsel to Motions to Dismiss* (Dkt. 613).

42.    The following Movants filed reply briefs: (i) the TCC (Dkt. 863); (ii) States Ad Hoc (Dkt. 863); (iii) the U.S. Trustee (Dkt. 862); (iv) A&I (Dkt. 854); (v) MRHFM (Dkt. 855); and (vi) NM & MS (Dkt. 872).  The Meso Ad Hoc filed a joinder to the TCC's reply (Dkt. 866).

43.    Both the Debtor and the AHC filed sur-replies.  *See* Dkt. Nos. 900, 906.

## IV.    Hearing of June 27–30, 2023

44.    The Court held a four-day hearing on the Dismissal Motions, from June 27, 2023 to June 30, 2023 (the "Hearing").

45.    Prior to the Hearing, the Movants, Debtor, and AHC stipulated, in relevant part, to the admission of the following evidence for the Hearing: (i) the exhibits admitted at the Preliminary Injunction Hearing; (ii) the transcripts of witness testimony from the Preliminary Injunction Hearing; (iii) exhibits that were admitted at the First MTD Hearing (which included all evidence previously admitted at the North Carolina Hearing); and (iv) the transcripts from the First MTD Hearing.[63]

46.    At the Hearing, the Court admitted certain exhibits offered by the TCC and other Movants, as well as certain exhibits offered by the Debtor, and instructed the parties to meet and confer to stipulate as to the admission of certain evidence.  The parties subsequently filed a stipulation addressing those matters.

---

[63] Pretrial Evidence Stip., Dkt. 852.

### A.    Fact Witnesses – Live Testimony

47.    The Court took live testimony from a number of fact witnesses, with direct examinations submitted by declaration.  The exhibit number of the direct examination declaration, the date of testimony, and the location in the Hearing transcript for each witness is as follows:

48.    **Robert Wuestoff** (Ex. D-3 / 1077 (declaration)).[64]  Mr. Wuestoff is the president of the Debtor and a member of its board of managers.  He has served as the Debtor's president since its formation on October 12, 2021, and, as of October 11, 2021, also serves as the president of Royalty A&M LLC, the Debtor's wholly owned subsidiary.  Mr. Wuestoff is an employee of Johnson & Johnson Services, Inc. ("J&J Services") who was seconded to the Debtor pursuant to a secondment agreement between J&J Services and the Debtor.  Mr. Wuestoff testified to the circumstances surrounding the Debtor's board of manager's approval of the 2021 Funding Agreement, as well as its decision to terminate that agreement and enter into the 2023 Funding Agreement.  Mr. Wuestoff also testified that LTL's total talc liabilities are not more than $8.9 billion.[65]

49.    **Richard Dickinson** (Ex. D-2 / 1075 (declaration)).[66]  Mr. Dickinson is the chief financial officer of the Debtor and a member of its board of managers.  He has held these positions since the Debtor's formation on October 12, 2021.  Mr. Dickinson is also an employee of J&J Services working for LTL pursuant to a secondment agreement.  Mr. Dickinson testified to LTL's financial condition and the circumstances surrounding LTL's decision to file its second bankruptcy petition, its termination of the 2021 Funding Agreement, and its financial condition.

---

[64] June 27, 2023 Hearing Tr., at 21:5–124:1.

[65] June 27, 2023 Hearing Tr., at 58:9–16.

[66] June 27, 2023 Hearing Tr., at 125:3–177:2.

50.    **John Kim** (Ex. D-1 / 1073 (declaration)).[67] Mr. Kim is the general counsel of the Debtor and has held that position since the Debtor's formation. Mr. Kim is an employee of J&J Services seconded to the Debtor. Mr. Kim testified to the circumstances surrounding the filing of the first and second bankruptcy petitions, including J&J and LTL's predecessor's history with talc litigation.

51.    **James Murdica** (Ex. D-5 (declaration)).[68] Mr. Murdica is J&J's national settlement counsel in talc litigation around the country. He is a partner at the law firm Barnes & Thornburg LLP, where he serves as chairman of the firm's Product Liability and Mass Torts practice. In that position, he has represented J&J since approximately 2004. Mr. Murdica testified to J&J's talc litigation history and efforts to resolve talc claims in the tort system and through bankruptcy, including the negotiation of certain plan support agreements with law firms purporting to represent individuals with injuries allegedly caused by talc.

52.    **Mikal Watts** (Ex. D-6 / 1117 (declaration)).[69] Mr. Watts is member of the AHC who purports to represent certain talc claimants. He testified to his client base and to his understanding of the plan support agreement that he executed and negotiated with J&J.

53.    **James Onder** (Ex. D-7 / 1118 (declaration)).[70] Mr. Onder is a member of the AHC who purports to represent certain talc claimants. Like Mr. Watts, Mr. Onder also testified to his understanding of the plan support agreement that he executed. Mr. Onder, who represented a member of the TCC in LTL 1.0, also testified to certain aspects of his negotiations with J&J over

---

[67] June 27, 2023 Hearing Tr., at 177:13–292:9.

[68] June 28, 2023 AM Hearing Tr., at 5:12–168:12.

[69] June 28, 2023 PM Hearing Tr., at 15:2–59:3.

[70] June 28, 2023 PM Hearing Tr., at 60:20–138:19.

the plan support agreement, and, as a representative of a member of the talc claimants committee

in the *Imerys* bankruptcy (discussed further below), Mr. Onder addressed the connection between

that case and the Debtor's recently filed amended plan.

54.      **Adam Lisman** (Ex. D-4 / 1119 (declaration)).[71] Mr. Lisman is an employee of J&J

Services and serves as the vice president and assistant corporate controller of J&J.  As such, he is

familiar with J&J's consolidated accounting and reporting, including SEC filings.  Mr. Lisman

testified to LTL's and Holdco's respective corporate structures, assets, and liabilities.  He also

testified to Holdco's ability to satisfy its obligations under the 2023 Funding Agreement.

### B.      Additional Fact Witnesses

55.      The Court took testimony from additional fact witnesses solely by deposition

designation.  The exhibit number of the deposition designation for each witness is as follows:

56.      ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████

57.      **Adam Pulaski** (TCC Tr. Ex. 952 (designation only)).  Mr. Pulaski is member of

the AHC who purports to represent certain talc claimants.  Mr. Pulaski testified to the nature of his

clients' injuries, the number of filed and unfiled cases, and his understanding of the plan support

agreement he executed.

---

[71] June 28, 2023 PM Hearing Tr., at 139:9–197:18.

58.    **Erik Haas** (TCC Tr. Ex. 772 (designation only)).  Mr. Haas is an employee of J&J and the world wide vice president for litigation.  He is the senior lawyer at J&J with direct day-to-day responsibility for the management of J&J's talc litigation.

59.    **Andy Birchfield** (TCC Tr. Exs. 820, 957 (designation only)).  Mr. Birchfield represents a member of the TCC and his law partner serves as Co-Lead Counsel of the Plaintiffs' Steering Committee, and in such roles he represents directly or indirectly thousands of talc claimants with compensable claims. Mr. Birchfield testified regarding the appropriateness of common benefit fee assessments in MDL litigation (which are borne by attorneys, not clients), flaws in LTL's proposed plan, and his belief that in bankruptcy J&J is seeking a significant discount on talc claims. He also testified as to the differences between the terms of a pre-bankruptcy filing, 2020 settlement negotiation, and the terms of the current proposed plan.

60.    ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

### C.    Expert Witnesses

61.    The Court took live testimony from a number of expert witnesses (except for Dr. Bell), with direct testimony submitted by expert report.  The exhibit number of the expert report, the date of testimony, and the location in the Hearing transcript for each expert witness is as follows:

62.    **Saul Burian** (TCC Tr. Exs. 876, 1112 (expert reports)).[72]  Mr. Burian was designated as an expert in financial restructurings and assessment of distressed companies.  Mr.

---

[72] June 29, 2023 PM Hearing Tr., at 5:7–68:22.

Burian has 35 years of restructuring experience, first as an attorney in private practice and then for the last 21 years at Houlihan Lokey, an investment bank, where he is a managing director in the financial restructuring group.  He testified about LTL's transactions in response to the Third Circuit opinion and Holdco's transfer of assets, about whether LTL was in financial distress at the time it filed for bankruptcy on April 4, 2023, and about Holdco's ability to satisfy its obligations to LTL.

63.  **Professor Theodore Rave** (TCC Tr. Exs. 966, 967 (expert reports)).[73]  Professor Rave was designated as an expert on the use of multi-district litigation and tools for resolution of mass torts.  He is a Professor of Law at the University of Texas School of Law, and has been researching, teaching, and writing about complex and multi-district litigation for the past 10 years, having published more than a dozen articles on those topics in that time.  Professor Rave testified about the use of multi-district litigation as a vehicle to resolve mass tort claims in general and LTL's and J&J's talc liabilities, specifically.

64.  **Hon. Royal Furgeson, U.S.D.J. (ret.)** (TCC Tr. Ex. 980 (expert report)).[74]  Judge Furgeson was designated as an expert on multi-district litigation.  He served as a United States District Judge for the Western District of Texas from 1994 until his retirement in 2013.  During his tenure on the bench, Judge Furgeson served as a member of the Judicial Panel for Multi-District Litigation ("JPML") from 2008 to 2013.  Judge Furgeson testified about the role that multi-district litigation plays in the resolution of complex litigation, and the role of the JPML in achieving those results.

---

[73] June 29, 2023 AM Hearing Tr., at 6:18–46:6.

[74] June 29, 2023 AM Hearing Tr., at 46:17–56:9.

65.    **Sheila Birnbaum** (Ex. D-68 / 1004 (rebuttal expert report)).[75]  Ms. Birnbaum was designated as a rebuttal expert on mass tort litigation to respond to the expert reports of Professor Rave and Judge Furgeson.  She is currently a partner at Dechert LLP, which represents J&J, including in connection with talc litigation, and is co-chair of the firm's product liability and mass torts practice.  Over the course of her career, she has served as national counsel or lead defense counsel for numerous Fortune 500 companies in complex tort litigation.  Ms. Birnbaum testified about whether multi-district litigation or bankruptcy proceedings provide a better forum for the resolution of mass torts.

66.    **Charles H. Mullin, Ph.D.** (TCC Tr. Exs. 1001, 1002 (expert reports)).[76]  Dr. Mullin was designated as an expert on the scope and resolution of talc liabilities.  Dr. Mullin is an economist and partner at Bates White, LLC, who has provided expert reports and witness testimony in over 50 matters, including several times in this matter.  Dr. Mullin testified as to the potential aggregate expenditures if LTL were to return to the tort system, under various litigation strategy scenarios, concluding that the expected value of total talc expenditures is $11 billion, stress tested in the worst case to $21 billion.  The Court struck the portions of Dr. Mullin's report (primarily Part VII) purporting to offer opinions comparing the bankruptcy and tort system.[77]

67.    **Gregory K. Bell, Ph.D.** (TCC Tr. Exs. 1003, 1021 (expert reports)).  Dr. Bell is an expert in economics and accounting in the life science industries, designated by Debtor to testify about whether LTL was in financial distress when it filed LTL 2.0 on April 4, 2023.  Dr. Bell's report discusses the solvency and market value of LTL and Holdco and analyzes the possible

---

[75] June 29, 2023 AM Hearing Tr., at 56:21–96:8.

[76] June 29, 2023 AM Hearing Tr., at 96:19–132:25; *see* June 29, 2023 PM Hearing Tr., at 75:3–154:25.

[77] June 30, 2023 Hearing Tr., at 4:21–5:1.

liquidation of Holdco assets.  Dr. Bell also analyzed the operating cash flows of LTL and Holdco and compared his cash flow scenarios to Dr. Mullin's forecasts of talc liabilities.  With the consent of the Parties, Dr. Bell did not testify live.

68.    On June 30, 2023, the Court heard closing arguments from the parties and instructed any party using an electronic slide deck to submit such slides to the Court.  The Court also instructed the parties to meet and confer and to submit a stipulation of admitted exhibits, along with any disputes, as set forth above.

## FINDINGS OF FACT[78]

### I.    J&J'S TALC LIABILITIES

69.    LTL 2.0, like LTL 1.0, arises from J&J's attempt to shed its talc liability through the vehicle of LTL.  That liability, in turn, is the result of lawsuits related to use of Johnson's Baby Powder ("JBP") and Shower to Shower ("STS"), two talc-containing cosmetic products originally manufactured, marketed, and sold by J&J.  Since 2010, J&J and Johnson & Johnson Consumer Inc. ("Old JJCI") faced mounting claims alleging that JBP and STS contained asbestos and other carcinogens (such as talc fibers and heavy metals) and that use of the products had caused users to develop ovarian cancer and mesothelioma.[79]  Between 2010 and October 2021, when LTL filed its first bankruptcy petition, these talc-related claims against J&J and Old JJCI increased from a handful of isolated lawsuits to over 38,000 pending ovarian cancer claims and over 400 pending mesothelioma claims.  *LTL Mgmt.*, 64 F.4th at 94.  LTL maintains that it became solely responsible

---

[78] To the extent that any of the findings of fact might constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

[79] TCC Tr. Ex. 533 ¶¶ 34–37 (Direct Declaration of John K. Kim ("Kim Decl. I")).

for all liability arising from these and any additional talc-related claims though a series of pre-petition transactions undertaken in 2021.[80]

### A.  J&J and Its Talc Business

70.  J&J is one of the top 10 companies in the United States by market value, with (as of the October 2021 filing) "well over $400 billion in equity value[,] a AAA credit rating and $31 billion just in cash and marketable securities. It distributed over $13 billion to shareholders in each of 2020 and 2021." *LTL Mgmt.,* 64 F.4th at 106.

71.  J&J began selling JBP in 1894.  *Id.* at 93. J&J was directly responsible for manufacturing, marketing, and selling JBP until 1979, when it transferred the assets of its Baby Products Division—including JBP—to a wholly-owned subsidiary, Johnson & Johnson Baby Products Company ("Baby Products").  *Id.*  Through a series of transactions, Baby Products was ultimately succeeded by Old JJCI, which continued to manufacture and sell JBP until its discontinuation in the U.S. and Canadian markets in 2020.  *Id.*

72.  From at least the 1960s through the end of 1978, J&J also manufactured STS.[81] Beginning in 1979, a wholly-owned subsidiary of J&J, Johnson & Johnson Personal Products Company ("Personal Products"), began to manufacture and sell STS.[82]  Personal Products manufactured and sold STS until about 1987, when the product line was transferred to Baby

---

[80] TCC Tr. Ex. 533 ¶ 16 (Kim Decl. I).

[81]  TCC Tr. Ex. 603.012, at 114:3–11, 201:15–25 (*LTL 1.0 Bankruptcy Proceeding*, No. 21-30589 (JCW), Dkt. 390 (Bankr. W.D.N.C. Nov. 12, 2021) ("Nov. 4, 2021 Hearing Tr.")).

[82] *Id.*, at 114:3–12, 205:22–206:7.

27

Products, and later, in 2012, it was sold to Valeant Pharmaceuticals International, Inc. (now Bausch Health Companies Inc.), an entity outside of the J&J group of entities.[83]

73.     From the 1960s through 1989, the talc used in JBP and STS was sourced from certain Vermont mines owned by a wholly-owned J&J subsidiary named Windsor Minerals, Inc. ("Windsor").[84]  Windsor was never owned or operated by Old JJCI or any of its predecessors.[85] J&J sold its interest in Windsor to Cyprus Mines Corporation ("Cyprus") in 1989, and agreed to indemnify Cyprus in connection with the sale.[86]  As a result of several subsequent transfers effectuated between 1992 and 2011, Cyprus became known as Imerys Talc America, Inc. ("Imerys").[87]  It continued to supply talc to Old JJCI despite its name change until 2020.[88]  In 2019, Imerys and its affiliates filed voluntary chapter 11 petitions in the United States Bankruptcy Court for the District of Delaware.  *In re Imerys Talc America*, Case No. 19-10289 (Bankr. D. Del. 2019).[89]  The *Imerys* bankruptcy remains pending without a confirmed plan.

---

[83]  TCC Tr. Ex. 913 ¶ 12 (Supplemental Declaration of John K. Kim in Support of Debtor's Complaint for Declaratory and Injunctive Relief and Related Motions ("Supp. Kim Decl. I")); TCC Tr. Ex. 603.012, at 130:11–131:21, 207:2–21, 208:18–209:4 (Nov. 4, 2021 Hearing Tr.).

[84]  TCC Tr. Ex. 603.012, at 209:20–211:3, 211:16–22, 212:9–15, 213:6–11 (Nov. 4, 2021 Hearing Tr.).

[85]  *Id.*, at 210:14–19, 212:2–8.

[86]  *Id.*, at 212:25–213:5, 218:7–12.

[87]  TCC Tr. Ex. 559 ¶ 12 (Declaration of Alexandria Picard, chief financial officer of the Debtors in Support of Chapter 11 Petitions and First Day Pleadings, *In re Imerys Talc America, Inc., et al.* (Bankr. Del. 19-10289), Dkt. 10).

[88]  TCC Tr. Ex. 533 ¶ 55 (Kim Decl. I).

[89]  *See also* TCC Tr. Ex. 533 ¶ 55 (Kim Decl. I).

## B.    Alleged Torts Caused by J&J Cosmetic Talc Products

74.      J&J's internal testing has long reflected the presence of asbestos minerals and talc fibers in the mines from which its talc was sourced.[90]    In 2019, the U.S. Food and Drug Administration found asbestos and talc fibers in a sample of JBP.  *LTL Mgmt.*, 64 F.4th at 94. In 2018, Health Canada found that the scientific evidence demonstrated a causal connection between exposure to talc and ovarian cancer.  *Id.*  Health Canada confirmed this finding in 2021. *Id.*  Following the discontinuance of JBP in 2020, J&J and Old JJCI continued to sell baby powder made from corn starch—an alternative that had been available for decades.[91]    To date, J&J maintains that neither JBP nor STS contained asbestos or other carcinogens and does not cause cancer.[92]

75.      The first lawsuit against J&J or Old JJCI alleging mesothelioma resulting from the use of its cosmetic talcum powder products was *Howard*, filed in 1996.[93]    As of the filing of LTL 1.0, there were fewer than 500 pending mesothelioma cases.[94]    The majority of these cases (well

---

[90] *See* TCC Tr. Ex. 601.003, at 45:19–46:8 (John Hopkins, Ph.D. Apr. 11, 2018 Dep. Tr.).

[91] *See* TCC Tr. Ex. 601.003, at 37:1–22 (John Hopkins, Ph.D. Apr. 11, 2018 Dep. Tr.).

[92] TCC Tr. Ex. 794 ¶ 36 (2023 Declaration of John K. Kim in Support of First Day Pleadings ("LTL 2.0 First Day Pleadings Kim Decl.")).

[93] TCC Tr. Ex. 603.012, at 200:4–11 (Nov. 4, 2021 Hearing Tr.).

[94] TCC Tr. Ex. 533 ¶ 44 (Kim Decl. I); TCC Tr. Ex. 603.012, at 120:6–121:3, 242:2–6 (Nov. 4, 2021 Hearing Tr.).

over 250) were pending in a coordinated proceeding in Middlesex County Superior Court in New Jersey.[95]

76.    The first lawsuit against J&J or Old JJCI alleging ovarian cancer from use of its cosmetic talcum powder products was *Berg v. J&J*, filed in December 2009.[96]  In February 2016, after a trial in another ovarian cancer case, *Fox*, a jury awarded the plaintiff $72 million.[97] By 2014, Old JJCI had been named in 46 ovarian cancer complaints.[98]  The number of ovarian cancer complaints filed increased to nearly 5,000 as of 2017, and as of the LTL 1.0 petition date, there were 38,000 ovarian cancer complaints pending, including approximately 35,000 in a federal multi-district litigation consolidated in New Jersey, as well as approximately 3,300 cases in state courts across the country.[99]

77.    The JPML selected New Jersey because it was a "convenient and accessible forum for this nationwide litigation and is located in close proximity to a large number of state court actions pending in New Jersey and other jurisdictions on the East Coast," and because J&J was headquartered there.  *In re Johnson & Johnson Talcum Powder Prods. Mktg., Sales Practices & Prods. Liability Litig.*, 220 F. Supp. 3d 1356, 1359 (J.P.M.L. 2016).

78.    Initially, J&J supported these centralization efforts.  Before the JPML, J&J advanced New Jersey as a preferred venue.  *Id.* at 1357.  In addition to the MDL, J&J sought centralization of talc claims elsewhere.  After Imerys filed a chapter 11 petition in the Bankruptcy

---

[95] TCC Tr. Ex. 912, at 125 (*LTL 1.0 Bankruptcy Proceeding*, No. 21-30589 (MBK), Dkt. 3 (Bankr. D.N.J. Oct. 14, 2021)).

[96] TCC Tr. Ex. 533 ¶ 35 (Kim Decl. I); TCC Tr. Ex. 603.012, at 120:6–121:3 (Nov. 4, 2021 Hearing Tr.).

[97] TCC Tr. Ex. 533 ¶ 36 (Kim Decl. I).

[98] *Id.* ¶ 43.

[99] *Id.* ¶¶ 42–43.

Court for the District of Delaware in 2019, J&J attempted to use that filing as a basis to remove

2,400 state court talc cases to district courts and then, pursuant to 28 U.S.C. § 175(b)(5), to transfer

them to the District of Delaware—effectively creating a second MDL.[100]    J&J argued that it was

only though a "single, centralized forum [in District Court] that the interests of all creditors can

best be served and harmonized."[101]    Ultimately, J&J's removal strategy failed after the district

court concluded that it lacked jurisdiction over the claims.  *See In re Imerys*, No. 19-mc-103 (MN),

2019 WL 3253366, at *2–7 (D. Del. July 19, 2019).

79.    As LTL's expert Ms. Birnbaum testified, the tort system was "a better forum" for

LTL until the MDL court rendered its *Daubert* decision.[102]    On April 27, 2020, in the MDL, Judge

Wolfson issued a 141-page decision admitting (with limited exceptions) expert testimony

establishing a causal relationship between talc products and epithelial ovarian cancer *In re Johnson*

*& Johnson Talcum Powder Prods. Mktg., Sales Practices & Prods. Liability Litig.*, 509 F. Supp.

3d 116, 187 (D.N.J. 2020).  LTL admits this ruling did not establish the admissibility of "diseases

other than ovarian cancers."[103]    Plaintiffs' experts specifically limited their opinions to epithelial

ovarian cancer.  J&J's *Daubert* briefing did not substantively discuss non-ovarian gynecological

---

[100]    *See* TCC Tr. Ex. 603.017 (Memorandum of Law in Support of Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157 (b)(5) and 1334(b), *In re Imerys Talc America, Inc., et al.* (D. Del. 19-MC-00103), Dkt. 2 ("Motion to Fix Venue")); TCC Tr. Ex. 603.018 (Reply Memorandum of Law in Support of Johnson & Johnson's and Johnson & Johnson Consumer Inc.'s Motion to Fix Venue for Claims Related to Imerys's Bankruptcy Under 28 U.S.C. §§ 157(b)(5) and 1334(b), *In re Imerys Talc America, Inc., et al.* (D. Del. 19-MC-00103), Dkt. 81).

[101]    TCC Tr. Ex. 603.017, at 2 (Motion to Fix Venue).

[102]    June 29, 2023 AM Hearing Tr., at 65:16–24.

[103]    Dkt. 906, at 25.

cancers, except to assert that talc "does not" cause "vaginal, cervical, [or] endometrial cancer."[104]

Judge Wolfson made provisions for bellwether trials to begin in April of 2022.[105]   A New Jersey

state court issued a similar ruling on causation three months later.  *See Carl v. Johnson & Johnson*,

237 A.3d 308, 311 (N.J. Super Ct. App. Div. 2020), *cert denied*, 244 A.3d 270 (N.J. 2021).

### C.   J&J's Independent Talc Liability

80.    Mr. Kim admitted that "for pre-1979 exposure" J&J is legally "responsible in the

sense that it should be named the party in the lawsuit."[106]   J&J also bore independent liability for

its post-1979 conduct.  Despite transferring the manufacture and sale of its talcum powder products

to subsidiaries in 1979, J&J continued to make health and safety policy decisions governing the

manufacture and sale of its subsidiaries' products, including the decision whether to include health

and safety warnings.[107]

81.    The corporate representative of both J&J and Old JJCI, Dr. John Hopkins, has

testified that post-1979 J&J made all health and safety policy decisions with regard to asbestos and

---

[104]   *Johnson & Johnson Talcum Powder Products Marketing, Sales Practices and Products Liability Litigation*, No. 16-MD-02738 (MAS) (RLS), Dkt. 9736, 88 (D.N.J. May 7, 2019) (Defendants' Memorandum of Law in Support of Motion to Exclude Plaintiffs' Experts' General Causation Opinions).

[105]   *See generally* TCC Tr. Ex. 912 (*LTL 1.0 Bankruptcy Proceeding*, No. 21-30589 (MBK), Dkt. 3 (Bankr. D.N.J. Oct. 14, 2021)) (referring to May 15, 2020 MDL order).

