**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No.:  23-12825 (MBK)<br><br>Judge:  Michael B. Kaplan<br><br>**Hearing Date and Time:**<br>June 27, 2023 at 9:00 a.m. |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS**
**OF LAW REGARDING MOTIONS TO DISMISS CHAPTER 11 CASE**

---

[1]     The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

I.    PROCEDURAL BACKGROUND.............................................................................. 9

FINDINGS OF FACT............................................................................................................ 13

I.    HISTORY OF THE DEBTOR'S TALC PERSONAL INJURY CLAIMS AND
THE 2021 CHAPTER 11 CASE ................................................................................ 13

    A.    The Costs and Burdens of Talc Litigation Lead to a Corporate
Restructuring and the 2021 Chapter 11 Case.................................................... 13

    B.    The Third Circuit Opinion. ................................................................................ 15

II.    PLAINTIFF LAW FIRMS REPRESENTING MAJORITY OF TALC
CLAIMANTS SUPPORT LTL'S SECOND BANKRUPTCY FILING......................... 16

    A.    Following the Third Circuit Opinion, Plaintiff Law Firms Initiate
Negotiations Around Global Resolution Through Second Bankruptcy
Filing. ............................................................................................................... 16

    B.    Seventeen Plaintiff Law Firms Representing 58,000 Claimants Sign Plan
Support Agreements to Support Global Resolution of Talc Liabilities in
Bankruptcy. ...................................................................................................... 18

    C.    Members of AHC of Supporting Counsel Maintain Rigorous Client Intake
Procedures to Eliminate Duplication and Non-Compensable Claims. ............... 21

III.    THE DEBTOR'S DECISION TO FILE THE 2023 CHAPTER 11 CASE.................... 22

    A.    The Talc Litigation Is the Cause of LTL's Financial Distress............................ 22

    B.    The LTL Board Determined That the 2021 Funding Agreement May No
Longer Be Available to Manage That Distress.................................................... 25

    C.    The LTL Board Addressed the Risk to the Enforceability of the 2021
Funding Agreement. .......................................................................................... 27

    D.    The LTL Board Authorized Entry Into the Modified 2023 Funding
Arrangements and the Filing of the 2023 Chapter 11 Case. ............................... 29

    E.    Members of AHC of Supporting Counsel Support the Debtor's Plan and
Expect to Recommend Their Clients Vote in Favor of It. ................................... 32

IV.    FINANCIAL DISTRESS........................................................................................... 33

    A.    LTL's and Holdco's Assets. .............................................................................. 33

    B.    LTL's Talc Liability and Associated Costs. ....................................................... 34

    C.    Expert Testimony on Financial Distress. ........................................................... 48

    D.    The Likelihood, Extent, and Uncertainty of Threatened Litigation.................... 60

## TABLE OF CONTENTS

(continued)

**Page**

V.    RESOLVING THE TALC LITIGATION THROUGH BANKRUPTCY PROCEEDINGS AFFORDS EFFICIENCIES UNAVAILABLE IN THE TORT SYSTEM .................................................................................. 61

    A.    Unknown Future Claims Cannot Be Resolved in MDLs .................................. 61

    B.    Comprehensive Resolutions of Mass Tort MDLs with Latent Injuries and Unknown Claimants Have Been Elusive. ............................................. 62

    C.    Bankruptcy Provides a Superior Forum for Resolving Mass Torts with Latency Periods and Unknown Claimants. .......................................... 65

CONCLUSIONS OF LAW ................................................................................................. 66

I.    JURISDICTION AND VENUE ................................................................................. 66

II.    THE DEBTOR WAS IN FINANCIAL DISTRESS ON THE PETITION DATE ........ 67

    A.    Legal Standard. ............................................................................................... 67

    B.    LTL Was in Financial Distress. ...................................................................... 72

III.    THE DEBTOR'S CONDUCT WAS NOT IN BAD FAITH NOR AN ATTEMPT TO MANUFACTURE FINANCIAL DISTRESS, AND DID NOT GIVE RISE TO A FRAUDULENT TRANSFER .............................................................. 81

    A.    The Changes to the Financing Arrangements Were Appropriate to Mitigate the Risk that J&J's Backstop Was Not Enforceable and to Ensure a Successful Reorganization. ............................................................. 82

    B.    Even Absent the Risk that J&J's Backstop Was Not Enforceable, the Changes to the Financing Arrangements Were Appropriate. ........................... 91

    C.    The Debtor's Entry into the New Financing Arrangements Was Neither an Actual nor a Constructive Fraudulent Transfer. .......................................... 92

IV.    THE CHAPTER 11 CASE WAS OTHERWISE FILED FOR A VALID REORGANIZATIONAL PURPOSE AND NOT AS A LITIGATION TACTIC .......... 97

V.    SECTION 1112(B)(2) APPLIES TO PREVENT DISMISSAL ................................. 102

    A.    Unusual Circumstances Exist that Dismissal Is Not in the Best Interests of Claimants. .................................................................................................. 103

    B.    Reasonable Likelihood of Plan Confirmation in a Reasonable Time ............... 106

    C.    Justification and Cure. .................................................................................... 107

VI.    CONGRESS ELIMINATED THE GOOD FAITH FILING REQUIREMENT IN ENACTING THE BANKRUPTCY CODE ............................................................... 109

VII.    THE BURDEN OF PROOF TO ESTABLISH CAUSE UNDER SECTION 1112(B)(1) IS ON THE MOVANTS ........................................................ 111

# TABLE OF AUTHORITIES

**Page**

CASES

Am. Prairie Constr. Co. v. Hoich,
  594 F.3d. 1015 (8th Cir. 2010) ...............................................................................................83

Arons v. Charpentier,
  36 A.D.3d 636, 828 N.Y.S.2d 482 (2007) ..............................................................................83

Atlantic Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of
  Atlantic Cty.,
  112 F.3d 652 (3d Cir. 1997)....................................................................................................88

Bestwall LLC v. Official Comm. of Asbestos Claimants (In re Bestwall LLC),
  No. 22-1127, 2023 WL 4066848 (4th Cir. June 20, 2023).....................................67, 100, 107

Brenner v. Little Red Sch. House, Ltd.,
  302 N.C. 207 (1981) ...............................................................................................................82

Congoleum Corp. v. Pergament (In re Congoleum Corp.),
  Adv. No. 05-06245, 2007 WL 4571086 (Bankr. D.N.J. Dec. 28, 2007)...........................86, 87

Fairfield Harbour Prop. Owners Ass'n, Inc. v. Midsouth Golf, LLC,
  215 N.C. App. 66 (2011) .........................................................................................................83

Green v. Howard Family Tr. (In re Green),
  No. 15-1349, 2016 WL 6699311 (B.A.P. 9th Cir. Nov. 9, 2016)..........................................108

In re 3M Combat Arms Earplug Products Liability Litig.,
  MDL No. 2885 (N.D. Fla.). Mullin Report ...............................................................39, 42, 43

In re A.H. Robins Co.,
  No. 85-01307 (Bankr. E.D. Va.)..............................................................................................98

In re Aearo Techs. LLC,
  2023 WL 3938436 (Bankr. S.D. Ind., June 9, 2023) ....................................................100, 101

In re Bestwall LLC,
  605 B.R. 43 (Bankr. W.D.N.C. 2019)..................................................................................85, 97

In re Bestwall LLC,
606 B.R. 243 (Bankr. W.D.N.C. 2019)....................................................................100

In re Bestwall LLC,
No. 17-31795 (Bankr. W.D.N.C. 2017)....................................................................98

In re Boy Scouts of Am. & Del. BSA, LLC,
650 B.R. 87 (D. Del. 2023).........................................................................69, 75, 76

In re Capitol Food Corp. of Fields Corner,
490 F.3d 21 (1st Cir. 2007)...................................................................................69

In re DBMP LLC,
No. 20-30080 (Bankr. W.D.N.C. 2020)....................................................................98

In re Dow Corning Corp.,
No. 95-20512 (Bankr. E.D. Mich.).........................................................................98

In re Fed.-Mogul Glob. Inc.,
684 F.3d 355 (3d Cir. 2012)...................................................................................99

In re Fruehauf Trailer Corp.,
444 F.3d 203 (3d Cir. 2006)...................................................................................94

In re Grasso,
497 B.R. 448 (Bankr. E.D. Pa. 2013) ....................................................................103

In re Grossman's Inc.,
607 F.3d 114 (3d Cir. 2010)...................................................................................72

In re Hinesley Family Ltd. P'ship No. 1,
460 B.R. 547 (Bankr. D. Mont. 2011) ...................................................................108

In re Imerys Talc Am., Inc., et al.,
No. 19-10289-LSS (Bankr. D. Del.), Dkt. 2818 .......................................................48

In re Imerys Talc Am., Inc.,
No. 19-10289 (Bankr. D. Del. 2019) .......................................................................98

In re Johns-Manville Corp.,
36 B.R. 727 (Bankr. S.D.N.Y. 1984).................................................................69, 79

In re Johns-Manville Corp.,
No. 82-11656 through 82-11676 (Bankr. S.D.N.Y.) .................................................98

In re Keith,
    No. 10-61722-11, 2010 WL 3835003 (Bankr. D. Mont. Sept. 29, 2010)..............................108

In re LG Motors, Inc.,
    422 B.R. 110 (Bankr. N.D. Ill. 2009) .....................................................................................103

In re Liberate Techs.,
    314 B.R. 206 (Bankr. N.D. Cal. 2004) .....................................................................................69

In re LTL Mgmt.,
    64 F.4th at 109 .................................................................................................. passim

In re LTL Mgmt., LLC,
    58 F.4th 738 (3d Cir. 2023), as amended by 64 F.4th 84 (3d Cir. 2023)....................3, 5, 6, 15

In re LTL Mgmt., LLC,
    637 B.R. 396 (Bankr. D.N.J. 2022) .................................................................. passim

In re LTL Mgmt. LLC,
    638 B.R. 291 (Bankr. D.N.J. Feb. 25, 2022) .............................................................67

In re Maremont Corp.,
    No. 19 10118 (Bankr. D. Del. 2019).........................................................................98

In re Mid-Valley, Inc.,
    305 B.R. 425 (Bankr. W.D. Pa. 2004) ......................................................................79

In re Muralo Co., Inc.,
    301 B.R 690 (Bankr. D.N.J. 2003) ...........................................................................97

In re ON Marine Servs. Co.,
    No. 20-20007 (Bankr. W.D. Penn. 2020) .................................................................98

In re Opus East, LLC,
    528 B.R. 30 (Bankr. D. Del. 2015).............................................................................94

In re Paddock Enters., LLC,
    No. 20-10028 (Bankr. D. Del. 2020) .........................................................................98

In re Rent-a-Wreck of Am., Inc.,
    580 B.R. 364 (Bankr. D. Del. 2018) ..........................................................................69

In re ResCap Liquidating Tr. Litig.,
    No. 13-CV-3451 (SRN/HB), 2020 WL 4728109 (D. Minn. Aug. 14, 2020),
    aff'd sub nom. ResCap Liquidating Tr. v. Primary Residential Mortg., Inc., 59
    F.4th 905 (8th Cir. 2023) .........................................................................................75, 76, 77

In re S. Beach Sec., Inc.,
    606 F.3d 366 (7th Cir. 2010) ...............................................................................................91

In re Scheffler,
    86 B.R. 576 (Bankr. W.D. Wis. 1986)..................................................................................91

In re SGL Carbon Corp.,
    200 F.3d 154 (3d Cir. 1999)...........................................................................................79, 97

In re Stolrow's Inc.,
    84 B.R. 167 (9th Cir. BAP 1988) ...................................................................................68, 79

In re Victory Const. Co., Inc.,
    37 B.R. 222 (B.A.P. 9th Cir. 1984).....................................................................................110

In re Victory Const. Co., Inc.,
    9 B.R. 549 (Bankr. C.D. Cal. 1981).....................................................................................110

In re W.R. Grace & Co.,
    475 B.R. 34 (D. Del. 2012) ...................................................................................................72

In re W.R. Grace & Co.,
    900 F.3d 126 (3d Cir. 2018)............................................................................................7, 97

In re Whittaker, Clark & Daniels, Inc.,
    No. 23-13575, 2023 WL 4111338 (Bankr. D.N.J. June 20, 2023) ...................................72, 105

Moody v. Sec. Pac. Bus. Credit, Inc.,
    971 F.2d 1056 (3d Cir. 1992)............................................................................................68, 95

NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated
    Telecom Express, Inc.),
    384 F.3d 108 (3d Cir. 2004)...................................................................................................69

Norfolk S. Ry. Co. v. Reading Blue Mountain & N. R. Co.,
    346 F. Supp. 2d 720 (M.D. Pa. 2004) ...................................................................................83

UNCC Properties, Inc. v. Greene,
    111 N.C. App. 391, 432 S.E.2d 699 (1993)...........................................................................83

Unihealth v. U.S. Healthcare, Inc.,
  14 F. Supp. 2d 623 (D.N.J. 1998) .......................................................................83

Union Cty. Utils. v. Bergen Cty. Utils. Auth.,
  995 F. Supp. 506 (D.N.J. 1998) ....................................................................83, 88

United States v. Moulder,
  141 F.3d 568 (5th Cir. 1998) ............................................................................83

**STATUTES**

11 U.S.C.
  § 109(a) ..........................................................................................................67, 79
  § 101(41) ..............................................................................................................69
  § 363(b)(1) ...........................................................................................................96
  § 524(g) ..........................................................................................................passim
  § 524(g)(2)(B)(ii)(II) ..........................................................................................70
  § 548(a)(1)(B)(ii) .....................................................................................93, 94, 95
  § 1102 .....................................................................................................................9
  § 1107(a) ..............................................................................................................66
  § 1108 ...................................................................................................................66
  § 1112(b)(2)(A), (B) ..........................................................................................103
  § 1112(b)(4)(A)–(P) .......................................................................110, 111, 112
  § 1123(a)(4) ..........................................................................................................69

28 U.S.C.
  §§ 157 and 1334 ..................................................................................................66
  § 157(b) ................................................................................................................66
  § 1334 ...................................................................................................................67
  §§ 1408 and 1409 ...............................................................................................66

Bankruptcy Act of 1898 ...................................................................................109

**OTHER AUTHORITIES**

156 CONG. REC. H7158-01 (2010) ..................................................................111

1994 U.S.C.C.A.N. 3340 .....................................................................................70

Frank R. Kennedy & Gerald K. Smith, *Postconfirmation Issues: The Effects of
  Confirmation and Postconfirmation Proceedings*, 44 S.C. L. Rev. 621, 732
  409 (1993) ..........................................................................................................110

H.R. REP. 103-835, 40-41 (1994) ................................................................................................70

https://www.thetascgroup.com/case-study/asbestos/ ...................................................................3

Janet A. Flaccus, *Have Eight Circuits Shorted? Good Faith and Chapter 11*
*Bankruptcy Petitions*, 67 Am. Bankr. L.J. 401, 402-03 (1993) ............................................110

Pursuant to paragraph 9 of the *Evidentiary Stipulation for Hearing on the Motions to Dismiss Debtor's Bankruptcy Case* [Dkt. 852], LTL Management LLC ("<u>LTL</u>" or the "<u>Debtor</u>") respectfully submits the proposed findings of fact and conclusions of law that follow the Introduction below.

## <u>INTRODUCTION</u>

The hearing on the motions to dismiss was a study in contrasts. LTL established and relied on facts that, as applied to settled law, demonstrate its right to access bankruptcy and proceed to a vote on a reorganization plan supported by plaintiffs' firms representing the substantial majority of claimants. Movants came forward with little to no evidence, but instead relied on the same empty rhetoric and slurs they have slung since the outset of LTL's first bankruptcy case. Movants persisted with these improper tactics notwithstanding and in contravention of this Court's repeated admonishments.[2] At the hearing, as before, LTL methodically presented facts and legal argument that refute Movants' heated and conclusory allegations and demonstrate that the motions to dismiss should be denied.

### <u>The Purpose of This Case</u>

Like its first chapter 11 case, the Debtor commenced this case to equitably, efficiently, and finally resolve current and future talc claims through confirmation of a consensual chapter 11 plan of reorganization and the establishment and funding of a trust to timely compensate current and future claimants and provide equivalent recoveries to similarly situated claimants. The impetus for this second chapter 11 case was a proposal by law firms representing some 60,000 talc claimants for a bankruptcy resolution of the Debtor's talc liability after nearly a decade of frustration, delay and widely disparate results in the tort system. The

---

[2]     Indeed, the unprofessional behavior continued after the hearing, with yet another improper attack on the integrity of the Future Claimants' Representative.

undisputed evidence at trial confirmed the legitimacy of this support and established that the

number of claimants represented by the law firms supporting the plan far exceeded (by a factor

of more than 2-to-1) the number of claimants purportedly represented by plaintiff law firms

seeking dismissal of this case.  None of the myriad attacks leveled by the Movants on the extent

or legitimacy of this support—that the support was somehow "illusory" and "duplicative"—was

supported by any record evidence.

### The Need for Chapter 11 Relief:  Financial Distress

The record evidence overwhelmingly established the Debtor's legitimate need to

file its second bankruptcy petition on April 4, 2023.  The defense and resolution of talc litigation

had only become more challenging since LTL's first filing, with current claims more than

doubling from 40,000 claims to some 100,000 claims.  Due to the backlog that had developed

during the first bankruptcy case, the Debtor faced significant increases in the number of

individual trials and in the dollar-value of settlement demands and defense costs.  Moreover, as

Movants' counsel conceded, they already have sought and intend to pursue consolidated trials

(like the one that resulted in the multi-billion-dollar Ingham judgment), which the evidence

presented at trial proved, increased the risk and size of adverse awards.  Any one of the 100,000

pending claims could result in a verdict in the millions or even billions of dollars—a potential

outcome reinforced just yesterday when the jury in Valadez, a single plaintiff case, returned a

verdict for $18.8 million following a $500 million demand.

The risk that the Debtor would incur adverse verdicts like yesterday's result in

Valadez had only increased since the Debtor first entered bankruptcy.  The plaintiffs' bar has

engaged in concerted efforts in this case, the prior bankruptcy case and other forums to poison

the public's perception of the Debtor and Johnson & Johnson ("J&J").  These false narratives

have been amplified by a "public relations and communications campaign" financed by "twenty

plaintiff law firms" involved in the bankruptcy proceedings brought by various debtors—

including the Debtor—who were formed by divisional merger.[3]  The stated goal of the campaign

is to "put public pressure on and shame these companies."  See TASC Group Website.  "The

campaign would in effect try these cases in the court of public opinion, bring public pressure to

bear on the courts and shed light on the issue for political leaders and members of Congress." Id.

And according to the firm retained to wage this campaign, it has worked: "Our campaigns have

dramatically increased the volume of favorable articles, influenced and changed the attitudes of

key legal reporters, creating a core group of journalists who cover our legal updates regularly,

and have affected policy outcomes in Congress." Id.

   In addition to the increased risk of adverse verdicts, the record evidence also

included detailed near- and long-term dollar-estimates of the Debtor's talc-related costs through

largely unchallenged expert testimony from economist Charles H. Mullin, Ph.D.  Dr. Mullin

estimated that the Debtor's talc-related defense and claim-resolution costs over the next three

years would range from approximately $3 billion to $7 billion (for personal injury suits alone)

(Cash Flow Analysis).  He estimated the Debtor's long-term aggregate costs to range from $11

billion to $21 billion (Balance Sheet Analysis).  Dr. Mullin's estimates were based on realistic

potential outcomes derived from the Debtor's historic experience and comparable cases under

various potential litigation and settlement scenarios.

   Moreover, the Debtor presented evidence from Gregory K. Bell, Ph.D., on the

Debtor's capacity to satisfy its talc-related costs.  See In re LTL Mgmt., LLC, 58 F.4th 738 (3d

Cir. 2023), as amended by 64 F.4th 84, 104 (3d Cir. 2023) ("courts must always weigh not just

the scope of liabilities the debtor faces, but also the capacity it has to meet them").  Dr. Bell

---

[3]  https://www.thetascgroup.com/case-study/asbestos/ (the "TASC Group Website").

evaluated LTL's ability to pay debts as they come due.  With respect to cash outflows, Dr. Bell

utilized the three different cost scenarios from Dr. Mullin's Cash Flow Analysis.  With respect to

cash inflows, Dr. Bell used four different sets of assumptions premised on dividends historically

received by LTL and Holdco (as defined below).

Dr. Bell concluded that operating cash flows were insufficient to fund potential

costs nearly half (43 percent) the time.  In a subsequent analysis that took into consideration a

dividend received shortly before the trial, Dr. Bell found that operating cash flows were

insufficient over half (51 percent) of the time.  Dr. Bell thus concluded that it was reasonable to

anticipate that Holdco , the Debtor's parent and the obligor on the 2023 Funding Agreement (as

defined below), would be required to liquidate its ownership interests in various subsidiaries or

indirect affiliates at a significant discount to cover required cash out-flows, which liquidation

would destroy value at Holdco and impair the Debtor's short- and long-term ability to receive

timely and sufficient funding to pay its talc-related costs.

In contrast to LTL's extensive expert showing, the Movants proffered no evidence

of the dollar-value of the Debtor's talc-related liabilities, or its ability to meet those obligations

in either the short- or long-term.  They came forward with no evidence the talc-related

liabilities—unquestionably a central issue—despite the TCC (as defined below) having engaged

two consultants (FTI Consulting and Brattle Group) and billing the Debtor's first bankruptcy

estate for nearly **8,000 hours** of work on claims estimation.

The TCC instead proffered the testimony of Saul Burian, who did not perform any

independent analysis of the Debtor's talc liabilities.  In fact, Mr. Burian acknowledged he had no

expertise with respect to claim estimation, and conceded he did not seek or receive input from

either TCC financial expert that had performed estimation work.  There can be little question that

the Movants' failure to present any estimate of the dollar-value of the liability is because that

estimate would exceed even the upper range of Dr. Mullin's estimates.

If anything, Mr. Burian's opinions corroborate the existence of financial distress.

Mr. Burian estimated a liquidation value for Holdco in the range of $17.91-$27.71 billion.

Applying that range to Dr. Mullin's estimated long-term aggregate talc costs of $11 billion to

$21 billion yields the possibility (using the lower end of Mr. Burian's asset liquidation value)

that LTL would actually have been balance-sheet insolvent, an undeniable indicator of financial

distress.

### The Debtor's Financial Distress Was Not "Manufactured"

The Movants further argue, in contradiction of their argument that the Debtor was

not in financial distress, that the Debtor and J&J "manufactured" financial distress.  But the

Debtor's financial distress has been and continues to be caused by the flood of talc litigation that

swamped Old JJCI (as defined below) in the five years leading up to the first bankruptcy filing.

Old JJCI was unequivocally in financial distress before the 2021 Corporate Restructuring (as

defined below).  The Third Circuit did not find otherwise.

Although the Debtor was subject to the same unrelenting costs of litigation faced

by Old JJCI, the Third Circuit concluded that the backstop put in place at the time of the

Debtor's prior chapter 11 case eliminated the Debtor's financial distress.  But J&J agreed to

backstop the funding of the Debtor under the 2021 Funding Agreement (as defined below)—as

part of what this Court has previously found to be a single integrated transaction—to facilitate

and support the Debtor's reorganization in chapter 11.  J&J did so even though "it was never

required to provide [the backstop] to claimants."  Id. at 110-11.  J&J's purpose of providing a

backstop to facilitate the Debtor's bankruptcy filing was made clear by the Debtor's

representatives, in court, almost a year before the Third Circuit's decision.  The Movants have

provided no evidence or rationale to the contrary, i.e., why J&J would agree to become co-liable for the talc claims in the tort system absent a bankruptcy filing.

The Third Circuit's ruling frustrated and defeated the primary purpose of the J&J backstop, causing J&J to immediately take the position that its backstop was void or voidable. The Third Circuit itself noted the "irony" of its decision:  that an agreement intended to facilitate the Debtor's bankruptcy filing instead prevented the Debtor from accessing bankruptcy.  Id.  And "irony," by definition, refers to an outcome that is contrary to what was intended or expected.

Even absent the material risk that J&J's obligations under the 2021 Funding Agreement were not enforceable, the changes to the financing arrangements were appropriate and in accordance with the Third Circuit's guidance.  Contrary to the Movants' suggestions, the Third Circuit did not "warn" the Debtor in footnote 18 of its opinion not to change its financing arrangements.  Rather, the Third Circuit forecast that a change in the funding backstop might be made and then pointed out that, if a change was made, it could be subject to challenge as a fraudulent transfer.

Here, the changes were appropriate and justified under the circumstances.  The settlement the Debtor and J&J had reached with the supporting law firms could only be implemented in bankruptcy.  The new financing arrangements made certain that the agreement could be consummated as agreed.  The evidence established that the value of the respective funding agreements was the same because in both this case and the prior bankruptcy case, the Debtor had sufficient resources to meet its obligations.  In short, the new arrangements did not harm claimants.

## The Record Contains No Other Basis for Bad Faith

The record evidence does not support any of the Movants' other challenges to the good faith of the Debtor's filing.  The evidence established that the Debtor's objective in this

case and its first bankruptcy case has always been the same—a final, equitable and efficient
resolution of all current and future talc claims for the benefit of all parties.  That goal and this
case are supported by law firms representing the vast majority of the claimants holding current
claims.

Particularly in the context of mass tort liabilities, seeking to distribute the debtor's
estate "in a way that is fair for both present and future asbestos claimants" is a proper purpose of
chapter 11.  In re W.R. Grace & Co., 900 F.3d 126, 130 (3d Cir. 2018).  Such a recognition does
not, as the TCC asserts, "eviscerate the 'good faith' standard" by causing "tactical litigation
advantages [to] become justifications for bankruptcy."  TCC Mot., 39.  That view was
specifically rejected by the Third Circuit and this Court in the Debtor's first bankruptcy case.
And it ignores the long history of similarly situated mass tort debtors that received chapter 11
relief in this circuit and elsewhere.

The Movants, who collectively represent only a minority of claimants, offered no
evidence that the Debtor is abusing the bankruptcy process to delay or frustrate claimants' efforts
to enforce their rights.  The Movants' characterization of the Debtor's efforts as an improper
litigation tactic would, if adopted, undermine every mass tort bankruptcy.  Courts, including the
Third Circuit and this Court, have repeatedly acknowledged the benefits of a bankruptcy-court
resolution of current and future mass tort claims, particularly, as here, in the context of alleged
injuries with potential long latency periods.

## LTL's Talc Liability Can Only Be Fully Resolved in Bankruptcy

The expert testimony provided at trial also demonstrated the benefits—to all
parties—of utilizing bankruptcy to resolve the talc claims pending against the Debtor.  The
Debtor's expert witnesses on this topic, Sheila Birnbaum and Dr. Charles Mullin, explained how
chapter 11 is the only available forum to globally resolve the Debtor's talc liability given the

Bankruptcy Code's power to address future claims with long latency periods and to bind all current claimants to a settlement supported by the vast majority.  The TCC's experts, by contrast, offered examples of highly distinguishable mass tort settlements achieved in non-bankruptcy situations that—in every case—did not involve the large numbers of unidentified future claimants and long latency periods that are central to this Chapter 11 Case.  Far from being an improper litigation management tool, the Debtor's experts established that chapter 11 provides the only practicable mechanism to resolve globally the Debtor's talc liability.

### Section 1112(b)(2) Provides an Alternative Basis to Deny the Motions

Some of the Movants argue that the Court has no ability to exercise its discretion not to dismiss the Chapter 11 Case under section 1112(b)(2) of the Bankruptcy Code.  But unusual circumstances exist that support denial of the motions to dismiss under this section.

With the support of claimants' counsel representing a vast majority of the current claims, the Debtor has filed a chapter 11 plan that will pay claimants in full.  The Debtor and supporting counsel are "on the two-yard line" in their efforts to achieve a historical settlement for claimants, a result that stands in stark contrast to the outcomes those claimants can expect in the tort system:  lengthy delays after which the vast majority of claimants will receive nothing.

