IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IN RE: | . | Case No. 21-30589(MBK) |
| | . | |
| LTL MANAGEMENT LLC, | . | |
| | . | U.S. Courthouse |
| Debtor. | . | 402 East State Street |
| | . | Trenton, NJ 08608 |
| . . . . . . . . . . . . . . | . | |
| | . | |
| IN RE: | . | Case No. 23-12825 (MBK) |
| | . | |
| LTL MANAGEMENT LLC, | . | |
| | . | |
| Debtor. | . | Wednesday, August 2, 2023 |
| | . | 9:57 A.M. |
| . . . . . . . . . . . . . . | . | |

TRANSCRIPT OF STATUS CONFERENCE REGARDING 2023 CHAPTER 11 CASE;
AND OMNIBUS MOTION OF THE SUBSTANTIAL CONTRIBUTION CLAIMANTS
FOR ALLOWANCE OF ADMINISTRATIVE CLAIMS FOR REIMBURSEMENT OF
EXPENSES INCURRED FOR THE PERIOD FROM OCTOBER 14, 2021 THROUGH
NOVEMBER 12, 2021 (PRIOR TO THE OFFICIAL COMMITTEE OF TALC
CLAIMANTS' RETENTION OF COUNSEL) THAT PROVIDED A SUBSTANTIAL
CONTRIBUTION IN THE DEBTOR'S CASE [NO. 21-30589, DKT. 3949];
AND MOTION OF AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC FOR
ALLOWANCE OF SUBSTANTIAL CONTRIBUTION CLAIM
[NO. 21-30589, DKT. 3951]

BEFORE THE HONORABLE MICHAEL B. KAPLAN
UNITED STATES BANKRUPTCY COURT JUDGE

Audio Operator:          Kiya Martin

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

2

APPEARANCES:

For the Debtor:                 Jones Day
                                By:  GREGORY M. GORDON, ESQ.
                                     DAN B. PRIETO, ESQ.
                                     AMANDA S. RUSH, ESQ.
                                2727 North Harwood Street, Suite 500
                                Dallas, TX 75201


For the Substantial            Sherman, Silverstein, Kohl, Rose &
Contribution Claimants:           Podolsky, P.A.
                                BY: ARTHUR J. ABRAMOWITZ, ESQ.
                                308 Harper Dr #200
                                Moorestown, NJ 08057


For Aylstock, Witkin           Klee, Tuchin, Bogdanoff & Stern LLP
Kreis Overholtz, PLLC:         BY: ROBERT J. PFISTER, ESQ.
                                1801 Century Park East
                                26th Floor
                                Los Angeles, CA 90067


For the Office of the          Office of the United States Trustee
United States Trustee:         By:  LINDA RICHENDERFER, ESQ.
                                     JEFF SPONDER, ESQ.
                                     LAUREN BIELSKIE, ESQ.
                                J. Caleb Boggs Federal Building
                                844 King Street, Suite 2207
                                Lockbox 35
                                Wilmington, DE 19801


For Various Talc               Maune Raichle Hartley Frency &
Claimants:                        Mudd, LLC
                                By:  CLAYTON L. THOMPSON, ESQ.
                                150 West 30th Street, Suite 201
                                New York, NY 10001

                                Levy Konigsberg, LLP
                                By:  JEROME H. BLOCK, ESQ.
                                     MOSHE MAIMON, ESQ.
                                101 Grovers Mill Road, Suite 105
                                Lawrence Township, NJ 08648


For States of                  Gibbons P.C.
New Mexico and                 BY: ROBERT K. MALONE, ESQ.
Mississippi:                    One Gateway Center
                                Newark, New Jersey 07102

3

APPEARANCES (CONTINUED):

```
For Ad Hoc Committee      Genova Burns LLC
of Certain Talc           By:  DANIEL M. STOLZ, ESQ.
Claimants and Ad Hoc      494 Broad Street
Committee of Creditors:   Newark, NJ 07102

                          Brown Rudnick
                          By:  JEFFREY L. JONAS, ESQ.
                               DAVID J. MOLTON, ESQ.
                               MICHAEL WINOGRAD, ESQ.
                          7 Times Square
                          New York, NY 10036

                          Otterbourg PC
                          By:  MELANIE CYGANOWSKI, ESQ.
                          230 Park Avenue
                          New York, NY 10169
```

- - - - -

4

1          (Proceedings commenced at 9:58 a.m.)

2          THE COURT:  Good morning again.  This is Judge Kaplan

3  for those who are watching or listening remotely.  We will go

4  over the LTL Management calendar.

5          We have two matters to be argued that are related,

6  the substantial contribution motions and then what I anticipate

7  is a status conference and discussion regarding where we go

8  from here with the matters that we have that are calendared for

9  today and other matters that I guess are scheduled for the 22nd

10 and thereafter.

11         Does anyone have any administrative matters they wish

12 to discuss at this point?

13         UNIDENTIFIED SPEAKER:  No, Your Honor.  Not from our

14 side.

15         THE COURT:  All right.  Then I think why don't we

16 have the substantial contribution motions, why don't we have

17 those argued.

18         OPERATOR:  Recording in progress.

19         THE COURT:  Good to know.

20                    (Laughter)

21         THE COURT:  And before we start, for those who are

22 appearing remotely, as usual, please make use of the "raise

23 hand" function and we'll do my best to bring you on board.

24         Good morning, Mr. Abramowitz.

25         MR. ABRAMOWITZ:  Good morning.

1           Arthur Abramowitz of Sherman Silverstein representing

2   the substantial contribution claims.

3           THE COURT:  Proceed.

4           MR. ABRAMOWITZ:  Your Honor, before I get into the

5   substance of the argument, I want to identify for the Court the

6   substantial contribution claimants that I represent.  They

7   consist of two separate ad hoc committees representing

8   creditors that were formed prior to the appointment of the TCC

9   as the Official Creditors' Committee.

10          One of those committees was formed by the MDL

11  Plaintiffs' Steering Committee or PSC, and the second was

12  formed by the mesothelioma claimants.  I also represent a law

13  firm that performed services and it also engaged an experienced

14  and well-versed firm that worked in coordination and in

15  conjunction with both the PSC and meso committee in

16  representing creditors during this TCC period.

17          No one can doubt that LTL was an extraordinary case.

18  J&J is a corporate icon and, at the time LTL filed, had a value

19  in excess of $400 billion.  LTL was not an overnight creation.

20  For months, some of the most sophisticated attorneys in the

21  United States meticulously created the LTL paradigm and

22  strategized the case well before the case was filed in North

23  Carolina.

24          This Court's records reflect that J&J employed

25  extreme measures to avoid present and future liability.  LTL

1  was not filed in North Carolina by chance.  It was the

2  combination of a strategy that had been referred to as the

3  "Texas Two-Step."  As a result of the filing, the phrase "Texas

4  Two-Step" is not only known as a country dance, it is now a

5  buzz word in bankruptcy and business vernacular.

6          This Court recognized the extraordinary scope of LTL

7  on numerous occasions including in its opinion in LTL where it

8  denied the motion to dismiss and entered a broad injunction.

9  Its extraordinary scope was recognized later in proceedings

10 when the Court allowed the direct appeal of the orders denying

11 the dismissal and the injunction to the Third Circuit.

12         Let's assume for a moment that the mass tort

13 attorneys who represent talc claimants, because of their lack

14 of familiarity with the bankruptcy matters, did nothing but

15 instead waited for the appointment of a committee.  Can we say

16 with any certainty that this case would have been transferred

17 to New Jersey?  Can we say with any certainty that the broad

18 injunction requested by the debtor in North Carolina would not

19 have been granted?

20         THE COURT:  So I have you all to blame.

21                         (Laughter)

22         MR. ABRAMOWITZ:  Of course not.

23         Due process is not just a buzz word.  Due process

24 embodies the fundamental principle that at the very least there

25 should be safeguards that entitle a party's rights to be

1  meaningfully heard.  There were over 38,000 talc victims who

2  were claimants in this case, some of whom as this Court has

3  recognized are on their death beds suffering from ovarian

4  cancer or mesothelioma.  Someone had to step up to the plate to

5  protect their interests, and the attorneys for the claimants

6  did just that.

7        Extraordinary cases often require extraordinary

8  efforts.  Between October 14 and November 12, for a period of

9  20 days, no committee was in place.  The claimants I represent

10  could not have provided duplicative services that the

11  committees ultimately provided because the committees had not

12  yet been formed.

13        The services provided by those attorneys are outlined

14  in the certifications attached to the motion.  The

15  certifications reflect that a coordinated effort was undertaken

16  by the movants.  There are no certifications challenging or

17  contradicting those certifications and, as such, the nature and

18  extent of those services are unchallenged.  We maintain that we

19  have met our burden in terms of the nature of the services

20  rendered and that the services that the claimants rendered

21  substantially contributed to the case.

22        As stated in its brief, the debtor views this case

23  through the prism of whether the services aided the

24  reorganization.  Rhetorically, what does that mean?  That if a

25  party opposes a debtor's reorganization efforts, that party

8

1 should not be paid, even if the services are determined to have

2 been at a substantial benefit to the estate?  That mantra of

3 whether the services aided the reorganization is not the law.

4       Substantial contribution services have been awarded

5 in many cases where there were no ultimate reorganizations,

6 including motions for conversion, appointments of a receiver,

7 and other instances that are referred to in our brief.

8       The claimants primarily address three significant

9 issues: First, the transfer of venue; second, the injunction;

10 and third, the dismissal of the case.  These were argued since

11 the inception of the case.  Venue for this case was transferred

12 from North Carolina to New Jersey.

13       Regardless of who initiated the process for the

14 transfer of venue, the claimants participated in the process at

15 the Court's invitation and their efforts are a part of the

16 record.  Importantly, not only were their findings necessary

17 and appropriate, but the pleadings and arguments of the

18 substantial contribution claimants afforded the Court a broad

19 and apparently consensus view of the entire creditor body.

20       These efforts were not duplicative but rather they

21 were cumulative in effect, which was no doubt important to the

22 transfer of LTL to this district.  That transfer directly

23 benefitted the debtor and all parties as this district was a

24 more convenient forum for the parties in light of the debtor's

25 operations, corporate ties to New Jersey, the location of the

1  MDL cases, and other talc-related cases that were pending in

2  New Jersey.

3          Clearly, the claimants' advocacy of transferring

4  venue was not serving the individuals of a client or a firm.

5  The initial broad injunction requested by the debtor in North

6  Carolina was limited by that court in large part due to the

7  efforts of the substantial contribution claimants in opposing

8  the debtor's request for injunctive relief.  Again, this was in

9  the absence of a committee and conferred a benefit to all

10 creditors.

11         It was only after that opposition of the substantial

12 contribution claimants following the debtor's filing of the

13 emergency motion seeking extension of the automatic stay that

14 the Court required the debtor to follow the bankruptcy rules

15 and commence an adversary proceeding to obtain a TRO and

16 preliminary injunction.

17         Additionally, although the North Carolina court

18 initially declined to extend the injunction to non-debtors and

19 though ultimately it did so, it limited that injunction to just

20 60 days.  And, finally, as requested by my clients and the

21 committees appointed afterwards, the case was dismissed by the

22 Third Circuit.  The claimants set the groundwork for the

23 dismissal and later passed that torch to the TCC once it was in

24 a position to take action.

