**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>**GENOVA BURNS LLC**<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>dstolz@genovaburns.com<br>dclarke@genovaburns.com<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ 07920<br>Tel: (973) 467-2700<br>Fax: (973) 467-8126<br><br>*Local Counsel to the Official Committee of Talc Claimants*<br><br>*-and-*<br><br>*Local Counsel for the Ad Hoc Committee of Certain Talc Claimants* | **BROWN RUDNICK LLP**<br>David J. Molton, Esq.<br>Jeffrey L. Jonas, Esq.<br>Michael S. Winograd, Esq.<br>Eric R. Goodman, Esq.<br>dmolton@brownrudnick.com<br>jjonas@brownrudnick.com<br>mwinograd@brownrudnick.com<br>egoodman@brownrudnick.com<br>Seven Times Square<br>New York, NY 10036<br>Tel: (212) 209-4800<br>Fax: (212) 209-4801<br><br>and<br><br>Sunni P. Beville, Esq.<br>sbeville@brownrudnick.com<br>One Financial Center<br>Boston, MA 02111<br>Tel: (617) 856-8200<br>Fax: (617) 856-8201<br><br>*Co-Counsel for the Official Committee of Talc Claimants*<br><br><br>*-and-*<br><br>*Co-Counsel for the Ad Hoc Committee of Certain Talc Claimants* |
| **OTTERBOURG P.C.**<br>Melanie L. Cyganowski, Esq.<br>Adam C. Silverstein, Esq.<br>Jennifer S. Feeney, Esq.<br>mcyganowski@otterbourg.com<br>asilverstein@otterbourg.com<br>jfeeney@otterbourg.com<br>230 Park Avenue<br>New York, NY 10169<br>Tel: (212) 661-9100<br>Fax: (212) 682-6104<br><br>*Co-Counsel for the Official Committee of Talc Claimants*<br><br>*-and-*<br><br>*Co-Counsel for the Ad Hoc Committee of Certain Talc Claimants* | **MASSEY & GAIL LLP**<br>Jonathan S. Massey, Esq.<br>Rachel S. Morse, Esq.<br>jmassey@masseygail.com<br>rmorse@masseygail.com<br>1000 Maine Ave. SW, Suite 450<br>Washington, DC 20024<br>Tel: (202) 652-4511<br>Fax: (312) 379-0467<br><br>*Special Counsel for the Official Committee of Talc Claimants*<br><br>*-and-*<br><br>*Ad Hoc Committee of Certain Talc Claimants* |

| | |
|---|---|
| In re:<br>LTL MANAGEMENT, LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No.: 23-12825 (MBK)<br><br>Honorable Michael B. Kaplan |

**JOINT OMNIBUS MOTION OF THE AD HOC COMMITTEE OF CERTAIN TALC
CLAIMANTS AND THE OFFICIAL COMMITTEE OF TALC CLAIMANTS FOR
ALLOWANCE OF ADMINISTRATIVE CLAIMS FOR REIMBURSEMENT OF
EXPENSES INCURRED FOR THE PERIOD FROM APRIL 4, 2023 THROUGH APRIL
14, 2023 (PRIOR TO THE FORMATION OF THE OFFICIAL COMMITTEE OF TALC
CLAIMANTS) THAT PROVIDED A SUBSTANTIAL CONTRIBUTION IN THE
DEBTOR'S CASE OR, IN THE ALTERNATIVE, AUTHORIZING RETENTION OF
THE TCC PROFESSIONALS EFFECTIVE AS OF THE PETITION DATE**

This omnibus motion (the "Motion"), made jointly by the Ad Hoc Committee of Certain

Talc Claimants (the "AHC") and the Official Committee of Talc Claimants (the "Committee" or

the "TCC"), seeks allowance of administrative claims for reimbursement of expenses incurred

during the period from April 4, 2023 through April 14, 2023

(the "Pre-TCC Period")—that is, from the Petition Date (as defined below) through the date of the

appointment of the Official Committee of Talc Claimants (the "Committee" or the "TCC")—for

the services provided during the Pre-TCC Period that made a substantial contribution in the above-

referenced Chapter 11 case (the "Chapter 11 Case") of LTL Management, LLC (the "Debtor" or

