**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**Caption in Compliance with D.N.J. LBR 9004-1(b)**

**OTTERBOURG P.C.**
Melanie L. Cyganowski, Esq.
Adam C. Silverstein, Esq.
Jennifer S. Feeney, Esq.
230 Park Avenue
New York, NY 10169
Tel:     (212) 661-9100
Fax:     (212) 682-6104
Email: mcyganowski@otterbourg.com
        asilverstein@otterbourg.com
        jfeeney@otterbourg.com

*Co-Counsel for the Official Committee of Talc Claimants*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br><br>　　　　　　　　　Debtor. | Chapter 11<br><br>Case No.: 23-12825 (MBK)<br><br>Hon. Michael B. Kaplan |

**APPLICATION OF OTTERBOURG P.C., AS CO-COUNSEL FOR THE**
**OFFICIAL COMMITTEE OF TALC CLAIMANTS, FOR FIRST AND FINAL**
**ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES**
**FROM APRIL 4, 2023 THROUGH AUGUST 11, 2023**

TO:    THE HONORABLE MICHAEL B. KAPLAN
       UNITED STATES BANKRUPTCY JUDGE:

Otterbourg P.C. ("Applicant"), Co-Counsel to the Official Committee of Talc Claimants

(the "TCC") in the above-captioned case (the "Case" or "LTL 2.0"), hereby submits its

application (the "Application") for its first and final allowance of compensation for professional

---

[1]      The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501
George Street, New Brunswick, New Jersey 08933.

7615525.1

services rendered in the aggregate amount of $3,828,953.00 and reimbursement of expenses in the aggregate amount of $32,533.60 incurred from April 4, 2023 through and including August 11, 2023 (the "<u>Application Period</u>")[2].   In support of its Application, Applicant submits the *Certification of Melanie L. Cyganowski, Esq*, annexed hereto as **Exhibit A**, and respectfully states as follows:

## <u>JURISDICTION AND STATUTORY PREDICATES</u>

1.      This Court has jurisdiction over this matter pursuant to the Court's *Order (I) Dismissing Debtor's Chapter 11 Petition Pursuant to 11 U.S.C. § 1112(b); (II) Establishing Procedures with Respect to Requests for Compensation; and (III) Granting Related Relief* [Dkt. No. 1211] (the "<u>Dismissal Order</u>").

2.      The statutory predicates for the relief sought herein are Section 330 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), and Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

3.      This Application has been prepared in accordance with (i) *Appendix B Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330 by Attorneys in Larger Chapter 11 Cases* (the "<u>US Trustee Guidelines</u>") promulgated by the Office of the United States Trustee (the "<u>US Trustee</u>"), (ii) this Court's *Order Establishing Procedures for Interim Compensation and Reimbursement of Retained Professionals* [Dkt. No. 562] (the "<u>Compensation Procedures Order</u>"), (iii) the Dismissal Order, and (iv) the *Order Authorizing Retention and Employment of Otterbourg P.C. as Co-Counsel to the Official Committee of Talc Claimants Effective as of April 14, 2023* [Dkt. No. 776] (the "<u>Retention Order</u>").

---

[2]      This Application includes time and expenses for the period April 4, 2023 through April 14, 2023, as a motion is pending before the Court to make the effective date of the retention of the TCC's professionals April 4, 2023, or to allow the fees and expenses for such period as a substantial contribution to this Case.

## BACKGROUND

4.      On April 4, 2023 (the "Petition Date"), LTL Management LLC (the "Debtor" or "LTL") voluntarily filed its second petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of New Jersey (the "Court"). LTL's refiling for bankruptcy quickly followed the entry of the Court's order on that same date dismissing LTL's first bankruptcy case, Case No. 21-30589 ("LTL 1.0"), as mandated by the Third Circuit Court of Appeals (the "Third Circuit").

5.      During the pendency of LTL 2.0, the Debtor continued as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code, and no trustee or examiner was appointed in the Case.

6.      The Case was dismissed pursuant to the Court's *Memorandum Opinion*, dated July 28, 2023, and Dismissal Order, dated August 11, 2023.  [Dkt. Nos. 1127, 1211].

### Debtor Seeks Injunctive Relief – Temporary Restraining Order; Preliminary Injunction

7.      Although the TCC (and its predecessor, the Ad Hoc Committee of Certain Talc Claimants (the "Ad Hoc Committee")), argued from day one that LTL's bankruptcy was improper and the Case should be dismissed, there was significant activity in the Case from the time of the filing of the petition until the Case was dismissed.

8.      On the Petition Date, the Debtor filed a verified complaint (the "PI Complaint") to commence an adversary proceeding against talc claimants, Adv. Pro. No. 23-01092 (the "Adversary Proceeding"), to immediately obtain a temporary restraining order (the "TRO"), a preliminary injunction (the "PI"), and a declaration that the automatic stay under the Bankruptcy Code applied or extended to certain actions against non-debtors.  [Dkt. No. 8].

7615525.1

9.      On April 5, 2023, the Court entered an *ex parte* TRO that prohibited and enjoined talc-related lawsuits against four affiliates of the Debtor for a period of 28 days and scheduled a hearing on the PI for April 18, 2023.  [Adv. Pro. Dkt. No. 9].

