**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re:<br><br>LTL MANAGEMENT LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No.:  23-12825 (MBK)<br><br>Judge:  Michael B. Kaplan<br><br>**Hearing Date and Time:**<br>October 18, 2023 at 10:00 a.m. |

## DEBTOR'S OMNIBUS OBJECTION TO THE FINAL
## APPLICATIONS FOR ALLOWANCE OF FEES AND
## REIMBURSEMENT OF EXPENSES FOR THE PERIOD OF
## <u>APRIL 4, 2023 THROUGH AUGUST 11, 2023 FILED BY THE TCC PROFESSIONALS</u>

LTL Management LLC, the debtor in the above-captioned case (the "<u>Debtor</u>"), objects

(this "<u>Objection</u>") to the Final Applications for Compensation (collectively, the "<u>Applications</u>")

filed by the following parties (collectively, the "<u>TCC Professionals</u>"), which are retained by the

---

[1]     The last four digits of the Debtor's taxpayer identification number are 6622.  The Debtor's address is
501 George Street, New Brunswick, New Jersey 08933.

Official Committee of Talc Claimants (the "TCC"):  (i) Genova Burns LLC ("Genova") for the

period 4/4/2023 through 8/11/2023 [Dkt. 1338]; (ii) Brown Rudnick LLP ("Brown Rudnick") for

the period 4/4/2023 through 8/11/2023 [Dkt. 1339]; (iii) Massey & Gail LLP ("Massey") for the

period 4/4/2023 through 8/11/2023 [Dkt. 1341]; (iv) Anderson Kill P.C. ("Anderson Kill") for

the period 6/1/2023 through 8/11/2023 [Dkts. 1344 and 1424]; (v) Houlihan Lokey Capital, Inc.

("Houlihan") for the period 4/14/2023 through 8/11/2023 [Dkt. 1347]; (vi) Miller Thompson

LLP ("Miller") for the period 4/4/2023 through 8/11/2023 [Dkt. 1349]; (vii) Otterbourg P.C.

("Otterbourg") for the period 4/4/2023 through 8/11/2023 [Dkt. 1357]; (viii) Honorable Royal

Furgeson (ret.) ("Hon. Furgeson") for the period 5/19/2023 through 8/11/2023 [Dkt. 1358]; (ix)

Professor D. Theodore Rave ("Prof. Rave") for the period 5/19/2023 through 8/11/2023 [Dkt.

1359]; (x) FTI Consulting Inc. ("FTI") for the period 4/4/2023 through 8/11/2023 [Dkt. 1360];

and (xi) MoloLamken LLP ("MoloLamken") for the period 4/4/2023 through 8/11/2023 [Dkt.

1361], and further states as follows:

## PRELIMINARY STATEMENT

1.      The TCC Professionals have filed applications seeking payment of over $27

million, an amount that would have been significantly lower if the professionals had avoided (i)

excessive staffing at hearings and depositions and other internal firm duplication, (ii) duplication

of efforts among the seven firms retained by the TCC, (iii) performing unauthorized services

outside the scope of their retention, and (iv) performing tasks that did not benefit and/or were not

necessary to the administration of the estate.  Further, a significant amount of the time entries fail

to conform to the U.S. Trustee Guidelines and are subject to reduction for such non-compliance.

2.      As a preliminary matter, several Applications include improper requests for

allowance of non-compensable fees and expenses for the period **prior** to the formation of the

TCC.  Moreover, portions of the Applications duplicate amounts that are already the subject of a

demand for payment in the *Joint Omnibus Motion of the Ad Hoc Committee of Certain Talc Claimants and the Official Committee of Talc Claimants for the Allowance of Administrative Claims for Reimbursement of Expenses Incurred for the Period from April 4, 2023 Through April 14, 2023 (Prior to the Formation of the Official Committee of Talc Claimants) That Provided a Substantial Contribution in the Debtor's Case or, in the Alternative, Authorizing Retention of the TCC Professionals Effective as of the Petition Date* (the "Substantial Contribution Motion"). Dkt. 1241. Any requests for professional compensation for the period prior to the formation of the TCC should be denied outright as they do not comply with the requirements of the Bankruptcy Code. To the extent the Applications seek compensation for amounts already requested in the Substantial Contribution Motion, they should also be denied.

3. In addition to the above non-compensable amounts, a review of the Applications shows that the TCC Professionals excessively staffed hearings and depositions. As an example, at least 31 TCC Professionals (either virtually or in person) attended the status conference on June 13, 2023. Of the 31, only 5 appeared on the record at the hearing.

4. The TCC Professionals also performed work outside of the scope of their retention resulting in significant duplication and unnecessary fees. For example, Massey expended $401,978.00 in appellate related work during the final fee period, a service for which they were not expressly retained. Indeed, such efforts appear entirely duplicative of the services of MoloLamken, the professional that was retained by the TCC for appellate purposes.

5. The TCC Professionals additionally performed work that was neither beneficial nor necessary to the administration of the estate. As an example, between July 29, 2023, and August 11, 2023, the period after the case was dismissed but prior to entry of the final form of Order, TCC Professionals billed $1,056,762.50 in fees, some of which appears to be unrelated to

issues involving dismissal of the case; rather, the work appears to involve substantive professional bankruptcy or litigation services on behalf of a committee which was soon to be disbanded.

6.      A thorough review of the Applications also reveals numerous instances by multiple professionals of block billing, lumped time entries, vague time descriptions, top heavy billing, and billing by transient timekeepers, all of which violate billing guidelines established by the U.S. Trustee.  Significant examples of such objectionable time entries are set forth below.

7.      Lastly, Houlihan's exorbitant success fee, awarded at the TCC's discretion, represents a 147% bonus, compared to the monthly fees incurred.

8.      For the reasons set forth herein, the Debtor respectfully requests that the TCC Professionals' Applications be rejected and the Court enter an Order allowing fees and expenses at the reduced amounts provided in this Objection.

## BACKGROUND

9.      On April 4, 2023 (the "Petition Date"), the Debtor commenced this reorganization case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

10.     The Debtor, a North Carolina limited liability company, is a defendant in thousands of lawsuits asserting personal injuries allegedly caused by exposure to talc-containing products.  It is the direct parent of Royalty A&M LLC, a North Carolina limited liability company, which manages a portfolio of royalty revenue streams, including some based on third party sales of certain products, and will seek opportunities to acquire or finance additional royalty revenue streams.

11.     The Debtor had reached agreement on the material terms of a plan of reorganization with counsel to thousands of talc claimants.  That agreement was memorialized in a series of plan support agreements.  The Debtor commenced this chapter 11 case (the "Chapter

11 Case") to pursue confirmation of a plan of reorganization that contains the terms agreed to in

the plan support agreements.  A comprehensive description of the Debtor, its history, its assets

and liabilities and the events leading to the commencement of the Chapter 11 Case can be found

in the declaration of John K. Kim [Dkt. 4] (the "First Day Declaration"), which was filed on the

Petition Date and is incorporated herein by reference.

