**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo, Esq.
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

| | |
|---|---|
| In re: | Chapter 11 |
| LTL MANAGEMENT LLC,[1] | Case No.: 23-12825 (MBK) |
| Debtor. | Judge: Michael B. Kaplan |
| | **Hearing Date and Time:** October 18, 2023 at 10:00 a.m. |

## DEBTOR'S OBJECTION TO JOINT OMNIBUS MOTION FOR ALLOWANCE OF SUBSTANTIAL CONTRIBUTION CLAIMS

LTL Management LLC, the debtor in the above-captioned case (the "Debtor"),

files this objection to the *Joint Omnibus Motion of the Ad Hoc Committee of Certain Talc*

*Claimants and the Official Committee of Talc Claimants for Allowance of Administrative Claims*

---

[1]      The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

*for Reimbursement of Expenses Incurred for the Period from April 4, 2023 Through April 14,*

*2023 (Prior to the Formation of the Official Committee of Talc Claimants) That Provided a*

*Substantial Contribution in the Debtor's Case or, in the Alternative, Authorizing Retention of the*

*TCC Professionals Effective as of the Petition Date* [Dkt. 1241] (the "<u>Motion</u>") jointly filed by

the Ad Hoc Committee of Certain Talc Claimants (the "<u>AHC</u>") and the Official Committee of

Talc Claimants (the "<u>TCC</u>") (collectively, the "<u>Substantial Contribution Claimants</u>" or the

"<u>Movants</u>")[2]. In support of this objection, the Debtor respectfully states as follows:

## <u>PRELIMINARY STATEMENT</u>

Mimicking arguments made in the Debtor's prior Chapter 11 proceeding

(the "2021 Case") by other counsel for various individual talc claimants, Movants seek the grant

of substantial contribution claims for aggressively opposing the Debtor at every turn in this case

until the TCC was formed.   The services, however, resulted in no discernable benefit to the

Debtor's estate, or to the more than 50,000 talc claimants whose counsel executed plan support

agreements and would have materially benefited from a confirmed plan.  Movants alternatively

seek to make the retention of the TCC Professionals effective as of the Petition Date – an

argument that is without any precedent and which should be summarily denied.

The Movants' decision to purportedly incur approximately $1.3 million in fees

pre-committee formation was made not for the benefit of all talc claimants; indeed, a majority of

talc claimants were supportive of the Debtor's filing.  Moreover, each of the issues Movants

purport to have pursued for the benefit of the estate could have been addressed after the

---

[2]     The Substantial Contribution Claimants consist of the following law firms retained by the AHC prior to the appointment of the TCC—Brown Rudnick LLP ("<u>Brown Rudnick</u>"), Otterbourg, P.C. ("<u>Otterbourg</u>"), Massey & Gail LLP ("<u>Massey & Gail</u>"), and Genova Burns LLC ("<u>Genova Burns</u>"), as well as the financial advisor FTI Consulting ("<u>FTI</u>"), similarly retained by the AHC prior to the appointment of the TCC (collectively, the "<u>TCC Professionals</u>").

NAI-1537540909

committee was appointed by the U.S. Trustee.  These issues were ultimately litigated to their

completion well after the TCC was appointed, at great cost to the estate, by a myriad of counsel

representing various talc claimants, as well as the eventual counsel for the TCC.  And, in any

event, Movants' efforts in connection with the First Day Motions, their *sua sponte* request for

dismissal and preliminary injunction ultimately were essentially unsuccessful, as the First Day

Motions were granted in their entirety, the request for *sua sponte* dismissal denied and the

preliminary injunction stayed claimants from commencing or continuing any trials or appeal of

any talc claims.  *Order Dissolving Temporary Restraining Order, Extending the Automatic Stay,*

*and Granting Limited Preliminary Restraints* [Adv. Dkt. 91].

      In addition, it was clear at a very early stage that relief would not be entered on a

prejudicial or permanent basis prior to the appointment of an official committee and committee's

retention of counsel (as is common in chapter 11 cases, both mass tort and otherwise).  That is

because, in accordance with the Local Rules, the proposed orders for each of the First Day

Motions included a provision that any party may move for modification thereof, which the AHC

did not seek.  Further, the Debtor conferred with interested parties regarding issues raised with

respect to the TRO, which were resolved by the entry of an amended TRO, as defined below.[3]

Thus, there simply was no need for the AHC to generate over $1.3 million in legal expenses in

10 days pursuing arguments that could have been presented after the TCC's formation.

Moreover, Movants spent wasteful time raising superficial arguments in opposition to typical

administrative First Day Motions, given that they were simultaneously pursuing immediate

substantive relief of dismissal prior to the First Day Hearing.  This unnecessary exercise, which

cost $493,474.50, was a frivolous pursuit with no merit.  The estate should not be forced to bear

---

[3]      Paragraph 5 of the TRO also allowed any party to seek relief from the TRO.

the cost of Movants' determinations to pursue a scorched-earth litigation strategy for the benefit

of certain individual talc claimants and their counsel—particularly when the strategy could have

been, and was, pursued after TCC appointment.

Substantial contribution claims are extraordinary, rarely granted and are meant to

compensate a creditor for non-duplicative services that directly and materially **contribute** to the

reorganization—they are not a blank check for counsel to pursue their clients' (or worse, their

own) goals at the estate's expense.  It cannot be disputed that that Movant's goal in seeking

immediate dismissal was in direct conflict with the goal of the majority of talc claimants, who

wanted the reorganization to proceed, undermining Movants' assertions that their services

benefited all talc claimants.  Authorizing the substantial contribution requests here would also set

a dangerous precedent that could be utilized by nearly any law firm participating in a chapter 11

case before the formation of an official committee to recoup costs incurred in performing

excessive and unnecessary work without any of the safeguards applicable to retained

professionals.

