| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
|---|---|
| **Caption in Compliance with D.N.J. LBR 9004-1(b)**<br><br>**GENOVA BURNS LLC**<br>Daniel M. Stolz, Esq.<br>Donald W. Clarke, Esq.<br>dstolz@genovaburns.com<br>dclarke@genovaburns.com<br>110 Allen Road, Suite 304<br>Basking Ridge, NJ 07920<br>Tel: (973) 467-2700<br>Fax: (973) 467-8126<br><br>*Local Counsel to the Official Committee of Talc Claimants*<br><br>*-and-*<br><br>*Local Counsel for the Ad Hoc Committee of Certain Talc Claimants* | **BROWN RUDNICK LLP**<br>David J. Molton, Esq.<br>Jeffrey L. Jonas, Esq.<br>Michael S. Winograd, Esq.<br>dmolton@brownrudnick.com<br>jjonas@brownrudnick.com<br>mwinograd@brownrudnick.com<br>Seven Times Square<br>New York, NY 10036<br>Tel: (212) 209-4800<br>Fax: (212) 209-4801<br><br>and<br><br>Sunni P. Beville, Esq.<br>sbeville@brownrudnick.com<br>One Financial Center<br>Boston, MA 02111<br>Tel: (617) 856-8200<br>Fax: (617) 856-8201<br><br>*Co-Counsel for the Official Committee of Talc Claimants*<br><br>*-and-*<br><br>*Co-Counsel for the Ad Hoc Committee of Certain Talc Claimants* |
| **OTTERBOURG P.C.**<br>Melanie L. Cyganowski, Esq.<br>Adam C. Silverstein, Esq.<br>Jennifer S. Feeney, Esq.<br>Michael R. Maizel, Esq.<br>mcyganowski@otterbourg.com<br>asilverstein@otterbourg.com<br>jfeeney@otterbourg.com<br>mmaizel@otterbourg.com<br>230 Park Avenue<br>New York, NY 10169<br>Tel: (212) 661-9100<br>Fax: (212) 682-6104<br><br>*Co-Counsel for the Official Committee of Talc Claimants*<br><br>*-and-*<br><br>*Co-Counsel for the Ad Hoc Committee of Certain Talc Claimants* | **MASSEY & GAIL LLP**<br>Jonathan S. Massey, Esq.<br>Bret R. Vallacher, Esq.<br>jmassey@masseygail.com<br>bvallacher@masseygail.com<br>1000 Maine Ave. SW, Suite 450<br>Washington, DC 20024<br>Tel: (202) 652-4511<br>Fax: (312) 379-0467<br><br>*Special Counsel for the Official Committee of Talc Claimants*<br><br>*-and-*<br><br>*Ad Hoc Committee of Certain Talc Claimants* |

| | |
|---|---|
| In re:<br>LTL MANAGEMENT, LLC,[1]<br><br>Debtor. | Chapter 11<br><br>Case No.: 23-12825 (MBK)<br><br>Honorable Michael B. Kaplan |

**[AMENDED] JOINT OMNIBUS REPLY OF THE TCC PROFESSIONALS, THE TCC COMMITTEE AND THE AD HOC COMMITTEE OF CERTAIN TALC CLAIMANTS IN SUPPORT OF (I) THE FINAL APPLICATIONS FOR ALLOWANCE OF FEES AND REIMBURSEMENT OF EXPENSES FOR THE PERIOD OF APRIL 4, 2023 THROUGH AUGUST 11, 2023 FILED BY THE TCC PROFESSIONALS AND (II) THE TCC COMMITTEE AND AD HOC COMMITTEE OF TALC CLAIMANTS' <u>SUBSTANTIAL CONTRIBUTION MOTION</u>**

The Official Committee of Talc Claimants (the "<u>Committee</u>" or the "<u>TCC</u>"), the TCC Professionals[2], and the Ad Hoc Committee of Certain Talc Claimants (the "<u>AHC</u>"), respectfully submit this joint omnibus reply (the "<u>Reply</u>") in response to the following objections:

(a) *Debtor's Objection to Joint Omnibus Motion for Allowance of Substantial Contribution Claims* [Dkt. No. 1510] ("<u>Debtor's Substantial Contribution Objection</u>");

(b) *United States Trustee's Objection to the Motion of the Ad Hoc Committee of Talc Claimants for Allowance of Administrative Claims for Reimbursement of Expenses Incurred for the Period From April 4, 2023 Through April 14, 2023 (Prior to the Formation of the Official Committee of Talc Claimants) That Provided a Substantial Contribution in the Debtor's Case or, in the Alternative, Authorizing Retention of the TCC Professionals Effective as of the Petition Date* [Dkt. No. 1495] ("<u>UST Substantial Contribution Objection</u>," and with the Debtor's Substantial Contribution Objections, the "<u>Substantial Contribution Objections</u>");

(c) *Debtor's Limited Objection to the Monthly Fee Statement for Allowance of Fees for the Period of August 12, 2023 Through August 31, 2023 filed by Massey & Gail LLP* [Dkt No. 1454] (the "<u>Massey Fee Objection</u>");

(d) *Debtor's Limited Objection to the Monthly Fee Statement for Allowance of Fees for the Period of August 12, 2023 Through August 31, 2023 filed by Anderson Kill P.C.* [Dkt. No. 1478] (the "<u>Anderson Kill Fee Objection</u>"); and

---

[1] The last four digits of the Debtor's taxpayer identification number are 6622. The Debtor's address is 501 George Street, New Brunswick, New Jersey 08933.

[2] The "TCC Professionals" include: Genova Burns LLC, Brown Rudnick LLP, Massey & Gail LLP, Anderson Kill P.C., Houlihan Lokey Capital, Inc., Miller Thompson LLP, Otterbourg P.C., Hon. Royal Furgeson (ret.), Professor D. Theodore Rave, FTI Consulting Inc., and MoloLamken LLP.

(e) *Debtor's Omnibus Objection to the Final Applications for Allowance of Fees and Reimbursement of Expenses for the Period of April 4, 2023 Through August 11, 2023 Filed by the TCC Professionals* [Dkt. No. 1496] (the "Debtor's Fee Objection" and together with the Massey Fee Objection, the Anderson Kill Fee Objection and the Substantial Contribution Objections, the "Objections").

## REPLY

**I.    Reply to Substantial Contribution Objections**

**a. The AHC's Actions in Furtherance of Dismissal, and in the Absence of an Official Committee, Conferred a Benefit on the Estate**

The Debtor continues to assert that 11 U.S.C. § 503(b)(3)(D) requires that a committee representing creditors make a substantial contribution to a "reorganization."[3] This assertion belies the plain reading of section 503(b)(3)(D) and ignores this Court's decision in LTL 1.0.[4] *See* 11 U.S.C. § 503(b)(3)(D); *2021 Substantial Contribution Opinion*, Case No. 21-30589 at Dkt. No. 3973.  Section 503(b)(3)(D) expressly provides that services rendered in making a substantial contribution to a **case** are compensable under section 503(b)(3)(D). 11 U.S.C. § 503(b)(3)(D).  In LTL 1.0, the Court awarded requests for allowance under section 503 for efforts undertaken in the absence of an official committee that were "necessary to shape the direction of subsequent investigation and litigation efforts and provided meaningful value" and "laid the groundwork for future efforts to gain dismissal." 2021 Sub. Con. Op. at 4.  In other words, to the extent that creditors' efforts in the absence of an official committee further the ultimate and proper disposition of the case—here, dismissal—those efforts are compensable.  No reorganization is required.

---

[3]    *See, e.g.,* Debtor Sub. Con. Obj. at ¶¶ 13 ("There has been no reorganization in this case, so the services for which compensation is sought are not compensable."), 15 (asserting that efforts must "foster and enhance" a "reorganization"), 16 (noting rejection of substantial contribution where "friction" hinders "the reorganization process"), 18 (distinguishing Bayou Group because there, creditors worked toward a successful restructuring); 20 (describing efforts to make a plan less likely as non-compensable).  Even the Debtor's arguments regarding cooperation, *see e.g.*, *id.* ¶ 17, make much the same point: the AHC's efforts cannot be compensable because they did not amount to working towards furthering the Debtor's desired aims for the case.

[4]    "LTL 1.0" refers to Case No. 21-30589-MBK (Bankr. D.N.J.).  "LTL 2.0" refers to the above-captioned case.