[106]   TCC Tr. Ex. 601.005, at 59:6–19, 63:15–17 (Oct. 22, 2021 Hearing Tr.).

[107]   *Id.*, at 85:9–86:8, 88:6–89:9.

talc products.[108]   Dr. Hopkins testified that J&J retains the authority to require warnings on

Johnson's Baby Powder.[109]

82.     At all relevant times, J&J has owned, and continues to own, all intellectual property

relating to Johnson's Baby Powder, including package labeling and advertisements, which lacked

any health warnings.[110]   Even after 1979, when J&J ceased to manufacture JBP directly, J&J's

copyright (owned by J&J) continued to appear in advertisements for JBP, and J&J's logo (owned

by J&J) continued to appear on certain JBP packaging.[111]   When Reuters published an article in

December 2018 reporting on the presence of asbestos in JBP, it was J&J itself that responded with

full-page newspaper ads, featuring photos of the JBP container, signed "Johnson & Johnson."[112]

83.     Juries and courts have found J&J directly liable for its tortious conduct and have

also separately considered J&J and Old JJCI in apportioning fault.[113]   Appellate courts have

---

[108] TCC Tr. Ex. 601.159, at 20:11–22:15 (*Barden v. Brenntag North America*, No. MID-1809-17AS (ACV), Dkt. 9736, 88 (D.N.J. May 7, 2019)); *see* TCC Tr. Ex. 601.005, at 86:25–87:21 (Oct. 22, 2021 Hearing Tr.) ("Q[:] Johnson & Johnson Corporate in New Brunswick made all health and safety policy decisions with regard to asbestos and talc products, correct?" "A[:] The -- yes. The company in New Jersey is the parent company for all the global companies, made those decisions, yes.") (quoting TCC Tr. Ex. 601.159, at 20:11–17).

[109] TCC Tr. Ex. 601.006, at 7752:11–15 (*Olson v. Brenntag North America*, No. 190328/2017 (GL), May 3, 2019 Hearing Tr.); *see* TCC Tr. Ex. 601.005, at 88:16–89:9 (Oct. 22, 2021 Hearing Tr.) ("Q[:] And you would agree that Johnson & Johnson has the authority to require warnings on Johnson's Baby Powder about cancer, correct?" "A[:] They have the authority to require warnings[.] If that were a medical requirement, they would, yes.") (quoting TCC Tr. Ex. 601.006, at 7752:11–15).

[110] TCC Tr. Ex. 601.005, at 77:10–78:19 (Oct. 22, 2021 Hearing Tr.) (testimony about 1980 advertisement for JBP copyrighted by "J&J"); *see* TCC Tr. Ex. 603.012, at 220:5–15 (Nov. 4, 2021 Hearing Tr.) (J&J owns intellectual property regarding JBP).

[111] TCC Tr. Ex. 601.005, at 77:10–78:19, 89:22–90:17 (Oct. 22, 2021 Hearing Tr.).

[112] TCC Tr. Ex. 601.005, at 96:19–102:19 (Oct. 22, 2021 Hearing Tr.).

[113] *See, e.g.*, TCC Tr. Ex. 259, at 1 (Verdict Form, *Leavitt v. Johnson & Johnson*, Case No. RG17882401 (Cal. Super. Ct., Alameda Cnty. Mar. 13, 2019)) (jury answered "Yes" to verdict questions whether J&J, JJCI, and co-defendant Cyprus were negligent, finding that all 3 corporations were "negligent"); TCC Tr. Ex. 267, at 5 (Verdict Form, *Prudencio v. Johnson & Johnson*, Case No. RG20061303 (Cal. Super. Ct., Alameda Cnty. Aug. 23, 2021)) (jury asked to enter separate findings as to each defendant and apportioned 85% to J&J and 15% to JJCI); TCC Tr. Ex. 263, at Da15519 (Jury Verdict Sheets - Amended, *Barden v. Johnson & Johnson*, Case No. MID-L-1809-17 (AS) (N.J. Super. Ct., Middlesex Cnty. Sept. 11, 2019)) (jury apportioned 80% to J&J and 20% to JJCI).

affirmed the separate liability findings against J&J and Old JJCI.[114]  J&J's independent liability was recently confirmed in *Valadez v. Johnson & Johnson et al.*, Case No. 22CV012759 (Cal. Super. July 18, 2023), in which a California jury awarded $18.8 million in compensatory damages (and no punitive damages) against J&J, holding it 100% responsible for plaintiffs' injuries and finding that J&J intentionally failed to make disclosures that plaintiff could not have reasonably discovered.  LTL was included by name on the verdict form; the jury considered LTL's liability separately and found LTL was not liable under any of plaintiff's claims.[115]  J&J has already publicly stated it will appeal the Valadez verdict.  In sum, courts around the country have found that J&J has independent and direct liability to talc claimants.

### D.    1979 Transfer Agreement

84.      The Debtor has relied heavily on the existence of a 1979 Agreement for Transfer of Assets and Bill of Sale in support of the purported assumption of all talc liabilities by Old JJCI, which is summarized in Mr. Kim's First Day Declaration and attached thereto.[116]  The 1979 Transfer Agreement provides that Johnson & Johnson Baby Products Company (a predecessor to Old JJCI) agrees to assume "all the indebtedness, liabilities and obligations of every kind and description ***which are allocated on the books or records*** of J&J as pertaining to its BABY Division[.]"[117]  Its recitals similarly state that "J&J is desirous of transferring to this Subsidiary all

---

[114]  *See Leavitt v. Johnson & Johnson*, No. A157572/A159021, 2021 WL 3418410, at *7-*8 (Cal. Ct. App. Aug. 5, 2021) (affirming separate jury verdicts against J&J and JJCI); *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 724 (Mo. App. 2020), *cert. denied*, 141 S. Ct. 2716 (2021) (affirming the separate liabilities of J&J and Old JJCI, with a greater amount imposed on J&J because of its greater reprehensibility and larger net worth).

[115]  *Valadez v. Johnson & Johnson et al.*, Case No. 22CV012759 (Cal. Super. July 18, 2023) (Valadez Judgment on Special Verdict).

[116]  TCC Tr. Ex. 794 ¶ 15 (LTL 2.0 First Day Pleadings Kim Decl.) ; *see id.*, at 44–52 (Annex A of First Day Pleadings Kim Decl.).

[117]  *Id.*, at 49 (Annex A of First Day Pleadings Kim Decl.) (emphasis added).

assets and liabilities ***which are now allocated to the BABY Division on the books or records*** of Johnson & Johnson[.]"[118]  However, there is no evidence showing that any liabilities relating to present or future talc-related personal injury lawsuits were "allocated to the BABY Division on the books or records of Johnson & Johnson."

85.    As Mr. Kim admitted, to identify the specific "indebtedness, liabilities, and obligations . . . allocated on the books or records" of the Baby Products division that were assumed, "you would have to look at books or records."[119]  Yet, as Mr. Kim further admitted, he has not "looked."[120]  Susan Schirger-Ward, J&J's Senior Legal Records Coordinator, was never asked to look for the books or records.[121]  Neither Mr. Kim nor any other representative of the Debtor could identify "a single document where J&J has talc liabilities described in books" or records prior to execution of the 1979 Agreement.[122]  Mr. Kim admitted that "prior to January 1, 1979, there were no lawsuits claiming any personal injury arising from the alleged use of Johnson's Baby Powder and/or Shower to Shower filed against any of the J&J companies[.]"[123]

86.    The limitation of the assumption to liability "on the books or records" recurred in subsequent transfer agreements.  In 1981, J&J Baby Products transferred all its assets, except those assets allocated to its diaper programs, to Omni Education Corporation, a wholly-owned subsidiary

---

[118] *Id.*, at 45 (Annex A of First Day Pleadings Kim Decl.) (emphasis added).

[119] TCC Tr. Ex. 603.012, at 194:2–12 (Nov. 4, 2021 Hearing Tr.).

[120] TCC Tr. Ex. 603.001, at 52:16–20, 54:6–11 (Oct. 31, 2021 Kim Dep. Tr.); *see* TCC Tr. Ex. 603.012, at 196:6–16 (Nov. 4, 2021 Hearing Tr.).

[121] TCC Tr. Ex. 601.205, at 10:21–11:2, 13:21–14:11, 53:16–54:6, 55:16–56:1, 58:22–63:4, 64:6–16 (Oct. 31, 2021 Schirger-Ward Dep. Tr.); *see* TCC Tr. Ex. 603.012, at 194:19–24 (Nov. 4, 2021 Hearing Tr.).

[122] TCC Tr. Ex. 603.001, at 54:6–11 (Oct. 31, 2021 Kim Dep. Tr.); *see* TCC Tr. Ex. 603.012, at 196:6–199:7 (Nov. 4, 2021 Hearing Tr.).

[123] TCC Tr. Ex. 603.012, at 198:4–11 (Nov. 4, 2021 Hearing Tr.).

of J&J Baby Products.[124]  That agreement provided for assumption only of liabilities "on the books

or records" of Baby Products[.][125]  There is no evidence in the record showing that any liabilities

relating to present or future talc-related personal injury lawsuits were included within this

language.

87.    Similarly, when Johnson & Johnson Baby Products Company transferred all its

assets in respect of its baby products business to Johnson & Johnson Dental Products Company in

1988, the relevant agreement again provided for an assumption only of liabilities "on the books or

records."[126]  Again, there is no evidence in the record showing that any liabilities relating to present

or future talc-related personal injury lawsuits were included within this language.

88.    In contrast, other J&J assignment and indemnification provisions used broader

language.  For example, when J&J sold Windsor Mines to Cyprus in 1989, J&J agreed to

indemnify Cyprus against "any product liability-based claim, suit, demand or cause of action

directed against Cyprus, Windsor or Western or any of their affiliates arising out of the sale of talc

or talc-containing products manufactured by Windsor, Western, J&J or the affiliates of Windsor,

Western or J&J, prior to Closing."[127]  The language used in the 1979 Transfer Agreement was

strikingly different.

89.    Prior to LTL 1.0, J&J charged the cost of defending talc lawsuits and paying

settlements and judgment to Old JJCI pursuant to internal accounting policies,[128] but all such costs

---

[124] TCC Tr. Ex. 600.052, at 5.

[125] *Id.*

[126] TCC Tr. Ex. 600.054, at 4.

[127] TCC Tr. Ex. 600.33, at Ex. 4, at § 11.2, p. 62 (January 6, 1989 Agreement Between Cyprus Mines Corp. and Johnson & Johnson)

[128] TCC Tr. Ex. 600.050 ¶ 8 (Lisman Dec. 20, 2021 Decl.).

were paid out of a central J&J account holding cash generated by all J&J business operations.[129]



Mr. Kim admitted that he has not seen any agreements regarding allocation of payments of judgments or settlements between J&J and Old JJCI.[133] There have been no negotiations between the two entities on that issue.[134] Rather, the internal allocation policy is imposed unilaterally by the parent, J&J, regardless of any intra-company indemnity obligation.[135]

---

[129] *Id.*

[130] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[131] ▮▮▮▮▮▮▮▮▮; *see* TCC Tr. Ex. 603.012, at 252:14–253:13, 255:20–22, 256:7–22 (Nov. 4, 2021 Hearing Tr.).

[132] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[133] TCC Tr. Ex. 603.012, at 252:14–253:13 (Nov. 4, 2021 Hearing Tr.).

[134] *Id.*, at 253:9–13.

[135] *Id.*, at 254:25–255:7.

[136] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

90.



Mr. Kim testified which entity (J&J or Old JJCI) pays a specific expense is a matter of "administrative convenience[.]"[140]

## II.    J&J'S FINANCIAL RESPONSIBILITY FOR TALC LITIGATION BEFORE OCTOBER 2021

91.    Until the filing of LTL 1.0, J&J and Old JJCI satisfied talc liabilities in the ordinary course. *LTL Mgmt.*, 64 F.4th at 94–95.  Prior to LTL 1.0, there were 15 completed ovarian cancer talc trials, and 28 completed mesothelioma trials. *Id.* at 94.  In addition, J&J settled roughly 6,800 talc-related claims in the tort system for just under $1 billion in total and obtained dismissals without payment of about 1,300 ovarian cancer actions and over 250 mesothelioma actions. *Id.* LTL has touted J&J's litigation successes.[141]

92.    "Addressing the scope of its litigation exposure in an October 2021 management representation letter to its auditors, J&J valued its and its subsidiaries' probable and reasonably estimable contingent loss for products liability litigation, including for talc, under [GAAP], at $2.4 billion for the next 24 months." *LTL Mgmt.*, 64 F.4th at 95.  In May 2020, J&J told the *Imerys*

---

[137] ████████████████████

[138] ████████████

[139] ██████████████

[140] TCC Tr. Ex. 603.012, at 255:23–256:6 (Nov. 4, 2021 Hearing Tr.); *see* TCC Tr. Ex. 913 ¶ 7 (Supp. Kim Decl. I).

[141] *See also* TCC Tr. Ex. 533 ¶ 38 (Kim Decl. I) ("Old JJCI achieved 16 key defense verdicts, including in four trials in 2021 alone."); *id.* ¶ 39 ("Notably, all of the ovarian cancer plaintiff verdicts to date have been reversed on appeal with the exception of *Ingham*").

bankruptcy court that it was "absurd" to suggest that "J&J may lack the financial wherewithal to meet its obligations."[142]

93.    As of the LTL 1.0 filing, defense costs for talc claims totaled nearly $1 billion and approximately $3.5 billion in connection with settlements and verdicts.[143]   Many of these costs "were attributable to the payment of one verdict, *Ingham*, a liability J&J described in public securities filings as 'unique' and 'not representative of other claims.'" *LTL Mgmt.*, 64 F.4th at 95. No other verdict approached *Ingham*, which the Third Circuit characterized as an "outlier," *id.* at 108, as did LTL's president at the 2022 Hearing.[144]   J&J (not Old JJCI) paid the *Ingham* judgment in Q2 2021,[145] and therefore it was not a liability of the Debtor upon the filing of the original case—or now.

94.    The Debtor's valuation expert, Dr. Mullin, testified that the *Ingham* verdict spawned settlement with a large group of claimants represented by the same plaintiffs' counsel, but at a level manageable for J&J and Old JJCI.



[146]

---

[142] TCC Tr. Ex. 377 ¶ 11 (Jan. 28, 2022 Expert Report of Matthew Diaz).

[143] TCC Tr. Ex. 533 ¶ 40 (Kim Decl. I).

[144] TCC Tr. Ex. 1006, at 178:15 (Feb. 14, 2022 Hearing Tr.); *see also* TCC Tr. Ex. 1008, at 102:23–103:11 (*LTL 1.0 Bankruptcy Proceeding*, No. 21-30589 (MBK), Dkt. 1518 (Bankr. D.N.J. Feb. 17, 2022) ("Feb. 16, 2022 Hearing Tr.")) (Lisman discussing J&J 10-Q that described *Ingham* as unique); TCC Tr. Ex. 2 (Form 10-Q for 3Q 2021), at 31 (same).

[145] TCC Tr. Ex. 1008, at 103:23–104:8 (Feb. 16, 2022 Hearing Tr.); TCC Tr. Ex. 600.050 ¶ 8 (Lisman Dec. 20, 2021 Decl.); *see id.*, at 6 (showing the ledger entry confirming that J&J paid the *Ingham* verdict).

[146] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## III.    J&J'S 2021 CORPORATE RESTRUCTURING

95.     In October 2021, "likely spurred by the U.S. Supreme Court's denial of certiorari in *Ingham*," *LTL Mgmt.*, 64 F.4th at 95, J&J executed a restructuring of Old JJCI under the Texas divisive merger statute, T.B.O.C. §§ 10.0001 *et seq*., with the stated purpose of "permanently protect[ing]" itself from "further talc-related claims[.]"[147] As the Third Circuit found, "J&J's goal [was] 'globally resolv[ing] talc-related claims through a chapter 11 reorganization without subjecting the entire Old [JJCI] enterprise to a bankruptcy proceeding.'" *LTL Mgmt.*, 64 F.4th at 97 (citation omitted).  Through use of the Texas statute, Old JJCI ceased to exist, and its talc liabilities were transferred to a new special-purpose entity—LTL—while its business assets and other liabilities went to a new Johnson & Johnson Consumer Inc. ("New JJCI").[148]  Within 48 hours of its creation, LTL filed a bankruptcy petition in the Western District of North Carolina.

96.     The restructuring was "pitch[ed]" to J&J six months earlier by Jones Day.[149] "Project Plato," as it was called, was known only to about 30 or 40 J&J personnel and, "at some point" "probably . . . also people from" Old JJCI.[150]

### A.    Project Diamond and Project Plato Operate Contemporaneously

97.     Contemporaneously with Project Plato, J&J personnel were also planning "Project Diamond"—a spin-off of the Consumer Health Business from JJCI into what is today known as

---

[147] *See* TCC Tr. Ex. 533 ¶¶ 16, 22–23, 59 (Kim Decl. I).

[148] *See* TCC Tr. Ex. 533 ¶¶ 16–25 (Kim Decl. I).

[149] *See* TCC Tr. Ex. 603.012, at 248:9–249:8 (Nov. 4, 2021 Hearing Tr.).

[150] *See id.*, at 249:5–18, 274:10–17.

Kenvue.[151] ████████████████████████████████████████████████████

████████████████████████████████████████[152]

98.     J&J personnel explicitly acknowledged the connection between the two projects, including the need for a J&J backstop in the funding agreement to support the spinoff of Kenvue while maintaining its value for talc creditors.  J&J's deputy treasurer, Duane Van Arsdale, explained: "The funding agreement is being structured in a way that JJCI can 'spin out' the Diamond [*i.e.*, Kenvue] assets up the chain or to a new [legal entity] and be unencumbered going forward.  If there are concerns, we may need to put an indemnity in place to protect Diamond.  To your point, JNJ/JJCI would be on the hook post [] separation up to a fair value amount that would include the original [fair value] of the Diamond assets[.]"[153]

## B.      The Divisional Merger of Old JJCI into LTL and New JJCI

99.     On October 12, 2021, J&J initiated a corporate restructuring and divisional merger under Texas law, which effectively divided Old JJCI into LTL and New JJCI (the "2021 Corporate Restructuring").  *LTL Mgmt.*, 64 F.4th at 95–96 & n.3.

100.    ████████████████████████████████████████████████████████

████████████████████████████████████[154] LTL's most valuable asset was its right as a payee under

---

[151] *See generally* TCC Tr. Ex. 300, at 1–4 (Email re: Plato) (emails between Michelle Ryan, J&J treasurer, and Duane Van Arsdale, deputy J&J treasurer, discussing relationship between Projects Plato and Diamond).

[152] TCC Tr. Ex. 1119 ¶ 21 (Lisman June 23, 2023 Decl.); *see also* ████████████████████
████████████████████████████████████████████████████████████████████

[153] TCC Tr. Ex. 300, at 1 (Email re: Plato); *see also* TCC Tr. Ex. 1007, at 25:15–20 (*LTL 1.0 Bankruptcy Proceeding*, No. 21-30589 (MBK), Dkt. 1494 (Bankr. D.N.J. Feb. 16, 2022) ("Feb. 15, 2022 Hearing Tr.")) (Mongon testifying that Project Diamond was not related to the divisional merger and creation of LTL).

[154] *See* TCC Tr. Ex. 533 ¶¶ 16, 24 (Kim Decl. I).  Neither J&J nor JJCI had an estimate of talc liabilities in 2021.  *See* ████████████████████████████████

a funding agreement (the "2021 Funding Agreement"),[155] under which J&J and New JJCI, on a joint and several basis, were obligated to pay "any and all costs and expenses" up to the value of New JJCI[156] excluding the talc liability that LTL incurred during LTL 1.0, "including the costs of administering the [LTL 1.0] Bankruptcy Case" to the extent necessary.[157] In addition, the 2021 Funding Agreement obligated New JJCI and J&J to fund amounts necessary:

> (a) to satisfy the Debtor's talc-related liabilities **_at any time when there is no bankruptcy case_** and (b) in the event of a chapter 11 filing, to provide the funding for a trust, in both situations to the extent that any cash distributions received by the Debtor from Royalty A&M are insufficient to pay such costs and expenses and further, in the case of the funding of a trust, the Debtor's other assets are insufficient to provide that funding.[158]

Debtor has no repayment obligation as the Funding Agreement does not establish a loan.[159]

    101.    The 2021 Corporate Restructuring also lays out Debtor as the direct parent of a North Carolina limited liability company, Royalty A&M LLC ("Royalty A&M" or "RAM"), which owns a portfolio of royalty revenue streams, including royalty revenue streams based on third-party sales of LACTAID®, MYLANTA® / MYLICON® and ROGAINE® products. Debtor asserted that it intended to review royalty monetization opportunities in the healthcare industry and grow its business by reinvesting the income from these existing royalty revenue streams into both the acquisition of additional external royalty revenue streams, as well as

---

[155] *See* TCC Tr. Ex. 792 (2021 Funding Agreement). The 2021 Funding Agreement is governed by North Carolina law. *Id*. § 9, at 13; TCC Tr. Ex. 533 ¶ 24 (Kim Decl. I).

[156] The Court further explained in a footnote: "As explained at trial by Debtor's Counsel, the 'floor' of the [2021] Funding Agreement is the value of Old JJCI at the time of the merger, minus the talc liability. The value of the [2021] Funding Agreement increases, however, as the value of New JJCI post-transaction increases." 637 B.R. at 402 n.5.

[157] TCC Tr. Ex. 792, at 5–6 (2021 Funding Agreement) (Permitted Funding Use definition).

[158] TCC Tr. Ex. 533 ¶ 27 (Kim Decl. I) (summarizing TCC Tr. Ex. 792, at 6 (2021 Funding Agreement) (Permitted Funding Use definition, subsection (c))) (emphasis added).

[159] *Id*. ¶ 27.

financings to third parties secured by similar royalty streams.[160]  On October 11, 2021, Old JJCI

organized Royalty A&M as a direct subsidiary of LTL and—in exchange for full ownership of

Royalty A&M's equity—contributed $367.1 million.[161]  Subsequently, Royalty A&M used those

funds to acquire certain royalty streams from Old JJCI and certain of its affiliates.[162]  At the time,

Debtor estimated that the fair market value of its interest in Royalty A&M was approximately

$367.1 million as of the 2021 petition date.  Together with the $6 million in cash it received for its

bank account after the merger, Debtor's value was approximately $373.1 million, not including

the Funding Agreement with New JJCI and J&J.[163]

      **C.**    **2021 Funding Agreement**

    102.    "Of the assets Old [JJCI] passed to LTL, most important were Old [JJCI's] rights

as a payee under the [2021] Funding Agreement with J&J and New [JJCI].  On its transfer, that

gave LTL, ***outside of bankruptcy***, the ability to cause New [JJCI] and J&J, jointly and severally,

to pay it cash up to the value of New [JJCI] for purposes of satisfying any talc-related costs as well

as normal course expenses."  *LTL Mgmt.*, 64 F.4th at 96 (emphasis added).

    103.    "In bankruptcy, the [2021 Funding] Agreement gave LTL the right to cause New

[JJCI] and J&J, jointly and severally, to pay it cash in the same amount to satisfy its administrative

costs and to fund a trust, created in a plan of reorganization, to address talc liability for the benefit

of existing and future claimants. In either scenario, there were few conditions to funding and no

repayment obligation."  *Id.* at 96–97.  "The Agreement provided LTL a right to cash that was very

---

[160] *Id.* ¶ 18.

[161] *Id.* ¶ 22.

[162] *Id.*

[163] *Id.* ¶ 26.

valuable, likely to grow, and minimally conditional. And this right was reliable, as J&J and New Consumer were highly creditworthy counterparties (an understatement) with the capacity to satisfy it." *Id.* at 106.

104.     ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████[164]—and the fair market value of New JJCI as of the "applicable calculation date[.]"[165] "The value of the payment right could not drop below a floor defined as the value of New [JJCI] measured as of the time of the divisional merger, estimated by LTL at $61.5 billion, and was subject to increase as the value of New [JJCI] increased after it." *LTL Mgmt.*, 64 F.4th at 97.

105.     Because J&J and New JJCI were jointly and severally liable, and the value floor was set at $61.5 billion, the Third Circuit characterized the 2021 Funding Agreement as "not unlike an ATM disguised as a contract, that [LTL] can draw on to pay liabilities without any disruption to its business or threat to its financial viability." *Id.* at 109.

106.     The 2021 Funding Agreement also contained an integration clause stating: "This Agreement constitutes the entire contract among the parties hereto relating to the subject matter hereof and supersedes, in its entirety, the Original Funding Agreement and any and all previous agreements and understandings, oral or written, relating to the subject matter hereof."[166]

107.     The 2021 Funding Agreement, on its own terms, applied outside of bankruptcy, and contains numerous provisions indicating that the existence of the first bankruptcy was not a

---

[164] ████████████████████████████

[165] TCC Tr. Ex. 792, at 4 (2021 Funding Agreement) (JJCI Value definition).