The Debtor's proposed plan also affords the opportunity to resolve—in whole or in material part—two other pending bankruptcies (Imerys and Cyprus) that have been frozen for years and that involve the same underlying claims asserted against the Debtor.

The Debtor's acts or omissions in connection with the filing of this Chapter 11 Case were fully justified.  The Debtor's prior chapter 11 case was transferred from its filing jurisdiction, where the existence of J&J's backstop to the 2021 Funding Agreement would have compelled denial of dismissal, and subsequently dismissed by the Third Circuit on the basis of that very same backstop.  Claimant representatives then approached the Debtor and J&J with a

-8-

potential resolution that will benefit all current and future claimants and that can only be achieved in a chapter 11 case.  Having sought and failed to obtain review of the Third Circuit's opinion, the Debtor was left with no practical alternative to effectuate this settlement other than the immediate commencement of a new chapter 11 case.

The Third Circuit did not rule that the absence of financial distress is unjustifiable or uncurable, as Movants contend.  Nor has any court ruled that the absence of financial distress is never subject to potential justification and cure under section 1112(b)(2).  In light of the widespread support for resolution of the Debtor's talc liability following the Third Circuit opinion and the contemplated establishment of a trust that is intended to pay all current and future claimants promptly and in full, confirmation of the Debtor's chapter 11 plan (or a grant of derivative standing to pursue estate claims) will provide the requisite cure of any cause.

\* \* \*

The Movants' arguments and heated rhetoric are just that.  They submitted little to no evidence to support their position and the record evidence makes clear that their arguments have no merit.  For these reasons and as demonstrated by the proposed findings of fact and conclusions of law below, the motions to dismiss should be denied.


## I.    PROCEDURAL BACKGROUND

1.    On April 4, 2023 (the "Petition Date"), LTL filed its petition commencing this chapter 11 case (the "Chapter 11 Case").  [Dkt. 1].

2.    On April 14, 2023, the United States Trustee for the District of New Jersey (the "U.S. Trustee") appointed an official committee of talc claimants (the "TCC") pursuant to section 1102 of the Bankruptcy Code.

3.      Motions to dismiss the Chapter 11 Case and related joinders to the motion
(collectively, the "Dismissal Motions") were filed by the following parties (collectively,
the "Movants"): (a) the TCC [Dkt. 286] (the "TCC Motion"); (b) the Ad Hoc Group of
Mesothelioma Claimants [Dkt. 335]; (c) Paul Crouch [Dkt. 346] (the "Crouch Motion");
(d) the Ad Hoc Committee of States Holding Consumer Protection Claims (the "Ad Hoc States")
[Dkt. 350] (the "States Motion"); (e) law firms on behalf of various mesothelioma claimants
[Dkt. 352]; (f) Maune Raichle Hartley French & Mudd, LLC [Dkt. 358]; (g) the U.S. Trustee
[Dkt. 379] (the "UST Motion"); (h) Arnold & Itkin LLP ("Arnold & Itkin") [Dkt. 384]
(the "A&I Motion"); (i) certain claimants represented by The Barnes Law Group [Dkt. 473]; and
(j) the States of New Mexico and Mississippi [Dkt. 480] (the "NM/MS Motion").

4.      On May 26, 2023, the Ad Hoc Committee of Supporting Counsel
(the "AHC of Supporting Counsel") filed the *Omnibus Objection to Motions to Dismiss* [Dkt.
613] (the "AHC Objection") and the Debtor filed the *Omnibus Objection to Motions to Dismiss
Chapter 11 Case* [Dkt. 614] (the "Omnibus Objection").

5.      On June 22, 2023, replies (collectively, the "Replies") were filed by the
following parties: (a) the TCC [Dkt. 857] (the "TCC Reply"); (b) the Ad Hoc Group of
Mesothelioma Claimants [Dkt. 866]; (c) the Ad Hoc States [Dkt. 863] (the "States Reply");
(d) Maune Raichle Hartley French & Mudd, LLC [Dkt. 855] (the "MRHFM Reply"); (e) the
U.S. Trustee [Dkt. 862] (the "UST Reply"); (f) Arnold & Itkin [Dkt. 854] (the "A&I Reply");
and (g) the States of New Mexico and Mississippi [Dkt. 872] (the "NM/MS Reply").

6.      On June 22, 2023, the Debtor, Johnson & Johnson ("J&J"), the AHC of
Supporting Counsel and the Movants submitted the *Evidentiary Stipulation for Hearing on the
Motions to Dismiss Debtor's Bankruptcy Case* [Dkt. 852] (the "Evidentiary Stipulation").

7.      On June 26, 2023, the Debtor filed the *Sur-Reply in Further Support of the Omnibus Objection to Motions to Dismiss Chapter 11 Case* [Dkt. 906], and the AHC of Supporting Counsel filed the *Omnibus Response of Ad Hoc Committee of Supporting Counsel to Replies in Support of Motions to Dismiss* [Dkt. 900] (together, the "Sur-Replies").

8.      On June 30, 2023, the Debtor and A&I entered into the *Joint Stipulation Regarding the Admission of Certain Evidence at Trial* [Dkt. 955].

9.      Pursuant to the Evidentiary Stipulation, direct testimony of the following fact witnesses was offered by the Debtor or the AHC through written declarations (collectively, the "Witness Declarations"):  (a) Richard Dickinson, Ex. D-2 (the "Dickinson Decl."); (b) John K. Kim, Ex. D-1 (the "Kim Decl."); (c) Adam Lisman, Ex. D-4 (the "Lisman Decl."); (d) James Murdica, Ex. D-5 (the "Murdica Decl."); (e) James G. Onder, Ex. D-7 (the "Onder Decl."); (f) Robert Wuesthoff, Ex. D-3 (the "Wuesthoff Decl."); and (g) Mikal C. Watts, Ex. D-6 (the "Watts Decl.").

10.     Pursuant to the Evidentiary Stipulation, direct testimony of the following expert witnesses was offered through written reports and, in some cases, rebuttal reports (collectively, the "Expert Reports"): (a) Gregory K. Bell, Ph.D.; (b) Sheila L. Birnbaum; (c) Hon. Royal Furgeson (Ret.); (d) Saul Burian; (e) Charles H. Mullin, Ph.D.; and (f) D. Theodore Rave.

11.     On June 27 through June 30, 2023 the Court held a hearing to consider the Dismissal Motions (the "Hearing").  By agreement of the Debtor, J&J, AHC of Supporting Counsel and the Movants, the factual record on which to resolve the Motions to Dismiss includes evidence from the April 18, 2023 hearing on the *Debtor's Motion Seeking an Order (I) Declaring That the Automatic Stay Applies or Extends to Certain Actions Against Non-*

*Debtors, (II) Preliminarily Enjoining Such Actions, and (III) Granting a Temporary Restraining*

*Order Ex Parte Pending a Hearing on a Preliminary Injunction* [Adv. Pro. No. 23-1092, Dkt. 2,

and at the February 14-18, 2022 hearing on the motions to dismiss filed by the Official

Committee of Talc Claimants [Dkt. 632] and the law firm of Arnold & Itkin, LLP, on behalf of

certain talc personal injury claimants [Dkt. 766] and the related preliminary injunction motion in

the adversary proceeding [Adv. Pro. No. 21-03032, Dkt. 2] in the Debtor's prior chapter 11 case.

See Evidentiary Stipulation, ¶¶ 1-6.

12.     On July 19, 2023, the Debtor, J&J, the AHC of Supporting Counsel and

the certain Movants submitted a *Joint Stipulation and Agreed Order Regarding the Admission of*

*Exhibits and Deposition Designations in Connection with Motion to Dismiss Hearing* (the "Joint

Exhibit Stipulation"), which governs the exhibits and deposition designations that the Court

admits into the record in connection with the Hearing.

13.     The Court has reviewed the Dismissal Motions, the AHC Objection, the

Omnibus Objection, the Replies, the Sur-Replies, the Witness Declarations, the Expert Reports,

and the other filings in connection with the Dismissal Motions.

14.     The Court has considered the arguments of counsel made on the record at

the Hearing and the evidence presented and admitted into the record at the Hearing pursuant to

the Joint Exhibit Stipulation.

15.     The Court has taken judicial notice of the papers and pleadings on file in

this Chapter 11 Case and in the Debtor's prior chapter 11 case.

16.     After due deliberation and for sufficient cause, and based on the evidence

admitted in connection with the Dismissal Motions, the Court denies the Dismissal Motions and

pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable to this contested

matter by Rule 7052 of the Federal Rules of Bankruptcy Procedure, enters the following

Findings of Fact and Conclusions of Law in connection with that determination:

## FINDINGS OF FACT[4]

I. **HISTORY OF THE DEBTOR'S TALC PERSONAL INJURY CLAIMS AND THE 2021 CHAPTER 11 CASE**

    A. **The Costs and Burdens of Talc Litigation Lead to a Corporate Restructuring and the 2021 Chapter 11 Case.**

        17.    Before LTL's formation and the filing of the petitions in LTL's successive

chapter 11 cases, Johnson and Johnson Consumer Companies, Inc. ("J&J Consumer

Companies"), the former Johnson & Johnson Consumer Inc. ("Old JJCI"), and J&J had been

defending against tens of thousands of talc-related product liability cases pending both in the

MDL proceeding in this judicial district and in other federal and state courts around the country.

That litigation was directed to two talc-containing products: Johnson's Baby Powder and Shower

to Shower.  See Kim Decl. at ¶ 7.

        18.    Although the products stopped being available in North America by 2020,

individuals could continue to bring talc-related suits against LTL through 2080 and beyond

because the latency period for the cancers alleged to be caused by the products is 60 years or

more.  See *Decl. of John K. Kim in Support of First Day Pleadings* [Dkt. 4] (the "Kim First Day

Decl.") at ¶ 42.  LTL and J&J believe that these products, manufactured and sold by LTL's

predecessors, did not contain asbestos, were safe, and did not cause any of the harm alleged.  Id.

at ¶ 8.  Nonetheless, the costs of defending the claims, the long latency period associated with the

---

[4]    To the extent any of the following findings of fact constitute conclusions of law, they are adopted and treated as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted and treated as such.

cancers alleged to be caused by the products, and the large verdicts that had been rendered made

the continued defense of the talc litigation in the tort system unsustainable.  Id.

19.     This significant and growing financial burden prompted Old JJCI to

implement a corporate restructuring (the "2021 Corporate Restructuring"), which was completed

on October 12, 2021.  Kim Decl. at ¶ 9.  As a result of this restructuring, Old JJCI ceased to exist

and two new entities were created: (i) LTL and (ii) Johnson & Johnson Consumer Inc. ("New

JJCI").  See Kim First Day Decl. at ¶ 24.  The 2021 Corporate Restructuring was effectuated

through a series of steps, including the establishment of a funding agreement between LTL, on

the one hand, and J&J and New JJCI on the other (the "2021 Funding Agreement").  See id. at ¶

32.

20.     The purpose of the 2021 Funding Agreement was to facilitate the

resolution of cosmetic talc claims through a chapter 11 filing by LTL.  Id.  The 2021 Funding

Agreement obligated New JJCI and J&J, on a joint-and-several basis, to provide funding, up to

the value of New JJCI for, among other things, (i) the administrative costs of LTL's chapter 11

case and (ii) a trust that would satisfy current and future talc claims, in both situations to the

extent that LTL was unable to provide that funding on its own.  Id.

21.     Two days after the 2021 Corporate Restructuring was completed, on

October 14, 2021, LTL filed its initial chapter 11 case (the "2021 Chapter 11 Case").  Id. at ¶ 9.

The 2021 Corporate Restructuring and the filing of the 2021 Chapter 11 Case were carried out to

equitably and efficiently resolve thousands of talc-related claims.  Id. at ¶ 9; June 2, 2023 Hr'g

Tr. at 264:19-265:3 [Kim]; June 27, 2023 Hr'g Tr. at 171:2-6 [Dickinson].  The 2021 Funding

Agreement, including the J&J backstop participation, was part of a single, integrated transaction

that included other steps in the 2021 Corporate Restructuring and ultimately the filing of the

2021 Chapter 11 Case. <u>See</u> *Joint Stipulation and Agreed Order Between Movants and Debtor Regarding the Admission of Exhibits at Motion to Dismiss Trial*, No. 21-30589, Dkt. 1497 (the "<u>2021 Exhibit Stipulation</u>"), Debtor Ex. 104 (January 28, 2022 Expert Report of Saul Burian), at 7; June 29, 2023 Hr'g Tr. (Vol. II)[5] at 7:14-9:16 [Burian]; 2021 Exhibit Stipulation, Debtor Ex. 78 (January 28, 2023 Expert Report of Matthew Diaz), at 19; Kim Decl. at ¶ 9; October 20, 2021 Hr'g Tr. at 28:17-29:11 [statements by counsel for the Debtor].

### B.    The Third Circuit Opinion.

22.    Various parties filed motions to dismiss the 2021 Chapter 11 Case. This Court denied those motions in its opinion of February 25, 2022, having determined that the filing was made in good faith and for a valid reorganizational purpose. <u>See</u> Kim Decl. at ¶ 12; <u>see also</u> In re LTL Mgmt., LLC, 637 B.R. 396, 429-30 (Bankr. D.N.J. 2022). After accepting a direct appeal certified to it by this Court, the United States Court of Appeals for the Third Circuit, in an opinion dated January 30, 2023, reversed. <u>See</u> <u>In re LTL Mgmt., LLC</u>, 58 F.4th 738 (3d Cir. 2023), <u>as amended by</u> 64 F.4th 84 (3d Cir. 2023) (the "<u>Third Circuit Opinion</u>"). Kim Decl. at ¶ 12.

23.    Thereafter, LTL filed a petition in the Third Circuit seeking a panel rehearing and an <u>en banc</u> rehearing of the Third Circuit Opinion. Kim Decl. at ¶ 14. The Third Circuit denied that petition and a subsequent motion by the Debtor seeking a stay of the mandate pending a ruling on a petition for writ of certiorari to the United States Supreme Court. <u>See</u> No. 22-2003 (3d. Cir.), Dkts. 172, 180. The mandate issued on March 31, 2023, and on April 4, 2023, this Court dismissed the 2021 Chapter 11 Case. <u>See</u> No. 21-30589, Dkt. 3938.

---

[5]    References to Volume I and Volume II of hearing transcripts herein refer to morning sessions and afternoon sessions, respectively.

## II.    PLAINTIFF LAW FIRMS REPRESENTING MAJORITY OF TALC CLAIMANTS SUPPORT LTL'S SECOND BANKRUPTCY FILING

### A.    Following the Third Circuit Opinion, Plaintiff Law Firms Initiate Negotiations Around Global Resolution Through Second Bankruptcy Filing.

24.    Throughout the 2021 Chapter 11 Case, LTL, J&J, and other key stakeholder constituencies participated in court-ordered mediation to negotiate a potential consensual plan of reorganization.  Murdica Decl. at ¶ 38.  Despite these efforts, no agreement had been reached before the Third Circuit Opinion was rendered.  Id.  LTL and J&J believed that one of the chief impediments to reaching a resolution was the greater financial compensation that many plaintiff law firms could receive if resolution occurred in the MDL.  Id.; see also June 7, 2023 Erik Haas Dep. Tr. at 109:6-113:14.  For example, objectors from MDL leadership stand to recover hundreds of millions of dollars from the MDL common benefit fund, which recoveries are not available in bankruptcy.  Murdica Decl. at ¶ 39; June 28, 2023 Hr'g Tr. (Vol. I) at 20:15-21:13 [Murdica].  The range of fees that could be contributed to the MDL common benefit fund is eight to 12 percent of the gross recovery amount.  April 17, 2023 Andrew Birchfield Dep. Tr. at 20:24-21:6.  Based on the proposed settlement amount of $8.9 billion, that range would aggregate $712 million to $1.068 billion.  Id. at 21:7-11.

25.    After the Third Circuit Opinion was issued, LTL, J&J, and various plaintiff law firms, with the assistance of the court-appointed mediators and pursuant to the Court's mediation order, continued negotiating a potential consensual resolution of the case.  Murdica Decl. at ¶ 40; Watts Decl. at ¶ 25; Onder Decl. at ¶¶ 23-24; June 28, 2023 Hr'g Tr. (Vol. II) at 117:16-118:9 [Onder].  Mikal Watts, a plaintiff lawyer representing over 16,000 talc claimants, contacted James Murdica of Barnes & Thornburg to discuss a final, global resolution of the talc liability, including all present and future claims, to be efficiently administered through a second bankruptcy by LTL.  Murdica Decl. at ¶¶ 40-41; Watts Decl. at ¶¶ 7, 25-26; June 28,

2023 Hr'g Tr. (Vol. I) at 39:3-9 [Murdica]. Mr. Murdica, J&J's long-time settlement counsel

who has worked for over three years to resolve the talc litigation, was authorized by LTL and

J&J to negotiate on their behalf.  June 27, 2023 Hr'g Tr. at 238:8-15 [Kim]; June 28 Hr'g Tr.

(Vol. I) at 8:21-9:8 [Murdica].

      26.     Mr. Watts and Mr. Murdica testified that it would be virtually impossible

under the circumstances to settle the talc claims on a global basis in the tort system.  June 28,

2023 Hr'g Tr. (Vol. II) at 46:19-22 [Watts]; June 28, 2023 Hr'g Tr. (Vol. I) at 23:17-24:7

[Murdica].  Rather, the only way to achieve a global settlement of the talc liabilities is through a

settlement trust administered under the Bankruptcy Code because it allows for the resolution of

claims on behalf of future claimants.  Murdica Decl. at ¶¶ 41; June 28, 2023 Hr'g Tr. (Vol. II) at

46:2-18 [Watts].  James Onder, a plaintiff lawyer representing over 20,000 talc claimants,

similarly testified that having a mechanism for future claimants to be compensated immediately

is an important goal to resolve the talc litigation.  June 28, 2023 Hr'g Tr. (Vol. II) at 122:18-

123:22 [Onder].  According to Mr. Watts, the period subsequent to the issuance of the Third

Circuit Opinion was an opportune time to explore settlement of the talc litigation on a global

basis within a second bankruptcy.  June 28, 2023 Hr'g Tr. (Vol. II) at 46:2-25 [Watts].

      27.     In early 2023, Mr. Watts and other plaintiffs' lawyers (including Mr.

Onder) negotiated with Mr. Murdica and Erik Haas, J&J's Worldwide Head of Litigation,

regarding terms of a Plan Support Agreement ("PSA"), pursuant to which the parties agreed to

work together to finalize and seek confirmation of a plan of reorganization that, if confirmed and

consummated, would fully resolve all current and future talc claims.  Murdica Decl. at ¶ 43;

Watts Decl. at ¶¶ 26-27; June 28, 2023 Hr'g Tr. (Vol. II) at 32:5-11 [Watts]; Onder Decl. at

¶¶ 24-27.  During this time, counsel to members of the Official Committee of Talc Claimants

from LTL's first bankruptcy were advised that negotiations around a possible resolution of the

talc liability were taking place.  June 28, 2023 Hr'g Tr. (Vol. II) at 117:16-118:9 [Onder]; May

24, 2023 Majed Nachawati Dep. Tr. at 112:9-113:8; see also *End of Case Statement by the*

*Official Committee of Talc Claimants*, No. 21-30589, Dkt. 3932.

> **B.** **Seventeen Plaintiff Law Firms Representing 58,000 Claimants Sign Plan
> Support Agreements to Support Global Resolution of Talc Liabilities in
> Bankruptcy.**

28.     As negotiations progressed, Mr. Murdica drafted the PSA using a template

that Mr. Watts had provided him, and Mr. Murdica also prepared a term sheet that reflected their

discussions regarding the general terms of a global resolution of all current and future talc

claims.  Murdica Decl. at ¶ 46.  The PSA and term sheet provided for a plan of reorganization

that includes the establishment of a trust funded in the amount of $8.9 billion on a net present

value basis.  Murdica Decl. at ¶ 47; Kim Decl. at ¶ 28, Exs. A-V.  This settlement amount of $8.9

billion is more than twice the $3.25 billion amount that was proposed by plaintiff lawyers

(including Andrew Birchfield, counsel to a member of the TCC and one of the lead lawyers in

the federal MDL) to settle all current and future ovarian cancer talc claimants in the Imerys

bankruptcy and would be the largest settlement amount in any asbestos bankruptcy case and one

of the largest settlements of personal injury claims in history.  Murdica Decl. at ¶¶ 48-49; Watts

Decl. at ¶ 29.

29.     Once the deal terms were agreed upon, LTL, J&J, and 17 law firms signed

PSAs that were substantially identical.  Murdica Decl. at ¶¶ 42-43; Watts Decl. at ¶ 28; Onder

Decl. at ¶ 28; Kim Decl. at ¶ 29, Exs. A-V; D-486; D-563.  According to the 2019 statements,

these supporting law firms disclosed that they represent approximately 58,392 claimants.  *See* D-

563 (*Verified Statement Pursuant to Bankruptcy Rule 2019 on Behalf of Ad Hoc Group of*

*Supporting Counsel* [Dkt. 470]); D-486 (*First Supplemental Verified Statement Pursuant to*

*Bankruptcy Rule 2019 on Behalf of Ad Hoc Group of Supporting Counsel* [Dkt. 807]).

30.      Following a ruling by the Court [Dkt. 708], a third-party selected by the

TCC to identify potential duplicate records audited the claimant lists of these supporting law

firms and identified only approximately 1,100 duplicate records.  D-517.  Thus, the 17 firms that

signed PSAs represent at least approximately 57,292 claimants.

| Law Firm | Number of Claims Represented |
| --- | --- |
| Andres Pereira Law Firm | 63 |
| Andrews & Thornton | 2,031 |
| De la Rosa Law Firm | 251 |
| Ferrer Poirot & Wansbrough | 107 |
| Heninger Garrison Davis, LLC | 97 |
| Johnson Law Group | 2,132 |
| Linville Law Group | 87 |
| McDonald Worley PC | 808 |
| Nachawati Law Firm | 4,949 |
| OnderLaw, LLC | 21,411 |
| Paul LLP | 17 |
| Pulaski Kherkher, PLLC | 6,231 |
| Rueb Stoller Daniel (f/k/a Dalimonte Rueb, LLP) | 1,258 |
| Singleton Schreiber | 144 |
| Slater Slater Schulman LLP | 366 |
| Trammell PC | 1,505 |
| Watts Guerra LLP | 16,935 |

**Total Claimants  =  58,392 – 1,100 Duplicates  =  57,292 Claimants**

<u>See</u> D-563; D-486.

31.      Based on the evidence presented, Plaintiff firms who object to LTL's

bankruptcy represent at most approximately 25,797 claimants.

| Law Firm | Number of Filed Claims | Number of Unfiled Claims |
|---|---|---|
| Arnold & Itkin | 979 | 12,155 |
| Ashcraft & Gerel, LLP | - | - |
| Barnes Law Group | 46 | 0 |
| Beasley Allen Law Firm | 5,981 | 5,600 |
| Dean Omar Branham Shirley, LLP | 35 | 0 |
| Kazan McClain, Satterley & Greenwood PLC | - | - |
| Levy Konigsberg LLP | 126 | 0 |
| Maune Raichle Hartley French & Mudd LLC | 46 | 0 |
| The Ruckdeschel Law Firm | - | 0 |
| Weitz & Luxenberg, P.C. | 637 | 192 |
| **Total = 25,797 claimants** | | |

See D-480, D-554-560.  Although these objecting firms, unlike the supporting plaintiffs' firms,

have not filed 2019 statements or provided claimant lists, the approximate number of their claims

is determinable from interrogatory responses and other information.  Id.  Thus, as the chart below

shows, counsel representing a substantial majority of claimants support LTL's plan to resolve

talc claims through this Chapter 11 Case.



32.     The 17 firms that signed PSAs formed the AHC of Supporting Counsel to

advance their common interests in connection with LTL's second bankruptcy.  D-563; D-486.

The AHC of Supporting Counsel include counsel to members of the mass tort plaintiffs' bar who

have decades of experience in mass tort litigation generally and who have led the talc litigation specifically. D-563; D-486; Onder Decl. at ¶ 29. Thousands of their clients filed talc lawsuits before LTL commenced the 2021 Chapter 11 Case. Id. Two of the 17 firms that comprise the AHC of Supporting Counsel—Nachawati Law Firm (f/k/a Fears Nachawati) and OnderLaw, LLC—were previously counsel to members of the Official Committee of Talc Claimants in the 2021 Chapter 11 Case. Murdica Decl. at ¶ 44.

C.     **Members of AHC of Supporting Counsel Maintain Rigorous Client Intake Procedures to Eliminate Duplication and Non-Compensable Claims.**

33.     Mr. Watts and Mr. Onder testified that they vet potential clients through rigorous intake procedures. Watts Decl. at ¶¶ 7-18; Onder Decl. at ¶¶ 9-13. For example, Mr. Watts testified that his process includes a 15-page intake questionnaire to determine whether threshold criteria are met, including whether the person has a durable history of talc product use. Watts Decl. at ¶ 12; June 28, 2023 Hr'g Tr. (Vol. II) at 54:24-55:5 [Watts]. For those clients who satisfy the initial intake criteria, Mr. Watts testified that his firm collects identification information and asks a set of corroborating questions. Watts Decl. at ¶¶ 13-14. Answers to these questions are recorded and software programs analyze the truthfulness of the responses. Id.

34.     Mr. Watts also testified that his firm orders and analyzes pathology reports and other medical records and determines the diagnostic category of each type of cancer his clients allege. Id. at ¶ 15; June 28, 2023 Hr'g Tr. (Vol. II) at 28:5-29:14; 35:1-10 [Watts]. He said his firm spends tens of millions of dollars to ensure that his clients have compensable cases and to eliminate non-compensable claims. June 28, 2023 Hr'g Tr. (Vol. II) at 54:9-55:5 [Watts]. According to Mr. Watts, this intake process eliminates all but approximately twenty percent of the people who respond to his firm's marketing efforts. Watts Decl. at ¶ 18.

35.    Mr. Onder testified that his firm follows a similar process to vet potential clients, which process includes ordering medical records and using an OB-GYN with expertise in gynecologic pathology to analyze those records.  Onder Decl. at ¶¶ 12-13.  Mr. Onder explained that, pursuant to his intake procedures, his firm has rejected over 80,000 potential claimants.  Id. at ¶ 11.  Mr. Onder testified that the intake processes they use were developed in consultation with medical experts and other law firms leading the talc litigation, including some that are moving to dismiss LTL's bankruptcy.  Onder Decl. at ¶ 8; June 28, 2023 Hr'g Tr. (Vol. II) at 113:22-115:1 [Onder].  Similarly, Mr. Watts testified that his intake criteria was based off of criteria developed by Mr. Jason Itkin, whose firm, Arnold & Itkin LLP, has appeared in and moved to dismiss the case on behalf of certain talc claimants.  Watts Decl. at ¶ 8.  Other members of the AHC of Supporting Counsel likewise testified that they employ established intake processes to avoid duplication and eliminate non-compensable claims.  June 14, 2023 Adam Pulaski Dep. Tr. at 58:16-59:12; 94:2-95:23; May 24, 2023 Majed Nachawati Dep. Tr. at 65:13-66:4.

III.    **THE DEBTOR'S DECISION TO FILE THE 2023 CHAPTER 11 CASE**

A.    **The Talc Litigation Is the Cause of LTL's Financial Distress.**

36.    LTL's business purpose, at formation and throughout its existence, has been to manage and to equitably, efficiently and permanently resolve all pending and future talc-related claims for which Old JJCI was responsible.  See Wuesthoff Decl. at ¶ 7; see also Kim Decl. at ¶ 22 ("The Debtor's aim is to achieve a final, equitable, and efficient resolution of all talc claims, current and future, for the benefit of all parties, including the claimants, LTL, and its

-22-

affiliates.")  These include claims formerly asserted against Old JJCI as well as claims asserted

against J&J, other affiliates of LTL, and other parties in the tort system.  See Kim Decl. at ¶ 7.