25         All of the initial steps taken while the case was

1  pending in North Carolina including establishing the factual

2  record and legal arguments that were built upon as the case

3  progressed and preserving the rights of the talc creditors

4  until the TCC was in place to do so substantially contributed

5  to the motion to dismiss and the ultimate decision by the Third

6  Circuit to dismiss the case.

7          As stated in the unchallenged certifications, the

8  discovery included depositions, elicited witness testimony, and

9  exhibits utilized by the substantial contribution claimants and

10  their professionals during the hearings conducted in North

11  Carolina.  They became a part of the record of the bankruptcy

12  case.

13          They were referenced and cited in numerous court

14  filings including motions opposing the preliminary injunction

15  and for dismissal.  They were subsequently used at the

16  dismissal hearing, and they were made a part of the appellate

17  record which formed the basis for the proper resolution which

18  was dismissal of this case.

19          The actions undertaken by my clients are in line with

20  the Third Circuit's articulation of the underlying policy

21  behind the allowance of substantial contribution claims.  That

22  policy  (indiscernible) allows compensation for a creditor's

23  efforts and substantially contributing to a bankruptcy to

24  promote meaningful credit participation in the reorganization

25  process.

1    The Third Circuit has explicitly endorsed this view

2 while emphasizing the need for the creditor effort to be

3 substantial, to be compensated, noting that these provisions

4 "represent an accommodation between the twin objectives of

5 encouraging meaningful creditor participation in the

6 reorganization process" and "keeping fees and administrative

7 expenses at a minimum so as to preserve as much of the estate

8 as possible for creditors."  That's from Lebron.

9    That is exactly what happened in this case.  The

10 dangerous precedent that the debtors allude to in its brief is

11 unsubstantiated in this case.  My clients' efforts were

12 directed to all of those issues at the outset of the case

13 before any committee was in place to protect the 38,000

14 claimants.

15    We are looking for payment only for that 29-day gap

16 period.  Clearly, as stated, there was no overlap with the

17 committee's efforts, and there was no one else in place to

18 challenge the debtors solely on behalf of the creditors.

19    If the TCC were in place during the pre-TCC period,

20 it would undoubtedly have had a right to seek compensation for

21 the same services rendered by the substantial contribution

22 claimants during the pre-TCC period, a fact conceded by the

23 debtor as it complains of an alleged duplication of services

24 and payment of significant amounts to professionals retained by

25 the committees.

1           There is, I recognize, a higher standard for my

2    clients, and that is do the services provided substantial

3    contribution to the case.  I have submitted approximately or

4    over 1,500 pages of exhibits including certifications that

5    reinforce the premise that they did.  Many of those exhibits

6    were a part of the record that ultimately led to a dismissal of

7    this case.

8           Notably, the debtor's professionals billed and

9    largely sought payment of legal fees in the amount of

10   approximately $4,600,000 during the pre-TCC period.  The

11   substantial contribution claimants who I represent seek an

12   allowance of claims of approximately $1.9 million for the same

13   period which includes legal fees and expenses.  In somewhat of

14   an anomaly, the debtors and the professionals have billed and

15   been paid ten of millions of dollars, yet, their efforts in the

16   LTL cases have resulted in two dismissals.

17          The substantial contribution claimants coordinated

18   with their efforts to avoid duplication of services and, as

19   stated in the pleadings, believe that the inclusion of that

20   time would not have been considered appropriate for this

21   motion.  Their efforts served as an important building block

22   for the committees that were subsequently appointed with the

23   authority of the U.S. Trustee and this Court.

24          Metaphorically, when chopping down a tree, initial

25   substantial chops are necessary to achieve an end result.  And

1  those efforts should be rewarded.  For all of those reasons, we

2  request that this Court approve the application.  Thank you.

3              THE COURT:  All right.  Thank you, Mr. Abramowitz.

4              Other counsel?  Mr. Pfister.

5              MR. PFISTER:  Yes.  Good morning, Your Honor.

6              THE COURT:  Good morning.

7              MR. PFISTER:  Thank you for allowing me to appear

8  remotely today.  Rob Pfister from Klee Tuchin on behalf of the

9  Aylstock firm.

10             Your Honor, I join in Mr. Abramowitz's argument and

11 in the briefing.  And I would just point out a few things.

12 Number one, the law is clear that courts are to assess

13 substantial contribution claims based on the record in light of

14 the Court's experience garnered during the course of the

15 administration of the debtor's case.  That comes from the

16 Grasso case from Pennsylvania.

17             And the Third Circuit has emphasized that a

18 substantial contribution motion presents a question of fact and

19 that the bankruptcy court is in the best position to perform

20 the necessary fact-finding here.  I think that's important

21 because the facts, as Mr. Abramowitz noted, are essentially

22 unchallenged.  That is, the certifications that he submitted,

23 the certifications that are appended to the Aylstock motion.

24             The factual record there, and I believe the Court's

25 experience in presiding over these proceedings will reflect

1  that the claimants played a -- will reflect, pardon me, the

2  role that the claimants played in the case.  And we're

3  certainly confident to rest on the Court's assessment of the

4  record and the unchallenged nature.  That is, no one has

5  indicated that any particular time or item is inappropriate or

6  not appropriately incurred.

7       Instead, the challenges that are raised in the

8  opposition to the motions are based more on broad-brush

9  principles including a notion that there cannot be a

10 contribution, pardon me, substantial contribution when the

11 applicants' efforts result in the dismissal of the case.

12      And I think the legislative history on that is clear

13 that creditors are sometimes -- sometimes creditors are best

14 served by reorganization, and I think a paradigmatic

15 substantial contribution motion is one where a plan has been

16 effected and confirmed and a benefit has been conferred in that

17 respect, i think.  But that does not mean that a creditor's

18 efforts to secure the dismissal of a case when that is in the

19 best interest of creditors, that that can also satisfy the

20 statutory standard for substantial contribution.  And, once

21 again, at bottom, this is a question of fact that is committed

22 to this Court's discretion.

23      And then the final point I'll say is let me echo

24 Mr. Abramowitz pointing out that a key aspect of this case both

25 in its early phase in North Carolina and in later proceedings,

1  both at trial before this Court and on appeal in the Third

2  Circuit, was the unanimity of the creditor body.  And that was

3  a fact that was remarked upon by both the North Carolina

4  bankruptcy judge, Judge Whitley, and at the Third Circuit that

5  creditors were unanimously opposed to the debtor's

6  "Texas Two-Step" maneuver.

7          I think that's an important fact, and i think that a

8  divided creditor body or a creditor body that was rowing in

9  different directions would have presented factually a very

10 different case.  Obviously, the legal issues in terms of is

11 there cause for dismissal, those legal issues would be the

12 same.  But the factual context and the factual record

13 supporting those legal issues I think would have been quite

14 different.

15          So with that, Your Honor, I will cede the podium.

16          THE COURT:  All right.  Thank you.

17          Mr. Pfister, let me -- I can direct my question to

18 you or Mr. Abramowitz.  In reading -- actually, I think

19 Mr. Abramowitz quoted this sentence.  I'm looking at one of the

20 briefs, and it just reemphasized the purpose of Section

21 503(b)(3)(D) is to further the objective of encouraging

22 meaningful creditor participation in the reorganization

23 process.

24          Now in 20 odd months, I could say and for those

25 remote, it's the opposite where this side of the room I don't

1  think was advocating for a reorganization process.  In fact, in

2  fairness, I believe every time Mr. Molton got up to speak, he

3  prefaces his statements with, Judge, for the record, we think

4  dismissal of this case is inappropriate, something along those

5  lines.

6          In fact, mediation wasn't going to start until after

7  the motion for dismissals were decided.  That was pointed.  Can

8  someone point to me case law not with respect to conversion

9  because that's still the bankruptcy process at work but where

10 substantial contribution was found appropriate for efforts

11 appointed at dismissal?  I think it's fair to say that there

12 was unanimity in that the interest of individual clients would

13 be furthered by dismissal of this case and access to the jury

14 -- the tort system and the jury process.

15         That's working for individual clients, not for an

16 estate, not for a reorganization purpose.  Not for a bankruptcy

17 purpose.  So is there case law, is there support in this

18 situation?  Mr. Pfister or Mr. Abramowitz or anyone else wish

19 to address those comments?

20         MR. PFISTER:  I'll let -- I can't tell if

21 Mr. Abramowitz is about to speak, but I'll let him --

22         THE COURT:  He's ducking.

23         MR. ABRAMOWITZ:  No.

24         MR. PFISTER:  Oh, he's ducking.

25                         (Laughter)

1          MR. PFISTER:  Well, so for the record, Mr. Pfister.

2    Let me answer that in two ways, Your Honor.

3          In terms of a specific case that deals with something

4    outside the reorganization process, Your Honor is correct that

5    those tend to focus on conversion.  And conversion and

6    dismissal certainly are different.

7          But with respect to what Your Honor is positing as

8    the question of does this meaningfully contribute to a

9    reorganization effort, I don't think conversion or dismissal, I

10   don't think in this narrow circumstance that there's much

11   difference between those because in a conversion, right, so the

12   Court read from the _Lebron_ quote which Mr. Abramowitz quoted

13   about a substantial -- to encourage creditor participation in

14   the reorganization process.

15         Yes, that is what _Lebron_ talked about and the case

16   that it was quoting talked about was in the reorganization

17   process.  That said, the legislative history, as I indicated,

18   indicates that the standard under the statute is did the

19   creditor make a substantial contribution to the case, not to

20   the reorganization process.

21         So, first of all, the Court's comments about

22   reorganization process, those weren't tied specifically to the

23   statutory language which is to the case.  That's one point.

24   And then the second point I would make is creditors -- so there

25   are different ways to participate in a case, and the fact that

18

1  a reorganization does not ultimately result tells us two

2  things.

3          Number one, it tells us that the creditors were

4  correct in their assessment that the case presented cause for

5  dismissal or conversion because, again, remember 1112(b), the

6  statute that the Court applied and that the Third Circuit

7  applied, that statute speaks of for cause, the court may

8  convert -- may dismiss or may convert or may appoint a trustee.

9          So the inquiry is the same.  It's the cause inquiry.

10  And whether that results in conversion, which does not result

11  in the reorganization, right -- conversion results in a

12  liquidation because you'd convert to Chapter 7 -- or whether it

13  results in dismissal.  In both instances, it does not result in

14  a reorganization, yet it still is a factor in terms of

15  creditors' contribution to the case.

16          So short answer, I don't have a case about dismissal

17  specifically.  Longer answer, the cases that do talk about

18  awarding substantial contribution outside the context of a

19  reorganization, those cases are on point because it's just the

20  remedy was different, right.  One remedy is to move to Chapter

21  7 liquidation.  Well, getting a debtor who shouldn't be

22  reorganized out of Chapter 11 and into Chapter 7, everyone

23  agrees that can be a substantial contribution.

24          So getting a debtor who shouldn't be a debtor out of

25  Chapter 11 and out the door can also be a substantial

19

1  contribution.