"LTL"). In the alternative, this Motion seeks to make the retention of certain TCC Professionals

(defined below), which also performed services on behalf of the AHC, effective as of the Petition

Date. In support of the Motion, the AHC and TCC respectfully state as follows:

**PRELIMINARY STATEMENT**

1.      During LTL's first bankruptcy ("LTL 1.0"), the Debtor schemed with Johnson &

Johnson, Inc. ("J&J") and its officers, directors and counsel in a purposeful, bad faith (and now

---

[1]  The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George
Street, New Brunswick, New Jersey 08933.

failed) effort to manufacture LTL's financial distress. While the Debtor was planning its second bankruptcy filing, the official committee of talc claimants in LTL 1.0 (the "Original TCC"), with the assistance of its counsel, was negotiating a dismissal order and preparing for the end of the bankruptcy case in accordance with opinion and mandate of the United States Court of Appeal for the Third Circuit.

2.      Little did the Original TCC know that a mere two hours after its first bankruptcy case was dismissed, the Debtor would file a second bankruptcy ("LTL 2.0") and attempt to obtain an emergency *ex parte* temporary restraining order shutting down the commencement of talc litigation that had just minutes before been allowed to re-commence—all before the Office of the United States Trustee (the "U.S. Trustee") had an opportunity to appoint an official committee of talc claimants.

3.      Given the speed with which the Debtor commenced, and sought to proceed in, LTL 2.0, the AHC immediately formed to continue the efforts of the Original TCC to safeguard the interests of talc claimants in the absence of an official committee. The AHC was comprised of nine of the members of the Original TCC, with the exception of two who were represented by the firms that had signed plan support agreements with the Debtor prior to the filing of LTL 2.0.

4.      The AHC further retained the same professionals that were engaged by the Original TCC, given their familiarity with the Debtor and the issues presented by its bankruptcy filings, and the need for immediate and extensive representation by professionals to protect the interest of talc claimants. As a result of this seamless transition, the AHC was able to quickly respond to the Debtor with a unified voice and with a deep bench of professionals to keep pace with the Debtor.

5.      During the Pre-TCC Period, the AHC filled the shoes of an official committee, briefing key issues, engaging in discovery, and participating at key hearings. The Pre-TCC Period

was consumed by litigious discovery, status conferences and hearings with this Court, the filing

of informational and case dispositive briefs, and preparations for an evidentiary hearing on the

Debtor's request for a preliminary injunction that was scheduled to commence just two business

days after the TCC was appointed in this Chapter 11 Case.

6.    Without the efforts of the AHC, the TCC, appointed in the late afternoon on April

14, would have had only one business day to prepare for the preliminary injunction hearing,

including to cover more than a half dozen depositions scheduled from April 14–April 16. The work

performed by the AHC and its professionals enabled the TCC—ultimately comprised of the same

nine members of the AHC plus two new members—to seamlessly to step into the case as a fully

functioning party and enabled the efficient and effective representation of talc claimants to

continue without missing a beat.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue for this Motion is proper under

28 U.S.C. §§ 1408 and 1409. The bases for relief requested herein include sections 105(a), 328(a),

503(b), and 1103(a) of title 11 of the United States Code (the "Bankruptcy Code"), as well as

Federal Rule of Civil Procedure 60(b), as made applicable by Federal Rule of Bankruptcy

Procedure 9024.

## PROCEDURAL HISTORY & BACKGROUND[2]

8.    As the Court is aware, on April 4, 2023 (the "Petition Date"), pursuant to a directive

from and the mandate of the Third Circuit Court of Appeals, this Court dismissed LTL 1.0.[3] Less

---

[2] The AHC incorporates by reference the Declaration filed in support of the Motion as if fully set forth at length herein.

[3] *See LTL Mgmt., LLC v. Those Parties Listed on Appendix A to Complaint et al. (In re LTL Mgmt., LLC)*, 64 F.4th 84 (3d Cir. 2023) (amended opinion).

than two hours and eleven minutes later (and contrary to its statement that it would be filing a writ

of certiorari with the U.S. Supreme Court), the Debtor filed a voluntary petition for relief under

Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of New

Jersey. ECF No. 1.