10.      On April 18, 2023, the Court held a hearing on the Debtor's request for the PI (the "PI Hearing") and on April 20, 2023, the Court issued a bench decision granting in part, and denying in part, the Debtor's request.   On April 25, 2023, the Court entered an order in accordance with its April 20 bench decision (the "PI Order").  [Adv. Pro. Dkt. No. 91].

11.      The PI Order dissolved the TRO and enjoined the commencement or continuation of any trial or appellate practice with respect to talc-related claims against certain protected parties identified on Appendix B to the PI Complaint, through and including June 15, 2023.  The PI Order did not enjoin any party from commencing or proceeding with discovery or other pre-trial activities or from filing lawsuits against a "Protected Party" (subject to the terms of the PI Order).  The PI Order also carved out from the injunction those parties in lawsuits pending in the multi-district litigation before the United States District Court for the District of New Jersey for certain circumstances, such as the perpetuation of testimony of any person subject to the PI Order who was not expected to survive the duration of the PI Order.

12.      On April 27, 2023, the Court issued a written decision that clarified and supplemented its April 20 bench ruling, and denied the request of certain talc claimants previously made for the Court's dismissal of the Case *sua sponte*.  [Adv. Pro. Dkt. No. 94].

13.      After a hearing on June 13, 2023, the Court extended the PI on the terms set forth in the PI Order through August 22, 2023 (the "PI Extension").

14.      On June 27, 2023, the Court issued a bench decision granting the Debtor's request to modify the protected parties covered by the PI Extension to include non-debtor affiliates

7615525.1

Janssen Pharmaceuticals, Inc. and Kenvue Inc., but only on the same terms as the PI Order then in effect for other protected parties. [Adv. Pro. Dkt. Nos. 197-98]. On July 14, 2023, the Court issued a written order memorializing its June 27 bench decision. [Adv. Pro. Dkt. No. 203].

**Motions to Dismiss**

15.    On April 24, 2023, the TCC filed its motion to dismiss the Case (the "TCC MTD"). [Dkt. No. 286]. Thereafter, other parties filed their respective motions and/or joinders to dismiss the Case (collectively, with the TCC MTD, the "Motions to Dismiss"). [Dkt. Nos. 335, 346, 350, 352, 358, 379, 384, 473, 480].

16.    The Court conducted a four-day evidentiary hearing on the Dismissal Motions, from June 27, 2023 to June 30, 2023 (the "MTD Hearing").

17.    On July 28, 2023, the Court issued its *Memorandum Opinion*, wherein the Court found "cause for dismissal due to LTL's lack of imminent and immediate financial distress" and thus, granted the Motions to Dismiss. [Dkt. No. 1127, at 39].

18.    Consistent with the Court's determination set forth in the Memorandum Opinion, on August 11, 2023, the Court entered the Dismissal Order.

19.    On August 24, 2023, the Debtor filed its notice of appeal of the Dismissal Order to the United States District Court for the District of New Jersey. [Dkt. No. 1262].

**Appointment of TCC and Retention of Applicant**

20.    On April 14, 2023, the US Trustee filed its *Notice of Appointment of Official Committee of Talc Claimants*. [Dkt. No. 162].

21.    On June 14, 2023, the Court entered the Retention Order, which authorized the TCC's retention and employment of Applicant as its co-counsel effective as of April 14, 2023. A copy of the Retention Order is annexed hereto as **Exhibit B**.

7615525.1

22.    As discussed below, on August 17, 2023, a joint omnibus motion was filed under
the unique circumstances of this Case seeking, as alternative relief, an order authorizing the
retention of Applicant (and co-counsel) effective as of the Petition Date.  That motion has been
adjourned to September 20, 2023.  [Dkt. No. 1284].

**Compensation Procedures Order and Applicant's Prior Filed Monthly Fee Statements**

23.    Pursuant to the Compensation Procedures Order, procedures to file and serve
monthly itemized billing statements (the "Monthly Fee Statements") and fee applications were
established for this Case.

24.    In accordance with the Compensation Procedures Order, Applicant filed the
following Monthly Fee Statements:

| Monthly Fee Statements Subject to This Application | | | | | |
|---|---|---|---|---|---|
| Statement | Amount Requested | | Amount Paid | | Balance |
|  | Fees | Expenses | Fees | Expenses |  |
| First Monthly Fee Statement<br><br>Pd: 4/14/23-4/30/23<br>Dkt. No. 836<br>Filed: 6/20/23 | $502,533.50 | $6,639.93 | $402,026.80 | $6,639.93 | $100,506.70 |
| Second Monthly Fee Statement<br><br>Pd: 5/1/23-5/31/23<br>Dkt. No. 997<br>Filed: 7/7/23 | $1,073,354.00 | $5,167.88 | $858,683.20 | $5,167.88 | $214,670.80 |

| | | | | |
|---|---|---|---|---|
| Third Monthly Fee Statement<br><br>Pd: 6/1/23-6/30/23<br>Dkt. No. 1065<br>Filed: 7/19/23 | $1,286,986.50[3] | $8,508.80 | $1,024,989.20 | $8,508.80 | $261,997.30 |
| Fourth Monthly Fee Statement<br><br>Pd: 7/1/23-7/31/23<br>Dkt. No. 1193<br>Filed: 8/10/23 | $533,846.00 | $10,094.38 | $427,076.80 | $10,094.38 | $106,769.20 |
| Fifth Monthly Fee Statement<br><br>Pd: 8/1/23-8/11/23<br>Dkt. No. 1293<br>Filed: 8/31/23 | $146,484.50[4] | $1,788.61 | $0.00 | $0.00 | $148,273.11 |
| **TOTAL** | **$3,543,204.50** | **$32,199.60** | **$2,712,776.00** | **$30,410.99** | **$832,217.11** |