12.    On April 14, 2023, the United States Trustee for the District of New Jersey (the

"U.S. Trustee") filed the Notice of Appointment of Official Committee of Talc Claimants [Dkt.

162] in the Chapter 11 Case.  The TCC Professionals subsequently filed retention applications

[Dkts. 399, 400, 401, 402, 538, 539, 541, 542, 721, 722, 947], effective as of April 14, 2023,

which were later approved by Order of the Court [Dkts. 754, 755, 774, 775, 776, 777, 794, 795,

898, 899, 1052].

13.    From June 27 through June 30, 2023, the Court held a four-day hearing on the

motions to dismiss this Chapter 11 Case.[2]

14.    On July 28, 2023, the Court entered an Opinion Granting Motions to Dismiss

[Dkt. 1127] (the "Dismissal Opinion").  As of that date, the TCC Professionals were aware this

case was being dismissed, and yet they continued billing at a rate as if the Chapter 11 Case was

going to continue.

15.    On August 11, 2023, the Court entered an *Order (I) Dismissing Debtor's Chapter*

*11 Petition Pursuant to 11 U.S.C. 1112(b); (II) Establishing Procedures with Respect to*

*Requests for Compensation; and (III) Granting Related Relief* [Dkt. 1211] (the "Dismissal

Order").

---

[2]    *See* Dkts. 286, 335, 346, 350, 358, 379, 384, 480 (collectively, the "Motions to Dismiss").

16.    The Dismissal Order directed all retained professionals seeking compensation to file and serve monthly, interim and final fee applications for periods through and including the Dismissal Date within thirty (30) days of the Dismissal Date, in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of this Court, the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Retained Professionals* [Dkt. 562] (the "Compensation Procedures Order").  Objections to Applications were to be filed and served no later than twenty-one (21) days following the filing of such Fee Applications, and the Court would schedule hearings to consider the Applications.  On September 27, 2023, after agreement between the Debtor and TCC Professionals, the Court reset the objection deadline for the Applications to October 5, 2023.

17.    On August 17, 2023, the Ad Hoc Committee of Certain Talc Claimants (the "AHC") and the TCC (together, the "Substantial Contribution Claimants")[3] jointly filed the Substantial Contribution Motion.  The Motion seeks reimbursement of the fees and expenses of the following professionals incurred from April 4, 2023 through April 14, 2023, before the appointment of the TCC, or, in the alternative, modification of the retention of the TCC Professionals to be effective as of the Petition Date.

| TCC Professional | Substantial Contribution Fees | Substantial Contribution Expenses |
|---|---|---|
| Brown Rudnick | $702,628.00 | $5,359.65 |
| Genova | $85,635.00 | $369.70 |
| Otterbourg | $285,748.50 | $0 |
| FTI | $106,920.50 | $746.66 |
| Massey | $145,755.50 | $471.56 |
| **Total** | **$1,326,687.50** | **$6,947.57** |

---

[3] The Substantial Contribution Claimants consist of the following law firms retained by the AHC prior to the appointment of the TCC—Brown Rudnick, Otterbourg, Massey, and Genova, as well as the financial advisor FTI, similarly retained by the AHC prior to the appointment of the TCC.

18.    In sum, the TCC Professionals' final fee applications request a total of

$27,097,382.99 in fees and $716,013.51 in expenses.  The below chart summarizes each

Application filed by each TCC Professional:

| TCC Professional | Period | Total Fees | Total Expenses | Total Requested[4] |
|---|---|---|---|---|
| Anderson Kill | 6/1 – 8/11 | $304,955.00 | $280.25 | $305,235.25 |
| Brown Rudnick | 4/4 – 8/11 | $10,432,306.75 | $564,291.91 | $10,996,598.66 |
| FTI | 4/4 – 8/11 | $4,605,966.25 | $57,772.96 | $4,663,739.21 |
| Hon. Furgeson (ret.) | 5/19 - 8/11 | $94,400.00 | $1,960.82 | $96,360.82 |
| Genova Burns | 4/4 - 8/11 | $1,137,165.00 | $32,548.92 | $1,169,713.92 |
| Houlihan | 4/4 – 8/11 | $3,363,709.68 | $2,786.36 | $3,366,496.04 |
| Massey | 4/4 – 8/11 | $2,137,547.00 | $8,110.75 | $2,145,657.75 |
| Miller Thompson | 4/4 – 8/11 | $340,203.31 | $0.00 | $340,203.31 |
| MoloLamken | 4/4 – 8/11 | $642,789.50 | $14,700.26 | $657,489.76 |
| Otterbourg | 4/4 – 8/11 | $3,828,953.00 | $32,533.60 | $3,861,486.60 |
| Prof. Rave | 5/19 – 8/11 | $209,387.50 | $1,027.68 | $210,415.18 |
| **Total** | | **$27,097,382.99** | **$716,013.51** | **$27,813,396.50** |

**OBJECTION**

19.    Section 330 of the Bankruptcy Code governs awards of compensation and

reimbursement of expenses for work performed on behalf of the estate.  11 U.S.C. § 330.

Awards for compensation are limited to "actual, necessary services."  11 U.S.C. 330(a)(1)(A).

Courts may not grant "compensation for (i) unnecessary duplication of services; or (ii) services

that were not (I) reasonably likely to benefit the debtor's estate; or (II) necessary to the

administration of the case."  11 U.S.C. § 330(a)(4)(A).

20.    To determine reasonableness, § 330(a)(3) of the Bankruptcy Code instructs that:

>    the court shall consider the nature, the extent, and the value of such
>    services, taking into account all relevant factors, including –
>
>    (a)    the time spent on such services;

---

[4]    The following TCC Professionals included the same fees and/or expenses in their Final Fee Application as
the Substantial Contribution Motion: Brown Rudnick, FTI, Genova, Massey, and Otterbourg.  Despite
failing to file a substantial contribution motion, Miller and MoloLamken included fees and/or expenses for
the pre-TCC formation period in their Applications.