The Court should also reject Movants' unprecedented attempt to have the TCC

Professionals to be treated as if they were retained for a time period before their client was even

formed.  Essentially the Movants are asking the Court to hold that a non-existent entity can be

deemed to have already chosen and retained professionals, a fiction Movants do not even attempt

to support with any relevant citations.  Compensating professionals for aggressively advocating

on behalf of individual creditors as if they are representing a yet-to-be formed formal committee

is not supported by the Bankruptcy Code.  Such relief also raises a myriad of legal and ethical

questions as to whom the professionals were serving – an anticipated statutory fiduciary or the

creditors on whose behalf they were filing pleadings.

NAI-1537540909

The Motion should be denied in its entirety.

## RELEVANT BACKGROUND

*Initial Filings and the Adversary Proceeding*

1.      The Debtor filed its voluntary petition under chapter 11 of the Bankruptcy Code on April 4, 2023 (the "Petition Date") in the United States Bankruptcy Court for the District of New Jersey [Dkt. 1].

2.      The Debtor had reached agreement on the material terms of a plan of reorganization with counsel to tens of thousands of talc claimants.  That agreement was memorialized in a series of plan support agreements.  The Debtor commenced the chapter 11 case to pursue confirmation of a plan of reorganization that contains the terms agreed to in the plan support agreements.

3.      On the Petition Date, the Debtor also filed various applications and motions seeking traditional, first day relief.  These included a motion requesting an order suspending entry and service of standard notice of commencement of case [Dkt. 5], a motion for an order authorizing the Debtor to file a list of the top law firms with talc claims against the Debtor in lieu of the list of the 20 largest unsecured creditors [Dkt. 10], a motion for an order authorizing the Debtor to retain a claims and noticing agent [Dkt. 11], a motion for an order (I) approving the continued use of its bank account and business forms and (II) authorizing the Debtor's bank to charge certain fees and other amounts [Dkt. 13], and a motion to extend time to file missing schedules [Dkt. 14] (collectively, the "First Day Motions").[4]  In accordance with District of New Jersey Local Bankruptcy Rule ("D.N.J. LBR") 9013-5(e), the proposed orders for each of these

---

[4]      The Debtor also filed an application for designation as a complex chapter 11 case [Dkt. 6] and a motion pursuant to 11 U.S.C. § 1505 for an order authorizing it to act as foreign representative on behalf of the Debtor's estate [Dkt. 12], to be heard at the hearing on the First Day Motions.

NAI-1537540909

first day filings included a provision that "[a]ny party may move for modification of this Order in accordance with D.N.J. LBR 9013-5(e)."  <u>See</u> Dkt. 5, Proposed Order ¶ 6; Dkt. 10, Proposed Order ¶ 11; Dkt. 11, Proposed Order ¶ 25; Dkt. 13, Proposed Order ¶ 15; Dkt. 14, Proposed Order ¶ 7.

4.      Pursuant to D.N.J. LBR 9013-5, the Debtor also filed an application for expedited consideration of first day matters [Dkt. 15].  On April 5, 2023, the Court entered an order granting the application for expedited consideration of first day matters [Dkt. 29], scheduling a hearing for April 11, 2023 at 10:00 a.m. (ET) (the "<u>First Day Hearing</u>").

5.      Notwithstanding the reservation of rights in the proposed orders of the First Day Motions, nine members of the Original TCC decided *ex parte* to form an ad hoc committee, in order to "timely respond to the Debtor's flurry of filings," Mot. ¶ 13, despite the ability of any party in interest or committee appointed by the U.S. Trustee to seek modification of any first day order pursuant to D.N.J. LBR 9013-5(e).  In advance of the First Day Hearing, the AHC determined to contest the First Day Motions through a blanket objection, which was unsuccessful, and now seeks substantial contribution claims totaling $361,673.50 for those misplaced efforts.  In addition to the blanket objection to the First Day Motions, the AHC also filed an informational brief [Dkt. 79], requesting the Court *sua sponte* dismiss the bankruptcy case, an effort that fared equally as poorly.  The Movants should not be rewarded for tactics that amounted to nothing more than harassment.

6.      On April 11, 2023, the Court held the First Day Hearing.  The Movants appeared at the First Day Hearing and, in line with their filed objection, and contrary to their statement that they "played an important role", Mot. ¶ 19, presented no argument on the First Day Motions, beyond a bare statement that the motions should not be granted because "this bankruptcy case is

NAI-1537540909

illegitimate and shouldn't continue."[5]  At the hearing, the Court granted the First Day Motions

and acknowledged that these were standard orders, and it would not be necessary to enter them

as interim, as they "should not be controversial."  See Apr. 11, 2023 Hr'g Tr. 128:7-17.  As a

result, and contrary to the AHC's suggestions, there was no need to "protect the broad interests

of talc claimants until an official committee was appointed in LTL 2.0."  Mot. ¶ 13.

Additionally, the Court declined to *sua sponte* dismiss the case, because "it flies in the face of

Rule 2002, the Code, Section 1112" and there was no record to support appellate review of such

a dismissal.  See Apr. 11, 2023 Hr'g Tr. 123:23-124:6.  All of which were or should have been

known to the Movants who now seek compensation for those misguided efforts.

7.     The Debtor also commenced an adversary proceeding [Adv. Pro. No. 23-1092]

(the "PI Adversary Proceeding") on April 4, 2023, and filed a motion seeking to stay or

preliminarily enjoin, as applicable, the prosecution of certain actions against non-debtor parties

[Adv. Dkt. 2] (the "PI Motion").  The PI Motion also sought a temporary restraining order

pending a final hearing on the motion.  On April 5, 2023, the Court entered an *Ex Parte*

*Temporary Restraining Order and Declaratory Judgement* [Adv. Dkt. 9] ("TRO").[6]  The Court

scheduled a hearing on continuation of the preliminary injunction for April 18, 2023.  Counsel to

the AHC filed an objection to the PI Motion, for which they now seek substantial contribution

claims of approximately $305,038.50.