3

At a time when an official committee had not yet been appointed, the AHC formed to expeditiously respond to the Debtor's second bankruptcy filing in a manner that seamlessly continued the efforts of the prior TCC, which had dissolved only two hours and eleven minutes earlier. Like the TCC in LTL 1.0—and like the TCC ultimately appointed in this case—the AHC litigated its position that the Debtor's (second) bankruptcy was (also) filed in bad faith. Consistent with that position and in the interests of all talc claimants, the AHC sought to move expeditiously, including, as the Debtor emphasizes, through seeking *sua sponte* dismissal. The actions of the AHC, at a time when no official committee existed, furthered the ultimate disposition of the case. As the Court has noted with respect to the initial phase of LTL 1.0, "the massive creditor body needed a voice and active representation early on in the proceeding." 2021 Sub. Con. Op. at 4.

The Debtor posits that because these efforts were inconsistent with the views of a group of claimants' attorneys who indicated support for the second filing, the AHC was acting only in its own self-interest. To the contrary, the AHC's efforts were intended to, and ultimately did, further the efforts of the official committee ultimately formed in this case. Indeed, the AHC's efforts laid the groundwork for the TCC to effectively litigate the Debtor's request for a preliminary injunction a mere *four* days after its formation. As a result of those efforts, the Court entered a more limited injunction than existed in LTL 1.0, in recognition that, here, a more tailored approach was necessary to balance the parties' interests. *See* PI Mem. Op. at 31, Adv. Pro. No. 23-01092-MBK, Dkt No. 94. In turn, the record established at that hearing formed a key portion of the record for the hearing on dismissal, which this Court ultimately granted as the outcome dictated by the Third Circuit's controlling decision. The Debtor attempts to paint these efforts as reflecting the interests of some minority group of claimants. Rather, the effort was a consistent approach taken by the

TCC—the official committee having a fiduciary duty to *all* talc claimants—and the AHC before it, to efficiently and effectively achieve dismissal—the necessary outcome of this case.

For much the same reason, there is no merit to the Debtor's argument that the AHC's opposition to the first day relief and injunction were unnecessary and could have waited until the formation of an official committee. The Debtor repeatedly asserts that the first day relief and injunction request were "routine" or "common" and therefore did not warrant an immediate and full-fledged response. *See e.g.*, Debtor Sub. Con. Obj. at ¶ 24. But this misses the point. Even if the specific relief sought in each first day pleading was in some way routine, the circumstances of those requests—in a refiling immediately after dismissal—were unprecedented, and as this Court recognized, raised considerable questions. *See* PI Mem. Op. at 18-20.

This Court acknowledged it was "skeptical" of the second filing and opined that LTL "[u]ndoubtedly" faced an "uphill battle" to show a good faith basis for proceeding in bankruptcy. *Id.* at 23. It described LTL's abandonment of the 2021 Funding Agreement as "the potentially 'largest intentional fraudulent transfer in United States history.'" *Id.* It "certainly appear[ed] to be manufactured" to create financial distress "in direct response to the Third Circuit's ruling." *Id.* at 18. Even if that transfer could stand, the Court could not say whether "this reduction in funding" or any of LTL's other maneuvers "adds to—or creates—[the] financial distress" necessary to survive dismissal. *Id.* Moreover, the Third Circuit, in ordering the dismissal in LTL 1.0., had warned against any attempt by LTL to "part with its funding backstop to render itself fit for a renewed filing" and noted that any such maneuver would be subject to challenge as a fraudulent transfer. *In re LTL Management LLC*, 64 F.4th 84, 109 n.18 (3d Cir. 2023). The Court of Appeals had flagged (although it did not need to resolve) a wide range of potential legal obstacles to LTL's second bankruptcy (in addition to the absence of financial distress), including whether J&J's two-

5

step restructuring transactions demonstrated bad faith because they "contradict[ed] the principles and purposes of the Bankruptcy Code," *id.* at 111; whether LTL's bankruptcy was filed primarily for litigation advantage, *id*. at 110 n.19; and whether J&J's attempt to assign its talc liabilities to LTL was legally effective. *Id*. at 108 n.16.

All of these questions were relevant to both dismissal and injunctive relief, as this Court noted. *See* Hearing Tr. 4-25-23, Dkt. No. 91, at 6:6-13 ("The fundamental question addressed by the parties is whether the debtor has a realistic possibility of success. It is the linchpin of the four-prong injunction test employed universally. In Chapter 11, the inquiry is more focused on whether the debtor has a reasonable possibility of reorganizing, which needless to say, at a minimum, requires that the debtor survive any motions to dismiss for cause, including lack of good faith."). The Debtor's first-day motions were thus hardly "routine"; they implicated fundamental questions about the validity of the Debtor's bankruptcy.  In the end, of course, this Court did dismiss LTL's second bankruptcy for failure to establish good faith and financial distress.  And this Court limited its injunction to narrow and highly tailored relief, rather than the broad relief sought by the Debtor.

Moreover, it was necessary and appropriate for the AHC, on behalf of *all* creditors, to promptly examine the issues of alleged claimant support for a revised funding agreement and respond accordingly.  The TCC's ultimate position—that nothing altered the Third Circuit's basis for finding a lack of financial distress—were informed by, and entirely consistent with, the AHC's early review of these issues.  Moreover, as noted above, because of the speed at which the Debtor sought to proceed, a prompt analysis and response was required.  The early efforts of the AHC paved the way for a prompt and efficient dismissal of a case that (as this Court's Dismissal Order ultimately showed) should never have been filed.

b. **Retention of the TCC Professionals Effective as of the Petition Date is Both Permissible and Warranted**

The Debtor concedes that the TCC was in existence when this Court entered the LTL 1.0 dismissal order at 1:49 pm on April 4, 2023, paragraph 9 of which provided that the TCC would remain in existence thereafter for the limited purpose of pursuing and defending appeals and "its Retained Professionals shall be authorized to continue to perform services on the TCC's behalf." Dkt. No. 3938. LTL's position is that the TCC was "automatically dissolved" at 8:46 pm on April 4th, by virtue of the Debtor's filing of its Notice of Intent Regarding Appeals [Dkt. No. 3939], in which the Debtor disclaimed any intent of further pursuing any appeals.

But, given the timeline, the upshot of LTL's argument is that (i) the TCC *was* in existence (albeit for a limited purpose) and its retained professionals were authorized to continue to perform services on the TCC's behalf when LTL filed its second bankruptcy petition at 4 p.m. on April 4th; (ii) LTL *subsequently* terminated the TCC's existence (and its professionals' authority) by filing its Notice of Intent Regarding Appeals at 8:46 p.m. on the same day; and (iii) this Court is powerless to address the gap in the TCC's existence created by LTL through the issuance of a *nunc pro tunc* order.

LTL's argument ignores this Court's broad power to authorize the retroactive approval of attorneys in Chapter 11 proceedings in extraordinary situations such as this. The Third Circuit has held that that "the bankruptcy courts have the power to authorize retroactive employment of counsel and other professionals under their broad equity power." *Matter of Arkansas Co., Inc.*, 798 F.2d 645, 648 (3d Cir. 1986). The Court of Appeals has instructed that "[t]he bankruptcy courts have traditionally been governed by equitable principles rather than statutory technicalities. Where equitable concerns weigh in favor of granting retroactive approval to enable deserving professionals to recover compensation for work actually done, we see nothing in the statute that

7

denies the bankruptcy court the power to grant such retroactive approval." *Id*.  "In the Third

Circuit, nunc pro tunc retention of a professional may be granted," "in the exercise of the

Bankruptcy Court's sound discretion," in "extraordinary circumstances." *In re Pilgrim Med. Ctr.,*

*Inc.*, 574 B.R. 523, 528–29 (Bankr. D.N.J. 2017).