[166] TCC Tr. Ex. 792, §11 at 14 (2021 Funding Agreement) (Counterparts; Entire Agreement; Electronic Execution).

precondition for its validity.[167]  Indeed, the 2021 Funding Agreement does not make J&J's funding obligation depend on whether LTL files for bankruptcy at all.  To the extent any witness testified that J&J's "purpose" in entering the 2021 Funding Agreement was limited to bankruptcy, that testimony is foreclosed by the terms of the Agreement, is contradicted by repeated testimony and representations to the Court by LTL's witnesses and attorneys, and is not credible.

108.    During the first bankruptcy, Mr. Mongon (head of J&J's consumer business and now CEO of Kenvue) testified that the 2021 Funding Agreement was available outside bankruptcy.[168]  Mr. Kim assured this Court of the same thing on several occasions during LTL 1.0.[169] ███████████████████████████████████████████████████████

███████[170]

---

[167] *See* TCC Tr. Ex. 792, at 5–6 (2021 Funding Agreement) (Permitted Funding Uses definition, noting funding obligations for both normal course expenses and talc liabilities outside of bankruptcy); *id.* §5 at 12 (indemnification obligations of LTL apply even outside bankruptcy); *id.* § 9 at 13 (choice of venue if LTL is not in bankruptcy).

[168] TCC Tr. Ex. 1007, at 65:17–19 (Feb. 15, 2022 Hearing Tr.).

[169] TCC Tr. Ex. 533 ¶ 27 (2021 Declaration of John K. Kim in Support of First Day Pleadings ("LTL 1.0 First Day Pleadings Kim Decl.")) ("[A]t any time when there is no bankruptcy case[.]"); TCC Tr. Ex. 1007, at 154:2–22 (Feb. 15, 2022 Hearing Tr.); TCC Tr. Ex. 1008, at 16:14–23 (Feb. 16, 2022 Hearing Tr.).

[170] ██████████████████████████████████ TCC Tr. Ex. 788, at 61:7–14 (*LTL 2.0 Bankruptcy Proceeding*, Dkt. 262 (Bankr. D.N.J. Apr. 21, 2023) ("Apr. 18, 2023 Hearing Tr.")).

109.    LTL explained to this Court that the 2021 Funding Agreement would apply even in the event of "dismissal" and was intended to avoid legal objections that LTL was "manipulating the whole system[.]"[171]  It was the consideration LTL received for taking on the talc liabilities.[172]

110.    Mr. Gordon told this Court, in the presence of Mr. Haas, J&J's head of worldwide litigation, that the 2021 Funding Agreement applied outside bankruptcy and would continue to apply even if the bankruptcy case were dismissed.  He explained that "there's literally no conditions or any material conditions on the permitted uses under this document[,]" and he expressly included "funds available to pay settlements, to pay judgments in the tort system. So it makes it very clear this is what we're talking about if there's no proceeding in bankruptcy. Whether there was no case filed or whether the case is filed *or dismissed*, the money's available for that purpose . . . . .  So this is there to protect the claimants. *It's there to assure this isn't treated or consider a fraudulent conveyance*.  The idea was and *the intent* was the claimants are covered either way in bankruptcy or outside."[173]

---

[171]   June 27, 2023 Hearing Tr., at 195:10–196:18; *see id.*, at 170:5–16 (Kim, confirming Mr. Gordon's statement: "You want funds available to pay settlements, to pay judgments in the tort system.  So it makes very clear[,] this is what we're talking about if there's no proceeding in a bankruptcy.  Whether there was no case filed, or whether the case is filed or dismissed, the money is available for that purpose.  And you can imagine, Your Honor, by the way, the hue and the cry [you] would have heard if . . . this provision weren't in there, because they would have said that they manipulat[ing] the whole system[,] because you filed bankruptcy[,] and now you're going to tell the Court, you can't dismiss our case, because there is no money available if we go back in the tort system.  So this is there to protect the claimants.").

[172]   June 27, 2023 Hearing Tr., at 283:1–14 (Mr. Kim explained this on questioning from the U.S. Trustee.) ("Q: Okay. There was a JJCI that had talc liabilities; correct? / A: Correct. / Q: Okay. And . . . we end up with LTL holding all the talc liabilities; correct? / A: That is correct. / Q: And in exchange for that wasn't one of the things that LTL got the 2021 funding agreement? A: It was . . . one of the assets that it was given.").

[173]   TCC Tr. Ex. 1011, at 60:16–20, 61:5–20 (Feb. 18. 2022 Hearing Tr.) (emphases added).

111.    Under questioning, LTL's counsel represented to the Third Circuit that the 2021

Funding Agreement applied outside bankruptcy.[174]   The Third Circuit found that the 2021 Funding

Agreement applied "outside of bankruptcy."  *LTL Mgmt.*, 64 F.4th at 96.  Footnote 18 of the Third

Circuit's opinion, *id*. at 109 n.18, demonstrates that the Third Circuit did not see the 2021 Funding

Agreement as being void if the case were dismissed.  Rather, it would continue to provide

protection for creditors.

112.    ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████[175]   Indeed, neither LTL nor J&J has ever suggested that the ***entire*** 2021 Corporate

Restructuring—of which the 2021 Funding Agreement was a component—should be voided in its

entirety simply because the first bankruptcy was dismissed.

113.    Contrary to Mr. Kim's assertion in this proceeding that the primary purpose of the

2021 Funding Agreement to facilitate a bankruptcy,[176] ███████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

---

[174] *See also* TCC Tr. Ex. 768, at 83:21–25 (*In re LTL Mgmt., LLC*, No. 22-2003 (3d Cir. Sept. 19, 2022)) ("Mr. Katyal:  Now you had asked before, Your Honor, I just have to slightly correct something.  I understand that the funding agreement does have provisions for funding outside of bankruptcy.  The Court: Yeah, that's what I thought.").

[175] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

[176] TCC Tr. Ex. 1073 ¶ 24 (Kim Decl. II).



[REDACTED][177]    [REDACTED]

[REDACTED][178]    He denied that LTL "rubber stamp[ed]" the bankruptcy

filing.[179]

114.    Mr. Wuestoff testified that he "understood as president of LTL that the [2021

Funding Agreement] obligated J&J whether or not LTL was in bankruptcy."[180]  He also testified

that, had he voted "no" on the first bankruptcy, he did not "feel that there was a risk that [2021

Funding Agreement] would be taken away[,]" and that "[n]o one threatened to take away the

[2021] Funding Agreement[.]"[181]  The LTL board was never told in October 2021 that, if it voted

"no" on the bankruptcy, it would be frustrating the purpose of the 2021 Funding Agreement and

would risk the Agreement becoming unenforceable.[182]

115.    The J&J funding backstop was a critical component of the 2021 Funding

Agreement. The J&J backstop provided LTL with direct access to "J&J's exceptionally strong

balance sheet" worth "well over $400 billion in equity value" and "$31 billion in cash and

marketable securities." *LTL Mgmt.*, 64 F.4th at 106.  The Third Circuit did not find that J&J's

funding obligation was gratuitous; rather, it opined "that J&J's triple A-rated payment obligation

for LTL's liabilities, **which it views as a** generous protection it was never required to provide to

claimants, weakened LTL's case to be in bankruptcy." *Id.* at 110–11 (emphasis added).

---

[177] [REDACTED]

[178] [REDACTED]

[179] TCC Tr. Ex. 1006, at 182:5–183:12 (Feb. 14, 2022 Hearing Tr.); *see also id.*, at 179:22–180:24.

[180] June 27, 2023 Hearing Tr., at 37:18–21.

[181] *Id.*, at 41:21–42:3.

[182] *Id.*, at 255:6–19.

116.    Mr. Wuestoff testified that it was important to him as president of LTL that J&J was a co-obligor on the 2021 Funding Agreement.[183]  He further testified that it did not "concern" him that, prior to the Third Circuit decision when the 2021 Funding Agreement was still in effect, New JJCI (renamed Holdco) "had transferred its assets"[184] — ████████████████████████ ████████████████████████████████████████████████████████[185]  Mr. Wuestoff also understood that "under the first funding agreement, Johnson and Johnson could have been liable for upwards of $61 billion," which "would've been a cap."[186]

117.    Although the value of Holdco dropped by $42.5 billion as a result of the spinoff, the existence of the J&J backstop ensured that the $61.5 billion value floor of the 2021 Funding Agreement remained in place.  An email from J&J's deputy treasurer confirmed that, in order for the Consumer Health Business to be spun off into Kenvue unencumbered, J&J's funding obligation would "include the original [fair value] of the Diamond [*i.e.*, Kenvue] assets[.]"[187]  As such, J&J's agreement to provide a funding backstop in that agreement was not gratuitous, as it was necessary for J&J's plan to execute the 2021 Corporate Restructuring and Project Diamond (*i.e.*, the Kenvue IPO) in tandem.  LTL conceded before this Court that the "addition of J&J to the funding agreement" was to "alleviate concerns" that the payor, such as Holdco, might transfer assets away, such as Kenvue, to the detriment of a payee, such as LTL.[188]

---

[183] June 27, 2023 Hearing Tr., at 39:12–18.

[184] June 27, 2023 Hearing Tr., at 56:13–57:3.

[185] ████████████████████████████████████

[186] June 27, 2023 Hearing Tr., at 52:14–16.

[187] TCC Tr. Ex. 300, at 1 (Email re: Plato).

[188] ██████████████████████████; June 30, 2023 Hearing Tr., at 119:3–10.

### D.    LTL Is Created as a Shell Company Solely to Manage J&J Talc Liabilities

118.    "At base level, LTL, whose employees are all J&J employees, is essentially a shell company 'formed,' almost exclusively, 'to manage[] and defend thousands of talc-related claims while insulating the assets [then in New JJCI]." *LTL Mgmt.*, 64 F.4th at 109.  LTL has no employees of its own.  The only current "employees" are Mr. Wuestoff, Mr. Kim, and Mr. Dickinson, each of whom admitted that they have been seconded to LTL under a services agreement with a J&J subsidiary.[189]

119.    Even now, LTL has no significant operations that would benefit from reorganization.  Mr. Wuestoff explained that LTL has "two operations.  One is to resolve the talc claims, current and future.  The other operation is the RAM equity business."[190]  It is undisputed that RAM is a royalty acquisition business,[191] which the Third Circuit described as "a collection of bare rights to streams of payments cobbled together on the eve of bankruptcy."  *LTL Mgmt.*, 64 F.4th at 109.

120.    On October 14, 2021, LTL filed for bankruptcy in the Western District of North Carolina.  LTL and J&J immediately began to reap the financial rewards, as thousands of plaintiffs found their cases halted.  J&J's 2022 Annual Report touted that its litigation expense declined from $1.6 billion to $200 million from 2021 to 2022, which J&J admitted was "primarily talc related[.]"[192]

---

[189]  TCC Tr. Ex. 1077 ¶ 3 (Wuestoff Decl.); TCC Tr. Ex. 1075 ¶ 2 (MTD Direct Declaration of Richard Dickinson ("Dickinson Decl.")); TCC Tr. Ex. 1073 ¶ 2 (Kim Decl. II).  Each also confirmed that there are no other LTL employees.

[190]  June 27, 2023 Hearing Tr., at 50:21–25.

[191]  June 27, 2023 Hearing Tr., at 28:10–12.

[192]  TCC Tr. Ex. 924, at 30 (Johnson & Johnson Form 10-K- Annual Report for FY ending Jan. 1, 2023).

## IV.    J&J'S 2022–23 CORPORATE RESTRUCTURING

### A.    Consumer Health Business Spinoff

121.    In December 2022, before the Third Circuit's January 30, 2023 ruling, New JJCI (*i.e.*, Johnson & Johnson Consumer, Inc.) changed its name to Johnson & Johnson Holdco NA in preparation to spin off the Consumer Health Business.[193]    In early January 2023, while LTL 1.0 was still pending, J&J transferred the Consumer Health Business to Holdco's parent, Janssen Pharmaceuticals, Inc., and then to Kenvue.[194]    When the transaction was undertaken, however, J&J was on notice that creditors had argued in both this Court and the Third Circuit that LTL was not in financial distress, requiring dismissal of the case, due to the 2021 Funding Agreement and LTL's access to both the cashflow of the consumer business and to J&J's funding backstop.  The possibility that appellants would prevail was reasonably foreseeable.

122.    ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████[195]████████████████████████████████

██████[196]    At the time of the Consumer Health Business transfer, the 2021 Funding Agreement, with the J&J backstop, was still in effect.  While the value of Holdco substantially decreased, the "JJCI Value" in the 2021 Funding Agreement continued to have its minimum value of $61.5 billion.

---

[193] TCC Tr. Ex. 794 ¶ 26 (LTL 2.0 First Day Pleadings Kim Decl.); TCC Tr. Ex. 1119 ¶ 21 (Lisman June 23, 2023 Decl.).

[194] TCC Tr. Ex. 794 ¶ 26 (LTL 2.0 First Day Pleadings Kim Decl.); TCC Tr. Ex. 1119 ¶ 21 (Lisman June 23, 2023 Decl.).

[195] ████████████████████████████████████████████

[196] ████████████████████████████

123.   ████████████████████████████████████████████ [197]

**B.     J&J Directs the Termination of the 2021 Funding Agreement**

124.     On January 30, 2023, the Third Circuit announced its decision in *In re LTL Mgmt.*,

58 F.4th 738, directing dismissal on the ground that LTL was not in immediate financial distress

at the time of its bankruptcy filing.  That decision was later amended on March 31, 2023, which

became the operative decision.  *In re LTL Mgmt.*, 64 F.4th 84 (as amended).

125.     After the Third Circuit decision was announced on January 30, J&J began to direct

the restructuring of the 2021 Funding Agreement and J&J Support Agreement.  At all relevant

times, J&J controlled the decision-making process as the corporate parent of LTL and Holdco.  It

is undisputed that all of LTL's managers and two of its three board members are employees of a

J&J services subsidiary who are seconded to LTL.[198]   Indeed, Mr. Kim testified that "in-house

counsel for J&J actually represent all J&J's subsidiaries."[199]

126.   ███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████ [200]   The minutes further indicate that Mr. Kim reported on

the status of LTL's motion for rehearing in the Third Circuit, and that LTL's outside counsel at

Jones Day led a discussion on contingency planning that included the possibility of United States

---

[197] ████████████████████████████

[198] *See supra* § III.D n. 186.

[199] June 27, 2023 Hearing Tr., at 244:8–10.

[200] *See generally* TCC Tr. Ex. 1087 (Feb. 23, 2023 Minutes of LTL's Board of Managers).  LTL's president testified that the board meeting minutes and the board presentations reflected in ████████████ and 1087 accurately summarized and depicted the LTL board's considerations, actions, and information that was provided to the board at the respective meetings.  TCC Tr. Ex. 1077 ¶¶ 12-13 (Wuestoff Decl.).

Supreme Court review and re-filing for bankruptcy.[201]   The minutes reveal no discussion of

whether the Third Circuit decision had rendered the 2021 Funding Agreement "void or voidable."



[201] TCC Tr. Ex. 1087, at 1 (Feb. 23, 2023 Minutes of LTL's Board of Managers).

███████████████████████████████████████████████████████████

██████[207] Mr. Wuestoff testified that he understood that "under the second funding agreement, if necessary, LTL could access Holdco's assets of approximately $29 billion[.]"[208]  He further testified that, immediately prior to the bankruptcy filing, LTL "had sufficient liquidity to meet its obligations."[209]   The minutes reveal no discussion of whether the Third Circuit decision had rendered the 2021 Funding Agreement "void or voidable."  Mr. Dickinson testified that, as of the March 28 Meeting, he "had not heard from J&J about their intent to void the funding agreement[.]"[210]

129.   ████████████████████████████████████████████[211]



███████████████████████████████████████████████████████████

████████████████████████████████████[212]  ██████████████████

███████████████████████████████████████████████████████████

██████████████████████[213]  ███████████████████████████████

██████████████████████[214] Mr. Wuestoff confirmed that he "did not have an estimate or valuation of LTL's aggregate talc liabilities,"[215] and that the board had not been provided with

---

[207] ███████████

[208] June 27, 2023 Hearing Tr., at 52:10–13.

[209] June 27, 2023 Hearing Tr., at 71:12–14.

[210] June 27, 2023 Hearing Tr., at 152:15–18.

[211] *See generally* ████████████████████████████████████████

[212] ████████

[213] ██████████████

[214] ██████████

[215] June 27, 2023 Hearing Tr., at 72:20–24.

projections of LTL's liability in the tort system for the following year, the next three years, or the next five years.[216]

130. ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████[218]    Mr. Wuestoff testified that at no point did the board discuss "negotiating with J&J in terms of the possibility that the funding agreement wasn't void or voidable,"[219] nor did he receive "any analysis about the strength of the void or voidability argument relating to the first funding agreement,"[220] nor did the board discuss "the chances of success of the void or voidability issue or argument[.]"[221]   Mr. Wuestoff did, however, testify that as president of LTL he expected "that J&J would honor its commitments under the [2021] funding agreement[.]"[222]

131. ████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████[223]███████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[216] *Id.*, at 42:25–43:3, 76:19–24.

[217] ████████████████████████████████████████████████

[218] ██

[219] June 27, 2023 Hearing Tr., at 83:12–23.

[220] *Id.*, at 85:5–8.

[221] *Id.*, at 85:13–17.

[222] *Id.*, at 42:25–43:3.

[223] ████████████████████████████████████████████



132.

[227] Mr. Wuesthoff testified that the LTL board did not consider seeking to enforce the 2021 Funding Agreement against J&J.[228] The board did not discuss negotiating with J&J over the "void or voidable" issue.[229] It did not evaluate other options to terminating the 2021 Funding Agreement.[230] It never received any analysis about the strength of the "void or voidabl[e]" argument.[231] It never discussed the chances of success of LTL's prevailing on the "void or voidable" issue.[232] No member of the



---

[228] June 27, 2023 Hearing Tr., at 83:8–11.

[229] *Id.*, at 83:12–23.

[230] *Id.*, at 84:17–21.

[231] *Id.*, at 85:5–12.

[232] *Id.*, at 85:13–86:2.

board suggested that LTL should seek better terms than what ended up being the 2023 Funding Agreement.[233]

133.    Mr. Dickinson confirmed that the April 2 Meeting was the first time that the LTL board was informed of the risk that the 2021 Funding Agreement was void or voidable,[234] and that the board did not discuss "J&J's intent to void the funding agreement."[235]  Mr. Dickinson also confirmed that at no point following the April 2 Meeting, at which the voidability of the 2021 Funding Agreement was discussed, did he reach out to anyone at J&J to confirm that J&J intended to void LTL's most valuable asset.[236]  No business person at J&J ever told LTL that the 2021 Funding Agreement was unenforceable.[237]

134.    

135.    The LTL 1.0 proceeding was pending when all these discussions took place—when LTL's managers were still subject to their fiduciary duties to creditors—yet LTL never raised any

---

[233] *Id.*, at 89:12–15.

[234] June 27, 2023 Hearing Tr., at 154:23–156:17.

[235] *Id.*, at 156:19–158:23 (Dickinson).

[236] *Id.*, at 158:11–21.

[237] *Id.*, at 159:17-23.

[238] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

[239] ▇▇▇▇▇

concern that the 2021 Funding Agreement was "void or voidable" with the TCC, the U.S. Trustee's Office, or this Court., the U.S. Trustee's Office, or this Court.  LTL never publicly suggested it was uncertain about the status of the 2021 Funding Agreement.  LTL never indicated it was considering replacing it.  Indeed, on March 21, 2023 (only two weeks before the second bankruptcy filing), LTL filed a monthly operating report, signed by LTL's CFO and its counsel, indicating that the 2021 Funding Agreement remained in place.[240]  And, as Mr. Kim admitted at the 341 Hearing in this case, J&J continued to honor requests on the 2021 Funding Agreement between January 30, 2023 and April 4, 2023, even though Mr. Kim had purportedly already concluded that such agreement was "void or voidable."[241]

136.  ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████[242]  He testified that the Debtor parted with the 2021 Funding Agreement, its most valuable asset, so that "its pre-filing financial condition" would be "sufficiently distressed to satisfy the standard established by the Third Circuit."[243]  Mr. Kim confirmed that the purpose of changing "LTL's "funding arrangements" at the April 2 Meeting was to "support that filing [of LTL's second bankruptcy]."[244]  He testified that "in entering into the second funding agreement, [he] knew that after doing so, LTL would be in financial

---

[240] TCC Tr. Ex. 858, at 14 (March Monthly Operating Report, Case No. 21-30589-MBK, Dkt. 3948-1).

[241] TCC Tr. Ex. 904, at 25:13–26:22 (Transcript of 341 Meeting of Creditors Before Linda Richenderfer, Esq. Office of the U.S. Trustee).

[242] ████████████████████████████████████████

[243] TCC Tr. Ex. 794 ¶¶ 78, 83 (Kim First-Day Decl. LTL 2.0).

[244] Ex. 1073 ¶ 48 (June 23, 2023 Kim Decl.).

distress."[245]   It is clear on this record that in April 2023, LTL entered into the new funding arrangements in an attempt to manufacture the appearance of financial distress in order to justify this Chapter 11 filing.

137.    As Mr. Kim testified, the idea that the 2021 Funding Agreement was now void or voidable came from Mr. Haas, in-house counsel for J&J.[246]   At no point did any of LTL's managers push back or attempt to negotiate with J&J concerning the enforceability of the 2021 Funding Agreement.  No one at LTL asked J&J or its affiliates to commit more than $8.9 billion to resolving talc claims, even though that would have been better for LTL's creditors.[247]   Mr. Wuesthoff testified, "[W]e're all part of the same company."[248]   Indeed, LTL has asserted a "common interest" with J&J regarding the surrender of the 2021 Funding Agreement.[249]   When the U.S. Trustee asked why LTL did not try to give back the talc liabilities (or take the position that LTL could no longer have talc liabilities) as a result of the alleged abrogation of the 2021 Funding Agreement, Mr. Kim refused to directly answer the question.[250]

138.    All three LTL managers testified on direct examination that, during the period between January 30 and April 4, 2023, they considered whether *Holdco*—a J&J affiliate and LTL's 100% equity holder, to whom LTL's board owed no fiduciary duties while still a debtor in

[245] June 27, 2023 Hearing Tr., at 200:19–22.

[246] June 27, 2023 Hearing Tr., at 197:17-24.

[247] *Id.*, at 91:7–14.

[248] *Id.*, at 65:16.

[249] Dkt. 524, at 5–6.

[250] *Id.*, at 283:15-284:1.

possession—would be financially distressed if LTL were forced to return to the tort system.[251]  But the managers had no duty to Holdco.

139.    The LTL board did not appear to have sufficient information to perform its duties properly.  For example, Mr. Wuestoff knew nothing in advance about the January 2023 transfer of the J&J consumer health business from Holdco to Kenvue, which deprived LTL of access to what the Third Circuit described as "Old Consumer's cash-flowing brands and products along with the profits they produced."  *LTL Mgmt.,* 64 F.4th at 106.[252]  Mr. Wuesthoff did not know the value of the consumer health business.[253]  He did not know whether, under the 2023 J&J Support Agreement, J&J's funding obligation was contingent on the confirmation of a plan of reorganization acceptable to J&J.[254]  He did not know whether J&J's funding obligation under the 2023 Funding Agreement is limited to $8.9 billion.[255]  He apparently believes that Holdco is responsible for providing $8.9 billion to talc victims only in bankruptcy.[256]

140.    When Mr. Wuesthoff filed his direct testimony via declaration stating that "LTL's and HoldCo's combined cash position could support defense costs upon a return to the tort system for only a limited period of time," he erroneously believed that Holdco's cash position was limited to $400 million rather than being in excess of $1.3 billion, because he had not been informed of a

---

[251] TCC Tr. Ex. 1077 ¶ 26 (Wuestoff Decl.); *see also* TCC Tr. Ex. 1075 ¶ 9 (Dickinson Decl.) (adopting that portion of Wuestoff's testimony); TCC Tr. Ex. 1073 ¶ 44 (Kim Decl.).

[252] June 27, 2023 Hearing Tr., at 56:18-22.

[253] *Id.* at 57:17-58:3.

[254] *Id.*, at 53:3-8.

[255] *Id.*, at 53:23-54:10, 55:1-8, 55:20-23.

[256] *Id.*, at 93:19-23.

$912 million dividend that Holdco had received in June 2023.[257]  He did not disagree that, if the dividend were factored in, LTL would have access to sufficient cash to support a return to the tort system for something like five years.[258]

### C.    2023 Funding Agreement and J&J Support Agreement

141.    LTL authorized the execution of three agreements to implement the April 4, 2023 changes to its funding arrangements.  First, LTL executed a Termination and Substitution Agreement (the "TSA") with Holdco and J&J to terminate the 2021 Funding Agreement.[259] Second, LTL executed the 2023 Funding Agreement with Holdco, which obligated Holdco to provide funding to LTL for talc liabilities and other costs in the normal course of business.[260] Third, LTL executed a Support Agreement with J&J and Holdco, for J&J to provide a funding backstop only upon the confirmation of a Chapter 11 Plan with terms acceptable to J&J.[261] Although the record is clear that these agreements were all negotiated and approved by the LTL board while LTL was still a debtor in possession, each is dated effective as of April 4, 2023 and purportedly executed in the two hours and eleven minutes between LTL's two bankruptcies.