37.    As of October 14, 2021 (the "2021 Petition Date"), LTL was responsible

for the defense and resolution of nearly 40,000 pending talc-related product liability actions.  Old

JJCI had incurred $1 billion in defense costs and had made $3.5 billion in indemnity payments,

most of which costs were incurred and payments made in the five years prior.  See Kim Decl. at

¶ 16.  The J&J Consumer Health Business of which Old JJCI was a part had turned unprofitable

in the year before the 2021 Petition Date solely as a result of the talc-related litigation.  See id.;

see also Expert Report of Gregory K. Bell, Ph.D. (No. 21-30589 (MBK)) at ¶ 8.  Claimant

demands included a $7.2 billion demand in the Forrest case and a $1 billion demand in the Geise

case.  In the most recent mesothelioma case to go to trial prior to the 2021 Chapter 11 Case (the

Johnson case), the plaintiff's counsel argued to the jury that $8 billion was an appropriate sum to

award in compensatory damages.  See Kim Decl. at ¶¶ 18-19.  And just last week, in the single-

plaintiff Valadez case, plaintiff's counsel asked the jury to return a $500 million verdict against

J&J—$50 million for compensatory damages and "nine times" that for punitive damages.  See

D-565.

38.    After the issuance of the Third Circuit Opinion, the LTL Board of

Managers held meetings on February 23, 2023, March 16, 2023, March 28, 2023, and April 2,

2023.  See Wuesthoff Decl. at ¶ 12.  In presentations at both March 28 and April 2 meetings, the

Board was informed that talc liabilities "are anticipated to increase and continue for decades;

defense costs are substantial and increasing; settlement demands are increasing; thousands of

additional claims are anticipated; almost all state AGs have filed, or are threatening to file, suit;

and LTL is subject to a myriad of indemnification claims, including from Imerys, where

claimants alleged that LTL owed Imerys billions." See Wuesthoff Decl. Ex. E at 25 and Ex. F at 10.

      39.    Based on the data available to it, LTL understood that the number of current claims had increased from approximately 40,000 claims as of October 14, 2021, to as many as 100,000 current claims now. See Kim Decl. at ¶ 58. By April 2, 2023, LTL's Chief Legal Officer, John Kim, believed that LTL faced an increasing risk that going forward talc trials would include multiple-plaintiff consolidated trials. See Kim Decl. at ¶ 36. These trials pose enhanced verdict risk—both in terms of an increased risk of a verdict for the claimants and an increased risk of larger dollar awards. Id.; see also June 27, 2023 Hr'g Tr. at 261:2-262:20 (Mr. Kim testifying: "The other real problem on the indemnity side of consolidated trials is we have literature that shows that the likelihood of winning a consolidated trial is much less than winning a single trial…when you have a mass of people, jurors tend to side with the mass of plaintiffs as opposed to an individual plaintiff."); see also June 29 Hr'g Tr. (Vol. II) at 153:2-8 (Dr. Mullin testifying: "There is a literature that looks at [the question of the impact of consolidated trials on outcomes and the likelihood of outcomes]. I think Professor [Rangel]…[T]hat literature in general shows that when you consolidate trials, the likelihood of a plaintiff verdict rises and conditional (indiscernible) plaintiff verdict, the damages on average that get awarded also rise."); see also June 7, 2023 Expert Report of Charles H. Mullin, D-64 ("Mullin Report") at ¶ 82.

      40.    The LTL Board was familiar with the historical spend to defend talc cases, as well as the volatile nature of verdicts, and the anticipated increasing number of cases to be tried at the time it considered the financial distress facing the Debtor as of April 2, 2023, when dismissal of its first chapter 11 case was imminent. See June 27, 2023 Hr'g Tr. at 135:17-20 (Mr. Dickinson testifying: "I think I said I didn't ask, and I didn't need to[,] based on my

familiarity with the historical spend to litigate, the wild and unpredictable verdicts, and I didn't

see that changing anytime soon"); id. at 206:16-18 (Mr. Kim testifying: "Well, again, based upon

the information from back then which was based on assumptions that we had about how many

cases that were being tried, the cost of the litigation back then."). The Board also believed that

these numbers were getting worse. Id. at 206:19-20 (Mr. Kim testifying: "But, again, as we said

in the board presentation, all those numbers were getting worse."); see also id. at 260:13-14 (Mr.

Kim testifying: "[W]e understand that the game plan of the plaintiffs' lawyers is to flood the

courts with our trials. So we expect a huge increase in trial costs.").

      **B.**      **The LTL Board Determined That the 2021 Funding Agreement May No Longer Be Available to Manage That Distress.**

      41.     The 2021 Funding Agreement was intended to financially support and

facilitate LTL's reorganization through chapter 11 proceedings, including the funding of a

Section 524(g) trust from which pending and future claims would be paid. See Kim Decl. at

¶ 24; see also Wuesthoff Decl. at ¶ 18; see also June 27, 2023 Hr'g Tr. at 264:19-21 (Mr. Kim

testifying: "The [2021] funding agreement was specifically intended to facilitate a resolution of

these talc liabilities in a bankruptcy."); see also id. at 171:2-6 (Mr. Dickinson testifying: "I

understand what the agreement says, that it survived in or out of bankruptcy. The intent, in my

opinion, was solely with regard to facilitating our bankruptcy process reaching a full and final

resolution. I still believe that to this day.").

      42.     The Debtor announced the parties' intent regarding the J&J voluntary

backstop in the 2021 Funding Agreement at the outset of this case and its position with respect to

the intent has not changed. The intent was to "alleviate concerns about hypothetical

transactions" during bankruptcy that might "diminish" payor New JJCI's assets. Oct. 20, 2021

Hr'g Tr. at 28:17- 29:11 [statements by counsel for the Debtor]. The intent was to preemptively

address complaints raised in earlier bankruptcies involving divisional mergers regarding the risk

that a funding agreement payor in New JJCI's position might start "dividending assets away—

divendending them up to the parent." Feb. 18, 2022 Hr'g Tr. at 67:6-58: 20 [statements by

counsel for the Debtor]. The J&J ultimate parent backstop here was intended to "take that issue

off the table." Id.

43.     Following the Third Circuit Opinion, J&J took the position that the 2021

Funding Agreement was no longer enforceable because it was rendered void or voidable. See

Kim Decl. at ¶ 25; see also June 7, 2023 Erik Haas Dep. Tr. at 12:3-20. Counsel for J&J and

Johnson & Johnson Holdco (NA) Inc. ("Holdco"), which had become the new name of New

JJCI, advised Mr. Kim as early as January 30, 2023, the day of the Third Circuit's decision, and

multiple times thereafter of their belief that the 2021 Funding Agreement had become void or

voidable as a result of the basis of the Third Circuit Opinion. See Kim Decl. at ¶ 26; see also

June 7, 2023 Erik Haas Dep. Tr. at 30:3-7. Mr. Kim informed board members that J&J had

taken this position. See Wuesthoff Decl. at ¶ 18.

44.     The Board was informed and determined that there was a material risk that

the 2021 Funding Agreement was void or voidable, and, thus, unenforceable. See June 27, 2023

Hr'g Tr. at 119:5-10 (Mr. Wuesthoff testifying: "[The Third Circuit's] ruling, as I understand it,

made it voidable…[b]ecause it frustrated the purpose of the J&J backstop which was to facilitate

a successful bankruptcy resolution of the claims, and that frustrated that purpose, and that's what

made it void or voidable, is my understanding."); see also June 27, 2023 Hr'g Tr. at 112:21-25

(Mr. Wuesthoff testifying: "I was told there was a material risk that [the first funding agreement]

could not be enforced.").

45. The Board further understood that without an enforceable funding agreement or suitable replacement funding, LTL's ability to meet even short-term litigation costs in the tort system would be materially impaired.  See Wuesthoff Decl. at ¶ 19.  This ability would be sorely tested by a crush of new filings that LTL anticipated would likely accompany a return to the tort system upon dismissal of the 2021 Chapter 11 Case.  See Kim Decl. at ¶ 36.

46. The LTL Board authorized LTL's entry into new funding arrangements to eliminate the material risk that the 2021 Funding Agreement had been rendered void or voidable, see Kim Decl. at ¶ 50; see also id. at Ex. Z; see also Wuesthoff Decl. at ¶ 35, and to support the funding requirements set forth in the Plan Support Agreements.

**C.    The LTL Board Addressed the Risk to the Enforceability of the 2021 Funding Agreement.**

47. As described above, after the Third Circuit Opinion, negotiations among the Debtor, J&J, and various law firms for talc claimants culminated in agreements to the material terms of a proposed plan of reorganization and the execution of Plan Support Agreements, which called for the establishment of a trust that would be funded with $8.9 billion on a net present value basis.  See Kim Decl. at ¶ 28.

48. The LTL Board met on April 2, 2023.  See Wuesthoff Decl. at Ex. F (April 2, 2023 Board Minutes).  During that meeting, the Board was informed that the Third Circuit declined to stay its mandate of dismissal.  See Wuesthoff Decl. at ¶ 30.  The Board considered several options in response to the Third Circuit Opinion, including awaiting the imminent return to the tort system and defending talc claims there, a potential recapitalization and sale of the liability, and the filing of a second bankruptcy to effectuate a plan of reorganization consistent with the terms of the Plan Support Agreements.  See Kim Decl. at ¶ 47; see also Wuesthoff Decl. at ¶ 31.  The Board determined that a return to the tort system was

-27-

financially untenable and that a liability sale was impracticable.  See Wuesthoff Decl. at ¶ 31-32;
see also Kim Decl. at ¶ 48.  Mr. Kim ultimately recommended that the Board authorize the filing
of the second bankruptcy and, with it, pursuit of the resolution of all claims outlined in the Plan
Support Agreements.  Id.; see also Wuesthoff Decl. at ¶ 33.

49.     At that same April 2 meeting, Mr. Kim and outside counsel reviewed
changes to LTL's funding arrangements that could support the filing of a second bankruptcy and
the funding of a trust to resolve all claims in the amount of $8.9 billion consistent with the terms
of the Plan Support Agreements.  See Wuesthoff Decl. at ¶ 33; see also Kim Decl. at ¶ 48.

50.     As a part of that review, the Board assessed LTL's financial condition and
that of Holdco, the proposed obligor under a new funding agreement.  See Kim Decl. at ¶ 48; see
also Wuesthoff Decl. at ¶ 33.  The Board reviewed financial information for both entities and
concluded that with the new funding agreement in place, LTL and Holdco would each be
solvent.  See Kim Decl. at ¶ 44; see also Wuesthoff Decl. at ¶ 26.  That information reflected that
Holdco was valued at $29 billion.  See Kim Decl. at ¶ 41; see also Wuesthoff Decl. at ¶ 24.

51.     Holdco's value reflected only $400 million in cash, which would support
defense costs upon a return to the tort system for only a limited period of time.  Holdco's
uncertain dividend stream and its minority ownership position in certain of its investments
presented additional liquidity pressure should Holdco be called upon to fund tort system spend
beyond its limited cash position.  See Wuesthoff Decl. at ¶¶ 24-25; see also Kim Decl. at ¶¶ 41-
43.  Asset sales, were they necessary and could they be achieved, would only serve to reduce
further income-generating holdings.  See Wuesthoff Decl. at ¶ 25; see also Kim Decl. at ¶ 43.
The LTL Board believed that LTL and Holdco would encounter unavoidable and material

liquidity pressure immediately upon return to the tort system.  See Wuesthoff Decl. at ¶ 25; see also Kim Decl. at ¶ 43.

52.     The LTL Board understood that if LTL were to return to the tort system, it would do so under immediate financial distress.  See Wuesthoff Decl. at ¶ 26; see also Kim Decl. at ¶ 44; see also June 27, 2023 Hr'g Tr. at 264:5-9 (Mr. Kim testifying: "So based upon the – on all the background that we had, all the data points, we felt that it was really – it's an easy decision to determine that we were under financial distress and we didn't feel that we had a need to bring in asset experts at that point to go through that.").  Based on his extensive experience in defending tort claims over more than twenty years, Mr. Kim understood that the cases and trial costs LTL would face would substantially increase.  Kim Decl. at ¶¶ 3-6; June 27, 2023 Hr'g Tr. at 260:2-18 [Kim].

**D.     The LTL Board Authorized Entry Into the Modified 2023 Funding Arrangements and the Filing of the 2023 Chapter 11 Case.**

53.     The LTL Board determined that a return to the tort system was not a viable option.  Rather, the Board authorized its officers to enter into the agreements that would memorialize the modified funding arrangements in support of the filing of a second chapter 11 case, all with the goal of resolving the talc liability consistent with the terms of the Plan Support Agreements.  See Kim Decl. at ¶ 48; see also Wuesthoff Decl. at ¶ 33; see also Wuesthoff Decl. at Ex. D (board resolutions attached to the minutes of the April 2 meeting).  LTL's modified funding arrangements are set out in three agreements (collectively the "2023 Funding Arrangements"), all dated April 4, 2023:  the Termination and Substitution Agreement (the "T&S Agreement"), which terminated the 2021 Funding Agreement; a new Funding Agreement with Holdco (the "2023 Funding Agreement"); and the separate Support Agreement

between the Debtor, Holdco, and J&J (the "J&J Support Agreement").  See Wuesthoff Decl. at Exs. G, H, and I.

54.     The T&S Agreement terminated the 2021 Funding Agreement among LTL, Holdco, and J&J; obligates Holdco and LTL to enter into the 2023 Funding Agreement; and obligates J&J, Holdco, and LTL to enter into the J&J Support Agreement.  The 2023 Funding Agreement eliminates J&J as a payor; defines Holdco's obligation to fund one or more trusts under a chapter 11 plan that contains terms set out in the Plan Support Agreements; and terminates upon satisfaction of LTL's talc liability and all bankruptcy-related costs.  The J&J Support Agreement obligates J&J to fund a trust on Holdco's behalf in a new chapter 11 case if Holdco fails to do so consistent with the terms of the 2023 Funding Agreement, and terminates when a chapter 11 plan becomes effective and a trust created pursuant to such plan has been funded or when the chapter 11 proceeding advancing such a plan has been dismissed.

55.     The LTL Board expressly authorized LTL's entry into the 2023 Funding Arrangements to eliminate the material risk that the 2021 Funding Agreement had been rendered void or voidable and to assure that LTL had funding sufficient to satisfy the financial terms set out in the Plan Support Agreements.  See Wuesthoff Decl. at ¶ 35; see also Kim Decl. at ¶ 50; see also June 27, 2023 Hr'g Tr. at 106:10-16 (Mr. Wuesthoff testifying: "[W]e believed that – the agreements that we – the previous agreements that would be in support of filing for the bankruptcy met our objectives of, one eliminating the risk of the nonenforceability of the first funding agreement and agreeing to the terms of the PSA to settle all these claims, current and future."); see also id. at 269:20-23 (Mr. Kim testifying: "[I]n discussions with J&J, we had a solution, you know, we had a new funding agreement that accomplished all the purposes that we were interested in, which is to get a full and fair and final resolution in bankruptcy."); see also

Wuesthoff Decl. Ex. D (Board Resolution stating, "[T]he Third Circuit's dismissal decision had the effect of defeating the primary purpose of the 2021 Funding Agreement…and, as a result, there is a material risk that the 2021 Funding Agreement…[was] rendered void or voidable," and entering into the 2023 funding arrangements "to eliminate that risk and secure funding consistent with the plan terms specified in the Plan Support Agreements…").

56.    The Board unanimously concluded that the 2023 Chapter 11 Case provided the only means to efficiently, equitably, and permanently resolve all talc claims, current and future, and that the filing was in the best interest of all stakeholders, including the holders of those claims.  See Wuesthoff Decl. at ¶ 37; see also June 27, 2023 Hr'g Tr. at 257:19-258:11; see also id. at 283:22-284:1 (Mr. Kim testifying: "[A]gain, the solution that presented itself was a termination and substitution agreement that was for the benefit of all parties, including the talc claimants, that would resolve the talc liability in the bankruptcy system fully and fairly and finally.  So that was the option that we chose").

57.    On April 4, 2023, LTL filed the 2023 Chapter 11 Case.  [Dkt. 1].  Consistent with the PSA's requirements, on May 15, 2023, LTL filed a Chapter 11 Plan of Reorganization [Dkt. 525].  Since then, the AHC of Supporting Counsel, LTL, and J&J have continued to negotiate and refine the plan of reorganization.  June 28, 2023 Hr'g Tr. (Vol. II) at 55:13-56:16 [Watts].  On June 26, 2023, LTL filed an Amended Chapter 11 Plan of Reorganization [Dkt. 912] (as may be further amended, the "Plan"), which reflected the changes that had been agreed upon through negotiations occurring over the prior six weeks.  Id.; June 28, 2023 Hr'g Tr. (Vol. I) at 47:19-48:2.  In connection with the Plan, LTL has filed a disclosure statement and scheduled a hearing on approval of the disclosure statement and solicitation procedures [Dkts. 1009-1012].

**E.      Members of AHC of Supporting Counsel Support the Debtor's Plan and Expect to Recommend Their Clients Vote in Favor of It.**

58.      Mr. Watts and Mr. Onder believe that the Plan has only a few issues left to resolve and expect that the final proposed plan of reorganization will satisfy their clients' best interests in many ways, including by paying money quickly without protracted litigation in the tort system.  June 28, 2023 Hr'g Tr. at (Vol. II) 26:12-18 [Watts]; 56:17-57:5 [Watts]; 119:8-120:3; 122:18-123:22 [Onder].  In terms of resolution, the parties are on the "two-yard line," according to Mr. Watts.  June 28, 2023 Hr'g Tr. (Vol. II) at 26:16 [Watts].

59.      One key issue that has been resolved in principle relates to medical liens on settlement amounts that claimants would be entitled to receive under the Plan.  June 28, 2023 Hr'g Tr. (Vol. II) at 120:4-19 [Onder].  A settlement has been reached with counsel to private lienholders, which hold around 85-90% of the medical liens.  Id. at 134:5-135:25 [Onder].  This resolution will allow payments to claimants to be made faster, which is a primary goal of the AHC of Supporting Counsel.  Id.

60.      Members of the AHC of Supporting Counsel expect to recommend to their clients that they vote in favor of the plan once it is finalized.  June 28, 2023 Hr'g Tr. (Vol. II) at 26:12-18, 58:5-11 [Watts]; 121:14-122:9 [Onder]; June 14, 2023 Adam Pulaski Dep. Tr. at 81:9-:82:6; 86:14-87:5.  And it is expected that the vast majority of the AHC of Supporting Counsel's clients will follow their lawyers' recommendations and vote in favor of the proposed plan of reorganization.  June 28, 2023 Hr'g Tr. (Vol. I) at 44:5-22 [Murdica]; June 28, 2023 Hr'g Tr. (Vol. II) at 58:12-20 [Watts].

## IV.    FINANCIAL DISTRESS

### A.    LTL's and Holdco's Assets.

61.    As of April 2023, the fair market value of LTL's assets—outside of its
rights under the 2023 Funding Agreement and without consideration of disputed insurance
coverage—totaled approximately $380 million; it held approximately $14.5 million in cash.  See
Lisman Decl. at ¶¶ 12-13; June 7, 2023 Expert Report of Gregory K. Bell, Ph.D., Debtor Ex. 66
("Bell Report"), at ¶ 55.  Outside the 2023 Funding Agreement, LTL's assets are primarily
comprised of cash and an ownership interest in Royalty A&M LLC ("Royalty A&M"), a wholly
owned subsidiary.  See Lisman Decl. at ¶¶ 12-13.

62.    LTL's ability to generate the cash needed to fund the costs necessary to
defend and resolve its talc liabilities relies largely on its ability to obtain cash from Holdco under
the 2023 Funding Agreement, as well as dividends that it may receive from Royalty A&M.  See
Bell Report at ¶¶ 10, 60-61; Lisman Decl. at ¶ 30.

63.    In December 2022, New JJCI changed its name to Holdco and in early
January 2023, Holdco transferred its Consumer Business assets to its parent entity.  See Kim
First Day Decl. at ¶ 26.  Accordingly, Holdco's assets no longer include the Consumer Business.
See id. at ¶ 83; Kim Decl., Ex. AA at 21.

64.    There is no evidence in the record to support the contentions of certain
Movants that J&J's decision to spin-off its Consumer Business, or the timing of the transfer of
the Consumer Business to Holdco's parent in early January 2023, was connected to either of the
Debtor's bankruptcy filings or LTL's determination to enter into the 2023 Funding
Arrangements.  Indeed, the evidence is contrary to that.  See Kim Decl. at ¶ 54; Lisman Decl. at
¶ 21 ("I personally was involved in the transaction at least one year prior to the November 2021
announcement"); June 29, 2023 Hr'g Tr. (Vol. II) at 10:6-15, 12:1-9 [Burian]; 2021 Exhibit

Stipulation, Claimants' P.I. Ex. 26, (Nov. 12, 2021 press release announcing Consumer Business

spin-off transaction).

65.     Today, Holdco is a holding company with ownership interests in certain

subsidiaries and indirect affiliates largely based outside of the United States.  Holdco's most

substantial asset is a 36.1 percent minority ownership interest in the holding company GH

Biotech Holdings Limited (Ireland) ("GH Biotech"), which Holdco owns through subsidiaries,

Apsis SAS (France) ("Apsis") and Johnson & Johnson Holding GmbH (Germany).  See Lisman

Decl. at ¶ 25.  Holdco also owns, primarily through its wholly owned subsidiary Apsis, indirect

ownership interests in certain other operating entities, including multiple limited-risk distributors

that distribute J&J products in foreign countries and a Germany-based subsidiary that

manufacturers 3D-printed titanium interbody implants for spinal fusion surgery.  See id. at ¶ 28.

66.     Collectively, the estimated fair market value of Holdco's direct and

indirect subsidiaries, as adjusted to reflect Holdco's direct and indirect ownership interests, is

approximately $30 billion.  See id. ¶¶ 22, 23.  Holdco's estimated fair market value is based on a

going-concern assumption that its subsidiaries and indirect affiliates will continue to operate

under the J&J corporate umbrella.  See Bell Report at ¶¶ 10, 42-46.

67.     As of April 4, 2023, Holdco has a net intercompany receivable of

approximately $300 million, which relates to cash held within the J&J treasury.  See Lisman

Decl. at ¶ 29.  This amount comprises $400 million deposited on account of Holdco within the

J&J treasury, less an intercompany payable of approximately $100 million.  See id. ¶ 29.

**B.      LTL's Talc Liability and Associated Costs.**

68.     As noted above, the LTL Board understood when it approved LTL's

second bankruptcy filing that the Debtor's talc liabilities "are anticipated to increase and

continue for decades; defense costs are substantial and increasing; settlement demands are

increasing; thousands of additional claims are anticipated; almost all state AGs have filed, or are threatening to file, suit; and LTL is subject to a myriad of indemnification claims, including from Imerys, where claimants alleged that LTL owed Imerys billions." See Wuesthoff Decl. at ¶ 12, Ex. E at 25; Ex. F at 10.  The Board understood that the number of current claims had increased from approximately 40,000 claims as of October 14, 2021, to as many as 100,000 current claims. See Kim Decl. at ¶ 58.

69.     The LTL Board further understood that LTL faced increased exposure to the volatile nature of verdicts, particularly given the expectation that more cases would be tried. See June 27, 2023 Hr'g Tr. at 135:17-20 [Dickinson]; id. at 206:16-18 [Kim].  The Board, accordingly, expected a "huge increase in trial costs."  Id. at 260:13-14 [Kim].  Mr. Kim understood that LTL faced an increased risk of multiple-plaintiff consolidated trials, which exposed LTL to even more volatile plaintiff verdicts.  See id. at ¶ 36; see also June 27, 2023 Hr'g Tr. at 261:2-262:20 [Kim]; June 29 Hr'g Tr. (Vol. II) at 153:2-8 [Mullin]; Mullin Report at ¶ 82.

### a.    Dr. Mullin's Estimates on Behalf of the Debtor

70.     The Debtor presented evidence of its estimated short-term cash needs and long-run costs to defend and resolve talc-related claims if it returned to the tort system.  The Debtor presented that evidence through the report and testimony of economist Charles H. Mullin, Ph.D.  Dr. Mullin, a partner at Bates White, LLC, routinely provides advice and expert analysis involving mass torts, class actions, bankruptcies, insurance coverage, and other matters.  See Mullin Report at ¶¶ 1, 4.  He is an expert on statistical and data analysis, econometrics, economic and microsimulation modeling, sample design, valuation of mass torts, and insurance allocation. See id. at ¶ 1.  He is frequently retained as an expert on the valuation of personal injury tort claims and has worked on numerous personal injury and mass tort quantification-related proceedings.  See id. at ¶ 2.  The Court finds that Dr. Mullin is qualified to provide expert

testimony on, inter alia, LTL's estimated short-term cash needs and long-run costs to defend and resolve talc-related claims if it returned to the tort system.

*(1)    Short-Term Cash Needs*

71.     Dr. Mullin opined that, had the Debtor returned to the tort system on April 4, 2023, it would have faced a wave of litigation "[a]fter an initial ramp up period" arising from the "backlog of ovarian cancer and mesothelioma claims." Id. at ¶ 64.  Relying on historical cost data and identified reasonable assumptions about what LTL's experience would be upon a return to the tort system, Dr. Mullin estimated a range of reasonable scenarios for LTL's costs to defend and resolve personal-injury talc claims for a three-year period if it had not filed its second bankruptcy petition.  This is referred to as Dr. Mullin's "Cash Flow Analysis."  See Mullin Report at ¶¶ 12-18, 59-89.[6]

72.     Dr. Mullin presented economic scenarios premised upon LTL's actual historical defense and resolution experience and upon comparability analysis informed by other mass tort defense and resolution efforts.  See id. at ¶¶ 59-89.  This type of forecasting is commonly employed by economists attempting to estimate mass tort defense and resolution costs; the presentation of factual scenarios and cost ranges is a means through which economists address and characterize unavoidable uncertainty in the estimation process.  June 29, 2023 Hr'g Tr. (Vol. II) at 75:19-76:12 [Mullin].

73.     LTL's precise cash needs, of course, would depend on LTL's chosen litigation strategy and litigation events and the timing of those events that may be beyond LTL's

---

[6]     Dr. Mullin's Cash Flow Analysis did not include any defense or resolution costs associated with any talc claims other than individual personal injury claims, such as government claims, indemnification obligations, or expenses associated with third-party payor claims.

control.  See Mullin Report at ¶ 83.  Dr. Mullin's scenario analysis accounts for these factors and is an appropriate way to address the unavoidable uncertainty.  See id. at ¶¶ 84-89

74.    Dr. Mullin considered four kinds of litigation costs and posited three aggregate expenditure scenarios.  The litigation costs were (i) trial costs, (ii) non-trial litigation costs, (iii) settlement payments, and (iv) verdicts.  See id. at ¶ 13.  The expenditure scenarios were (i) litigate all and settle none; (ii) selectively litigate and settle (low end); and (iii) selectively litigate and settle (high end).  See id. at ¶¶ 14-18.  The difference between the latter two scenarios included the percentage of claims settled (and, therefore, calling for payment), the values at which certain claims were settled, the number of additional claims recruited and filed, the non-trial litigation costs to be incurred, and the number of trials completed within the three-year period.  See id. at ¶¶ 14-18, 76-77.