2         THE COURT:  All right.  Thank you, Mr. Pfister.

3         Mr. Abramowitz?

4         MR. ABRAMOWITZ:  Yes.  There are a couple of items.

5         First of all, I think you have to look at the entire

6  case.  The entire case and the services that we're requesting

7  are not just with regard to dismissal.  I mean we also had a

8  situation at the outset of the case where we addressed the

9  venue and we also addressed the issue of the injunction.  So

10 it's not as if you can isolate that and say that because of the

11 issue with regard to the dismissal, we should not be entitled

12 to payment.  That's number one.

13        Number two, I have been in cases where there have

14 been Chapter 7s where there have been substantial contributions

15 raised, issues raised, and it has been granted.  Now, granted

16 the circumstances are far different, but the substantial

17 contributions have to be viewed within the circumstances of the

18 case.

19        Now I wasn't ducking.  I was reading my brief, which

20 --

21                       (Laughter)

22        MR. ABRAMOWITZ:  -- which you may feel is ducking.

23 But I would note, Your Honor, that we did a little research on

24 this to look for specifics.  And we did find a case, In re --

25 and this cites In re Alumni Hotel Corp which is 203 B.R. 624.

1  It's an Eastern District of Michigan case.

2          And it states, basically, indeed, legislative history

3  merely defines substantial contribution negatively as not

4  requiring a contribution that leads to confirmation of a plan.

5  For many cases, it will be a substantial contribution if the

6  person involved uncovers facts that would lead to a denial of

7  confirmation.  And that's from the Encyclopedia Intern, 1998 WL

8  801898.

9          And I think, again, it would be too constrained.  I

10  mean reorganization is a process.  It says the process.  Does

11  it mean that it has to be a successful reorganization?  Does

12  that mean that if you oppose the reorganization, that you

13  should not then be entitled to substantial contribution

14  compensation?  That's too narrow a reading.  And it seems to me

15  that you have to look at the entire case.  And in this case, I

16  mean this is an extraordinary case.  For me, it's going to be

17  the case of a lifetime but then again, I probably will have a

18  short future life.

19                      (Laughter)

20          MR. ABRAMOWITZ:  But I'm just suggesting, Your Honor,

21  that in light of this, I think you have to look at the case and

22  what happened.  The real issue in this case is that there is a

23  gap period.  There is a gap period when somebody files until

24  when a committee is appointed.  If you're saying, well, you

25  shouldn't have substantial contribution in a case like this

21

1  during that period, you're tying people's hands.  If this would

2  have been a committee, they would have been paid.

3         The Code doesn't provide for that gap period except

4  for administrative expenses which we're seeking in this case.

5         THE COURT:  But wasn't the U.S. Trustee's Office

6  active during that period?  Back there it was the Bankruptcy

7  Administrator.

8         MR. ABRAMOWITZ:  Can I ask a question about that?

9  And I don't mean to be rude.  I know the U.S. Trustee's Office,

10 okay.  The U.S. Trustee's Office is not charged with

11 representing the interests of 38,000 claimants.  They are

12 charged with administering the case, and that's what their

13 responsibility is.

14        They didn't step up and file the pleadings that we

15 filed in the case both with regard to the TRO, with regard to

16 the injunction.  They didn't take the depositions.  Let's face

17 it, they don't have the manpower to do it.  We had to drop

18 everything.  You saw the 1,500 pages.  You saw the depositions

19 taken.  You saw the involvement of attorneys that are here

20 today that are on the committee that pick up the mantle that

21 did the work.  That somebody had to do this in order so that

22 it's not a fait accompli.

23        It's sort of like watching yourself cannibalized once

24 the 30 days goes by.  somebody has to do something, especially

25 in an extraordinary case.  There were substantial services

1   here.  There were depositions, there were notices to produce,

2   there were arguments.  You had experienced counsel.  You had

3   the Otterbourg firm involved not knowing whether they would

4   ultimately be in the committee or not but they understood that

5   they had to be involved at the outset.

6          If you look at the pleadings, these are not pleadings

7   with just, well, we object.  These are pleadings that go on and

8   on about the case and the objectives in the case.  They were

9   ultimately utilized as building blocks by the subsequent

10  committees in this case.  And I think to suggest that it should

11  only be awarded in the case of a reorganization, with all due

12  respect, would be myopic.  I think that you have to look at

13  this case not only microscopically but telescopically.

14         And I think there's another aspect of this case which

15  is very important.  This case is going to send a message that

16  if you're going to be doing cases like this, you can't expect

17  to just steamroll a case with no opposition.  That's really

18  what this is about.  And we provided that substantial

19  contribution to hold the fort until the cavalry came when the

20  committee was appointed.  Thank you.

21         THE COURT:  Thank you, Mr. Abramowitz.

22         Mr. Block?

23         MR. BLOCK:  Good morning, Your Honor.

24         THE COURT:  Good morning.

25         MR. BLOCK:  Jerome Block from Levy Konigsberg.  We

1   are one of the substantial contribution plaintiffs.  I want to

2   just bring everyone back to October, for me, it was October

3   13th or October 14th, 2021.  We had heard rumors shortly before

4   that that this could happen, that one of the wealthiest

5   companies in the world could do some type of divisive merger

6   and try to stop all these cases in the bankruptcy system.

7       Frankly, I was one of the people that said that will never

8   happen.  J&J would not take the reputation and try to use the

9   bankruptcy system with it widely known that it's one of the

10  wealthiest companies in the world.  So I remember the shock of

11  seeing the bankruptcy filing, and I remember thinking what are

12  we going to do.  I saw the notice of the first-day hearing, and

13  they had this planned, like Mr. Abramowitz said.

14          I mean Mr. Kim over here, they submitted a first-day

15  declaration for him many pages, many paragraphs.  That was his

16  sworn testimony, and that was the basis for LTL asking Judge

17  Whitley right out of the box for the relief it wanted, okay.

18  The U.S. Trustee's Office did not cross-examine Mr. Kim at the

19  PI hearing or take his deposition, okay.  I cross-examined

20  Mr. Kim at that hearing.  Mr. Satterley and others took

21  Mr. Kim's deposition in North Carolina.  And all of these other

22  things had to be done.

23          You did make one comment that I just want to -- I'm

24  not sure exactly what was behind it, but I want to respond to

25  it.  You said, well, this is the lawyers or claimants basically

representing their clients, okay.  Let me respond to that.
When we took on the contingent fee representation of cancer
victims against one of the wealthiest companies in the world,
we had no reason to foresee that we would ever be litigating
against this company, okay, with the litigation managed by
Mr. Haas in bankruptcy court.

The invoice that I'm seeking reimbursement from, for
example, from Mr. Massey only arose because of a bankruptcy
which was filed in bad faith, all right.  So we were litigating
these cases for years.  I never had to hire an expert in
bankruptcy and constitutional law, Mr. Massey, because that's
not what me, what my firm or my clients signed up for, right.
We sued one of the largest companies in the world, clearly
solvent, clearly able to pay its bills as they come due.  And
they're the ones that filed the bankruptcy that now has been
twice adjudicated to be in bad faith, okay.

And what they're trying to do is take an expense that
we should have never had to undertake, here Mr. Massey's
professional services that we paid for to protect creditors.
Similarly, the MDL group had litigated these cases long and
hard for years.  They never had to hire Otterbourg, right.
They never had any reason to believe that they would need to
hire bankruptcy lawyers to fight one of the wealthiest
companies in the world in bankruptcy court.

Same thing with the Maune Raichle firm, right.  They

1  had to hire an expert bankruptcy law firm in North Carolina.

2  What are they even doing in North Carolina against

3  Johnson & Johnson?  Could they have ever foreseen Maune Raichle

4  when they entered contingency relationships with cancer victims

5  that they would be in bankruptcy court in North Carolina and

6  have to hire Mr. Waldrop, a former bankruptcy judge, to guide

7  us through the process?

8       So what a mockery the proceedings would have been in

9  North Carolina without our firms, okay, and the lawyers we had

10 to hire stepping up for that 29 days to have a fair proceeding,

11 right.  I mean you have the transcripts, Your Honor.  Witnesses

12 were called.  Witnesses were cross-examined.  Mr. Gordon made

13 his arguments.  He presented his PowerPoints.  Arguments were

14 made in response.  And a fair result of the North Carolina

15 proceeding from that time period resulted, okay.

16      The injunction was more limited than Mr. Gordon and

17 LTL had requested.  And the case was transferred to New Jersey,

18 which was a monumental part of this case.  And, Your Honor, you

19 know it's a hard question when you ask, well, how do we

20 contribute to the reorganization, right, because really what we

21 know now and what we always said when we, the substantial

22 contribution claimants said then is true now, that LTL never

23 had the right to come into bankruptcy court and seek to

24 reorganize.

25      THE COURT:  But don't we operate generally under the

1 American rule where each client pays their own fees?  And, in

2 fact, even under 503(b), it's a presumption that you're

3 providing services for the benefit of your client.  You have to

4 rebut that presumption.  And I recognize that --

5          MR. BLOCK:  Sure.

6          THE COURT:  -- you have to undertake additional fees

7 and costs.

8          MR. BLOCK:  Sure.  But here there's a mechanism.

9 There's a mechanism, and that's why it's a substantial

10 contribution motion.  The mechanism is here.  So did we make a

11 substantial contribution to the reorganization process, okay.

12          So as an end result, they were not entitled to

13 reorganize in bankruptcy court.  The Third Circuit said that,

14 okay.  So that has been adjudicated.  This company was not

15 entitled to a reorganization in bankruptcy.  That is what the

16 Third Circuit said in LTL1, okay.

17          So did we contribute to the reorganization process,

18 okay.  The process was everything that led up to dismissal.

19 And certainly, what we did in North Carolina hot this case in

20 LTL1 in the right courtroom, the proper courtroom, and

21 ultimately led to dismissal which I think as a bankruptcy

22 matter was the equitable and just result as set forth by the

23 Third Circuit.

24          So, Your Honor, for all these reasons, we would ask

25 that you view this unique case under these unique circumstances

27

1   and say what would have happened, what would have happened if

2   these creditors did not have that representation for those 29

3   days and are these substantial contribution claimants entitled

4   to be reimbursed for that limited time period.  And I would say

5   the answer is yes, and I would ask you o grant our motion.

6   Thank you.

7           THE COURT:  Thank you, Mr. Block.

8           From the debtor?

9           MR. PRIETO:  Good morning, Your Honor.

10           THE COURT:  Good morning.

11           MR. PRIETO:  Dan Prieto of Jones Day on behalf of the

12   debtor.

13           Your Honor, from our perspective, the movants here

14   are seeking unprecedented and extraordinary relief.  The relief

15   is unprecedented, and I think you heard -- I think your

16   questions go to this because to our knowledge, no court has

17   ever granted a substantial contribution claim to a creditor or

18   an informal committee in a case that's been dismissed.

19           And I think you asked questions about conversion.

20   Well, conversion is different.  There's still an estate.  There

21   could be reasons to convert that could maximize the recovery

22   for claimants.  This is a situation where they were seeking

23   ultimately dismissal and ultimately to frustrate and derail the

24   restructuring.

25           And I think that the lack of precedent makes sense

1   because a substantial contribution claims are rarely granted

2   and are meant to compensate a creditor for services that

3   directly and materially contribute to a reorganization.  You

4   heard that already today.  And from my perspective, that's just

5   not possible to show when the work was intended to stop the

6   restructuring entirely.