9.        The Debtor's first bankruptcy case was one of the largest and most complex cases

ever filed. Unquestionably, the Debtor's second bankruptcy filing was unprecedented—seeking to

accomplish what it could not in LTL 1.0 and rushing to obtain expansive injunctive relief (again)

for the benefit of a multitude of non-debtor parties.

10.        In furtherance of its attempt to accelerate the prosecution of its second bankruptcy

filing, the Debtor filed a barrage of substantive documents on the Petition Date. As reflected on

the docket of this bankruptcy case, the flurry of documents filed on the Petition Date included:

- *Voluntary Petition for Non-Individuals Filing for Bankruptcy* [ECF No. 1];

- *Debtor's Statement Regarding Refiling of Chapter 11 Case* [ECF No. 3];

- *Declaration of John K. Kim in Support of First Day Pleadings* [ECF No. 4];

- *Motion Requesting Order Suspending Entry and Service of Standard Notice of Commencement of Case* [ECF No. 5];

- *Application for Designation as a Complex Chapter 11 Case* [ECF No. 6];

- *Complaint* commencing an adversary proceeding to obtain immediate injunctive relief and reinstatement of the automatic stay [ECF No. 8];

- *Motion for an Order: (I) Authorizing the Debtor to File a List of the Top Law Firms with Talc Claims Against the Debtor in Lieu of the List of the 20 Largest Unsecured Creditors; (II) Approving Certain Notice Procedures for Talc Claimants; and (III) Approving the Form and Manner of Notice of Commencement of This Case* [ECF No. 10];

- *Motion for an Order Authorizing Debtor to Retain a Claims and Noticing Agent* [ECF No. 11];

- *Motion Pursuant to 11 U.S.C. § 1505 for an Order Authorizing It to Act as Foreign Representative on Behalf of the Debtor's Estate* [ECF No. 12];

- *Motion for an Order: (I) Approving the Continued Use of Its Bank Account and Business Forms; and (II) Authorizing the Debtor's Bank to Charge Certain Fees and Other Amounts* [ECF No. 13];

- *Motion to Extend Time to File Missing Schedules* [ECF No. 14];

- *Application for Expedited Consideration of First Day Matters* [ECF No. 15]; and

- numerous *Applications for Attorneys to Appear Pro Hac Vice* [ECF Nos. 17-26].

11.    On April 5, 2023, this Court entered an Order granting the *Application for Expedited Consideration of First Day Matters*, scheduling a hearing for April 11, 2023 at 10:00 a.m. (ET).

12.    Also on April 5, 2023, this Court entered an *Ex Parte Temporary Restraining Order and Declaratory Judgment* ("TRO") issuing a preliminary injunction that required all cases against J&J and other Protected Parties to immediately cease. The Court scheduled a hearing on continuation of the preliminary injunction for April 18, 2023 at 10:00 a.m. (ET), less than two weeks from the date of entry of the TRO.

13.    In light of the unprecedented second filing and the need to timely respond to the Debtor's flurry of filings, the nine members of the Original TCC deemed it vital to form an ad hoc committee to protect the broad interests of talc claimants until an official committee was appointed in LTL 2.0.

14.    The AHC consisted of thee following nine of the eleven members of the Original TCC:

- Rebecca Love (Ashcraft & Gerel, LLP)

- Tonya Whetsel (Karst von Oiste L.L.P.)

- William A. Henry (Levin Papantonio Rafferty)

- Patricia Cook (Weitz & Luxenberg, P.C.)

- Alishia Landrum (Beasley Allen Law Firm)

6

- Kristie Doyle (Kazan, McClain, Satterley & Greenwood P.L.C.)

- Randy Derouen (Levy Konigsberg LLP)

- April Fair (Robinson Calcagnie, Inc.)

- Blue Cross Blue Shield of Massachusetts (Hill Hill Carter Franco Cole & Black, PC)

15.     The two members who were not invited to participate in this ad hoc committee were represented by counsel who had signed nondisclosure agreements with LTL while they were serving on the Original TCC and had signed Plan Support Agreements, purportedly binding them to recommend to their clients that they support the Debtor's proposed reorganization plan in LTL 2.0.