25.    With respect to Applicant's first through fourth Monthly Fee Statements, a certification of no objection was filed after each applicable objection period expired without the filing of an answer, objection or other responsive pleading to the Monthly Fee Statement filed and served. [Dkt. Nos. 981, 1096, 1147, 1265]. As of the filing of this Application, the deadline for Applicant's fifth Monthly Fee Statement did not pass and no interim payment was made relating to that Monthly Fee Statement (covering the partial month of August).

---

[3]    This amount is $5,750.00 higher than the Third Monthly Fee Statement filed due to time that was inadvertently not captured prior to the submission of that Monthly Fee Statement. The time at issue is included in the time detail attached hereto as **Exhibit H**.

[4]    This amount is $11,986.50 higher than the Fifth Monthly Fee Statement filed due to time that was inadvertently not captured prior to the submission of that Monthly Fee Statement. The time at issue is included in the time detail attached hereto as **Exhibit H**.

7615525.1

26.     The TCC was provided with all of the Monthly Fee Statements, including time detail, that comprise the fees and expenses being sought in the Application and have had an opportunity to object to or question any of the fees and expenses being sought.

27.     Applicant has not filed any prior interim fee application in this Case.

**Joint Omnibus Motion for Allowance of Substantial Contribution Claims**

28.     In view of the similarity of virtually all aspects of LTL's two bankruptcy filings, which were separated by little more than two hours of time, Applicant's familiarity of LTL and the issues, and the rate at which LTL was proceeding in LTL 2.0, the original official committee of talc claimants in LTL 1.0 (the "Original TCC") quickly established the Ad Hoc Committee to protect the interests of talc claimants in the absence of an official statutory committee and employed Applicant, among others, to render services as of the Petition Date (which Applicant did).

29.     On August 17, 2023, the Ad Hoc Committee and the TCC filed their *Joint Omnibus Motion of the Ad Hoc Committee of Certain Talc Claimants and the Official Committee of Talc Claimants for Allowance of Administrative Claims for Reimbursement of Expenses Incurred for the Period from April 4, 2023 Through April 14, 2023 (Prior to the Formation of the Official Committee of Talc Claimants) That Provided a Substantial Contribution in the Debtor's Case or, in the Alternative, Authorizing Retention of the TCC Professionals Effective as of the Petition Date* (the "Contribution Motion").  [Dkt. No. 1241].

30.     Through the Contribution Motion, Applicant seeks the allowance of $285,748.50 as an administrative claim for services.  The amounts sought in the Contribution Motion are included in the total fees and expenses being requested in this Application.

## SUMMARY OF PROFESSIONAL COMPENSATION AND
## REIMBURSEMENT OF EXPENSES REQUESTED

31.    By this Application, Applicant seeks the entry of an order approving on a final basis for the Application Period: (a) compensation totaling $3,828,953.00 for professional services performed and (b) reimbursement totaling $32,533.60 for expenses incurred in connection with the professional services rendered.

32.    Applicant attaches the following in support of this Application:

- **Exhibit C**: Summary of Fee Application.

- **Exhibit D**: Customary and Comparable Compensation Disclosures with Fee Applications.

- **Exhibit E**: Summary of Timekeepers Included in This Fee Application.

- **Exhibit F**: Budget and Staffing Plan.

- **Exhibit G**: Summary of Compensation Requested by Project Category.

- **Exhibit H**: Computer Generated Time Detail.

- **Exhibit I**: Summary of Expenses.

- **Exhibit J**: Computer Generated Expense Detail.

## SUMMARY AND HIGHLIGHTS OF SERVICES RENDERED

33.    During the Application Period, Applicant performed services on a variety of tasks, all of which are set forth in Applicant's detailed time records.  The following summary is intended only to highlight some of the services rendered by Applicant during the Application Period and is not intended to be a complete recitation of all activities performed or of all project categories.  Although every effort was made to consistently categorize the actual services provided into the appropriate category, certain tasks were interrelated and could properly be categorized in multiple categories.

7615525.1

A.      <u>Injunction Litigation (L0017)</u>

34.      Since October 14, 2021, LTL (and hundreds of non-debtor parties, some of whom claimants have direct claims against) enjoyed the protections of an injunction against litigation. Approximately 6 months later, LTL 1.0 was dismissed and the moment arrived when claimants were finally relieved from the figurative shackles prohibiting the prosecution of their respective claims in court.  That however was fleeting, as LTL refiled for bankruptcy relief just over two hours after the entry of the LTL 1.0 dismissal order.

35.      Much like in LTL 1.0, the Debtor sought on the first day of the Case extraordinary injunctive relief in the form of a temporary restraining order and a preliminary injunction, and a request for declaratory relief that the automatic stay was applicable to and/or extended to certain non-debtor parties.  Prior to the appointment of the TCC, the Court granted the TRO on April 5 and scheduled the PI Hearing for April 18.