(b)     the rates charged for such services;

(c)     whether the services were necessary to the administration of, or beneficial at the time at which such services were rendered toward the completion of, a case under this title;

(d)     whether the services were preformed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue or task addressed:

(e)     with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and

(f)     whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

21.     Courts have broad discretion to award or deny attorney fees and bankruptcy courts have an independent duty to review fees requested "to assure that the services rendered were necessary and appropriate and that the fees requested are reasonable." See In re Flemings Cos., Inc., 304 B.R. 85, 89 (Bankr. D. Del. 2003) (citing In re Busy Beaver Bldg. Ctrs., Inc., 19 F.3d 833, 841 (3d Cir. 1994)).  A court cannot allow compensation for "(i) unnecessary duplication of services; or (ii) services that were not (I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case" pursuant to 11 U.S.C. § 330(a)(4)(A). 11 U.S.C. § 330(a)(4)(A); In re Silicon Alley Grp. Inc., 2017 WL 2780743, at * 2 (D.N.J. June 27, 2017) ("A Court cannot allow compensation for" services that fall under section 330(a)(4)(A)); In re DeMarco, 2016 WL 899915, at *2 (Bankr. D.N.J. Feb. 9, 2016) (noting that "[t]he [Bankruptcy] Code expressly forbids compensation of unnecessarily duplicative services" and finding sufficient evidence to show that there were unnecessary duplicative services performed by attorneys); In re Hosp. Partners of Am., Inc., 597 B.R. 763, 766 (Bankr. D. Del. 2019) (noting that the "shall not" language in section 330(a)(4)(A) "limits" the court's discretion

to award compensation); see also Busy Beaver, 19 F.3d at 856 (attorneys are obligated to

exercise same billing judgment as nonbankruptcy attorneys and to write off unproductive or

duplicative services); In re Raritan Hospitality LLC, 2011 WL 2680906, at *4 (Bankr. D.N.J.

July 8, 2011) (noting court must determine whether work was reasonably likely to benefit the

estate at the time the work is performed).

22.     The applicant bears the burden of proving that it is entitled to compensation and

that its fees were reasonable and necessary.  Flemings Cos., 304 B.R. at 89; see also Zolfo,

Cooper & Co. v. Sunbeam-Oster Co., Inc., 50 F.3d 261 (3rd Cir. 1995).  This burden is not to be

taken lightly.  In re Wyche, 425 B.R. 779, 792 (Bankr. E.D. Va. 2010) (citations omitted); see

also In re Spanjer Bros., Inc., 191 B.R. 738, 747 (Bankr. N.D. Ill. 1996).  To satisfy its burden,

an applicant must justify its charges with detailed, specific, itemized documentation.  In re

Baker, 374 B.R. 489, 494 (Bankr. E.D.N.Y. 2007); In re Bennett Funding Grp., 213 B.R. 234,

244 (Bankr. N.D.N.Y. 1997).  Time records must be detailed enough to enable a court to

determine whether the attorneys are claiming compensation for hours that are "redundant,

excessive, or otherwise unnecessary."  See, e.g., Bennett Funding, 213 B.R. at 241 (citing

Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S. Ct. 1933, 1939 (1983)); see also In re Recycling

Indus., Inc., 243 B.R. 396, 401 (Bankr. D. Colo. 2000).  Further, while overstaffing and failure to

exercise billing judgment in and of themselves warrants reduction of fees, overstaffing a file

often results in obvious duplication of time entries.  Preston Exploration Co., LP v. GSP, LLC,

2013 WL 3229678, at *9 (S.D. Tex. June 25, 2013).

23.     The Court also is empowered to review the Applications sua sponte and may

identify further bases for reduction.  See In re Redington, 2018 WL 3054678, at *2 (D.N.J. June

19, 2018) (noting that section 330(a) provides bankruptcy courts with the power to review fee

applications <u>sua</u> <u>sponte</u> or on motion from a party in interest); <u>id.</u> ("The Third Circuit has gone

further in holding that bankruptcy courts not only have the power, but also 'a **duty** to review fee

applications.'") (emphasis in original) (quoting <u>Busy Beaver</u>, 19 F.3d at 847).

24.     The following areas highlight examples of unreasonable and objectionable fees

incurred by the TCC Professionals.

**A.     Excessive Staffing Was Unreasonable and Resulted in Duplication of Services.**

25.     Professionals that overstaff a case or engage in billing that is "excessive,

redundant, or otherwise unnecessary"[5] are not entitled to full compensation.  <u>See</u> <u>In re Nat'l</u>

<u>Heritage Found., Inc.</u>, No. 09-10525, 2013 WL 3167698, at *20 (Bankr. E.D. Va. June 21, 2013)

(citations omitted); <u>see also</u> <u>Am. Civil Liberties Union of Ga. v. Barnes</u>, 168 F.3d 423, 428 (11th

Cir. 1999).  "When multiple professionals are working on the same matter, or bill for attendance

at the same proceeding, the court must be mindful of the necessity of each person."  <u>In re Manley</u>

<u>Toys Ltd.</u>, 2018 WL 3213710, at *5 (Bankr. D.N.J. July 21, 2018).  Further, overstaffing also

often results in duplication, which further justifies a reduction in requested fees.  <u>Preston Expl.</u>

<u>Co., LP v. GSP, LLC</u>, 2013 WL 3229678, at *9 (S.D. Tex. June 25, 2013).

26.     As demonstrated herein, the TCC Professionals failed to reasonably limit the

number of professionals incurring fees in this Chapter 11 Case, particularly in connection with

hearings and depositions.  The applicants permitted an extraordinary number of professionals to

attend and charge the estate for hearings, depositions and strategy sessions.  Although the Debtor

is well aware of the complexity of this case and understands that some conferencing among

---

[5]     Section 330(a)(3)(A) of the Bankruptcy Code provides that in determining the reasonableness of the
compensation to be awarded a professional, one of the factors to consider is "the time spent on such
services."  11 U.S.C. § 330(a)(3)(A).  Moreover, another factor to consider is "whether the services were
performed within a reasonable amount of time commensurate with the complexity, importance, and nature
of the problem, issue, or task addressed."  11 U.S.C. § 330(a)(3)(D).

multiple professionals regarding strategy may be necessary, there is simply no reasonable or

necessary basis for the multitude of TCC attorneys that attended hearings and depositions

particularly where only one or two had substantive speaking roles.  See, e.g., Flemings Cos., 304

B.R. at 91 (finding a reduction of fees warranted because counsel did not adequately demonstrate

that each attorney present contributed to the hearing in a meaningful way).