8.     Late in the day on April 14, 2023, the U.S. Trustee appointed the TCC.

[Dkt. 162].  The TCC subsequently filed retention applications on May 3, 2023 [Dkts. 399, 400,

---

[5]        See Apr. 11, 2023 Hr'g Tr. 125:4-14.

[6]        As a result of subsequent conferences between the Debtor and interested parties regarding issues raised
           with respect to the TRO, further amended TROs were entered.  Adv. Dkts 15, 16, 20 (together, the
           "Amended TROs").

401, 402] and May 17, 2023 [Dkt. 539], effective as of April 14, 2023, which were later

approved by Order of the Court [Dkts. 754, 755, 774, 776, and 777]. No application was ever

made to deem the TCC Professionals retained before their client came into existence.

9.      The Motion seeks reimbursement of counsels' fees and expenses from April 4,

2023 through April 14, 2023, before the appointment of the TCC, or, in the alternative,

modification of the retention of the TCC Professionals to be effective as of the Petition Date.

## OBJECTION

### I.  Movants Have Failed to Demonstrate a Direct Material Benefit to the Debtor's Estate That Would Warrant Allowance of Substantial Contribution Claims.

10.      In the 2021 Case, certain TCC Professionals filed a substantial contribution claim,

which this Court granted in part and denied in part on September 25, 2023. Case No. 21-30589,

Dkt. 3973 (the "2021 Substantial Contribution Opinion"). In the 2021 Substantial Contribution

Opinion, the Court allowed fees for the twenty-nine (29) day period between the opening of the

case and formation of the TCC related to (1) General Discovery, (2) First Day Matters, and

(3) Supporting Venue Change, but denied 75% of fees related to Opposing the Preliminary

Injunction and Extension of the Automatic Stay, because "this Court on multiple occasions

granted the Debtor relief sought with respect to extending the automatic stay and continuing (or

imposing) the preliminary injunction originally entered in North Carolina. In the Court's view,

the relief sought by the Debtor furthered the interests of the bankruptcy estate and aided the

Debtor in its reorganization efforts", and "the Court does not consider the Movants' opposition to

such relief as serving the best interests of the bankruptcy estate and compensable under

§ 503(b)(3)(D). Rather, such work performed in opposing the relief sought by the Debtor aided

primarily the interests of individual plaintiffs seeking to pursue relief outside of the bankruptcy

court." Id. Although this Court granted the fees related to first day matters in the 2021 Case,

NAI-1537540909

where they were being heard for the first time, here, there was no need for the TCC Professionals

to spend such a significant amount of time defending substantially the same motions, which were

all granted in the 2021 Case, and which this Court stated "should not be controversial".  See

Apr. 11, 2023 Hr'g Tr. 128:7-17.

11.     Section 503(b)(3)(D) of the Bankruptcy Code provides for the allowance of an

administrative expense for the actual, necessary expenses incurred by "a creditor . . . or a

committee representing creditors . . . other than a committee appointed under section 1102 of this

title, in making a substantial contribution in a case under chapter 9 or 11 of this title."  11 U.S.C.

§ 503(b)(3)(D).  Relatedly, section 503(b)(4) provides in relevant part:

> reasonable compensation for professional services rendered by an
> attorney or an accountant of an entity whose expense is allowable
> under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this
> subsection, based on the time, the nature, the extent, and the value
> of such services, and the cost of comparable services other than in a
> case under this title, and reimbursement for actual, necessary
> expenses incurred by such attorney or accountant;

11 U.S.C. § 503(b)(4).

12.     Courts rarely grant requests for payment of compensation and expenses as a

substantial contribution.[7]  Instead, a creditor's attorney generally must "look to its own client for

payment."  Lebron v. Mechem Fin., 27 F.3d 937, 940 (3d Cir. 1994) (quoting In re Consol.

Bancshares, Inc., 785 F.2d 1249, 1253 (5th Cir. 1986)).  In the 2021 Substantial Contribution

Opinion, this Court recognized the following principles that should guide its decision on the

subject motion:

---

[7]     Because of the limited circumstances under which courts grant substantial contribution claims, a creditor's
attorney "must show by a preponderance of the evidence that he 'made a substantial contribution to the
[debtor's] estate'" to be so entitled.  Katchen v. Neumann, 2021 WL 1625100, at *4 (D.N.J. Apr. 27, 2021).

NAI-1537540909

Fees incurred by an attorney or other professional representing an individual creditor are presumed to be incurred for the benefit of that professional's client alone, and the professional bears the burden of showing otherwise.

A substantial contribution allowance is limited to extraordinary creditor actions that led directly to tangible benefits to creditors, the debtor or the estate.

The sort of contribution that reaches this threshold is exceedingly narrow and fees should be granted only in rare and extraordinary circumstances.

See also In re Summit Metals, Inc., 379 B.R. 40, 67 (Bankr. D. Del. 2007) (quoting Psychiatric Hosps. of Hernando Cty. Inc., 228 B.R. 764, 767 (Bankr. M.D. Fla. 1998)); see also Katchen v. Neumann, 2021 U.S. Dist. LEXIS 80704, *11 (Bankr. D.N.J. Apr. 27, 2021) ("'[E]xtensive participation in a case, without more, is insufficient.' . . . [C]ourts grant fee awards only in 'rare and extraordinary circumstances'") (citations omitted) (collecting cases); In re Kior, Inc., 567 B.R. 451, 459 (D. Del. 2017); In re Am. Plumbing & Mech., Inc., 327 B.R. 273, 291 (Bankr. W.D. Tex. 2005) ("[A]bsent some spectacular result, such as dramatically improving treatment of all creditors, expected and routine activities do not constitute substantial contribution."). There is no basis for such an award for the types of fees requested in this case. Over half of the fees requested fall into three (3) categories: (a) opposing first day motions, (b) filing an informational brief, and (c) opposing the preliminary injunction. None of those services produced any direct and tangible benefits to creditors, the Debtor or the estate.