This case is nothing if not extraordinary.  Given the continuity of the efforts among the

TCC in LTL 1.0, the AHC (during the absence of a TCC) and the TCC in LTL 2.0, the Court

should consider the authorization of the retention of the TCC Professionals to be effective as of

the Petition Date.  The Debtor and the US Trustee argue that this Court lacks authority to authorize

retention of an official committee's professionals prior to that committee's formation.  But that

overlooks the fact that the TCC actually *was* in existence when the second bankruptcy petition was

filed.  More fundamentally, the arguments of the Debtor and U.S. Trustee would impose artificial

limitations on the broad equitable power of this Court.  The question is one of this Court's power,

not the TCC's existence.  Thus, other courts have authorized retention of an official committee's

professionals prior to that committee's formation.  *See In re Service Merchandise Co., Inc.*, 256

B.R. 738, 741 (Bankr. M.D. Tenn. 1999) (authorizing retroactive retention and awarding

reimbursement of fees and expenses of a law firm and financial advisor for work performed for a

group of creditors who, for the most part, became members of the official committee of unsecured

creditors and were later retained as professionals for the official committee).  A similar outcome

was reached in *In re Motors Liquidation Co.*, 438 B.R. 365 (Bankr. S.D.N.Y. 2010), in which the

court authorized the retention and compensation of committee counsel for work performed for the

committee's benefit, but prior to the committee's formation.  There, the court granted the

retroactive retention over the objection of the US Trustee, explaining that nothing in section 1103

prevented committee counsel to be compensated prior to the committee's formation, and indeed,

"a bankruptcy court has the power, under section 328, to determine the date from which a committee professional's services may appropriately be compensable, just as the bankruptcy court can fix other aspects of the terms and conditions of the professional's employment." *Id.* at 373-374.  Accordingly, to the extent that the committee sought to retain its professionals for work performed prior to the committee's formation, that work was compensable to the extent it was deemed reasonable under section 328. *Id.* at 375.  The same reasoning is applicable here, and neither the Debtor nor the US Trustee can dispute the *Motors Liquidation* court's analysis. *See also In re S.W.G. Realty Assocs., II, L.P.*, 265 B.R. 534 (E.D. Pa. 2001) (court allowed fees for law firm whose employment by unsecured creditors' committee had been approved nunc pro tunc in an involuntary chapter 7 petition, before case was converted at debtor's request to one under Chapter 11, and before unsecured creditors' committee was appointed, was entitled to recover for services that it provided to the original petitioning creditor).

In sum, the Court has authority to authorize the TCC's retroactive retentions, and, as described in the Substantial Contribution Motion and above, such action is warranted because the efforts of the AHC's professionals were, in effect, performed for the benefit of the TCC—and indeed contributed to the TCC's efforts in achieving dismissal of this case.

## II.  **Reply to the Debtor's Fee Objection**

The Debtor seeks the reduction of millions of dollars of fees incurred by the TCC Professionals, yet does not subject any other estate professional to the same level (or any level) of scrutiny. The Debtor's sweepingly broad objection seeks disallowance of up to **33%** of the TCC Professional fees.  By way of reference, the average reduction of fees agreed to by the fee examiner appointed in LTL 1.0, and ordered by this Court, was 5%.  The Debtor's outrageous request is a continuation of the Debtor's ongoing litigation strategy to attack the integrity of the TCC, its

members, and its professionals.  The TCC, the AHC and the TCC Professionals respectfully

request the Court deny the Debtor's Fee Objection.

The Debtor's Fee Objection raises several categories across which it seeks to generally

reduce the TCC Professionals requested fees by millions of dollars, as well as raises certain

objections to work performed by specific TCC Professionals.  The objections are addressed in turn

below.[5]

### A.  Excessive Staffing/Duplication of Services

The Debtor asserts that the TCC Professionals excessively staffed hearings and depositions

across firms, as well as within each firm.  In sum, the Debtor asserts that multiple attendees at

hearings were unnecessary, given that only a portion of the attendees actively participated.  As a

result, the Debtor argues, a "substantial"—but unspecified—reduction is warranted across all

firms.

To the extent that any of the TCC firms had multiple attendees for a hearing or deposition,

such attendance was made necessary to ensure efficient coordination between and among the firms

while attempting to meet the needs of a fast-moving case.  So that information did not need to be

passed down among and between firms after the fact, having multiple timekeepers at hearings and

depositions allowed those working on related issues to process and implement in real-time.  In

turn, this enabled the TCC's professionals to readily formulate and discuss strategy and next steps

on behalf of the TCC on a real-time basis and as the circumstances of the case warranted.  In this

---

[5]     The Debtor raises certain general objections (e.g., excessive expenses) but does not request a specific reduction.
In other categories, the Debtor identifies certain time entries as problematic.  This Reply is intended to address
the issues generally.  The TCC Professionals each reserve their right to respond further at the hearing to specific
reduction requests directed at each of their firms.

regard, whether any one professional had a speaking role does not render their services duplicative or otherwise improper, as each professional's participation was important.

### B. Block Billing, Lumping, Vague Time Entries

The Debtor's Fee Objection has identified and objected to TCC Professionals' entries totaling over $2.4 million on the basis that such entries reflect block billing, lumping, vagueness, and/or transient timekeepers. Because of these alleged deficiencies, the Debtor has proposed a fee reduction of 33% of these fees. The TCC Professionals disagree that any reduction is warranted.

First, a review of the time entries included on the Debtor's Exhibit D reflect only a few allegations of top-heavy billing for a small number of TCC Professionals, far from anything that might justify a reduction as large as 33%. In a case with multiple co-movants, a committee with multiple members and the coordination of the efforts of co-counsel and other moving parties, it should be expected that much of the strategic thinking and participation in meetings, depositions and hearings would be performed at the partner level.

Second, with respect to block billing, lumping and vagueness, many of the cited entries do not contain multiple discrete tasks (i.e., lumping) that warrant separate entries. And, where one entry *does* include discrete tasks, often those tasks are identified by a separate time marker, allowing the reviewer to determine the reasonableness of the related tasks. *See, e.g.*, Debtor Fee Obj., Ex. D at 144 (entry of Michael R. Maizel). Indeed, a review of the time entries of counsel to the Debtor and to the Ad Hoc Committee of Supporting Counsel (the "Ad Hoc Committee") throughout the case reflect entries entered in the very same way. *See, e.g.*, ECF No. 1303-2, p. 11; *see also* **Exhibit A** attached hereto providing indicative entries. Yet, the Debtor has not filed an objection to any other fee application other than the TCC Professionals.

11

Third, to the extent certain time entries referenced communications with "co-counsel," "TCC counsel" or "professionals," instead of a specific person or firm, this was generally used in instances where meetings included *all* TCC Professional firms, making including specific firm or individual names impracticable.  Indeed, meetings of all TCC counsel were generally held on a weekly basis to confer and coordinate among the various firms, and the entries are described as such.  *See, e.g. id.* at Ex. C, p. 14 (entries reflecting calls with "TCC Counsel").  In other cases, there was a heightened level of care and caution with respect to disclosing information – including, for example, ordinary administrative matters– to preserve and safeguard legal strategies.

Ultimately, the basis for an across-the-board reduction of 33% is excessive, and is simply not borne out by a review of the time entries. [6]   As a result, the TCC Professionals respectfully submit the Debtor's objections should be rejected.

## C.  Objections to Fees Incurred by Massey & Gail LLP ("<u>M&G</u>")

### i.    *M&G's Retention Does Not Exclude Appellate Services*

Debtor's primary argument [Dkt. No. 1496, ¶¶ 4, 38-40, 52; Dkt. No. 1454] is that M&G's retention does not encompass appellate litigation, including the appeal of this Court's dismissal order [Dkt. No. 1127] in the second LTL bankruptcy.  LTL's argument is wrong.  Nowhere does M&G's retention application [Dkt. No. 402], or this Court's Order authorizing and approving M&G's retention [Dkt. No. 777], exclude appellate litigation from the scope of M&G's retention. The language in the retention is broad and is not limited to bankruptcy court litigation.  *See* Dkt.

---

[6]    By way of another example of this, the Debtor cites Chaim Aronov of Otterbourg P.C., asserting that he "billed 100% of his time in .5 increments." But this is not true.  A review of Otterbourg's time detail submitted with its final application shows that Mr. Aronov also had at least 2 other time entries on June 13 and 14, 2023 for which he did not bill in .5 increments, and which are not included on the Debtor's Exhibit D.  But setting aside the fact that there were time entries not billed in .5 increments, that does not mean the entries in .5 increments were not actually performed as billed.

No. 402, ¶ 6(a) ("Provide recommendations and input for legal strategies, tactics, and positions to be taken by the Committee"); *id.* at ¶ 6(e) ("Provide such other services to the Committee as may be necessary in this Case or any related proceedings.").

Indeed, M&G's retention application and supporting documents expressly refer to appellate proceedings and Mr. Massey's appellate expertise:

- In describing M&G's role and the division of labor among the law firms representing the TCC, the retention application states that "Massey & Gail serves as special counsel, providing unparalleled mass tort and other complex case experience *before trial and appellate courts, including the Supreme Court.*" Dkt. No. 402, ¶ 6(c) (emphasis added).

- Remarkably, in arguing that M&G's retention excludes appellate services, LTL *twice* quotes the language referring to M&G's "mass tort and complex case experience," (Dkt. No. 1454, ¶ 2 (quoting Dkt. No. 402, ¶ 6(c); Dkt. No. 1454, ¶ 2 (quoting Dkt. No. 402, ¶ 6(c)), but twice omits the italicized language noted above (*"before trial and appellate courts, including the Supreme Court"*), even though it is the very next part of the very same sentence.  LTL has not accurately represented the scope of M&G's retention.