142.    The TSA contains two substantive sections.  The first terminates the 2021 Funding Agreement and a related intercompany agreement between Holdco and J&J.  The second binds LTL and Holdco to enter into the 2023 Funding Agreement and LTL, Holdco and J&J to enter into

---

[257] *Id.*, at 78:9-80:1.

[258] *Id.*, at 80:2-80:21

[259] *See* TCC Tr. Ex. 1081 (Termination and Substitution Agreement).

[260] *See* TCC Tr. Ex. 1082 (2023 Funding Agreement).

[261] *See* TCC Tr. Ex. 1083 (J&J Support Agreement).

the Support Agreement.[262]  Although the TSA recites that LTL's most important asset is its rights

as a payee under the 2021 Funding Agreement,[263] there is no evidence in the record that any actual

consideration was paid to LTL.  Instead, the only consideration in the TSA is a reference to the

recitals, which set forth the risk that the 2021 Funding Agreement were rendered void or voidable

without ever stating that such agreement was, in fact, void.[264]

143.    Under the 2023 Funding Agreement, LTL (as Payee) has a right to demand from

Holdco (as Payor) a funding request for any permitted funding use, the only restriction on which

is that LTL may not request more than it needs for permitted funding uses.[265]  A permitted funding

use is ensuring that LTL's funding account will maintain a minimum $5 million balance at any

time.[266]  A "permitted funding use" includes the "payment of any and all costs and expenses of the

Payee incurred in the normal course of its business . . . at any time when ***there is no proceeding***

***under the Bankruptcy Code pending*** with respect to the Payee," as well as "the funding of any

amounts to satisfy (i) the Payee's Talc Related Liabilities . . . at any time when there is no

proceeding under the Bankruptcy Code pending with respect to the Payee . . . and (iii) in the case

of either (i) or (ii), any ancillary costs and expenses of the Payee associated with such Talc Related

Liabilities and any litigation thereof, including the costs of any appeals."[267]  The 2023 Funding

---

[262] TCC Tr. Ex. 1081, at 3 (Termination and Substitution Agreement).

[263] *Id.*, at 2 (Recital H).

[264] *See id.*, at 1-3 (Recitals).

[265] TCC Tr. Ex. 1082, at 6-7 (§ 2) (2023 Funding Agreement).

[266] *See id.*, at 5 (§ 1 Permitted Funding Use(d)).

[267] *Id.*, at 4-5 (§ 1 Permitted Funding Use(a), (c)) (emphasis added).

Agreement nowhere limits LTL's access to its payment rights based on Holdco's financial circumstances.

144.    The J&J Support Agreement applies inside bankruptcy only and requires J&J to backstop Holdco's payment obligations under the 2023 Funding Agreement solely to fund plan trusts created in connection with this bankruptcy.[268]  The J&J Support Agreement also confirms that Holdco's funding obligation to LTL exists outside of bankruptcy.[269]

145.    LTL claims that no value was lost between the 2021 Funding Agreement and the 2023 Funding Agreement, because the value of each "is the amount of the talc liability minus the value of LTL," and LTL's "[b]oard was aware of no reasonable approximation of the value of defending and resolving the talc litigation in the tort system that approaches $29 billion."[270]  This method of valuation does not, however, account for the value of the J&J backstop in the 2021 Funding Agreement that is absent in the 2023 Funding Agreement.  LTL's president, Mr. Wuestoff, testified that it was important to LTL that it had the backing of J&J up to $61.5 billion—whether or not LTL was in bankruptcy—on top of what was then New JJCI.[271]

## V.    LTL WAS NOT IN FINANCIAL DISTRESS WHEN IT FILED ITS SECOND BANKRUPTCY

146.    LTL was far from being in financial distress as of its second bankruptcy filing on April 4, 2023. ████████████████████████████████████████████████████

████████████████████████████████████████[272]  LTL's president Mr. Wuestoff testified that, as of

---

[268] TCC Tr. Ex. 1083, at 4 (§ 2(a)(i)) (J&J Support Agreement).

[269] Id., at 1 (Recital B).

[270] TCC Tr. Ex. 1073 ¶ 53 (June 23, 2023 Kim Decl.).

[271] June 27, 2023 Hearing Tr., at 37:13-21; 39:12-18; 61:19-62:4.

[272] ████████████████████████████████████████

the filing date, both Debtor and Holdco "had the capacity to pay their debts as they became due for the foreseeable future."[273]  He added that, at the time of the second bankruptcy filing, LTL was solvent, able to pay its bills, able to meet its liabilities, and had sufficient liquidity to meet its obligations.[274]  The Debtor's chief financial officer, Mr. Dickinson, acknowledged that, "after the restructuring, LTL was able to meet its [foreseeable] liabilities as they came due."[275]  The Debtor's chief legal officer, Mr. Kim, similarly acknowledged that LTL had "the capability to pay their debts as they became due for the foreseeable future."[276]

147.    Mr. Burian's testimony showed that LTL was showing no signs of financial distress: "[I]t's not losing contracts. It's not operating inefficiently. It doesn't have employees that are leaving or quitting, vendors' or customers' issues. It's paying its debts as they come due. It has

---

[273] TCC Tr. Ex. 1077 ¶ 26 (Wuesthoff Decl.).

[274] June 27, 2023 Hearing Tr., at 71:1-14.

[275] *Id.*, at 134:19-21 ("[Question] Okay. And on April 4th, after the restructuring, LTL was able to meet its liabilities as they came due, true?  [Answer] The foreseeable liabilities, correct.").

[276] TCC Tr. Ex. 1073 ¶ 44 (Kim Decl.).

no problem collecting on the royalties that a subsidiary provides, it even invested in a couple of royalties. There's no operating distress whatsoever."[277]

148.    LTL tells this Court that "the Debtor's ability to satisfy its liability remains the same under either funding agreement."[278]   If that is so, then the Third Circuit's decision compels dismissal.

### A.    Assets Available to LTL As of Its April 4, 2023 Filing

149.       The evidence shows Holdco likely will continue to receive dividends in the future and also may borrow from J&J's internal bank to generate cash flow to satisfy its obligations under the 2023 Funding Agreement.  LTL's rights under the 2023 Funding Agreement include the right to demand payment from Holdco, and there is no obligation for LTL to take Holdco's financial condition into account

---

[277] June 29, 2023 PM Hearing Tr., at 44:18-23; *see also* 

[278] LTL Surreply in Opp. to MTD (Dkt. 906) at 22.

[279]  ; June 28, 2023 PM Hearing Tr.,6-28-23 PM Tr. at 160:15-21. Given J&J's credit rating, this loan is essentially as good as cash.

[280]

[281]

when making such demands.[282] 

[283]

### 1. Cash

150. [284]

Given J&J's credit rating, this loan is essentially as good as cash. Holdco's cash and cash equivalents now total over $1.2 billion.

---

[282] LTL also possesses a $41.5 billion litigation claim for the transfer of the Consumer Business for no consideration. In addition, the assets of the bankruptcy estate (but not of LTL pre-filing) also consist of the debtor-in-possession's right to bring a potential fraudulent transfer claim against J&J for abandoning its funding backstop without reasonable exchange in value. Dismissing this case returns the right to bring such cause of action (if any) to the creditors of LTL. *See, e.g.*, N.J. Rev. Stat. 25:2-29(a)(1) (2021) (Remedies of Creditor) ("In an action for relief against a transfer or obligation under this article, a creditor, subject to the limitations in R.S.25:2-30, may obtain (1) Avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim. . . .").

[283]

[284]

[285] ; June 28, 2023 PM Hearing Tr., at 160:15-21. Given J&J's credit rating, this loan is essentially as good as cash.

[286] ; June 28, 2023 PM Hearing Tr., at 160:15-21.

[287]

151.    As of the April 4, 2023 bankruptcy date, LTL's board believed Holdco would be receiving an $1.8 billion dividend in June 2023,[288] ████████████████

██████████████████████████████████████████████████████

██████████████████████[289]  Thus, when the LTL board decided to file for bankruptcy in April 2023, it knew that LTL had access to $430 million cash on hand and believed it would soon have access to $1.8 billion more, for a total of over $2.2 billion from Holdco.

### 2.  Dividends

152.    ████████████████████████



153.    ████████████████████

████████████████████████

██████████[292]  Holdco has other subsidiaries that also generate hundreds of millions of dollars in annual cash flow.[293]

---

[288] June 27, 2023 Hearing Tr., at 66:24-67:8, 69:3-6 (Wuesthoff: indicating LTL board believed as of April 2 that Holdco would receive $1.8 billion dividend in June 2023).

[289] *See*



[293] TCC Tr. Ex. 1112, at 34 (Burian Rebuttal Report).

154.   

[redacted][294] Apsis did not transfer this $1.8 billion to Holdco supposedly due to a French reserve requirement, even though Mr. Lisman testified that J&J could have taken steps to enable Apsis to do so.[295] [redacted][296] As Mr. Burian testified, "J&J has simply decided not to provide Holdco access to the $1.8 billion dividend paid in 2022 (either through a distribution or an intercompany loan), instead keeping it at Apsis and then" loaning it to finance other J&J operations.[297]

155.   [redacted][298]

### 3. Equity Interests

156.   As to Holdco's equity interests, the parties agree that the market value of Holdco on the eve of LTL's bankruptcy was approximately $30 billion, consisting primarily of equity interests in European affiliates of J&J, with few accompanying liabilities.[299] [redacted]

[300] As of April 4, 2023, JSI's fair market value was $34,672,900,000, for a Holdco share of $12,521,875,000, and JIFC's fair market value

---

[294] [redacted]

[295] June 28, 2023 PM Hearing Tr., at 169:16-171:16.

[296] [redacted]

[297] TCC Tr. Ex. 1112, at 32 (Burian Rebuttal Report); *see also* [redacted]

[298] [redacted]; Debtor's Exhibit 107 from LTL 1.0.

[299] TCC Tr. Ex. 1119 ¶ 23 & Ex. C (June 23, 2023 Lisman Decl.).

[300] [redacted]

was $26,569,100,000, for a Holdco share of $9,595,244,000.[301]



157.

158.

---

[301] *Id.*, at Ex. H; TCC Tr. Ex. 1119 ¶ 24 (Lisman Decl.).

[302] ████████████████; TCC Tr. Ex. 1119, at 9, Figure 1.

[303] *See* ████████████; TCC Tr. Ex. 1119, at 9, Figure 1.

[304] ████████████

[305] ████████████████

[306] ████████████████

[307] ████

[308] ██

159. ███████████████████████████████████████████████[309]

#### 4. Other Sources of Cashflow within the J&J "Integrated Cash Ecosystem"

160. ███████████████████████████████████████

████████████████████████████████████████████████████

███████[310] ████████████████████████████[311] Permitting Holdco to receive dividends from its subsidiaries to fulfill cash needs on Holdco's part to satisfy funding requests from LTL would thus be consistent with J&J's policies.

161. Another factor in J&J's cash allocation policy is reputational harm.[312] Mr. Lisman made clear that J&J would suffer "reputational harm" if it allowed Holdco to default on its obligation to fund payments to talc claimants.[313] Indeed, J&J has never allowed one of its subsidiaries to file for bankruptcy (until it manufactured LTL for that purpose).[314]

162. Mr. Lisman, J&J's assistant controller, testified that dividends within the J&J enterprise are governed by J&J internal policies dictated by the parent corporation.[315] ██████████

████████████████████████████████████████████████████

---

[309] ████████████████

[310] ███████████████████████

[311] ████ *accord* TCC Tr. Ex. 1119 ¶ 32 (June 23, 2023 Lisman Decl.) ("cash balance and needs" of subsidiaries a factor in determining payment of dividends); *id.* ¶ 33 (discussing "evolving cash needs" as factor).

[312] June 28, 2023 PM Hearing Tr., at 165:20-166:1.

[313] *Id.*, at 171:2-8.

[314] *Id.*, at 171:9-11.

[315] *Id.*, at 148:4-9.

 confirming that J&J has the power to make dividend allocation decisions for the entire corporate enterprise.

163.    In addition to dividends, Mr. Lisman clarified that "it is an option" for "J&J affiliates [to] borrow money from J&J's in-house bank."[317]

Thus, J&J—as the beneficial owner of Holdco and its assets, and which also has the power to direct Holdco and LTL—has the ability to provide even further liquidity to Holdco via its centralized cash management function.

164.    

## B.    LTL's Talc Liabilities

165.    LTL asserts that it is liable for J&J's talc liabilities as well as those of Old JJCI and other parties.  Because LTL never produced talc products (or any type of products, for that matter), LTL is exposed to the value of J&J's talc liabilities due only to assignment and/or indemnification

---

[316] 

[317] June 28, 2023 PM Hearing Tr., at 146:2-4.

[318] 

[319] 

[320]

obligations that J&J engineered it to undertake. ████████████████████
████████████████████ [321]

166.    LTL witnesses have admitted that LTL did not ascertain the value of the talc

liabilities before filing LTL 2.0. ████████████████████
████████████████████ [322]

LTL's chief financial officer testified that, as of the date he voted for LTL to file a second

bankruptcy, he "didn't see any financial analysis [of LTL's talc liabilities], nor did [he] know that

they were in financial distress."[323]   J&J's assistant controller similarly testified that outside of

bankruptcy, "J&J has no aggregate estimate of talc liability."[324]

167.    Nevertheless, Mr. Kim testified that "in no event, was the dollar-value of the costs

to defend and resolve talc claims in the tort system believed to approach the $29 billion asset value

of Holdco."[325]   On cross, Mr. Kim testified that the magnitude of the talc liabilities was in the $8

billion to $10 billion range, but was unable to provide further detail.[326]   Mr. Wuestoff testified

several times that the value of the talc liabilities was not more than $8.9 billion.[327]   He testified

that, if LTL's experts assumed that talc liabilities were greater than $8.9 billion, "we'd have a



---

[321] ████████████████████████

[322] ████████████████████████

[323] June 27, 2023 Hearing Tr., at 129:18-23.

[324] June 28, 2023 PM Hearing Tr., at 144:12-15.

[325] TCC Tr. Ex. 1073 ¶ 44 (June 23, 2023 Kim Decl.).

[326] June 27, 2023 Hearing Tr., at 185:7-10.

[327] *See, e.g.*, *Id.*, at 58:13-16 ([Question] "Sir, you don't believe, LTL doesn't believe that its talc liabilities exceed $8.9 billion, right? [Answer] At this point, nothing that we see would indicate that it's more."); *id.*, at 72:20-24 (testifying that the data point of the PSA was the key estimate of the talc liabilities when deciding whether or not to file the second bankruptcy).

difference of opinion."[328]  When Debtor's counsel attempted to redirect on this point, Mr. Wuestoff

further explained that LTL "believe[s] that's a really strong data point as to what the talc liabilities

are, because the attorneys representing the majority of the claimants agree that that is the

appropriate amount to settle all and resolve all current and future claims."[329]  Mr. Wuestoff also

testified, in the context of possible claims against the 2023 Funding Agreement, "we believe the

talc liabilities are no more than $10 billion."[330]

168.    J&J disclosed to the market in its April 28, 2023 10-Q that it has taken a total

reserve of $8.9 billion "to resolve all the current and future talc claims."[331]  That is J&J's

determination of the probable and reasonably estimable amount of its total talc liabilities.

169.    Third-party analyses were in line with these figures.  For example,



170.    In terms of near-term costs, the Third Circuit found that LTL's "continuing run rate

was between $10 million to $20 million per month."  *LTL Mgmt.*, 64 F.4th at 94.  LTL asserts that,

---

[328] *Id.*, at 66:12-20.

[329] June 27, 2023 Hearing Tr., at 96:14-19; see also *id.*, at 107:20-110:11.

[330] *Id.*, at 61:3-4, 62:11-12.

[331] TCC Tr. Ex. 785, at 26 (April 28, 2023 J&J Form 10-Q).

[332] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[333] ▮

in addition, it costs "$2 million to $5 million" per trial,[334] and Mr. Wuesthoff testified (and LTL's counsel argued) that LTL could not realistically try more than 10 cases per year.[335] LTL's expert Dr. Mullin admitted that despite a "litigate all" strategy from 2013-2019, LTL never tried more than approximately 10-12 cases per year.[336] Thus, at a maximum, if LTL had to defend itself in the tort system, it would face no more than $290 million in costs per year ($240 million plus $50 million, even assuming *arguendo* that those costs were additive).

171.    Under LTL's own evidence Holdco's ***existing*** cash on hand of more than $1.3 billion would ensure that LTL could cover nearly ***4.5 years*** of talc-related litigation costs at the historical run-rate, even with ***no*** additional Holdco dividend revenue, ***no*** borrowing by Holdco, and ***no*** liquidation of any Holdco assets.  Further, as of the April 4, 2023 bankruptcy date, LTL's board believed Holdco would be receiving an even larger dividend in June 2023 and expected to have access to over $2.2 billion in cash to pay talc claims.[337]  The $2.2 billion would cover over ***7.5 years*** of defense costs at the historical run rate.  LTL's own evidence disproves any assertion of "immediate," "imminent," or "apparent" financial distress.

172.    Mr. Kim speculated in his testimony that, despite the historical run rate, LTL would face "increasing cost to defend and resolve the talc litigation" if it were returned to the tort system.[338]  There was no evidence to support this assertion.  The "$10 million-$20 million" per

---

[334] Dkt. 614, at 40.

[335] TCC Tr. Ex. 1006, at 180:7–11 (Feb. 14, 2022 Hearing Tr.); *see also* TCC Tr. Ex. 1011, at 33:8–11 (Feb. 18, 2022 Hearing Tr.) (Mr. Gordon representing to this Court that 10 cases per year was the maximum).

[336] June 29, 2023 PM Hearing Tr., at 94:18-25; *see also id.*, at 98:7-99:11.

[337] June 27, 2023 Hearing Tr., at 66:24–67:8, 69:3–6 (Wuesthoff) (indicating LTL board believed as of April 2 that Holdco would receive $1.8 billion dividend in June 2023).

[338] TCC Tr. Ex. 1073 ¶ 59 (June 23, 2023 Kim Decl.).

month figure for litigation costs were the only "real numbers" that LTL had.[339] ████████████

████████████████████████████████████████████████████████████

████████████████████[340]    LTL's president Mr. Wuesthoff testified that the board

had no estimate or valuation of talc costs when it voted to file for bankruptcy.[341]  He specifically

confirmed that the board was not presented with any information as to supposedly increasing

defense costs.[342]  LTL's chief financial officer, Mr. Dickinson testified that, as of the date he voted

for LTL to file a second bankruptcy, he "didn't see any financial analysis [of LTL's talc costs],

nor did [he] know that they were in financial distress."[343]  He did not have any financial analysis

of what the cash flow demands would be if the talc claims were returned to the tort system.[344]  As

to defense costs, he added, "All I know is what they did spend."[345]  LTL did not perform any

evaluation of how much cash flow it would need in the tort system over the next three or even five

years.[346]  J&J's assistant controller similarly testified that outside of bankruptcy, "J&J has no

aggregate estimate of talc liability."[347]

---

[339] June 27, 2023 Hearing Tr., at 275:25-276:4.

[340] ███████████████████████████████████████████
████████████████████████████

[341] June 27, 2023 Hearing Tr., at 72:20-73:4.

[342] *Id.*, at 74:15-76:4.

[343] *Id.*, at 129:18-23.

[344] *Id.*, at 129:24-130:19.

[345] *Id.*, at 137:3-9.

[346] *Id.*, at 163:17–22.

[347] June 28, 2023 PM Hearing Tr., at 144:12-15.

173.    Based on the testimony of LTL's managers, it is apparent that (a) LTL did not have an analysis of its total talc liabilities when it filed for bankruptcy, (b) LTL's president and chief legal officer generally scoped the magnitude of the talc liabilities in the $8 billion to $10 billion range, and (c) no one at LTL thought the talc liabilities came close to Holdco's asset value of nearly $30 billion.

### C.    Expert Analyses of LTL's Assets and Liabilities

174.    LTL offered the expert testimony of Dr. Charles Mullin, an economist at Bates White who has previously offered testimony in support of LTL. ███████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████[348] which includes personal injury, indemnification, and governmental claims. ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████[349]

175.    ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[348] ███████████████████████████████████; June 29, 2023 PM Hearing Tr., at 82:7-83:19.

[349] ████████████████████ June 29, 2023 PM Hearing Tr., at 82:25-83:19.



176.     On rebuttal, Mr. Burian questioned Dr. Mullin's use of 100 trials in two of his three

scenarios (or even 20 trials in his third scenario), noting that Mr. Wuestoff had previously testified

(and LTL's counsel argued) that LTL could not realistically try more than 10 cases per year, and

even twenty was not possible.[352]    Dr. Mullin was unable to identify a specific source for his

assumption of 100 trials, conceding that from 2013-2019 J&J followed a "litigate all" strategy and

never tried more than approximately 10 cases per year.[353] He admitted he had no familiarity with

the court systems in which talc cases would be tried and conceded that he did not know whether

they had the capacity to conduct the number of proceedings his analysis assumed.[354]   He could

offer nothing more than a conclusory (unqualified) opinion that he believed Mr. Wuestoff (LTL's

president) and Mr. Gordon (LTL's lead bankruptcy counsel) were wrong.[355]

177.

_____

[350] *See generally* ████████████████████████

[351] ██████████████

[352] TCC Tr. Ex. 1112, at 12 (Burian Rebuttal Report); TCC Tr. Ex. 1006 (Feb. 14, 2022 Hearing Tr.), at 180:7-16 (Wuestoff); *see also* TCC Tr. Ex. 1011, at 33:8–11 (Feb. 18, 2022 Hearing Tr.) (Mr. Gordon representing to this Court that 10 cases per year was the maximum).

[353] June 29, 2023 PM Hearing Tr., at 94:18-15; *see also id.*, at 98:7-99:11.

[354] June 29, 2023 PM Hearing Tr., at 124:8-127:17 (Mullin).

[355] *Id.*, at 95:21-96:12, 98:15-99:13.

[REDACTED][356]

Dr. Mullin assumed that J&J would settle uterine and cervical cancer claims in the tort system for $50,000 each, even though it had never paid a penny on such claims historically in the tort system.[357] He assumed 100,000 talc claims on file, even though Mr. Watts (with purportedly 17,000 unfiled claims) and other lawyers who signed plan support agreements have not filed any of their cases in the tort system (even though there has been no bankruptcy stay or injunction preventing such filings against J&J since April 20, 2023).[358]

178.    [REDACTED]

[REDACTED][359] for average annual costs of $160 million. Yet he assumed (without adequate foundation) non-trial litigation costs in two of his three scenarios to be 250% of actual historical costs leading up to the 2021 bankruptcy filing.[360] Mr. Kim testified that the only estimates of defense costs available to the LTL board were $10 million to $20 million per month pre-bankruptcy, although he feared "it was getting worse."[361]

179.    Mr. Burian performed a re-analysis of Dr. Mullin's estimate, accepting his $40 million quarterly figure for non-trial litigation costs, revising per-trial costs to $3.5 million based on the historical average cost (which Mr. Burian opined is a more reasonable estimate and does

---

[356] [REDACTED]

[357] June 29, 2023 PM Hearing Tr., at 118:19-119:18.

[358] *Id.*, at 112:14-113:19.

[359] [REDACTED]

[360] TCC Tr. Ex. 1112, at 14 (Burian Rebuttal Report); June 29, 2023 PM Hearing Tr., at 78:22-79:16; 100:15-101:6.

[361] June 27, 2023 Hearing Tr., at 205:3-7 ([Question] "You didn't have projections looking out over 6 the next year as to -- in that type of analysis? [Answer] No, we only knew that it was getting worse.").

not even account for economies of scale),[362] and assuming an average of ten trials per year, consistent with the historical average and LTL's president's testimony.[363]   With Mr. Burian's adjustments, LTL's total costs in the first three years upon return to the tort system would be only $0.6 billion under the first scenario, $2.6 billion under the second scenario, and $4.8 billion under the third scenario.[364]



180.

But Dr. Bell provided no analysis to support that assertion, and the substance of his own report refutes it.

181.

---

[362] TCC Tr. Ex. 1112, at 11-14 (Burian Rebuttal Report); *see also* June 29, 2023 PM Hearing Tr., at 58:20-61:24.

[363] TCC Tr. Ex. 1112, at 12.

[364] *Id.*, at 15.

[365] ; TCC Tr. Ex. 1112, at 16; June 29, 2023 PM Hearing Tr., at 83:20-84:10.