75.    Dr. Mullin estimated short-term defense and resolution costs to range from approximately $3 billion to $7 billion over the next three years if LTL had not filed its second bankruptcy case.  See id. at ¶ 12.  These results are depicted below:

| Category | Cost type | Litigate all | Selective litigation and settlements (low end) | Selective litigation and settlements (high end) |
|---|---|---|---|---|
| Defense costs | Trial costs | $1,500 M | $300 M | $1,500 M |
| | Non-trial litigation costs | $1,200 M | $350 M | $1,200 M |
| | **Subtotal** | **$2,700 M** | **$650 M** | **$2,700 M** |
| Payments to claimants (conditional on settling) | Settling ovarian cancer claims | $0 | $1,800 M | $3,200 M |
| | Settling mesothelioma claims | $0 | $200 M | $650 M |
| | Verdicts | $0 | $0 | $350 M |
| | **Subtotal** | **$0** | **$2,000 M** | **$4,200 M** |
| **Total** | | **$2,700 M** | **$2,650 M** | **$6,900 M** |

76.    Dr. Mullin also opined that tort system expenditures would become increasingly uncertain and volatile beyond the third year given the possibility of multiple structural shifts in the talc litigation.  See id. at ¶ 61.  This includes the volume of potential claims, which would depend in part on the recruitment practices of plaintiff law firms (itself

dependent on the economic return on recruiting, which in turn depends on the average recovery

per recruited claim).  See id.  The future average recovery amount is uncertain and would depend

on the results of the litigation and settlement trends within the next three years.  See id.  The

increased uncertainty also stems from the impact of future plaintiff verdicts (awarded after LTL

returns to the tort system) which survive appeal.  See id. These verdict amounts could be zero or

in the billions of dollars.  See id.  The likelihood of outlying plaintiff verdicts would increase if

consolidated trials are permitted, as occurred in the Ingham case.  See id. at ¶¶ 32, 61.

77.     Claimants, including through expert testimony of Saul Burian proffered by

the TCC, challenged certain aspects of Dr. Mullin's Cash Flow Analysis.[7]

78.     First, Mr. Burian opined that "uncertainty" in Dr. Mullin's calculations

rendered them "unreliable."  See June 2023 Rebuttal Report of Saul E. Burian, TCC Ex. 1112

("Burian Rebuttal Report") at 9.  Dr. Mullin testified that uncertainty is common in a mass tort

and that estimation involves reducing that uncertainty to mathematical results using scenarios

and ranges.  Dr. Mullin testified that economists frequently do this in the face of uncertainty.

See June 29, 2023 Hr'g Tr. (Vol. II) at 76:2-12 [Mullin].

79.     Second, Mr. Burian and certain Movants challenged the assumption in two

of Dr. Mullin's scenarios that LTL could be faced with 100 trials per year upon a return to the

tort system.  See Burian Rebuttal Report at 11-12.  But, as Dr. Mullin explained, a build-up of a

substantial backlog of pending cases during the pendency of LTL's two bankruptcies is known to

have occurred and is to be expected.  See Mullin Report at ¶¶ 64-65; June 29, 2023 Hr'g Tr.

(Vol. II) at 77:5-20 [Mullin].  And counsel for claimants have argued for the freedom to move

---

[7]     Mr. Burian acknowledged that his criticisms were "minor" and that he "did not dispute the bulk of the work
done by Dr. Mullin regarding his valuation of the claims, his statistical analysis of the claims, his
attribution of the claims."  June 29, 2023 Hr'g Tr. (Vol. II) at 26:24-27:8 [Burian].

forward with trying cases, whether on an individual or consolidated basis.  During Dr. Mullin's

re-direct examination, counsel for certain claimants (Mr. Maimon) stipulated that he had

requested consolidated trials and that he had sought additional judges to handle the backlog of

cases.  Id. at 151:19-152:8.  That the number of cases tried would significantly exceed historical

annual rates is likely.  Andrew Birchfield, counsel for TCC member Alishia Landrum and a

member of the Plaintiffs' Steering Committee of the ovarian cancer MDL, testified that, prior to

LTL's first bankruptcy case, the ovarian cancer litigation had transitioned to the point where he

expected a "significantly increased number of trials" over the next 12 to 18 months.  See May

30, 2023 Andrew Birchfield Dep. Tr. at 68:18-69:3; 71:23-74:10.

80.      Moreover, the number of cases to be tried in Dr. Mullin's scenarios, even

at the high-end, is less than the number of asbestos claims actually tried by Owens Corning in the

1990s (hundreds per year) and less than the number of silicone breast implant claims slated

against Dow Corning before its chapter 11 petition date (90 trials to commence in the following

six months).  Mullin Report at ¶67; June 29, 2023 Hr'g Tr. (Vol. II) at 77:5-20 and 86:3-23

[Mullin].  It is also less than the number of cases the court said it intends to remand from In re

3M Combat Arms Earplug Products Liability Litig., MDL No. 2885 (N.D. Fla.).  Mullin Report

at ¶ 66.

81.      Third, Mr. Burian critiqued Dr. Mullin for assuming that trial costs would

be five million dollars per trial.  See Burian Rebuttal Report at 11, 13.  Dr. Mullin testified that

Mr. Burian was inaccurately quoting representatives of the Debtor and that the five million

figure comes from actual data records on legal costs that are assigned to an individual claimant

throughout the life of the case (not just the pendency of trial).  Dr. Mullin further testified that

the trial itself is a subset of those costs and that it is common for the trial itself to cost two to five

million dollars from day one through verdict.  He also testified that there is also roughly $1.5 million in pretrial costs associated with a claim on average, almost $1 million in expenses, and over half a million dollars of post-trial costs.  Dr. Mullin ultimately found that a case taken to trial through appeals averages around $5 million, with $2 to $5 million being for the trial itself.  See June 29, 2023 Hr'g Tr. (Vol. II) at 78:6-21 [Mullin].

82.      Fourth, Mr. Burian criticized Dr. Mullin's assumptions regarding the amount of non-trial litigation costs.  See Burian Rebuttal Report at 11, 14.  Dr. Mullin explained that non-trial litigation costs should increase as the MDL moves out of a Daubert phase into evaluating individual cases for ovarian cancer claims.  Because there is uncertainty in how these non-trial costs will change, Dr. Mullin further explained that his report included a range from a low-end in which non-trial costs are only 75% of their historical levels to a high-end where non-trial costs increase to 250% of their historical levels.  He also explained that he intentionally did not account for inflation of legal fees and, therefore, such costs are based on nominal expenditures from an average of four or five years ago.  He testified that accounting for inflation of legal fees would probably lead to a doubling of costs.  See June 29, 2023 Hr'g Tr. (Vol. II) at 79:2-13 [Mullin].

83.      Fifth, Mr. Burian criticized the settlement values used in Dr. Mullin's analysis.  See Burian Rebuttal Report at 11, 16.  Dr. Mullin discussed his estimated settlement ranges and explained that for both ovarian cancer and mesothelioma claims he conducted multiple lines of analysis based on various master settlement agreements and a comparability analysis.  He further explained that, for mesothelioma claims, the data shows that 95% of historical payments went to claims receiving more than $200,000.  He therefore focused his report on this subset of high-value claims to estimate the Debtor's likely cash flows during the

next three years with an upward adjustment to account for settlements under $200,000.  See June

29, 2023 Hr'g Tr. (Vol. II) at 79:23-80:19 [Mullin]; Mullin Report at ¶ 78.

84.    Finally, Mr. Burian faulted Dr. Mullin for ascribing all of the talc liability

to LTL without any allocation or apportionment to other defendants (including J&J).  See Burian

Rebuttal Report at 11, 17.  Dr. Mullin explained that he did not account for the allocation of talc

liability to any entity other than LTL because he understood the talc liabilities were the

responsibility of the Debtor.  Dr. Mullin also noted that he was not aware of recoveries from

other defendants.  See June 29, 2023 Hr'g Tr. (Vol. II) at 80:20-81:8 [Mullin].

85.    Furthermore, notwithstanding Mr. Burian's assertion that "LTL's

indemnification obligations as to J&J and/or Old JJCI are disputed," Burian Rebuttal Report at

17, the Court has previously found that the 1979 Agreement allocated the talc liabilities from

J&J to Old JJCI and its predecessors and created indemnification obligations from Old JJCI and

its predecessors to J&J relating to talc claims.  See February 25, 2022 *Memorandum Opinion*,

Adv. Pro. No. 21-03032-MBK, Dkt. 184 at 3-4 ("Following these intercompany transactions,

Old JJCI assumed responsibility for all claims alleging that J&J's talc-containing baby powder

caused ovarian cancer and mesothelioma…. Similarly, through a series of transfers and

indemnification agreements, Old JJCI assumed responsibility for all claims alleging that another

J&J product, 'Shower to Shower' caused cancer or other diseases.").[8]

86.    The Court credits Dr. Mullin's reasons, principles, and methods and

rejects the criticisms of Mr. Burian.  Dr. Mullin's opinions inform the Court's view of the

---

[8]    Consistent with Old JJCI's—and since the 2021 Corporate Restructuring, the Debtor's—indemnification
obligations, talc litigation costs historically were born by Old JJCI.  See 2021 Exhibit Stipulation,
Claimants' P.I. Ex. 600.050 (Nov. 2, 2021 Declaration of Adam Lisman) at ¶ 8.  Solely for administrative
convenience and pursuant to company policy, J&J initially paid such amounts through the integrated,
centralized cash management system it shared with Old JJCI, before charging 100% of those costs to Old
JJCI.  See id.

imminent financial burden that LTL would have faced if it had not filed its second bankruptcy case on April 4, 2023.

> (2)     *Estimate of LTL's Long-Run Costs to Defend and Resolve Talc Claims*

87.     The Debtor also presented evidence concerning the aggregate, projected long-term costs to defend and resolve personal-injury talc claims through litigation in the tort system.  The Debtor presented this evidence through the portion of Dr. Mullin's report and testimony that concerned what he termed his "Balance Sheet Analysis."  See Mullin Report at ¶¶ 19, 90-105.

88.     Dr. Mullin's Balance Sheet Analysis considered the number of pending individual ovarian cancer and mesothelioma claims against the Debtor, included a forecast of the number of ovarian cancer and mesothelioma claims the Debtor may face in the future, and relied on certain assumptions favorable to claimants and against the Debtor's interest.  See id.

89.     Dr. Mullin accepted the statements of counsel for claimants concerning the number of current ovarian cancer claims and then applied the only available data on the rate of claims that would qualify for payment (derived from an earlier master settlement agreement involving ovarian cancer claims).  See id. at ¶ 92; June 29, 2023 Hr'g Tr. (Vol. II) at 106:24-107:24 [Mullin].  Dr. Mullin adjusted the number of current mesothelioma claims for the possibility that additional claims would have been filed if not for the bankruptcy stay.  See Mullin Report at ¶¶ 95-97.

90.     Dr. Mullin then based his estimate of the number of future claims on an economic model of the population of individuals exposed to talcum powder.  See id. at ¶¶ 49-57.

91.     Last, he estimated the value of those claims.  For ovarian cancer claims, Dr. Mullin used LTL's average historical settlement values and comparability analysis he had

previously performed in the Imerys bankruptcy.  See id. at ¶¶ 91-94.  For mesothelioma claims, he used LTL's historical settlement values for those claims that factually involved no evidence of alternative asbestos exposure.  See id. at ¶¶ 40-41, 95-98.

92.    Dr. Mullin's analysis estimated that the net present value of LTL's expenditures for current and future ovarian cancer claims would be $5.6 billion and would be $3.5 billion for mesothelioma claims.  See id. at ¶ 104.  Including the future legal costs to defend these claims would generally add another $2 billion in future costs, for a total net present value of approximately $11 billion.  See id.  Under the "stress test" scenario in which the cost to resolve LTL's ovarian cancer claims is double its historical average and LTL aggressively litigates future claims, LTL's total costs of defending and resolving personal injury talc claims would be approximately $20 billion.  See id. at ¶ 10.

93.    Dr. Mullin's Balance Sheet Analysis also added another $1 billion to defend and resolve Governmental Action Claims.  See id. at ¶¶ 19, 109-112.  Dr. Mullin's $1 billion figure assumed, however, that the "settlement value of the Governmental Action Claims will be between $0 and $400 million," with the high end based on the Debtor's response to an interrogatory on the basis for allocating $400 million to Governmental Action Claims in the PSA term sheet.  See id. at ¶ 109.  The Ad Hoc Committee of States has stated that it views the $400 million amount to be "woefully inadequate to satisfy governmental entities' talc-related claims." See Dkt. 350 at ¶ 55.  If that view is credited, Dr. Mullin's estimate of Government Action Claims understates the Debtor's total talc liability and the extent of its financial distress.

94.    The Court credits Dr. Mullin's Balance Sheet Analysis.  It both informs the Court's view of the financial burden that a return to the tort system would involve and the extent to which LTL was or was not solvent upon the filing of this chapter 11 case.

b.      **Movants' Prior Work and Statements on LTL's Talc Liability**

95.      In LTL's first bankruptcy case, the Court authorized the TCC's retention

of FTI Consulting, Inc. ("FTI") and The Brattle Group, Inc. ("Brattle Group") to perform

analysis pertaining to the estimation of the Debtor's liability for current and future talc claims.

See 2021 Chapter 11 Case, Dkt. 2390 (authorizing FTI engagement to focus on, inter alia, "(iii)

estimating the Debtor's current and contingent mesothelioma liabilities"); 2021 Chapter 11 Case,

Dkt. 1289 (application to employ Brattle Group to, inter alia, perform "analysis of the value of

the talc personal injury claims relating to the Debtor and Talc Liability); 2021 Chapter 11 Case,

Dkt. 2389 (authorizing Brattle Group retention "upon the terms and conditions set forth in the

Application).

96.      FTI billed 7,494.4 hours on claims estimation in LTL's first bankruptcy

case. See D-552 (summary exhibit). FTI's work on claims estimation included, inter alia,

"review[ing] and analy[zing] … historical trust distribution procedures, asbestos trusts, personal

injury questionnaires, and verdicts to assist the Committee in understanding the Debtor's talc

liability," "preparing various analyses regarding future talc-claims in connection with the

Debtor's talc liability," "preparing presentations for the Rule 706 Expert and the Committee

regarding the Debtor's current and future talc claim estimates," and "preparing statistical models

in connection with the forecast of future talc claims." See D-544 (FTI's third interim fee

application).

97.      Brattle Group billed 481.41 hours for claims estimation work. See D-552

(summary exhibit). Brattle Group's work on claims estimation included, inter alia, "analyzing

the number and value of ovarian cancer claims in connection with the Debtors' talc liabilities."

See Debtor Ex. 543 (Brattle Group's third interim fee application).

98.    Despite the extensive estimation work undertaken by both firms, neither

FTI nor Brattle Group provided expert testimony on the extent of LTL's talc liability, or any

other issue pertinent to the issue of financial distress, in connection with the motions to dismiss

LTL's second bankruptcy case.

99.    The TCC instead proffered expert testimony from Mr. Burian.  See June 7,

2023 Expert Report of Saul Burian (the "Burian Report") at 4, 23-27.  Mr. Burian acknowledged

that he has no experience estimating the value of asbestos- or talcum powder-related personal

injury claims.  See June 29, 2023 Hr'g Tr. (Vol. II) at 13:25-14:6 [Burian].  Mr. Burian did not

provide an independent valuation or estimation of LTL's talc liability.  See id. at 14:7-18.  Mr.

Burian did not address or consider the talc liability estimation work that FTI or Brattle Group

had previously performed on behalf of the TCC.  See id. at 16:18-22, 20:25-21:3.  In fact, Mr.

Burian admitted that he was not provided that prior work and did not ask for it.  See id. at 21:4-

11.

100.    Mr. Burian was, however, aware of claims values that the TCC in the

Imerys bankruptcy had proposed for talc-related personal injury claims.  See id. at 23:13-24:15.

But Mr. Burian also did not consider those values in connection with his analysis of whether

LTL was in financial distress.  See id. at 24:16-25.  Although Mr. Burian has been involved in

discussions relating to a plan of reorganization the TCC is preparing in this case, he testified that

he has not been made aware of any proposed claim values.  See id. at 25:5-22.

101.    The Debtor issued interrogatories to the TCC asking for it to identify "any

estimates the TCC has developed, shared, or discussed concerning the dollar-value of the

aggregate liability attributable to all or any subset of Talc Claims" and "any estimates the TCC

has developed, shared, or discussed concerning the dollar amount required to resolve all or any

subset of the Talc claims in the tort system." See Debtor Ex. 484 [Interrogatory Nos. 2 & 4].

Only after being compelled by this Court to state whether it has any such estimates, regardless of

whether they are privileged, the TCC responded, as to both Interrogatory Nos. 2 and 4, that "it

does not have and has not shared any privileged analysis of aggregate liability of Talc Claims."

Id.

102.    In sum, although the TCC retained professionals for the purpose of

estimating the talc liability, and those professionals charged almost 8,000 hours estimating that

liability, none of the professionals retained by the TCC in the Debtor's first bankruptcy case to

perform claims estimation work provided testimony in connection with the Motions to Dismiss.

And the TCC otherwise offered no estimate of the talc liability.

103.    Despite the absence of any estimate of the talc liability from the TCC, its

answer to a different interrogatory from the Debtor sheds light on its position regarding the

extent of the liability.  In response to the Debtor's interrogatory asking it to state the "amount of

trust funding that would be adequate to provide fair compensation" to individual ovarian cancer

and mesothelioma claimants, the TCC stated:  "the total value previously available under the

2021 Funding Agreement."  Debtor Ex. 481 [Response to Interrogatory No. 1].  With respect to

that value, Mr. Burian opined:  "[a]t a minimum, the value available under the 2021 Funding

Agreement at time it was terminated was ~\$61.5bn."  Burian Report at 17.

104.    Pleadings filed by the TCC and its predecessor (the "Ad Hoc Committee

of Certain Talc Claimants") in this case are consistent with this interrogatory answer.  In its

Informational Brief, the Ad Hoc Committee of Certain Talc Claimants maintained that the \$8.9

billion proposed settlement would "prove[] inadequate to pay present and future tort claims in

full" and fail to cover "billions of dollars of claims asserted by third-party payors and

government units, and likely billions of dollars for claims for indemnification and other damages asserted by talc suppliers such as bankrupt Imerys and Cyprus companies, distributors, and hundreds of retailers." Dkt. 79, ¶¶ 30, 72.  The TCC itself later maintained—as does the U.S. Trustee—that the proposed $8.9 billion settlement would compensate talc liabilities at "pennies on the dollar."  Dkt. 517, ¶ 12 (TCC reply in support of cross-motion to temporarily suspend case); UST Mot., 3 ("cents on the dollar").

105.    Similarly, Mr. Birchfield has repeatedly stated to the Court that the $8.9 billion proposal is "a deeply discounted settlement" that pays "deeply discounted values" and falls "woefully short."  Apr. 18, 2023 Hr'g Tr. at 306:14-15, 310:24-311:1; Apr. 11, 2023 Hr'g Tr. at 121:25-122:5; see also id. at 84:18-92:14.  Mr. Birchfield's firm, Beasley Allen, had publicly stated that $500,000 should be considered the "minimum compensation" for ovarian cancer claimants.  See D-175 (Beasley Allen article: "A conservative estimate of the direct treatment costs and lost wages for an individual claimant in this litigation averages nearly $500,000, even without other complications.  That should be considered the minimum compensation for victims as we move forward."); May 30, 2023 Andrew Birchfield Dep. Tr. at 32:15-18 and 33:8-25 (testifying he would not disavow statement that $500,000 should be considered "minimum compensation" to ovarian cancer claimants); D-176 (Beasley Allen and Ashcraft & Gerel Statement: "Attorneys representing tens of thousands of ovarian cancer and mesothelioma patients are seeking damages from Johnson & Johnson say that any proposed deal that doesn't adequately compensate the women for medical bills, pain and suffering, and lost wages is a 'non-starter.'").

106.    Further, plaintiffs' firms representing many of the claimants with talc claims against LTL filed a plan in the Imerys bankruptcy.  See June 14, 2023 Rebuttal Expert

Report of Charles H. Mullin, Ph.D., D-65 ("Mullin Rebuttal Report") at ¶ 29; compare In re Imerys Talc Am., Inc., et al., No. 19-10289-LSS (Bankr. D. Del.), Dkt. 2818 with Dkt. 162 (showing three law firms representing members of the TCC in this chapter 11 case are also counsel to members of the talc claimants committee in the Imerys chapter 11 case). Plan proponents in Imerys have asserted that the Debtor's aggregate liability for the same claims exceeds $100 billion. See Mullin Rebuttal Report at ¶ 30. The trust distribution procedures, or TDPs, proposed in the Imerys plan valued the Imerys liability share at $320,000 per qualifying ovarian cancer claim. See id. The trial record demonstrates that the LTL liability share is more than the Imerys share. See id. at ¶ 30.

107.    The Court takes judicial notice of these other indications of the extent of the Debtor's talc liabilities.

108.    By contrast, Dr. Mullin's estimates of LTL's costs to resolve ovarian cancer claims assumed settlement values of $50,000 to $100,000 per claim. D-64 at ¶¶ 77, 92, 95. The Court takes judicial notice of these other indications of the extent of LTL's talc liabilities.

**C.    Expert Testimony on Financial Distress.**

109.    Both the Debtor and the TCC provided expert testimony on the question of whether LTL was in financial distress when it filed its second bankruptcy petition on April 4, 2023. The Debtor provided an expert report and a supplemental expert report from Dr. Gregory Bell, Ph.D. Dr. Bell, a Group Vice President at Charles River Associates ("CRA"), holds a PhD in Business Economics and is a Chartered Professional Accountant. See Bell Report at ¶ 1. For the last thirty years, Dr. Bell has led CRA's Life Sciences practice, which focuses on economic issues in the pharmaceutical, biotechnology, medical device, diagnostic, and wellness industries.

See id. at ¶ 2.  He has considerable experience with the structure and operations of large, multinational companies operating in the life sciences industries.

110.    I find that Dr. Bell is qualified to provide expert testimony on whether LTL was in financial distress.

a.        **Balance-Sheet Solvency**

111.    Dr. Bell provided expert testimony on the extent to which LTL, including with its funding rights against Holdco under the 2023 Funding Agreement, was solvent from a balance-sheet perspective when it filed its second bankruptcy case on April 4, 2023.  Both Dr. Bell and Mr. Burian relied primarily upon contemporaneous third-party valuations to determine the collective value of LTL's and Holdco's assets.  See Bell Report at ¶¶ 40, 44, 55; Burian Report at 29.  Both Dr. Bell and Mr. Burian concluded that the fair market value of LTL's and Holdco's assets—on a going-concern basis and assuming Holdco's affiliates continue to operate under the J&J umbrella—were approximately $30 billion.  See Bell Report at ¶ 55; Burian Report at 29; see also Lisman Decl. at ¶¶ 22-23.

112.    Both Dr. Bell and Mr. Burian likewise accounted for the possibility that a sale of Holdco's ownership interests in various foreign affiliates would not return the values assumed from the contemporaneous third-party valuations.  See Bell Report at ¶¶ 47-54, 56-58; Burian Report at 42.  Both experts relied upon literature concerning marketability (liquidity) and minority discounts to calculate the potential discount on asset sales.  See Bell Report at ¶¶ 49-54, 57-58; Burian Report at 42, 64.  Applying a marketability discount of 20.6 percent and a 10 percent minority discount, as appropriate, Dr. Bell found that the collective value of LTL's and Holdco's collective asset value would fall to $22.7 billion.  See Bell Report at ¶ 58.[9]  Applying a

---

[9]        Dr. Bell further indicated that that marketability and minority interest discounts he applied would not account for, among other potential impacts, the impact of an ill-timed liquidation of Holdco's ownership

-49-

total discount range of 10 percent to 50 percent to Holdco's ownership interests, Mr. Burian

found that the discounted value of Holdco's ownership interests would range from $17.1 billion

to $26.9 billion.  See Burian Report at 42.  Combined with Holdco's cash position of $400

million at LTL's asset values of approximately $410 million, Mr. Burian's discounted value of

LTL's and Holdco's collective assets would range from $17.91 billion to $27.71 billion.

113.    To assess the extent of LTL's balance-sheet insolvency, Dr. Bell relied

upon the $11 billion to $21 billion range (including Government Action Claims) calculated by

Dr. Mullin's Balance Sheet Analysis.  See Bell Report at ¶ 55, 58.  Under a going-concern

assumption (where assets remain under the J&J corporate umbrella), Dr. Bell found that LTL

was solvent as of April 4, 2023.  See id.  LTL would remain solvent using Dr. Mullin's estimates

even if Holdco's assets are valued using marketability and minority discounts, but the extent of

solvency would narrow considerably to $1.7 billion to $11.7 billion.  See id. at ¶ 58.

114.    Mr. Burian did not assess the extent of LTL's balance-sheet solvency in

either his initial or rebuttal report.  As noted, his initial report provided no estimate of LTL's talc

liability; accordingly, he could not provide an opinion on whether LTL was insolvent.  Mr.

Burian's rebuttal report does not address Dr. Mullin's Balance Sheet Analysis.  Applying Dr.

Mullin's range of $11 billion to $21 billion to Mr. Burian's discounted value range of $17.91

billion to $27.71 billion for LTL's and Holdco's collective assets, however, would yield a

possibility that LTL was balance sheet insolvent as of April 4, 2023.  Moreover, as noted above,

there are credible reasons to believe that the Movants' undisclosed estimates of LTL's total talc

liability exceed even the "high-end" and "stress-case" scenarios provided in Dr. Mullin's report.

---

interests on likely capital gains tax exposure that would further dilute the value that could be used to satisfy
obligations under the 2023 Funding Agreement.  Bell Report at 26 n.106.

115.    Regardless of whether LTL was balance-sheet solvent or insolvent as of

April 4, 2023, it is clear that the extent of Debtor's balance-sheet solvency has narrowed

significantly since October 14, 2021, the date of LTL's first bankruptcy filing.  The Court finds,

at a minimum, that the Debtor was not "highly solvent" as of April 4, 2023 when it filed its

second bankruptcy petition.  <u>In re LTL Mgmt.</u>, 64 F.4th at 109.

### b.    Ability to Pay Debts as They Come Due

#### (1)    *Holdco's Uncertain Operating Cashflows (Dividends)*

116.    LTL's ability to generate the cash needed to fund the costs necessary to

defend and resolve its talc liabilities relies largely on its ability to obtain cash from Holdco under

the 2023 Funding Agreement, as well as relatively small dividends that it may receive from

Royalty A&M.  <u>See</u> Bell Report at ¶¶ 10, 60-61; Lisman Decl. at ¶ 30.

117.    Holdco's ability to generate cash in the ordinary course of business (and

thereby support its obligations to LTL under the 2023 Funding Agreement) is dependent upon

receiving any dividends that flow through the cash ecosystem that J&J manages in support of its

global operations.  <u>See</u> Bell Report at ¶¶ 11-13; 62-76; Lisman Decl. at ¶ 30.  Holdco's receipt of

such dividends is uncertain, however, and dependent on several factors beyond Holdco's control.

<u>See</u> Bell Report ¶¶ 11-13; Lisman Decl. at ¶ 30.

118.    Holdco has no independent ability to require that any amount of dividends

be paid to it, as dividends are determined at the J&J corporate level.  <u>See</u> Bell Report at ¶¶ 12,

63, 67, 69; Lisman Decl. at ¶¶ 31-34.  The payment of any dividends is governed by J&J's

Worldwide Dividend Policy, and whether any non-U.S. affiliate declares a dividend depends on

the cash needs of J&J's various business operations, local regulations and statutory requirements

governing dividend remittance, research and development efforts, acquisition opportunities, tax

requirements, financial risk management, and debt servicing.  <u>See id.</u>  As such, dividend

declarations must be approved by multiple areas of regional and global J&J management,

including the controller, tax, and treasury functions.  See id.

119.    Moreover, any dividends paid by Holdco's indirect operating affiliates

must "pass through" various foreign parent entities before they are ultimately paid to Holdco,

which further complicates the process of those dividends making it up to the Holdco level.  See

Bell Report at ¶¶ 12, 70; Lisman Decl. at ¶ 34.  An example of this complication can be seen

with respect to a $5 billion dividend paid by GH Biotech in 2022.  While $1.8 billion of the $5

billion dividend (corresponding to Holdco's 36.1% indirect interest in GH Biotech) potentially

could be paid to Holdco, that $1.8 billion would first have to pass through two entities, Johnson

& Johnson GmbH (a German entity) and Apsis (a French entity).  Lisman Decl. at ¶ 37.  At the

time it received the approximate $1.8 billion dividend, Apsis did not have sufficient distributable

cash reserves under French law to declare and pay the dividend to Holdco.  See id.  The

approximate $1.8 billion was therefore placed in a newly established treasury center, Janssen

Finance Treasury Unlimited Company (Ireland) and lent to J&J on a long-term basis.  See id.