7           The relief is also extraordinary from my perspective,

8   Your Honor, because it seeks compensation for work that was

9   unnecessary -- and I'll address that -- unsuccessful, or

10  pursued by the Bankruptcy Administrator or the Official

11  Committee of Talc Claimants.  And there I'm referring to the

12  motion to dismiss.

13          In fact, LTL expended over $22 million for services

14  provided by 12 different professional firms to the official

15  committees in litigating the preliminary injunction and

16  dismissal issues during the three-month period only from

17  November 2021 to January 31st, 2022.

18          And the claims are correct that the committee came

19  after their work, but the point we're making is that they had

20  to redo the work and we had to spend an enormous amount, tens

21  of millions of dollars having them do that.  So under those

22  circumstances, they can't be substantial contributions.  Their

23  work had to be redone.

24          Your Honor, to make matters worse, one of the movants

25  here is actually seeking substantial contribution after the

1  official committee was appointed and for work that the

2  committee itself was already doing, and that's the Aylstock

3  firm, Your Honor, seeking with respect to its work on the

4  motions to dismiss, as well as the appeals.

5        So, Your Honor, we believe granting the substantial

6  contribution request would set a dangerous precedent.  It would

7  encourage creditors to be more litigious and perform excessive

8  work in the Chapter 11 case to pursue their own self-interests

9  because of the possibility of obtaining reimbursement of their

10  costs as substantial contribution.

11        And I'm not suggesting the movants didn't have every

12  right to pursue their own interests in this case and to spend

13  money on professionals to advance those interests.  But under

14  the Third Circuit precedent, Your Honor, they are not entitled

15  to have the debtor pay for those efforts.

16        So, Your Honor, obviously, we filed an objection

17  laying out the factual predicates for our objection and the

18  standards.  But I do want to briefly highlight the standards

19  here because they're so exceedingly difficult to satisfy, and I

20  think it's worth underscoring.

21        As an initial matter, the movants have the burden to

22  show by a preponderance of the evidence that they've made a

23  substantial contribution to the debtor's estate.  Courts have

24  held that "administrative expenses compensation based on a

25  substantial benefit to a bankruptcy estate must be strictly

1  limited to extraordinary creditor actions that led directly to

2  tangible benefits to the creditors, the debtor, or the estate."

3  That's the <u>Summit Metals</u> case, Your Honor, out of Delaware.

4        Courts have said that substantial contribution claims

5  should only be granted in "rare and extraordinary

6  circumstances."  That's the <u>RS Legacy Corp</u> case.

7        And the Third Circuit has held that services provided

8  by a creditor or unofficial committee "are presumed to be

9  incurred for the benefit of the engaging party and are

10 reimbursable if but only if the services directly and

11 materially contributed to the reorganization."  That's the

12 <u>Lebron</u> case you heard about earlier.

13       The Third Circuit in <u>Lebron</u> went on to find that "the

14 benefit received by the estate must be more than incidental one

15 arising from activities the applicant has pursued in protecting

16 his or her own interests.  Creditors are presumed to be acting

17 in their own interests until they satisfy the court that their

18 efforts have transcended self-protection."  That's on Page 944

19 of the <u>Lebron</u> case.

20       So obviously here, Your Honor, the standard is very

21 difficult to satisfy under the Third Circuit.  It requires very

22 specific evidence of clear and direct benefit, not incidental,

23 and beyond their own self-interests.  So what do we have here

24 in terms of the services they provide?  As I read their briefs

25 and I heard their argument today, they're focusing on four

1 areas.  So I'll only briefly go through why I think none of

2 those areas where they provided services actually provided any

3 benefit, much less a substantial one.

4        The first areas, and you didn't hear much about it

5 today but they talked about this in their briefs, was the work

6 they did contesting the first-day motions.  I think Mr. Block

7 did refer to sort of Mr. Kim's declaration and the relief we

8 sought on the first-day and how they had to sort of rush into

9 court to oppose that.

10       Well, Your Honor, as the movants themselves admit,

11 the first-day motions filed in LTL1 sought routine relief,

12 routine for a mass tort case.  And on top of that, Your Honor,

13 as is typical in North Carolina Bankruptcy Court, the first-day

14 relief was sought subject to specific reservations of rights

15 for the official committee and the future claimants

16 representative once those entities were formed or appointed to

17 challenge the orders if they thought there was issues with

18 those orders.

19       Nevertheless, the movants objected.  In fact, both

20 the PSC and the meso committee filed duplicative objections to

21 the first-day motions.  And I think in their brief, I think in

22 their reply, they sort of suggest, well, you may be right about

23 those motions, but you guys filed a really lengthy complicated

24 informational brief, and we had to address those right away.

25       Well, why?  The informational brief wasn't seeking

32

1  relief.  It was our position that TCC, once formed, could take

2  the opportunity to address that.  There was no urgency.  And if

3  they felt any need to do it immediately, that's because of

4  their own self-interest, not because the case required it.

5       So, Your Honor, I think with respect to the first-day

6  motions, to me, there's clearly no benefit to the estate for

7  this work.  The objections were denied.  They were unnecessary

8  because the relief sought was routine, and the rights of the

9  TCC and the FCR were fully preserved in accordance with North

10 Carolina bankruptcy practice.

11      So let me turn to the PI request, the 2021 PI motion.

12 Your Honor, as we explained in our objection,  a preliminary

13 injunction and an extension of the state in mass tort cases is

14 routine.  I know they don't like that, but it's been granted in

15 multiple, multiple cases.  And, in fact, and I've been involved

16 in many of these in many cases where the claimants actually

17 agree to the relief on the first-day at least for a short

18 period of time to permit the official committee, once formed,

19 to weigh in on the issues.

20      And in this case, when we were in North Carolina,

21 there was actually recent rulings as Your Honor is probably

22 aware where the North Carolina court had addressed similar

23 circumstances involving debtors that were formed in divisional

24 mergers that indicated the relief we were seeking was

25 appropriate.  Nevertheless, the movants objected, took a bunch

1  of emergency discovery, and ultimately both the North Carolina

2  bankruptcy court and this court had to overrule those

3  objections.

4          Now it's true as the movants point out that the North

5  Carolina Bankruptcy Court did limit the preliminary injunction

6  that we sought to an initial 60 days.  But as Your Honor

7  recalls, that was not because the court was concerned about the

8  objections that were being lodged.  It was because the court

9  was transferring the case to this Court and wanted this Court

10  to have an opportunity once the Court had a chance to take a

11  look at the issues to rule as this Court saw fit.

12          And I would further point out that even when the

13  Third Circuit issued its dismissal order, it did not address

14  the PI or otherwise find it inappropriate in terms of the

15  standards of the PI.

16          So, Your Honor, what do we have?  We have

17  unsuccessful challenges to the preliminary injunction motion

18  that simply caused delay and it caused the debtor to incur

19  significant and unnecessary professional expenses.  So this

20  work did not benefit the estate, Your Honor.  Quite the

21  opposite.

22          All right.  So let me address the transfer of the

23  case to this Court.  Your Honor, as we laid out in our

24  objection, the North Carolina Bankruptcy Court sua sponte

25  raised the issue of venue transfer and entered a show cause

34

1   order.  Then the Bankruptcy Administrator filed a motion to

2   support venue transfer, and four other motions or joinders were

3   filed by representatives of claimants who are not the movants

4   or otherwise seeking substantial contribution.  And the TCC

5   even, once formed, filed a letter supporting transfer.

6           And I guess the final point is all those transfer

7   motions were largely duplicative of the Bankruptcy

8   Administrator's transfer motion.  So this is not the type of

9   services or work that I think constitutes extraordinary

10  activity that justifies substantial contribution, especially

11  given that other parties were already pursuing that relief

12  including the Bankruptcy Administrator and there was

13  duplication that occurred.

14          And then we get to the dismissal litigation.  I think

15  most of the claimants are arguing and I think they argued today

16  that basically, their work in connection with the PI set up

17  somehow or set the stage for or were the predicates for the

18  TCC's motion to dismiss.  And this to me is almost like they're

19  trying to attempt to justify the measures they took in

20  connection with opposing the PI saying, well, we didn't win the

21  PI objections, but it had some incidental benefit down the road

22  with respect to the motion to dismiss that was later brought

23  because the work we did was relied on to some extent.

24          Well, Your Honor, I would say as an initial matter,

25  and I've already covered this, but work done in connection with

1    the PI -- well, the PI didn't really have much impact, I don't

2    believe, on the dismissal motion.  After the TCC filed its

3    motion in December, and I'm sure Your Honor recalls this

4    because of all the telephonic conferences we had, the TCC

5    engaged in extensive discovery that expanded and recreated the

6    work done at the PI hearing.  So really to the extent there was

7    a benefit, it was very minimal in my view, and the debtor had

8    to pay for all that work basically to be redone by the TCC

9    which is precisely why the claimants here should have waited.

10           Further, achieving dismissal does not substantially

11   contribute to the successful resolution of the case.  In fact,

12   Your Honor, we now know with the benefit of hindsight that most

13   -- the vast majority of the claimants don't want dismissal,

14   didn't want dismissal.  And this Court found that confirmation

15   of a plan that equitably and efficiently satisfies the talc

16   claims through trust procedures would be more beneficial than a

17   return to the tort system for most claimants.  So under those

18   circumstances, Your Honor, I don't see how this case.

19           And then the final point I wanted to make with

20   respect to Aylstock, we didn't get into this too much yet this

21   morning, but obviously as Your Honor probably is aware, not

22   only are they seeking substantial contribution for the 29-day

23   period, but they're seeking it throughout the entirety of the

24   first case during the period of time that the TCC was already

25   formed.

1          And, Your Honor, we think that the work it did in

2    connection with the motions to dismiss, the 2021 case and the

3    appeals, could not have benefitted the estate because the TCC

4    and its ten law firms were already pursuing those matters at

5    the expense of the debtor's estate, and they included appellate

6    counsel that they had retained to deal with the appeal.

7          Again, Aylstock is free to pursue its own interests

8    if it did not trust the TCC to litigate those issues in the way

9    it thought most appropriate.  But it's not entitled to have the

10   debtor reimburse it for that work.

11         So let me just see if there's anything in terms of

12   reply points, Your Honor, I wanted to cover.  I think there

13   were some arguments about, well, you know, there was a gap

14   period and it was absolutely critical that somebody fill that

15   gap period.  Your Honor, that's true in every case.  There's

16   always a gap period.  That's not a basis to say, well, because

17   we were active during -- before the committee was formed and,

18   therefore, we must by definition get substantial contribution.

19   As I've already covered, the activities they were doing in my

20   view, Your Honor, were not necessary and were unsuccessful.  So

21   that's not a basis for substantial contribution.

22         The other side I think in their reply and again today

23   said, well, those duplication arguments doesn't make any sense

24   because we obviously preceded the TCC, and I think I may have

25   covered this already.  But the point is that the services had

1  to be repeated by the TCC.  So there's really no benefit in

2  having them done at a time when they were unnecessary to be

3  done when the TCC, when formed, would have to do the work

4  again.