16.     In light of their extensive familiarity with the Debtor, the Debtor's professionals and the case issues, the AHC determined to retain the law firms of Brown Rudnick, Otterbourg, Massey & Gail, and Genova Burns to continue their representation of the interests of talc claimants (the "TCC Counsel"). The AHC also retained FTI Consulting (including Compass Lexecon), also a former professional of the Original TCC, to serve as financial advisor and to provide litigation support (the "TCC Financial Advisors," and, with the TCC Counsel, the "TCC Professionals").[4]

17.     From the outset of LTL 2.0, the Debtor expressed its intention to move as quickly as possible through the Chapter 11 process. In order to appropriately represent and protect the interests of the creditors of LTL, the AHC and its professionals needed to "hit the ground running" and perform a large volume of work in a very short period of time. None of this work could await the official appointment of the TCC.

---

[4] Houlihan Lokey provided services to the AHC during the Pre-TCC Period, but the AHC is not seeking reimbursement of its fees and expenses for those services as part of this Motion, as such fees and expenses will be addressed in Houlihan's final fee application to be filed in this case.

18.     While the U.S. Trustee acted more swiftly than is ordinarily possible in a large and complex Chapter 11 case, the Committee was not appointed until late in the day on Friday, April 14th (the "Committee Appointment Date"). *See* ECF No. 162. Due to the highly atypical circumstances surrounding the filing of LTL 2.0, the members of the AHC determined that creditors who were otherwise unrepresented at the outset of LTL 2.0 would therefore greatly benefit from having experienced bankruptcy counsel work to protect their interests until an official committee was formally appointed. Given the time span between the Petition Date and the Committee Appointment Date, it was necessary for the AHC members to overcome any different self-interests and for the professionals representing the AHC to work intensively and feverishly to respond to the numerous and voluminous pleadings filed by the Debtor at the commencement of the second Chapter 11 case—especially in light of the preliminary injunction hearing scheduled just two weeks after the Petition Date.

19.     The AHC's professionals filed extensive pleadings raising significant and important objections to much of the relief that was requested by the Debtor, and they also prepared an informational brief in response to the Debtor's *Statement Regarding Refiling of Chapter 11 Case*. On April 11th, the Court conducted a long and complicated hearing, at which professionals for the AHC played an important role.

20.     In light of the impending April 18th date for the hearing on the continuation of the preliminary injunction, preparation could not await the formal appointment of an official committee. The AHC and its professionals assumed the lead responsibility for laying the groundwork for this upcoming contested hearing, which required significant time and effort. While the evidentiary hearing itself occurred after the TCC's formal appointment, much of the preparation work was performed before the official committee was appointed by the U.S. Trustee.

Once appointed, the TCC was able to rely on the preparatory work already in place as a result of the AHC's and its professionals' efforts.

21.     As a result of those efforts, the Court declined to continue the TRO, and instead, granted a much more limited injunction, allowing cases to be commenced and to proceed up to the point of trial. This form and scope of injunction remained in place through the dismissal of this case by the Court.

22.     During the Pre-TCC Period, the AHC and its professionals also communicated with a large number of creditors and claimants and their counsel, to answer questions and provide guidance on the anticipated course of LTL's second bankruptcy case.

23.     The TCC in this Chapter 11 Case was ultimately comprised of the nine (9) members of the AHC, listed above, with two additional members—Brandi Carl (Golumb Spirt Grunfeld) and Sue Sommer-Kresse (Motley Rice, LLC). Shortly after the Committee Appointment Date, the TCC approved the retention of the TCC Professionals, all of which had performed the services described above on behalf of the AHC, thereby ensuring continuity of efforts between the AHC and the TCC. The TCC Professionals' retentions were later approved by Order of this Court effective as of April 14, 2023. ECF Nos. 754 (Genova Burns), 755 (Brown Rudnick), 774 (FTI) 776 (Otterbourg), 777 (Massey & Gail).

**RELIEF REQUESTED**

24.     By and through the Motion, the AHC and TCC seek the entry of an Order, pursuant to Bankruptcy Code sections 105(a), 503(b)(3)(D), 503(b)(4), and 507(a)(2), allowing administrative claims for reimbursement of expenses incurred in making a substantial contribution in the Debtor's case.