36.      Given the speed with which the Debtor commenced, and sought to proceed in, the Case, the Ad Hoc Committee immediately formed to continue the efforts of the Original TCC to safeguard the interests of talc claimants, especially because no official statutory committee existed at the time for the Case and it was uncertain when any such committee would be appointed.  The Ad Hoc Committee was composed of nine of the eleven members of the Original TCC.[5]

37.      Applicant, who was co-counsel to the Original TCC in LTL 1.0, was employed along with other Original TCC professionals by the Ad Hoc Committee (collectively, the "<u>Ad Hoc Committee Professionals</u>").  This provided a seamless transition that allowed the Ad Hoc

---

[5]      The remaining two members of the Original TCC were not invited to participate on the Ad Hoc Committee because they were represented by counsel who had signed nondisclosure agreements with LTL while they were serving on the Original TCC and had signed plan support agreements that purportedly bound them to recommend to their clients that they supported the Debtor's proposed chapter 11 plan in connection with LTL 2.0.

Committee to quickly respond to the relief requested by the Debtor.  For example, the Ad Hoc Committee Professionals worked intensively to promptly file extensive pleadings raising significant and important objections to much of the relief requested by the Debtor.

38.    Importantly, the Ad Hoc Committee Professionals acted immediately to prepare for the April 18 PI Hearing.  This involved taking a critical role laying the groundwork for opposing the PI.  Among other things, the Ad Hoc Committee Professionals diligently performed valuable services such as substantial pre-trial discovery.  Absent those services, it would have been nearly impossible for the TCC to adequately prepare for the PI Hearing.

39.    Under the circumstances, there was a great deal for the TCC to expeditiously undertake to adequately prepare for the PI Hearing.  Indeed, with the TCC formally appointed in the late afternoon on April 14, 2023[6], there was only one business day to prepare for the PI Hearing, including to cover more than a half dozen depositions scheduled from April 14 – April 16.  The TCC, as the successor to the Ad Hoc Committee, required immediate contributions from its professionals, including Applicant, to continue the efforts and strides made by the Ad Hoc Committee in challenging the Debtor's efforts to obtain broad injunctive relief.

40.    As reflected in Applicant's time detail, Applicant devoted significant time to a variety of matters relating to the PI.  Applicant had the primary task of drafting the TCC's opposition to the PI, and took an active and integral role on behalf of the TCC performing, participating in and attending depositions of witnesses and other discovery needs related to the PI and the PI Hearing.  By way of example, Applicant extensively prepared for and was the lead firm handling the deposition Adam Pulaski, Esq., one of the members of the Ad Hoc Committee of Supporting Counsel who purportedly represented certain talc claimants.

---

[6]    The TCC was comprised of eleven members: the nine members from the Ad Hoc Committee and two additional claimants.  [Dkt. No. 162].

7615525.1

41.     Applicant also analyzed and researched critical issues pertinent to opposing the PI, and worked collaboratively with co-counsel by, among other things, developing approaches and tactics in preparation of depositions ahead of the PI Hearing.  Additionally, to maximize and streamline efforts, Applicant actively engaged, communicated and coordinated with co-counsel to strategize, formulate and prepare legal arguments and points of discussion.

42.     Applicant attended and participated in the PI Hearing, and further contributed subsequent to the PI Hearing and the Court's ruling on the PI by reviewing the Debtor's proposed draft of the PI Order and providing substantive comments to the same order, as well as coordinating and strategizing with the TCC's other co-counsel on next steps post-entry of the PI Order, including mandamus and certification issues, and providing substantive input and analysis of the impact of the injunction on applicable statutes of limitations.

43.     More than a month after the commencement of LTL 2.0, the Debtor sought on shortened notice a bridge order extending the Court's injunction under the PI Order to protect the Debtor's related non-debtor entities, Kenvue and Janssen (the "PI Bridge Motion").  Applicant devoted time to extensively examine the PI Bridge Motion and the impact, if any, on claims against the Debtor and was tasked with the primary drafting responsibility of preserving the TCC's rights and opposing the PI Bridge Motion, which included preparing objections and a supplemental pleading on behalf of the TCC.  [Adv. Pro. Dkt. Nos. 157, 169, 189].

44.     Other tasks performed in this project category during the Application Period included in-depth review of the Ad Hoc Committee of Supporting Counsel's motion to intervene in the Adversary Proceeding, researching key issues and providing extensive revisions to the TCC's opposition papers to the intervention.

Fees: $607,885.50                    Hours: 593.7

7615525.1

B.    <u>**Dismissal (L0018)**</u>

45.    LTL's dance into bankruptcy first occurred on October 14, 2021, just two days after its creation.  It filed with a funding backstop from J&J of approximately $61 billion in tow as part of its "Texas Two-Step" scheme.  The commencement of LTL 1.0 put an abrupt halt on litigation for thousands of victims with claims, not only against LTL but also against a staggering collection of non-debtor parties.