    **(i)**    **Hearing Over-Attendance**

27.    The TCC Professionals charged the estate **approximately $1,652,708.82** for

attendance at hearings.  The number of TCC Professionals at each of the hearings in this Chapter

11 Case during their engagement is set forth below and a detailed chart indicating the number of

attendees by firm is attached as **Exhibit A** hereto.

| Hearing Date | TCC Professional Timekeepers in Attendance | Hours Billed to Hearing Attendance[6] | Total Fees |
|---|---|---|---|
| 4/18/23 | 25 | 190.3 | $204,375.00 |
| 4/20/23 | 16 | 12.7 | $12,814.00 |
| 5/3/23 | 29 | 135.5 | $126,638.30 |
| 5/9/23 | 34 | 111.6 | $104,843.80 |
| 5/11/23 | 17 | 42.5 | $31,321.30 |
| 5/16/23 | 28 | 82.6 | $88,033.50 |
| 5/30/23 | 23 | 35.8 | $35,707.00 |
| 6/2/23 | 27 | 58.6 | $43,682.06 |
| 6/13/23 | 31 | 142.4 | $140,868.06 |
| 6/22/23 | 19 | 51.3 | $54,896.50 |
| 6/27/23 | 33 | 220.2 | $201,515.45 |
| 6/28/23 | 33 | 244.2 | $218,014.45 |
| 6/29/23 | 30 | 202.9 | $179,122.95 |
| 6/30/23 | 34 | 188.3 | $169,316.45 |
| 7/27/23 | 1 | 3.7 | $2,220.00 |
| 8/2/23 | 21 | 40 | $39,340.00 |
| **Total** | 401 | 1762.6 | $1,652,708.82 |

---

[6]    Several timekeepers lumped their time entries for hearing preparation and attendance into one entry. Where this occurred, the Debtor attempted to isolate hearing attendance by reviewing other timekeepers on that same day who separated their time entries appropriately.  Nonetheless, the figures in the chart likely understate the over-attendance of TCC Professionals.  General issues with TCC Professionals' block billing and vague time entries are addressed below.  Regardless, "[a]ny uncertainties due to poor record keeping

28.     Notably, even though the Dismissal Opinion was rendered on July 28, 2023, 21 attorneys for the TCC appeared at the August 2, 2023 hearing, incurring fees of $39,340.00.

29.     The TCC Professionals' time records also fail to reveal each attendee's substantial contribution, if any, at the hearings.  Generally, only a few TCC attorneys had speaking roles at hearings, and the Applications do not establish that the additional professionals made meaningful contributions.  This overstaffing and resulting duplication of effort at hearings was neither reasonable nor necessary and substantial reduction is warranted.

**(ii)     Deposition Attendance**

30.     Multiple TCC attorneys appeared at depositions resulting in the TCC firms seeking compensation related to 783.9 hours totaling at least **$998,781.00**[7] for attendance, <u>exclusive of time spent in preparation</u>, compared to the Debtor's counsel's 310.9 hours totaling $421,221.50.  This is more than double the fees incurred by the Debtor for the same depositions.  Enclosed as **Exhibit B** is a chart of deposition attendance by the Debtor's counsel and TCC Professionals.

31.     Further demonstrating and emphasizing the unreasonableness of deposition attendance, the majority of TCC Professionals failed to ask a single question.  Rather, Brown Rudnick and Otterbourg undertook the vast majority of questioning of the Debtor's witnesses at each deposition.[8]

---

are resolved against the applicant." <u>In re 530 W. 28th St., L.P.</u>, 2009 WL 4893287, at *8 (Bankr. S.D.N.Y. Dec. 11, 2009) (citing <u>In re Poseidon Pools of Am.</u>, 216 B.R. 98, 100-01 (E.D.N.Y. 1997)).

[7]     Additionally, FTI billed 44.5 hours totaling $32,884.50 and Houlihan billed 266 hours.  In total, all TCC Professionals spent 1,094.4 hours totaling $1,031,665.5, for merely attending depositions.

[8]     The examining attorneys for the TCC's offensive depositions were Michael Winograd, Lydell Benson, Jeffrey Jonas, Cameron Moxley, Shari Dwoskin of Brown Rudnick; and Adam Silverstein and Richard Haddad of Otterbourg.

32.     The clear duplication of effort among the numerous TCC Professionals appearing

at depositions and lack of value such substantial attendance provided to the estate warrants a

substantial reduction in the compensation awarded to these professionals.  See Daiwa Special

Asset Corp. v. Desnick, 2002 WL 31767817, at *3 (S.D.N.Y. 2002) (finding a substantial

reduction in compensation was warranted for the significant duplication of attorney efforts in

connection with the preparation and taking of depositions).

**(iii)    Intrafirm Duplication**

33.     The UST Guidelines provide that "[i]f more than one professional from the

applicant firm attends a hearing or conference, the applicant should explain the need for multiple

attendees."  UST Appendix B Guidelines, § C(9)(f); see also UST Appendix A Guidelines, §

(b)(4)(v); Local Rule 2016-1(a)(2)(D) (a fee application must contain "a narrative explaining . . .

reasons for the use of multiple professional persons for a particular activity").  While it may be

appropriate to have multiple attendees at some meetings, conferences, hearings or other events,

the applicant bears the burden to justify overlapping staffing and to identify each participant's

role.  See, e.g., Brous, 370 B.R. at 575; see also In re Kohl, 421 B.R. 115, 128 (Bankr. S.D.N.Y.

2009) ("the applicant must give an adequate explanation for more than a single attorney charging

for internal meetings . . . .  An applicant can meet this standard by identifying the other

participants and explaining the nature and purpose of the meeting."); Fleming, 304 B.R. at 91

(reducing fees where professional failed to adequately demonstrate that each attorney present at

hearing contributed to the hearing in a meaningful way).

34.     Multiple attendees from the same firm at hearings, depositions or calls with no indication of the lower billing timekeeper's role resulted in fees totaling $**909,019.50**,[9] as summarized below with more detail on **Exhibit C** attached hereto:

| TCC Professional | Total Fees of Additional Attendees |
|---|---|
| FTI | $118,368.00 |
| Genova Burns | $65,655.00 |
| Massey | $129,459.50 |
| Miller | $22,847.50 |
| MoloLamken | $5,369.50 |
| Otterbourg | $567,320.00 |
| **Total** | **$909,019.50** |

**B.      TCC Professionals Should Not Be Compensated for Services Performed Beyond the Scope of Their Retention.**

35.     Each of the TCC Professionals were authorized to act as counsel based on representations in their retention applications that each would have a "distinct purpose" differentiating justifying the hiring of seven (7) different firms.  Dkts. 399, 400, 401, 402, 541, 542, 947.  The distinct services as described by the retention applications are as follows:  (i) Brown Rudnick served as lead bankruptcy counsel, providing a deep bench of attorneys with core bankruptcy, bankruptcy litigation, and mass tort bankruptcy experience; (ii) Otterbourg served as lead mass tort/litigation counsel and special bankruptcy counsel, providing the unique perspective of a former bankruptcy chief judge and expertise in preliminary injunction and district court litigation; (iii) Massey served as special counsel, providing unparalleled mass tort and other complex case experience before trial and appellate courts, including the Supreme Court; (iv) Genova served as local counsel, one of few New Jersey firms with appropriate

---

[9]      This amount does not include Brown Rudnick's Application.  There are 400 entries of Brown Rudnick timekeepers which are objectionable on the basis of multiple attendees, totaling $1,746,717.50.  However, many of these entries include preparation for the attendance, emails related to the attendance, or unrelated matters.  As discussed below due to Brown Rudnick's significant lumped entries, the Debtor requests Brown Rudnick's final fee application be reduced across the board.

experience that is without conflicts in this case; (v) MoloLamken served as the TCC's special

counsel for appeals; (vi) Miller served as Canadian counsel to the TCC; (vii) Anderson's sole

and exclusive focus as special counsel was to be on insurance issues and on recoveries from

insurance policies sold to J&J. Id. Further, FTI was retained as the TCC's financial advisor.