13.    The Third Circuit, and courts within it, have rejected an overly flexible approach to substantial contribution requests. See Lebron, 27 F.3d at 943; Kior, 567 B.R. at 459; RS Legacy Corp., 2016 WL 1084400 at *4; In re Geriatrics Nursing Home, Inc., 195 B.R. 34, 39 (Bankr. D.N.J. 1996). Rather, the Third Circuit has held that "[t]he services engaged [in] by creditors, creditor committees and other parties interested in a reorganization are presumed to be incurred for the benefit of the engaging party and are reimbursable if, but only if, the services

-10-

'directly and **materially contributed' to the reorganization.**"  Lebron, 27 F.3d at 943

(emphasis added).  As a result, the Third Circuit has found:

> that the benefit received by the estate **must be more than
> an incidental one** arising from activities the applicant has
> pursued in protecting his or her own interests.  Creditors are
> **presumed to be acting in their own interests** until they
> satisfy the court that their efforts have transcended
> self-protection.

Id. at 944 (emphasis added).[8]  There has been no reorganization in this case, so the services for

which compensation is sought are not compensable.

14.    In line with the Third Circuit's guidance, courts within the Third Circuit have held

that:

> extensive and **active participation alone does not qualify**
> . . . services that are **duplicative of other estate
> professionals are insufficient** . . . **activities that primarily
> further the movant's self-interest do not suffice** . . . and
> **expected or routine activities in a chapter 11 case**—such
> as encouraging negotiation among parties, commenting and
> participating in successful plan negotiations, and reviewing
> documents – **generally do not constitute a substantial
> contribution**.  **A substantial contribution is one that
> confers a benefit to the entire estate and fosters the
> reorganization process.**

RS Legacy, 2016 WL 1084400 at *4 (denying substantial contribution claim and finding that

creditor's efforts were "predominantly aimed at furthering its own position") (internal citations

omitted) (emphasis added).[9]

---

[8]    See also In re Encapsulation Int'l Inc., 1998 WL 801898, at *3 (Bankr. W.D. Tenn. 1998) (commenting
upon the Third Circuit standard and noting that it "distinguish[es] between direct and indirect benefits and
inquir[ies] into the applicant's motivation for rendering services:  Any indirect benefits resulting from the
applicant's work which either advanced his own interests or arose out of his motivation to benefit himself
were not substantial contributions."); In re DP Partners Ltd., 106 F.3d 667, 672 (5th Cir. 1997) (noting that
"decisions from other circuits appear to distinguish between creditors' actions that 'incidentally' benefit the
estate and creditors' actions that directly and demonstrably benefit the estate" and that those cases
"examine a creditor's motivation in expending the time and fees at issue").

[9]    See also In re Bayou Grp., LLC, 431 B.R. 549, 561 (Bankr. S.D.N.Y. 2010) ("A direct benefit also cannot
be established merely by the movant's extensive participation in the case or be based on services that

NAI-1537540909

15.    The Debtor is not aware of any case where unsuccessfully advocating to immediately "*sua sponte*" dismiss a bankruptcy case, in violation of the rule requiring creditor notice of such motions and in the absence of a record supporting dismissal, constituted a substantial contribution.  Instead, consistent with the standard set forth in the above cases, courts have concluded that substantial contributions "foster and enhance—rather than retard and interrupt—the progress of reorganization."  In re Granite Partners, L.P., 213 B.R. 440, 446 (Bankr. S.D.N.Y. 1997) (citing In re Best Prods. Co., 173 B.R. 862, 865 (Bankr. S.D.N.Y. 1994)).  While this Court in the 2021 Substantial Contribution Opinion allowed fees which "laid the groundwork for future efforts to gain dismissal of the proceeding," there is a difference between efforts in connection with a *sua sponte* dismissal, sought through an information brief (which the Court itself admonished against, Apr. 11, 2023 Hr'g Tr. 123:23-124:6), as opposed to a motion to dismiss through traditional bankruptcy practices.  The AHC relies on In re Team Systems Int'l LLC, see Mot. ¶ 39, but the court in that case merely stated that the judgment creditors' work in establishing cause for dismissal **might** have been a substantial contribution. 640 B.R. 296, 302 (Bankr. D. Del. 2022).[10]  And, it does not appear that the judgment creditors in that case asserted a substantial contribution claim after conversion of the case.  See generally In re Team Sys. Int'l LLC, No. 22-10066 (CTG) (Bankr. D. Del.).  Finally, that case's dissimilar facts, such as egregious misconduct of the debtor, including the potential fabrication of

---

duplicated those of professionals already compensated by the estate, such as counsel for the debtor or an official committee."); Geriatrics Nursing Home, 195 B.R. at 39 ("[W]here creditor self-interest appears to dominate a creditor's actions[,] courts have not allowed substantial contribution claims.").

[10]    Movants also reference In re Encapsulation Int'l Inc., 1998 WL 801898, at *3 (Bankr. W.D. Tenn. 1998), for the proposition that legislative history supports assertion of substantial contribution claims where movants' efforts lead to "facts that would lead to a denial of confirmation," but the limited relief granted by that court was based entirely on the achievement of a successful plan.

NAI-1537540909

documents during the course of discovery in litigation leading up to the bankruptcy case and

during the bankruptcy case, render it inapposite.  Team Sys., 640 B.R. at 301, 306-08.[11]

16.    The AHC also relies on In re Food Workshop, 70 B.R. 962, 968 (Bankr. S.D.N.Y.

1987), for the proposition that a creditor's efforts need not lead to confirmation of a plan.  Mot.

¶ 39.  But that court rejected the argument that efforts to dismiss the petition warrant a

substantial contribution claim.  Id. at 967-68.  Indeed, such efforts were "hardly a contribution

but served instead to foster even greater friction between the [creditors]" in the reorganization

process.  Id. at 968.  So too here, Movants' efforts served to foster greater friction—not only

between the Debtor and the TCC, but between the majority of talc claimants represented by

counsel who signed plan support agreements, who opposed dismissal and supported confirmation

of a plan—by pursuing baseless and unnecessary litigation tactics prematurely.