- The retention application further states that "Massey & Gail is well-versed in the issues presented by the Debtor's current bankruptcy proceeding, having represented the Official Committee of Talc Claimants in the Debtor's prior Chapter 11 bankruptcy proceeding before this Court, *as well as in the Committee's appeal to the Third Circuit Court of Appeals.*"  Dkt. No. 402, ¶ 4.

- Mr. Massey's supplemental certification in support of M&G's retention contains the same statement.  Dkt. No. 698, ¶ 3.

- Mr. Massey recited his appellate experience in his initial certification in support of M&G's retention.  Dkt. No. 402-1, ¶ 2.

These references to M&G's appellate expertise in the retention application and supporting materials would not have been relevant unless the TCC was retaining M&G for potential appellate work as well as bankruptcy court litigation.  Thus, after LTL filed its objection, the TCC voted unanimously to re-affirm its understanding that M&G's retention has always encompassed appellate services.

LTL also fails to mention that M&G played precisely the same role in LTL 1.0, when M&G also served as special counsel to the TCC.  M&G worked extensively on the briefing and every other facet of the appeal in LTL 1.0—to the point where Mr. Massey sat at counsel table during the Third Circuit argument—with no objection from LTL, the Office of the U.S. Trustee, or the Fee Examiner appointed in LTL 1.0.  M&G's role was no secret.  Mr. Massey entered an appearance in the Third Circuit, and his name appeared on every brief and appellate filing.  Mr. Massey's certification in support of M&G's Third Interim Fee Application in LTL 1.0, filed on November 30, 2022, stated:

> During the period covered by the Third Interim application, Massey & Gail provided services relating to the Third Circuit appeals of the Bankruptcy Court's orders denying the TCC's motion to dismiss and extending (over the TCC's objection) stay relief to J&J and other non-debtors. The Third Circuit appeals encompassed:
>
> a. The TCC's opening brief, filed June 30, 2022.
>
> b. Coordination with three other appellants' briefs filed the same day, as well as five supporting amici briefs filed seven days later.
>
> c. A joint appendix of over 10,000 pages.
>
> d. Significant developments during the pendency of the appeal, such as rulings by the 3M/Aearo MDL and bankruptcy courts.
>
> e. The Debtor's brief filed August 16, 2022, along with four amici briefs filed in support of the debtor.
>
> f. The TCC's reply brief, filed on September 6, 2022.
>
> g. Assistance with oral argument preparation.
>
> h. The Third Circuit argument on September 19, 2022. Jonathan Massey was one of two TCC attorneys at counsel table for the argument.

Dkt. No. 3392-1, ¶ 2 (Case No. 21-30589-MBK).

M&G's detailed time records in LTL 1.0 disclosed every hour and minute of the firm's extensive work on the Third Circuit appeal, with no suggestion by LTL that these services fell outside the scope of M&G's retention.  *See* Dkt. No. 3392-2, Ex. G; Dkt. No. 3571-2, Ex. A; Dkt.

No. 3572-2, Ex. A, Dkt. No. 3631, Ex. A; Dkt. No. 3719-2, Ex. A; Dkt. No. 3894-2, Ex. A (all

docket entries from Case No. 21-30589-MBK).

It would make little sense to prevent M&G, a firm with significant experience in complex

litigation presenting novel and difficult legal questions, from participating in appellate litigation

in this case. M&G played a significant role in drafting the TCC's motion to dismiss, the reply

brief in support thereof (which this Court described as an "opening statement"),[7] and the findings

of fact and conclusions of law submitted at the conclusion of the trial, as M&G's time records

reflect.[8] M&G is deeply familiar with the issues presented by the appeal. Creditors and the estate

will benefit from M&G's experience in the Bankruptcy Court proceeding, and the TCC's decision

to deploy M&G as part of the appellate team is more than reasonable.

LTL improperly seeks to disrupt the working relationship among the TCC's counsel that

existed during the appeal in LTL 1.0. LTL seeks to interfere with the TCC's ability to manage its

legal team in the most efficient and effective manner. In particular, LTL improperly seeks to deny

the TCC the benefit of M&G's appellate expertise as well as its experience in LTL 2.0 while it

was pending in this Court.

LTL argues that permitting M&G to work on appellate matters would "conflict[]" with

MoloLamken's role. Dkt. No.1496, ¶ 38. Nowhere does any relevant retention application state

that MoloLamken will be the *exclusive* appellate counsel, or the *only* law firm working on appellate

proceedings for the TCC. By LTL's logic, its retention of the Hogan Lovell firm as appellate

counsel in LTL 1.0 would have precluded Jones Days from working on the appeal. Yet multiple

---

[7]    May 30, 2023 Hearing Tr., at 6:8–20; June 13, 2023 Hearing Tr., at 151:6–8.

[8]    Dkt. No. 967-2, Ex. A (M&G April and May 2023 time entries); Dkt. No. 1026-2, Ex. A (M&G June 2023 time entries); Dkt. No. 1242-2, Ex. A (M&G July 2023 time entries).

attorneys from Jones Day, as well as lawyers from eight other law firms, entered appearances in the Third Circuit in LTL 1.0 on the Debtor's behalf (Skadden Arps Slate Meagher & Flom, Wollmuth Maher & Deutsch, King & Spalding, Shook Hardy & Bacon, White & Case, Miller Kistler Campbell, Miller Williams & Benson, and Rayburn Cooper Durham). Jones Day's own fee applications reveal hundreds of entries regarding its extensive work relating to briefing and argument in the LTL 1.0 Third Circuit appeal. *E.g.*, Dkt. No. 3069-2, at 38-55 (Case No. 21-30589-MBK); Dkt. No. 3171, at 32-54 (Case No. 21-30589-MBK). For example, Jones Day's summary of its July 2022 services disclosed that it was engaged in "reviewing, commenting on and drafting inserts to the Debtor's brief in the Third Circuit Appeal, including conducing necessary research." Dkt. No. 3069, ¶ 8 (Case No. 21-30589-MBK). Jones Day's summary of its August 2022 services made the same disclosure. Dkt. No. 3171, ¶ 8 (Case No. 21-30589-MBK). None of this should be surprising; no doubt the Debtor was well served by having Jones Day participate in the appeal, by virtue of its the experience in the case. But the same reasoning applies to M&G, which has been involved in the LTL bankruptcy proceeding since its first petition was filed in North Carolina.

LTL suggests that M&G's "time records contain admissions that it is not serving as appellate counsel." Dkt. No. 1496, ¶ 39. That suggestion is false; there are no such admissions. LTL cites a reference to the TCC's "appellate counsel" in one of Mr. Massey's time entries, referring to a call "with" (*i.e.*, among) the TCC's appellate counsel. The TCC's appellate counsel included attorneys at five firms—MoloLamken, Brown Rudnick, Otterbourg, Genova Burns, and M&G—all of whom entered appearances in the Third Circuit and whose names appeared on the TCC's submissions. The reference cited by LTL is not an admission that Mr. Massey was not *also* one of the "appellate counsel."

ii.    *Fees Incurred in Connection with the Writ of Mandamus Are Proper*

LTL objects to fees incurred in connection with the petition for writ of mandamus filed in

the Third Circuit on May 1, 2023, on the ground that the petition "did not provide a benefit to the

estate." Dkt. No. 1496, ¶ 55.  But this is not a substantial contribution issue.  Rather, a "bankruptcy

court may approve applications for compensation of services that were competently performed and

that were actual, necessary, and beneficial to a debtor's estate."  *In re Zagara's Fresh Markets,*

*LLC*, No. 03 43017 GMB, 2006 WL 4452980, at *3 (Bankr. D.N.J. Apr. 13, 2006).  Success is not

required, but rather the court "must conduct an objective inquiry based upon what services a

reasonable professional would have performed in the same circumstances." *In re Channel Master*

*Holdings, Inc*., 309 B.R. 855, 861–62 (Bankr. D. Del. 2004) (quoting *In re Cenargo Int'l, PLC*,

294 B.R. 571 (Bankr. S.D.N.Y. 2003)); *see also In re Jefsaba, Inc*., 172 B.R. 786, 799 (Bankr.

E.D. Pa. 1994) ("[S]o long as there was a reasonable chance of success which outweighed the cost

in pursuing the action, the fees relating thereto are compensable.").  Moreover, "the test of what is

necessary cannot be applied in hindsight. If at the time the work is performed, it reasonably appears

that it would benefit the estate, it may be compensated."  *In re Berg*, No. 05-39380DWS, 2008

WL 2857959 at *7 (Bankr. E.D. Pa. July 21, 2008); *see also Hosp. Partners of Am., Inc*., 597 B.R.

at 766 (explaining that, in the Third Circuit, "for services to be compensable under § 330(a)(4)(A),

they must only have been reasonably likely to benefit the debtor's estate at the time they were

rendered, not in hindsight.") (internal quotations omitted) (emphasis in original); *Cenargo*, 294

B.R. at 595 (when determining what is necessary, courts do not attempt to "invoke perfect

hindsight.").