[366]

[367]

[368]



[369] ████████████████████████████████████████████

████████████████████████████████████████████

[370] ████████████████████████████████████████████

████████████████████████████████████████████

[371] ████████████████████████ Mr. Burian identified numerous flaws in Dr. Bell's

analysis that skewed his testimony in LTL's favor.[372]

182.    Nevertheless, Dr. Bell's analysis, even taken at face value, conclusively shows LTL

was not in financial distress. ████████████████████████████

[373] ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

[374] ████████████████████████████████

183.    ████████████████████████████████

████████████████████████████████████████████

[375] ████████████████████████████████████████████

████████████████████████████████████████████

---



[369] ██████████████

[370] ████████

[371] ██████████

[372] *See* TCC Tr. Ex. 1112, at 19-31 (Burian Rebuttal Report).

[373] ████████████████████████

[374] ██

[375] ██████████████████████████████



185.    Mr. Burian testified that, even taking the testimony of Dr. Bell and Dr. Mullin at face value, their estimates simply do not demonstrate any financial distress either under the Third Circuit's standard or based on what a bankruptcy practitioner would consider financial distress.[379]

### D.    Unfiled And Non-Compensable Claims

186.    Unfiled and scientifically unsupported or non-compensable claims are not relevant to the financial distress analysis.   Although LTL and J&J have entered into Plan Support Agreements ("PSAs") with attorneys purportedly representing tens of thousands of talc claimants, not a single claimant has signed a PSA.   Nor has LTL demonstrated what the signatories (attorneys representing talc claimants) committed to, if anything, by signing the PSA.   ████████████

████████████████████████████████████████████████████████████████

---



[379] June 29, 2023 PM Hearing Tr, at 48:2-14.



[380] ████████████████████████████████████████████████

[381] ███████████████████████████████████████████████   ██████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

[382] ██████████████   ████████████████████████████████

[383] ████████   ████████████████████████████████████████

████████████████████████████████████████████████████

[384] ██████████████████████████   Further, he made clear that "I can't
bind my clients to do that in which they do not wish to do. . . . It's not my decision.  It's the clients'.

[385] ████████████████████   Mr. Pulaski similarly confirmed: "My
clients are not bound to anything."[386]



---

[380] TCC Tr. Ex. 952, at 59:17–22 (April 15, 2023 Pulaski Dep. Tr.).

[381] ████████████████████████

[382] ██████████

[383] ██████████

[384] ████████

[385] ████████████████

[386] TCC Tr. Ex. 952, at 55:9-10 (April 15, 2023 Pulaski Dep. Tr.); *see also* June 28, 2023 PM Hearing Tr.,
at 24:12-22, 52:17-21 (Watts saying the same).

187.    Mr. Murdica, who has relied on J&J for approximately 95% of his livelihood as outside counsel for years,[387] did not ask if any of the PSA firms had engagement letters with the unfiled claimants, did not ask whether a complaint had been drafted, and did not ask if the attorney even had pathology reports  or medical records for any of the unfiled claimants.[388]  Mr. Murdica simply took the law firms' representations and claimant forms at face value.[389]  Mr. Murdica does not know the histologic subtypes of any of the ovarian cancer claimants, and the claimant lists he requested do not specify them.[390]

188.    Mr. Kim testified that LTL has not verified whether plaintiffs' attorneys have collected pathology reports or confirmatory medical records, whether claims are timely under applicable statutes of limitation, whether claimants have alleged non-ovarian gynecological cancers rather than ovarian cancer or mesothelioma, or even whether claimants had any talc-related injuries at all.[391]

189.    The testimony at trial established that a substantial portion of the supposedly new-found claims are largely unverified and are still being processed by PSA-signing firms to determine whether the potential claims are timely and are supported by the evidence.  For example, of the 38,000 filed claims as of October 14, 2021 (when LTL 1.0 was filed), Mr. Watts had zero (0) filed claims, while Mr. Pulaski had one (at most) filed claim.[392]  Now each purports to represent

---

[387] June 28 AM Hearing Tr., at 69:7-14.

[388] June 28 AM Hearing Tr., at 30:1-12; 31:14-22, 32:18-21.

[389] Id., at 30:13-25.

[390] June 28, 2023 AM Hearing Tr., at 31:14-22; 32:5-21.

[391] June 27, 2023 Hearing Tr., at 215:14-216:3.

[392] June 28, 2023 PM Hearing Tr., at 19:8-10 (Watts stating he has not filed a claim in the tort system); TCC Tr. Ex. 761, at 33:1–39:21 (June, 14, 2023 Pulaski Dep. Tr.).

many thousands of potential claimants.  Mr. Watts testified that he signed his first talc claimant on

March 19, 2022 2022 (after the first motion to dismiss was denied by this Court on February 25,

2022) and accumulated 15,000 cases in less than 11 months.[393]   In other words, Mr. Watts began

to sign up cases only after he apparently believed he could rely on bankruptcy to resolve them and

would not be required to litigate them in the tort system.  There is no assurance that *any* unfiled

cases will ever become civil actions.

190.    Mr. Watts testified that he relies on "the intake vendor"—a third party hired to

recruit potential claimants —"to follow the written protocols that are the policy of the firm."[394]

Mr. Watts testified that his firm is in the process of vetting these claimants and assessing whether

they can prove damage, have medical records to confirm the diagnosed condition, are not

represented by another attorney already, are interested in bringing a lawsuit, and are responsive to

inquiries.[395]  Mr. Watts admitted that none of his clients have thus far filed talc claims in the tort

system, which he attempted to excuse by incorrectly stating "they're not allowed to by order of

this Court."[396]   In fact, this Court's Order of April 25, 2023, does not bar claimants from filing

actions against non-debtors such as J&J.

191.    Moreover, it appears that a substantial number of the new-found claims involve

"non-ovarian gynecological" cancers, such as cervical and uterine cancers for which there is no

scientific support and that have not been treated as compensable in the tort system.  Mr. Onder

testified that he represents roughly 21,000 talc claimants, of whom approximately 9,000 are

---

[393] June 28, 2023 PM Hearing Tr., at 17:14-16; 32:22-24 (Watts).

[394] *Id.*, at 18:22-24.

[395] *Id.*, at 18:3-19:7.

[396] *Id.*, at 19:8-10.

ovarian cancer claimants in the MDL, another 9,000 are uterine cancer claimants with unfiled claims, and 3,000 are claimants whose disease is unconfirmed.[397]   Mr. Onder testified repeatedly that non-ovarian cancers such as uterine and cervical cancer had not been compensable in the tort system, including, based on his experience in negotiating with Mr. Murdica, agreeing that settlement of uterine cancers was "something that [Mr. Murdica] said he'd never give [Mr. Onder] in the tort system."[398]   Mr. Onder testified that "we'll give a company money to advertise. And there's an estimated cost per claim. You wouldn't necessarily want to pay, using your example, $5,000 for a cervical or a uterine case."[399]   Mr. Onder's criteria for referring attorneys instructed that cervical cases be declined, because Mr. Onder did not want to pay $5,000 for cervical or uterine cancer cases that were "lesser-valued."[400]   Mr. Onder sent a mass email communication to claimants: "Many of these claimants have gynecologic cancers that are ***not as convincingly proven*** by science to be related to talc; as such they will receive lesser compensation."[401]   Mr. Watts agreed that "the science is better" for some types of talc cases than others.[402]

---

[397] TCC Tr. Ex. 1118 ¶ 14 (Onder Decl.); June 28, 2023 PM Hearing Tr., at 62:13-22.  Mr. Onder represents ten mesothelioma claimants.  *Id.* at 62:23-25.

[398] June 28, 2023 PM Hearing Tr., at 94:2-8; *see also id.* at 65:10-16 ("Q: Okay. Some cancers -- or strike that. Some cases are stronger than others, right? / A: Correct. / Q: And that's because – that some cases are stronger than others, that's because some diagnoses have a weaker association with talc, right? / A: Correct."); *id.*, at 71:1-3 ("Q: And they're lower-value talc claims because they are not as strongly supported by the medical literature, right? / A: That's correct."); *id.*, 92:19-93:18; *id.*, at 97:6-9 ("Q: Then you say, in addition to that, J&J will pay small Settlements to clients with other gynecological cancers.  And by that you meant other than ovarian cancer, right? / A: Correct.").

[399] June 28, 2023 PM Hearing Tr., at 69:21-24.

[400] *Id.*, at 69:11-16; *see also* TCC Tr. Ex. 830 (OnderLaw Criteria for Referring Attorneys).

[401] TCC Tr. Ex. 1022, at 1 (OnderLaw Talc Litigation Update); June 28, 2023 PM Hearing Tr., at 67:11-19.

[402] *Id.*, at 23:24-24:2.

192.



193.    J&J has never settled or paid any compensation for non-ovarian gynecological cancer claims, such as uterine and cervical cancer.[406]    Dr. Mullin admitted that the master settlement agreements in which J&J has entered (including with Mark Lanier) exclude non-ovarian gynecological cancers.[407]    Under the *Daubert* decision in the MDL, the only gynecological cancer found to be scientifically linked to talc was epithelial ovarian cancer.  *In re Johnson & Johnson Talcum Powder Prod. Mktg., Sales Pracs. & Prod Litig.*, 509 F. Supp. 3d 116, 181 (D.N.J. 2020).

194.    The Debtor's own expert opined that the "values of mass tort claims correlate strongly with the strength of the causal evidence linking the allegedly defective product to the alleged harm," and analyzed the potential costs only of ovarian cancer and mesothelioma claims, not non-ovarian "gynecological" cancers.[408]    And the trust distribution procedures in Debtor's June



[406] June 28, 2023 AM Hearing Tr., at 41:1-7.

[407] June 29, 2023 PM Hearing Tr., at 102:7-103:1, 104:12-16.

2023 Proposed Plan treat ovarian cancer and mesothelioma claims very differently from non-ovarian cancer claims; the latter are eligible only for $1,000 quick-pay compensation.[409]

195.    Unfiled, unverified, and scientifically unsupported or non-compensable claims in the tort system could not have caused LTL financial distress at the time of filing.  J&J's most recent Form 10-Q does not even mention unfiled claims, indicating that J&J does not consider them material.[410]  While the precise number of such claims is not in evidence, in any event such claims were included in the estimates made by LTL's experts and in the claims at issue in LTL 1.0—thousands of "new" claims did not arise during the 2 hours and 11 minutes between LTL 1.0 and LTL 2.0.  Such phantom claims have not placed LTL in financial distress.

## VI.    THE ABILITY OF THE TORT SYSTEM TO RESOLVE TALC CLAIMS, INCLUDING FUTURE CLAIMS

196.    At the beginning of the MTD Hearing, the Court made clear that it was not intending to conduct a policy seminar on the relative merits of resolving mass torts through the bankruptcy system, the MDL process, or the state court system.[411]  The Court stated that it would not "make a factual determination as to which is the best system" and that "policy is usually never subject to factual determinations at trial."[412]

197.    Experts from both sides agree that settlement—and not piecemeal litigation of each of the tens of thousands of pending claims—is by far the most likely outcome in the tort system.[413]  Debtor's own experts Ms. Birnbaum and Dr. Mullin acknowledged that 99% of all federal products

---

[409] Dkt. 912-13 at Ex. M § 5.3.3 ("Other Allegedly Talc-Related Diseases").

[410] TCC Tr. Ex. 785, at 54 (Apr. 28, 2023 J&J Form 10-Q).

[411] June 27, 2023 Hearing Tr., at 16:2-17:6.

[412] June 27, 2023 Hearing Tr., at 17:2-6.

[413] June 29, 2023 AM Hearing Tr., at 104:18-23.

liability cases are resolved without trial.[414]    In fact, Dr. Mullin admitted 99% of all such cases settle.[415]    In the multi-district litigation context specifically, the TCC's expert, Professor Rave, testified that more than 97% of cases transferred to an MDL court are resolved prior to being remanded to their original courts for trial.[416]

198.    The Third Circuit emphasized the feasibility of settling talc claims in the tort system; one of its grounds for reversal was failure to consider the possibility of "a meaningful global or near-global settlement" outside this case. 64 F.4th at 107-08.  Judge Furgeson provided robust examples of the MDL system's ability to resolve products liability and other complex litigation, such as Deepwater Horizon and Vioxx.[417]    Professor Rave cited further examples of the MDL system's capacity to provide defendants with "global peace" and to address future claims.[418]    He testified that talc is simpler than many product liability cases, because the vast majority of talc claims involve a single product type manufactured by a single defendant that is alleged to have caused two primary disease types.[419]    In addition, he noted that criticisms of plaintiffs' attorney fee structures are misplaced.[420]

---

[414] *Id.*, at 75:14-17; 104:18-23.

[415] *Id.* at 131:5-13

[416] June 29, 2023 AM Hearing Tr., at 35:8-14.

[417] TCC Tr. Ex. 980 ¶¶ 47-50 (Furgeson Report).

[418] *See generally* TCC Tr. Ex. 966 ¶¶ 34-80 (Rave Report).

[419] *Id.*, at ¶¶ 81-87.

[420] TCC Tr. Ex. 967 ¶ 10 (Rave Rebuttal Report).  LTL has incorrectly argued that law firms in the talc MDL seek to profit through a "common benefit" fund at their clients' expense.  That argument is false.  The MDL Common Benefit Order applies to any bankruptcy resolution as well as in the MDL, *see* June 28, 2023 AM Hearing Tr., at 22:19-24, 23:8-16, and in any event the "common benefit" fee assessment is deducted from the contingent fee percentage of the private counsel.  It does not increase the amount of fee that a client bears.  It simply avoids free-riding and ensures appropriate compensation for value created and benefits provided.  *See* Hon. Eldon E. Fallon. "Common Benefit Fees in Multidistrict Litigation," 74 La. L. Rev. 371, 376 (2014) ("[I]n MDLs, the common benefit

199.    Professor Rave testified that LTL's counter-examples did not prove what LTL contended.  For example, in the Roundup case, which involved a widely used consumer product with a substantial latency period for non-Hodgkin's lymphoma, the district court rejected the proposed settlement, but only because it did not provide enough money for future claimants.[421] The asbestos MDL (No. 875) successfully resolved over 185,000 claims under Judge Robreno, who remanded only 750 cases to the transferor courts (and "nowhere near 750 of those went to trial").[422]  Today, "there's no ongoing asbestos MDL."[423]  In Judge Robreno's words, "the asbestos paradigm developed in MDL-875 could well inform the resolution of future mass tort litigation in the federal courts."[424]

200.    In response to questions from the Court, Professor Rave explained that large-scale—and even global—settlements are achievable in the tort system, even when there are future claims involving latent injuries.[425]   Indeed, Professor Rave testified that tools exist in the tort system to enable LTL to achieve global resolution of its talc liabilities.[426]  For example, Professor Rave noted that, in a settlement class action, a subclass with separate counsel (much like an FCR under Section 524(g)) could be created to represent the interests of future claimants, and, even

---

fee is extracted from the fee of the primary attorney and not the claimant, as is the case with class actions. Thus in MDLs, the claimant does not pay the common benefit fee; the primary attorney who is the beneficiary of the common benefit work pays it."). Some of the firms participating in the AHC signed the Participation Agreement in the MDL, which makes clear that all of their cases are subject to the common benefit holdback.

[421] June 29 AM Hearing Tr., at 28:19-29:11.

[422] *Id.*, at 34:12-35:7.

[423] *Id.* at 35:6-7.

[424] Hon. Eduardo C. Robreno, "The Federal Asbestos Product Liability Multidistrict Litigation (MDL-875): Black Hole or New Paradigm?," 23 Widener L.J. 97, 100 (2013).

[425] June 29, 2023 AM Hearing Tr., at 26:3-28:7; *see also id.*, at 22:7-13, 25:13-25, 32:23-35:7, 42:4-10.

[426] *Id.*, at 22:7-13.

with regard to a group of not readily identifiable future claimants, the challenge of providing effective notice would not be insurmountable.[427]  In the context of the talc litigation, Professor Rave added that concerns regarding notice are ameliorated by the ubiquity of J&J's products.[428] Professor Rave further explained that there are "lots and lots of class actions where it's hard to identify the class of people you're giving notice to," and yet "there are lots and lots of notice programs designed to get at that problem."[429]  Even the Debtor's expert, Dr. Mullin, acknowledged that global resolutions of mass tort disputes are possible, and have occurred, within the tort system, and that such resolutions rely on similar compensation schemes, like grids or point systems, utilized in bankruptcy trust distribution procedures.[430]  And Ms. Birnbaum would not testify that bankruptcy is the only forum within which LTL could resolve its talc liabilities.[431]

201.    Professor Rave explained that the flexibility afforded in the civil justice system allows for mass tort settlements involving future claims on an opt-in basis.[432]  For example, Professor Rave cited to a model that pairs upfront medical monitoring (which can also mitigate harm from the underlying disease) with back-end compensation if and when latent injuries arise.[433] Alternatively, there have been global resolutions of present claims in the tort system that effectively have served to resolve future claims, as well.[434]  As Professor Rave explained: "If you

---

[427] *Id.*, at 25:13-25; 26:3-28:7, 30:9-31:2.

[428] *Id.*, at 26:3-28:6.

[429] *Id.*, at 27:5-20.

[430] *Id.*, at 106:15-107:20.

[431] *Id.*, at 73:12-74:1.

[432] *Id.*, at 31:21-32:22

[433] *Id.*

[434] *Id.*, at 32:23-33:22.

make the settlement program attractive, people will opt in."[435]  For example, he noted that the

*Actos* settlement successfully resolved claims arising from a diabetes drug causing injuries with a

latency period of more than a decade.  Although the settlement did not expressly deal with future

claims – but simply created a framework governing all claims – "the Actos settlement seems to

have worked. . . . [T]here's no Actos litigation to speak of today."[436]

202.    Moreover, even without a class settlement resolving future claims, future talc

victims could simply continue to file (and proceed to settle, individually or collectively) claims

against J&J.  Unlike in cases where there is a limited pot that might be depleted before future

claimants' injuries arise, here there is no evidence that J&J—one of the wealthiest corporations in

the United States—will go out of business.  There is no evidence that future claimants are facing

a potentially depleted pool of funds in the unfortunate event that latent injuries manifest and are

compensable in the tort system.

203.    In fact, Dr. Mullin's testimony undercuts LTL's contention that bankruptcy is

needed to protect future claimants.  ██████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████[437] ███████████████████████

██████████████████████████[438] ███████████████████████

███████████████████████████████████████████████████████

[435] *Id.*, at 32:21-22.

[436] *Id*. at 33:7-22.

[437] ████████████████████████████████

[438] ████████████

███████████████████████████████████████████████

████████████████████████[439]

## <u>CONCLUSIONS OF LAW</u>

204.    Dismissal is required here, based on the foregoing factual findings, analyzed under

the Third Circuit's decision in *LTL Mgmt.*, 64 F.4th 84 (as amended) ("*LTL Mgmt.*"), and other

applicable law.  First, LTL's own evidence and testimony reveals that at the time of filing LTL

2.0, LTL was not in financial distress. Second, any appearance of financial distress in this case

was intentionally created by J&J and the Debtor in an attempt to justify this filing and therefore

cannot provide a basis for good faith.  Third, the narrow exception of Section 1112(b)(2) does not

apply in this case and does not excuse the obligation under Section 1112(b)(1) to dismiss for cause.

## I.    STATUTORY FRAMEWORK AND LEGAL STANDARD

205.    The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a)

and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as

amended September 18, 2012, referring all bankruptcy cases to the Bankruptcy Court. This matter

is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).

206.    The Third Circuit's decision in *LTL Mgmt., 64 F.4th 84*, is controlling on this Court

both as a published decision of the Court of Appeals in this Circuit, and as the law of the case to

the extent that this bankruptcy is in effect a continuation of the LTL's first bankruptcy. *See Barber*

*Asphalt Corp. v. La Fera Grecco Contracting Co.*, 116 F.2d 211, 214 (3d Cir. 1940) ("The orderly

administration of justice requires that matters decided by the Circuit Court of Appeals of any

circuit have a binding effect upon all the District Courts in that circuit"); *In re City of Phila. Litig.*,

158 F.3d 711, 717–18 (3d Cir. 1998) ("The law of the case doctrine . . . acts to preclude review of

---

[439] ██████████

only those legal issues that the court in a prior appeal actually decided, either expressly or by implication").

207.    In dismissing the Debtor's prior bankruptcy petition, the Third Circuit observed that "Congress designed Chapter 11 to give those businesses teetering on the verge of a fatal financial plummet an opportunity to reorganize on solid ground and try again, not to give profitable enterprises an opportunity to evade contractual or other liability." *LTL Mgmt.*, 64 F.4th at 103 (internal citation and quotation marks omitted)).  But because bankruptcy "presents an inviting safe harbor" for "companies that face massive potential liability and litigation costs," its "lure creates the possibility of abuse which must be guarded against to protect the integrity of the bankruptcy system and the rights of all involved in such proceedings." *In re SGL Carbon Corp.*, 200 F.3d 154, 169 (3d Cir. 1999).

208.    Accordingly, "Chapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith." *LTL Mgmt.*, 64 F.4th at 100 (internal citation and quotation marks omitted).  Specifically, a party in interest may move to dismiss a bankruptcy for cause and a "lack of good faith constitutes cause." *Id.*  Notably, "[o]nce at issue, the burden to establish good faith is on the debtor." *Id.* at 100–101 (citing *In re 15375 Mem'l Corp. v. BEPCO, L.P.,* 589 F.3d 605, 618 (3d Cir. 2009), and *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 118 (3d. Cir. 2004).  Thus, LTL bears the burden of proving good faith and financial distress.  It is not Movants' burden to prove the absence of financial distress or the absence of good faith.

209.    "[T]he good-faith gateway asks whether the debtor faces the kinds of problems that justify Chapter 11 relief." *LTL Mgmt.,* 64 F.4th. at 102. One problem that "Chapter 11 is designed to address" is "that the system of individual creditor remedies may be bad for creditors as a group when ***there are not enough assets to go around***." *Id.* (internal quotation marks and citation

omitted) (emphasis added).  Thus, although "insolvency is not strictly required," a debtor's "balance-sheet insolvency or insufficient cash flows to pay liabilities" are likely "always relevant." *Id.*

210.    At bottom, "financial distress is vital to good faith," *id.* 103. Accordingly, a "debtor who does not suffer from financial distress cannot demonstrate its Chapter 11 petition serves a valid bankruptcy purpose supporting good faith." *Id.* at 101. Moreover, the debtor's financial distress must be "immediate," "imminent," and "apparent." *Id.* at 102, 108.

211.    Although the Debtor relies on *Bestwall LLC v. Official Committee of Asbestos Claimants (In re Bestwall LLC)*, 71 F.4th 168 (4th Cir. 2023), the Fourth Circuit explained that the two cases are "simply not relevant" to one another. *Id.* at 182. Among other reasons, the Fourth Circuit explained that the *Bestwall* claimants did "not contend that Bestwall was not in financial distress when it filed for bankruptcy," and that appeal did not "involve a motion to dismiss filed on that basis." *Id.* Further, the Fourth Circuit acknowledged that it applies a "more comprehensive standard to a request for dismissal of a bankruptcy petition for lack of good faith" than the Third Circuit. *Id.*

## II.    LTL WAS NOT IN IMMEDIATE FINANCIAL DISTRESS AT THE TIME OF FILING

### A.    LTL's Post Hoc Rationales for Financial Distress Are Legally Insufficient

212.    The Third Circuit demands "evidence" of financial distress, rather than "conclusory allegations." *SGL Carbon*, 200 F.3d at 168.  In LTL 1.0, the Debtor failed to perform any detailed analysis of talc liabilities before filing for bankruptcy, and the Third Circuit held that LTL's after-the-fact projections of financial distress did not suffice and lacked reliability.  64 F.4th at 107–08.

213.    After the Third Circuit took LTL to task for failing to analyze its talc liability sufficiently before seeking bankruptcy protection, LTL did nothing to fix that defect for this new

filing.  LTL performed no meaningful analysis of its talc liability before re-refiling for bankruptcy

on April 4, 2023.  All of the Debtor's expert opinions in this case were generated after the fact.

214.    The Debtor must meaningfully analyze and establish its "gateway" eligibility for

bankruptcy before filing, not afterwards.  In *SGL Carbon*, for example, the Third Circuit dismissed

a bankruptcy petition for lack of good faith where the debtor sought to rely on post hoc litigation

assertions that "it was forced into Chapter 11 by serious economic difficulty stemming from the

litigation," when that rationale was not adequately supported by the "[debtor's] financial disclosure

documents" "[p]rior to filing." 200 F.3d at 166–67.  Judge Silverstein dismissed a bankruptcy

petition for failure to prove good faith where "Debtors did not analyze their current ability to pay

their debts as they came due prior to filing their bankruptcy cases."  *In re Rent-A-Wreck of

America, Inc*., 580 B.R. 364, 379 (Bankr. D. Del. 2018).  "The lack of credible facts demonstrating

financial distress supports a finding that these cases were not filed in good faith."  *Id*. at 382.