120.    On June 22, 2023, GH Biotech paid another dividend to its shareholders.

In turn, Johnson & Johnson Holding GmbH paid a dividend to Apsis.  See June 20, 2023

Supplemental Expert Report of Gregory K. Bell, Ph.D., D-67 ("Bell Suppl. Report") at ¶¶ 2-3;

Lisman Decl. at ¶ 38.  Apsis then paid a dividend of approximately $912 million to Holdco.  See

id.  The $912 million dividend received by Holdco had been previously anticipated to be $1.8

billion, subject to certain contingencies and risks.  See Bell Suppl. Report at ¶ 3.[10]  This amount

was approximately half of what was originally contemplated as a result of local statutory

---

[10]    No further dividends from GH Biotech to Johnson & Johnson Holding GmbH are expected for 2023.  See
Bell Suppl. Report at ¶ 3.

distributable reserve requirements, further demonstrating the unpredictability of Holdco's

dividend stream.  See Lisman Decl. at ¶ 38.

121.    Given these foregoing considerations, the amount and timing of dividends

that Holdco has historically received from its direct and indirect subsidiaries have been uncertain

and variable.  See Bell Report at ¶¶ 12, 62-63; Lisman Decl. at ¶ 35.  In many instances between

2019-2022, Holdco's operating subsidiaries paid dividends, but those dividends did not

immediately (or ever) make it up to the Holdco level in the United States for numerous reasons.

Lisman Decl. at ¶ 36.

122.    The various factors that caused historical variability in Holdco's dividends

are expected to continue in the future.  See Bell Report at ¶¶ 13, 63, 72, 76, 90; Lisman Decl. at

¶ 30, 33, 39.  Moreover, any dividends from Holdco's indirect subsidiaries are further subject to

significant risks associated with the pharmaceutical industry, including the continuing threat of

price pressures on a global scale and the threat of new branded competitors and generic and

biosimilar versions of J&J's products.  See id. at ¶¶ 72-74; Lisman Decl. at ¶ 47.  These threats

are particularly acute for products partially owned by Janssen Sciences Ireland, the principal

operating entity within the Holdco ownership structure.  See id. at ¶¶ 72-74.

123.    In sum, future dividends to Holdco are expected to be uncertain and

variable.  The uncertainty and variability associated with future dividends jeopardizes Holdco's

ability to satisfy its obligations under the 2023 Funding Agreement from cash flows generated in

the ordinary course of business.  See Bell Report at ¶¶ 12, 90.

*(2)    Dr. Bell's Scenario Analysis*

124.    Similar to Dr. Mullin's use of scenario analysis to estimate LTL's short-

term cash needs stemming from the talc litigation, Dr. Bell used scenario analysis to assess

LTL's near-term ability to pay its debts as they come due from existing cash or operating

cashflows.  See Bell Report at ¶¶ 14, 77-84.[11]  With respect to cash outflows, Dr. Bell utilized

the three different cost scenarios from Dr. Mullin's Cash Flow Analysis:  Litigate All, Low, and

High.  See id. at ¶ 83.  For each scenario, Dr. Bell further utilized Dr. Mullin's three different

assumptions associated with the timing distribution of the projected costs in each of the

scenarios.  See id.

   125. With respect to cash inflows, Dr. Bell used four different sets of

assumptions for cash and operating cashflows that could be available to LTL, considering both

Royalty A&M and LTL's rights under the 2023 Funding Agreement.  See id. at ¶¶ 78.  Dr. Bell's

operating cashflow scenarios are premised on dividends historically received by LTL and Holdco

and potential modifications thereto.  See id. at ¶¶ 79-82.  For example, Dr. Bell's third scenario

assumed $50 million per year in dividends from Royalty A&M (which assumed no reinvestment

of cashflow by Royalty A&M to purchase new royalty streams); $86 million a year from

Holdco's majority-owned subsidiaries (being the average annual dividends received from those

entities from 2019-2022); a $1.8 billion dividend from GH Biotech in 2023; and $900 million in

dividends from GH Biotech in 2024 and 2025.  See id. at ¶ 81.

   126. Dr. Bell then applied his four cash inflows to the various cost scenarios

provided in Dr. Mullin's Cash Flow Analysis.  See id. at ¶ 14, 84, Ex. N.

   127. An excerpt from Dr. Bell's Scenario Analysis is provided below.  This

excerpt shows the results of applying Dr. Bell's third dividend scenario to Dr. Mullin's "high

end" selective litigation and settlements scenario (assuming 15% of costs in first year, 60% of

---

[11] Dr. Bell's Scenario Analysis considered only costs associated with the defense and resolution of
talc-related personal injury claims.  Bell Report at ¶ 14.

costs in second year, 25% of costs in third year).  In this assessment, operating cash flows are

insufficient at the end of years two (negative $1.945 billion) and three (negative $2.648 billion).

| | | **Dividend Scenario 3** | | |
| | | Year 1 | Year 2 | Year 3 |
| | | [i] | [j] | [k] |
| [29] | Beginning Cash | $300 | $1,183 | -$1,945 |
| [30] | Cash Available to Pay Talc Liabilities | $2,208 | $2,205 | -$923 |
| [31] | Talc Liability Payments | $1,025 | $4,150 | $1,725 |
| [32] | Ending Cash | $1,183 | -$1,945 | -$2,648 |

128.    Dr. Bell's analysis yielded 108 different annual comparisons of potential

operating cashflows to potential costs associated with the talc-related person injury claims.  See

id. (4 cash inflow scenarios x 3 cost scenarios x 3 timing distributions x 3 years = 108 scenarios).

Dr. Bell found that in 46 (43 percent) of the 108 annual comparisons, the "potential operating

cashflows would be insufficient to fund the potential costs associated with the defense and

resolution of talc-related personal injury claims."  See id. at ¶ 14, 84, Ex. N.

129.    Based on his analysis, Dr. Bell determined that "it is apparent that

Holdco's expected ability to use operating cashflows to fund talc liabilities as they come due

through the 2023 Funding Agreement is in jeopardy."  See id. ¶ 90.  Accordingly, Dr. Bell

concluded that "it is reasonable to anticipate that Holdco may be required to liquidate its

ownership interests at a significant discount, impairing LTL's short- and long-term ability to

receive timely and sufficient funding through the 2023 Funding Agreement" and that "LTL was

in financial distress when it voluntarily filed for relief under Chapter 11 of the Bankruptcy Code

on April 4, 2023."  See id.

130.    In his supplemental report, Dr. Bell provided an alternative Scenario

Analysis that took into consideration the $912 billion GH Biotech dividend paid to Holdco on

June 22, 2023.  Dr. Bell's alternative Scenario Analysis eliminated any scenario whereby Holdco

did not receive any GH Biotech dividend in 2023; assumed Holdco received an indirect $912

million dividend from 2023 GH Biotech in all scenarios; and reduced the forecasted GH Biotech

dividends in 2024 and 2025.  See Bell Suppl. Report at ¶ 8, Supp. Ex. N.  Dr. Bell found that "41

(51 percent) of the 81 different annual scenarios resulted in operating cashflows that would be

insufficient to fund potential talc-related personal injury claims, notwithstanding any of the state

matters or indemnification matters that are also associated with the Talc Litigation."  Id. at ¶ 9.

*(3)    Mr. Burian's Critiques of Dr. Bell's Scenario Analysis*

131.    Mr. Burian's initial expert report did not include any cash flow or other

analysis concerning LTL's ability to meet its debts as they come due.  See June 29, 2023 Hr'g

Tr. (Vol. II) at 26:1-8 [Burian].  Instead, Mr. Burian's initial report merely cited statements from

the Debtor's objection to the motions to dismiss [Dkt. 614] that the Debtor believed it had the

means to pay debts as they come due (i.e., that the Debtor believed it was not equitably

insolvent).  See Burian Report at 24.

132.    Mr. Burian's rebuttal report included various "reasonable changes" to Dr.

Mullin's and Dr. Bell's scenario analyses which, if adopted, would result in 94% to 97% of Dr.

Bell's scenarios showing cash flows sufficient to fund LTL's near-term talc-related costs.  See

Burian Rebuttal Report at 29.  With respect to Dr. Mullin's assumptions, Mr. Burian's proposed

changes would (a) reduce the number of trials to 10 per year, (b) reduce the cost per trial to $3.5

million, and (c) maintain LTL's historical non-trial costs into the future.  For the reasons

discussed above, the Court finds that Dr. Mullin's assumptions are reasonable and well-founded;

it therefore rejects Mr. Burian's proposed modifications to Dr. Mullin's calculations.

133.    With respect to Dr. Bell's assumptions, Mr. Burian assumes (a) that

Holdco will receive the 2022 $1.8 billion dividend from GH Biotech (the dividend for which

Apsis did not have sufficient distributable reserves to pay to Holdco) in 2023 and (b) that Holdco

could sell 10% of its assets values in 2024.  <u>See</u> Burian Rebuttal Report at 29.  Mr. Burian also

criticized Dr. Bell's conclusion that future dividends are uncertain and subject to risk by pointing

to the fact that four 100% Holdco-owned operating subsidiaries are expected to generate an

average of $302 million in cash flows for each of the next five years.  <u>See</u> <u>id.</u> at 26.

134.    Based on the evidentiary record, the Court does not find any factual basis

to assume that the 2022 GH Biotech dividend will be paid to Holdco in 2023.  Mr. Burian's

initial report observed that this dividend has been moved to a new treasury center (Janssen

France Treasury Unlimited Company), which subsequently entered into a long-term facility

agreement with J&J in the amount of the dividend ($1.77 billion).  <u>See</u> Burian Report at 58-59;

<u>see also</u> Lisman Decl. at ¶¶ 37, 48.  Mr. Burian acknowledged at the hearing that he did not

know if the $1.8 billion GH Biotech dividend from 2022 would be paid to Holdco in 2023.  <u>See</u>

June 29, 2023 Hr'g Tr. (Vol. II) at 32:15-25; 57:11-14; 61:2; 65:4-8 [Burian].

135.    Mr. Burian's adjustment to assume a sale of 10 percent of Holdco's assets

in 2024 is not consistent with the purpose of Dr. Bell's Scenario Analysis, which is to assess

LTL's ability to fund its talc liability from LTL's and Holdco's operating cashflows.  <u>See</u> Bell

Report at ¶ 14.  Finally, Mr. Burian acknowledged that Dr. Bell's Scenario Analysis included

dividends from the four 100% Holdco-owned operating subsidiaries cited by Mr. Burian.  <u>See</u>

June 29, 2023 Hr'g Tr. (Vol. II) at 33:9-19 [Burian].

136.    Accordingly, the Court likewise rejects Mr. Burian's proposed

adjustments to Dr. Bell's cash-flow assumptions.  The Court credits Dr. Bell's reasons,

principles, and methods, and his opinions inform the Court's view of whether LTL was in

financial distress when if filed its second bankruptcy case on April 4, 2023.

137.    Regardless of whether LTL was equitably solvent or insolvent, the Court

finds, at a minimum, that the Debtor did not have "access to cash to meet comfortably its

liabilities as they came due for the foreseeable future" when it filed its second bankruptcy

petition on April 4, 2023.  In re LTL Mgmt., 64 F.4th at 109.

### c.    Intercompany Support From J&J or External Borrowing

138.    Mr. Burian's opinion that LTL was not in financial distress is based, in

part, on the premise that J&J would provide financial support to LTL or Holdco—either through

intercompany lending or otherwise—so they could meet their obligations to talc claimants or

under the 2023 Funding Agreement without suffering any destruction in value.  See Burian

Report at 30 ("J&J is the beneficial owner of all of Holdco's assets, and would ultimately either

lend to Holdco through its established intercompany lending program, or buy back Holdco's

equity interests before allowing Holdco to liquidate its value assets at a discount or transfer

control of Holdco to talc claimants."), 31 (citing J&J internal intercompany loan transfer pricing

document stating "(i) the J&J parent company will, when necessary, increase the capital of

OpCos in financial distress, (ii) no OpCo has never gone bankrupt and (iii) the bankruptcy of an

OpCo would trigger an unacceptable, reputational damage and would have an adverse impact on

the credit rating of the J&J parent company"), 44; see also June 29, 2023 Hr'g Tr. (Vol. II) at

49:10-13, 52:9-18, 63:10-22 [Burian].

139.    The Court has previously considered—and rejected—this argument in

connection with its decision denying the motions to dismiss LTL's first bankruptcy case.  See In

re LTL Mgmt., LLC, 637 B.R. 396, 418 (Bankr. D.N.J. 2022) ("Claimants repeatedly have called

to the Court's attention the market capitalization ($450 billion) and stellar credit-rating of

Debtor's indirect parent, J&J.  Nonetheless, apart from voluntarily undertaking such an

obligation or a judicial finding as to alter ego status, J&J (like all parent corporations) have no

legal duty to satisfy the claims against its wholly-owned or affiliated subsidiaries." (citing

Travelers Indem. Co. v. Cephalon, Inc., 32 F. Supp. 3d 538, 556 (E.D. Pa. 2014), aff'd, 620 F.

App'x 82 (3d Cir. 2015) (a parent company is not liable for the actions of its subsidiaries unless

the parent company itself has engaged in wrongdoing, or exercises control over the subsidiary

entity))).

140.    Nothing in the evidentiary record in this case dictates a different result.

Mr. Burian acknowledged that he was not rendering an opinion that all of the J&J entities were

alter egos of each other. See June 29, 2023 Hr'g Tr. (Vol. II) at 64:9-11 [Burian]. Mr. Lisman

stated that J&J has no obligation to fund Holdco's obligations under the 2023 Funding

Agreement and provided multiple examples of instances where J&J declined to support a failing

company. See Lisman Decl. at ¶¶ 41-42; June 28, 2023 Hr'g Tr. (Vol. II) 170:18-21 (Mr.

Lisman testifying: "we don't capitalize companies that are not operating well. So if a business

is running out of money and the business isn't doing well, we at times make decisions to walk

away from that business"). And the notion that J&J would provide funding to avoid the

reputational risk of a J&J-affiliated entity filing bankruptcy is belied by the two instances of LTL

filing for bankruptcy—and the extensive media scrutiny attendant to each.

141.    Dr. Bell opined that Holdco would be highly constrained in its ability to

seek external borrowing to supplement its potential dividend cashflows in order to meet its

obligations under the 2023 Funding Agreement. See Bell Report at ¶¶ 85, 87-89. Dr. Bell cited

the relative illiquidity of Holdco's assets, difficulty in pledging its assets as collateral, the

uncertainty and volatility of potential dividends to Holdco, and the fact that loans would be used

to satisfy Talc Litigation as opposed to being invested in a business opportunity with the

potential to generate a return that would support the servicing and repayment of the debt. See id.

at ¶ 88. Mr. Burian did not address LTL's or Holdco's ability to obtain external debt financing. The Court credits Dr. Bell's conclusion that it would be difficult for Holdco to obtain debt financing to meet its obligations under the 2023 Funding Agreement.

**D.    The Likelihood, Extent, and Uncertainty of Threatened Litigation.**

142.    The Court finds that this case does not involve the mere possibility of threatened litigation. It is undisputed that the Debtor already faces some 100,000 asbestos-related personal injury claims, and is expected to face tens of thousands more in the future. While it is difficult to assess the eventual cost to defend and resolve the talc claims, there is nothing speculative about the fact the Debtor faces material liability. It has already incurred billions of dollars in judgments, settlements, and litigation costs.

143.    The possibility of jury demands and verdicts in the hundreds of millions to billions of dollars looms for any case that makes it to trial. As mentioned above, for example, counsel in the single-plaintiff Valadez trial asked the jury last week to return a $500 million verdict against J&J—$50 million for compensatory damages and "nine times" that for punitive damages. See D-565. On July 18, 2023, the jury in Valadez returned a verdict of $18.8 million in compensatory damages and no punitive damages in favor of the plaintiff. In doing so, it assigned all of the liability to J&J and none to LTL. See D-566.

144.    Even if LTL desired to do so, it has no practical ability to defend against all the tens of thousands of claims that it would have faced had it not filed its second bankruptcy case.

## V.    RESOLVING THE TALC LITIGATION THROUGH BANKRUPTCY PROCEEDINGS AFFORDS EFFICIENCIES UNAVAILABLE IN THE TORT SYSTEM

145.    The bankruptcy forum provides a materially more efficient means for resolving the Debtor's talc litigation liabilities equitably and permanently compared to litigating in the MDL and other federal and state courts.

### A.    Unknown Future Claims Cannot Be Resolved in MDLs.

146.    There are two insurmountable hurdles to globally resolving talc litigation in MDLs—latency periods for injuries and unknown future claimants.  Sheila Birnbaum, who testified for the Debtor and has several decades of direct experience litigating and settling MDL cases, addressed both issues. June 29, 2023 Hr'g Tr. (Vol. I) at 59:21-24 [Birnbaum].

147.    Ms. Birnbaum opined that "MDLs are not always a good vehicle to resolve mass personal injury litigation, especially in cases that involve future claims with latent injuries." Id. at 59:21-24 [Birnbaum]; June 14, 2023 Rebuttal Expert Report of Sheila Birnbaum, D-68 ("Birnbaum Rebuttal Report") at 1.  Latent injuries make it "impossible to identify who the plaintiffs are going to eventually be, because they have no injury at the moment, and their injury may manifest years after their exposure to a particular product, substance, or device." June 29, 2023 Hr'g Tr. (Vol. I) at 81:4-11 [Birnbaum].

148.    She also testified about the due process concerns around providing notice and an opportunity to opt out of a settlement to unknown future claimants: "That's a very big problem in the fact of due process. That is one of the reasons that settlements through class actions after Amchem and Ortiz just never continued because of the problems of ... notice, of due process, of having people understanding the ability to opt out or even know they've been exposed." Id. at 81:12-19.

149.     Professor Theodore Rave and retired Judge Royal Furgeson, who testified as experts for the TCC, did not disagree that unknown claimants and latency periods present significant challenges to resolving mass tort cases in MDLs.  See Birnbaum Rebuttal Report at 1. Professor Rave conceded that latency and future claims complicate the resolution of any mass tort in any form and acknowledged that long latency periods and the number of people exposed are the biggest challenges for talc litigation. June 29, 2023 Hr'g Tr. (Vol. I) at 11:22-12:4 [Rave].

150.     In contrast to Ms. Birnbaum's decades of direct experience in this area, neither Professor Rave nor Judge Furgeson has any direct experience with either litigating or settling MDL claims.  Professor Rave testified that, other than his brief stint in private practice, he has no experience representing a party in mass tort litigation, or in representing a party in a mass tort settlement. June 29, 2023 Hr'g Tr. (Vol. I) at 8:18-9:6 [Rave].  And Judge Furgeson testified that he had never represented a party in MDL litigation or been involved in efforts to settle MDL litigation, and presided over only one MDL case during his time on the bench, which "settled fairly shortly after it started."  June 29, 2023 Hr'g Tr. (Vol. I) at 47:24-48:12 [Furgeson]. Judge Furgeson did not discuss the talc litigation in his expert report at all, and agreed he is "not familiar with the talc cases" and does not "know anything about the talc litigation." June 29, 2023 Hr'g Tr. (Vol. I) at 48:16-21 [Furgeson].

**B.     Comprehensive Resolutions of Mass Tort MDLs with Latent Injuries and Unknown Claimants Have Been Elusive.**

151.     Professor Rave has written in a law review article that "in mega mass torts -- those involving multiple defendants and multiple products and activities over extended periods of time (for example, asbestos, silicone gel breast implants, opioids) -- comprehensive resolution has proven elusive," and he testified that he stands by those words today. June 29, 2023 Hr'g Tr.

(Vol. I) at 12:5-20 [Rave].  The parties' experts' testimony is consistent on this point:  no party

or its expert identified even a single example of a global settlement that has been achieved in

circumstances like this case—where both latent injuries and unknown future claimants exist—in

the more than 20 years since Amchem and Ortiz were decided.  Id. at 81:4-19 [Birnbaum] and

39:12-17; 39:24-40:4 [Rave].

152.    Ms. Birnbaum addressed several categories of mass tort MDL cases that

involve long latency periods and unknown claimants, including asbestos cases, silicone breast

implant cases, and the RoundUp litigation.  A global resolution was not achieved through MDL

settlements in any of those cases, and ultimately mass tort defendants in the asbestos and silicone

breast implant cases filed for bankruptcy to resolve their mass tort liability.  Professor Rave and

Judge Furgeson did not consider or address these examples of MDL cases in their reports.

Specifically, Professor Rave testified that he did not discuss, assess, or offer any opinions on

examples of mass tort defendants that filed for bankruptcy despite efforts to achieve global

resolution of their cases in the MDLs—including, specifically, that he did not mention the W.R.

Grace, Dow Corning, or Purdue Pharma bankruptcy cases that followed unresolved MDL

litigation. Id. at 16:19-17:18:3 [Rave].

153.    Ms. Birnbaum testified about cases most comparable to the talc litigation,

and highlighted Professor Rave and Furgeson's failure to consider the cases most comparable to

the talc litigation, using the demonstrative below.



154.    In contrast, Professor Rave focused almost exclusively on the <u>In re NFL Concussion</u> MDL litigation, a case in which unknown future claimants were not a factor.  He testified that a class settlement was achieved in that litigation but acknowledged that it was significantly different from the talc litigation because the class members did not include unknown future claimants.  June 29, 2023 Hr'g Tr. (Vol. I) at 16:2-18 [Rave].  The the Vioxx and BP Deepwater Horizon settlements, which he cited in his report (Rave Report at ¶¶ 54, 58) did not include either latent injuries or future claimants and that the Fen-Phen settlement did not involve latent injuries.  <u>See id.</u> at 87:24-88:13.

155.    Professor Rave did not provide any example of a class action settlement involving latent injuries and unknown claimants since the <u>Amchem</u> and <u>Ortiz</u> decisions were issued in 1998 and 1999.  <u>See</u> June 29, 2023 Hr'g Tr. (Vol. I) at 39:12-17; 39:24-40:4 [Rave].  Ms. Birnbaum testified that there have been no resolutions of MDL case involving latent claims and unknown future claimants in the more than 20 years since those decisions were issued.  <u>Id.</u> at 90:3-16 [Birnbaum].

C.     **Bankruptcy Provides a Superior Forum for Resolving Mass Torts with
Latency Periods and Unknown Claimants.**

156.    Ms. Birnbaum also testified that, where there are a significant number of

future claimants with latent injuries, and the identities of those future claimants are unknown—

bankruptcy courts provide a superior forum for resolving claims compared tort litigation

(including MDL proceedings).  See Birnbaum Rebuttal Report at 2.

157.    Consistent with that testimony, Dr. Mullin, an economist with significant

experience in the resolution of mass tort litigation through bankruptcy proceedings, identified

these primary chapter 11 advantages: (i) consolidation of all claims before a single judge; (ii) the

authority and methods to collect necessary claim-related information from claimants and to pay

those claimants based on that information, eliminating the need to serially undertake claimant-

directed factual discovery and to try certain of the same liability issues repeatedly; and (iii) the

unique authority to resolve the claims of unknown future claimants—those whose injuries

remain latent and manifest only years in the future.  Mullin Report at ¶¶121, 123-124; Mullin

Rebuttal Report at ¶14; June 29, 2023 Hr'g Tr. (Vol. I) at 1234-21; Birnbaum Rebuttal Report at

2.

158.    These advantages cumulatively reduce transaction costs for all parties

compared to resolution through tort litigation.  Mullin Report at ¶ 20-23; ¶ 120-135.

159.    Professor Rave suggested that certain efficiencies can be derived from

MDL proceedings and/or class treatment of certain mass tort claims.  But the claims resolved

through the processes that Professor Rave identified involved injuries either without latency or

with latent injuries that affected only a readily identifiable population, i.e., the NFL concussion

case.  Birnbaum Rebuttal Report at 7-8; June 29, 2023 Hr'g Tr. (Vol. I) at 15:23-16:18 [Rave].

He also admitted that MDL courts do not have the power to bind parties to a settlement, whereas

he agreed that bankruptcy courts have that authority.  June 29, 2023 Hr'g Tr. (Vol. I) at 18:20-25

[Rave].  He further testified that, even in the event a settlement is reached in an MDL, "the MDL

judge doesn't have the power to reach out and bring everyone in" to such a settlement, and

agreed that the MDL does not have any procedural tools that require state courts to coordinate

with federal MDLs and that fewer than half of the states have state corollary procedures to the

federal MDL process that would coordinate state court litigation.  Id. at 19:16-20:12 [Rave].

160.    The court concludes, as it did in February 2022, that the factual record

establishes efficiency advantages to resolution of these talc claims through this chapter 11

filing—advantages that cannot be achieved through tort-system resolution, foremost among

them, the ability to resolve the claims of unknown future claimants.

## CONCLUSIONS OF LAW

## I.    JURISDICTION AND VENUE

161.    This Court has subject matter jurisdiction to consider this matter pursuant

to 28 U.S.C. §§ 157 and 1334, and the *Standing Order of Reference to the Bankruptcy Court*

*Under Title 11* of the United States District Court for the District of New Jersey, dated

September 18, 2012 (Simandle, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The Debtor is

authorized to continue to manage its property and operate its business as a debtor in possession

pursuant to sections 1107(a) and 1108 of title 11 of the United States Code (the "Bankruptcy

Code").

162.    Neither the Debtor nor J&J "manufactured" bankruptcy jurisdiction, as

MRHFM and the States allege.  MRHFM Reply, 21; States Reply, 8.  "The record establishes

conclusively that Old JJCI complied with all requirements under Texas law," In re LTL Mgmt.

LLC, 637 B.R. 396, 422 (Bankr. D.N.J. Feb. 25, 2022) rev'd and remanded by In re LTL Mgmt.

LLC, 64 F.4th 84 (3d. Cir. 2023), and that the "Debtor was created pursuant to—and in

compliance with—a long-standing Texas statute."  In re LTL Mgmt. LLC, 638 B.R. 291, 305

(Bankr. D.N.J. Feb. 25, 2022); see also LTL Mgmt., 64 F.4th at 105 (recognizing that the Debtor

is "a North Carolina limited liability company formed under state law and existing separate from

both its predecessor company (Old Consumer) and its newly incorporated counterpart company

(New Consumer)").  The Debtor, as a validly created North Carolina limited liability company,

filed its petition under chapter 11 of the Bankruptcy Code, which filing properly invoked this

Court's jurisdiction under 28 U.S.C. §1334.  Further, the Debtor complied with the eligibility

requirements of section 109 of the Bankruptcy Code, as it properly qualifies as a "person that

resides or has a domicile, a place of business, or property in the United States."  11 U.S.C. §§

109(a), 101(41).

163.    Jurisdiction is not manufactured for the additional reason that the same

liabilities would have been within the jurisdiction of the Court if, instead of the Debtor, its

predecessor had filed a petition for relief.  See Bestwall LLC v. Official Comm. of Asbestos

Claimants (In re Bestwall LLC), No. 22-1127, 2023 WL 4066848, at *7 (4th Cir. June 20, 2023)

("Old GP, New GP, and Bestwall did not manufacture jurisdiction via their Texas divisional

merger.  This is evident because without the restructuring, the asbestos claims would have

remained with Old GP.  And, if Old GP had filed for bankruptcy, the bankruptcy court would

have had jurisdiction over those claims as it does over the same claims here.").

## II.    THE DEBTOR WAS IN FINANCIAL DISTRESS ON THE PETITION DATE

### A.    Legal Standard.

164.    Under the standard employed in the Third Circuit, a petition is filed in

good faith if it (i) serves a valid bankruptcy purpose and (ii) is not filed merely to obtain a

tactical litigation advantage.  LTL Mgmt., 64 F.4th at 100-01 (citing In re 15375 Mem'l Corp. v.