5          I think there's been arguments that the case is so

6  complex, so high-profile and involves the debtor with

7  significant assets that that somehow converts their activity

8  into being justified.  That's not the standard.  It doesn't

9  matter how much resources we have.  That's not the -- the

10 standard is did they directly and materially benefit the

11 reorganization case and do something out of the ordinary that

12 requires reimbursement.  They haven't met the standard, Your

13 Honor.

14         And then the final point I'd make is, and Your Honor

15 mentioned this, the American rule.  I think that is a very good

16 analogy here, and the irony is under their rationale, the

17 company, LTL and J&J, should be reimbursed for all the times we

18 won in the tort system which is most of the time.  We didn't

19 get those fees reimbursed.  And I think they're trying to

20 basically use the substantial contribution standards to

21 basically convert it into some different rule where they get

22 their litigation costs reimbursed.  That wouldn't be fair, Your

23 Honor.

24         So for all those reasons, Your Honor, I'd ask you to

25 deny these motions.

1        THE COURT:  Thank you, counsel.

2        U.S. Trustee?  Ms. Bielskie, good morning.

3        MS. BIELSKIE:  Good morning, Your Honor.  Lauren

4   Bielskie with the Office of the United States Trustee.  And

5   I'll just state -- start by saying it's different than the

6   bankruptcy administrator that exists in North Carolina.  I know

7   Your Honor knows that, but just to be clear.

8        The U.S. Trustee filed an omnibus objection to the

9   pending substantial contribution motions in light of the

10  statutory requirements of Section 503(b) and the Third

11  Circuit's interpretation of the exacting standards under the

12  statute.  I won't restate the standards that are in the papers

13  and that the parties have already set forth today.

14       But we think it's helpful to look at the request in

15  two separate categories: fees incurred for the period between

16  the petition date and when a Committee was appointed and fees

17  incurred for services after appointment of the Committee.  And

18  this is given the role that the Committee and its involvement

19  in the case once it was formed.

20       For the post-petition, pre-Committee period, it

21  stands to reason that services performed in this time frame may

22  have benefitted creditors as a whole, because there was no

23  Committee yet and significant activity was happening in the

24  case.  This is a case that came into bankruptcy with a unique

25  set of facts, including the Texas two-step and a well-known

1  parent entity.  There's nothing routine about this case.

2        The activity included first day motions, venue,

3  preliminary injunction, and others.  And creditors could not

4  just sit idly by.  But for the period after the appointment of

5  the Committee, and even two Committees for a period, the

6  applicant's ability to meet its burden to show services were

7  provided for the benefit of all parties that directly,

8  significantly, and demonstrably benefitted the estate and were

9  not duplicative is a much bigger hurdle to overcome.

10        It is not clear from our review that the applicant

11  seeking the post-Committee can meet that burden.  And so we

12  leave the movants to their proof to satisfy this Court that an

13  administrative expense is warranted.  Thank you, Your Honor.

14        THE COURT:  Thank you, Ms. Bielskie.

15        Any replies?

16        MR. ABRAMOWITZ:  Your Honor, in their reply -- or

17  response this morning, they said, well, this -- parts of

18  this -- this is just an ordinary case.  Well, at least one

19  aspect of the case was with regard to the injunction, which

20  I'll get to in a minute.

21        The one question that was raised by both you and by

22  my adversary has to do with the Lebron interpretation.  Bear in

23  mind that the Lebron case is a 1994 case, Third Circuit.

24        There's also another Third Circuit case, though, that

25  is S.S. Body Armor, which is 961 F.3d 216, which is 2020.  And

40

1   it says, "The bankruptcy court permits the payment of

2   administrative expenses, including the reasonable compensation

3   for professional services rendered by an attorney of an equity

4   security holder in making a substantial contribution in a case

5   under Chapter 11."

6           If you look at the Code, the Code itself doesn't say

7   "and a reorganization."  It talks about particular chapter, in

8   Chapter 11.  It doesn't say that it has to be a reorganization.

9   And I would submit, Your Honor, that to restrict it to just a

10  reorganization, as I said before, is a narrow reading.  I'm not

11  going to repeat what I said earlier.

12          I would like to respond to a couple of the issues

13  that were raised.  First, they said that what was done by the

14  claimants were unnecessary, unsuccessful, and ultimately were

15  pursued by the Committees.  Well, I'd really feel much better

16  about that, because if I had a case like this, and I

17  represented, let's say, a thousand claimants, I'd say, don't

18  worry, there's nothing we have to do.  What we would be doing

19  is probably unnecessary.  We might not even be successful.

20  Let's just trust them.

21          Because that's really what is -- this case comes down

22  to.  The whole adversary system is to cut the deck.  Now, you

23  indicated, well, the American system doesn't provide for

24  payment for attorney's fees in instances.  That's true.  But

25  the Bankruptcy Code is a part of the American system of law and

1 carved that out and said there are circumstances, however,

2 where there should be payment.  And this is one of them.

3       This is a situation where when the motion was made to

4 transfer, we represented -- or my group represented the

5 mesothelioma claimants and the ovarian cancer claimants, 38,000

6 claimants.  That's a real consensus that the Judge looked at

7 and said, yes, they are in favor also.  And that must be given

8 some weight.

9       The fact that the proceedings were screwed up, to say

10 the least, in North Carolina by motion as opposed to adversary

11 proceeding, is not insignificant.  There are rules there.  We

12 picked that up.  The injunction was entered 60 days -- for 60

13 days.  We understand that it was a hold until it was

14 transferred.  But this is a situation where we believe that

15 they were not even entitled to an injunction, because each case

16 has to be looked at on its own facts.

17       It's very easy in retrospect to say what could have

18 or what should have been done.  I can tell you that if I were

19 in my office representing -- or being a mesothelioma or ovarian

20 cancer advocate, and I was told that J&J has filed for a -- or

21 LTL filed for bankruptcy and there's an injunction being sought

22 to extend it to J&J, I would be helpless.  The first thing I

23 would probably have to do is to have to figure out how do I

24 protect not only my clients but the situation.

25       Because what we're having a problem is we're

42

1    conflating the situation that if my client has benefitted,

2    obviously it's being done for your client.  Well, the transfer,

3    for example, the Court said was being done for the benefit of

4    everybody.  The Court basically said that.  It's not just us.

5    It's everyone.  You have a situation also with the injunction

6    that it's not just my client; it's the 38,000 claimants.

7             So we're in a situation, Your Honor, where I --

8    again, I don't think you can look at this myopically.  This was

9    an extraordinary case.  It's one of the biggest, if not the

10   largest, case ever filed.

11            We had to do something during that gap period.  And

12   to say that, well, it was duplicative, we had to -- that what

13   you did had to be redone, where in the certifications does it

14   say that what we did was not used or redone?  Our documents

15   were used in the underlying case as well as on the appeal.

16   There's just a conclusion by saying, well, whatever we did had

17   to be redone by the committees.

18            That's not true.  We had depositions.  We had

19   exhibits.  Those were a part of the record.  They may also have

20   been a part of the record that was included by the various

21   committees with regard to the appeal.

22            But what we did was a building block, and it was an

23   essential building block.  We were able to give them a head

24   start on a lot of this, which was a substantial issue in this

25   case and resulted in a ultimate dismissal of this case.  So in

43

1  essence, we gave those committees a substantial benefit by

2  giving them a head start in a situation where they didn't have

3  to come in cold 30 days later to figure out what they wanted to

4  do in terms of the case.

5          Your Honor, I believe that -- I strongly believe that

6  this case mandates a substantial contribution for the claim --

7  the claimants that I represent during that 29-day gap period.

8  As the United States Trustee has already conceded, it didn't

9  sound like there was an objection expressed by them with regard

10 to that period.

11         And it's very unusual in these cases that you don't

12 hear an objection on substantial contribution claims in Chapter

13 11s or Chapter 7s from the United States Trustee.  And there is

14 a reason.  And the reason is the facts in this case are

15 extraordinary, and the request that we're making is reasonable.

16 Thank you.

17         THE COURT:  Thank you, Mr. Abramowitz.

18         MR. PFISTER:  Just a few points, Your Honor, if I

19 may?

20         THE COURT:  Yes.  You can stay there, Mr. Block.

21         MR. PFISTER:  Mr. --

22         THE COURT:  Go ahead.

23         MR. PFISTER:  Oh, I --

24         THE COURT:  Go ahead.

25         MR. PFISTER:  Thank you, Your Honor.  Couple of

44

1  points.  Mr. Prieto said that I believe, quote, the vast

2  majority of claimants don't want the case dismissed -- or

3  didn't want the case dismissed.

4       Well, Your Honor, we're here at this moment in the

5  LTL 1 case.  And in the LTL 1 case, there was creditor

6  unanimity on these points.  And I think that creditor unanimity

7  was, in fact, a key point here.  It was only in the LTL 2 case

8  that an allegedly different set of facts was present.  But in

9  terms of what the Third Circuit -- what happened and how the

10 Third Circuit ultimately ruled in LTL 1, there was, indeed,

11 creditor unanimity there.

12      Second, Mr. Prieto said that if individual creditors

13 took action after a TCC -- the TCC was formed, that that meant

14 that they didn't trust the TCC or indicated, you know, they

15 could do -- they could take action if they didn't trust the

16 TCC.  Well, and the UST makes a similar point about the

17 adequacy of the TCC.

18      So let me be very clear that TCC's work in this case,

19 you know, was exceptional, was critical and, you know, led to

20 the result.  But I think Mr. Abramowitz's analogy of the

21 lumberjack and the axe -- you know, swinging the axe and

22 felling the tree is a good one.  If you swing the axe nine

23 times and, you know, time number one the tree doesn't fall,

24 time number two the tree doesn't fall, time number three the

25 tree doesn't fall, all the way up until time number nine, and

1   then axe swing number ten is the one that does it, the fact

2   that the tree fell on the tenth swing of the axe does not

3   indicate that the first nine weren't important or that the sole

4   responsibility or sole credit goes to the tenth.  In fact, each

5   piece is accretive and cumulative.

6           And then going -- then I think stepping back to this

7   meta issue that the Court's questions touched on and that

8   Mr. Prieto's comments touched on is about reorganization and

9   whether there was a contribution to reorganization.  Again,

10  it's -- the statutory standard is a substantial contribution in

11  the case, not reorganization.

12          But with respect to reorganization, you know, the

13  time sought -- the time at issue in the motions is all time

14  spent by bankruptcy lawyers, not individual tort counsel.

15  Reorganization is a wonderful thing when it is sought in a

16  manner and by a debtor that is, you know, consonant with the

17  letter and spirit of the Bankruptcy Code.

18          That is a critical threshold question.  And what

19  happened here is a multi-year proceeding across multiple courts

20  starting in North Carolina, then before this Court, then before

21  the Third Circuit where facts were marshaled, law was argued,

22  and the question was a bankruptcy question.  It is, is this

23  debtor properly in bankruptcy?  Is this debtor one that can

24  avail itself of the reorganization provisions of Chapter 11?

25          That's a bankruptcy question.  It was argued by

1  bankruptcy lawyers.  And it was ultimately resolved on a

2  bankruptcy basis.

3           And that critical question is what this case stands

4  for.  This will be an important case for years to come.  People

5  will cite the LTL case.  And it is a bankruptcy case.  And it

6  is a case about who can be a proper debtor under the Bankruptcy

7  Code and what kinds of activities -- what kinds of debtors are

8  eligible for reorganization.