25.    Specifically, the relief sought by this Motion is based on 11 U.S.C. § 503(b)(4) which encompasses in relevant part 11 U.S.C. § 503(b)(3)(D), while section 507(a) establishes its administrative priority similar to other allowed professional fees in this case.

26.    Section 503(b)(4) provides:

"[a]fter notice and a hearing, there shall be allowed, administrative expenses . . . including - (4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant[.]"

11 U.S.C. § 503(b)(4).

27.    Section 503(b)(3)(D) provides that:

"[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including – (3) the actual necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by – (D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title . . ."

11 U.S.C. § 503(b)(3)(D).

28.    The Third Circuit, in *Lebron*, determined that the interplay between Bankruptcy Codes sections 503(b)(3)(D) and (b)(4) permit the reimbursement of attorney fees and general expenses incurred by an unofficial committee of creditors in connection with activities which made a substantial contribution in a case under chapter 11. *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 943 (3d Cir. 1994); *see also S.S. Body Armor I Inc.*, 961 F.3d 216, 231 (3d Cir. 2020) ("The Bankruptcy Code permits the payment of 'administrative expenses,' including the 'reasonable compensation for professional services rendered by an attorney' of 'an equity security holder ... in

making a substantial contribution **in a case under chapter ... 11**.'" (citing 11 U.S.C. §

503(b)(3)(D), (b)(4) (emphasis added))).

29.    Consistent with the Third Circuit, the AHC, as an ad hoc committee of creditors

under subsection (b)(3)(D), is seeking recovery under subsection (b)(4) for reimbursement for the

fees of the professionals acting on its behalf which constituted a substantial contribution in this

Chapter 11 Case.

30.    In the alternative, the AHC and TCC seek the entry of an Order modifying the

retention of the TCC Professionals to be effective as of the Petition Date.

## LEGAL ARGUMENT

### I.    Applicable Authority Supports a Finding of a Substantial Contribution

31.    The AHC served the essential service of informally stepping into the role of an

official committee during the Pre-TCC Period, preserving the rights of talc claimants and

contributing significantly to the outcome of this Chapter 11 Case, thereby constituting a substantial

contribution.

#### A.    General Law Defining Substantial Contribution

32.    The Bankruptcy Code does not define "substantial contribution." *In re Summit*

*Metals, Inc.*, 379 B.R. 40, 50 (Bankr. D. Del. 2007). "Since the Bankruptcy Code does not define

'substantial contribution' and the legislative history is of little help, courts have interpreted the

statutory language in similar but slightly different ways." *In re Breland*, 2022 WL 17085014, at

*3 (Bankr. S.D. Ala. Nov. 17, 2022) (citing *In re New Power Co.*, 311 B.R. 118 (Bankr. N.D. Ga.

2004); *In re DP Partners, Ltd.*, 106 F.3d 667 (5th Cir. 1997); *In re Alert Holdings, Inc.*, 157 B.R.

753 (Bankr. S.D.N.Y. 1993); *In re Alumni Hotel Corp.*, 203 B.R. 624 (Bankr. E.D. Mich. 1996)).

Indeed, legislative history merely defines substantial contribution negatively, "as not requiring a

contribution that leads to confirmation of a plan, for in many cases, it will be a substantial contribution if the person involved uncovers facts that would lead to a denial of confirmation." *In re Encapsulation Intern., Inc.*, 1998 WL 801898, at *3 (Bankr. W.D. Tenn. Nov. 9, 1998) (citing *NORTON BANKRUPTCY LAW AND PRACTICE 2D*, § 42.27).

33.    Given the lack of a statutorily defined meaning of the term "substantial contribution" in this context, the determination is essentially a factual inquiry. *See In re Geriatrics Nursing Home, Inc.*, 195 B.R. 34, 36 (Bankr. D.N.J. 1996). As such, whether a creditor makes a substantial contribution is a fluid concept, dependent upon the particular facts and circumstances of each case. *Encapsulation Intern, Inc.*, 1998 WL 801898, at *3. The burden of proof is on the applicant to show by a preponderance of the evidence that a substantial contribution claim has been made. *See Summit Metals, Inc.*, 379 B.R. at 50. Importantly, the Court has broad discretion to allow section 503(b) administrative claims. *Encapsulation Intern.*, 1998 WL 801898, at *3.