46.    Through the tireless efforts of the Original TCC and other parties in interest (collectively, the "<u>Opposing Parties</u>"), a substantial evidentiary record was established during the five-day trial in support of dismissing LTL 1.0 as a bad faith filing.  On January 30, 2023, the Third Circuit agreed with the Opposing Parties that LTL 1.0 should have been dismissed, holding the lack of financial distress was a bad faith filing, and issued its decision reversing the Court's order that had denied the dismissal of LTL 1.0.  On March 31, 2023, the Third Circuit issued its *Certified Judgment* that remanded the bankruptcy case to the Court with instructions to dismiss LTL's bankruptcy petition.  With the Court's dismissal of LTL 1.0 on April 4, 2023, the talc claimant plaintiffs were finally given the opportunity that they were forced to sit idle for--the unfettered prosecution of their respective claims.

47.    Before the proverbial ink could dry in the two hours and eleven minutes after the dismissal of LTL's first bankruptcy case, LTL 2.0 was commenced with a drastically reduced funding agreement, but still not financial distress.  Given the Third Circuit's ruling dismissing LTL 1.0 for bad faith, the TCC (and its predecessor, the Ad Hoc Committee) believed the second bankruptcy was another bad faith filing and the TCC immediately sought to dismiss the Case as such.

48.    This project category includes analysis and preparation of all motions, opposition to motions, and reply memoranda related to the dismissal of the Case.  During the Application

7615525.1

Period, Applicant spent significant time collaborating with co-counsel to prepare and finalize the TCC's motion to dismiss the Case.  This included, among other things, reviewing and sharing extensive comments and revisions to drafts of the TCC dismissal motion and reply papers; researching discrete issues of law; reviewing transcripts, pleadings and documents; dissecting demonstratives used during the Case; and also developing legal arguments, strategy plans and next steps.

49.    Applicant also spent time monitoring, reviewing and analyzing motions to dismiss filed by numerous other parties in interest, such as the US Trustee.  Given the volume of Dismissal Motions and the allotment of time made available by the Court to consider all of those motions, Applicant actively participated, supported and coordinated with co-counsel and the other moving parties to apportion time and structure an orderly manner for proceeding going forward.  For example, there were multiple discovery-related tasks that were necessary to be completed in advance of the MTD Hearing.  Among other things, Applicant provided substantive services by preparing discovery requests and other discovery tools (including motions to compel) and analyzing common interest issues and potential jurisdictional questions.  Applicant also attended multiple depositions of witnesses, which were conducted within a compressed time period, to promptly analyze information for time efficiency.  In addition, Applicant interviewed expert candidates in furtherance of the TCC's efforts to dismiss the case.

50.    Applicant attended and participated in the full four-day MTD Hearing, during which Applicant coordinated and strategized with co-counsel to promptly and effectively respond to and counter the opposing parties' arguments and showings at trial.  Applicant was primarily responsible for preparing two of the TCC's experts, including their direct testimony and re-direct at trial, and cross-examining certain of the Debtor's experts.

51.    Following the conclusion of the MTD Hearing, at the Court's instructions, the parties were permitted to submit proposed findings of fact and conclusions of law (the "FoF/CoL") for the Court's consideration.  On behalf of the TCC, Appellant had the laboring oar of preparing the initial draft of the FoF/CoL.  The task was a hefty undertaking, requiring the devotion of significant time and effort by Applicant.

52.    By way of illustration, it was necessary for Applicant to review and digest, among other things, the extensive record from the 4-day MTD Hearing, all of the witness testimony admitted by deposition designations, the record from the PI Hearing, the record from the entirety of the motion to dismiss and preliminary injunction hearing in LTL 1.0, and volumes of documents, pleadings, and transcripts.  Applicant also performed research to supplement legal arguments and consistently communicated with co-counsel to organize the structure of the FoF/CoL.  Appellant continued to contribute services after the initial draft by reviewing and giving substantive comments to finalize the work product, which ended up being more than 140 pages.

Fees: $1,775,663.00                    Hours: 1,844.2

## C.    Meetings/Communications with TCC (L0005) and Co-Counsel (L0006)

53.    During the Application Period, Applicant participated in regularly scheduled weekly meetings with the TCC and co-counsel, pre-meetings with co-counsel in preparation of the weekly TCC meetings, and multiple additional meetings with co-counsel and subsets of the TCC representatives and members to address specific matters as they arose, including, for example, emergent discovery disputes.

54.    Given the pace of proceedings in LTL 2.0, there were frequently multiple meetings every week and often multiple meetings in a single day to promptly deal with matters.

The meetings were conducted primarily by way of videoconference (with the occasional in-person meeting and meetings before and after court hearings) to discuss pending matters, strategy, and other topics pertinent to the TCC, and to assist the TCC members and their representatives in the performance of the members' statutory obligations and the exercise of their informed judgment and decisions on various issues in the Case as they arose.

55.     To prepare for the weekly meetings, Applicant routinely reviewed the status of relevant matters, agenda of discussion topics, case update reports, and other materials for the TCC's consideration, information and review.  Applicant convened with co-counsel and other professionals to coordinate and efficiently address pending issues for the TCC and discuss general case strategy, action plan and the division of tasks.  Applicant also communicated with TCC leadership on a regular basis to discuss various pleadings and upcoming issues and proposed responses thereto and prepared and assisted co-counsel with the preparation of e-mail summaries of matters for the TCC's consideration.

56.     In an effort to keep the general creditor body informed of issues impacting their respective claims and of the status of the Case, the TCC, through its professionals, hosted multiple virtual town hall forums for discussions and questions.  During the Application Period, Applicant collaborated with co-counsel in preparing and guiding the TCC for the town halls, which Applicant understands were well-received by attendees.