Dkt. 539.

36.     It is axiomatic that services rendered outside of the scope of a professional's

retention are not compensable. See In re West End Fin. Advisors, LLC, 2012 WL 2590613, at

*14 (Bankr. S.D.N.Y. July 2, 2012); In re Cuisine Magazine, Inc., 61 B.R. 210, 216 (Bankr.

S.D.N.Y. 1986). Moreover, "[t]he fact that such unauthorized services may have been beneficial

to the estate is immaterial." Cuisine Magazine, 61 B.R. at 216; see also In re Roper &

Twardowsky, LLC, 2016 WL 7322787, at *6 (D.N.J. Dec. 14, 2016) (affirming bankruptcy

court's denial of applicant's request for compensation for services rendered outside the scope of

retention and noting that the applicant provided those services "at its own risk").

37.     The Applications reveal that Massey, Miller and FTI all performed work that

exceeded the scope of their retention, as described below, and the Court should not compensate

these applicants for such services.

### (i)     Massey's Fees Incurred in Performing Appellate Related Services

38.     Massey purportedly incurred $401,978.00 in appellate related work during the

final fee period, a service for which Massey was not expressly retained. Indeed, Massey's

retention does not disclose that it was to serve as special appellate counsel. Rather, Massey was

proposed by the TCC (and authorized by the Court) to serve a "distinct purpose" based on its

"mass tort and other complex case experience." Dkt. 402 ¶ 6(c).

39.     Moreover, permitting Massey to act as special appellate counsel conflicts with the

TCC's retention of MoloLamken as designated special appellate counsel. Massey's retention

application also explicitly acknowledges the "distinct purpose" of each of the TCC's multiple counsel and refers only to MoloLamken as appellate special counsel: "MoloLamken serves as the TCC's special counsel for appeals. MoloLamken is a preeminent appellate firm with substantial experience before the highest courts in the country, as well as before the Third Circuit Court of Appeals in LTL I." Dkt. 402 ¶ 6(e). While Massey's application touts that it has appellate experience in mass torts and complex case litigation, its retention does not include provision of appeal-related services. Thus, the TCC was not authorized to engage Massey to perform appellate services, and Massey's unauthorized appellate-based work is outside the scope of its approved services and is therefore non-compensable. Moreover, such services were also unnecessary and duplicative of the services provided by MoloLamken and provided no benefit to the estate. Massey was also well aware of the limitations on its retention to the point that certain of Massey's time records contain admissions that it is not serving as appellate counsel.[10]

40.     For example, both Massey and MoloLamken worked on drafting the appeal brief regarding the preliminary injunction order, motion for direct certification and writ of mandamus. Massey's role in providing appellate-based services was outside the scope of its retention and duplicative of MoloLamken's explicit role as appellate counsel for the Committee.

**(ii)    Miller's Fees Incurred in Performing Discovery Related Services**

41.     The scope of Miller's retention as special Canadian counsel does not allow for participation in discovery and attendance at depositions that are unrelated to their services in Canada. Yet the firm billed $22,551.00 attending or communicating about depositions and $11,837.50 on non-deposition discovery, totaling $34,388.50.

---

[10]     For example, an April 20, 2023 time entry of timekeeper Jonathan Massey acknowledges, at least implicitly, that his firm is not appellate counsel for the TCC: "Call with TCC appellate counsel to discuss next steps regarding bankruptcy court ruling on PI motion."

42.     Miller's retention application notes their "distinct purpose" as "Canadian counsel to the Committee."  Dkt. 541-1 ¶ 3(e).  The time Miller spent on depositions and non-deposition discovery is outside of this distinct scope.

### (iii)    FTI's Fees Incurred in Connection with Unauthorized Work

43.     FTI incurred fees of $434,662.00 in connection with work related to developing the TCC website, town halls, and other media activities.  These activities clearly exceeded the scope of FTI's role as Financial Advisor, not a public relations advisor, to the TCC.  Thus, this unauthorized work was unnecessary and provided no benefit to the estate.

44.     Further, FTI's application has a substantial amount of work attributed to a senior vice president that does not appear to be an employee of FTI.  Timekeeper Alexander Rinaudo is identified as a senior vice president at Lexecon.  He is purported to have billed $564,139.00 but unlike other professionals at his level, he is not listed on the Lexecon or FTI website.  Moreover, Mr. Rinaudo's LinkedIn profile states that he works for EconOne, an expert retained by the FCR. FTI did not file any disclosure related to this employee's connection with EconOne. Accordingly, the Debtor objects to the entirety of the amounts billed by Mr. Rinaudo.

## C.    TCC Professionals Should Not Be Compensated for Services That Either Did Not Benefit and/or Were Not Necessary to the Administration of the Debtor's Estate.

45.     The Applications seek compensation for services that either did not benefit the Debtor's estate and/or were not necessary to the administration of the Debtor's estate—most notably, (i) FTI's fees related to estimation, totaling $2,679,886.00, and (ii) substantial work that continued after the Dismissal Opinion was rendered, such as work on insurance-related matters, that could not conceivably have benefited the estate.

(i)      **Unnecessary Fees Incurred Between July 29 and August 11**

46.      Disregarding their expiring role as the Chapter 11 Case would soon be dismissed by Order of the Court, TCC Professionals continued to bill at the same unreasonable rate they had over the course of the Chapter 11 Case.  After the Dismissal Opinion was issued and before the Dismissal Order was entered, TCC Professionals billed $1,056,762.50 in fees, yet most of those services had nothing to do with issues related to dismissal.

47.      For example, of the amounts incurred from July 29, 2023 through August 11, 2023, roughly **$396,442.31** related to work on and related to the form of Dismissal Order.  A large portion of the remaining fees appear to have been generated by firms billing for substantive legal services unrelated to dismissal, as though the Dismissal Opinion had not been rendered, incurring substantial fees:

| TCC Professional | Total Fees of Post-Dismissal Opinion Substantive Work |
|---|---|
| Anderson Kill[11] | $82,470.50 |
| FTI | $27,557.50 |
| Massey | $21,280.00 |
| **Total:** | **$131,308.00** |

48.      Although the Debtor submits that nearly $400,000 in fees for work related to the Dismissal Order itself appears to have been excessive, certainly all or a substantial portion of the $131,308.00 in fees incurred by firms with limited roles in this case for services unrelated to the Dismissal Order were excessive and/or not necessary to the administration of the estate and should not be approved.