17.    Movants' other cases, cited for the proposition that critical services provided as an

unofficial committee or on behalf of all creditors and absent an expectation of reimbursement

justify allowance of a substantial contribution claim, actually support denial of the Motions.  See

Mot. ¶¶ 35-36, 43.  For example, in In re Serv. Merchandise Co., Inc., an out-of-circuit case, the

court granted a substantial contribution request, notwithstanding the movant's self-interest, after

finding that there was an "air of cooperation" by the parties and commenting that "the

---

[11]    The bankruptcy court found that, after considering the evidence and arguments, there was enough to raise a
question of the debtor's good faith and to justify conversion of the case.  Id. at 301-02.  The bankruptcy
court highlighted the following issues as influencing its decision:  "(1) the district court in Florida had
expressed serious concerns that documents [the debtor] had produced in that case had been fabricated;
(2) evidence unearthed, for the first time, in discovery in this bankruptcy case suggest[ed] the debtor
engaged in other misconduct in the Florida litigation; (3) evidence produced in this bankruptcy case
show[ed] that after the Florida litigation was filed, the debtor's principals moved substantial value from the
debtor to themselves; (4) the debtor engaged in litigation conduct during this bankruptcy case that, at the
very least, raise[d] very serious concerns; and (5) the evidence provided in this case indicate[d] that both
the receivables that [the debtor] [said were] due for past government contracting work and the prospects for
future government contracting work [were] somewhere between speculative and highly dubious."  Id. at
301.

NAI-1537540909

administrative costs saved by the synergy of the parties [was] significant."  256 B.R. 738, 743

(Bankr. M.D. Tenn. 1999).  "**Hotly litigated issues and scorched earth policies would have**

**generated even larger professional fees and expenses**."  Id. (emphasis added).  Movants'

purported substantial contribution here resulted in precisely the opposite result.

18.     And, in Bayou Group, a case which involved a Ponzi-scheme debtor, the court

was tasked with determining whether a substantial contribution request by an unofficial

committee, which included work by the committee not only at the outset of the case but prior to

the filing of the case, was proper.  431 B.R. at 553.  In granting the substantial contribution

claim, the court highlighted several factors that supported the request, including that the

unofficial committee "worked with an eye to the prompt commencement of an organized chapter

11 case" and "specifically contemplated and prepared for the members of the Committee being

appointed."  Id. at 564.  Rather than attempting to defeat the filing of the bankruptcy case, the

creditors in Bayou Group worked towards a successful restructuring, even prior to the filing.

19.     The Movants' cases cited for the proposition that creditors may be reimbursed

under section 503(b)(3)(D) for services performed by it or its attorney prior to the formation of

an official committee are similarly inapplicable here.  For example, Movants quote In re

Worldwide Direct, Inc. for the proposition that a creditor may be reimbursed even "for services

performed by it or its attorney prior to the formation of an official committee" but gloss over its

crucial qualification: "to the extent that those services provide a substantial contribution to

the estate."  Mot. ¶ 35 (quoting 259 B.R. 56, 61-62 (Bankr. D. Del. 2001)).  The In re Worldwide

Direct court rejected a reimbursement claim on exactly those grounds.  259 B.R. at 61-

62.  Where, as here, "there is no evidence that the services rendered by [claimant's] counsel prior

to the formation of the Committee provided a substantial contribution to the estate," such claims

NAI-1537540909

should be denied.  Id. at 62.  Indeed, "[p]rior to formation of an official committee, there is *no*

*authority for the committee or its members to act* and *no duties to perform*."  Id. at 61 (emphasis

added).  "Thus, it is hard to conclude that any actions which committee members undertake

before the committee is actually formed are necessary for the fulfillment of their duties as

committee members."  Id.

20.    Similarly, Movants cite In re General Electrodynamics Corp., 368 B.R. 543, 554-

56 (Bankr. N.D. Tex. 2007), as an example of a court awarding reimbursement for work outside

of official committee activities.  Mot. ¶¶ 35, 43.  There, the court provided three grounds for its

decision, none of which apply here.  First, the creditor in that case made a $400,000 commitment

of capital to the debtor after confirmation of the restructuring plan, fostering its success and

"mak[ing] return to *all* creditors more certain."  Id. at 554-55 (emphasis in original).  It cannot be

disputed that Movants opposed the progress of restructuring at every step, offered no funds to the

Debtor to aid its reorganization, and by advocating a return to the tort system, made "return to *all*

creditors" far **less** certain.  Id.  Second, the creditor in General Electrodynamics helped ensure

changes to the restructuring plan which "ma[d]e it more likely that the Plan w[ould] be carried

out."  Id. at 555.  The AHC did nothing to facilitate any restructuring plan before the formation

of the official committee.  On the contrary, their actions made any plan **less** likely to be created,

much less carried out.  Last and most importantly, no official committee was ever formed

in  General Electrodynamics, thus, monitoring tasks fell to the UST and creditors' counsel for the

entire duration of the bankruptcy.  Id. at 554-56.  Here, of course, an official committee was

promptly formed ten (10) days after the petition date.  Any activities the AHC members

undertook before the committee's formation were necessarily insubstantial and duplicative of its

work after its formation.

-15-

21.     Finally, the Movants seek extraordinary treatment for services that they admit

were rendered to an unofficial committee in the first few weeks of the case.  Yet, a review of the

case docket shows that at no time did any of the professionals file a statement pursuant to

Bankruptcy Rule 2019 disclosing such ad hoc representation.  The absence of such filings

reinforces that the Movants were not representing an ad hoc group that was seeking to advance

the bankruptcy proceedings in some fashion so as to warrant a claim of substantial contribution.