The fees in question pass muster under that standard.  The TCC reasonably decided that

the best interest of creditors would be served by giving the Third Circuit a prompt opportunity to

17

review the legal validity of LTL's second bankruptcy petition, which was filed less than two hours and eleven minutes after this Court's April 4, 2023 dismissal order.  Indeed, a failure by the TCC to seek prompt relief from the Third Circuit would have been utterly inconsistent with its obligations to sick and dying claimants who, because of a second bankruptcy filing, were locked out of court again.  This Court, in reducing the scope of the injunction sought by the Debtor, noted "the interests of the tens of thousands of claimants who wish to go forward outside of the bankruptcy."  PI Mem. Op. at 31.

There was good reason to believe the Third Circuit, which expedited issuance of the mandate in the prior appeal, might have felt it appropriate to terminate this second bankruptcy promptly for the same reasons it terminated the first.  After all, the Third Circuit had cautioned against any effort by LTL to "part with its funding backstop to render itself fit for a renewed filing" and observed that such an attempt would be subject to challenge as a fraudulent transfer.  *In re LTL Management LLC*, 64 F.4th 84, 109 n.18 (3d Cir. 2023).   Moreover, at the time the petition for writ of mandamus was filed, even this Court stated that it was "skeptical" of LTL's second bankruptcy, as noted above.  PI Mem. Op. at 23.

The TCC's judgment was a reasonable one, especially given LTL's avowed intent to file a reorganization plan by May 14, rush the plan confirmation process, and thereby seek to outrun the appellate process.  Not until the hearing on May 3, 2023 (after the petition for writ of mandamus was filed) did this Court make clear that it was not going to allow LTL to play "beat the clock." May 3, 2023 Hearing Tr., at 121:14–20.

Despite LTL's suggestion that the arguments in the petition for writ of mandamus lacked merit, in fact they provided the foundation for objections in the eventual motions to dismiss, such as whether LTL's attempt to manufacture financial distress was itself further evidence of bad faith.

When this Court ultimately dismissed LTL's second bankruptcy for lack of financial distress, it

noted but did not resolve the arguments initially raised in the mandamus petition. Dkt. No. 1127,

at 39 n.22. Nor did the Third Circuit reject the arguments in the mandamus petition. The Third

Circuit's May 9, 2023 Order denying the writ merely provided:

> In order to allow the Chapter 11 proceedings of LTL Management, LLC, No. 23-12825, to continue on the expedited basis set by the Bankruptcy Court for the District of New Jersey, and recognizing that the writ of mandamus is a drastic and extraordinary remedy and there are other adequate means for the petitioner to obtain the relief it seeks, the Public Petition for Writ of Mandamus of Talc Claimants is hereby denied.

The TCC's decision to file the writ was not unreasonable, and the fees in question are

compensable.

### iii.    Other Objections to M&G Fees Lack Merit

M&G has coordinated with the TCC's other counsel to maximize efficiency and avoid

unnecessary duplication of effort. M&G has focused on the novel and complex legal questions

presented, while other firms retained by the TCC have been responsible for discovery, witness

preparation, trial, bankruptcy administration, and other matters. In connection with the dismissal

of LTL 1.0, the Debtor asked that the fee examiner be discharged and indicated that the Debtor

itself would review the various fees requested by TCC professionals and would object to those the

Debtor deemed excessive. After reviewing M&G's remaining LTL 1.0 fees, the Debtor did not

request any reduction in M&G's fees or expenses, and they were paid in full, without deduction.

LTL's new-found objections lack merit.

Although the Debtor complains of "excessive staffing" at hearings, Dkt. No. 1496, at 10,

its own Exhibit A shows that typically only a handful of M&G lawyers (sometimes only one or

two) attended Bankruptcy Court hearings (and often remotely). Dkt. No. 1496-1. During the

motion to dismiss trial, a maximum of four M&G attorneys attended court hearings. *Id*. Given

the significant role M&G played in the motion to dismiss briefing and findings of fact/conclusions of law, this staffing was entirely appropriate.

LTL also complains of "excessive" deposition attendance.  Dkt. No. 1496, at 12-13.  But the Debtor's Exhibit B, Dkt. No. 1496-2, shows that M&G attorneys did not attend depositions on a routine basis.  The Debtor has identified only six occasions where M&G attorneys attended any portion of a deposition.  The total amount of M&G fees attributable to deposition attendance, according to the Debtor, comes to only $6,756.50.

LTL also contends that some of M&G's time entries are "top heavy." Dkt. No. 1496, ¶ 61. This objection misses the mark.  The nature of the novel and complex legal questions assigned by the TCC to M&G demands the attention of a small team of seasoned lawyers.  Having a large number of associates work on the questions would have only increased the cost to the estate. Moreover, M&G has been able to successfully leverage the work of associates at other TCC firms and should not be punished for engaging in precisely the kind of coordination and avoidance of duplication that the U.S. Trustee Guidelines demand (and that the retention applications in this case promised).  Tellingly, LTL did not object to M&G's fees in LTL 1.0 on this basis, and its newly minted objection on such basis has no merit.

LTL's complaint about the supposed "vagueness" in M&G billing records falls flat.  They are much more detailed than the vague, block-billing by LTL's own counsel or counsel for the Ad Hoc Committee.[9]  In any event, the kind of detail LTL seeks (such as specifics as to arguments

---

[9]     For example, one Jones Day partner billed 11.3 hours in a single day with only the description: "review and revise draft trust distribution procedures." Dkt. No. 1311-2 at 14. This attorney used substantially the same description for additional blocks of 7.8 and 6.5 hours, respectively. *Id.* at 12, 21. The same lawyer billed 4.0 hours to "Review and analyze plan issues." Another Jones Day attorney block-billed 5.9 hours to "Draft outline for reply in support of solicitation procedures, including related research." *Id.* at 24.

One Ad Hoc Committee attorney billed 20.30 hours in two entries with only the description: "Work on Trust Distribution Procedures (TDP) and extended meeting with C. Rubio to discuss and make substantial revisions thereto (8.9)" and "Complete research in Boy Scout case on broad support by ad hoc victims committee for

being researched or drafted) would require disclosure of information protected by the attorney-work product privilege.  In a bankruptcy like this one, that would mean disclosure of the nature of arguments in real time, while briefing was still ongoing.

### D.  Objections to Fees Incurred by FTI

#### i.   *FTI's Fees Incurred In Connection with Allegedly Unauthorized Work*

##### a.   Strategic Communications

The Debtor asserts that FTI's fees in connection with work related to developing the TCC website, town halls, and other media activities exceeded the scope of FTI's retention, were unnecessary and provided no benefit to the estate. Debtor Fee Obj, ¶ 43.

Pursuant to FTI's Retention Order entered on June 14, 2023 [Dkt. No.774], ¶ 15 states that FTI's scope of services includes "assistance in the development and implementation of communications strategies, including digital insights and development, with various stakeholders and including assisting and advising the TCC on matters related to satisfying its obligations under section 1103 of the Bankruptcy Code."

Clearly this communications services work is within the FTI scope of services authorized by the Court, is consistent with the Committee's obligations under section 1103 of the Bankruptcy Code and is fully compensable. As such the Court should fully overrule the Debtor's objection.

##### b.   Alexander Rinaudo

---

victims for individual voting rights by digital method (1.9) and discuss same with C. Rubio (.3); and communicate findings to M. Watts (.3); work on Trust Distribution Procedures (TDP) and extended meeting with C. Rubio to discuss and make substantial revisions thereto (8.9)." Dkt. No. 1059, at 14. Another Ad Hoc Committee attorney billed 8.90 with the description: "Work on Trust Distribution Procedures with L. Parkins." Another billed 5.6 hours for: "Draft reimbursement agreement, motion to approve ad proposed order and multiple correspondence with S. Van Aalten and revisions thereto." Dkt. No. 1061, at 16. Yet another billed 7.30 hours for: "Continue to revise, finalize redacted and unredacted 2019 statement, exhibits motion to seal/proposed order/notice; coordinate service of same." Dkt. No. 1061, at 24.