### B.       LTL Fails to Meet the Third Circuit's Standard for Financial Distress

#### 1.  Legal Standard for Financial Distress

215.    LTL has the burden of demonstrating financial distress, and it has failed to meet

that burden.  The Third Circuit requires that the Debtor's financial distress must be "immediate,"

"imminent," and "apparent"; an "attenuated possibility" of a future filing is insufficient.  64 F.4th

at 102, 108.  The Court of Appeals referred to "businesses teetering on the verge of a fatal financial

plummet" and drew comparisons to the Johns-Manville case, where the debtor faced "urgency,"

including " 'forced liquidation of key business segments,' " and *A.H. Robins*, which "had only $5

million in unrestricted funds" and was unable to borrow.  *Id*. at 103, 104 (citations omitted).

216.    The Third Circuit did not treat such "urgent[]," *id.* at 103, circumstances as merely

one illustrative type of financial distress that would warrant bankruptcy. Rather, it treated them, in

the context of a debtor made for bankruptcy to manage legacy litigation, as an ***essential***

*precondition* for a bankruptcy filing, warning that "[r]isks associated with premature filing may be particularly relevant in the context of a mass tort bankruptcy" and explaining that further litigation in the tort system would help, not hinder, LTL's reorganization.  *Id.* at 103 & n.14.  In addition, the Third Circuit opined that "testing the nature and immediacy of a debtor's financial troubles" is "necessary because bankruptcy significantly disrupts creditors' existing claims against the debtor."  *Id.* at 103.

217.    Although the Third Circuit stated that "we cannot today predict all forms of financial difficulties that may in some cases justify a debtor's presence in Chapter 11," *id.* at 102, this language reflected concerns pertaining to debtors operating ongoing businesses, which may need to file for bankruptcy to "enable a continuation of [their] business and to maintain access to the capital markets."  *Id.*  The Court of Appeals recognized that ongoing businesses could be threatened by "the exodus of customers and suppliers wary of a firm's credit-risk."  *Id.*  These concerns do not apply to LTL.  There is no evidence that LTL has lost employees, financing, royalties, or contracts as a result of talc litigation.  There has been no impairment of LTL's "business."  In fact, "LTL, whose employees are all J&J employees, is essentially a shell company 'formed,' almost exclusively, 'to manage and defend thousands of talc-related claims' while insulating the assets" of the consumer business.  *Id.* at 109.  As the Third Circuit found, and the parties do not now dispute, there are no "serious financial and/or managerial difficulties" that would otherwise be relevant to a financial distress inquiry for this Debtor.  *Id.* (quoting *SGL Carbon*, 200 F.3d at 164).  *See also In re Aearo Techs. LLC*, No. 22-02890-JJG-11, 2023 WL 3938436, at *17-18, 20 (Bankr. S.D. Ind. June 9, 2023), direct appeal certified (June 14, 2023) (relying heavily on Third Circuit precedent to hold that Aearo's filing could not "serve a valid reorganization purpose" because it "has been, and currently is, financially healthy," "timely meets

its obligations," and has "no reported cash flow problems," and can also draw on a funding agreement to pay its obligations outside bankruptcy; "unlike the debtors in Johns-Manville, Dow Corning, and A.H. Robins, Aearo is not presently suffering financial problems of the type that warrants Chapter 11 relief. Nor is Aearo creating or preserving value in these cases that would be lost outside of bankruptcy").

### 2. LTL Acknowledges Its Solvency

218.    The Third Circuit opined that a debtor's solvency is "likely always relevant" to financial distress. *LTL Mgmt.*, 64 F.4th at 102; *id.* at 103 n.14 (bankruptcy "filings usually involve 'impending insolvency'") (citation omitted).  LTL concedes it is solvent.[440]  Indeed, LTL's own evidence and testimony show that the assets of LTL far exceed its estimated liabilities.  The fair market value of the 2023 Funding Agreement, outside of bankruptcy, is approximately $30 billion due to the value of Holdco.  Even assuming, for purposes of this Motion, the accuracy of Dr. Mullin's $12 billion estimate of LTL's talc liabilities, inclusive of litigation costs *and of unfiled claims*, it is dwarfed by the value of the 2023 Funding Agreement.  Even in a hypothetical worst-case scenario of a forced liquidation of Holdco ($22.3 billion) *and* the stress test case of all talc liabilities ($21 billion), LTL has a cushion of $1.3 billion plus the $400 million value of RAM.  Under any estimate of liability in the record, LTL's talc liabilities are far less than its right to access on demand Holdco's $29.9 billion value.

### 3. LTL's Own Evidence Shows It Can Pay Its Debts As They Come Due

219.    LTL's own testimony shows it has the ability to pay its current and future debts as they come due.  The Debtor's president, chief financial officer, and chief legal officer, all

---

[440] *See* Dkt. 906, at 14 (LTL Surreply in Opp. to MTD) (explaining that its own expert "opinions show balance sheet solvency").

acknowledged that LTL, as of the bankruptcy filing, was able to meet its liabilities as they came due for the foreseeable future.

220.    Holdco's alleged illiquidity cannot establish a basis for LTL's financial distress. The Third Circuit held that the Debtor (LTL) is the focus of the financial distress, not Holdco or any other non-debtor entity.  *See LTL Mgmt.*, 64 F.4th at 105-106 ("Only LTL's Financial Condition is Determinative.").   This Court has noted that "*this* Debtor," "the Third Circuit instructs," "is the entity upon which the inquiry should be focused."[441]

221.    The Third Circuit specifically allowed for the possibility that "a draw on the payment right [might require] a forced liquidation of New Consumer"—Holdco's former name— "and have a 'horrific impact' on th[at] compan[y]."  64 F.4th at 107; *see also id.* at 109 ("we cannot say any potential liquidation by LTL of Royalty A&M" "to pay talc costs would amount to financial distress"). The Third Circuit rejected the suggestion that, "out of concern for its affiliates, LTL may avoid drawing on the payment right to its full amount," explaining that such forbearance would "disregard[] the duty of LTL to access its payment assets." *Id.* at 107.

222.    Holdco's financial condition is relevant "only to the extent that it informs [the Court's] view of the financial condition of LTL itself." *Id.* at 106.   Hence, a partial or even complete liquidation of Holdco in response to an LTL funding request does not establish financial distress on the part of LTL.   Further, the potential forced liquidation of Holdco assets is precisely the kind of speculation that the Third Circuit has deemed irrelevant to the key question of whether

---

[441] Adv. Pro. Dkt. No. 94, at 19 (emphasis in original).

LTL was in financial distress on the eve of filing.  *Id.* at 107. The financial condition of Holdco did not cause LTL financial distress on the eve of filing.

223.    J&J deliberately kept Holdco (then New JJCI) out of bankruptcy when it chose to implement the divisive merger and continues to keep Holdco out of bankruptcy now.  Any illiquidity on Holdco's part is self-inflicted—a product of J&J's cash-management decisions and limits on dividend payments to Holdco.  Any illiquidity is also a result of J&J's spin-off of the consumer business to Kenvue that was undertaken while the first bankruptcy was still pending and deprived LTL of access to what the Third Circuit described as "Old Consumer's cash-flowing brands and products along with the profits they produced."  *Id.* at 106.

224.    Even assuming that, as the Debtor suggests, Holdco's financial distress were relevant, the evidence presented to the Court demonstrates Holdco does not meet the Third Circuit's requirement of immediate financial distress. ████████████████████

████████████████████████████████████████████████████

████████████████████████████[442]

### 4.  LTL Has Failed to Show Any *Immediate* Financial Distress

225.    The time horizon of the potential liabilities also makes clear that LTL was not in immediate financial distress when it filed for bankruptcy. ████████████████

████████████████████████████████████████████████████

██████████████[443] ████████████████████████████████████

████████████████████████████████████████████████████

---

[442] ████████████████████████████████████████████

[443] ████████████████████████████; June 28, 2023 PM Hearing Tr., at 160:15-21.

█████████████████████████████[444]    Moreover, the evidence shows that, under

J&J policies, Holdco has the ability to borrow from J&J's internal bank against Holdco's roughly

$30 billion in assets.

226.    LTL's own evidence disproves any assertion of "immediate" or "imminent"

financial distress.    LTL asserts that it costs "$2 million to $5 million" per trial,[445] and Mr.

Wuesthoff testified that LTL could not realistically try more than 10 cases per year.[446]    The Third

Circuit found that LTL's "continuing run rate was between $10 million to $20 million per month."

64 F.4th at 94.    Thus, at a maximum, LTL would face no more than $290 million in costs per year

in the tort system ($240 million plus $50 million, even assuming that the two kinds of legal spend

are additive).    At that rate, LTL's own evidence show that Holdco's *existing* cash on hand of more

than $1.3 billion would cover nearly *4.5 years* of LTL's litigation costs, even with *no* additional

dividend revenue, *no* borrowing, and *no* liquidation of any Holdco assets.    Moreover, as of the

April 4, 2023 bankruptcy date, LTL's board believed Holdco would be receiving an even larger

dividend in June 2023 and expected to have a right to access over $2.2 billion in cash to pay talc

claims.    The $2.2 billion would cover over *7.5 years* of LTL's litigation costs at the historical run

rate.

227.    LTL's own experts showed that it faces no immediate financial distress.    According

to Dr. Mullin's report, LTL's *total* costs and liabilities in the first three years upon return to the

tort system would range from $2.7 billion to $6.9 billion.    Mr. Burian's re-analysis, using more

---

[444] ████████████████████████████

[445] Dkt. 614, at 40.

[446] TCC Tr. Ex. 1006, at 180:7–11 (Feb. 14, 2022 Hearing Tr.); *see also* TCC Tr. Ex. 1011, at 33:8–11 (Feb. 18, 2022 Hearing Tr.) (Mr. Gordon representing to this Court that 10 cases per year was the maximum).

realistic assumptions, reduced those ranges to $0.6 billion to $4.8 billion **total** for the first three

years.  LTL has failed to demonstrate that these obligations would trigger financial distress.

228.    In dismissing LTL 1.0, the Third Circuit warned of the danger of "premature"

bankruptcy filings in mass tort cases and observed that "a longer history of litigation outside of

bankruptcy may provide a court with better guideposts when tackling these [mass tort bankruptcy]

issues."  64 F.4th at 103.   That reasoning requires dismissal here. According to LTL, only 49

cosmetic talc cases have gone to trial, with 27 resolved.[447]   The talc track record pales in

comparison with Dalkon Shield, where "the Court and stakeholders had the benefit of data from

15 years of tort litigation by A.H. Robins before its filing."  64 F.4th at 103 n.13.  According to

the Third Circuit, the prior Dalkon Shield litigation yielded a "claimants' trust [that] has been

recognized as one that functioned effectively and remained solvent for years."  *Id*.  Even where

defendants have ultimately resorted to bankruptcy to resolve latent injury claims, they have

typically settled more claims outside bankruptcy first.  *See, e.g., In re Paddock Enters., LLC*, No.

20-10028 (LSS), (2022 WL 1746652, at *6 (Bankr. D. Del. May 31, 2022) (over 400,000 claims);

*Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 722 (D. Del. 2005) (over 330,000

claims).

229.    LTL's contention that consolidated trials will drive up its defense costs does not

withstand scrutiny.  ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████[448]  In

fact, Dr. Mullin estimated that consolidation would reduce costs on a per-plaintiff basis by 20%.[449]

---

[447] TCC Tr. Ex. 1011, at 32:15–16 (Feb. 18, 2022 Hearting Tr.) (emphasis added).

[448] *See* ██████████████████████████████████████████████████████████
████████████████████████████ ; *see also* June 27, 2023 Hearing Tr., at 265:14-25.

[449] June 29, 2023 PM Hearing Tr., at 91:12-92:9.

Similarly, courts have found that consolidation will ***reduce*** defense costs, not ***increase*** them.[450]
Courts decide consolidation on a case-by-case basis, according to the relevant factors, which
provide that consolidation should be denied where it would prejudice a defendant or disserve
judicial economy.  LTL has not cited any case finding that increased defense liability is generally
the result when actions are consolidated.

230.    LTL has pointed to a supposed increase in the volume of talc claims, but additional
talc cases are not a new development and cannot have caused immediate financial distress to the
Debtor as of April 4, 2023.  The original 2021 bankruptcy filing included all current and future
talc claims.  The Third Circuit was aware that there would be additional cases in the future and
accounted for them in its reasoning.  *LTL Mgmt.*, 64 F.4th at 102, 108.  Those unfiled claims were
known to the Debtor when it formulated the $8.9 billion settlement offer and are part of the $12
billion-$21 billion range for talc liability offered by Dr. Mullin.  They therefore cannot be an
independent basis to find financial distress.

231.    Moreover, those claims are largely unverified and are still being processed by firms
that have signed PSAs to determine whether the potential claims are timely and are supported by
the evidence.  They appear to include many claims involving types of cancer would be non-
compensable in the tort system.  Claims that are not compensable in the tort system, with no
leverage to force litigation or resolution, cannot be the basis for financial distress.  Unfiled

---

[450] *See Campbell v. Boston Scientific Corp.*, 882 F.3d 70, 76 (4th Cir. 2018) ("Both plaintiffs and defendants benefit from lessened litigation costs."); *Nayak v. Herbison*, No. 1:14-CV-02211, 2015 WL 11605255, at *1 (M.D. Pa. May 26, 2015) (consolidating two actions, in part, because "the overall costs of litigation should be reduced"); *Sprafka v. DePuy Orthapedics, Inc.*, No. 22-331 (DWF/DTS), 2022 WL 17414477, at *2 (D. Minn. Dec. 5, 2022) (concluding that consolidation is appropriate, including because "all parties will benefit from the lessened litigation costs").

claims—which, even if filed, will take years to litigate—represent the kind of premature speculation on which a court should not rely.[451]

### 5. LTL Did Not Assume J&J's Talc Liabilities

232.    The Third Circuit questioned whether LTL faced any financial distress at all, because its ostensible assumption of J&J's talc liabilities under a 1979 agreement was legally uncertain.  The Third Circuit opined that "it is not obvious LTL must indemnify J&J for the latter's independent, post-1979 conduct that is the basis of a verdict rendered against it."  64 F.4th at 108 n.16.  "It is also not clear the indemnity should be read to reach punitive damage verdicts rendered against J&J for its own conduct. Additionally, the Court never discussed how it reached its conclusion that Old Consumer assumed responsibility from J&J for all claims relating to [STS]."  *Id.*  The Third Circuit's concern was well founded: LTL did not assume J&J's talc liabilities.  LTL never performed any analysis of whether its promise to indemnify J&J was valid under New Jersey law.[452]

233.    The 1979 Transfer Agreement was limited to "liabilities and obligations of every kind and description which are allocated on the books or records of J&J as pertaining to [its] BABY Division," 64 F.4th at 108 n.16, and LTL has not provided sufficient proof that talc liabilities are included within that language. The phrase "books or records" has a specific meaning in corporate law.  N.J. Stat. Ann. § 14A:5–28 (West 2021) (describing "books," "records," "minutes" and other documents).  The provision here is a far cry from the broad language in the assumption agreement

---

[451] *Lithuanian Com. Corp. v. Sara Lee Hosiery*, 179 F.R.D. 450, 457 (D.N.J. 1998) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997); *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009)) (rejecting "speculation and conjecture"); *Horan v. Dilbet, Inc.*, No. CIV. A. 12-2273, 2015 WL 5054856, at *7 (D.N.J. Aug. 26, 2015) ("mere allegations, conclusions, conjecture, and speculation" should not be considered) (citing *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir.1995)).

[452] June 27, 2023 Hearing Tr., at 232:10-233:10.

in *Bouton v. Litton Indus., Inc*., 423 F.2d 643 (3d Cir. 1970), where the assumption agreement

referred to "all liabilities and obligations . . . in respect of the contracts and commitments . . . and

all other contracts and commitments entered into in the regular and ordinary course of . . . business

at any time." *Id*. at 649.

234.     The Third Circuit also questioned whether LTL's predecessor could have assumed

liability for J&J's STS talc product.  The 1979 Agreement could not have encompassed liabilities

arising from STS because, in 1979, STS was not manufactured or sold by the Baby Products

Division, but rather by another J&J company.  Because STS was not a part of J&J's Baby Products

Division, the 1979 Agreement could not have transferred to LTL's predecessor any talc liabilities

relating to STS.  Nor could the 1979 Transfer Agreement have encompassed liabilities arising from

J&J's Windsor talc mines, because in 1979, Windsor was a separate J&J subsidiary and not a part

of J&J's Baby Products Division.

235.     In addition, the Third Circuit questioned whether LTL's predecessor could have

assumed J&J's punitive damage liability.   Indeed, New Jersey public policy prohibits

indemnification for punitive damages.  *Johnson & Johnson v. Aetna Cas. & Sur. Co*., 667 A.2d

1087, 1089–93 (N.J. Sup. Ct. App. Div. 1995).  Accordingly, there is no legal basis for finding

that LTL has assumed J&J's punitive damages liability.

236.     These considerations provide an independent basis for concluding that LTL has

failed to demonstrate financial distress.

237.     Court judgments have determined that J&J bears independent liability for its own

wrongdoing.  At most, LTL would be liable only for a portion of any talc liabilities.  LTL put

forward no evidence establishing Old JJCI's and J&J's respective shares of talc liability.

Moreover, even where Old JJCI and J&J had joint and several liability, there is no reason to believe

that talc claimants would pursue recovery on judgments from LTL (Old JJCI's successor), rather

than J&J.  Indeed, while the record established that J&J made book entries charging Old JJCI for

historical talc expenses and liabilities, LTL came forward with no evidence that any talc claimant

actually sought collection from Old JJCI.

### III.    EVEN IF LTL WERE FINANCIALLY DISTRESSED, CONTRIVED FINANCIAL DISTRESS CANNOT PROVIDE A GOOD FAITH BASIS FOR A BANKRUPTCY FILING

#### A.    The Contrived Appearance of Financial Distress Cannot Establish Good Faith

238.    Even assuming *arguendo* that LTL could establish the appearance of financial

distress (and it cannot), this bankruptcy must still be dismissed for lack of good faith.  In seeking

to create the appearance of financial distress, the Debtor points to circumstances of LTL's and

J&J's own making, including (i) LTL's surrender of its rights under the 2021 Funding Agreement;

(ii) alleged limits on Holdco's liquidity in light of the January 2023 transfer of the consumer

business to Kenvue and Janssen, which deprived LTL of access to the cashflow of the consumer

business; and (iii) asserted uncertainty under J&J's centrally managed cash management system

as to whether J&J will refuse to provide liquidity to its wholly owned subsidiary Holdco, despite

never having refused to do so.  Regardless of whether any of these transactions or circumstances

would satisfy the elements of a fraudulent conveyance claim, they represent (in the best light to

LTL) self-created financial distress.  They cannot create a genuine need for reorganization and do

not justify resort to the tools of bankruptcy. A highly solvent non-debtor's attempt to manufacture

the appearance of financial distress in a subsidiary as a pretext for bankruptcy, solely to benefit

the non-debtor, cannot provide the basis for good faith.

239.    "The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the

'honest but unfortunate debtor.'"  *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007).

Congress did not enact the Code to enable debtors to address artificially self-imposed financial

distress, much less to use that distress as a pretext for resolving mass tort (or other disfavored) liabilities.  The Third Circuit has noted that bankruptcy "can impose significant hardship on particular creditors."  64 F.4th at 103.  The Supreme Court recently held that creditor interests can outweigh the debtor's interest in a "fresh start," particularly in cases involving fraud (even when not committed by the debtor herself).  *Bartenwerfer v. Buckey*, 143 S.Ct. 665, 676 (2023).  *See also In re South Beach Sec., Inc.*, 606 F.3d 366, 377 (7th Cir. 2010) ( "to make a firm that one controls insolvent in order to . . . shield assets from judgment creditors, is not a proper invocation of bankruptcy law") (citing *BEPCO*, 589 F.3d at 625–26).

240.    This bankruptcy is strikingly different from other mass tort bankruptcies approved by the courts.  The mass tort bankruptcies to which the Third Circuit referred—Johns-Manville, Dow Corning, and Dalkon Shield, *see* 64 F.4th at 104—involved pre-existing operating companies whose financial distress arose organically, because tort liability had been asserted against them, not because a parent entity had arbitrarily manipulated its assets in an effort to create the appearance of financial distress.  Prior mass tort bankruptcies were intended to preserve and rehabilitate operating companies.  In contrast, LTL's supposed "financial distress" is (if anything) a product of J&J's own choices.

241.    J&J's approach would allow even financially healthy companies to shed disfavored liabilities by (i) creating corporate shells with no genuine business activities; (ii) manufacturing "financial distress" through staged transactions; and (iii) invoking the bankruptcy system while keeping the operating business connected with that liability safely outside the bankruptcy system (and exposed to the costs only to the extent the parent voluntarily allowed).  Mass tort liabilities, environmental liabilities, and other unsecured liabilities (such as employer retiree liabilities) could be resolved or extinguished using the same impermissible strategy.  This approach would upset

106

the Code's "balancing process between the interests of debtors and creditors," which the good faith

standard is meant to maintain. *SGL Carbon*, 200 F.3d at 161-162 (citation omitted).

242.    Moreover, any "financial distress" in this case (and LTL has failed to prove any)

was manufactured solely for the benefit of its ultimate parent, J&J, which is further evidence of

bad faith.  The Third Circuit found bad faith in *BEPCO* because the debtors' managers were

"employed by" the non-debtor parent, and that parent "was ultimately in control of whether the

Debtors filed" for bankruptcy. *BEPCO,* 589 F.3d at 624–25.  The Third Circuit held that a petition

is in bad faith where it is "primarily concerned with protecting [a non-debtor parent], not the

Debtor." *Id.* at 624.

243.    Bad faith is even clearer here.  All of the relevant transactions in this case have been

orchestrated by J&J.  LTL's board simply abandoned the 2021 Funding Agreement, with no

negotiation with J&J—even though refused any funding request under that Agreement.  The board

was not even told of the supposed "void or voidable" issue until April 2, long after J&J began

planning the second bankruptcy.  The board did not reach out to J&J to discuss the "void or

voidable" issue, never requested that any analysis be performed regarding it, and did not consider

obtaining new counsel or advice.  The board voted to authorize LTL 2.0 on the very same day it

learned of the "void or voidable" issue, while LTL 1.0 was still pending.  LTL went so far as to

assert a "common interest" with J&J regarding the surrender of the 2021 Funding Agreement.

LTL's managers—current or former J&J employees—have forsaken LTL's interests in their effort

to serve J&J's.  Mr. Wuestoff, LTL's president, did not seem to understand fundamental terms of

the 2023 Funding Agreement and J&J Support Agreement, but agreed to them anyway.

244.    The manner in which LTL undertook the 2023 restructuring transactions also gives

rise to an independent basis for finding bad faith, because the transactions were undertaken to

107

evade the Third Circuit's ruling, in violation of the Debtor's fiduciary duties and with no disclosure to the U.S. Trustee, the TCC, or this Court.  "[A] good faith standard protects the jurisdictional integrity of the bankruptcy courts by rendering their equitable weapons . . . available only to those debtors and creditors with 'clean hands.'"  *SGL Carbon*, 200 F.3d at 161 (citation omitted).  "As a general matter, bankruptcy relief is equitable in nature, and, as a general rule, equitable remedies are not available to any party who fails to act in an equitable fashion."  *Id*. (citation omitted); *see also BEPCO*, 589 F.3d at 624 n.14 (debtor's breach of fiduciary duty is "relevant to the good faith inquiry").

245.    A debtor in possession is "bound by all of the fiduciary duties of a bankruptcy trustee."  *In re Insilco Techs., Inc*., 480 F.3d 212, 215 n.3 (3d Cir. 2007).  Those duties include "[o]pen, honest and straightforward disclosure to the Court and creditors" and the "duty to protect and conserve property in its possession for the benefit of creditors."  *In re Marvel Ent. Grp., Inc*., 140 F.3d 463, 474 (3d Cir. 1998) (internal quotation marks and citations omitted).  LTL undertook the 2023 restructuring transactions, including the surrender of the 2021 Funding Agreement (LTL's most significant asset), during the pendency of LTL 1.0.  Discussions with J&J began about terminating the first Funding Agreement shortly after the Third Circuit's January 30, 2023 decision, and the LTL board authorized the termination of that Agreement and the filing of the second bankruptcy on April 2, 2023 – all during the pendency of LTL 1.0.

246.    These transactions are not protected by the business judgment rule.  They were non-ordinary-course transactions that occurred while the Debtor had fiduciary duties to preserve corporate assets (like the 2021 Funding Agreement) for the benefit of creditors.  Moreover, the 2023 restructuring was an insider transaction between a corporation and its controlling shareholder.  LTL's board was neither disinterested nor independent.  *First Union Corp. v.*

*Suntrust Banks, Inc.*, No. 01-CVS-100075, 2001 WL 1885686, at *10 (Sup. Ct. N.C. Aug. 10, 2001).

247.    LTL is wrong in arguing that its fiduciary violations can be ignored if a plan is confirmed.  A breach of fiduciary duty cannot be excused on the ground it has produced a greater good.  "[T]he objective merit of a decision will not cure a fiduciary breach." *Struble v. N.J. Brewery Emps.' Welfare Tr. Fund*, 732 F.2d 325, 335 (3d Cir. 1984), *disapproved on other grounds by Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989).