BEPCO, L.P., 589 F.3d 605, 618 (3d Cir. 2009) and NMSBPCSLDHB, L.P. v. Integrated

Telecom Express, Inc. (In re Integrated Telecom Express, Inc.), 384 F.3d 108, 119-20 (3d Cir.

2004)).  Financial distress is required in the Third Circuit as a component of a petition's valid

bankruptcy purpose.  See LTL Mgmt., 64 F.4th at 101 ("[A] debtor who does not suffer from

financial distress cannot demonstrate its Chapter 11 petition serves a valid bankruptcy purpose

supporting good faith.").

165.    The Third Circuit has not "set out any specific test to apply rigidly when

evaluating financial distress." Id. at 102.  Indeed, it is not possible to "predict all forms of

financial difficulties that may in some cases justify a debtor's presence in Chapter 11." Id. ("So

many spokes can lead to financial distress in the right circumstances that we cannot divine them

all.").  Rather, considering "all relevant facts in light of the purposes of the Code," "the good-

faith gateway asks whether the debtor faces the kinds of problems that justify Chapter 11 relief."

Id.

166.    Although "balance-sheet insolvency or insufficient cash flows to pay

liabilities (or the future likelihood of these issues occurring) are likely always relevant," a debtor

is not required to be insolvent—either from a balance-sheet or equitable perspective—to file for

chapter 11 relief.  See id. at 102 ("We recognize as much, as the Code conspicuously does not

contain any particular insolvency requirement.") (citing In re SGL Carbon Corp., 200 F.3d 154,

163 (3d Cir. 1999); Integrated Telecom, 384 F.3d at 121); Moody v. Sec. Pac. Bus. Credit, Inc.,

971 F.2d 1056, 1064 (3d Cir. 1992) (describing two types of insolvency, "insolvency in the

'bankruptcy sense' (a deficit net worth immediately after the conveyance), and insolvency in the

'equity sense' (an inability to pay debts as they mature)"); In re Stolrow's Inc., 84 B.R. 167, 171

(9th Cir. BAP 1988) (citation omitted) ("[n]either insolvency nor inability to pay debts is a

prerequisite to seeking voluntary relief under the Bankruptcy Code."); In re Johns-Manville

Corp., 36 B.R. 727, 732 (Bankr. S.D.N.Y. 1984) (similar).

167.    Considerations relevant to an assessment of financial distress may include,

for example:  "solvency; cash reserves; recent financial performance and profitability; the

proportion of debt owed to insiders; realistic estimates of actual or likely liability; the threat of

litigation; whether a debt is fixed, substantial, and imminent; current cash position or current

liquidity; ability to raise capital; and overdue debts or the ability to pay debts as they come due."

In re Rent-a-Wreck of Am., Inc., 580 B.R. 364, 375-76 (Bankr. D. Del. 2018) (citing cases for

each factor).

168.    Financial distress must be evaluated "in light of the purposes of the Code."

LTL Mgmt., 64 F.4th at 102.  Among the key purposes of chapter 11 are:  (i) the "avoidance of

liquidation," In re Liberate Techs., 314 B.R. 206, 212 (Bankr. N.D. Cal. 2004) (quoting Johns–

Manville, 36 B.R. at 736); and (ii) treating creditors and other stakeholders fairly and equitably

(thereby avoiding a "race[] to the courthouse" that results in inequitable treatment of similar

claims), 11 U.S.C. § 1123(a)(4); In re Boy Scouts of Am. & Del. BSA, LLC, 650 B.R. 87, 139

(D. Del. 2023).  Those aims are heightened in mass tort cases, where liquidation of a going-

concern business may cut off recoveries to future claimants.  See id.; In re Capitol Food Corp. of

Fields Corner, 490 F.3d 21, 25 (1st Cir. 2007) ("Since 'going-concern value is likely to be higher

than liquidation value,'" Integrated Telecom, 384 F.3d at 121 (citation omitted), "a successful

reorganization in turn can maximize the value of the assets available to settle the outstanding

claims of unsecured creditors.").

169.    Congress expressly acknowledged these goals in enacting section 524(g):

"[T]he Committee also recognizes that the interests of future claimants are ill-served if

Johns-Manville and other asbestos companies are forced into liquidation and lose their ability to

generate stock value and profits that can be used to satisfy claims." H.R. REP. 103-835, 40-41

(1994), reprinted in 1994 U.S.C.C.A.N. 3340.

170.    Financial distress "must not only be apparent, but it must be immediate

enough to justify a filing." LTL Mgmt, 64 F.4th at 102 (quoting SGL Carbon, 200 F.3d at 164).

Citing this language, the TCC maintains that uncertainty over the extent and timing of LTL's

projected talc liabilities is irrelevant to the Court's determination of whether LTL was in

financial distress. See, e.g., TCC Reply, 48 (arguing LTL's "immediacy" requirement

"forecloses" consideration of the "considerable uncertainty" of LTL's talc liabilities), 56 ("But

uncertainty prevents LTL from meeting its burden of showing 'imminent' and 'immediate'

financial distress").

171.    The Movants are incorrect in arguing that projected liabilities must be

liquidated or certain to justify a filing.  Neither the Bankruptcy Code nor applicable case law—

including the Third Circuit's opinion in the Debtor's prior chapter 11 case—contains any such

requirement.  See LTL Mgmt., 64 F.4th at 102 ("Financial health can be threatened in other

ways; for instance, uncertain and unliquidated future liabilities could pose an obstacle to a debtor

efficiently obtaining financing and investment.").  To hold otherwise would eviscerate section

524(g), which applies specifically to debtors facing future demands for asbestos liability "the

actual amounts, numbers and timing of [which] cannot be determined."  11 U.S.C.

§ 524(g)(2)(B)(ii)(II).

172.    The Movants also err in interpreting the Third Circuit's language on

financial distress, including LTL's language on the "immediacy," to require what amounts to

equitable insolvency. See, e.g., TCC Reply at 46 (citing statements from LTL officers that they

believed LTL had the ability to pay debts as they come due); A&I Reply at ¶ 46 (same); TCC

Mot. at 24-25 (same); A&I Mot. at ¶¶ 14, 64; NM/MS Mot. at ¶¶ 3, 20 (same).

173.    Mr. Burian, the sole expert offered by the Movants on the issue of

financial distress, applied such an interpretation in reaching his conclusion that LTL was not in

financial distress.  Finding of Fact ("FOF") ¶ 131.  Under Mr. Burian's interpretation of the

Third Circuit's standard, a company "can be insolvent from a balance-sheet perspective, but still

not be in financial distress."  June 29, 2023 Hr'g Tr. (Vol. II) 33:20-23 [Burian].  He testified, for

example, that whether LTL's talc estimated liability was "$8.9 billion, $22.5 billion, or $50

billion, wouldn't change [his] fundamental analysis of whether LTL is in financial distress

today."  Id. at 38:13-17.  In his view, if the litigation "did not impact the business today," the

extent of LTL's talc liability would be irrelevant.  Id. at 38:18-19; see also id. at 37:16-38:1

(Burian would not consider an entity with 80 percent chance of being insolvent in three years to

be in financial distress if it was still paying its employees, had no vendor issues, and was making

money);  38:22-39:3 (assessment of whether an entity facing significant future tort liability is in

financial distress need not consider whether the entity will be able to cover future claims); 41:24-

42:4 (in response to Court's inquiry, stating:  "But it has to be, it has to have a degree of distress

today, tomorrow, in the very near future, that is, that is granular, that is real.  Not just imagined.

And the Third Circuit continues to talk about threatened litigation as being inherently uncertain,

and not real enough to meet that standard without an impact on the business today.").

174.    While the Third Circuit has held that financial distress "must be

immediate enough to justify a filing," LTL Mgmt., 64 F.4th at 102, it has not required a showing

of either balance-sheet insolvency or an inability to pay debts on the day of filing.  Rather, it has

acknowledged that the "future likelihood" of balance-sheet insolvency or insufficient cash flows

to pay liabilities would be relevant to assessing financial distress.  Id.  Financial distress is

"immediate enough" if the debtor "face[s] such financial difficulty that, if it did not file at that

time, it could anticipate the need to file in the future."  Id. (quoting Baker v. Latham

Sparrowbush Assocs. (In re Cohoes Indus. Terminal, Inc.), 931 F.2d 222, 228 (2d Cir. 1991)

(further clarifying that a debtor "need not be *in extremis* in order to file")).

175.    The Movants and their experts' interpretation of the Third Circuit's

standard for financial distress overlooks this language.  It also is inconsistent with section 524(g)

and governing precedent acknowledging that Congress intended for section 524(g) to provide

relief to Debtors "likely to be subject to substantial demands for payment in the future arising out

of the same or similar conduct," even when the amounts and timing of such future claims are

uncertain." In re Grossman's Inc., 607 F.3d 114, 126 n.12 (3d Cir. 2010) (quoting In

Combustion Eng'g, Inc., 391 F.3d 190, 234 n.45 (3d Cir. 2005)); see also In re Whittaker, Clark

& Daniels, Inc., No. 23-13575, 2023 WL 4111338, at *8 (Bankr. D.N.J. June 20, 2023) (denying

motion to dismiss bankruptcy, citing "the unique qualities of asbestos-related bankruptcies,

Congressional intent in structuring a scheme under 11 U.S.C. § 524(g) to address such claims

and the considerable interests of future, unidentified claimants"); In re W.R. Grace & Co., 475

B.R. 34, 171 (D. Del. 2012) ("§ 524(g) was also designed to ensure that present claimants do not

exhaust all of the debtor's assets before future claimants have even manifested injuries.").[12]

**B.    LTL Was in Financial Distress.**

176.    The evidence at trial established that the Debtor's financial distress on the

Petition Date was apparent and sufficiently immediate to justify the Debtor's filing.  The

---

[12]    Mr. Burian acknowledged that he that he has no experience with valuing asbestos-related personal injury
claims.  FOF ¶ 99.

Debtor's financial distress exists as a result of tens of thousands of unliquidated, disputed talc

claims that were pending and threatened against Old JJCI and allocated to the Debtor in the 2021

Corporate Restructuring.  FOF ¶¶ 17-21.

### a.      The 2021 Chapter 11 Case.

177.     Prior to the filing of the 2021 Chapter 11 Case, the pursuit of talc claims

caused Old JJCI to incur $1 billion in defense costs over the five years prior to the 2021 Chapter

11 Case and approximately $3.5 billion in indemnity payments in connection with settlements

and verdicts.  FOF ¶ 37.  The J&J Consumer Health Business of which Old JJCI was a part had

turned unprofitable in the year before the 2021 Petition Date solely as a result of the talc-related

litigation.  See id.  Claimant demands included figures such as $7.2 billion in the Forrest case

and $1 billion in the Geise case.  In a then-recent mesothelioma trial (the Johnson case), the

plaintiff's counsel argued to the jury that $8 billion was an appropriate sum to award in

compensatory damages.  See id.

178.     This Court previously determined that the financial distress of Old JJCI

was "patently apparent," LTL Mgmt. LLC, 637 B.R. at 419.  As to Old JJCI specifically, that

finding was not disturbed by the Third Circuit.  Nor did the Third Circuit find that Old JJCI's

talc liability was speculative or uncertain.  Rather, the Third Circuit held that Old JJCI's

financial distress was relevant "to the extent it informs our view of the financial condition of

LTL itself."  LTL Mgmt., 64 F.4th at 106.

179.     The Third Circuit then reasoned that the backstop J&J provided through

the 2021 Funding Agreement to satisfy the talc liability in a chapter 11 bankruptcy served to

negate the Debtor's financial distress.  Id.  The Third Circuit acknowledged—and Mr. Burian

admitted—that the 2021 Funding Agreement was executed as part of a "single-integrated

transaction" that included the filing of the 2021 Chapter 11 Case, which was designed to

effectuate an efficient and equitable resolution of claims therein. <u>Id.</u> at 99.  Notwithstanding that undisputed purpose and intent, the Third Circuit ruled that the backstop eliminated the Debtor's financial distress because the funding agreement was effective for two days before the 2021 Chapter 11 Case was filed. <u>Id.</u> at 105.

180.    That backstop was the "most important" distinction between the financial conditions of Old JJCI and the Debtor as of the commencement of the 2021 Chapter 11 Case. <u>Id.</u> at 106.  As noted above, this backstop no longer existed prior to the commencement of this Chapter 11 Case as a result of the restructuring of the Debtor's funding arrangements that occurred thereafter.

## b.    Developments Since the Filing of the 2021 Chapter 11 Case.

181.    Evidence presented to the Court established that, between October 14, 2021 and April 4, 2023, the scale and immediacy of the Debtor's financial distress had increased dramatically for a number of reasons.  Holdco had transferred its Consumer Business assets to its parent entity, reducing the value of Holdco (previously New JJCI) from approximately $61.5 billion to approximately $30 billion.  FOF ¶¶ 63, 66.  Moreover, the number of talc claims filed against the Debtor has increased significantly.  LTL understood that the number of current claims had increased from approximately 40,000 claims as of October 14, 2021, to as many as 100,000 current claims as of April 4, 2023.  FOF ¶ 39.

182.    Given a multi-year backlog in claims, LTL faced an increasing risk that talc trials would include multiple-plaintiff consolidated trials.  FOF ¶ 39.  These trials pose enhanced verdict risk—both an increased risk of a verdict for the claimants and an increased risk of larger dollar awards. <u>Id.</u>

183.    Had the Debtor returned to the tort system on April 4, 2023, it would have

faced a wave of litigation "[a]fter an initial ramp-in period" arising from the "backlog of ovarian

cancer and mesothelioma claims."  FOF ¶ 71; see also FOF ¶ 40.

> **c.    Fact and Expert Testimony Shows LTL Was Sufficiently Distressed Under the Third Circuit's Standards.**

184.    Dr. Mullin determined that the Debtor likely would have incurred between

approximately $3 billion and $7 billion in litigation costs defending and resolving talc-related

claims over the first three years alone.  FOF ¶ 75.  This cost range was based on realistic

potential outcomes derived from the Debtor's historic experience and comparable cases under

various potential litigation and settlement scenarios allocated across a three-year period.  See

FOF 71-74.

185.    Dr. Mullin's scenario analysis was an appropriate way to assess the

Debtor's potential costs using alternative assumptions and scenarios.  See e.g., Boy Scouts,

650 B.R at 117 (accepting expert's use of scenario analysis to estimate sex abuse claims, noting

"[t]his methodology necessarily includes testing [through] scenario analysis which requires an

evaluation of the assumptions used to value and group the claims to see the impact on the

analysis if factors are changed"); In re ResCap Liquidating Tr. Litig., No. 13-CV-3451

(SRN/HB), 2020 WL 4728109, at *66 (D. Minn. Aug. 14, 2020), aff'd sub nom. ResCap

Liquidating Tr. v. Primary Residential Mortg., Inc., 59 F.4th 905 (8th Cir. 2023) (affirming

reliability of expert's use of scenario analysis).  It was not a "back-of-the-envelope forecast of

hypothetical worst-case scenarios," LTL Mgmt., 64 F.4th at 108, as certain Movants attempted to

characterize it in closing arguments.  June 30, 2023 Hr'g Tr. 46:13-57:24 [counsel for Paul

Crouch].

186.    Dr. Bell compared the litigation-cost scenarios developed by Dr. Mullin to the projected annual cashflows available to the Debtor under various Holdco dividend scenarios, yielding 108 results.  FOF ¶¶ 124-128.  The unrebutted testimony established that uncertainty surrounding the timing and amount of dividend payments to Holdco arose, not via manipulation by J&J, but as a result of various factors, including the cash needs of J&J's various business operations, local regulations and statutory requirements governing dividend remittance, research and development efforts, acquisition opportunities, tax requirements, financial risk management, and debt servicing.  FOF ¶ 118.  As with Dr. Mullin's analysis, Dr. Bell's use of a scenario analysis was an appropriate way to assess LTL's ability to pay its debts as they came due from operating cash flows utilizing alternative assumptions.  See Boy Scouts, 650 B.R. at 117; ResCap, 2020 WL 4728109, at *66.

187.    Considering only personal injury claims, Dr. Bell concluded that, in almost half of the scenarios (43 percent), as of the Petition Date, the "potential operating cashflows would be insufficient to fund the potential costs associated with the defense and resolution of talc-related personal injury claims."  FOF ¶ 128.

188.    Dr. Bell's supplemental report reflected Holdco's receipt of a $912 million dividend shortly before the trial.  FOF ¶ 130.  The amount of this dividend, which was substantially lower than the maximum amount that Holdco potentially could have received, actually *increased* the percentage of scenarios under which Holdco cashflows would be insufficient to fund the Debtor's talc liability to over 50 percent.  Id.; see also FOF ¶ 120.

189.    Based upon these analyses, Dr. Bell concluded that the Debtor was in financial distress on the Petition Date because Holdco's "ability to use operating cashflows to fund talc liabilities as they come due through the 2023 Funding Agreement is in jeopardy."  FOF

¶ 129.  Accordingly, it is "reasonable to anticipate that Holdco may be required to liquidate its ownership interests at a significant discount, impairing [the Debtor's] short- and long-term ability to receive timely and sufficient funding through the 2023 Funding Agreement."  Id.

190.    Dr. Bell's analysis does not impute, as the Movants alleged, Holdco's financial distress to the Debtor.  See TCC Reply at 46; A&I Reply at 22.  Rather, because the Debtor's rights under the 2023 Funding Agreement represent the Debtor's largest asset (see FOF ¶¶ 61-62), consistent with the Third Circuit's opinion, any potential impairment of those rights "informs our view of the financial condition of LTL itself."  LTL Mgmt., 64 F.4th at 106.  The significant likelihood that Holdco would need to liquidate its illiquid assets, which include minority interests in foreign companies, to satisfy its obligations under the 2023 Funding Agreement would put near- and long-term pressure on the Debtor's financial condition.  FOF ¶¶ 65, 129.

191.    Dr. Bell's scenario analyses demonstrated a material risk that LTL would not be able to meet its obligations from the cash and operating cash flows (dividends) available to it from Royalty A&M and through its funding rights from Holdco.  FOF ¶ 124-130. Regardless of whether LTL was equitably insolvent on the date it filed its second bankruptcy petition, the Court finds that the Debtor did not have "access to cash to meet comfortably its liabilities as they came due for the foreseeable future" when it filed its second bankruptcy petition on April 4, 2023.  LTL Mgmt., 64 F.4th at 108.

192.    With respect to a balance-sheet analysis, Dr. Mullin determined that the net present value of the Debtor's talc liability would fall in the range of $11 billion to $21 billion, inclusive of government claims.[13]  FOF ¶¶ 92-93.  Dr. Bell, in turn, determined that

---

[13]    Dr. Mullin assumed the governmental entities' claims could be resolved for the $400 million set aside for such claims in the proposed plan.  FOF ¶ 93.  The Ad Hoc Committee of States has stated its view that

the collective value of LTL's and Holdco's assets that could be used to satisfy its obligations to

the Debtor under the 2023 Funding Agreement would be $22.7 billion, after accounting for

discounts applicable in the context of a forced liquidation triggered by a call on the 2023

Funding Agreement.  FOF ¶ 112.  Although these opinions show balance-sheet solvency, they

demonstrate that virtually the entirety of the value of the Debtor and Holdco might be required to

pay tort system talc costs.

193.    The TCC's expert, Mr. Burian, estimated that the likely proceeds from a

sale of Holdco's subsidiaries—comprising the vast majority of its assets—are between $17.1

billion and $26.9 billion.  Id.  Combined with LTL's assets, Mr. Burian's discounted value range

of $17.91 billion to $27.71 billion for LTL's and Holdco's collective assets would yield a

possibility that LTL was insolvent as of April 4, 2023.  FOF ¶¶ 112, 114.  Moreover, as noted

above, there are credible reasons to believe that the Movants' estimates of LTL's total talc

liability exceed even the "high-end" and "stress-case" scenarios provided in Dr. Mullin's report.

194.    Regardless of whether LTL was balance-sheet solvent or insolvent as of

April 4, 2023, it is clear that the extent of Debtor's balance-sheet solvency has narrowed

significantly since October 14, 2021, the date of LTL's first bankruptcy filing.  Accordingly, the

Court finds that the evidentiary record does not support the conclusion that the Debtor was

"highly solvent" as of April 4, 2023 when it filed its second bankruptcy petition.  LTL Mgmt., 64

F.4th at 108.

195.    The Movants offered no contrary evidence of the short- or long-term

amounts of the Debtor's talc costs and denied having worked up any such estimates.  This

---

"$400 million is woefully inadequate to satisfy governmental entities' talc-related claims."  States Motion
at ¶ 55.

despite the TCC's professionals apparently having expended thousands of hours working on

doing precisely that, according to their bills.  FOF ¶¶ 96-97.  Despite the fact that three law firms

representing members of the TCC are also counsel to members of the talc claimants committee

in the Imerys chapter 11 case, the TCC ignores that the plan proponents in that case have

asserted that the Debtor's aggregate liability for the same claims exceeds $100 billion, which

would plainly render the Debtor insolvent.  FOF ¶ 106.  Mr. Burian was aware of claims values

proposed in the Imerys bankruptcy but he did not consider those values in connection with his

analysis of whether LTL was in financial distress.  FOF ¶ 100.  The TCC also ignores that a

single plaintiff in a single case recently asked for a jury to return a verdict of approximately $500

million.  FOF ¶¶ 37, 143.

        196.    The Movants argued instead that the Debtor lacked financial distress

because the Debtor's own estimates of the value of its and Holdco's assets exceeds the Debtor's

estimates of the talc liability and, in all of the scenarios set forth in Dr. Bell's initial report, the

Debtor is anticipated to be able to pay its talc liabilities as they come due, albeit following

liquidation of Holdco assets in multiple cases.  See, e.g., TCC Reply, 57-59.  But "[n]either

insolvency nor inability to pay debts is a prerequisite to seeking voluntary relief under the

Bankruptcy Code."  Stolrow's, 84 B.R. at 171 (citation omitted); see also LTL Mgmt., 64 F.4th

at 102 ("To say, for example, that a debtor must be in financial distress is not to say it must

necessarily be insolvent."); SGL Carbon, 200 F.3d at 163 ("[I]t is well established a debtor need

not be insolvent before filing for bankruptcy protection."); In re Mid-Valley, Inc., 305 B.R. 425,

429-31 (Bankr. W.D. Pa. 2004) ("fact of solvency does not require a finding that the bankruptcy

filing was in bad faith"); Johns-Manville, 36 B.R. at 732 ("it should also be noted that neither

Section 109 nor any other provision relating to voluntary petitions by companies contains any

insolvency requirement").  No court has held to the contrary, and the Movants' arguments

contravene that clear precedent.

197.    Not only did the Movants not offer any estimate of aggregate tort-system

talc costs, they also offered no cash-flow analysis to controvert the Debtor's evidence.  In fact,

the only evidence that the TCC offered—Mr. Burian's analysis of the range of possible values of

Holdco—was generally consistent with Dr. Bell's analysis and showed potential balance sheet

insolvency.  FOF ¶¶ 112, 114.

198.    The evidence also refuted certain Movants' allegation, repeated by

Mr. Burian, that the Debtor lacked financial distress because J&J would simply have funded the

payment of talc litigation costs to protect itself and the value of its equity in Holdco.  See A&I

Reply, 5, 22, 26-27.  But there was no historic practice of J&J satisfying talc litigation costs, as

Arnold & Itkin alleged.  Id. at 26.  Rather, consistent with Old JJCI's—and since the 2021

Corporate Restructuring, the Debtor's—indemnification obligations, talc litigation costs

historically were always borne by Old JJCI.  FOF ¶ 85 n.6.  Solely for administrative

convenience and pursuant to company policy, J&J initially paid such amounts through the

integrated, centralized cash management system it shared with Old JJCI, before charging 100%

of those costs to Old JJCI.  Id.  Movants offered no evidence to support the proposition that J&J

would have changed its approach and for the first time begun to pay the Debtor's talc

obligations.  Stated simply, J&J had no obligation to pay the Debtor's talc liability prior to

bankruptcy.  LTL Mgmt., 64 F.4th at 106-07 ("And, of course, J&J's primary, contractual

obligation to fund talc costs was one never owed to Old [JJCI] (save for the short moment during

the restructuring that it was technically a party to the Funding Agreement).").  And J&J's actions

to date demonstrate that J&J would not have paid the costs since J&J was unwilling to make

payments to avoid the Debtor's current and prior chapter 11 filings.  In sum, the record

established that, if Holdco were not able to timely pay talc costs, J&J would not have provided

its own funding.  This is consistent with J&J's historic practice of not capitalizing affiliates that

are not operating well and sometimes taking the decision to walk away.  FOF ¶ 140.

199.    The Debtor was thus in financial distress as of the Petition Date because,

among other things and based on unrebutted evidence, there are multiple potential scenarios over

the next three years where Holdco would likely be required to liquidate assets to provide

funding, which would cause a material destruction of Holdco's value (due to the illiquid nature

of its assets and the minority interests it holds in foreign entities), and create a material risk that

the Debtor would have insufficient funding timely to pay talc costs.  Indeed, if Holdco were

unable to liquidate assets in a timely manner and for sufficient values, the Debtor would have

insufficient funding to satisfy the foreseeable talc costs.  Moreover, based on the Debtor's

estimates of its talc liability (which likely are materially below those of the Movants), there are

scenarios where there is a relatively small cushion between the aggregate amount of the talc

liability and the combined value of the Debtor and Holdco.  Further, based on Mr. Burian's

estimate of the value of Holdco, there are scenarios where the amount of talc liability could

exceed the combined value of the Debtor and Holdco.  In sum, the record establishes that the

Debtor reasonably "could anticipate the need to file in the future," had it not filed on the Petition

Date,

## III.    THE DEBTOR'S CONDUCT WAS NOT IN BAD FAITH NOR AN ATTEMPT TO MANUFACTURE FINANCIAL DISTRESS, AND DID NOT GIVE RISE TO A FRAUDULENT TRANSFER

200.    The evidence presented at the hearing refuted the Movants' allegations

that the exchange of the Debtor's rights under the 2021 Funding Agreement for its rights under

the 2023 Funding Agreement constituted bad faith conduct, an attempt to manufacture financial

distress, an actual or constructive fraudulent transfer and/or a breach of fiduciary duty.  See, e.g.,

A&I Mot. at 5-7, 34-37; TCC Mot. at 28-36; UST Mot. at 14-15, 18-19; States Mot. at 14-17;

Crouch Mot. at 1-13; TCC Reply at 12-38; A&I Reply at 34-47; UST Reply at 14-17; States

Reply at 4, 7-8, 12-13; MRHFM Reply at 21-22, 24-26; NM/MS Reply at 8.

**A.    The Changes to the Financing Arrangements Were Appropriate to Mitigate
the Risk that J&J's Backstop Was Not Enforceable and to Ensure a
Successful Reorganization.**

201.    The Debtor had a reasonable, good-faith belief that a material risk existed

that J&J's obligations under the 2021 Funding Agreement were rendered void or voidable by the

Third Circuit Opinion, and could have been unenforceable.  This risk was eliminated by the

Debtor's entry into the 2023 Funding Agreement and the J&J Support Agreement and did not

harm the interests of claimants.

202.    North Carolina law, which governs the 2021 Funding Agreement,

provides that performance under a contract may be excused "whenever a fortuitous event

supervenes to cause a failure of the consideration or a practically total destruction of the

expected value of the performance," even if performance is still possible.  Brenner v. Little Red

Sch. House, Ltd., 302 N.C. 207, 211 (1981) (quoting 17 Am. Jur. 2d Contracts § 401 (1964)).

The doctrine "is based upon the fundamental premise of giving relief in a situation where the

parties could not reasonably have protected themselves by the terms of the contract against

contingencies which later arose."  Id.  Its application is thus limited to reasonably unforeseeable

intervening events.  Id.