9           In that regard, I think the analogy that strikes me

10 is to the criminal law context where the Supreme Court, I

11 think, famously back in the '30s decided a case that said, you

12 know, it's important when you're the prosecutor -- or you're

13 the Government.  You know, you want to win.  I get it.  But the

14 United States as a sovereign that brings to bear its power in

15 the criminal enforcement context, the United States prevails

16 whenever justice is done.  And that's the ultimate standard.

17          Here, the bankruptcy system prevails.  The proper

18 result being reached is the key.  And whether that ultimate

19 result is a confirmed Chapter 11 plan or a conversion to

20 Chapter 7 or an order of dismissal, at the end of the day, the

21 right result is reached, and the folks who contributed to that

22 result are eligible under Section 503 to make an application

23 for administrative expense as a substantial contribution.

24          Thank you, Your Honor.

25          THE COURT:  Thank you, Mr. Pfister.

1        Mr. Block?

2        MR. BLOCK:  Thanks, Your Honor.  Jerome Block from

3   Levy Konigsberg again.  I have to correct Mr. Prieto on some

4   things.  Maybe in the normal course -- and I'm not a bankruptcy

5   lawyer, but maybe in the normal course a first day hearing is

6   pretty mundane, administrative matters, not a lot of contesting

7   or fighting.  This case, I think you know, throughout the whole

8   case there's been nothing mundane, nothing merely

9   administrative.

10        And what happened here, Your Honor, was at the first

11   day hearing in front of Judge Whitley, LTL really, knowing that

12   there was no committee formed, was rushing to get the relief it

13   wanted, and including, Your Honor, they had already sent out

14   notices to the courts where all the tort cases were pending and

15   the lawyers, giving notice that there's been a bankruptcy

16   filing.  And not only is the case stayed against this new

17   entity, LTL, but it's stayed against this list of hundreds of

18   protected parties.

19        So even before Judge Whitley granted any relief, it

20   was asserted by Jones Day and by LTL and sent out around the

21   country trying to essentially shut the cases down.  So we went

22   in front of Judge Whitley on that first day.  Very hotly

23   contested first day hearing.

24        And Judge Whitley rightfully said, you know what, we

25   need to have a TRO hearing like immediately.  And I don't have

1  the calendar in front of me, but I think it was like days

2  later.  Like days later.  I think I brought, you know, a -- you

3  know, maybe two suits, and I should have brought three.  Okay?

4  Had to extend my hotel reservation.

5          So we then had to -- I cross-examined Mr. Kim at the

6  TRO hearing.  Didn't have an opportunity to take his

7  deposition, because this was all emergency arguments on both

8  sides.  And the claimants, we, my firm, Mr. Massey, the

9  Otterbourg firm, Melanie Cyganowski, Adam Silverstein, Tom

10 Waldrep, Maune Raichle, all those firms won the TRO hearing.

11 Judge Whitley denied the TRO relief sought by LTL.  And one of

12 the main reasons he cited in his opinion was they didn't have

13 an agreement in the record showing that there was any agreement

14 in 1979 about talc liabilities.

15         So after the TRO hearing was denied, they, a couple

16 days later, found the 1979 agreement.  They found it.  You

17 know, I'm not insinuating anything, but they didn't have it

18 when they filed.  We won the TRO hearing.  And then they did

19 some digging, and they found it.  Okay?  So that 1979 agreement

20 was found because essentially we opposed the TRO, and they had

21 to find it, because they couldn't get the relief we (sic)

22 wanted.

23         We had to do discovery for the preliminary injunction

24 hearing.  Mr. Kim was deposed.  A custodian of records was

25 deposed.  They put in a bunch of declarations.  Mr. Kim

supplemented his declaration.  They came forward with a new

witness, Dr. Kuffner, who they identified as -- would testify

in the PI hearing.  We had to take his deposition.

We then went through the PI hearing.  They produced

hundreds of documents.  We had to review the documents.  A lot

of those documents became the key documents in the case.  The

PI hearing, we've already said, limited relief.  Sixty days.

But let me talk about the motion to transfer venue.

Yes, Judge Whitley did raise the issue sua sponte.  Right?  He

said what is this company doing in my court?  What connection

do they have to North Carolina?

But, you know, it wasn't like a fait accompli that he

was going to transfer venue.  He said I want to have briefing

on it.  And did Jones Day agree?  Did they agree, you know

what, Your Honor, it's true, we have no connection to North

Carolina, we're fine, transfer us to New Jersey?  No.  They

fiercely, fiercely advocated for the position that they had the

right to be in North Carolina.

We briefed the issue, right, with the bankruptcy

experts, Mr. Massey, Mr. Waldrep, Melanie Cyganowski, the

professionals that we had to bring in.  And we won.  We won.

They lost.

Your Honor, they never wanted this case to be in your

court.  They never wanted it to be here.  And what Judge

Whitley found in his opinion, based upon our briefing, our

50

1  legal arguments, was that this company manufactured venue in

2  North Carolina to try to put themself there, and they didn't

3  belong.  So they never wanted the case to be here, and they

4  never should have filed for bankruptcy on the duplicative

5  record argument.

6        Your Honor, if the North Carolina record, right, that

7  we created by stepping in for those 29 days, if it was

8  duplicative, then why was it part of the record on appeal to

9  the Third Circuit, right?  If it was all the same, then it

10 wouldn't have been part of the record, right?  It all would

11 have been covered in the New Jersey LTL 1 case, and there would

12 have been no need to have the North Carolina record as part of

13 the record.  It was part of the record, and it was part of the

14 record leading to dismissal, because it was not duplicative.

15       So, Your Honor, you know, when we take on these

16 cases, you know, we hire medical experts that are necessary for

17 the prosecution of the case.  In a contingency fee arrangement,

18 costs are advanced.  If there is a recovery, the client

19 reimburses for necessary costs in litigation.

20       But what is LTL saying?  Are they saying that our

21 clients should have to pay Jonathan Massey?  That our clients

22 should have to pay the Otterbourg firm?  That our clients

23 should have to pay a former bankruptcy judge in North Carolina,

24 because a bankruptcy case was filed that never should have been

25 filed, is what the Third Circuit said.

51

1          So should we bear the costs?  Should our clients bear

2     the costs?  No.  Under the substantial contribution law, under

3     equity, out of fairness, Your Honor, LTL should pay.

4          And you should grant -- respectfully, you should

5     grant our substantial contribution motion.  Thank you very

6     much, Your Honor.

7          THE COURT:  Thank you, counsel.

8          Any other argument?  All right.  I'm going to take it

9     under advisement and reflect on the arguments.

10          I do have a question.  The statute doesn't speak of

11     all or nothing, but it speaks as to substantial contribution

12     and the efforts that were undertaken.  And I will have to

13     admit, I didn't go into detail on the underlying

14     certifications.

15          Are the projects or the works broken down dollar

16     amount by project?

17          MR. ABRAMOWITZ:  I don't know that they're by

18     project.  They're by firm.  And I would also note, Your Honor,

19     that in the certifications, you will see that a number of the

20     firms indicated that they had performed substantial services

21     above those that are being requested.  Because, not breaching

22     attorney/client privilege, I indicated that they had to look

23     for those services that were rendered that were substantially

24     contributed as opposed to general services.

25          And you'll see in the certifications, in many of the

1  certifications, that there has been that culling.  But it was

2  not broken down by what they did, because a lot of this was

3  done simultaneously.  So, again, if that's your want,

4  obviously, we would have to go back to the drawing board for

5  preparing those fee applications.  But I can indicate to you

6  that they have been combed thoroughly by the applicants to make

7  sure that the non-substantial aspects were taken out.

8         THE COURT:  I will take a first run at looking at

9  them.  If I have further questions, I'll contact the

10 applicants.

11        MR. ABRAMOWITZ:  Thank you very much, Your Honor.

12        THE COURT:  Thank you.

13        MR. PFISTER:  If I may add, Your Honor, on that

14 point --

15        THE COURT:  Yes.

16        MR. PFISTER:  -- for the AWKO application, we did

17 divide our work into three phases.  We called it the North

18 Carolina phase, the trial phase, and the appellate phase.  And

19 in my certification -- or my declaration, rather, time entries

20 in each of those phases are broken down.

21        And just like Mr. Abramowitz, we are not seeking

22 substantial contribution for all of our time.  Anything that

23 was client specific or involved matters -- we exercised a fair

24 amount of discretion in only including the matters that we

25 thought were compensable.  And I'll just note that, you know,

53

1  no one has taken issue with any line-by-line type thing.

2          So but with that, Your Honor, we certainly -- we'll

3  provide any information the Court would like, but we certainly

4  rest on the Court's knowledge of the case, knowledge of how

5  everything unfolded and transpired, and the Court's assessment

6  of the record to make the requisite factual finding.

7          THE COURT:  Great.  Thank you.

8          All right, counsel.  As I said, it's under

9  advisement.  I'll issue a ruling in the near term.

10         That takes us to the balance of today's calendar,

11 which points to where we're going in the future.  As far as an

12 order of dismissal, I saw a draft.  And we have matters

13 scheduled for the 22nd.

14         I'll throw it open.  Does anybody wish to speak as to

15 the steps to be taken going forward?

16         MR. MOLTON:  Good morning, Judge.  David Molton of

17 Brown Rudnick here with my colleagues and co-counsel on behalf

18 of the Talc Claimants Committee.  Just to give you a heads-up

19 of where we are on that, Judge, we did, after Friday's delivery

20 of the opinion, put together a proposed order following in the

21 template that we used in part one, TCC -- LTL 1.0 with a few

22 changes.

23         But we did circulate that to all the co-movants,

24 including the U.S. Trustee.  We got comments from everybody,

25 and I circulated it to the debtor as well.  We've had some

54

1  informal, indirect, at least from my perspective, feedback from

2  them.  But we haven't yet had a formal meet and confer with

3  them about the order.

4          It would be our request, Judge, that we move with all

5  due speed to get a proposed order in front of you to enter.  I

6  would be hoping as soon as possible this week.

7          I would imagine that the debtor may have some issues

8  with some of the provisions.  And, you know, I can go through,

9  you know, what I think those may be.  But I'd probably be

10  premature, because I really haven't talked to Mr. Gordon or

11  Mr. Prieto.

12          I'm sorry for butchering your name last time, Dan.  I

13  won't do it again.

14          In any event, but we -- we're looking forward to

15  doing that.  And as we've done in the past, Judge, should it be

16  that there is not a consent order by all the parties, we'd

17  propose to deliver up to Your Honor the two competing orders

18  but in a manner that is very easy for you to see what the

19  differences are and to, you know, almost like a menu selection

20  for Your Honor in order to pick them and get those -- get that

21  entered as soon as we can.

22          If Your Honor would like, you know, authority or case

23  law with respect to any particular point, we can deliver those.

24  I would suggest that that be delivered as exchange, you know,

25  with the proposed orders that the debtor submits theirs with --

1  if they think there's any authority that Your Honor needs to

2  look at with respect to any proposed provision.  They include

3  that.  We include that with ours.

4        Not briefing back and forth.  We don't need that.  I

5  think Your Honor is fully capable of understanding the issues

6  and utilizing whatever authority we think might be useful to

7  you to get this done.