34.    The applicable test in the Third Circuit to determine whether a party has made a "substantial contribution" within the meaning of section 503(b)(3)(D) is "whether the efforts of the applicant resulted in an ***actual and demonstrable benefit to the debtor's estate and the creditors***." *Lebron*, 27 F.3d at 944 (citing *In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988)) (emphasis added). "Inherent in the term 'substantial' is the concept that the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting" their "own interests." *Id.* "Creditors are presumed to be acting in their own interests until they satisfy the court that their efforts have transcended self-protection." *Id.* (internal citations omitted). Put another way, the Court must be able to find that his or her own actions were designed to benefit others who would foreseeably be interested in the estate. *Id.* at 946. "Most activities of an interested

party that contribute to the estate will also, of course, benefit that party to some degree, and the existence of a self-interest cannot in and of itself preclude reimbursement." *Id.* at 944.

35.    Significantly, courts have found parties-in-interest to have made a "substantial contribution" in a variety of circumstances, including as in this case, where creditors step-in to perform the duties of a committee, unofficially, prior to appointment. *In re Bayou Group*, *LLC*, 431 B.R. 549, 562 (Bankr. S.D.N.Y. 2010) (citing *In re Granite Partners*, 213 B.R. 440, 446-47 (Bankr. S.D.N.Y. 1997)). For example, in *In re Bayou Group*, the court found that an unofficial creditors committee made a substantial contribution by, *inter alia*, identifying suitable candidates and moving for the appointment of receiver, researching potential claims, and by sharing that research with other creditors and the receiver. *Id.* at 563-66. Additionally, creditors may be reimbursed "under section 503(b)(3)(D) for services performed by it or its attorney prior to the formation of an official committee, to the extent those services provide a substantial contribution to the estate." *In re Worldwide Direct, Inc.*, 259 B.R. 56, 61-62 (Bankr. D. Del. 2001). For instance, a creditor (through counsel), might appear and raise issues "protective of unsecured creditors' rights at a hearing on interim financing before the committee formation can be held." *Id.* at 62. As another example, in *In re General Electrodynamics Corp.*, 368 B.R. 543, 554-56 (Bankr. N.D. Tex. 2007), the court found that the applicant's actions as a surrogate creditors' committee, which policed the actions of the debtors and identified potentially voidable transfers to insiders, were a substantial contribution to the estate.

36.    In addition, in *In re Service Merchandise Co., Inc.*, 256 B.R. 738 (Bankr. M.D. Tenn. 1999), the court concluded that a law firm and financial advisor that initially represented a group of creditors who, for the most part, later became members of the official committee of unsecured creditors, and later were retained as professionals for the official committee (as occurred

in this case), were not only entitled to an award of fees and expenses for critical services rendered

prior to the formation of the official committee pursuant to section 330 as part of *nunc pro tunc*

retention, but the same expenses could also be approved as an administrative claim under sections

503(b)(3) and (4) as a substantial contribution. *Id*. at 741-43. In that case, the professionals

provided "immeasurable benefits to the estate" and "were motivated by both self-interest and the

estate's interests." *Id.*

37.     Similar to the cases noted above, the AHC performed essential work to protect a

broad range of talc claimant interests prior to the appointment of the official committee, which

official committee was later appointed to represent the same broad range of interests.

38.     This case is unique, and that characterization is itself an understatement. The

Original TCC ceased to exist upon the entry of the Dismissal Order and the notice that the Debtor

would not be pursuing any further appeals, but the bankruptcy case continued with all of the same

players a mere two hours and eleven minutes later when LTL 2.0 was launched. Due to the

Debtor's re-filing, the Original TCC in LTL 1.0 immediately effectively transitioned to an ad hoc

committee in LTL 2.0 that, with the addition of two new members, would become the official

committee of LTL 2.0 less than two weeks later when the U.S. Trustee appointed the TCC in LTL

2.0. The technicality of the timing of the official appointment of the TCC should not bar recovery

of their professional fees for the work performed that period.