57.     Applicant regularly communicated (whether by e-mail, telephone, video-conference, or in-person) with co-counsel to discuss a variety of matters, ranging from overall Case strategy to specific tasks that were required.  By maintaining constant communication, the overall work product and representation of the TCC was strengthened and made more efficient.

Fees: $402,028.00                    Hours: 348.8

16

7615525.1

D.      **Contested Matters/Litigation (L0010)**

58.     This project category includes general litigation matters, and analysis and preparation of motions, opposition to motions, reply memoranda, and other pleadings and papers that do not generally fit within a more specific project category.  For example, Applicant coordinated with co-counsel and analyzed opposition and issues relating to the Debtor's motion to appoint Randi Ellis as the legal representative for future talc claimants ("FCR") for LTL 2.0. Relatedly, Applicant reviewed documents produced in connection with the FCR dispute, provided edits and comments to the appellate brief for the FCR dispute, and reviewed the motion to disqualify Ms. Ellis as the FCR.

59.     Additionally, during the Application Period Applicant strategized with co-counsel and substantially contributed by collaborating with co-counsel on a draft complaint asserting a variety of avoidance and other causes of action, as well as reviewed and commented on the TCC's companion motion for requisite standing for the derivative complaint.

60.     Applicant also examined the appropriateness of the Debtor's motion for authority to reimburse the expenses of the Ad Hoc Committee of Supporting Counsel's professionals and provided comments for the TCC's opposition papers to that reimbursement motion.

61.     Other tasks performed by Applicant in this project category included reviewing the Debtor's motion to extend time to remove actions and collateral lawsuits commenced by J&J against experts.

Fees: $176,909.00                          Hours: 180.1

E.      **Claims Administration (L0013)**

62.     This category includes attention to claims-related matters.  Among other things, Applicant reviewed and analyzed the Debtor's motion to waive the requirements of Local Rule 3003-1(a)(1) concerning claim bar dates, and companion motion to establish bar dates and

procedures for filing claims, which was narrowed to only certain claimants.  Applicant reviewed

the TCC's statement preserving its rights on the bar date motion, and also provided comments

and revisions to the TCC's cross-motion to set a bar date for the Case.

63.    Additionally, with the possibility that the Dismissal Motions might not be

granted, Applicant reviewed and provided strategic feedback to co-counsel with respect to the

TCC's motion for an order authorizing the estimation of current talc claims for purposes of

voting, the appointment of an estimation expert, and the establishment of estimation procedures.

64.    Applicant also had a primary role assisting and coordinating the submission of

claims for expense reimbursement by LTL 1.0 committee members, consistent with the Court-

approved procedures set forth in the dismissal order of LTL 1.0.

Fees: $58,551.50                    Hours: 51.5

**F.    Plan and Disclosure Statement (L0014)**

65.    Under this project category, Applicant analyzed the Debtor's motion for an

expedited scheduling process for the approval of its proposed disclosure statement

notwithstanding the absence of a chapter 11 plan (the "DS Scheduling Motion"), and strategized

with co-counsel to formulate the TCC's opposition.  Further, Applicant had the primary task of

drafting the TCC's opposition to the shortening of notice for the DS Scheduling Motion.

Relatedly, Applicant analyzed objections to the DS Scheduling Motion filed by other parties in

interest.

66.    Applicant also reviewed and commented on the TCC's motion to terminate the

Debtor's period of exclusivity to file a plan and solicit acceptances.  After the Debtor filed its

initial proposed plan and disclosure statement (as well as an amended proposed plan), Applicant

thoroughly scrutinized the proposed plan terms, such as classes and releases, and assessed their

impact on creditors.  Applicant devoted time to evaluate potential recovery distributions using

the claims calculation methodology proposed by the Debtor.

67.    Applicant reviewed and analyzed issues that may become relevant to the payment of claims, including procedures for making distributions through a trust established in connection with a confirmed plan of reorganization.    This work included research relevant to trust distribution procedures ("TDPs") and review of a proposed TDP for the TCC's consideration.

68.    Other plan-related tasks performed, included analyzing Section 524(g) issues, researching confirmation standards, and examining the impact of a proposed term sheet with certain third-party payers.

Fees: $383,343.00              Hours: 415.7

**G.    Case Administration (L0001)**

69.    This project category includes general case administration services.    Tasks included, among other things, analysis of Debtor's motion to honor obligations under the Court's prior order dismissing LTL 1.0; attendance of the 341 meeting of creditors; maintenance of the calendar diary of deadlines, hearings and other pertinent dates; analysis of Bankruptcy Rule 2019 compliance requirements and issues raised by the US Trustee and responses thereto; and obtaining *pro hac vice* admission for Applicant's attorneys.

Fees: $27,458.50              Hours: 35.4

**H.    Fee/Employment Applications (L0008)**

70.    Under this project category, the tasks performed included, among other things, the preparation of Applicant's application for employment by the TCC.    In connection with that application, Applicant communicated, to the extent necessary, with the US Trustee to address or clarify any matters of potential concern raised by the US Trustee and prepared supplemental papers in furtherance of its employment by the TCC.