(ii)      **FTI's Fees Related to Estimation, an Expert Report, and Motions to Dismiss**

49.      FTI incurred $2,679,886.00 in fees related to estimation.  At least $707,331.00 of these fees are related to drafting and research for an expert report, yet it rendered no expert report

---

[11]      27% of Anderson Kill's total fees ($304,955.00) were generated post-Dismissal Opinion.

in connection with the motions to dismiss in this Chapter 11 Case or for any other purpose. Thus, the applicant failed to produce a work product notwithstanding billing more than $700,000 for doing so.  And estimation was not an issue that was ever before the Court in this case.  Such services are particularly questionable given that FTI previously billed over $5.1 million in fees in the 2021 Chapter 11 Case related to estimation, and generated a report in connection with the motions to dismiss in that case.  FTI has not demonstrated that such fees provided any benefit to the estate, particularly given the previous amounts already billed for the same service.

50.    Moreover, FTI's application contains questionable entries that suggest significant overbilling on estimation matters by its professionals.  Large blocks of time from FTI timekeepers are devoted to single tasks, yet those timekeepers appear to artificially break up those entries to ensure that each such entry is under 4 hours.[12]  This issue is endemic at all levels of seniority and some timekeepers have three separate entries devoted to the same task on the same day.  Some examples below:

| Date | Professional | Hours | Rate | Total | Activity |
|---|---|---|---|---|---|
| 6/9/2023 | O'Brien, Daniel | 1.3 | $1,055.00 | $1,371.50 | Prepare summary re: key takeaways from expert report of C. Mullin. |
| 6/9/2023 | O'Brien, Daniel | 1.9 | $1,055.00 | $2,004.50 | Continue to prepare summary re: key takeaways from expert report of C. Mullin. |
| 6/9/2023 | O'Brien, Daniel | 1.7 | $1,055.00 | $1,793.50 | Further prepare summary re: key takeaways from expert report of C. Mullin. |
| 6/30/2023 | Kubali, Volkan | 2.8 | $1,210.00 | $3,388.00 | Develop code for alternative models re: estimation of meso liability. |
| 6/30/2023 | Kubali, Volkan | 2.9 | $1,210.00 | $3,509.00 | Continue to develop code for alternative models re: estimation of meso liability. |
| 6/30/2023 | Kubali, Volkan | 2.1 | $1,210.00 | $2,541.00 | Further develop code for alternative models re: estimation of meso liability. |
| 6/30/2023 | Tai, Nikki | 3.8 | $510.00 | $1,938.00 | Prepare updated future claims analysis re: ovarian claims estimation. |

---

[12]    Of FTI's 3,503 entries, none are four hours or higher, however 910 of those entries contain the word "continue" and/or "further."

| 6/30/2023 | Tai, Nikki | 3.3 | $510.00 | $1,683.00 | Continue to prepare updated future claims analysis re: ovarian claims estimation. |
|---|---|---|---|---|---|
| 6/30/2023 | Tai, Nikki | 3.4 | $510.00 | $1,734.00 | Further prepare updated future claims analysis re: ovarian claims estimation. |
| 7/18/2023 | Scheff, William | 3.8 | $475.00 | $1,805.00 | Prepare updated expert report slides re: estimation of meso liability. |
| 7/18/2023 | Scheff, William | 2.8 | $475.00 | $1,330.00 | Continue to prepare updated expert report slides re: estimation of meso liability. |
| 7/18/2023 | Scheff, William | 2.9 | $475.00 | $1,377.50 | Further prepare updated expert report slides re: estimation of meso liability. |

51.     Separate and apart from the unnecessary work FTI completed related to

estimation, FTI also incurred fees totaling $171,704.00 related to reviewing, summarizing, and

discussing expert reports related to the motions to dismiss.  FTI had no expert role in the hearing

on the motions to dismiss and cannot be said to have provided any benefit to the estate.

**(iii)    Massey's Fees Incurred in Performing Appellate Related Services**

52.     As discussed above at section B(i), Massey performed duplicative services

outside the scope of its retention related to appellate work, despite MoloLamken's retention for

the explicit purpose of rendering those services to the TCC.  For the reasons stated above, these

services did not provide any benefit to the estate and Massey's fees of $401,978.00 related to

these services should not be allowed.

**(iv)    Anderson Kill**

53.     Anderson Kill was identified as special insurance counsel, a role that was no

longer necessary upon issuance of the Dismissal Opinion.  Yet, as noted above, Anderson Kill

aggressively billed substantive work.  Moreover, it billed at least $4,374.00 in non-substantive

services related to review of press, updating monitoring charts and review of unrelated pleadings

that clearly had no connection to its role as special insurance counsel.

54.     Further, Anderson Kill billed $3,505.00 for services related to reviewing and/or revising its retention application in July, which is subsequent to the filing of its retention application on June 29, 2023.  Dkt 947.

**(v)     MoloLamken's and Massey's Fees Incurred in Seeking a Writ of Mandamus**

55.     MoloLamken and Massey incurred fees of $64,686.25 and $79,598.00, respectively, in connection with work seeking a writ of mandamus.  The writ of mandamus, seeking remand with instructions to dismiss and vacate the preliminary injunction, was filed while an appeal of the preliminary injunction was pending in the District Court, and was duplicative of the TCC's motion for direct certification, which was denied by this Court.  As discussed in the Debtor's opposition to the writ, mandamus provides a "drastic remedy that a court should grant only in extraordinary circumstances in response to an act amounting to a judicial usurpation of power."  In re Diet Drugs Prods. Liab. Litig., 418 F.3d 372, 378 (3d Cir. 2005) (citation omitted).  The writ of mandamus was a scorched earth tactic that was summarily denied by the Third Circuit, without argument or the rendering of an opinion.  In denying the writ, the Third Circuit recognized that "the writ of mandamus is a drastic and extraordinary remedy and there are other adequate means for the petitioner to obtain the relief it seeks," further emphasizing the unnecessary nature of such a tactic.  This work did not provide a benefit to the estate and these fees should be disallowed in their entirety.

**D.     TCC Professionals' Block Billing, Lumping and Vague Time Entries Should Result in a Percentage Reduction of the Requested Fees**

56.     The Applications are replete with time entries that demonstrate block billing, lumping, top heavy billing and include vague descriptions of the work performed and work performed by transient timekeepers.  Such time should not be compensable.