Rather, as their appearances confirmed, they were representing their individual clients.  The

Court should not award fees to an ad hoc group that failed to comply with the bankruptcy

disclosure rules.

22.     The Third Circuit has made clear that substantial contribution is an extraordinary

measure to be granted only in rare circumstances.  Hallmarks of appropriate substantial

contribution efforts, as demonstrated by Movants' own cited case law, include those actions

which enhance efficiency, add to the prompt administration and resolution of a case and help

preserve value for creditors and the estate.  Premature, excessive and scorched-earth litigation

tactics, such as those employed by Movants here, do not qualify, particularly where the majority

of creditors in the form talc claimants opposed such tactics.

## II.     None of the Services Provided by the AHC Directly and Materially Contributed to the Debtor's Reorganization, Conferred a Benefit to the Entire Estate or Fostered the Reorganization Process.

23.     The AHC argues that they provided services in two areas that constitute

substantial contributions and should be compensated by the estate:  (a) contesting the First Day

Motions and (b) contesting the PI Motion.  Neither of these services meet the Third Circuit's

high standard for granting a substantial contribution claim.  Additionally, FTI spent a significant

amount of time media monitoring and drafting press releases, totaling $12,178.50, neither of

which had any benefit to the estate.  The chart below highlights the fees requested by each of the

TCC Professionals in each category of services, demonstrating the excessive and duplicative

nature of the fees claimed.

| Movant | Total Fees | First Day Motions | Informational Brief | Preliminary Injunction |
|---|---|---|---|---|
| Brown Rudnick | $702,628.00 | $190,525.50 | $120,856.50 | $136,390.00 |
| Genova Burns | $85,635.00 | $22,260.00 | $555.00 | $12,160.00 |
| Otterbourg | $285,748.50 | $91,061.00 | $7,392.50 | $111,368.00 |
| FTI | $106,920.50 | $35,967.00 | $285.00 | $11,732.00 |
| Massey | $145,755.50 | $21,860.00 | $2,712.00 | $33,388.50 |
| **Total** | **$1,326,687.50** | **$361,673.50** | **$131,801.00** | **$305,038.50** |

### A.    Contesting Routine First Day Motions Did Not Confer a Benefit to the Estate or Creditors.

24.    The First Day Motions sought relief routinely requested in mass tort cases,[12] as

the Court and the U.S. Trustee acknowledged at the First Day Hearing.  Apr. 11, 2023 Hr'g Tr.

128:7-17.  Each of the motions sought straightforward administrative relief subject to the rights

of the TCC, once appointed, to seek reconsideration of any order granting the relief.  There was

no threat (imminent or otherwise) to talc claimants.  Nevertheless, the AHC determined a need to

prematurely form a committee and file both a blanket objection to the First Day Motions and an

informational brief, frivolously requesting immediate dismissal of the Chapter 11 Case.  Not

only were these efforts ultimately unsuccessful, they were unnecessary at the onset of the case,

---

[12]    See, e.g., In re Cyprus Mines Corp., No. 21-10398 (LSS) (Bankr. D. Del. Feb. 11, 2021), Dkts. 3, 5 (application and motion requesting similar relief as First Day Motions); In re DBMP LLC, No. 20-30080 (JCW) (Bankr. W.D.N.C. Jan. 23, 2020), Dkts. 3, 4, 5, 7 (application and motions requesting similar relief as First Day Motions); In re Paddock Enters., LLC, No. 20-10028 (LSS) (Bankr. D. Del. Jan. 6, 2020), Dkts. 3-5 (same); In re Imerys Talc Am., Inc., No. 19-10289 (LSS) (Bankr. D. Del. Feb. 13, 2019), Dkts. 5, 11, 14 (same); In re Bestwall LLC, No. 17-31795 (LTB) (Bankr. W.D.N.C. Nov. 2, 2017), Dkts. 9, 10, 17, 22 (same).

NAI-1537540909

as the Movants were not prejudiced by waiting until the TCC was appointed and subsequently

seeking reconsideration of any order granting relief related to the First Day Motions. The

Movants' wasteful efforts led to claims of approximately $493,474.50 in fees by the following

firms: $311,382.00 by Brown Rudnick, $22,815 by Genova Burns, $98,453.50 by Otterbourg,

$36,252.00 by FTI,[13] and $24,572.00 by Massey & Gail.

25.      The objections to the First Day Motions provided no benefit to the estate and were

overruled.  Regardless, the objections were superficial, not substantive.  The content of the

AHC's objection and informational brief focused **not** on the specific relief requested in the First

Day Motions, but on contesting the filing of the chapter 11 case itself.  If anything, these filings

revealed the AHC's true purpose—pursuit of a scorched-earth litigation strategy motivated by a

desire to return to the tort system, which could be potentially profitable for counsel (but most

often not for claimants).  In other words, the Movants hoped to obtain immediate dismissal

before the First Day Hearing without the need for a proper motion, notice to all interested parties

or a proper record, as the Court recognized when it rejected such relief.  See Apr. 11, 2023 Hr'g

Tr. 123:23-124:6 (such a request "flies in the face of" Bankruptcy Rules and the Code).  Such

deficient tactics should not be rewarded by the grant of substantial contribution claims.

26.      The Movants also claim their efforts related to "laying a foundation which

resulted in the ultimate dismissal of the case by this Court" and "set the stage for the dismissal of

the Chapter 11 Case." Mot. ¶¶ 40, 42.  However, these vague statements are not supported by

any discernible evidence that the actions taken by Movants in the first two weeks of the case did

as they claim.  In fact, the Movant's push for immediate "*sua sponte*" dismissal prior to the First

---

[13]      It is unclear why FTI's services as financial advisor were necessary to contest purely administrative
motions.

NAI-1537540909

Day Hearing was adamantly rejected by the Court.  Failed efforts that run directly contrary to bankruptcy practice, rules and statutes cannot be a benefit to the estate.  In light of the Court's refutation of Movants' informational brief, which had almost nothing to do with the propriety of any of the traditional first day applications, any time spent in furtherance of such relief is not appropriate for a substantial contribution claim.  Finally, to the extent any time was spent on the superficial response to the routine First Day Motions, it was both unnecessary and did not serve to benefit the estate or creditors.