The Debtor objects to the entirety of the amounts billed by Mr. Alexander Rinaudo, boldly asserting that Mr. Rinaudo is not an employee of FTI. Debtor Fee Obj. at ¶ 44. This is incorrect, Mr. Rinaudo is an employee of FTI through its subsidiary Compass Lexecon. Compass Lexecon was retained in connection with the retention of FTI. *See* FTI Retention Order at ¶ 18. Mr. Rinaudo joined Compass Lexecon as a Senior Vice President in October 2022. While Mr. Rinaudo previously worked for EconOne, he has since updated his LinkedIn profile to reflect his current position at Compass Lexecon. Accordingly, the work performed by Mr. Rinaudo was fully authorized and appropriate under the FTI Retention Order, the work is compensable and the Court should fully overrule the Debtor's objection.

### ii. *Estimation*

The Debtor objects to the amount FTI incurred for estimation services for the entire case. In so doing, the Debtor avers that FTI has not demonstrated such fees provided any benefit to the estate.

In LTL 1.0, the Debtor made repeated representations that $2.0 billion was a sufficient amount to fund all of its liabilities. Without taking a position on the overall liability, the Debtor has increased the $2.0 billion proposed in LTL 1.0, to an amount of $8.9 billion (net present value) [Kim Decl. ¶ 8, Dkt No. 4] in LTL. Clearly, FTI's work on estimation, one of the seminal issues in the case, was reasonable, necessary and provided great benefit to the administration of the Debtor's estate.

The Debtor noted that FTI did not produce a report. That is because we never reached that point in the case, instead the case was dismissed. Had the TCC's motion to dismiss the bankruptcy not been granted, the Debtor intended to move through an expedited plan process. FTI was asked by the TCC to assist in the preparation of its Disclosure Statement objection. Because sizing of the

potential liability was a key issue in this case, FTI spent significant time preparing and presenting analyses related to the development of an expert report in connection with the TCC's Disclosure Statement objection.[10]

It is important to note that in LTL 2.0, FTI played a dual role in estimating both the mesothelioma and the ovarian cancer claims, while in LTL 1.0 those roles were bifurcated between FTI and the Brattle Group ("Brattle").[11]

Additionally, the Debtor objects to FTI time spent on the Debtor's expert reports relating to the Motion to Dismiss, alleging that FTI had no role in connection with the Motion to Dismiss. At the request of the TCC, and in its capacity as financial advisor, FTI dedicated time to reviewing and analyzing the Debtor's expert reports with respect to financial related matters.  This work was necessary in order for the TCC to develop an understanding of the Debtor's underlying financial assumptions contained in the expert reports.

As a result, the Debtor's objections to the FTI fees are without merit and should be overruled in their entirety.

---

[10]   The Debtor also alleges that FTI's time entries reflect block-billing, or contain multiple entries relating to a single workstream on the same day. However, this concern is unfounded as addressed in the general section above. FTI's billing practices are consistent with the Bankruptcy Code, the US Trustee Fee Guidelines.  The Court should overrule the Debtor's objection

[11]   As set forth in ¶ 2 of FTI's Retention Order, and in addition to FTI's role as financial advisor to the TCC, FTI was retained as talc consultant to the TCC. In this role, FTI was tasked with estimating current claims (which included claims existing as of October 14, 2021 (the "LTL 1.0 Petition Date"), including claims that accrued during the pendency of the first bankruptcy case) and future claims. Moreover, in LTL 1.0, FTI was retained to advise the Committee on the estimation of the Debtor's current and contingent mesothelioma liabilities, while Brattle was retained by the Committee as talc consultant during the 2021 Case. In LTL 2.0, FTI's role was expanded with the involvement of Compass Lexecon to focus on estimating all of the Debtor's current and future liabilities. Specifically, ¶ 15 to FTI's Retention Order provides for FTI's "assistance in the review and/or preparation of information in connection with developing estimations of the number and value of present and future personal injury claims." The additional scope of FTI's role in LTL 2.0, as well as additional developments, required substantial time and resources.

### iii.    Hearing Over-Attendance

The Debtor also asserts that FTI overstaffed for attendance at hearings, resulting in duplication of effort that it alleges was neither reasonable nor necessary. Exhibit A to the Debtor's Objection is a breakdown of the attendees, hours, and fees for each TCC Professional for each hearing throughout the pendency of LTL 2.0. The Debtor alleges that FTI billed 60.0 hours and $61,440.50 for attendance at hearings.

From the Petition Date through the date of entry of an order dismissing LTL's second bankruptcy, FTI attended only 10 of the 16 hearings, totaling 59.6 in hours and $60,910.50 in fees. The attendance of FTI Professionals at these 10 hearings was beneficial to the estate and necessary to support TCC Counsel with financial inquiries and issues that may have arisen and/or did arise in connection with the subject matter of those 10 hearings. FTI also assisted with the presentation of slides and materials for some of the hearings.

FTI's attendance at hearings was reasonable and necessary. Indeed, FTI was judicious and FTI only attended hearings when requested by Counsel or the Committee when financial matters were expected to arise.  As a result, the Debtor's objection should be overruled.

### iv.    Deposition Attendance

From the Petition Date through the Dismissal Order, the Debtor's Fee Objection identifies 11 deponents that were deposed in connection with the preliminary injunction adversary proceeding and 18 deponents that were deposed in connection with the motion to dismiss.

FTI attended 12 of the 29 depositions, amounting to attendance at approximately 45% of the depositions held during the duration of LTL 2.0. The TCC was thoughtful when requiring that a FTI Professional attend a deposition and FTI only attended certain depositions where financial

matters were reasonably anticipated to be discussed. FTI's attendance was reasonable and necessary in order to assist TCC Counsel regarding financial inquiries of the deponents.

A summary of FTI's deposition attendance is below.  As shown below, FTI attended less than half of the depositions held during LTL 2.0.  The Debtor's objection is, thus, without merit.

| FTI Deposition Attendance | | | | | | |
|---|---|---|---|---|---|---|
| Deponent | Preliminary Injunction | MTD Deposition | Total Depositions | # of Depositions Attended by FTI | FTI Hours | FTI Fees |
| Bell | - | 1 | 1 | - | - | $ - |
| Birchfield | 1 | 1 | 2 | 1 | 1.4 | 973.00 |
| Dickinson | 1 | 1 | 2 | 1 | 3.7 | 1,757.50 |
| Haas | 1 | 1 | 2 | 1 | 4.8 | 2,808.00 |
| Kim | 1 | 1 | 2 | 1 | 8.0 | 6,064.00 |
| Lisman | 1 | 1 | 2 | 1 | 3.6 | 3,330.00 |
| Molton | 1 | - | 1 | - | - | - |
| Murdica | 2 | 1 | 3 | 2 | 5.6 | 5,260.00 |
| Natchawati | - | 1 | 1 | 1 | 3.8 | 2,641.00 |
| Onder | - | 1 | 1 | 1 | 4.9 | 2,327.50 |
| Pulaski | 2 | 1 | 3 | - | - | - |
| Rave | - | 1 | 1 | - | - | - |
| Watts | 1 | 1 | 2 | 1 | 2.8 | 1,946.00 |
| Wong | - | 1 | 1 | 1 | 1.1 | 1,457.50 |
| Wuesthoff | - | 1 | 1 | 1 | 2.4 | 1,140.00 |
| Burian | - | 1 | 1 | 1 | 2.4 | 3,180.00 |
| Mullin | - | 1 | 1 | - | - | - |
| Ferguson | - | 1 | 1 | - | - | - |
| Birnbaum | - | 1 | 1 | - | - | - |
| **Total** | **11** | **18** | **29** | **13** | **44.5** | **$ 32,884.50** |

### v.  Multiple Attendees

In addition to the objections noted above, the Debtor also submits a general objection to the attendance of multiple FTI Professionals at hearings, depositions or calls, leading to potential intrafirm duplication of effort.[12]

In addition to the responses above, FTI was very conscious of the number of attendees at meetings and in instances where more than 2 professionals attended, these meetings generally required the expertise of specific subject matter experts (i.e., experts in restructuring, strategic communications, claims estimation, economics, tax, forensic accounting, liquidity and intercompany accounting). *See* FTI Retention Order, ¶ 15.

Exhibit C to the Debtor's Fee Objection includes time entries relating to FTI attendance at depositions, hearings, and the 341 Creditors Meeting.[13] The Debtor identifies 63 meetings that FTI participated in throughout LTL 2.0. Of those meetings, FTI had an average of 2.6 attendees.

The attendance of FTI professionals at hearings, depositions, meetings and conference calls was reasonably, necessary and provided benefit to the administration of the Debtor's estate.  As such, the Court should fully overrule the Debtor's objection.