### B.    LTL's Assertions of Financial Distress Establish the Elements of Fraudulent Conveyance

248.    LTL faces a dilemma with respect to whether the 2022-2023 Restructuring Transactions created financial distress.  In an effort to argue for financial distress, LTL contends that it does not have sufficient "liquid assets" necessary "to pay talc costs."[453]  LTL argues that, after replacing the 2021 Funding Agreement with the 2023 Funding Agreement, its cash would be exhausted "in less than six months" defending talc claims in the tort system.[454]  If false, those assertions would require dismissal for lack of financial distress.  If true, LTL's own assertions would prove the elements of both actual and constructive fraudulent conveyance claims.  By itself, fraud amounts to bad faith and requires dismissal under Section 1112(b)(1).  Moreover, attempting to base financial distress on fraudulent transactions is ultimately self-defeating, because the transactions would be subject to avoidance under both state and federal law—meaning that the assets would be returned to the estate, the illusion of financial distress would disappear, and dismissal would be required.

---

[453] Dkt. 614, at 39 (LTL MTD Opposition Brief).

[454] *Id.* at 35, 40, 41.

249.    The fraud issue is not "premature." Further proceedings are unnecessary, because LTL's own assertions establish the facts necessary to satisfy the elements of fraud. Even the issue of intent can be decided as a matter of law where, as here, there is no genuine dispute of material fact. *E.g.*, *Ritchie Cap. Mgmt., LLC v. Stoebner*, 779 F.3d 857, 861 (8th Cir. 2015); *Brown v. Third Nat'l Bank* (*In re Sherman*), 67 F.3d 1348, 1355 (8th Cir. 1995); *F.D.I.C. v. Anchor Props.*, 13 F.3d 27, 32 (1st Cir. 1994). Nor is there any need to wait for the TCC's derivative standing motion, because LTL is on the horns of a dilemma, and either horn requires dismissal. If LTL's assertions of financial distress are accepted, then it has proven the elements of—and procured this bankruptcy through—actual and constructive fraud. If those assertions of financial distress are (correctly) rejected, LTL 2.0 must be dismissed under the Third Circuit's decision.

250.    Section 548(a)(1)(A) provides that transfers made with the "actual intent to hinder, delay, or defraud" creditors can be avoided and recovered for the benefit of creditors. *See* 11 U.S.C. § 548(a)(1)(A). If LTL's assertions of financial distress are accepted, this case involves a textbook example of an actual fraudulent transfer: reducing value available to pay claims amounts to actual intent to hinder, delay, or defraud one's creditors. *See In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 667 (7th Cir. 2013). Whether LTL's ultimate goal was to facilitate a bankruptcy resolution is irrelevant. "Under § 548(a)(1)(A), liability can attach even if the party had good intentions and did not intend to cause harm." Donna Larsen Holleran, BANKRUPTCY CODE MANUAL § 548:18 (May 2023 update). Similarly, LTL's insistence that its post-dismissal machinations have not rendered it insolvent is also irrelevant, because insolvency is not an element of actual fraud. *See* 5 COLLIER ON BANKRUPTCY ¶ 548.04[1][b][iii] ("[S]ection 548(a)(1)(A) does not require the trustee to show that the debtor was insolvent when the transaction occurred or that the transaction rendered the debtor insolvent.").

110

251.    Under Section 548(a)(1)(B), a transfer can be avoided as constructively fraudulent

if it was made in exchange for less than "reasonably equivalent value" and if one of three financial

conditions is present—*i.e.*, balance sheet insolvency, cash flow insolvency, or unreasonably small

capital.  *See* 11 U.S.C. § 548(a)(1)(B).

252.    LTL's assertion that neither the Debtor nor Holdco has sufficient "liquid assets"

necessary "to pay talc costs,"[455] if true, would establish cash flow insolvency.  In addition, the

Third Circuit has interpreted "unreasonably small capital" in a way that LTL's assertions would

also meet.[456]  Thus, LTL's allegations regarding its financial distress, if credited, necessarily prove

two of the three sufficient financial conditions under section 548(a)(1)(B), as well as under New

Jersey law.[457]

253.    The Third Circuit warned in footnote 18 of its opinion that surrender of the 2021

Funding Agreement would be subject to challenge as a constructive fraudulent conveyance.  The

Debtor's interpretation of the Third Circuit's opinion—that it was providing a suggested blueprint

for a second bankruptcy filing—is unconvincing.  The Debtor focuses on the Third Circuit's

recognition of "an apparent irony": that "J&J's triple A-rated payment obligation for LTL's

liabilities . . . weakened LTL's case to be in bankruptcy."  64 F.4th at 110-11.  But the Third

---

[455] Dkt. 614, at 39 (LTL MTD Opposition Brief).

[456] Compare *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070, 1073 (3d Cir. 1992) (inadequate capital turns on the nature of the debtor's business and whether it is "reasonably foreseeable" that the debtor will be able to "generate sufficient profits to sustain operations"), with *LTL Mgmt.*, 64 F.4th at 108 (LTL was not in financial distress because it had "access to cash" to pay talc claims in full as they come due "for the foreseeable future.").

[457] Under the New Jersey fraudulent transfer statute, a transaction is avoidable as a constructive fraudulent transfer if the debtor acted "(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (a) [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) [i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due." N.J. Stat. Ann. § 25:2-25(a)(2) (West 2021).

Circuit, in the next sentence, explained that "this perceived incongruity [is] dispelled" by the nature of the bankruptcy system. *Id.* at 111.

254.    LTL's allegations, if true, would also establish that the 2021 Funding Agreement and the 2023 Funding Agreement do not have the same reasonably equivalent value.  The very basis for LTL's argument for financial distress is that, under the 2023 Funding Agreement, the Debtor does not have the same ability to fund cash payments to talc claimants as under the 2021 Funding Agreement.  Accordingly, under LTL's own allegations, the value of the 2021 Funding Agreement and the 2023 Funding Agreement are not equivalent at all, let alone reasonably equivalent in value.

### C.    The Debtor's Arguments for Good Faith Are Flawed

#### 1.    Resolving Mass Tort Liability, By Itself, Is Not a Valid Reorganizational Purpose

255.    The Third Circuit ruled out resolving mass tort liability, standing alone, as a valid reorganizational purpose and held that resolving mass torts, even if they are "a more-than-thorny problem," cannot itself justify bankruptcy. *Id.,* 64 F.4th at 111. A desire to invoke bankruptcy remedies is insufficient. *See Id.,* 64 F.4th at 101; *Integrated Telecom*, 384 F.3d at 126–129.

256.    Although the Third Circuit stated that, "***when financial distress is present***, bankruptcy may be an appropriate forum for a debtor to address mass tort liability," 64 F.4th at 104 (emphasis added), that statement does not help LTL.  The Third Circuit's statement merely reflects the fact that, when the debtor otherwise is properly in bankruptcy, it may use the tools of bankruptcy to address mass tort liability.  The Court of Appeals made clear that the existence of mass tort liability is not equivalent to financial distress.

257.    LTL, on its own, lacks a valid reorganizational purpose.  As the Third Circuit explained, it is a "shell company 'formed,' almost exclusively, 'to manage and defend . . . talc-

related claims' while insulating . . . the assets" of its affiliates. *Id.* at 109 (citation omitted). It has no "going concern" to preserve, nothing to rehabilitate, no employees to protect, or no genuine trade relationships to maintain. LTL "faced [no] 'serious financial and/or managerial difficulties' calling for the need to reorganize" to achieve its limited purpose; absent that need to reorganize, "LTL's petition has no valid bankruptcy purpose." *Id.* at 109-10 & n.19 (citation omitted); *see also BEPCO*, 589 F.3d at 619 (debtor had "no going concerns to preserve—no employees, offices, or business other than the handling of litigation").

### 2. The "Void" or "Voidable" Argument Lacks Merit

258.    There is no merit to LTL's argument that the Third Circuit decision rendered the 2021 Funding Agreement "void or voidable" due to a frustration of purpose. Indeed, LTL has never specified whether it contends the Agreement was "void" of whether it was "voidable"—an omission suggesting that even LTL harbors uncertainty about its position. Either way, there was no frustration of purpose and the 2021 Funding Agreement remained valid and binding.

259.    LTL's premise is false. The Third Circuit's decision did not "change the law." The Third Circuit explained that its decision was compelled by longstanding circuit precedent. *LTL Mgmt.*, 64 F.4th at 101–03. The Third Circuit's ruling accords with extensive caselaw from other circuits (in fact, every court of appeals to have considered the financial distress issue), as well as the legislative history of Chapter 11. *Id*. at 103–04 & n.14.

260.    Moreover, under North Carolina law, which governs the 2021 Funding Agreement,[458] frustration of purpose is merely an affirmative defense to a breach of contract action. *Brenner v. Little Red School House, Ltd*., 274 S.E.2d 206, 209 (N.C. 1981). That affirmative defense never came into play, because J&J never refused to make a payment under the

---

[458] TCC Tr. Ex. 792, at § 9 (2021 Funding Agreement).

2021 Funding Agreement, and no businessperson at J&J ever indicated that it would refuse to do

so. Instead, after the LTL board first learned of the issue at the April 2, 2023 meeting, LTL

voluntarily walked away from the 2021 Funding Agreement and surrendered its rights to a $61.5

billion ATM. The board commissioned no independent analysis and engaged in no negotiation

with J&J.

261. Even if frustration of purpose had come into play, LTL cannot satisfy its elements

under North Carolina law. "Essentially, there must be an implied condition to the contract that a

changed condition would excuse performance; this changed condition causes a failure of

consideration or the expected value of performance; and that the changed condition was not

reasonably foreseeable." *Faulconer v. Wysong and Miles Co.*, 574 S.E.2d 688, 691 (N.C. App.

2002). "The [frustration] doctrine is a 'narrow one,' and its utility is 'limited to instances where a

virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party[.]'"

*Caper Corp. v. Wells Fargo Bank, N.A.*, 578 F. App'x 276, 288 (4th Cir. 2014) (citation omitted).

262. There was no "implied condition" in the Funding Agreement limiting J&J's

funding obligation to a bankruptcy proceeding. To the contrary, J&J expressly agreed that its

funding obligation would also apply outside bankruptcy.  LTL made such representations to this

Court and the Third Circuit, [459] and it is judicially estopped from arguing otherwise.[460]

263.    If "the parties have contracted in reference to the allocation of the risk involved in

the frustrating event, they may not invoke the doctrine of frustration to escape their obligations."

*Brenner,* 274 S.E.2d at 209; *The Currituck Assocs. v. Hollowell*, 601 S.E.2d 256, 265 (N.C. Ct.

App.) (frustration doctrine was inapplicable where the party could have protected itself "by the

terms of the [] agreement").  LTL and J&J had every opportunity to include language in the 2021

Funding Agreement limiting J&J's funding obligation or making it "void or voidable" in the event

of dismissal ***for any reason*** and chose not to do so.  Frustration of purpose is not an excuse to

override the clear terms of a contract.  *See Golden Triangle #3, LLC v. RMP-Mallard Pointe, LLC*,

No. 19 CVS 13580, 2022 WL 3048320, at * 19 (Sup. Ct. N.C. Aug. 2, 2022).  Highly instructive

is Judge Ferguson's decision in *Congoleum Corp. v. Pergamen (In re Congoleum Corp.)*, Adv.

---

[459] Mr. Gordon told this Court, in the presence of Mr. Haas, J&J's head of worldwide litigation, that the Funding Agreement would apply even if LTL's case were dismissed: "[w]hether there was no case filed or whether the case is filed or dismissed, the money's available for that purpose. . . . It's there to assure this isn't treated or consider[ed] a fraudulent conveyance." TCC Tr. Ex. 1011, at 61:1–20 (Feb. 18, 2022 Hearing Tr.). During the first bankruptcy, Mr. Kim similarly assured this Court that the 2021 Funding Agreement applied outside bankruptcy. TCC Tr. Ex. 533, ¶ 27 (Kim First Day Decl. LTL 1.0) ("at any time when there is no bankruptcy case"). Mr. Kim made the same admission, under oath, ███████████████ and at the April 18, 2023 hearing. ██████████████████████████████████████; TCC Tr. Ex. 788, at 61:7–14 (Apr, 18 2023 Hearing Tr.). Mr. Katyal acknowledged the same thing before the Third Circuit. TCC Tr. Ex. 768, at 83:21–25 (Sept. 19, 2022 Third Circuit Oral Arg. Tr.) ("Mr. Katyal:  Now you had asked before, Your Honor, I just have to slightly correct something. I understand that the funding agreement does have provisions for funding outside of bankruptcy.  The Court: Yeah, that's what I thought.").

[460] As this Court has opined, "[t]he Debtor cannot now take a contrary position, which better serves its current interests." *In re Congoleum Corp.*, 627 B.R. 62, 72 (Bankr. D.N.J. 2021); *see also Stewart Title Guaranty Co. v. Kesler (In re Kesler)*, No. 12-12716 (MBK), 2013 WL 653089, at *6 (Bankr. D.N.J. Feb. 21, 2013) (debtor third-party actions barred by judicial estoppel). The Third Circuit has often judicially estopped litigants from asserting inconsistent positions even when the initial court did not accept the party's prior position. *See Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 419–20 (3d Cir. 1988); *Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 321 (3d Cir. 2003); *Danise v. Saxon Mortg. Servs. Inc.*, 738 F. App'x 47, 50–51 (3d Cir. 2018). Thus, the fact that the Debtor lost first LTL bankruptcy does not prevent judicial estoppel from barring its inconsistent positions. *See Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 357 (3d Cir. 1996) (party asserting an inconsistent position need not have benefitted from the earlier position in order to be precluded by judicial estoppel).

No. 05-06245, 2007 WL 4571086 (D.N.J. Dec. 28, 2007), which held that "the Debtor's argument that this Court's interpretation of *In re Combustion Eng'g, Inc*., 391 F.3d 190 (3d Cir. 2005) 'frustrates' the principal purpose of the parties is also not persuasive" and "without merit." *Id.* at *10. The court looked to "the objective intent of the parties" as recited in the documents at issue and concluded that the debtor's post hoc argument about its purpose was reflected "[n]owhere in the documents submitted." *Id.* Precisely the same is true here. Nowhere does the 2021 Funding Agreement provide that its terms apply only in bankruptcy. Precisely the opposite: It expressly applied outside bankruptcy. And the parties consistently represented that it applies "whether no case is filed or a case is filed and dismissed."[461] As in *Congoleum*, LTL seeks to rewrite an agreement after the fact to include provisions it does not contain– and that LTL's lawyers have disclaimed in this Court and the Third Circuit.

264.    Next, frustration of purpose does not apply because the Third Circuit's decision was reasonably foreseeable. LTL acknowledged before this Court on April 18, 2023, that dismissal was a "reasonably foreseeable" event and that LTL understood that its case "might be dismissed at some point."[462]    Previous divisive mergers had been challenged prior to LTL's filing for bankruptcy in October 2021. "If the frustrating event was reasonably foreseeable, the doctrine of frustration is ***not a defense***." *Brenner*, 274 S.E.2d at 209 (emphasis added); *see also Fairfield Harbour Prop. Owners Ass'n, Inc. v. Midsouth Golf, LLC*, 715 S.E.2d 273, 284 (N.C. App. 2011)

---

[461] June 27, 2023 Hearing Tr., at 195:10–196:18 (Kim).

[462] TCC Tr. Ex. 788, at 209:14–210:5 (Apr. 18, 2023 Hearing Tr.).

(frustration of purpose defense "is inapplicable where the frustrating event is reasonably foreseeable").  That principle is dispositive here.[463]

265.    There is no merit to the argument that, although dismissal was foreseeable, the Third Circuit's rationale was not.  The **basis** for the Third Circuit's opinion is irrelevant to the frustration of purpose doctrine.  The provisions in the 2021 Funding Agreement under which J&J agreed to provide funding outside of a bankruptcy proceeding are without qualification.  As LTL admitted, there are "no conditions or any material conditions on the permitted funding uses under the [2021 Funding Agreement]."[464]  Moreover, the Third Circuit explained that there was no "incongruity" in holding that LTL's "ample financial support" under the 2021 Funding Agreement made it ineligible for a "[bankruptcy] system designed to protect those without" such resources. *LTL Mgmt.*, 64 F.4th at 111.  J&J can hardly claim surprise that the Third Circuit took LTL "at [its] word" that "there was not 'any imminent or even likely need of [it] to invoke the Funding Agreement to its maximum amount or anything close to it.'" *Id.* at 108–109.

266.    Nor is there any merit to the argument that J&J's "purpose" in making its funding commitment was limited to funding a bankruptcy plan.  Mr. Gordon told this Court, in the presence

---

[463] LTL has cited to *Union County Utilities Auth. v. Bergen Cnty. Utilities Auth.*, 995 F. Supp. 506 (D.N.J. 1998), but that case applied New Jersey rather than North Carolina law and is inapposite for further reasons.  *Union County* involved the very different situation where the New Jersey District Court, applying a Third Circuit decision invalidating New Jersey's regulatory scheme for out-of-state hazardous waste disposal on dormant commerce grounds, held that certain provisions of contracts entered into via negotiations that prohibited out-of-state competition were retroactively void and unenforceable.  *Id.* at 515.  The District Court left to the state courts "how best to allocate the contractual liabilities and economic burdens" among the parties stemming from the retroactive effect of the injunction based on "the particulars of the contractual relationship between the parties." *Id.* at 516.  The District Court did not apply the frustration of purpose doctrine but merely mentioned it, and only in the context of listing the "entire arsenal" of New Jersey "state contract law" doctrines available to state courts in making these determinations. *Id.*  To state the obvious, the decision has nothing to do with North Carolina's frustration of purpose doctrine or the situation here.  Further, *Union County* indicated that "parties who contract in highly regulated environments are on notice that the law may change against their interest," *id.* at 517, that "[c]ourts consistently have held that contracts should be construed in ways that preserve the legality and validity of the agreements that the parties have freely entered into," *id.*, and that courts "will have to carefully examine the language of the contract." *Id.*  These observations militate strongly against LTL's attempt to invoke frustration of purpose.

[464] *See* TCC Tr. Ex. 1011, at 60:16–61:20 (Feb. 18, 2022, Hearing Tr.) (Statements of Mr. Gordon).

of Mr. Haas of J&J, that "[t]he idea was and **_the intent_** was the claimants are covered either way in bankruptcy or outside."[465] LTL's counsel, moreover, expressly represented to this Court that the 2021 Funding Agreement remains in effect following even "dismissal" of the bankruptcy – at a time when TCC's motion to dismiss for lack of financial distress was pending. The 2021 Funding Agreement does not make J&J's funding obligation depend on whether LTL files for bankruptcy at all. And the record shows that J&J delegated to the LTL board the decision whether to file for bankruptcy, which Mr. Wuesthoff testified was the subject of analysis and discussion in October 2021. In addition, J&J's asserted "purpose" (which is not recited in the Agreement or reflected in its terms) is irrelevant because the 2021 Funding Agreement contains an "entire agreement" clause,[466] which "excludes from the agreement everything not included in the writing." *Clifford v. River Bend Plantation, Inc*., 323 S.E.2d 23, 25 (N.C. 1984). Independently, the absence of an anticipated benefit to a single party is insufficient to form the basis of a frustration-of-purpose defense. *Gen. Elec. Cap. Corp. v. Charleston*, No. CIV. A. 88-6132, 1989 WL 63213, at *2 (E.D. Pa. June 12, 1989), *aff'd*, 898 F.2d 140 (3d Cir. 1990) ("It is not sufficient that the desires of one party is frustrated, the common purpose of the contract has to be frustrated."); *A-Leet Leasing Corp. v. Kingshead Corp*., 375 A.2d 1028, 1214 (N.J. Super. Ct. App. Div. 1977) ("[I]t is not sufficient that the desired object of but one of the contracting parties has been frustrated."). Rather, for the defense to apply, "the subject of the contract must be destroyed." *Tucker v. Charter Med. Corp*., 299 S.E.2d 800, 804 (N.C. App. 1983) (finding the purpose of a commercial lease was not frustrated).

---

[465] *Id.*, at 60:16-20, 61:1-20 (emphasis added).

[466] TCC Tr. Ex. 792, at § 11 (2021 Funding Agreement).

267.    In fact, this Court should not even consider LTL's "frustration of purpose"

argument because the Debtor has refused to provide relevant discovery (including communications

between LTL and J&J) on the question, even though LTL put it at issue.  Given the assertion of

privilege as a sword rather than a shield, LTL should be barred from raising its "void or voidable"

frustration of purpose defense.[467]

268.    Even if the frustration of purpose defense applied, and it does not, the remedy

would undo the entire divisive merger that created LTL and purported to assign it the talc

liabilities.  If the 2021 Funding Agreement were voided, then the entire transaction, including the

2021 Texas Two-Step would be void, and the talc liabilities would remain a JJCI-related entity

(and not be transferred to LTL).  A party cannot selectively void a single aspect of what LTL has

repeatedly called "a single integrated transaction" without unwinding the transaction in its entirety.

*See Jackson v. Associated Scaffolding & Equip. Co.*, 568 S.E.2d 666, 669 (N.C. App. 2002)

(invalid provision "render[s] the entire contract invalid"). When multiple agreements represent a

"single, integrated transaction," the voiding of one voids the others. *Moss v. First Premier Bank*,

No. 2:13-cv-05438, 2020 WL 5231320 (E.D.N.Y. Sept. 2, 2020); *see also Hackel v. F.D.I.C.*, 858

F. Supp. 289 (D. Mass. 1994) (holding that when a party repudiates a contract that is part of an

integrated transaction, all other agreements that are part of the integrated transaction also become

---

[467] *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 221 n.24 (3d Cir. 2006) ("[T]he attorney-client privilege cannot be used as both a 'shield' and a 'sword': Berckeley cannot rely upon the legal advice it received for the purpose of negating its scienter without permitting Colkitt the opportunity to probe the surrounding circumstances and substance of that advice."); *Moran v. Davita, Inc.*, No. 06 Civ. 5620 (JAP), 2008 WL 4447093, at *6 (D.N.J. Sept. 26, 2008) (precluding evidence and argument where party refused to disclose underlying documents shielded by the attorney-client privilege: "It is impermissible for the Defendants to use the attorney-client privilege as a sword and a shield. Defendants seek to use the privilege as a shield, by refusing to disclose the 409A opinion letter authored by Sheppard, and as a sword, by arguing that they acted upon a good faith business reason when applying 409A to Plaintiff . . . Accordingly, the Court precludes evidence and argument [on the issue]."); *Gallatin Fuels, Inc. v Westchester Fire Ins. Co.*, No. CIV.A. 02-2116, 2006 WL 2289789, at *1 (W.D. Pa. Jan. 13, 2006) (precluding defendant from invoking the "advice of counsel" defense at trial where defendant "has refused to produce any documents or information containing advice of counsel and/or developed by or at the guidance of counsel").

"null and void").  The fact that LTL and J&J have shown no desire for such relief casts severe doubt on whether those parties truly believed that the 2021 Funding Agreement was "void or voidable."

### 3.  LTL's Proposed Plan Cannot Negate Its Bad Faith

269.    The Third Circuit described good faith as a "gateway" issue that "asks whether the debtor faces the kinds of problems that *justify* Chapter 11 relief."  *LTL Mgmt.*, 64 F.4th at 102 (emphasis added).  The Third Circuit specifically rejected LTL's argument that, notwithstanding the absence of good faith, the Debtor should be permitted "to move thousands of claims out of trial courts and into bankruptcy court so they may be resolved, in J&J's words, 'equitably' and 'efficiently.'"  *Id.* at 110. Even a "sincerely held" belief that "this bankruptcy creates the best of all possible worlds for it and the talc claimants is not enough."  *Id.* at 111.

270.    The possibility of a successful reorganization cannot overcome the absence of good faith.  In fact, there was a confirmed plan in *Integrated Telecom Express*, 384 F.3d 108 (3d Cir. 2004).  Yet the Third Circuit ordered the dismissal of the bankruptcy petition regardless, explaining that "[t]he question of good faith is therefore antecedent to the operation of" the provisions of the Code.  *Id*. at 128.  If a confirmed plan could have overcome the absence of good faith, the outcome in *Integrated Telecom Express* would have been different.