203.    The North Carolina Court of Appeals has distilled the doctrine to three

requirements: "(1) there was an implied condition in the contract that a changed condition would

excuse performance; (2) the changed condition results in a failure of consideration or the

expected value of the performance; and (3) the changed condition was not reasonably

foreseeable." <u>Fairfield Harbour Prop. Owners Ass'n, Inc. v. Midsouth Golf, LLC</u>, 215 N.C.

App. 66, 79 (2011).  The changed condition need not be completely unforeseeable for the

purpose of a contract to be frustrated.  <u>Norfolk S. Ry. Co. v. Reading Blue Mountain & N. R.

Co.</u>, 346 F. Supp. 2d 720, 724 (M.D. Pa. 2004) (citing <u>Opera Co. of Boston v. Wolf Trap

Foundation</u>, 817 F.2d 1094, 1100–01 (4th Cir. 1987)).  Rather, the occurrence must be

"unexpected, and not a realistic possibility." <u>Id.</u> at 724.  It is clear that the purpose of a contract

can be frustrated by government action, including intervening court decisions.  <u>See</u> <u>Union Cty.

Utils. v. Bergen Cty. Utils. Auth.</u>, 995 F. Supp. 506 (D.N.J. 1998) (purpose of waste disposal

contracts was frustrated by Third Circuit determination that statutes governing waste disposal

were unconstitutional).[14]

204.    The evidence presented at the Hearing established that, promptly

following the Third Circuit's entry of its opinion, J&J expressed to the Debtor its view that its

backstop obligation under the 2021 Funding Agreement was rendered void or voidable by the

decision.  FOF ¶ 43.  J&J and the Debtor entered into the 2021 Funding Agreement as part of a

single integrated transaction that included the filing of the 2021 Chapter 11 Case.  Both J&J and

the Debtor were in accord on this and Mr. Burian expressly agreed this was the case.[15]  FOF

---

[14]      <u>See also</u> <u>UNCC Properties, Inc. v. Greene</u>, 111 N.C. App. 391, 397, 432 S.E.2d 699, 702 (1993) (county's
actions in condemning property frustrated purpose of agreement pursuant to which owner would provide
certain easements to plaintiff); <u>Am. Prairie Constr. Co. v. Hoich</u>, 594 F.3d. 1015, 1027 (8th Cir. 2010)
(bankruptcy court decision converting debtor's chapter 11 case to chapter 7 frustrated purpose of investor
in purchasing creditor's claim to remove objection and make it more likely bankruptcy would approve
confirmation of chapter 11 plan); <u>United States v. Moulder</u>, 141 F.3d 568, 572 (5th Cir. 1998) (purpose of
plea agreement was frustrated by subsequent United States Supreme Court ruling that conduct was no
longer criminal); <u>Unihealth v. U.S. Healthcare, Inc.</u>, 14 F. Supp. 2d 623, 637 (D.N.J. 1998) (purpose of
hospital service agreement frustrated by state legislature decision abolishing billing system); <u>Arons v.
Charpentier</u>, 36 A.D.3d 636, 828 N.Y.S.2d 482 (2007) (purpose of contract providing for the payment of
certain expert witness fees in lawsuit under Individuals with Disabilities Education Act was frustrated by
U.S. Supreme Court decision providing that such fees were not recoverable).

[15]      The TCC's experts in the 2021 Chapter 11 Case likewise took the position that the 2021 Corporate
Restructuring and the 2021 Chapter 11 Case were a single integrated transaction.  FOF ¶ 21.

¶ 21.  The evidence also demonstrated that the parties to the 2021 Funding Agreement agreed

that its purpose was to secure J&J's funding for the Debtor to enable a resolution of all Talc

Related Liabilities in the context of a chapter 11 case and alleviate claimant concerns about

potential corporate transactions by New JJCI that might impair its ability to provide needed

funding during the 2021 Chapter 11 Case.  FOF ¶¶ 20, 41-42.  Indeed, there would have been no

reason for J&J to provide backstop funding outside of a bankruptcy filing; the evidence

demonstrated that J&J had never done so in the past and the Movants adduced no contravening

evidence.  In sum, the purpose of the J&J backstop was frustrated by a changed condition—the

Third Circuit Opinion.

205.     The Third Circuit Opinion, which determined that participation of J&J in

the 2021 Funding Agreement rendered bankruptcy unavailable to the Debtor, was the reverse of

the Debtor and J&J's intent, as the Third Circuit itself acknowledged.  See LTL Mgmt., 64 F.4th

at 110-11 (noting the "***apparent irony***" that "J&J's triple A-rated payment obligation for LTL's

liabilities, which it views as a generous protection it was never required to provide to claimants,

weakened LTL's case to be in bankruptcy") (emphasis added).  The Oxford Languages

dictionary defines "irony" as "a state of affairs or an event that seems deliberately contrary to

what one expects."[16]  Likewise, the Merriam-Webster dictionary defines "irony" as "incongruity

between the actual result of a sequence of events and the normal or expected result."[17]  Because

the Third Circuit Opinion interpreted the 2021 Funding Agreement as having the exact opposite

effect of that intended by the parties, it wholly frustrated the agreement's intended purpose

---

[16]     See Irony, Oxford English Dictionary (3rd ed. 2013), https://www.oed.com/view/Entry/99565?rskey
=E42X4z&result=1&isAdvanced=false#eid (accessed June 26, 2023).

[17]     See Irony, Merriam-Webster.com Dictionary, Merriam-Webster,
https://www.merriamwebster.com/dictionary/irony (accessed June 26, 2023).

and—from J&J's perspective—rendered it void or voidable by J&J as a matter of law.  FOF

¶¶ 43-44.  The Movants' attempt to focus on the availability of the 2021 Funding Agreement

both in and outside of bankruptcy in order to defeat the frustration of purpose doctrine ignores

that it was the specific grounds for the Third Circuit's dismissal, not dismissal itself that was

unforeseen.  It was reasonably foreseeable that certain claimants might seek dismissal of the

2021 Chapter 11 Case and that dismissal could be successful.  What was not foreseeable was that

the momentary backstop support J&J provided the Debtor outside of chapter 11, in the midst of

an integrated transaction would be the cause of dismissal of the Debtor's prior chapter 11 case.

206.    Under the dismissal standard applicable in the Fourth Circuit, where the

Debtor originally sought chapter 11 relief, the presence of J&J's backstop would have assured

denial of the motions to dismiss, rather than providing cause for dismissal.  In Bestwall, for

example, the court found that the financial support that the debtor received under its funding

agreement was the most important reason for denying dismissal, not—as the Third Circuit

found—the most important reason for granting it.  Compare In re Bestwall LLC, 605 B.R. 43, 49

(Bankr. W.D.N.C. 2019) ("*Most importantly*, Bestwall has the full ability to meet all of its

obligations (whatever they may be) through its assets and New GP's assets, which are available

through the Funding Agreement, and to continue as a going concern.") with LTL Mgmt., 64

F.4th at 106 ("*Most important*, though, the payment right gave LTL direct access to J&J's

exceptionally strong balance sheet.") (emphasis added).

207.    This Court similarly noted the irony of the contentions in the motions to

dismiss the 2021 Chapter 11 Case when it previously questioned "how a bankruptcy filing,

which took place in North Carolina and most likely satisfied the good faith standards under the

applicable law in that jurisdiction, suddenly morphs post-petition into a bad faith filing simply

because the case travels 400 miles up I-95 to Trenton, New Jersey." LTL Mgmt., 637 B.R. at

406.  By dismissing the Debtor's prior chapter 11 case on a basis that alone would have

warranted denial of a motion to dismiss in the jurisdiction where the case was originally filed,

the Third Circuit Opinion frustrated the purpose of the J&J backstop.

208.    Based on the occurrence of this unforeseen contingency and J&J's

position that its obligations under the 2021 Funding Agreement were no longer enforceable due

to the Third Circuit Opinion frustrating and defeating the primary purpose of the J&J backstop,

the LTL Board determined that a material risk existed to the enforcement of the backstop

(whether or not the backstop was in fact void or voidable).  FOF ¶ 44.  The evidence established

that, after J&J expressed its view, counsel for the Debtor considered the issue, and the Debtor's

Board discussed it.  FOF ¶¶ 43-44.  Thereafter, the Board concluded that there was a material

risk that the J&J backstop was void or voidable and it determined to enter into the 2023 Funding

Agreement to eliminate any uncertainty as to funding.  FOF 44-46.  By eliminating this

uncertainty, the Debtor's management ensured that the Debtor had enforceable financing

arrangements that provided the funding needed both to pay the substantial costs of this Chapter

11 Case and implement the resolution supported by representatives of the majority of claimants

through an agreed chapter 11 plan.  FOF ¶ 55.

209.    Contrary to the TCC's position, Judge Ferguson's decision in Congoleum

Corp. v. Pergament (In re Congoleum Corp.), Adv. No. 05-06245, 2007 WL 4571086 (Bankr.

D.N.J. Dec. 28, 2007), actually supports the reasonableness of the Debtor's conclusion that a

material risk existed regarding the enforceability of the 2021 Funding Agreement.  In that case,

the debtor entered into prepetition settlement agreements with certain existing asbestos claimants

liquidating their claims and securing them by an interest in insurance policy collateral.  Id. at *1.

The debtor's purpose in entering into the settlement agreements was "to move towards a consensual Bankruptcy Code § 524(g) plan of reorganization that would provide for an orderly and efficient means of allowing and paying tens of thousands of asbestos-related claims and provide the business with the substantial benefit of a channeling injunction against future claims." Id. at *9. According to the debtor, that purpose was frustrated by the Third Circuit's supervening decision in Combustion Eng'g, which required equality of distribution among asbestos claimants and thus rendered unconfirmable the debtor's proposed plan, which recognized the preferential security interests contained in the prepetition settlement agreements. Id. at *9-10.

210.    The bankruptcy court in Congoleum denied summary judgment with respect to the debtor's frustration of purpose defense not because the defense was not viable, but because the claimants did not share the debtor's purpose in entering into the settlement agreements. Id. at *10. Instead, the settling claimants' purpose was simply "to receive payment for their claims in exchange for granting a release to the Debtor" not, as alleged by the debtor, to effectuate an "orderly resolution of asbestos claims and reorganization of the Debtor pursuant to a 524(g) plan." Id. To that extent, the bankruptcy court ruled that the debtor was "attempting to ascribe its own motives . . . to the [claimants]." Id. There was no evidence in the record that the claimants' primary purpose was for the debtor to reorganize successfully. Id. Hence, the doctrine of frustration of purpose was inapplicable in that case. Id. at *11.

211.    Here, in contrast to Congoleum, there is no dispute that the Debtor and J&J shared a common purpose in entering into the 2021 Funding Agreement. Both were seeking to pursue an equitable resolution of current and future Talc Related Liabilities in chapter 11

through confirmation of a plan of reorganization that provides for the establishment of a trust to satisfy such claims.

212.     <u>Union County</u> is also instructive.  In that case, the Bergen County Utilities Authority ("<u>BCUA</u>") sought a declaration from the court that a waste-disposal contract was, in its entirety, void and unenforceable as a result of the Third Circuit's opinion in <u>Atlantic Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atlantic Cty.</u>, 112 F.3d 652 (3d Cir. 1997).  <u>Union Cty.</u>,995 F. Supp. at 508.  In <u>Atlantic Coast</u>, the Third Circuit held that certain New Jersey statutes governing the disposal of in-state solid waste violated the dormant Commerce Clause by unconstitutionally excluding out-of-state facilities from consideration as possible sites for disposal of the waste.  <u>Id.</u>  The court found that <u>Atlantic Coast</u> did "not necessarily invalidate all existing contracts for the disposal and processing of solid waste in New Jersey." <u>Id.</u> at 513.  Nonetheless, the court ruled that <u>Atlantic Coast</u> did void the waste-delivery provisions in the contracts at issue and potentially voided other provisions of those contracts, including under the frustration of purpose doctrine.  <u>Id.</u> at 508, 515-517, 520.

213.     The court, however, left the determination of whether those other provisions were voided by Atlantic to the state courts, with certain guidance.  <u>Id.</u> at 516-519. Specifically with regard to frustration of purpose, the state courts were to consider "whether the sole or primary purpose of an Impacted Old Law Contract was to provide for the delivery of in-state solid waste to an in-state facility," to "carefully examine the language of the contract and the evidence of the parties' intent to determine the extent to which the Atlantic Coast [] injunction frustrated their contractual goals," and to consider "whether or not the parties specifically allocated the risk of the invalidation" of the provisions.  <u>Id.</u> at 517.

214.    In this case, the evidence clearly demonstrated that the supervening Third Circuit Opinion upended J&J's and the Debtor's primary purpose by denying the Debtor access to chapter 11 as a result of J&J's prepetition participation in the Debtor's funding support, which chapter 11 case and funding support were part of a single integrated transaction to globally resolve the Talc Related Liabilities.  This thus created a material risk that the 2021 Funding Agreement was void or voidable as to J&J's obligations.  Substitution of the financing arrangements was appropriate to avoid this material risk.

215.    The Movants are incorrect that the Debtor was required to bring the risk of enforcement of the 2021 Funding Agreement to the attention of the Court following entry of the Third Circuit Opinion.  The Third Circuit had directed that the 2021 Chapter 11 Case be dismissed; it remained pending only while the Debtor sought review of the Third Circuit Opinion and the enforceability of the J&J backstop would only have become an issue upon dismissal of the case.  Nor was the Debtor required to wait for J&J to refuse to honor its obligations under the 2021 Funding Agreement prior to taking any action, as argued by the U.S. Trustee.  See U.S. Trustee Mot. at 14.  The evidence established that the Debtor, consistent with its fiduciary obligations, developed a contingency plan to replace the 2021 Funding Agreement with the 2023 Funding Agreement and J&J Support Agreement while pursuing review of the Third Circuit Opinion and a potential settlement with talc claimants.  FOF ¶¶ 47-53.  The modified funding arrangement avoided any uncertainty as to J&J's obligations under the 2021 Funding Agreement and assured that the Debtor had sufficient funding to implement the proposed agreed plan in a second bankruptcy case if the 2021 Chapter 11 Case was dismissed.  FOF ¶ 55.

216.    The argument that the Debtor was required to disclose such activities to the U.S. Trustee or the TCC is a red herring.  There was no such requirement, and in any event,

the evidence establishes that both counsel to the TCC and counsel to the members of the TCC
were in fact contemporaneously aware of the Debtor's and J&J's ongoing negotiations with
counsel to talc claimants, despite assertions to the contrary.  FOF ¶ 27.

217.   The substitution of funding arrangements benefitted creditors rather than
harming them.  The Debtor's ability to access funds under both funding agreements is, and
always has been, strictly limited to certain specific purposes.  In addition to ordinary course
expenses outside of chapter 11 and costs of administration of any chapter 11 case, each Funding
Agreement provides the Debtor with funding to satisfy only "Talc Related Liabilities."  And
each Funding Agreement features an identical definition of "Talc Related Liabilities."  Compare
2021 Funding Agreement, Sch. 1 (definition of "Talc Related Liabilities") with 2023 Funding
Agreement, Sch. 1 (same definition).  Pursuant to the definition of "Permitted Funding Use," the
amount payable under each Funding Agreement is the Talc Related Liabilities less the amount of
any dividends the Debtor receives from Royalty A&M LLC and, in the case of the funding of a
chapter 11 trust only, less the value of the Debtor's assets.  See 2021 Funding Agreement, § 1
(definition of "Permitted Funding Use"); 2023 Funding Agreement, § 1 (same).  The maximum
amount of funding that each funding agreement can provide is thus the total Talc Related
Liabilities less the value of the Debtor.

218.   The Movants' arguments that the "value" available under the funding
agreements differed or was tied in any relevant way to the value of New JJCI or Holdco ignore
the plain language of the agreements.  See, e.g., UST Mot., 9-10; Crouch Mot., 2; States Mot.,
21.  The unrebutted evidence established that the net present value of the Debtor's talc liability is
no more than $21 billion, and the Movants chose to present no contrary evidence.  Since it is
undisputed that the value of both Old JJCI and Holdco exceeded this amount, the maximum

amount potentially payable to claimants under the respective funding agreements (that is, their value) is the same.

219.    The entry into the new financing arrangements by the Debtor, J&J and Holdco did not harm claimants because the Debtor has sufficient resources to fund its obligations in this Chapter 11 Case and under the Plan, and Holdco's value remains sufficient to meet talc expenses had the Debtor not filed the Chapter 11 Case. The cases that the Movants cite where courts have found bad faith conduct are inapposite.  See, e.g., In re S. Beach Sec., Inc., 606 F.3d 366 (7th Cir. 2010) (parent's rendering of subsidiary insolvent to make it judgment proof would have been improper); In re Scheffler, 86 B.R. 576, 578–79 (Bankr. W.D. Wis. 1986) (chapter 11 filing to target single secured creditor in bad faith).[18]

**B.    Even Absent the Risk that J&J's Backstop Was Not Enforceable, the Changes to the Financing Arrangements Were Appropriate.**

220.    Even absent the material risk that J&J's obligations under the 2021 Funding Agreement were not enforceable, the changes to the financing arrangements were appropriate and in accordance with the Third Circuit's guidance.  The Debtor's entry into the new financing arrangements returned responsibility for the Debtor's talc liability solely to New JJCI, now Holdco, which responsibility had existed and continued uninterrupted for more than 42 years prior to the commencement of the 2021 Chapter 11 Case.

221.    Contrary to the Movants suggestions, the Third Circuit did not "warn" the Debtor in footnote 18 of its opinion not to change its financing arrangements.[19]  See LTL Mgmt.,

---

[18]    The transfer of Holdco's Consumer Business also provides no support for a bad faith finding.  The unrebutted evidence established that the transfer of the Consumer Business:  (a) took place in early January, prior to the issuance of the Third Circuit Opinion; (b) was implemented in connection with the long planned spin-out of that business that was publicly announced in November 2021 after years of planning; and (c) was completely separate from both this Chapter 11 Case and the 2021 Chapter 11 Case.  FOF ¶ 64.

[19]    Movants' interpretation of footnote 18 in the Third Circuit Opinion essentially means that the Debtor has no option that would not violate the Third Circuit Opinion—even though the Debtor reached an agreement

64 F.4th at 109 n.18.   Rather, the Third Circuit forecast that a change in the funding backstop

might be made and then pointed out that, if a change was made, it could be subject to challenge

as a fraudulent transfer.  Id. ("Some might read our logic to suggest LTL need only part with its

funding backstop to render itself fit for a renewed filing. … we note interested parties may seek

to 'avoid any transfer' made within two years of any bankruptcy filing by a debtor who

'receive[s] less than a reasonably equivalent value in exchange for such transfer" and "became

insolvent as a result of [it].'").

222.    Not only was the change that was ultimately made not a fraudulent

transfer for the reasons set forth below, it ensured the Debtor had sufficient funds to implement

the proposed plan.  The settlement the Debtor and J&J had reached with the supporting law firms

could only be implemented in bankruptcy and the new financing arrangements made certain that

the agreement could be consummated as agreed.

**C.    The Debtor's Entry into the New Financing Arrangements Was Neither an Actual nor a Constructive Fraudulent Transfer.**

223.    The evidence before the Court refutes the Movants' allegations that the

restructuring of the Debtor's financing arrangements gave rise to an actual or constructive

fraudulent transfer.  See, e.g., TCC Mot., 6-7, 31-32; A&I Mot., 34-37; UST Mot., 13; Crouch

Mot., 9; States Mot., 14; TCC Reply, 20-29; A&I Reply, 43-48; MRHFM Reply, 25-26.

---

with counsel to the majority of talc claimants that it believes is beneficial to all claimants and can only be implemented in bankruptcy, the Debtor would be completely foreclosed from filing for bankruptcy.  If the Debtor made no changes to the financing arrangements and filed for bankruptcy, Movants would argue that the case should be dismissed for the exact reasons the 2021 Chapter 11 Case was dismissed.  But, as has already happened, if the Debtor made any changes to address the Third Circuit's financial distress standard, the Movants would argue the case should be dismissed because of those changes.

a.      **There Is No Evidence of Fraudulent Intent.**

224.    Subject to certain limitations, section 548(a)(1)(A) of the Bankruptcy

Code allows a trustee to "avoid any transfer . . . of an interest of the debtor in property, or any

obligation . . . incurred by the debtor," if the debtor "made such transfer or incurred such

obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or

became, on or after the date that such transfer was made or such obligation was incurred,

indebted." 11 U.S.C. § 548(a)(1)(A).

225.    The evidence established that the Debtor's intent in replacing the 2021

Funding Agreement with the 2023 Funding Agreement and the J&J Support Agreement was to

eliminate a material risk to enforcement of the J&J backstop in the 2021 Funding Agreement and

to facilitate the filing and resolution of this Chapter 11 Case pursuant to a confirmed plan of

reorganization that will establish a trust that is intended to pay all current and future claimants

promptly and in full.  FOF ¶¶ 55-56.  Thus, rather than making it more difficult for talc claimants

to receive payment on their claims, the Debtor's actions were intended to expedite such

payments.  No Movant presented any evidence of any contrary intent to hinder, delay or defraud

any entity or to deprive itself of assets and liquidity needed to pay talc claimants in such an

attempt.

226.    The TCC's authority is distinguishable.  The TCC relies on case law

where fraudulent intent has been inferred from a debtor's unlawful conduct that exposed "clients

to a substantial risk of loss of which they were unaware" such that liquidity issues were "a

natural consequence of its actions."  See TCC Reply, 22-23 (citing In re Sentinel Mgmt. Grp.,

Inc., 728 F.3d 660, 667-69 (7th Cir. 2013)).  But no evidence was presented that the Debtor's

conduct was unlawful, created any substantial risk of loss to claimants or caused material

liquidity constraints.  To the contrary, the evidence establishes that the Debtor intended to

facilitate confirmation of a plan that would expeditiously pay claimants in full.

### b.    There Is No Evidence of Constructive Fraud.

227.    Section 548(a)(1)(B) of the Bankruptcy Code generally provides for the

avoidance of transfers made and obligations incurred if a debtor "received less than a reasonably

equivalent value in exchange for such transfer or obligation" and that debtor:

> (I)    was insolvent on the date that such transfer was made or such
> obligation was incurred or became insolvent as a result of such
> transfer or obligation;
>
> (II)    was engaged in business or a transaction, or was about to
> engage in business or a transaction, for which any property
> remaining with the debtor was an unreasonably small capital; [or]
>
> (III)    intended to incur, or believed that the debtor would incur,
> debts that would be beyond the debtor's ability to pay as such debts
> matured . . . .

11 U.S.C. § 548(a)(1)(B)(ii).  The party bringing the fraudulent conveyance action bears the

burden of proving each of these elements by a preponderance of the evidence.  In re Fruehauf

Trailer Corp., 444 F.3d 203, 211 (3d Cir. 2006).  Movants have failed to support any claim of

constructive fraudulent transfer.

228.    The concept of reasonably equivalent value "requires a comparison of

what was transferred with what was received by the debtor but does not require a dollar-for-

dollar exchange."  In re Opus East, LLC, 528 B.R. 30, 83 (Bankr. D. Del. 2015) (citing to In re

R.M.L., Inc., 92 F.3d 139, 145, 154 (3d Cir. 1996)).  Here, the Debtor received at least

equivalent value for substituting the 2023 Funding Agreement and the J&J Support Agreement

for the 2021 Funding Agreement for the reasons discussed above.

229.    Further, no Movant asserts that the new financing arrangements rendered

the Debtor insolvent.  The Debtor's evidence demonstrated that the value of its assets, including

the 2023 Funding Agreement, is approximately $30 billion, which is greater than all of the

Debtor's projections of its talc liability.  FOF ¶¶ 66, 111.  And the Movants declined to offer any

contrary evidence.

230.    Nor does the Debtor's established financial distress equate to

unreasonably small capital under section 548(a)(1)(B)(II) of the Bankruptcy Code, as some

Movants alleged.  See TCC Mot., 23 n.91; A&I Mot., 36.  The Third Circuit has commented that

"unreasonably small capital denotes a financial condition short of equitable insolvency."

Moody, 971 F.2d at 1070 (applying Pennsylvania law).  But the Third Circuit went on to define

"capital" as "[a]ccumulated goods, possessions, and assets, used for the production of profits and

wealth."  Id.  "Viewed in this light, 'unreasonably small capital' would refer to the inability to

generate sufficient profits to sustain operations."  Id.  No Movant presented any evidence that the

replacement of the 2021 Funding Agreement with the 2023 Funding Agreement left the Debtor

with insufficient assets to generate proceeds to sustain operations.  The evidence demonstrates

the Debtor entered into the 2023 Funding Agreement precisely to ensure it had sufficient funding

for a resolution of this Chapter 11 Case.  FOF ¶ 46, 55.

231.    Finally, no Movant presented any evidence of any belief or intent on the

part of the Debtor to incur debts beyond its ability to pay under section 548(a)(1)(B)(III) of the

Bankruptcy Code.  On the record before the Court, there is no basis for any constructive

fraudulent transfer claim.

### c.    The Debtor's Management Fulfilled Their Fiduciary Duties.

232.    The evidence established that the Debtor's management fulfilled their

fiduciary duties by seeking to use the tools of chapter 11 to resolve current and future Talc

Related Liabilities equitably and consensually through a trust established pursuant to a confirmed

plan of reorganization.  FOF ¶¶ 55-56.  The Movants offered no evidence in support of their

arguments that the replacement of the 2021 Funding Agreement with the 2023 Funding

Agreement harmed claimants.  See, e.g., UST Mot., 14; TCC Mot., 28.  To the contrary, the

Debtor's evidence established that the transaction provided the Debtor with a reliable funding

source that permitted it to reenter chapter 11 with the support of counsel to tens of thousands of

claimants and the financial ability to fund the plan supported by the Debtor, J&J and counsel to

those claimants.  FOF ¶¶ 56-57.

   233. There is also no evidence that the Debtor's management violated the

Bankruptcy Code.  The replacement of the 2021 Funding Agreement was not effectuated until

the interval between dismissal of the 2021 Chapter 11 Case and commencement of this Chapter

11 Case.  Accordingly, court approval under section 363 for a transaction "other than in the

ordinary course of business" was not required.  11 U.S.C. § 363(b)(1).  There is also no

requirement that the Debtor's management obtain court approval for ongoing negotiations

(which the Court encouraged) or contingency planning.  Nor is there a requirement that the

Debtor disclose such activities to the U.S. Trustee or the TCC, although the evidence clearly

established that counsel to the TCC and counsel to the members of the TCC were in fact

contemporaneously aware of the negotiations despite their assertions to the contrary.  FOF ¶ 27.

Likewise, the Debtor had no duty to disclose its legal strategies or contingency plans to the U.S.

Trustee in the event it was dismissed from chapter 11, and the U.S. Trustee has cited no law or

legal authority requiring such disclosure.

   **d.**  **The Consensual Substitution of Funding Arrangements Did
Not Unwind the 2021 Corporate Restructuring.**

   234. The TCC's argument that the replacement of the 2021 Funding Agreement

and backstop with the 2023 Funding Agreement and the J&J Support Agreement had the effect

of unwinding the 2021 Corporate Restructuring is not persuasive.  See TCC Reply, 29-30.  The

cases that the TCC relies upon involved agreements that were found to be unenforceable or repudiated, not consensually substituted.  See id. (citing Hackel v. F.D.I.C., 858 F. Supp. 289, 292-93 (D. Mass. 1994) (when FDIC disaffirmed lease, it repudiated related note and limited guaranty); Jackson v. Associated Scaffolders & Equip. Co., 152 N.C. App. 687, 692 (N.C. App. 2002) (unenforceable indemnification provision rendered a rental agreement invalid); Moss v. First Premier Bank, 2020 WL 5231320 (E.D.N.Y. Sept. 2, 2020) (class waiver provisions in loan application were unenforceable due to usurious interest rates in related note)).  The TCC cites no authority that supports its contention that the consensual modification of funding arrangements among the parties somehow repudiated the entire 2021 Corporate Restructuring.