8        Again, we've got folks out there that are -- you

9  know, have read the decision, read the -- read Your Honor's

10 opinion.  And we're looking very much forward to moving this

11 case or moving the cases of the plaintiffs outside of this

12 bankruptcy.  And everybody, needless to say, can only do that

13 once Your Honor enters an order.

14        So that would be my suggestion.  And I think we can

15 do that in the next day or two, if not sooner.  And I'd urge

16 that we schedule a meet and confer -- a formal meet and confer

17 with debtor's counsel in order to do that.

18        We do have dates upcoming, Judge.  And, actually, we

19 have next -- I think it's next Tuesday the 8th was the date

20 that objections to disclosure statement and solicitation

21 procedures was due.  I would imagine, Judge, that that needs --

22 we need some clarity on that.

23        And I do know from our perspective, you know, we went

24 pens down on everything after your order -- or after your

25 decision.  With respect to that, we do know -- also, the

1  debtor -- one of the things that Your Honor had the treat of

2  seeing was exchange by the Committee and others and the debtor

3  as to what we call pre-order solicitation activities by the

4  debtor.  I'm not going to -- no need for me to editorialize the

5  parties' positions on that.  Your Honor is well aware of that.

6  They've been articulated in the papers.

7          But they were asking for responses by the 15th of

8  August, which is coming up again.  We'd like clarity on that,

9  Your Honor.  We don't think anybody needs to do anything.  And,

10 indeed, we're hopeful we have a dismissal order this week so

11 that we can start -- again, the plaintiffs and their counsel

12 can start moving the cases in their courts of competent

13 jurisdiction.

14         On the 22nd, Judge, we have a -- well, before I get

15 to that, there's been some case management with respect to the

16 appeals that are in front of Judge Shipp.

17         THE COURT:  Right.

18         MR. MOLTON:  And there are two of them, I believe,

19 Judge.  There's the FCR appeal for which there is a date -- I

20 think it's the 11th, August 11th -- for the moving brief.  And

21 I -- on the PI appeal, Judge, I think that the debtors have

22 their response earlier than that, I think.

23         UNIDENTIFIED SPEAKER:  Today.

24         MR. MOLTON:  It was today.  We came to agreement with

25 the debtor, and there were letters that went up to Judge Shipp

57

1  through Mr. Stolz's office today basically case managing those

2  into abeyance until we -- you know, until this case is resolved

3  by Your Honor's order.

4         THE COURT:  That was the good news for Judge Shipp.

5  He gets the bad news.

6         MR. MOLTON:  Yeah.  There you go.  But on the 22nd,

7  Judge, there's a boatload of plan motions that are going to

8  require -- you know, would have required substantial attention,

9  work, possibly discovery.  All those, Judge, we believe

10 should -- you know, are mooted out by Your Honor's opinion and

11 clearly mooted out by Your Honor's forthcoming order.  And we

12 would ask Your Honor to deep six those into case management

13 abeyance until Your Honor's order is entered.

14         I don't think, from my perspective, I missed

15 anything.  I'm looking over at my side.  And, you know, I'll

16 let the debtors put forward their response to my suggestion.

17 Thank you, Judge.

18         THE COURT:  All right.  Thank you, Mr. Molton.

19         Mr. Gordon?

20         MR. GORDON:  Good morning, Your Honor.  Greg

21 Gordon --

22         THE COURT:  Good morning.

23         MR. GORDON:  -- on behalf of the debtor.  So a fair

24 amount of this we're hearing for the first time.  And in terms

25 of the dismissal order itself, we didn't see anything until

1  yesterday morning from the other side.  And we were traveling.

2        Having said all that, I don't anticipate much in the

3  way of difficulty with issues going forward.  I mean, there

4  obviously -- there's at least two major issues in the form of

5  dismissal order that we're going to have a disagreement over if

6  we can't work them out.  At the top of the list is a provision

7  that would prohibit a refiling anytime within six months.

8        We honestly don't think Your Honor should even

9  seriously consider that.  There's been no showing of cause.  I

10 think your opinion itself urges the parties to continue the

11 negotiation process.  That would seem counter to that.  This

12 would seem to be asking Your Honor to prejudge any future

13 filing, no matter what it is, when it occurs, whether there's a

14 plan, what that plan might provide.  And so we would strongly

15 resist that.

16       And I would just say on that, if Your Honor has any

17 inclination even to seriously consider it, then it should be

18 briefed, and we would want the opportunity to brief it.

19 Because we don't think there's any support for that or any case

20 that would be anywhere close to being applicable on the facts.

21       And then the second probably issue we have, primary

22 issue we have, and there's some others, is that we would oppose

23 the concept of the Committee continuing in any form

24 post-dismissal.  We don't think there's any basis in the

25 Bankruptcy Code for that.  And that's another provision.  If

1  Your Honor, you know, wants to -- you know, has any interest in

2  considering that, then we would want to brief that as well.

3         Those are the two big things.  There's other

4  provisions that we've already expressed a point of view to the

5  Committee on that we think are unnecessary like the fee

6  application provisions.  That seems to us like a formal

7  process.  It's not required.  It will just engender significant

8  expense.  And we had a way to handle that in LTL 1 that seemed

9  acceptable to the parties, and we would advocate for something

10 like that.

11        So we're not interested in delaying anything.  We're

12 not interested in holding anyone up.  But we do want to have

13 time to talk to the other side, see if we can work out issues

14 and come up with a form of order hopefully that's acceptable to

15 the parties.

16        But I have a sense that the two issues I've

17 identified, the continuation of the Committee and the

18 prohibition against a future filing for 180 days, we're not

19 going to reach agreement on that.  If you can provide any

20 guidance today, that would be helpful.  If not, obviously

21 that's fine as well.  But I did want to flag that for the

22 Court -- or flag those two issues.

23        I should also mention, Your Honor -- obviously this

24 is no surprise -- we will be appealing.  And that raises an

25 issue about certification.  And there have been discussions

60

1   about whether there may be an agreement on certification,

2   obviously subject to Your Honor's approval.  And I don't know

3   whether we have an agreement today or not.

4           I think we are prepared to enter into a stipulation

5   with the other side to certify the appeal.  But if that's not

6   done today, then we'll continue to have discussions with the

7   other side about that as well.  So I just wanted to make a

8   comment on the record about that.

9           THE COURT:  What about the calendar?  And I'll get

10  back to the other issues, and I'll hear from Ms. Richenderfer.

11  But what about the upcoming calendars?  It would make sense to

12  have pens down or -- approach?

13          MR. GORDON:  That would be my view, Your Honor.

14  There's no reason to put anybody to task to respond to things

15  that will basically, in our view, be moot upon dismissal of the

16  case.

17          MR. MOLTON:  Judge, just to let you know that, if I

18  wasn't clear, we'd be suggesting they be taken off the calendar

19  to show sufficient clarity to all of those out there who may be

20  thinking about responding and had been, you know, working on

21  that in the event this case continued that they need not do

22  that.  So we'd suggest --

23          THE COURT:  Yeah.

24          MR. MOLTON:  -- that they be taken off the calendar.

25          THE COURT:  I was going to suggest the approach I've

1  taken to other cases, is that they be marked withdrawn without

2  prejudice to be reinstated by letter if they -- if it's

3  appropriate.  Well, they go back on the calendar if some event

4  makes it that they should be.

5          MR. GORDON:  We're fine with that, Your Honor.

6          THE COURT:  All right.  So what I would ask then is

7  why don't the parties just send a letter to chambers outlining

8  the matter.  I mean, we have a calendar on for the -- for 8/22.

9  But I just want to make sure we have it all appropriate.

10         If there's any motions that need to be entered, just

11 to preserve rights or address them, I'm sure we all can agree.

12 But we'll clarify that.

13         As to the two issues that were raised, I guess,

14 number one, I saw in the proposed language that was provided to

15 the Court, the 180-day bar.  It would be extraordinary for me

16 to  want to enter such -- I don't -- on the third filing.  I

17 don't even do that in Chapter 13s, so let alone restrict any

18 complicated Chapter 11 case from whichever direction.

19         Parties reserve their rights, of course, but I would

20 not be inclined to provide for any bar.  I just don't have a

21 crystal ball, and I don't think I should be expected to have a

22 crystal ball.

23         As to the TCC -- and I guess my question is, if

24 there's an obvious intent to appeal, how do we handle the TCC's

25 rights to oppose the appeal or any other issue that might arise

62

1  post-dismissal?

2          MR. GORDON:  Well, there are multiple other parties,

3  Your Honor, as you know, that moved for dismissal.  So it's not

4  like those appeals won't be prosecuted.  But from our

5  perspective, it just comes down to a simple issue of whether

6  there's any basis in the Code to allow a Committee to continue

7  in a post-dismissal environment.  And we don't think there is.

8          THE COURT:  Standing here, I know we touched on this

9  in the prior matter.  Yet it was resolved.  I don't -- I hate

10  to have briefing, because it all comes just out of more

11  expense.  But I don't want to -- I don't want this to delay

12  entry of the order.  I don't think anybody's served by delaying

13  a dismissal order.

14          Mr. Molton?

15          MR. MOLTON:  Yeah, Judge.  I'm sorry.  I don't want

16  to -- I didn't want to push Mr. Gordon away.  A few things.  We

17  believe, Your Honor, under the facts and circumstances of this

18  case our request for a prohibition on filing for a period is

19  appropriate.  And there is Code provisions and Code authority

20  for it.

21          We'd like Your Honor to consider that.  And that

22  wouldn't be extensive briefing.  That would just be reference

23  to certain authorities as we submit our proposal to you.

24          Interestingly, the debtor had agreed to Committee

25  existence in part one, LTL part one, for the purpose of their

63

1   alleged purported appeal to the Supreme Court of the United

2   States and their stay motion to the Supreme Court of the United

3   States.  Those never happened.  But if Your Honor goes back and

4   looks at the docketed order that Your Honor actually entered on

5   consent, that's in there.  And if Your Honor would like

6   briefing on that or case authority on that, we'd be glad to --

7   to supply you.

8        What we don't want to do, Judge, is slow anything

9   down.  And to the extent that it looks like -- and I read you,

10  Your Honor, as saying that you don't want to slow things down

11  either.  But to the extent that any delay occurs, clearly we'd

12  be looking for, you know, Your Honor to entertain or to remove

13  the preliminary injunction, at least with respect to all the

14  non-debtors if this bogs down in anything.  But from what I'm

15  getting from Mr. Gordon and both from you is that this should

16  move very quickly.

17       The fee procedures, Judge, you know, Your Honor knows

18  the history of that.  We did agree to a simplified fee

19  procedure in part one dismissal order, LTL 1.  It wasn't so

20  simple.  And we ran into some issues with respect to it.  And,

21  accordingly, we want to do it by the book.  We want to do it by

22  the book.  And that's what we put in there.

23       And, Judge, with respect to certification, I think

24  that, as we've told informally, I think, Mr. Prieto and the

25  debtor -- and no doubt Mr. Gordon, I hope, has been told of

1  this -- I think all the (indiscernible) movants would agree to

2  a stipulation agreeing to direct appeal to the Third Circuit,

3  of course the circuit itself, direct appeal by the debtor.  Of

4  course the circuit itself would have to agree to that, but we

5  can accelerate that process by agreeing to a stipulation.