39.     Importantly, substantial contribution does not necessarily mean that a creditor's

efforts must lead to confirmation of a plan. *In re Food Workshop, Inc.*, 70 B.R. 962, 968 (Bankr.

S.D.N.Y. 1987). The focus is on the benefit to the debtor's estate, the creditors, and if relevant, the

shareholders. *Id.* In fact, the court in *In re Team Systems Intern. LLC*, 640 B.R. 296, 302 (Bankr.

D. Del. 2022), when denying a motion to dismiss, made clear that it believed that the work that the

judgment creditors had done in establishing cause under section 1112(b) (work that may have been made more difficult and more costly as a result of the debtor's conduct in discovery) may turn out to provide a substantial contribution to the debtor's estate. In fact, the judgment creditor had the ability to seek an administrative claim for work under section 503(b)(3)(D) following the conversion and appointment of a trustee. *Id.* Additionally, efforts to convert a chapter 11 to chapter 7 after the debtor refused to cooperate, defend a conversion order on appeal, and obtain a change of venue, have constituted a substantial contribution. *In re Williams*, 49 Fed. Appx. 845, 850 (10th Cir. 2002).

42.    In the case before this Court, similar to the cases cited above, the AHC's efforts contributed to the limited scope of the Preliminary Injunction Orders and set the stage for the dismissal of the Chapter 11 Case.

## B.  The Movants Have Demonstrated a Substantial Contribution in this Case

41.    As discussed more fully herein, the AHC undertook significant efforts which constituted a substantial contribution (as recognized by many courts in the case-law cited above). A summary of the services performed is described in **Exhibit A** attached hereto and a copy of the invoices reflecting the fees and expenses incurred by the AHC's professionals are attached hereto as **Exhibit B**.

42.    As a matter of law and equity, all of the services described herein by the AHC and its professionals during the Pre-TCC Period have met the standard of substantial contribution. Based upon the particular facts and circumstances of this case, the services provided by the AHC and their professionals demonstrate an actual demonstrable benefit to the estate and its full array of creditors (*i.e.*, ovarian cancer claimants, mesothelioma claimants and third party payors) as required by Third Circuit precedent (*see, e.g.*, *Lebron*, 27 F.3d at 344) because such services

related to critical issues affecting all creditors such as opposing the preliminary injunction and

laying a foundation which resulted in the ultimate dismissal of the case by this Court. The efforts

by the AHC and its professionals, as predecessors to the TCC, ensured that, under the provisions

of the Bankruptcy Code, only proper debtors are allowed to avail themselves of the bankruptcy

process and to utilize the tools of bankruptcy, such as the automatic stay and injunctive relief.

43.    Important to this analysis, the AHC undeniably performed the duties of an official

committee until the TCC had been appointed. Notably, each of the members of the AHC later also

served on the TCC. As explained above, courts have allowed administrative priority claims when

parties make a substantial contribution by serving the function of an official committee in an

unofficial capacity. *See e.g., Bayou Group*, 431 B.R. at 566; *General Electrodynamics Corp*. 368

B.R. at 554-56; *Service Merchandise Co., Inc.*, 256 B.R. at 741-43.

44.    In performing such services, the benefits conferred to the estate and its creditors

were more than incidental and the efforts undertaken by the AHC transcended self-interest. *See*

*Lebron*, 27 F.3d at 944. As the Court observed in LTL 1.0, given the different disease types at

issue, there have been disagreements among individual law firms representing the respective

interests of ovarian cancer and mesothelioma victims. Yet the work of the AHC transcended any

such differences and served to benefit all creditors. In fact, there was a clear causal connection

between the services provided and the benefit of limiting the injunctive relief requested by the

Debtor, which was to the benefit of all creditors in the case. *See e.g., In re Kior, Inc.*, 567 B.R.

451, at 458 (Bankr. D. Del. 2017); *Breland*, 2022 WL 17085014, at *4.