7615525.1

71.     Applicant also coordinated and communicated regularly with co-counsel to streamline the TCC's employment of professionals.  For example, Applicant served as an intermediary to resolve concerns raised by the Debtor with respect to the TCC's retention of Houlihan Lokey Capital Inc. and FTI Consulting Inc. as its investment banker and financial advisor, respectively.

72.     Time was also spent by Applicant preparing its Monthly Fee Statements in accordance with the Compensation Procedures Order.  Applicant's attorneys and paraprofessionals reviewed Applicant's time detail, and drafted and coordinated the filing of each Monthly Fee Statement that is subject to this Application.

Fees: $69,543.50          Hours: 82.0

### I.     Mediation/Settlement (L0015)

73.     During the Application Period, Applicant reviewed and provided comments with respect to the order for mediation of disputes among the parties.  Applicant also prepared for and participated alongside the sub-group of claimants in a mediation session.

Fees: $12,120.00          Hours: 8.9

### J.     Court Attendance (L0016)

74.     This project category generally includes time to prepare for various omnibus hearings in LTL 2.0 (for the main case and Adversary Proceeding), and included, among other things, reviewing the agenda items, extensively analyzing court filings and other documents relevant for each hearing.  Relatedly, Applicant attended (in-person and/or by video conference) and actively participated in multiple hearings by presenting arguments and collaborating with co-counsel to formulate strategy.

Fees: $223,527.50          Hours: 199.4

## EVALUATING APPLICANT'S SERVICES

75.    Applicant submits that its request for the third interim allowance of compensation is reasonable and appropriate.  The services rendered by Applicant, as highlighted above, required substantial time and effort.  Further, in accordance with the US Trustee Guidelines, Applicant provided the TCC with an opportunity to review the fees and expenses being requested pursuant to this Application.

76.    Section 330 of the Bankruptcy Code provides that a court may award a professional employed under Bankruptcy Code section 327 "reasonable compensation for actual, necessary services rendered … and reimbursement for actual, necessary expenses."  Bankruptcy Code section 330 also sets forth the criteria for the award of such compensation and reimbursement.

77.    In determining the amount of reasonable compensation to be awarded, the Court should consider the nature, extent, and the value of such services, taking into account all relevant factors, including:

   a.    the time spent on such services;

   b.    the rates charged for such services;

   c.    whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

   d.    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed;

   e.    with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

7615525.1

      f.      whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

78.     Courts in the Third Circuit have employed twelve factors to determine the reasonableness of fees.  *See Staiano v. Cain (In re Lan Assocs. XI, L.P.)*, 192 F.3d 109, 123 (3d Cir. 1999) (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974)). These factors include the following:

    (i)     the time and labor required;
    (ii)    the novelty and difficulty of the questions involved;
    (iii)   the skill required to perform the legal services properly;
    (iv)   the preclusion of employment by the attorney due to acceptance of the case;
    (v)    the customary fee charged;
    (vi)   whether the fee is fixed or contingent;
    (vii)  time limitations imposed by the client or the circumstances;
    (viii)  the amount involved and the results obtained;
    (ix)   the experience, reputation and ability of the attorneys;
    (x)    the undesirability of the case;
    (xi)   the nature and length of the professional relationship with the client; and
    (xii)  awards in similar cases.

*In re Lan Assocs, XI, L.P.*, 192 F.3d at 123, n.8.

79.     Applicant submits that consideration of the relevant factors set for in *Lan Associates*, establishes that the compensation requested is reasonable in light of the nature, extent and value of such services.

    a.     <u>Time and Labor Required</u>.    Applicant's representation of the TCC required the dedication of substantial time and effort in order to effectively address the many issues arising in this Case.

    b.     <u>Novelty and Difficulty of Questions</u>.    During the Application Period, many complex legal issues and challenges arose and/or continued to exist from before the Application Period in the Case that required Applicant's diligent attention and thoughtful deliberation.

c. <u>Skill Required to Perform the Legal Services Properly</u>. Applicant believes that its attorneys have demonstrated the skill necessary to effectively and vigorously represent the TCC and its interests.

d. <u>Preclusion of Other Employment by Applicant Due to Acceptance of this Bankruptcy Case</u>. Applicant's employment by the TCC did not preclude its acceptance of new matters unrelated to this Case.

e. <u>Customary Fee</u>. Applicant's hourly rates and fees charged are consistent with the market rate for comparable services. The rates charged are the same as those generally charged to, and paid by, Applicant's other clients. As disclosed in its application to be retained in this Case, Applicant generally revises, pursuant to its ordinary practice, its hourly rates as of October of each year.

f. <u>Fee is Fixed or Contingent</u>. Not applicable.

g. <u>Time Limitations Imposed</u>. Not applicable.

h. <u>Experience, Reputation and Ability of the Attorneys</u>. Founded in 1909, Applicant is a professional corporation of attorneys, having extensive expertise in, among other areas, the representation of creditors' committees, creditors, debtors, trustees and other fiduciaries in all facets of insolvency-related proceedings.

i. <u>Undesirability of this Bankruptcy Case</u>. Not applicable.

j. <u>Nature and Length of Professional Relationship</u>. Applicant was selected to serve as co-counsel on April 14, 2023. Prior to its selection as the TCC's co-counsel, Applicant was employed by the Ad Hoc Committee (comprised of nearly all of the members that were subsequently appointed to the TCC) to render services as of the Petition Date in the absence of an official statutory committee. Under the circumstances, the Ad Hoc Committee and the TCC seek by way of the Contribution Motion, and as alternative relief, authorization to have Applicant's employment by the TCC effective as of the Petition Date.

k. <u>Awards in Similar Cases</u>. The fees requested by Applicant are commensurate with fees that have been awarded to it in other chapter 11 cases.