57.     A professional is required to bill each task separately, and billing records must

clearly identify each discrete task performed and the precise amount of time spent.  Baker, 374

B.R. at 494; see also In re Fibermark, Inc., 349 B.R. 385, 395 (Bankr. D. Vt. 2006).  This permits

a court to scrutinize the reasonableness of the time expended and avoids a temptation to inflate

the actual time spent and group multiple tasks together hoping to camouflage the true length of

an individual task.  See, e.g., Molefi v. The Oppenheimer Tr., 2007 WL 538547, at *7 (E.D.N.Y.

Feb. 15, 2007).

58.     It is especially difficult for a court to evaluate reasonableness when a group of

attorneys block bill and work together on a task with no differentiation as to how much time each

attorney spent on a task.  See Baker, 374 B.R. at 494.  This is because it is unfeasible for a court

to tell if attorneys' work is complimentary, and not duplicative, since block billing prevents a

court from knowing whether one attorney is primarily working on a task, and thus billing more

hours, while another is simply reviewing and revising. See, e.g., Steffen v. Senterfitt, 2007 WL

1601750, at *5 (M.D. Fla. June 1, 2007); Daiwa Special Asset Corp., 2002 WL 31767817, at *3;

In re Malden Mills Indus., 281 B.R. 493, 498 (Bankr. D. Mass. 2002); See also In re Worldwide

Direct, 316 B.R. 637, 643 (Bankr. D. Del. 2004).[13]

59.     Likewise, with respect to strategy, internal communications, research or

reviewing materials, the time entries must provide at least a minimum description sufficient to

ascertain the discrete task being performed.  Entries that contain such vague characterization of

the services performed such as "review materials or docket," "litigation matters and admin.,"

"confer regarding," "research," "strategy meeting re: work processes," and "trial prep" fail to

---

[13]     Not surprisingly, the United States Trustee's large case guidelines also address block billing. "*Block billing or lumping*: Whether the entries in the application are recorded in increments of .1 of an hour and whether discrete tasks are recorded separately.  The United States Trustee will object to block billing or lumping." UST Appendix B Guidelines, § B(1)(h).

adequately describe the services provided and are routinely disallowed.  See, e.g., Malden Mills Indus., 281 B.R. at 498 ("Charging 10 or more hours a day described by only such terse notations as 'attend to management tasks' is unacceptable and grounds for reduction in the amount of fees awarded.").

60.    Because of block or vague billing, a timekeeper fails to sustain his/her burden of proving that his or her fees are reasonable.  See Busy Beaver, 19 F.3d at 841; In re Brous, 370 B.R. 563, 576 (Bankr. S.D.N.Y. 2007).  Consequently, courts summarily will disallow time for discrete legal services merged together in a fee application.  See Baker, 374 B.R. at 494, 496 (bankruptcy court deducted 20 percent from the requested fees for improper block billing and 30 percent reduction for vague time entries); In re Adventist Living Ctrs., Inc., 137 B.R. 701, 706 (Bankr. N.D. Ill. 1991) (court reduced by 50% the amount of fees requested for lumped time entries); see also Zolfo, 50 F.3d at 261 (finding that a reduction of 12% was not abuse of discretion).  Indeed, courts in this district have sustained objections on the same basis.  See Raritan Hospitality, 2011 WL 2680906, at *4 ("Finally, there are some instances where [counsel's] time entries are lumped or presented in an unacceptably vague manner.  The Court will make an additional $3,000 adjustment in sustaining that objection.").

61.    Instances of block billing, lumping or vague billing in the Applications total in excess of **$2,472,370.00**,[14] including substantial amounts of time billed to research, litigation strategy, internal strategy and internal communications/meetings, which should not be compensable because the time entries lack sufficient detail.  Notably, a substantial number of vague time entries occurred in partner time entries.  Examples of block billed, lumped or vague

---

[14]    This amount does not include Brown Rudnick's Application, which, as discussed below due to Brown Rudnick's significant lumped entries, the Debtor requests be reduced across the board.

time entries are attached hereto as **Exhibit D** hereto.  The Debtor requests reduction of 33% of

the fees associated with top heavy, block billed, lumped or vague time entries or entries by

transient timekeepers:

| TCC Professional | Total Hours | Total Fees |
|---|---|---|
| Anderson Kill | .3 | $119.00 |
| FTI | 338.5 | $302,783.50 |
| Hon. Furgeson (ret.) | 21.5 | $21,500.00 |
| Genova Burns | 1,060.6 | $648,560.00 |
| Massey & Gail | 249.6 | $201,343.00 |
| Miller Thompson | 40.6 | $32,452.00 |
| MoloLamken | 207.1 | $232,520.00 |
| Otterbourg | 1,010.8 | $973,155.00 |
| Prof. Theodore Rave | 68.5 | $59,937.50 |
| **Total** | **2,997.5** | **$2,472,370.00** |

62.      By way of example, one Otterbourg timekeeper, Chaim Aronov, billed 100% of

his time in .5 increments.  As an example of a vague time entry, in Brown Rudnick's

Application, one timekeeper billed 11.9 hours, with a description of "DEPOSITION

PREPARATION."  Without further information, the Debtor, the United States Trustee and the

Court cannot know what deposition the timekeeper was preparing for or what they did to prepare

for it.

63.      The TCC Professionals also frequently described communications with "co-

counsel," "TCC counsel" or "professionals," rather than identifying a specific person or firm.

This is inherently vague, as the TCC has retained seven different firms as counsel and two firms

as advisors.  It is unclear from the entries whether these terms refer to all of the TCC's counsel or

professionals (which could implicate certain special counsel exceeding their scope on some

topics) or only some counsel, which is vague.  As evidence that the TCC Professionals knew the

term "TCC counsel" is vague, some entries clarify certain counsel that is included.

64.      Absent detailed descriptions of the services performed by TCC Professionals and

the exact amounts of time spent on such services, the Debtor, the United States Trustee, and the

Court are not able to ascertain (i) whether the time spent was reasonable, (ii) whether the work performed benefitted the estate, and (iii) whether the total billed for such services should be compensable.  Accordingly, a reduction in compensation is warranted.

65.    For Brown Rudnick, the Debtor urges this Court to make a 33% percentage reduction of Brown Rudnick's Application, rather than entry-specific reductions.  1,276 of 3,301 time entries by Brown Rudnick timekeepers are lumped together with multiple services in a single entry, contrary to the UST Guidelines.  UST Appendix A Guidelines, § (b)(4)(v) ("Services should be noted in detail and not combined or ''lumped'' together, with each service showing a separate time entry. . . .").[15]  Additionally, within those entries are vague and further lumped entries.  Examples are contained in **Exhibit E**.  Isolation of discrete vague or lumped amounts is extremely burdensome in this circumstance.  Courts have found that across the board percentage reductions in the fees requested are routinely utilized for efficiency purposes when the billing records are voluminous, as they are in this Chapter 11 Case.  See Daiwa Special Asset Corp., 2002 WL 31767817 at *2 (courts need not spend their time "set[ting] forth item-by-item findings concerning what may be countless objections to individual billing items") (citing Lunday v. City of Albany, 42 F.3d 131, 134 (2d Cir. 1994)); see also In re Poseidon Pools of Am., 180 B.R. 718, 751 (Bankr. E.D.N.Y. 1995); Adventist Living Ctrs., 137 B.R. at 706.