**B.      The Movants' Efforts in Opposing the PI Motion Were Unnecessary and Did Not Benefit the Estate or Creditors.**

27.      The Movants claim that it was critical to address the PI Motion prior to formation of a committee because of the "highly atypical circumstances surrounding the filing of LTL 2.0" and the fact that the April 18th hearing on the PI Motion was scheduled for "just two weeks after the Petition Date", and "preparation could not await the formal appointment of an official committee." Mot. ¶¶ 18, 20.  These efforts resulted in approximately $305,038.50 in total claims by the following firms: $136,390.00 by Brown Rudnick, $12,160.00 by Genova Burns, $111,368.00 by Otterbourg, $11,732.00 by FTI,[14] and $33,388.50 by Massey & Gail. Preliminary injunction motions in mass tort chapter 11 cases, however, are not "atypical;" rather, they are common and, until recently, have been uncontroversial, with parties, including tort claimants, recognizing that halting both the liquidation of claims against the debtor and the litigation of estate claims outside of a chapter 11 case benefits the estate.[15]  Indeed, this Court

---

[14]     It is unclear why FTI's services as financial advisor were necessary for a legal brief.

[15]     See, e.g., In re Aldrich Pump LLC, No. 20-30608, Adv. No. 20-03041 (Bankr. W.D.N.C. Aug. 23, 2021); In re DBMP LLC, No. 20-30080, Adv. No. 20-03004 (Bankr. W.D.N.C. Aug. 11, 2021); In re Mallinckrodt PLC, No. 20-4018, Adv. No. 20-50850 (D. Del. Feb. 11, 2021); In re Purdue Pharma L.P. et al., No. 19-23649, Adv. No. 19-08289 (Bankr. S.D.N.Y. Oct. 11, 2019); In re Bestwall LLC, No. 17-31795, Adv. No. 17-03105 (Bankr. W.D.N.C. July 29, 2019); In re Kaiser Gypsum Co. Inc., No. 16-31602, Adv. No. 16-03313 (Bankr. W.D.N.C. Nov. 4, 2016); In re Specialty Prods. Holding Corp., No. 10-11780, Adv.

extended a substantially similar injunction issued in LTL I based on the same arguments, so

Movants should have known their efforts were likely to be unsuccessful.  As Movants admit, the

"U.S. Trustee acted more swiftly than is ordinarily possible in a large and complex Chapter 11

case" in appointing the committee a mere 10 days after the Petition Date.  Mot. ¶ 18.  It is,

therefore, illogical to argue that there was a need for the AHC to begin work in response to

common mass tort chapter 11 filings where the U.S. Trustee would normally take *longer* to

appoint a committee "in a large and complex Chapter 11 case."  Moreover, the Movants'

position is a non-sequitur as the preliminary relief was, by definition, not permanent and was not

directed against a future official committee, obviating any substantive or procedural risk to such

a committee from such an order.

28.    Additionally, the AHC's opposition to the PI Motion did not benefit the estate.

Achieving the AHC's goal of returning to the tort system (to a limited extent and for a limited

period of time) did not benefit the estate or a majority of its creditors, who preferred

confirmation of a plan, nor did it  contribute to the Debtor's reorganization.  Despite the AHC's

efforts, the Court extended the automatic stay and granted limited preliminary restraints, Adv.

Dkts. 91, 94, making the opposition to the PI unsuccessful.

---

No. 10-51085 (Bankr. D. Del. July 23, 2010); In re Leslie Controls, Inc., No. 10-12199, Adv. No. 10-51394
(Bankr. D. Del. July 14, 2010); In re Garlock Sealing Techs. LLC, No. 10-31607, Adv. No. 10-03145
(Bankr. W.D.N.C. June 21, 2010); In re Quigley Co., Inc., No. 04-15739, Adv. No. 04-04262 (Bankr.
S.D.N.Y. Dec. 17, 2004); In re Mid-Valley, Inc., No. 03-35592, Adv. No. 03-3296 (Bankr. W.D. Pa. Dec.
17, 2003); In re Combustion Eng'g, Inc., No. 03-10495, Adv. No. 03-50839 (Bankr. D. Del. Mar. 7, 2003);
In re ACandS, Inc., No. 02-12687, Adv. No. 02-5881 (Bankr. D. Del. Sept. 27, 2002); In re G-I Holdings,
Inc., No. 01-30135, Adv. No. 01-3013 (Bankr. D.N.J. Feb 22, 2002); In re Harbison-Walker Refractories
Co., No. 02-21627, Adv. No. 02-2080 (Bankr. W.D. Pa. Feb. 14, 2002); In re N. Am. Refractories Co.
(NARCO), No. 02-20198, Adv. No. 02-2004 (Bankr. W.D. Pa. Jan. 4, 2002); In re W.R. Grace & Co.,
No. 01-02239, Adv. No. 01-771 (Bankr. D. Del. May 3, 2001); In re Babcock & Wilcox, No. 00-10992,
Adv. No. 00-01029 (Bankr. E.D. La. Apr. 17, 2000); In re Pittsburgh Corning Corp., No. 00-22876, Adv.
No. 00-2161 (Bankr. W.D. Pa. Apr. 16, 2000).

NAI-1537540909

29.     Rather than providing a substantial contribution, the AHC's determination to engage in premature and extensive preparation for opposition to the PI Motion served only the Movants' individual interests to return to the tort system and delayed the administration and progress of the chapter 11 case.  See Katchen, 2021 U.S. Dist. LEXIS 80704, at *13-14 (denying substantial contribution claim where "none of the services rendered by [claimant] . . . fostered or enhanced the progress of the [Debtor] reorganization" and claimant's "services produced no actual and demonstrable benefit to the [Debtor]"); RS Legacy, 2016 WL 1084400 at *4 (finding that "activities that primarily further the movant's self-interest" do not constitute a substantial contribution because a substantial contribution "is one that . . . fosters the reorganization process"); Granite Partners, 231 B.R. at 446 (services that are substantial contributions "foster and enhance—rather than retard and interrupt—the progress of reorganization.").  Consequently, none of the services are compensable.