### vi.  Post-Dismissal Order

Lastly, the Debtor objects to the work performed by FTI following entry of Judge Kaplan's opinion in favor of dismissing LTL's second bankruptcy on July 28, 2023 (the "Dismissal Ruling") [Dkt No. 1127] on matters unrelated to dismissal, which appears to be an error. FTI spent minimal

---

[12]    Exhibit C to the Debtor's Objection also includes objections to the supposed "vagueness" of FTI time entries. That objection is meritless. FTI's time entries contain sufficient detail to describe the services provided at the request of the Committee. Additional detail would have disclosed client confidences, privilege, and strategy.

[13] Exhibit C to the Debtor's Objection also includes objections to the supposed "vagueness" of FTI time entries. That objection is meritless. FTI's time entries contain sufficient detail to describe the services provided at the request of the Committee. Additional detail would have disclosed client confidences, privilege, and strategy.

time following entry of the Dismissal Ruling. The Debtor did not provide a breakdown of the time

detail comprising these fees.  Following entry of the Dismissal Ruling, FTI's work primarily

related to assisting the Committee with certain motions/draft orders, preparation of fee

applications, and strategic communications time.  FTI submits that the limited amount of post-

dismissal time incurred for these services are appropriate, reasonable and fully compensable.

### E.  Objections to Fees Incurred by Anderson Kill

In the Debtor's Fee Objection and the Anderson Fee Objection, the Debtor objects to

certain of the fees incurred by Anderson Kill after the formation of the Committee.  The Debtor's

argument that Anderson Kill's services did not benefit or were not necessary for the administration

of the Debtor's estate is unfounded and incorrect.  The Debtor generally asserts, without providing

much detail, that Anderson Kill's role as special insurance counsel was no longer necessary upon

the issuance of the Dismissal Opinion.  That is simply not true.

Anderson Kill's work as insurance counsel continued post August 11, 2023 in connection

with the appeal insofar as a) the availability of about $2 billion in insurance coverage underlies

certain aspects of the "good faith" issue which is central to the dismissal; and b) members of the

committee post-dismissal reached out to Anderson Kill with questions relating to the Debtor's (and

J&J's) insurance coverage.  When the actual time entries are examined, Anderson Kill's time was

spent in committee meetings discussing the appeal and reviewing appellate papers with attention

to matters concerning insurance as may be affected by the appeal.  Anderson Kill does not

arbitrarily perform any task.  Anderson Kill needs to be aware of and understand what is going on

to analyze and assess the impact on about $2 billion in insurance coverage for the Debtors and

claimants.  It is both Anderson Kill's legal and ethical obligation to remain well-informed as to

what is going on with the appeal, especially as the Debtors' position is that this case should be returned to this Court.

The reason that some of Anderson Kill's time was designated under the "Asset Analysis and Recovery" category is simply that such designation is the standard designation for the firm's work.

### F. Objection to Genova Burns Fees and Expenses

Genova Burns generated fees for the four months and one week that the second LTL Chapter 11 case was pending totaling $1,137,165.00. The Debtor's somewhat rambling objection to the TCC fees does not specify the amount that the Debtor seeks to reduce the Genova Burns fees.

The fee examiner in the first LTL case reviewed Genova Burns' fees and, after conferring with Genova Burns, recommended to the Court that the fees sought be reduced by 2.8% of the amount requested.

In connection with the dismissal order in the first LTL Chapter 11 case, the Debtor requested that the fee examiner be discharged and indicated that LTL would review the various fees requested by TCC professionals and would object to those that the Debtor deemed excessive. After reviewing the Genova Burns remaining fees from LTL1, the Debtor advised Genova Burns that the Debtor requested no reduction in the fees or expenses of Genova Burns and the fees and expenses were paid in full, without deduction.

If anything, during the second LTL Chapter 11 case, Genova Burns used fewer attorneys and billed less in the way of fees. Therefore, any argument by LTL that the Genova Burns fees, as detailed in the final fee application are excessive, is spurious and without reasonable basis.

The Court should remember that in the 2 hours and 11 minutes between LTL1.0 and LTL2.0, LTL not only paid the fees and expenses of the Debtor's professionals, but paid additional amounts to assure that, if anything, the Debtor's professionals had been overpaid.

There is no valid basis for the disallowance of any of the fees or expenses detailed by Genova Burns in its final fee application.

### G. Objection to Miller Thomson Fees

The Debtor objects to Miller Thomson LLP's fees in the amount of $34,388.50 for attending - and communications concerning – depositions and discovery.  Miller Thomson has a distinct purpose: to advise the TCC on Canadian issues impacting this case, including the Canadian Recognition Proceeding. Miller Thomson cannot anticipate the extent to which statements or matters arising from the depositions and discovery would relate to, or impact Canadian issues.  This is a cross-border case by the Debtor's choice.  Miller Thomson cannot rely on its US colleagues to identify whether a particular matter arising from or statement made in the depositions would have an impact on Canadian law and litigation strategy.  Accordingly, Miller Thomson sent a minimal amount of representation (in almost all instances, one partner) to depositions to ensure matters affecting Canada are identified and the TCC is properly advised. In keeping with its role as Canadian counsel to the TCC, Miller Thomson receives inquiries from counsel to Canadian claimants concerning the implications of the case to Canadians. In order to respond to those inquiries, it is essential that Miller Thomson be current as to all aspects of the case which the Debtor commenced.

The minimal costs incurred by Miller Thomson to remain informed about the chapter 11 case and its impact on Canadian claimants are both appropriate and reasonable. It is also to be

noted that Miller Thomson's accounts are in Canadian dollars (at this time, the Canadian dollar is at approximately 73 cents to the US dollar).

### H. Objection to Brown Rudnick Fees

The Debtor identifies Brown Rudnick's fees as being particularly problematic due to vague time entries and lumping of time. Many of the entries described as vague (e.g., description of tasks relating to discovery related disputes or development of litigation strategy) required the timekeeper to be less descriptive to avoid revealing potential litigation strategies or other confidential information in our monthly fee statements. Other of the time entries referenced general correspondence where our timekeepers were responding to specific inquiries that would be difficult to articulate in a time entry. In addition, given the number of counsel, committee members and committee representatives involved, 'numerous correspondence/calls' often reflects that conversations or email communications may have been sequential with different individuals or groups. But given the interrelated nature of the communications, attempts to separate out the communication would be artificial.

As to the lumping of time, the Debtor's Exhibit E includes time entries in which counsel identifies various pieces of one task under one time entry (e.g., review and edit). In these instances, the description is of one billable task, but is describing the various actions taken to complete that task. For example, a timekeeper may review and analyze a comment to a brief as the comments are being implemented into the work product. Similarly, some entries include the time required to prepare for and attend a call within the same entry. Frequently, particularly where numerous parties are involved, such entries involve meetings that do not begin at the appointed time, and the attorney's preparation time bleeds into the supposed meeting time and it can be unclear when in fact the meeting actually begins. It is not useful to delineate time entries under such circumstances;

in fact, doing so could result in overbilling by remainder increments. Moreover, often the preparation and call itself did comprise one 'billable event' and efforts to separate them out would be somewhat artificial. The Debtor also identifies a number of entries as lumping where time assigned to describe substantive tasks was in excess of one hour. As the litigation generally required extensive research and drafting, many of the tasks undertaken by the attorneys did take multiple hours to complete.

As noted above, the request for a 33% reduction is excessive and unsupported by a review of the time entries. Brown Rudnick respectfully requests that the Court overrule the Debtor's objections to its fees.[14]

### I.  Travel Not Billed at Half Rate

The Debtor objects to the travel time of Judge Royal Furgeson (Ret.), who served as an expect for the TCC during the dismissal trial. Judge Furgeson's time entries reflect travel billed at "4.0" hours each for travel to and from Dallas, Texas to the dismissal hearing in Trenton, New Jersey. Dkt. No. 1358-3, at 4. The Debtor asserts that these entries were not billed at 50%, as required. There is, however, no basis for the assertion that these entries are incorrect, and that Judge Furgeson's travel did not take at least eight hours to complete. Indeed, a review of Jones Day's time entries often reflects travel time of close to 8 or more hours for one leg of a trip between Dallas and Trenton. *See* Dkt. No. 1303-2, e.g., p. 52 (reflecting entry by G. Gordon for 8.5 hours of travel from Trenton to Dallas on June 30, 2023).

---

[14]   On Exhibit F of the Debtor's Fee Objection, the Debtor identified approximately $6,000 in fees incurred by Brown Rudnick that appear to be entered in error. Brown Rudnick consents to the $6,000 fee reduction.