271.    In a case cited with approval by the Third Circuit (*see BEPCO*, 589 F.3d at 618 n.7), another court of appeals has held that "[t]he possibility of a successful reorganization cannot transform a bad faith filing into one undertaken in good faith."  *Phoenix Piccadilly, Ltd. v. Life Ins. Co. of Va. (In re Phoenix Piccadilly, Ltd.)*, 849 F.2d 1393, 1395 (11th Cir. 1988).  In *Phoenix Piccadilly*, the court of appeals found that the bankruptcy petition had been filed "for the purpose of delaying and frustrating the efforts of the Secured Creditors to enforce their rights in the property" and therefore held that "the prospects of a successful reorganization do not override, as

a matter of law, the finding of bad faith in this case or compel, as a matter of fact, a contrary finding." *Id*. at 1394. *See also Basin Elec. Power Co-op. v. Midwest Processing Co*., 769 F.2d 483, 486 (8th Cir. 1985) ("the wrongful attempt to commence a bankruptcy proceeding" cannot be cured); *In re Allen*, 300 B.R. 105, 124 (Bankr. D.D.C. 2003) ("Even if reorganization would be possible, that cannot cure a petition that was filed in bad faith or that otherwise constitutes an abuse of the bankruptcy system.").

## IV.    ADDITIONAL, INDEPENDENT REASONS REQUIRE DISMISSAL FOR LACK OF GOOD FAITH

272.    LTL's second bankruptcy petition makes clear that additional concerns raised by the TCC in the first bankruptcy—which the Third Circuit noted but did not need to resolve—have materialized and independently require the petition to be dismissed.  The Third Circuit raised the questions (but did not need to resolve) whether LTL's bankruptcy filing was in bad faith as an improper litigation tactic, *Id.* at 110 n.19, and whether any "divisional merger to excise the liability and stigma of a product gone bad contradicts the principles and purposes of the Bankruptcy Code." *Id.* at 111.  These issues present additional, independent "cause" requiring dismissal under Section 1112(b)(1).

273.    LTL's second bankruptcy petition was filed for an improper litigation advantage, to pre-empt tort system claims that J&J expected after the dismissal of LTL 1.0 (hence the extreme haste with which LTL acted in refiling for bankruptcy less than 2 hours and 11 minutes after this Court's dismissal order in LTL 1.0) and to give J&J a structural advantage in any settlement negotiations with talc claimants.  The Third Circuit warned that a bankruptcy must be filed for "a valid bankruptcy purpose" and not be filed "merely to obtain a tactical litigation advantage."  64 F.4th at 101.  The Third Circuit further explained that "a filing to change the forum of litigation where there is no financial distress" raises "the specter of 'abuse which must be guarded against

to protect the integrity of the bankruptcy system.'" 64 F.4th at 110 n.19 (quoting *SGL Carbon*, 200 F.3d at 169).

274.    That is precisely the situation here. LTL's bankruptcies were filed to obtain a litigation advantage over talc claimants and to hamstring their lawyers' ability to try cases or negotiate an arms-length resolution.    LTL levels a broadside against the procedures and constitutional guarantees of the civil justice system.  It criticizes consolidation and similar rules of the tort system, and it is particularly suspicious of juries, which it views as irrational and subject to "bias" and liable to find "guilt by association."[468]  As LTL's expert Ms. Birnbaum testified, the tort system was "a better forum" for LTL until the MDL court rendered its *Daubert* decision.[469] Faced with the loss of its dispositive motion, and with claimants' unwillingness to resolve cases for the value proposed by J&J, LTL turned to bankruptcy to leverage a resolution on its terms. ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████[470]

275.    In *Aearo*, the bankruptcy court recognized that the bankruptcy cases filed there were initiated "to manage the MDL process, a process that Aearo insisted was 'broken.'  These [bankruptcy] cases were and are a litigation management [tactic] and not a rehabilitative effort." *In re Aearo Techs.,* 2023 WL 3938436, at *20 (Bankr. S.D. Ind. June 9, 2023), *direct appeal certified* (June 14, 2023). Judge Graham compared Aearo to LTL and found that Aearo had used

---

[468] LTL Omnibus Obj. to MTD (Dkt. No. 614), at 36 & n.39 (citations omitted).

[469] June 29, 2023 AM Hearing Tr., at 65:16-24.

[470] ████████████████████████████████████████████

bankruptcy as a litigation management tactic even though "Aearo was a real company with real

debts, unlike LTL which was merely created to hold liabilities using the 'Texas Two-Step.'" *Id.*

The same conclusion applies here.

276.    Further, LTL's second petition was filed to subvert the Bankruptcy Code's

structural protections.  As Mr. Kim testified in the first bankruptcy case, "the whole purpose of the

restructuring was to enable LTL, the company, to file for bankruptcy without subjecting the rest

of the assets of JJCI to the bankruptcy procedure."[471]  That improper purpose was clearly illustrated

by the spin-off of the consumer business to Kenvue without judicial supervision.  Had the real

tortfeasors J&J or JJCI filed for bankruptcy, that transaction would have required the approval of

the bankruptcy court—and proof that it was in the best interests of talc creditors.  *See* 11 U.S.C. §

363(c); *Stranton v. New*, 283 U.S. 318, 320 (1931).  Instead, the structure of LTL's bankruptcy

allowed J&J to spin off its consumer business "unencumbered" by talc liabilities,[472] and without

consideration for the interests of talc creditors.  The Kenvue spin-off culminated in a lucrative IPO

that gave a windfall to equity holders, but deprived talc creditors of the cashflow represented by

those businesses and brands.  That violated the "fundamental" bankruptcy command that equity

"receive nothing until all ... creditors have been paid in full."  *Czyzewski v. Jevic Holding Corp.*,

580 U.S. at 451, 457 (2017).

277.    The structure of LTL's bankruptcy—in which a "shell company" is placed into

bankruptcy while the real tortfeasors continue business-as-usual outside of bankruptcy, defies the

Bankruptcy Code.  As the *Aearo* court explained, "allowing an otherwise financially healthy debtor

with no impending solvency issues to remain in bankruptcy, much less one whose liability for

---

[471] February 15, 2022 Hearing Tr., at 201:12-15.

[472] TCC Tr. Ex. 1007, at 201:12-15 (February 15, 2022 Hearing Tr.)

most of its debts is supported by an even more financially healthy, Fortune 500 multinational

conglomerate, exceeds the boundaries of the Court's limited jurisdiction." *In re Aearo Techs.* ,

2023 WL 3938436, *22.

**V.     THE NARROW SECTION 1112(B)(2) EXCEPTION DOES NOT APPLY HERE**

278.    Section 1112(b)(2) provides a narrow exception to the otherwise mandatory

obligation to dismiss upon a finding of cause.  Section 1112(b)(2) applies only where four

conjunctive conditions are met: (a) the court finds that there are "unusual circumstances"

establishing that dismissal or conversion is not in the best interests of creditors and the estate, ***and***

(b) the Debtor establishes that (i) there is a reasonable likelihood that a plan will be confirmed

within a reasonable period time, ***and*** (ii) there is a reasonable justification for the act or omission

of the debtor constituting "cause," ***and*** (iii) the defect will be cured within a reasonable period of

time.  These requirements cannot be met here.

279.    In *LTL Mgmt.*, the Third Circuit held that where the "ground for dismissal is LTL's

lack of financial distress," then "[n]o 'reasonable justification' validates that missing requirement."

64 F.4th at 110.  Accordingly, Section 1112(b)(2) is unavailable here.  As other courts have

explained, there can be no reasonable justification for filing a case in bad faith.  *See, e.g.*, *Green*

*v. Howard Family Tr. Dated Aug. 21, 1998 (In re Green)*, No. BAP NV-15-1349-KILDO, 2016

WL 6699311, at *11 (9th Cir. BAP Nov. 9, 2016); *In re Hinesley Family Ltd. P'ship No. 1*, 460

B.R. 547, 553 (Bankr. D. Mont. 2011); *In re Keith*, No. 10-61722-11, 2010 WL 3835003, *6

(Bankr. D. Mont. Sept. 29, 2010).

280.    That conclusion is fortified by the "gateway" function served by the good faith

requirement.  64 F.4th at 102.  As the Third Circuit has explained, even a bankruptcy solution

"creat[ing] the best of all possible worlds" cannot be adopted in the absence of financial distress

and good faith.  *Id.* at 111.  The good faith requirement is fundamental to a debtor's ability to avail

itself of the "considerable powers . . . that can impose significant hardship on particular creditors," *id.* at 103, as this requirement is grounded in the very "purposes underlying Chapter 11." *Id*. at 100. Allowing an entity to justify its bad faith in seeking bankruptcy relief by pointing to resolution of a non-bankruptcy issue (in this case, a global resolution of a particular mass tort) would, in effect, obviate the good faith requirement. This Court is bound to recognize the "equitable limitations of Chapter 11," *id*. at 100, and cannot provide relief for bad faith filers.

281.    The Third Circuit also held there is no basis for finding that the absence of financial distress can be cured: "we cannot currently see how its lack of financial distress could be overcome. For these reasons, we go counter to the Bankruptcy Court's conclusion that 'unusual circumstances' sanction LTL's Chapter 11 petition." *Id.* at 110.

282.    The Debtor is wrong in suggesting that proposing an allegedly confirmable plan that is in the best interest of creditors can "cure" a bad-faith filing. To begin, confirmability of a plan and best interests of creditors are each separate elements of the analysis (Sections 1112(b)(2)(A) and (b)(2), respectively) and cannot render superfluous the "cure" requirement of Section 1112(b)(2)(B)(ii). In addition, "cure" has a specific meaning under the Code. "Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. This is the concept of 'cure' used throughout the Bankruptcy Code." *Di Pierro v. Taddeo* (*In re Taddeo*), 685 F.2d 24, 26–27 (2d Cir. 1982) (citing 11 U.S.C. §§ 365(b), 1110(a), 1168(a)(2), 1322(b)(5)). Proposing a plan does not restore pre-default conditions or otherwise "cure" the debtor's ineligibility for bankruptcy. *See Midlantic Nat'l Bank v. DeSeno* (*In re DeSeno*), 17 F.3d 642, 643–44 (3d Cir. 1994) (explaining that "the concept of 'curing a default' has the same meaning in Chapters 7, 11, and 13," and "[n]either the text of the statute, the legislative history, nor the policies animating the Bankruptcy Code suggest

125

that the concept of 'curing a default' should be ascribed any more than a single, consistent meaning

throughout the Code.").  The absence of financial distress is not an "act or omission" that can be

cured retroactively because under the Third Circuit's decision the relevant time for finding

financial distress is the "petition date," 64 F.4th at 110, which was April 4, 2023.

283.    Debtor has argued that, if the absence of financial distress cannot be "justified" or

"cured," then the "justification" and "cure" prongs of Section 1112(b)(2)(B) should simply be

disregarded.  But the Third Circuit's holding rejecting the Section 1112(b)(2)(B) exception in the

first appeal forecloses LTL's argument.  Moreover, inability to satisfy statutory requirements is

not a basis for ignoring them.  Indeed, LTL's argument proves the opposite of what it believes.

The fact that the absence of financial distress cannot be justified or cured means that the savings

clause of Section 1112(b)(2)(B) is **not available** in cases like this, but rather is available only for

technical errors like a failure to file operating reports, pay fees, and similar procedural foot-faults.

LTL's argument was squarely rejected in *In re Forum Health*, 451 B.R. 780, 790 (Bankr. N.D.

Ohio 2011) ("[T]he Committee equated satisfaction of this second element [of Section

1112(b)(2)(B)] with its non-applicability. This second element simply cannot be satisfied or met

under the present circumstances. There is nothing that can be rehabilitated or cured. . . . The

Committee's interpretation that this element is satisfied turns the statute on its head.").

284.    The implications of LTL's Section 1112(b)(2)(B) argument are staggering.  Under

LTL's view, bankruptcy would be available for mass tortfeasors even where the defendant is

financially healthy and able to pay all creditors in full on an ongoing basis.  Bankruptcy without

financial distress is no longer "bankruptcy" but simply an administrative compensation scheme.

But Congress has not created such a system.  Congress might have enacted Section 524(g) as a

freestanding statute outside the Bankruptcy Code, making it freely available regardless of a

company's financial condition. But Congress declined to do so. In fact, Congress has considered (but declined to enact) administrative compensation schemes for asbestos claims (without the requirement of financial distress needed to enter bankruptcy).[473] Under LTL's view, these proposals would have been superfluous since the Bankruptcy Code already would have provided a mechanism for resolving such claims outside the tort system, regardless of financial distress.

285.    The lack of reasonable justification and cure necessarily dooms the Debtor's effort to save this bankruptcy under Section 1112(b)(2). In addition, the Third Circuit has already held that the Debtor cannot show unusual circumstances: "what is unusual instead is that a debtor comes to bankruptcy with the insurance accorded LTL." 64 F.4th at 110. The Third Circuit's assessment of what is truly unusual about this case remains true—a debtor with access to billions of dollars in funding outside of bankruptcy.

286.    The Debtor suggests that the filing of a Chapter 11 plan can serve as an "unusual circumstance." But that suggestion is foreclosed by the 2010 revision to the statute, which makes clear that a court must find both "unusual circumstances" **and** the probable confirmability of a plan.[474] A court must not effectively read "unusual circumstances" out of the statute by collapsing those two requirements. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal

---

[473] *E.g.*, H.R. 128, Asbestos Compensation Act of 2000, 106th Cong., 2d Sess. (2000).

[474] The 2005 version of Section 1112(b)(1) provided for dismissal for cause "absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors." Pub. L. 109-8, § 442(a), 119 Stat. 115 (2005). In Section 1112(b)(2), the 2005 version also required dismissal "absent unusual circumstances specifically identified by the court that establish that such relief is not in the best interests of creditors and the estate, if the debtor or another party in interest objects and establishes" "reasonable likelihood" of plan confirmation, "reasonable justification for the act or omission," and cure within a reasonable period of time. Under the 2005 version of Section 1112(b), both subparagraphs (b)(1) and (b)(2) provided exceptions to the otherwise mandatory duty of dismissal for cause. In 2010, Congress adopted the current version of the statute and made clear that there is only one exception to the mandatory duty of dismissal for cause—an exception (now located exclusively in Section 1112(b)(2)) requiring all three conjunctive conditions to be satisfied. See Pub. L. 111-327, 124 Stat. 3561 (2010). Congress merged the two subparagraphs in the 2005 version of the statute and combined into Section 1112(b)(2) the criteria of "unusual circumstances," "reasonable likelihood" of plan confirmation, "reasonable justification for the act or omission," and cure within a reasonable period of time.

principle of statutory construction that a statute ought, upon the whole, to be so construed that, if

it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.")

(internal quotations and citation omitted); *United Steelworkers of Am., AFL-CIO-CLC v. N. Star

Steel Co., Inc.*, 5 F.3d 39, 42 (3d Cir. 1993) ("we have consistently held that "[c]ourts should avoid

a construction of a statute that renders any provision superfluous."). Thus, LTL's reliance on

alleged claimant support for its proposed plan is irrelevant, because that supposed support cannot

qualify as an "unusual circumstance."[475]

287. In any event, the unusual circumstances requirement also requires a finding that

dismissal is not in the best interests of the creditors. ████████████████████

███████████████████████████████████████████████████

████████████████[476] It is not in the best interest of creditors to worsen their negotiating position

in that resolution process by forcing them to negotiate in the context of a bankruptcy. Their

negotiating position would improve if LTL did not have the ability to use the bankruptcy system

to eliminate the talc claimants' pre-bankruptcy remedies.

288. Moreover, it is not in the best interests of future claimants to lose their rights to a

jury trial, which is also their primary leverage to negotiate a settlement once their injuries manifest.

The companies from which they could otherwise seek redress are some of the wealthiest in the

---

[475] Debtor's reliance on *In re Orbit Petroleum, Inc.*, 395 B.R. 145, 149 (Bankr. D.N.M. 2008), is therefore misplaced. *Orbit* is a pre-2010 case that does not account for the 2010 change in the statute requiring that unusual circumstances be considered separately from the confirmability of a plan. Moreover, *Orbit* did not involve a debtor that had filed its petition in bad faith, in the absence of financial distress. Rather, the defect in Orbit was the lack of intent to reorganize, for which the cure was a confirmed plan.

██ [476] *E.g.,* ████████████████████████████████████████████

world, and thus there is no evidence they will go out of business.[477]  The The Third Circuit has

long recognized that "future asbestos claimants of the non-debtors might prefer having recourse

against solvent entities rather than being limited to proceeding against . . . a limited fund subject

to depletion." *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 238 (3d Cir. 2004), *as amended* (Feb.

23, 2005).  In *LTL Mgmnt*., the Third Circuit held that the future claimants' jury rights should be

"disrupted only when necessary," 64 F.4th at 111, and this case simply does not present the

situation in which "there are not enough assets to go around," *id.* at 102.

289.    While this is not a plan confirmation hearing, any proposed plan must be

confirmable consistent with the Bankruptcy Code, including Section 1129(a)(7), which require

that creditors receive no less than what they would receive in a liquidation.  Although J&J has

attempted to use the PSAs to dictate a limited $8.9 billion potential pot plan, with points instead

of dollars assigned for the ovarian cancer and mesothelioma claims that have thus far proven

compensable in the tort system, a liquidation of LTL's 2023 Funding Agreement could result in

greater recoveries for creditors, given the Holdco liquidation value of $22.3 billion.  The potential

recovery of the 2021 Funding Agreement, with its $61.5 billion ATM, could increase that recovery

even more.  Nor has LTL explained how J&J could benefit from a channeling injunction for its

own direct and independent liability in the face of the Third Circuit's opinion in *In re Combustion*

*Eng'g, Inc.*, 391 F.3d at 233.  LTL does not explain how it can have a successful reorganization

when the relief it deems indispensable (Doc. 4 at 38) is statutorily unavailable.  In addition, LTL's

proposed plan is contingent on a settlement with Imerys and Cyprus, which have been in

---

[477] *See* Appendix B to Debtor's Complaint (Adv. Dkt. No. 1-3) (the "Protected Parties" include, among others:
Johnson & Johnson, Johnson & Johnson Consumer Inc., Johnson & Johnson Holdco (NA) Inc., Johnson & Johnson
Inc., along with massive retailers such as 7-Eleven, Inc, Albertsons Companies, Inc., Costco Wholesale Corporation,
CVS Health Corporation, Duane Reade, Inc., Walgreen Co., and Walmart Inc.).

bankruptcy since 2019 and 2021, respectively, with no signs of a resolution.[478]  At this stage of the proceedings, the existence of the foregoing issues raise serious doubt that Debtor's Plan can be confirmed, and counsel against a finding of reasonable likelihood of plan confirmation under Section 1112(b)(2)(A).

290.    LTL's claimed support for its proposed plan relies on speculation and exaggeration.[479]  Not a single claimant has signed a PSA.  The alleged claims are unverified and have not been scientifically proven. LTL has tried to suggest additional claimant support for LTL's proposed plan, but the Court struck Mr. Murdica's testimony on that issue based on his refusal to identify the law firms allegedly involved.[480]

## VI.    THE STAY ORDER SHOULD BE DISSOLVED

291.    As this Third Circuit has explained, dismissal of the case "annuls the litigation stay ordered by the Court."  64 F.4th at 111.  Because this case was not filed with a valid bankruptcy purpose, there is no reason to continue disrupting claimants' pre-bankruptcy remedies.  The injunction in the Adversary Proceeding must therefore be dissolved.

## CONCLUSION

292.    The TCC respectfully requests that this Court enter the Findings of Fact and Conclusions of Law, dismiss LTL's second bankruptcy petition for cause pursuant to

---

[478] June 28, 2023 PM Hearing Tr., at 125:18-128:20.

[479] The Debtor has repeatedly referred to settlement talks in the *Imerys* bankruptcy, ignoring the fact that the Third Circuit specifically cited those discussions as a reason to dismiss LTL 1.0, not to continue LTL's bankruptcy. 64 F.4th at 107-08.  The Debtor has misrepresented a September 2020 draft term sheet as a $3.25 billion settlement proposal. ██████████████████████  That mischaracterization substantially understates the value of the proposal (by more than $2 billion dollars) and overlooks the fact that the proposal for a voluntary settlement of current claims was made under very different circumstances.  TCC Tr. Ex. 957, at 67:7-18, 75:13-19 (Apr. 17, 2023 Birchfield Dep. Tr.); ███████████████████████████████████████████; June 28, 2023 AM Hearing Tr., at 17:2-15, 17:19-19:25, 107:15-109:5, 167:9-168:7.

[480] *Id.*, at 83:24-84:4.

11 U.S.C. § 1112(b)(1) and Rule 9011 of the Bankruptcy Rules, dissolve the stay order in the

Adversary Proceeding, and enter the attached Proposed Order.

Dated: July 19, 2023

Respectfully submitted,

**GENOVA BURNS, LLC**
By:＿＿＿/s/ *Daniel M. Stolz*＿＿＿＿＿＿＿
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 533-0777
Facsimile: (973) 467-8126
Email: dstolz@genovaburns.com
Email: dclarke@genovaburns.com

*Local Counsel to the Official Committee of Tort
Claimants of LTL Management, LLC*

131

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>**GENOVA BURNS LLC**<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>dstolz@genovaburns.com<br>dclarke@genovaburns.com<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ 07920<br>Tel: (973) 467-2700<br>Fax: (973) 467-8126<br><br>*Local Counsel to the Official Committee of Talc Claimants* | **BROWN RUDNICK LLP**<br>David J. Molton, Esq.<br>Jeffrey L. Jonas, Esq.<br>Michael S. Winograd, Esq.<br>Eric R. Goodman, Esq.<br>dmolton@brownrudnick.com<br>jjonas@brownrudnick.com<br>mwinograd@brownrudnick.com<br>egoodman@brownrudnick.com<br>Seven Times Square<br>New York, NY 10036<br>Tel: (212) 209-4800<br>Fax: (212) 209-4801<br><br>and<br><br>Sunni P. Beville, Esq.<br>sbeville@brownrudnick.com<br>One Financial Center<br>Boston, MA 02111<br>Tel: (617) 856-8200<br>Fax: (617) 856-8201<br><br>*Co-Counsel for the Official Committee of Talc Claimants* |
| **MASSEY & GAIL LLP**<br>Jonathan S. Massey, Esq.<br>Bret Vallacher, Esq.<br>jmassey@masseygail.com<br>bvallacher@masseygail.com<br>1000 Maine Ave. SW, Suite 450<br>Washington, DC 20024<br>Tel: (202) 652-4511<br>Fax: (312) 379-0467<br><br>*Special Counsel for the Official Committee of Talc Claimants* | **OTTERBOURG P.C.**<br>Melanie L. Cyganowski, Esq.<br>Adam C. Silverstein, Esq.<br>Jennifer S. Feeney, Esq.<br>David A. Castleman, Esq.<br>mcyganowski@otterbourg.com<br>asilverstein@otterbourg.com<br>jfeeney@otterbourg.com<br>dcastleman@otterbourg.com<br>230 Park Avenue<br>New York, NY 10169<br>Tel: (212) 661-9100<br>Fax: (212) 682-6104<br><br>*Co-Counsel for the Official Committee of Talc Claimants* |

|  |  |
|---|---|
| In re:<br><br>**LTL MANAGEMENT LLC,**[1]<br><br>                              Debtor. | Chapter 11<br><br>Case No. 23-12825 (MBK)<br><br>Honorable Michael B. Kaplan |
| **LTL MANAGEMENT LLC,**<br><br>                              Plaintiff,<br><br>      v.<br><br>**THOSE PARTIES LISTED ON**<br>**APPENDIX A TO COMPLAINT**<br>**and JOHN AND JANE**<br>**DOES 1-1000,**<br><br>                              Defendants. | Adv. Pro. No. 23-01092 (MBK) |

## <u>PROPOSED ORDER</u>

In accordance with the foregoing findings and conclusions, it is hereby **ORDERED**,

**ADJUDGED**, and **DECREED** that**:**

1.  The Motions of (i) the Official Committee of Talc Claimants [Dkt. No. 286]; (ii)

the Ad Hoc Group of Mesothelioma Claimants [Dkt. No. 335]; (iii) Paul Crouch

[Dkt. No. 346]; (iv) the Ad Hoc Committee of States Holding Consumer Protection

Claims [Dkt. No. 350]; (v) Law Firms on Behalf of Various Mesothelioma

Claimants [Dk. No. 352]; (vi) Maune Raichle Hartley French & Mudd, LLC [Dkt.

No. 358]; the Office of the United States Trustee [Dkt. 379]; (vii) Arnold & Itkin

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

LLP [Dkt. No. 384]; certain claimants represented by the Barnes Law Group [Dkt.

No. 473]; and (viii) the States of New Mexico and Mississippi [Dkt. No. 480], to

Dismiss the Bankruptcy Petition are **GRANTED**.

2.   The Debtor Objection [Dkt. No. 480] and the AHC Objection [Dkt. No. 480] are

**OVERRULED**.

3.   The Preliminary Injunction in effect in the Adversary Proceeding, Adv. Pro. No.

23-01092 [Dkt. No. 203] is **DISSOLVED**.

4.   The findings of fact and the conclusions of law set forth in this Order constitute

findings and conclusions of law in accordance with Bankruptcy Rule 7052, made

applicable to this proceeding by Bankruptcy Rule 9014.  All findings of fact and

conclusions of law announced by the Court at the Hearing, including with respect

to the admissibility of evidence, are hereby incorporated into this Order.


Dated: _____


                                        _____
                                        Honorable Michael B. Kaplan
                                        United States Bankruptcy Judge