## IV.    THE CHAPTER 11 CASE WAS OTHERWISE FILED FOR A VALID REORGANIZATIONAL PURPOSE AND NOT AS A LITIGATION TACTIC

235.    In the context of mass tort liabilities, seeking to distribute the debtor's estate "in a way that is fair for both present and future asbestos claimants" is a proper purpose of chapter 11.  W.R. Grace, 900 F.3d at 130; see also Bestwall, 605 B.R. at 49 ("Attempting to resolve asbestos claims through 11 U.S.C. § 524(g) is a valid reorganizational purpose, and filing for Chapter 11, especially in the context of an asbestos or mass tort case, need not be due to insolvency.  The Committee agrees."); SGL Carbon, 200 F.3d at 163-64, 169 (distinguishing confined nature of litigation in SGL Carbon with the debtor's need in Johns-Manville, A.H. Robins, and Dow Corning to resolve thousands of mass tort claims) (citing Alan N. Resnick, Bankruptcy as a Vehicle for Resolving Enterprise–Threatening Mass Tort Liability, 148 U. PA. L. REV. 2045, 2050–51 (June 2000)); In re Muralo Co., Inc., 301 B.R 690, 697, 706 (Bankr. D.N.J. 2003) (finding debtor's "sudden high-risk exposure to thousands of seemingly random and unmanageable asbestos . . . cases" a "significant factor evidencing the good faith of Debtors' filings").

236.    Contrary to the TCC's argument, allowing the equitable and efficient resolution of tort claims to be a valid purpose of bankruptcy would not, "eviscerate the 'good faith' standard" that would cause "tactical litigation advantages [to] become justifications for bankruptcy." TCC Mot. 39. That view was specifically rejected by the Third Circuit and this Court in the 2021 Chapter 11 Case. See LTL Mgmt., 64 F.4th at 104 ("The takeaway here is that when financial distress is present, bankruptcy may be an appropriate forum for a debtor to address mass tort liability."); LTL Mgmt., 637 B.R. at 407-408 ("Let's be clear, the filing of a chapter 11 case with the expressed aim of addressing the present and future liabilities associated with ongoing global personal injury claims to preserve corporate value is unquestionably a proper purpose under the Bankruptcy Code."). Moreover, it ignores the lengthy history of similarly situated mass tort debtors that received chapter 11 relief in this circuit and elsewhere. See, e.g., In re Johns-Manville Corp., No. 82-11656 through 82-11676 (Bankr. S.D.N.Y.); In re A.H. Robins Co., No. 85-01307 (Bankr. E.D. Va.); In re Dow Corning Corp., No. 95-20512 (Bankr. E.D. Mich.); In re Bestwall LLC, No. 17-31795 (Bankr. W.D.N.C. 2017); In re Maremont Corp., No. 19 10118 (Bankr. D. Del. 2019); In re Imerys Talc Am., Inc., No. 19-10289 (Bankr. D. Del. 2019); In re Paddock Enters., LLC, No. 20-10028 (Bankr. D. Del. 2020); In re ON Marine Servs. Co., No. 20-20007 (Bankr. W.D. Penn. 2020); In re DBMP LLC, No. 20-30080 (Bankr. W.D.N.C. 2020), among many other cases.

237.    The evidence established that the Debtor's objective in this case and the 2021 Chapter 11 Case has always been the same—a final, equitable and efficient resolution of all current and future talc claims for the benefit of all parties. FOF ¶ 36. Rather than "goals that are antithetical to the principles of the bankruptcy system," TCC Reply, 12-18, the Debtor's goal

furthers the bankruptcy purposes of preserving value, treating creditors fairly and equitably and

avoiding a race to the courthouse that could harm future claimants.

238.    At the time the Debtor commenced this Chapter 11 Case it had, and has

now, support for this case from counsel to the vast majority (69%) of the approximately 100,000

claimants holding current claims.  FOF ¶¶ 29-31.  Seventeen plaintiff law firms representing

approximately 58,000 claimants signed Plan Support Agreements supporting the terms of the

settlement originally proposed by claimants to the Debtor.  FOF ¶¶ 28-30.  And there was

minimal duplication between the claimant lists of these supporting law firms.  FOF ¶ 30.  In

contrast, the plaintiff firms who object to the settlement purport to represent only approximately

25,000 claimants.  FOF ¶ 31.

239.    Moreover, there is minimal risk of delay to claimants because there is no

current restriction on claimants pursuing their claims against any Protected Party up to

commencement of trial.  The Movants, who collectively represent only a minority of claimants,

offered no evidence that the Debtor is abusing the bankruptcy process to delay or frustrate

claimants' efforts to enforce their rights.  See, e.g., TCC Reply at 39; States Reply at 4.

The Movants' characterization of the Debtor's efforts to resolve its talc liability through the tools

available in chapter 11 as an improper litigation tactic would, if adopted, undermine every mass

tort bankruptcy.  See TCC Reply at 62; UST Reply at 16; MRHFM Reply at 16; A&I Reply at

12; States Reply at 9.  Inherent in every such case is an intent by the debtor to reorganize and

resolve its mass tort liabilities outside of the tort system.  Courts, including the Third Circuit,

have repeatedly acknowledged the benefits of a bankruptcy-court resolution of current and future

mass tort claims, particularly, as here, in the context of alleged injuries with potential long

latency periods.  See, e.g., In re Fed.-Mogul Glob. Inc., 684 F.3d 355, 362 (3d Cir. 2012)

("[O]bservers have noted the trusts' effectiveness in remedying some of the intractable

pathologies of asbestos litigation, especially given the continued lack of a viable alternative

providing a just and comprehensive resolution.") (citing various sources); In re Bestwall LLC,

606 B.R. 243, 257 (Bankr. W.D.N.C. 2019) ("[A] section 524(g) trust will provide all

claimants—including future claimants who have yet to institute litigation—with an efficient

means through which to equitably resolve their claims."). Bankruptcy has procedures that

"promote the equitable, streamlined, and timely resolution of claims in one central place

compared to the state tort system, which can and has caused delays in getting payment for

legitimate claimants." Bestwall, 2023 WL 4066848, at *9. It is a valid reorganizational purpose,

and not merely a litigation tactic, to pursue those global benefits.

    240.    The TCC attempts to analogize this Chapter 11 Case to In re Aearo Techs.

LLC, 2023 WL 3938436 (Bankr. S.D. Ind., June 9, 2023), which was recently dismissed as a

"litigation management tactic" by the United States Bankruptcy Court for the Southern District

of Indiana. See TCC Reply, 62-63. But the cases are entirely distinguishable, and Aearo, in fact,

supports a denial of dismissal in this case. Unlike this case, Aearo involved no future claims

with long latency periods, and the Aearo court agreed that a debtor should be entitled to

chapter 11 relief if it has a "need" that the Bankruptcy Code can address. Id. at *15. The court

specifically acknowledged that Congress "intervene[d]" via section 524(g) to provide a means to

resolve mass-tort asbestos litigation, where long latency periods create the challenge of

significant future claims. Id. at *21 n.24. The debtor in Aearo had no such need, however,

because it had no future claims. In contrast, the underlying cancers forming the basis for the

Debtor's talc-related liability in this Chapter 11 Case may have a latency period of 60 years or

more. FOF ¶ 18. Even though the Debtor stopped selling its talc-based Johnson's Baby Powder

in North America in 2020, individuals may continue to bring talc-related suits against the Debtor

through 2080 and beyond. Id. Unlike the Aearo debtor, the Debtor in this Chapter 11 Case has a

clear need for the relief that only chapter 11 and section 524(g) in particular can provide.

241.    Moreover, the debtor in Aearo had never paid any judgment or defense

costs arising from the underlying multidistrict litigation. Instead, the debtor made clear "[f]rom

the very beginning of these cases," that "the filings were not prompted by concerns over

financial distress or impending insolvency but were initiated to manage the MDL process."

Aearo, 2023 WL 3938436, at *20. The court found that filing as a pure litigation management

tactic and not a rehabilitative effort warranted dismissal. Id. The contrast with this Chapter 11

Case is clear. As of the commencement of the 2021 Chapter 11 Case, the Debtor or its

predecessor, Old JJCI, were defendants in tens of thousands of talc-related lawsuits and had

themselves paid nearly $1 billion in defense costs and over $3.5 billion in indemnity payments

over just the previous five years. FOF ¶ 37.

242.    Nor does J&J's obligation to provide funding only for a "Supported Plan"

consistent with the Plan Support Agreements evidence an improper litigation tactic or an intent

to hinder or delay creditors, as alleged by the TCC and Arnold & Itkin. See TCC Reply, 62-63;

A&I Reply, 44-45. Under the 2023 Funding Agreement, a "Supported Plan" means the chapter

11 plan or an amended chapter 11 plan that is acceptable, not just to the Debtor, J&J and Holdco,

but also to ***every counsel that has entered into a Plan Support Agreement*** given the agreements

on plan terms that have been reached. See 2023 Funding Agreement, 5-6 (emphasis added). As

such, the provision is necessary and appropriate to protect the rights of all parties who have come

to agreement so far and to ensure that any plan that receives J&J and Holdco's financial support

achieves a final and equitable resolution of talc-related liabilities, satisfactory to all parties that

executed Plan Support Agreements.

243.    Sheila Birnbaum, the Debtor's expert witness, testified that this

Chapter 11 Case is the optimal forum to resolve the Debtor's talc liability given the Bankruptcy

Code's power to address future claims with long latency periods.  FOF ¶ 156.  Dr. Mullin

testified that other chapter 11 advantages include:  (i) consolidation of all claims before a single

judge; (ii) the authority and methods to collect necessary claim-related information from

claimants and to pay those claimants based on that information, eliminating the need to serially

undertake claimant-directed factual discovery and to try certain of the same liability issues

repeatedly; and (iii) the unique authority to resolve the claims of unknown future claimants—

those whose injuries remain latent and manifest only years in the future.  FOF ¶ 157.

244.    In contrast, the TCC's experts, Professor Rave and Judge Furgeson,

offered only examples of highly distinguishable mass settlements achieved in non-bankruptcy

situations that—in every case—did not involve the large numbers of unidentified future

claimants and long latency periods that are central to this Chapter 11 Case.  FOF ¶¶ 153-155,

159.  The uncontroverted testimony of the Debtor's expert witnesses established that, far from

being an improper litigation  management tool, chapter 11 provides the only viable mechanism

to resolve globally the Debtor's talc liability.

## V.     SECTION 1112(B)(2) APPLIES TO PREVENT DISMISSAL

245.    No "cause" exists requiring dismissal of this Chapter 11 Case under

section 1112(b)(1) of the Bankruptcy Code.  Nevertheless, if cause did exist, "the court retains

discretion in evaluating whether there are 'unusual circumstances' that establish that conversion

or dismissal 'is not in the best interests of creditors and the estate.'"  Korn, 523 B.R. at 465

(quoting 11 U.S.C. § 1112(b)(2)).  Section 1112(b)(2) further requires, in relevant part, that:  (i)

"there is a reasonable likelihood that a plan will be confirmed . . . within a reasonable period of time;" (ii) "there exists a reasonable justification for the act or omission" giving rise to the finding of cause; and (iii) the act or omission "will be cured within a reasonable period of time fixed by the court." 11 U.S.C. § 1112(b)(2)(A), (B).

### A.    Unusual Circumstances Exist that Dismissal Is Not in the Best Interests of Claimants.

246.    The term "unusual circumstances" is not defined in the Bankruptcy Code. "Many courts have stated that 'unusual circumstances' under § 1112(b)(2) involve 'conditions that are not common in most chapter 11 cases.'" Korn, 523 B.R. at 468 (quoting In re Orbit Petroleum, Inc., 395 B.R. 145, 148 (Bankr. D.N.M. 2008); accord, e.g., In re Grasso, 497 B.R. 448, 455 (Bankr. E.D. Pa. 2013); In re LG Motors, Inc., 422 B.R. 110, 116 (Bankr. N.D. Ill. 2009).

247.    Analyzing prior caselaw, the United States Bankruptcy Court for the Eastern District of Pennsylvania reasoned that unusual circumstances exist when:

> despite the existence of cause-based prior shortcomings . . ., those shortcomings are excusable and chapter 11 offers a convincing prospect that creditors will be paid in full (or in large part, or substantially more than in a chapter 7 liquidation), without the risks of failure typically associated with the implementation of a chapter 11 reorganization plan.

Korn, 523 B.R. at 469.  In that case, the court found no unusual circumstances because "perhaps most importantly, the Debtor has not demonstrated that chapter 11 is certain enough to provide a relatively risk-free, clear path to a materially superior result for creditors than a conversion to chapter 7" or, presumably, dismissal.[20]  Id.

---

[20]    The court also found nothing unusual in a major litigation setback that precipitated the filing and the debtor's failure to comply with financial reporting requirements in chapter 11.  See id.  Neither of these findings is relevant to this Chapter 11 Case.

248.    Under either the "common meaning of the term" or "the specialized way it is employed in § 1112(b)(2)," id., the "unusual circumstances" of this Chapter 11 Case are obvious.   The evidence established that the Debtor commenced this Chapter 11 Case to implement a comprehensive settlement through the confirmation of a chapter 11 plan that will establish a trust intended to pay all current and future claimants in full.  The Debtor and J&J agreed to this settlement even though they continue to vigorously dispute that they have any liability for talc claims, which they maintain have no valid basis.  See FOF ¶ 18.  Representatives of the majority of claimants proposed the settlement, which contemplates the establishment of the largest asbestos trust ever, to the Debtor and J&J following the Third Circuit's dismissal of the 2021 Chapter 11 Case.  FOF ¶¶ 25-28.  That dismissal arose as a direct result of the transfer of the 2021 Chapter 11 Case to this Court and the change in dismissal standard that involved, as the Third Circuit later determined.  Dismissal prevented the Debtor and J&J from implementing any settlement brought to them by claimants as a practical matter, so an immediate refiling was necessary.

249.    In consultation with claimants' counsel, the Debtor has filed the Plan to effectuate the material terms of that settlement with the financial support of J&J.  FOF ¶ 57.  In terms of resolution, the parties are "on the two-yard line."  FOF ¶ 58.  Confirmation of the Debtor's Plan is thus the means by which the "materially superior result," Korn, 523 B.R. at 469, for claimants constituting unusual circumstances will be accomplished, not the unusual circumstances in its own right, as the TCC attempts to argue.  See TCC Reply, 69.  Moreover, section 1112(b)(2)'s additional requirement of a reasonable likelihood that the plan will be confirmed in a reasonable time is purely temporal and in no way forecloses the Court's

consideration of the superior result that can be achieved for claimants in the unusual

circumstances of this Chapter 11 Case through confirmation of the Plan.  See id.

250.    The contrast is stark with the outcome current claimants—if not their

lawyers—can expect in the tort system.  After lengthy delays, many claimants receive nothing in

the tort system, while occasional blockbuster verdicts in plaintiff-friendly jurisdictions and other

financial incentives provide certain plaintiff firms with windfalls and impose a substantial

financial burden on the Debtor.  Kim First Day Decl. ¶ 36.  And the situation is exacerbated for

future claimants who consist primarily of users of talc-containing Johnson's Baby Powder, one

of the most ubiquitous consumer health products, which was sold in North America for over 100

years until 2020, and who may seek to hold the Debtor responsible for cancers that develop

following alleged latency periods of 60 years or more.  FOF ¶ 18.

251.    Further contributing to the unusual circumstances of this Chapter 11 Case,

the Plan affords the opportunity to resolve—in whole or material part—two other pending

bankruptcies.  The companies that mined talc used in the Debtor's products—Imerys and

Cyprus—have been frozen in bankruptcy for years, facing in large part the same underlying

claims asserted by the same claimants and counsel involved in this case.  The Plan contemplates

the resolution of those claims, in exchange for incremental contributions by those debtors to the

trust established in this case.  See June 28, 2023 Hr'g Tr. (Vol. II) 88:5-7 (Mr. Onder testifying:

resolution of Imerys case is a condition precedent to the Plan).

252.    This Court, in a different case, recently recognized "the unique qualities of

asbestos-related bankruptcies, Congressional intent in structuring a scheme under 11 U.S.C. §

524(g) to address such claims and the considerable interests of future, unidentified claimants."

Whittaker, Clark & Daniels, 2023 WL 4111338, at *8.  Even in the presence of cause, the

interests of claimants support denying dismissal under the unusual circumstances of this Chapter 11 Case.

**B.    Reasonable Likelihood of Plan Confirmation in a Reasonable Time**

253.    The Debtor filed a chapter 11 plan within weeks of commencing this case, amended that plan in consultation with claimant representatives, filed a disclosure statement and scheduled a hearing on approval of the disclosure statement and solicitation procedures for August 22, 2023.  FOF ¶ 57.  The evidence presented established that the Debtor is continuing to negotiate refinements to the Plan with those law firms that have signed Plan Support Agreements.  FOF ¶ 58.  The Debtor expects that sufficient claimants will vote in favor of the Plan when presented with the opportunity.

254.    The Movants have asserted a number of objections to confirmation of the Plan through the Dismissal Motions and Replies, including allegations that the final form of any Plan will necessarily discriminate unfairly, fail the best interests of creditors test, provide impermissible third-party releases, fail to comply with the Third Circuit's interpretation of section 524(g) of the Bankruptcy Code and/or violate principles of sovereign immunity.  See, e.g., TCC Mot., 8 n.23; States Mot., 18-19; A&I Mot., 37-44; TCC Reply, 79-80; States Reply, 10-11; A&I Reply, 58-60; NM/MS Reply, 2,8.  The Debtor, for its part, has not deviated from its position that the Plan will satisfy all applicable requirements for confirmation, including those under sections 1129, 524(g) and 105(a) of the Bankruptcy Code.  In any event, such objections are premature and may be presented in connection with the proceedings on confirmation of the Debtor's Plan.

255.    The fact that the Debtor is continuing to negotiate the detailed terms of its Plan with the Plan Support Agreement signatories and other parties does not mean there is no agreement with such parties, as the Movants allege.  Nor does it mean that claimant support is

illusory.  Rather, it demonstrates that the plan process is moving forward in the manner to be

expected.  As is typical in large, complex chapter 11 cases, the form of the chapter 11 plan that

will be solicited and presented for confirmation may not be identical in all respects to the Plan

currently on file.  Thus, every indicator before the Court suggests that the Debtor will be able to

confirm its Plan within a reasonable time.  The Movants' threat to engage in "lengthy appeals" of

any order confirming the Plan can no more provide a basis for dismissal, A&I Reply, 60, than

speculation about potential delays in confirmation caused by Movants' scorched-earth litigation

tactics and "relentless[] attempt[s] to circumvent the bankruptcy proceeding."  Bestwall LLC,

2023 WL 4066848 at *9.

256.    Meanwhile, the TCC has sought to terminate exclusivity to propose its

own plan that it claims is ready to move forward [Dkt. 702].  Thus, if—as the Movants claim—

the Debtor, J&J and the majority of claimants were to be unsuccessful in confirming a chapter 11

plan, the TCC—if it is to be believed—claims it is fully prepared to step in and do so in a

reasonable time.

### C.    Justification and Cure.

257.    The Debtor's acts or omissions in connection with the filing of this

Chapter 11 Case were also justified.  The Debtor's prior chapter 11 case was transferred from its

filing jurisdiction (where the existence of J&J's backstop to the 2021 Funding Agreement would

have compelled denial of dismissal) and subsequently dismissed by the Third Circuit on the basis

of the existence of that same backstop.  In the wake of that unforeseen decision, claimant

representatives approached the Debtor and J&J with a potential resolution that will benefit all

current and future claimants and that can only be achieved in the context of a chapter 11 case.

FOF ¶¶ 25-28.  Moreover, a critical component of the settlement was that it be consummated as

soon as practicable to provide prompt initial payments to claimants.  FOF ¶ 26.  The Debtor

having sought and failed to obtain review of the Third Circuit's opinion was left with no

alternative to effectuate this settlement upon dismissal of its prior case other than the immediate

commencement of a new chapter 11 case, which was thus fully justified under the circumstances.

258.    The Third Circuit did not rule that the absence of financial distress is

unjustifiable or uncurable, as some Movants incorrectly allege.  See TCC Reply, 70-71; A&I

Reply, 61.  Rather, the court stated that "we cannot *currently* see how [the Debtor's] lack of

financial distress could be overcome" and held that no reasonable justification for that distress

was available "*in this case*."  LTL Mgmt., 64 F.4th at 110 (emphasis added).  The evidence

clearly established that the alleged acts or omissions giving rise to cause for dismissal and

justifying circumstances between the two cases are unrelated, and the Third Circuit's comment,

which is firmly grounded in the circumstances of the prior chapter 11 case and a specific moment

in time, is not relevant to this Chapter 11 Case.

259.    The Movants also cite cases for the proposition that a bad-faith filing

could never be reasonably justified or cured.  See TCC Reply, 70 (citing Green v. Howard

Family Tr. (In re Green), No. 15-1349, 2016 WL 6699311, at *11 (B.A.P. 9th Cir. Nov. 9, 2016);

In re Hinesley Family Ltd. P'ship No. 1, 460 B.R. 547, 553 (Bankr. D. Mont. 2011); In re Keith,

No. 10-61722-11, 2010 WL 3835003, at *6 (Bankr. D. Mont. Sept. 29, 2010)); A&I Reply, 61

(citing Green).  But the Movants' cases do not involve a purported lack of financial distress and,

thus, are clearly distinguishable.  See Green, 2016 WL 6699311, at *8 (bad faith based on filing

solely to harass judgment creditor); Hinesley Family, 460 B.R. at 553-54 (bad faith based on

gross mismanagement of financial affairs and failure to disclose encumbrance and dispute with

governmental entity); Keith, 2010 WL 3835003 at *7 (bad faith based on, among other things,

perjury).  No court has ruled that the absence of financial distress is never subject to potential

justification and cure under section 1112(b)(2).

260.    In light of the widespread support for resolution of the Debtor's talc

claims on the terms proposed by claimant representatives following the Third Circuit Opinion,

and the contemplated establishment of a trust that is intended to pay all current and future

claimants promptly and in full, confirmation of the Debtor's Plan will provide the requisite cure

of any cause.  Moreover, to the extent that the Debtor's acts or omissions with respect to the

prepetition termination and substitution of its financing arrangements were a basis for cause, as

alleged by the Movants, those acts or omissions may be cured by granting the TCC derivative

standing (as it has requested) to pursue its proposed fraudulent conveyance claims in this Chapter

11 Case for the benefit of all claimants.

261.    The Court concludes that it is not in the best interest of creditors and the

estate for it to appoint a trustee or examiner under section 1104(a).  There is no cause to appoint

a trustee, and the appointment of a trustee to displace the Debtor's management and

professionals would be highly disruptive to this Chapter 11 Case and the ongoing plan process

that has the support of counsel to the majority of claimants.  In addition, there is no need to

appoint an examiner to conduct an investigation of the Debtor.  The TCC has already conducted

extensive discovery in connection with its motion to dismiss and has sought derivative standing

to pursue estate claims related to the Debtor's alleged conduct.

## VI.    CONGRESS ELIMINATED THE GOOD FAITH FILING REQUIREMENT IN ENACTING THE BANKRUPTCY CODE

262.    Notwithstanding the focus on the Debtor's good faith above, it is clear that

Congress repealed the good faith filing requirement that existed under the Bankruptcy Act of

1898 (the "Act") when it replaced the Act with the Bankruptcy Code in 1978.

263.    In doing so, Congress intentionally removed the "good faith" requirement

for filing a case (but kept it for confirmation of a plan) and eliminated the insolvency

requirement for chapter 11 eligibility (although insolvency is required for municipal bankruptcy

filings and chapter 7 liquidations).  See Janet A. Flaccus, *Have Eight Circuits Shorted? Good

Faith and Chapter 11 Bankruptcy Petitions*, 67 Am. Bankr. L.J. 401, 402-03 (1993).  As the

initial drafters of the Bankruptcy Code explained, "the *'good faith' test* [for filing] a petition is

*eliminated*."  Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc.

No. 137, 93rd Cong., 1st Sess. (1973) at 183 (emphasis added).  Specifically, the Commission

"generally agreed that the good-faith test should be replaced with specific grounds for dismissing

or adjudicating" a bankruptcy petition.  See Frank R. Kennedy & Gerald K. Smith,

*Postconfirmation Issues: The Effects of Confirmation and Postconfirmation Proceedings*, 44

S.C. L. Rev. 621, 732, n.409 (1993) (reprinting portions of the minutes of the meeting held on

February 22–24, 1973, by the Commission) (citation omitted).

264.    As a result, section 1112(b) of the Bankruptcy Code provides for dismissal

of a chapter 11 case "for cause" upon the "request of a party in interest" and enumerates a list of

sixteen "causes" for dismissal.  See 11 U.S.C. § 1112(b)(4)(A)–(P).  Failure to file a chapter 11

case in "good faith" is not an enumerated ground.  Despite the repeal of the Act and introduction

of the Bankruptcy Code, many courts continue to engraft a good faith filing requirement under

chapter 11, largely based on pre-Code caselaw and its progeny.  Importantly, the doctrine's

genesis appears largely due to the decision in In re Victory Const. Co., Inc., 9 B.R. 549 (Bankr.

C.D. Cal. 1981), which did not acknowledge that Congress had eliminated the good faith

requirement and was subsequently vacated by the Bankruptcy Appellate Panel.  See In re Victory

Const. Co., Inc., 37 B.R. 222 (B.A.P. 9th Cir. 1984).

## VII.    THE BURDEN OF PROOF TO ESTABLISH CAUSE UNDER SECTION 1112(B)(1) IS ON THE MOVANTS

265.    Similarly, notwithstanding the Debtor's proffering of evidence to support

its good faith, the burden of proof to establish cause is on the Movants.  In 2005, Congress

amended section 1112(b) to provide that dismissal of a chapter 11 case is required "if the movant

establishes cause."  11 U.S.C.A. § 1112(b)(1) (West 2005).[21]  As a result, the 2005 amendments

to the Bankruptcy Code abrogated any existing case law placing the burden of proof for a motion

to dismiss on the debtor.  In 2010, Congress removed the language requiring that "the movant

establish[] cause" from section 1112(b) as part of certain clarifying amendments to that section

pursuant to "The Bankruptcy Technical Corrections Act of 2010."  Section 1112(b) now states

that the court shall dismiss "for cause."  See 11 U.S.C. § 1112(b)(1).  However, the legislative

history to the Bankruptcy Technical Corrections Act of 2010 is clear that the act was not

intended to effectuate any substantive changes to the Bankruptcy Code.[22]  As a result, the intent

---

[21]     Section 1112(b)(1) of the Bankruptcy Code, as amended in 2005, provided that:

> Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, *if the movant establishes cause*.

> Id. (emphasis added).

[22]     See 156 CONG. REC. H7158-01, H7159 (2010) (comments to the House of Representative Robert C. Scott that "since [the 2005 amendment's] enactment, a number of technical drafting errors have been identified.... The Bankruptcy Technical Corrections Act of 2010 corrects these purely technical errors."); 156 CONG. REC. H7158-01, H7160 (2010) (comments to the House of Representative John Conyers, the bill's original sponsor, that the proposed bill "amends Bankruptcy Code section 1112(b), which sets forth the grounds for converting or dismissing a chapter 11 case. The amendment restructures this provision to eliminate an internal redundancy."); 156 CONG. REC. H7158-01, H7161 (2010) (comments to the House of Representative Lamar Smith of Texas, a co-sponsor of the bill, that "this bill does not, and is not intended to, enact any substantive change to the Bankruptcy Code. . . .  No Federal judge should interpret any provision of this bill to confer, modify, or delete any substantive bankruptcy right, nor should anyone infer a congressional intent to alter substantive rights . . . .").

of Congress remains that, consistent with the language of section 1112(b) in 2005, the burden of

proof with respect to the Motions to Dismiss is squarely with the Movants.