6          So those are my points, Judge.  I don't think I have

7  anything else.

8          THE COURT:  Well, good.  That'll obviate the need for

9  another opinion on direct appeals.

10         Ms. Richenderfer?

11         MS. RICHENDERFER:  Good morning, Your Honor.  Linda

12  Richenderfer for the Office of the United States Trustee.  I

13  just want to briefly remark on the a couple of the points that

14  are the highlights that Mr. Gordon divulged to us today that

15  were the initial sticking points, at least, as he put it.

16         The U.S. Trustee very much believes that there should

17  be some language in there regarding a time period within which

18  this debtor cannot re-file.  I appreciate what Your Honor's

19  process here is in Chapter 13s.  I'm more used to Chapter 13s

20  than 7s down in Delaware.

21         And I will tell you under circumstances like this, I

22  have even gotten agreements out of the debtors.  I realize this

23  is a Chapter 11 company, but I would imagine that we will also

24  be supplying some affirmation on this.  I think that there's

25  great precedent here concerning 2 hours and 11 minutes, and I

1  think that that in and of itself gives reason why there should

2  be some period of time.

3  Your Honor, as to -- with respect to the TCC, all I

4  can point to is that when they were given the ability to stay

5  in existence the last time, we did not object to that.

6  The formal process.  Your Honor, that was done

7  without consultation with the United States Trustee.  I don't

8  know if Your Honor recalls, but we knew there was an order in

9  process.  By the time we got it and were able to start thinking

10 of comments, the debtors presented it to Your Honor's chambers

11 before we had time.  We reached out for more time, and I don't

12 know what happened but we never got the time.

13 But that was one of the things we were going to

14 strongly object to, because it takes away from us -- our

15 responsibility, which is to review the fees.  It's my

16 understanding that it did not go well until recently.  There

17 were still four major professionals from the first case who

18 hadn't been paid.  Needless to say, when you hold the

19 checkbook, you can make decisions.  I think there's still one

20 that hasn't been paid from the first case.

21 I don't know what the issues are, but all I know is

22 that if we do the formal process, we will have our input, and

23 people will not be left waiting and hanging out there.  If

24 there's a problem, the debtor has to put it on the docket.

25 They have to explain it to you.  And then Your Honor gets to

1 make the decision as it is also Your Honor's purview.  So we

2 would be against any informal process.

3         And as to certification, that is something we will

4 take back and we will talk to our client about.  Again, first

5 time I'm hearing about it.  I think sometimes we get lost in

6 the shuffle, because this time we were a movant.  So we will

7 definitely take that back.

8         But whatever timeline Your Honor would like, we will

9 have information of our own that we will submit regarding the

10 time period during which there will be sort of a stay, a filing

11 if you will, and that we think that the formal process is the

12 way.  And that's what the Code says.  It's not unusual for

13 dismissal orders to (indiscernible) the process that will be

14 followed for the fee applications that will follow.  Thank you,

15 Your Honor.

16         THE COURT:  All right.  Thank you.

17         Mr. Malone?

18         MR. MALONE:  Good morning, Your Honor.  Robert

19 Malone, Gibbons PC, on behalf of the States of Mississippi and

20 New Mexico.  Your Honor, just with respect to some of the

21 comments that have been going back and forth -- and I think one

22 obvious thing that's not been mentioned today is -- and I don't

23 know if it would be applicable in this situation anyhow seeing

24 that it's a dismissal.  But if the debtors are going to seek

25 any kind of stay of Your Honor's order pending the appeal, I

1 think that would have to be an operative fact with respect to

2 whether they're opposing the existence of the TCC to proceed

3 with the appeal or not.

4        So maybe that's something that we'll note today.  If

5 they're -- if they have the intent to seek a stay of this

6 Court, that would probably be something that the Court should

7 have to take into consideration.

8        The second one is more as a comment with respect to

9 the direct certification to the Third Circuit.  My clients do

10 not oppose such a request by the debtor.

11        THE COURT:  Thank you, Mr. Malone.

12        Mr. Maimon?

13        MR. MAIMON:  Thank you, Your Honor.  So I think that

14 with regard to direct certification, Your Honor, I don't think

15 that even a stipulation between the parties is the final order.

16 There are two more authoritative words.  One is Your Honor's,

17 because parties can stipulate to direct certification but it's

18 only the Court exercising its jurisdiction that has to grant

19 certification.

20        My understanding is that that happens after a notice

21 of appeal is filed, which again can only be filed after the

22 dismissal order is entered.  So first order of business, I

23 think, logistically is the entry of a dismissal order which

24 will get rid of the PI, the stays, and we can be moving to the

25 next stage which is the debtor's stated intent to seek an

1    appeal to the Third Circuit.  And if they're serious, they'll

2    file a notice of appeal quickly after that.  And then Your

3    Honor will decide, A, whether or not to grant that application

4    for direct certification, and the circuit will decide whether

5    or not to take it or not.  Because, again, it's, again, not up

6    to the parties.

7         With regard to a bar on refiling, I think that one of

8    the things that Your Honor needs to take into consideration --

9    and in the course of delivering the opinion that you did, you

10   didn't have to deal with the issues that were raised in

11   different -- by different movants, and particularly the United

12   States Trustee, with regard to what happened between --

13        THE COURT:  Bear with me one second.

14              (Court and clerk confer)

15        THE COURT:  Go ahead.  I'm sorry.

16        MR. MAIMON:  No.  Your Honor didn't have to deal with

17   those issues, because Your Honor found no financial distress

18   and, therefore, a good faith requirement for filing the

19   bankruptcy absent and ordered the dismissal in your opinion.

20   However, there was quite a lot that happened without disclosure

21   to the Court, without disclosure to the U.S. Trustee, without

22   advice to the Official Claimants' Committee which was charged

23   with representing the interests of all claimants in LTL 1.

24        We shouldn't be put in that position again.  And so

25   one of the things that I think that it's important, and the

69

1  Court has the authority to do, is had we known when the circuit

2  court issued its opinion last January that these meetings were

3  taking place, that term sheets were being drawn up, that

4  meetings with the then FCR were taking place, we would have

5  sought discovery then.  We would have asked for transparency

6  then so that we didn't have all this that became ultimately not

7  part of Your Honor's decision but it became the subject of a

8  lot of motion practice, both in the PI as well as in the motion

9  to dismiss.

10         So I would suggest that the Court order the debtor to

11  disclose all communications, all documents with regard to any

12  discussions or plans with regard to a refiling and then take

13  into consideration the parties' contentions or positions about

14  the appropriateness of -- for a period of time, not forever but

15  for a reasonable period of time, with -- which I think Your

16  Honor, having presided over the motion to dismiss hearing,

17  having seen the expert reports, having looked at what the

18  debtor itself says about its assets and available funds,

19  something reasonable, I think, could be done.

20         But we shouldn't be put in a position where there are

21  clandestine and secret meetings taking place while they're

22  still debtor in possession.  And that's really inappropriate,

23  and we should avoid that at all costs.  Thank you, Your Honor.

24         THE COURT:  All right.  Thank you, Mr. Maimon.

25         Is there anybody who wishes to be heard appearing

1  remotely?  All right.

2          Then here's what we're going to do.  I would ask if

3  it's possible -- today is Wednesday.  Assuming we can --

4  there's a version of the order that debtor's counsel has

5  already seen, by close of business Friday if I could have

6  submissions limited -- we'll put a five-page, single-space

7  limit on submissions with respect to any provision that you --

8  parties can agree upon.  Most likely will be the 180-day bar

9  and the TCC continuation and the fees -- and the fee.

10          Provide me with your argument for or against.  I

11  would like to enter an order.  I'll be away Monday, Tuesday,

12  Wednesday.  Doesn't mean I'm not reachable.  I'll just be at

13  the Mid-Atlantic conference, ABI conference.

14          If I have the order and I have the arguments, it is

15  my intent to enter an order of dismissal next week.  If I have

16  an issue, I'll call the parties to have -- and we can have a

17  telephone conference.

18          Provide me with the list of matters that are on the

19  calendar for the balance of August that we'll mark withdrawn

20  without prejudice to be reinstated by a letter request as

21  appropriate.

22          Any other issues, Mr. Gordon?

23          MR. GORDON:  I hate to ask this, Your Honor, but I

24  actually have a mini vacation planned through the weekend, and

25  I would ask if we could have that date pushed to Monday close

1 of business if possible.

2         THE COURT:  Of course.  Monday is fine.  It probably

3 means I don't have to ruin my few-day break either.  But it is

4 still my goal to have an order entered next week.  Maybe it

5 will be the end of the week.  All right?

6         MR. GORDON:  Thanks, Your Honor.

7         THE COURT:  All right.  Mr. Stolz?

8         MR. STOLZ:  Your Honor, can we make that 5 p.m.?

9 Midnight filings are killing me with overtime on my staff.  So

10 if we can make that 5 p.m. on Monday?

11         THE COURT:  Oh, well, we'll do New York.  9 p.m.

12         MR. STOLZ:  9 p.m.  Thank you.  Thank you --

13         THE COURT:  How's that for splitting the pie?

14         MR. STOLZ:  Eastern time.

15         THE COURT:  9 p.m. Eastern.  Right.  Wow.  Talk about

16 a lack of trust here.

17         All right.  Thank you, all.  Some of you I'll be

18 seeing in the Whittaker matter.  I'm sure I'll be seeing all of

19 you at some aspect of this.  I appreciate your time and effort

20 and all the professionalism.

21         Mr. Gordon?

22         MR. GORDON:  So, Your Honor, Greg Gordon.  I wanted

23 to say the same on behalf of the debtor, on behalf of J&J.  We

24 very much appreciate the time Your Honor has dedicated to this.

25 We appreciate the way you've handled the proceeding, the

72

1  respect you've shown to everyone.  You have a great staff.  And

2  we're just very appreciative of all the time and the effort

3  that's been put in by everyone on your staff.

4          THE COURT:  Well, thank you.  My staff thanks you all

5  as well.

6          Mr. Molton?

7          MR. MOLTON:  Yeah.  Judge, I just want to echo that

8  and reiterate that Mr. Gordon and I are aligned on our thanks

9  to Your Honor and your wonderful staff that has made this very

10 challenging and extraordinary case easier to progress and

11 manage in front of Your Honor.  Thank you, Judge.

12         THE COURT:  Great.  Thank you.

13         Be safe, everybody.  Take care.

14         IN UNISON:  Thank you.

15             (Proceedings concluded at 11:44 a.m.)

16                       *  *  *  *  *

17

18

19

20

21

22

23

24

25

1    **C E R T I F I C A T I O N**

2        We, DIPTI PATEL and LIESL SPRINGER, court approved

3   transcribers, certify that the foregoing is a correct

4   transcript from the official electronic sound recording of the

5   proceedings in the above-entitled matter, and to the best of

6   our ability.

7

8   /s/ Dipti Patel

9   DIPTI PATEL

10

11   /s/ Liesl Springer

12   LIESL SPRINGER

13   J&J COURT TRANSCRIBERS, INC.        DATE:  August 3, 2023

14

15

16

17

18

19

20

21

22

23

24

25