45.    Importantly, due to the absence of an official committee during the Pre-TCC

Period, the AHC's participation enabled creditor representatives to act as a singular unit, while

also coordinating with other constituencies and creditors to avoid duplication of services. *See In*

*re Deval Corp.*, 592 B.R. 587, 599 (Bankr. E.D. Pa. 2018). In addition, because the AHC

recognized that the rights of all creditors needed to be preserved during this critical period, the

services were provided and related expenses incurred absent an expectation of reimbursement. *See*

*id.* Despite that absence of an expectation of payment, it is noteworthy that if a committee were in

place during the Pre-TCC Period, it would have a right to seek compensation for the same services,

during which, the Debtor's professionals billed nearly 3x the amount of legal fees compared to the

fees and expenses incurred by the AHC. It would be fundamentally unfair for counsel and creditors

to protect the interests of the creditors without compensation at a time when they were

unrepresented by official committee counsel, while the debtors' professionals are able to pursue

swift relief with no fears of being uncompensated for their efforts.

46.     In sum, based upon the particular facts and circumstances of this case, the services

of the AHC conferred a benefit on this Chapter 11 Case.

## II.     **Alternatively, Authorizing Retention of the TCC Professionals Effective as of the Petition Date is Warranted**

47.     As described above, the services performed by the AHC during the Pre-TCC Period

are the very services that otherwise would have been performed by an official committee. And,

indeed, those services were performed by the same group of professionals that served the TCC in

LTL 1.0, and would go on to serve on behalf of the TCC in this Chapter 11 Case after its

appointment. Under similar circumstances—in which creditors' counsel performed services on

behalf of the estate and was later retained by the committee—the committee's professionals have

been retained effective as of the petition date. *See Service Merchandise*, 256 B.R. 741. The same

is appropriate here: even if the AHC's services outlined above are deemed not to meet the standard

for substantial contribution under § 503 for any reason, the respective retentions of the TCC

Professionals should be made effective as of the Petition Date.

48.     Moving the effective date of the TCC Professionals' retentions by less than two weeks would allow for those professionals to seek compensation for services effectively rendered on behalf of the TCC, though before the TCC could be formally appointed. The retention of the TCC Professionals allowed for not only an efficient and near seamless transition between the efforts of the former TCC in LTL 1.0, but also those of the AHC and the TCC in this Chapter 11 Case. Given the speed at which this Case followed from LTL 1.0, and at which critical events unfolded in this Case on and immediately after the Petition Date, ensuring such continuity was essential to protect the interests of creditors not otherwise represented in the early days of this Chapter 11 Case. It also minimized any duplication of efforts that might have otherwise resulted from the appointment of new or different professionals. Foreclosing the possibility of compensation for services rendered under these circumstances, simply because the TCC had not been formally appointed, elevates form over substance. Making the TCC Professionals' retention effective as of the effective date is therefore warranted.

*[Remainder of page intentionally left blank]*

**CONCLUSION**

49.     For all the foregoing reasons, the AHC and TCC respectfully requests that the Motion be granted and they be allowed administrative priority claims under sections 503(b)(3), (b)(4) on account of the substantial contribution made in this case for the benefit of the estate and its creditors in the amounts set forth on **Exhibit A** attached hereto. In the alternative, the AHC and TCC respectfully request that the TCC Professionals' retentions be made effective as of the Petition Date.

Dated: August 17, 2023

Respectfully submitted,

**GENOVA BURNS, LLC**
By:    */s/ Daniel M. Stolz*
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 533-0777
Facsimile: (973) 467-8126
Email: dstolz@genovaburns.com
Email: dclarke@genovaburns.com

*Local Counsel to the Official Committee of Tort Claimants of LTL Management, LLC*

-and-

**THE OFFICIAL COMMITTEE OF TALC CLAIMANTS**

/s/ *Michelle Parfitt*
Michelle Parfitt, Esq. as specifically authorized by Committee Co-Chair Rebecca Love,
c/o Ashcraft & Gerel, LLP
1825 K Street, NW, Suite 700
Washington DC 20006

*/s/ P. Leigh O'Dell*

Leigh O'Dell, Esq., as specifically authorized by Committee co-chair Alishia Landrum c/o Beasley Allen Law Firm PO Box 4160 Montgomery, AL 36103

/s/ *Perry Weitz*

Perry Weitz, Esq., as specifically
authorized by Committee co-chair Patricia Cook
c/o Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10083

*Co-Chairs of the Official Committee of Talc Claimants*