80. In summary, Applicant respectfully submits that the services for which it seeks compensation in this Application were necessary and beneficial. Applicant also submits that the services rendered were performed economically, effectively and efficiently and were necessary

7615525.1

to ensure a fair and maximization of potential recovery to creditors.  Although certain services, such as participation in conference calls and meetings and review of pertinent documents, necessarily required the involvement of multiple co-counsel advising the TCC, Applicant worked closely with and coordinated with co-counsel to the TCC to assign tasks and avoid duplication of services.  Accordingly, approval of the compensation sought herein is warranted.

## DISBURSEMENTS

81.    Applicant incurred actual and necessary out-of-pocket expenses during the Application Period, which are set forth in **Exhibit H**.  By this Application, Applicant respectfully requests allowance of such reimbursement in full.  The disbursements for which Applicant seeks reimbursement include, among others:

    a.    <u>Electronic Research</u> – Applicant's practice is to bill clients for electronic research at actual cost.

    b.    <u>Photocopies</u>:  Photocopies were charged at $.10 per page.

    c.    <u>Travel Out-of-Town Lodging and Transportation</u> – Applicant's practice is to charge expenses incurred in connection with travel to and from Court for hearings, including railroad, taxi, car service, lodging, meals, car mileage, parking and tolls.  The expenses do not include luxury accommodations or deluxe meals.

**APPLICANT'S STATEMENTS REGARDING
SECTION C.5 OF THE US TRUSTEE GUIDELINES**

82.    The following is provided to comply with § C.5 of the US Trustee Guidelines.

    a.    **Question**:  Did you agree to any variations from, or alternatives to, your standard or customary billing rates, fees or terms of services pertaining to this engagement that were provided during the application period?  If so, please explain.

        **Answer**:  No.

7615525.1

b.     **Question**:  If the fees sought in this fee application as compared to the fees budgeted for the time period covered by this fee application are higher by 10% or more, did you discuss the reasons for the variation with the client?

> **Answer**:  The fees sought in the Application do not exceed the fees budgeted for the Application Period and are, in fact, considerably less than the amount budgeted.[7]

c.     **Question**:  Have any of the professionals included in this fee application varied their hourly rage based on the geographic location of the bankruptcy case?

> **Answer**:  No.

d.     **Question**:   Does the fee application include time or fees related to reviewing or revising time records or preparing, reviewing, or revising invoices?  (This is limited to work involved in preparing and editing billing records that would not be compensable outside of bankruptcy and does not include reasonable fees for preparing a fee application.)  If so, please quantify by hours and fees.

> **Answer**:  Yes.  Applicant spent 9.5 hours ($7,315.00) with respect to the review of time detail, excluding fees in connection with the preparation of a fee application for the Application Period.

e.     **Question**:  Does this fee application include time or fees for reviewing time records to redact any privileged or other confidential information?  If so, please quantify by hours and fees.

> **Answer**:  No.

f.     **Question**:   If the fee application includes any rate increases since retention: (i) Did your client review and approve those rate increases in advance? (ii) Did your client agree when retaining the law firm to accept all future rate increases?  If not, did you inform your client that they need not agree to modified rates or terms in order to have you continue the representation, consistent with ABA Formal Ethics Opinion 11-458?

> **Answer**:  N/A

---

[7]     On May 30, 2023, Applicant's proposed budget and staffing plan (the "Budget and Staffing Plan") for the period April 14, 2023 through July 31, 2023 was transmitted to the TCC.  The TCC approved Applicant's Budget and Staffing Plan.

7615525.1

### NO PRIOR REQUEST

83.     With the exception of the Monthly Fee Statements submitted in accordance with the Compensation Procedures Order, and the Contribution Motion jointly filed by the Ad Hoc Committee and the TCC, Applicant has made no prior application to this Court or any other court for the relief requested herein for the Application Period.

### CONCLUSION

**WHEREFORE**, Applicant respectfully requests that this Court enter an order (a)  final allowance of compensation in the aggregate amount of $3,828,953.00 for services rendered during the Application Period; (b) final allowance of actual, necessary expenses incurred in connection with such services in the aggregate amount of $32,533.60; (c) authorizing and directing the Debtor to pay to Applicant all fees and expenses allowed that remain unpaid, including all unpaid amounts heldback in connection with the Monthly Fee Statements and amounts requested in the Contribution Motion; and (d) granting Applicant such other and further relief as may be just or proper.

Dated:  September 8, 2023
       New York, New York

                    OTTERBOURG P.C.

                  By: */s/ Melanie L. Cyganowski*
                    Melanie L. Cyganowski, Esq.
                    Adam C. Silverstein, Esq.
                    Jennifer S. Feeney, Esq.
                    230 Park Avenue
                    New York, NY 10169
                    Tel:    (212) 661-9100
                    Fax:    (212) 682-6104
                    *Co-Counsel for the Official*
                    *Committee of Talc Claimants*

7615525.1