**E.    Excessive Expenses**

66.    A court may allow reimbursement of expenses that are "actual" and "necessary." 11 U.S.C. § 330(a)(1)(B).  "This provision reflects Congress' intent to protect the estate from

---

[15]    See also UST Appendix B Guidelines, § C(9)(d) "Services should be described in detail and not combined or 'lumped' together, with each service showing a separate time entry. Each timekeeper, however, may record one daily entry that combines tasks for a particular project that total a de minimis amount of time if those tasks do not exceed .5 hours on that day."  Brown Rudnick ignored these guidelines and should receive an across the board percentage reduction.

excessive and unreasonable expenditures." <u>Fleming</u>, 304 B.R. at 99.  In other words, the Debtor should not have to bear the costs for lavish and unnecessary expenditures.

67.    "In order to be deemed sufficient, a professional's fee application should clearly identify, describe, and explain the services and expenses charged to the estate clearly, so that the court is able to evaluate the reasonableness of the compensation requested."  3 Collier on Bankruptcy ¶ 330.03[6] (16th ed. 2022).  The Applications fall woefully short of this standard in regards to the expenses referenced above, and those expenses should not be allowed.

68.    The Debtor has requested backup documentation for expenses that are not properly identified and reserves the right to supplement this Objection after receipt and review thereof.

**F.    Travel Not Billed at Half Rate**

69.    Hon. Furgeson (ret.) failed to bill travel at half of its normal rate, resulting in excess fees of $4,000.

70.    The Compensation Procedures Order states that "[t]ime spent traveling without actively working on the Chapter 11 Case shall be billed at 50% of the professional's normal hourly rate."  Compensation Procedures Order ¶ 2(c).  Accordingly, this time should have been billed at half of its normal rate, and such Application should be reduced by $4,000.

**G.    Time Entry Errors**

71.    Some entries from timekeepers at Brown Rudnick and Genova are clear errors because:  (i) multiple days are billed in one entry, (ii) a deposition or hearing is noted as a service rendered, yet one did not occur that day, (iii) duplicative entries on the same day for the same task by the same time keeper and for the same amount, (iv) total hours does not match the description in lumped entries, or (v) the entry is blank.  The total amount billed for these errors is $24,144.50, as outlined in **Exhibit F**.

**H.      Houlihan Lokey's Discretionary Bonus**

72.      Houlihan Lokey is seeking to collect a $2,000,000 discretionary bonus from the

TCC awarded as a success fee.  Houlihan does not even attempt to articulate why it is entitled to

a premium over its regular monthly payments, which totaled $1,363,709.68.  Importantly, this is

not a case where Houlihan was authorized in its retention papers to charge a transaction fee on

the occurrence of an event.  Rather Houlihan seeks a pure fee enhancement of $2 million in

excess of its lodestar fees.  There is a strong presumption that the lodestar represents a

reasonable fee.  In re Celotex Corp., 232 BR 484, 487 (M.D. FL 1998) (citing Pennsylvania v.

Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 565 (1986)).  Fee enhancements

are impermissible without a showing of "rare and exceptional circumstances."  In re Pilgrim's

Pride Corp., 690 F.3d 650, 660 (5th Cir. 2012).  There is nothing in Houlihan's application

which satisfies the high bar to granting such an enhancement.  Further, the outcome of this

Chapter 11 Case did not result in settlement, resolution of any claims or confirmation of a plan,

which could, under some circumstances, justify a discretionary bonus or "success fee."

73.      In the Court's *Order Authorizing Retention of Houlihan Lokey Capital, Inc. as

Investment Banker to the Official Committee of Talc Claimants Under Bankruptcy Code Section

328(a) Effective April 14, 2023* [Dkt. 899], the Court "retain[ed] all rights to review and object to

Houlihan Lokey's monthly, interim and final fee applications (including expense reimbursement

and any request for counsel fees) based on the reasonableness standard in section 330 of the

Bankruptcy Code."  Further, "[n]otwithstanding anything contained herein or in the Agreement

to the contrary, the Court retains its rights to sua sponte review and raise objections to Houlihan

Lokey's request for payment of the Deferred Fee (as defined in the Agreement) and, as may be

applicable, the Discretionary Fee."  Id.

74.     The lodestar amount paid to Houlihan is presumptively reasonable, and courts have denied the payment of comparable discretionary fees to financial advisors employed by creditor committees under similar circumstances.  See In re Northwest Airlines Corp., 400 B.R. 393 (Bankr. S.D.N.Y. 2009).  When the professional "has already been sufficiently compensated for the services it performed," and "the [Discretionary] Fee would result in an excessive (i.e., unreasonable) award of compensation under the circumstances of th[e] case" the request will be denied.  Id. at 401.  This is so "even if comparably skilled financial advisors received 'substantially larger fees' in this case and in similar cases."  Id. at 402.

75.     It should also be noted that Houlihan (i) billed 245.5 hours **after** the Motion to Dismiss trial, (ii) had **six** attendees at each of the nine hearings it was present for, and (iii) spent time on unnecessary work, such as reviewing documents that had nothing to do with their report (for example, "Review of motion of Ad Hoc Committee of Supporting Counsel to shorten time").  Further, Houlihan's work was duplicative of work performed in the 2021 Chapter 11 Case, where it was also retained by the committee in that case to assess the financial condition of the Debtor.  Therefore, much of the background, onboarding, and analysis was already completed.  This is clearly excessive and did not provide a benefit to the estate.

76.     Houlihan is already seeking $1,363,709.68 independent of the payment of any discretionary fee.  This number presumptively represents sufficient compensation for the services Houlihan has rendered, and Houlihan has made no showing that an enhancement of any amount is appropriate.

77.     The Debtor reserves the right to modify or supplement this Objection up to the date of the hearing and file a response to any replies of the TCC Professionals, if any.

## <u>CONCLUSION</u>

WHEREFORE, the Debtor respectfully requests this Court to decline to award the TCC

Professionals the full compensation of fees and expenses requested in the Applications and grant

such other and further relief to the Debtor as the Court deems just and proper.

Dated: October 5, 2023

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul R. DeFilippo*
Paul R. DeFilippo, Esq.
James N. Lawlor, Esq.
Joseph F. Pacelli, Esq. (admitted *pro hac vice*)
Stephanie A. Weaver, Esq. (admitted *pro hac vice*)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com
jlawlor@wmd-law.com
jpacelli@wmd-law.com
sweaver@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*