**III.    The Services Provided by the AHC Were Excessive and Unnecessary as Purported Experts of the Case and Include Inappropriate Time Entries.**

30.     The Movants admit to their "extensive familiarity" with the Debtor, the Debtor's professionals and the case issues.  Mot. ¶ 16.  This is further reflected in each of the Professionals' subsequent retention applications, which touted that extensive familiarity as grounds for retention.  See, e.g., Application of the Official Comm. of Talc Claim. to Retain and Employ Brown Rudnick LLP As Co-Counsel Effective as of April 14, 2023, Dkt. 400, p. 13 ("Brown Rudnick is well-qualified to represent the Committee in a cost effective and efficient manner, especially in light of its representation of the official committee of talc claimants in the prior chapter 11 case . . . and resulting familiarity with the Debtor, the case parties and case issues.").  Despite such extensive familiarity, the Movants now argue they were forced to expend an extraordinary amount of time totaling over $1.3 million at the outset and prior to appointment,

in order to pursue strategies that could have just as easily and effectively been addressed post-appointment.

31.     In Paragraphs 1 and 2 of the Motion, the Movants allege no advance knowledge of a second case filing.  Such claims are simply not true.  The Movants were aware of such a filing, and there was no April 4th surprise warranting a rapid-fire response.[16]

32.     Additionally, the invoices submitted with the Motion are deficient, as they include inappropriate entries.[17]  By way of example, Genova Burns included a post-formation time entry, for "review of the notice of appointment of official TCC."  Mot. Exh. B-3, p. 9.  Massey & Gail also included a time entry for work done in connection with the 2021 Case, for review of "FCR's submission re dismissal order."  Mot. Exh. B-4, p. 2.  FTI's invoices also show at least $4,400.00 in time spent media monitoring, Mot. Exh. B-5, pp. 7-8, which the Court specifically warned against charging the Debtor for in the 2021 Case.  21-30589 May 24, 2022 Hr'g Tr.58:16-59:1.

## IV.   The AHC's Alternative Argument to Authorize Retention of the TCC Professionals Effective as of the Petition Date Is Unsupported.

33.     The AHC cites to only one case to support their alternative argument that the retention applications of the TCC Professionals be made effective as of the Petition Date, notwithstanding final and now non-appealable Orders that made them effective as of April 14, 2023.  Mot. ¶ 47.  However, the case cited by the AHC, Service Merchandise, does not involve retroactively changing the effective date of retention orders.  See 256 B.R. at 741.  Rather, in that

---

[16]    This is proven as evidenced by the End of Case Statement filed by the TCC in the 2021 Case, filed prior to the entry of the Dismissal Order and subsequent 2023 filing, in which the TCC notes "Johnson & Johnson and/or its affiliates . . . threatened a second bankruptcy filing."  21-30589, Dkt. 3934 ¶ 3.

[17]    The April monthly fee statements of the TCC Professionals show both entries and disbursements which appear to be prior to appointment.  For example, the April monthly fee statements of Brown Rudnick and Otterbourg appear to include pre-committee entries on 4/14, as the committee was not appointed until 8:35 p.m. on April 14, 2023 (see Dkt. 162), and entries on that date appear to be for earlier in the day, which would have been prior to appointment.  Additionally, Genova Burn's April monthly fee statement also shows multiple disbursements from dates prior to the committee's formation.

NAI-1537540909

case, the retention orders originally listed the effective date as the Petition Date, and there were

no objections to those orders.  Id.  Here, the retention orders of the TCC Professionals list the

effective date as April 14, 2023 (as the TCC and its professionals requested), and the Movants

point to no caselaw (nor is the Debtor aware of any) to support a retroactive alteration of a final

retention order's effective date that they themselves proposed.  Pretending a yet-to-be formed

committee has the power to retain professionals before its formation stretches far beyond the

limited flexibility provided by the Bankruptcy Code as to retention of professionals.  The

Movants' argument is legally insupportable and should be denied.

34.     Moreover, the request raises concerns as to the proper role of professionals when

allegedly representing individual creditors, while also anticipating the formation of a statutory

official committee for which they will be counsel.  If the allegations are to be taken at face value,

the Movants were representing individual interests prior to the committee's formation and those

interests were contrary to the interests of the majority of talc claimants, who had executed plan

support agreements.  It is impossible for the Court to conclude that the professionals' services at

that point were consistent with the fiduciary standards required of an estate creditor

representative when those professionals were actually adverse to interest of the majority of

creditors.

NAI-1537540909

## **CONCLUSION**

For the reasons set forth herein, the Debtor respectfully requests that the Court deny the Motion and grant such other and further relief to the Debtor as the Court deems just and proper.

Dated: October 11, 2023

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/ Paul R. DeFilippo*
Paul R. DeFilippo, Esq.
James N. Lawlor, Esq.
Joseph F. Pacelli, Esq. (Admitted *pro hac vice*)
Stephanie A. Weaver, Esq. (Admitted *pro hac vice*)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com
jlawlor@wmd-law.com
jpacelli@wmd-law.com

**JONES DAY**
Gregory M. Gordon, Esq.
Brad B. Erens, Esq.
Dan B. Prieto, Esq.
Amanda Rush, Esq.
2727 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 220-3939
Facsimile: (214) 969-5100
gmgordon@jonesday.com
bberens@jonesday.com
dbprieto@jonesday.com
asrush@jonesday.com
(Admitted *pro hac vice*)

*ATTORNEYS FOR DEBTOR*

NAI-1537540909