**J.  Houlihan Lokey Discretionary Bonus**

Finally, the Debtor's Fee Objection takes particular issue with the $2.0 million Discretionary Fee that was approved by the TCC to reflect the extraordinary services provided by Houlihan Lokey.  Houlihan Lokey asks the Court to reject the Debtor's objection, and enter an order approving the fees requested by Houlihan Lokey under its Final Fee Application, in light of the facts and circumstances as described below.

The Debtor's Fee Objection attempts to improperly narrow Houlihan Lokey's responsibilities to only the production of the Expert Report of Saul E. Burian (the "Report"). Debtor Fee Obj. at ¶ 75.  However, Houlihan Lokey was hired to serve as Investment Banker to the TCC, with a broad scope of services as set forth in Houlihan Lokey's Retention Application. Dkt. No. 538 at ¶ 5. Houlihan Lokey was selected by the TCC for this role in a competitive pitch process that considered all of Houlihan Lokey's skills and experiences as a premiere investment banking advisor, particularly in complex financial restructuring situations.

Houlihan Lokey served the TCC far beyond providing the Report and testimony related to the TCC's motion to dismiss. Houlihan Lokey engaged in full coordination with other TCC professionals to put the TCC in the best position to perform its duties by performing a wide variety of tasks, including significant document and deposition discovery and potential settlement negotiations,[15] analysis of the Debtor's and the Debtor's affiliates financial condition and transactions including the Initial Public Offering of Kenvue and the ultimate split-off of Kenvue to J&J shareholders in August 2023.

The Discretionary Fee provision of Houlihan Lokey's compensation structure was well known to all parties in interest in the case.  Going back to LTL 1.0, Houlihan Lokey made

---

[15]    In light of the confidential nature of settlement discussions, no details can be disclosed.

numerous concessions and modifications to its compensation structure to resolve objections. In addition to the fee concessions (totaling approximately $850,000 between LTL 1.0 and LTL 2.0), Houlihan Lokey further revised its compensation structure to reflect the Court's concern at the LTL 1.0 retention hearing. Houlihan Lokey reduced the proposed Deferred Fee from $5.0 million to $3.0 million and, importantly, included a Discretionary Fee that could be approved in the TCC's business judgement and subject to review by all parties.

Ultimately, Houlihan Lokey acquiesced to a request for a further modification (reduction) to its monthly fees in reliance on the Discretionary Fee. The Court approved this compensation structure, including the Deferred Fee and Discretionary Fee as revised at the June 14, 2022 hearing in LTL 1.0.

LTL 2.0 proceeded at an extremely rapid pace. The TCC needed representation immediately and there was an enormous amount of financial work and analysis that had to be done on an expedited timeframe. So as to not delay the provision of these critical services, Houlihan Lokey agreed to a compensation arrangement in this case that was fundamentally the same as LTL 1.0, including the Discretionary Fee. This was done as an accommodation and explicitly in reliance on the good faith of the TCC, the other parties in interest, and ultimately the Court, to treat Houlihan Lokey fairly.

When requesting TCC approval of the Discretionary Fee, Houlihan Lokey initially requested the TCC approve a net Discretionary Fee of $2.3 million, which was calculated as approximately $850,000 in fee concessions across both cases, plus 50% of the $3.0 million Deferred Fee that would have been payable had a plan of reorganization been consummated with respect to the Debtor.  Ultimately, the TCC, using its business judgement, approved a $2.0mm net

Discretionary Fee (and Houlihan Lokey gratefully accepted such amount) in recognition of the extraordinary services provided by Houlihan Lokey.

There is no dispute that Houlihan Lokey's services have been necessary, productive, professional, effective, and extraordinarily timely and of high quality.

To put the Houlihan Lokey fees in context and relative to the other professional fees requested to be paid in both LTL 1.0 and LTL 2.0, Houlihan Lokey's requested fees, including the Discretionary Fee, are well below several other professionals in these cases on an hourly rate[16] basis.

Despite not customarily billing for our services on an hourly basis, Houlihan Lokey agreed to provide "reasonably detailed summary time records in 0.5 hour increments, which records shall indicate total hours incurred by each professional for each day, the individuals who provided the services and provide a brief description of the nature of the work performed." These records have been provided to the Court, and show that Houlihan Lokey professionals worked approximately 2,486 hours during LTL 1.0 in support of the TCC. This would equate to approximately $550 per hour for the duration of the case, assuming the $2.0mm Discretionary

---

[16] The Financial Restructuring Group within Houlihan Lokey, is not set up to bill for its services on an hourly basis given the transactional nature of the services Houlihan Lokey provides. This was made aware to the Committee and all parties in interest in Houlihan Lokey's retention applications in both LTL 1 and LTL 2. Instead, Houlihan Lokey's services are billed both on a monthly/ongoing basis, and on a transactional and/or discretionary basis depending on the circumstances. Generally, Houlihan Lokey believes that, most likely, the hours recorded in its fee statements under represent hours actually worked for a number of reasons, including (i) only financial restructuring professionals working day to day on this case report hours, while all of the resources of Houlihan Lokey's nearly 2,000 worldwide financial professionals are available and often contribute as needed on complicated matters, and (ii) our culture even within the financial restructuring group is to get the work done effectively and estimate the hours retrospectively. No financial professional at Houlihan Lokey is managed or compensated based on the number of hours worked or recorded.

Fee is not paid. This hourly rate of $550 is less than the average hourly rate billed by Junior[17] employees at other firms in LTL 1.0 of approximately $652. *See* **Exhibit B** annexed hereto.

In LTL 1.0, Houlihan Lokey received fees of $3,269,765.33 and worked 5,725 hours for an average hourly rate of $571. Again, this is in stark contrast to other professionals in these cases, see **Exhibit C** where firms in LTL 1.0 billed an average hourly rate of $870.

Including the requested $2.0 million net Discretionary Fee as approved by the TCC, Houlihan Lokey's imputed hourly rate across both LTL 1.0 and LTL 2.0 combined is approximately $808, which is more in-line with other professionals in these cases where the average hourly rate billed is $907, see **Exhibit D**.

Houlihan Lokey respectfully asks the Court to approve the Final Fee Application, including the $2.0 million net Discretionary Fee as approved by the TCC. The Court is well aware of the quality of services provided by Houlihan Lokey and its efforts within a very short timeframe. These efforts required intense senior level focus that precluded other assignments. The fees requested, including the Discretionary Fee, are reasonable and appropriate. To the extent the hours and hourly rates are relevant, the included exhibits more than amply highlight the reasonableness of the Houlihan Lokey request.

## **CONCLUSION**

For the reasons set forth herein, the TCC, TCC Professionals, and AHC respectfully request that the Court overrule the objections in full.

---

[17]    Professionals categorized as "Junior" as follows: i) Law Firms: Associate, Paralegal, Case Assistant, Law Clerk, Staff Attorney, Project Manager, and Librarian and ii) Financial Professionals: Consultant, Manager, Associate, Analyst, Economist, Consultant, Engineer, Project Assistant, and Project Coordinator.

Dated: October 13, 2023

Respectfully submitted,

**GENOVA BURNS, LLC**
By:___*/s/ Daniel M. Stolz*_____
Daniel M. Stolz, Esq.
Donald W. Clarke, Esq.
110 Allen Road, Suite 304
Basking Ridge, NJ 07920
Telephone: (973) 533-0777
Facsimile: (973) 467-8126
Email: dstolz@genovaburns.com
Email: dclarke@genovaburns.com

*Local Counsel to the Official Committee of Tort
Claimants of LTL Management, LLC and to the Ad
Hoc Committee of Certain Talc Claimants*

-and-

**THE OFFICIAL COMMITTEE OF TALC
CLAIMANTS AND AD HOC COMMITTEE
OF CERTAIN TALC CLAIMANTS**

/s/ Michelle Parfitt_____
Michelle Parfitt, Esq. as specifically authorized by
Committee Co-Chair Rebecca Love,
c/o Ashcraft & Gerel, LLP
1825 K Street, NW, Suite 700
Washington DC 20006

*/s/ Leigh O'Dell*_____
Leigh O'Dell, Esq., as specifically authorized by
Committee co-chair Alishia Landrum c/o Beasley
Allen Law Firm PO Box 4160 Montgomery, AL
36103

/s/  Perry Weitz
Perry Weitz, Esq., as specifically
authorized by Committee co-chair Patricia Cook
c/o Weitz & Luxenberg, P.C.
700 Broadway
New York, NY 10083

*Co-Chairs of the Official Committee of Talc
Claimants and of the Ad Hoc Committee of Certain
Talc Claimants*