```
                   IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE DISTRICT OF NEW JERSEY

IN RE:                          .    Case No. 23-12825(MBK)
                                .
                                .
LTL MANAGEMENT LLC,             .
                                .    U.S. Courthouse
              Debtor.           .    402 East State Street
                                .    Trenton, NJ 08608
                                .
                                .    October 18, 2023
. . . . . . . . . . . . . . . . .    10:02 a.m.


         TRANSCRIPT OF HEARING REGARDING PROFESSIONAL FEES
            BEFORE THE HONORABLE MICHAEL B. KAPLAN
          UNITED STATES BANKRUPTCY COURT CHIEF JUDGE


TELEPHONIC APPEARANCES:

For Ad Hoc Committee of         Genova Burns LLC
Certain Talc Claimants and      By:  DANIEL M. STOLZ, ESQ.
Ad Hoc Committee of             494 Broad Street
Creditors:                      Newark, NJ 07102

                                Brown Rudnick
                                By:  JEFFREY L. JONAS, ESQ.
                                7 Times Square
                                New York, NY 10036

For the Debtor:                 Wollmuth Maher & Deutsch LLP
                                By:  JOSEPH F. PACELLI, ESQ.
                                     PAUL R. DeFILIPPO, ESQ.
                                500 Fifth Avenue
                                New York, NY  10110




Audio Operator:                 Kiya Martin

Proceedings recorded by electronic sound recording, transcript
              produced by transcription service.
```

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (CONT'D):

| | |
|---|---|
| For Ad Hoc Committee of Certain Talc Claimants and Ad Hoc Committee of Creditors: | Genova Burns LLC<br>By:  DANIEL M. STOLZ, ESQ.<br>494 Broad Street<br>Newark, NJ 07102 |
| | Brown Rudnick<br>By:  JEFFREY L. JONAS, ESQ.<br>7 Times Square<br>New York, NY 10036 |
| For the Office of the United States Trustee: | Office of the United States Trustee<br>By:  LINDA RICHENDERFER, ESQ.<br>     LAUREN BIELSKIE, ESQ.<br>J. Caleb Boggs Federal Building<br>844 King Street, Suite 2207<br>Lockbox 35<br>Wilmington, DE 19801 |
| For the TCC: | Massey & Gail<br>By:  JONATHAN S. MASSEY, ESQ.<br>The Wharf<br>1000 Main Avenue SW, Suite 450<br>Washington, D.C. 20024 |
| For Houlihan Lokey: | Houlihan Lokey<br>By:  SAUL BURIAN, ESQ.<br>10250 Constellation Blvd., 5th Floor<br>Los Angeles, CA  90067 |

- - - - -

1          (Proceedings commenced at 10:02 a.m.)

2          THE COURT:  Okay.  Good morning, everyone.  This is

3 Judge Kaplan and we will start the hearings on LTL

4 Management LLC.  Let me just go through and get my computer set

5 up.

6          All right.  We have just a few counsel and parties

7 who've requested presenter status.  Since the bulk of the

8 application represent the TCC's motion for approval of various

9 fees, let me turn to the TCC's counsel and have appearances and

10 see how you wish to proceed.

11         MR. JONAS:  Good morning, Your Honor.  It's Jeff

12 Jonas from Brown Rudnick for the movants today.

13         And at least, initially, I expect to speak for all of

14 the movants.  We'll see how that goes, of course.  Everybody's

15 got their own fees at stake and I don't want to take away

16 anybody's opportunity.  I know especially Mr. Burian, Saul

17 Burian of Houlihan Lokey, is present, and he probably more than

18 anyone may want to speak briefly when I'm done.

19         But that's just my quick opening, Your Honor.  And if

20 you want me to proceed, I'm happy to take up the various pieces

21 that are before you today and kind of lay out how I see

22 handling today.

23         THE COURT:  That's fine.  Before I tell you to

24 proceed, is there anyone who wants to raise any issues with the

25 process for today's hearing?

4

1                    (No audible response)

2              THE COURT:  Great.

3              Then, Mr. Jonas, the floor is yours.

4              MR. JONAS:  Great.  Thank you, Your Honor.  Again,

5    Jeff Jonas from Brown Rudnick for the movants.

6              Your Honor, I'll address the four categories, I think

7    it's four categories, of motions that are on for today in turn.

8    Let me just explain what I think those are to see if we at

9    least agree on the size of the table.

10             We have a motion for professional fees for the period

11   April 4th through April 14, 2023.  That was what could be

12   called the before-the-Committee-was-formed period.  The TCC was

13   formed on, I think it was April 15th, so that's the first

14   motion.

15             THE COURT:  That's the substantial contribution

16   motion.

17             MR. JONAS:  Yes, Your Honor.

18             THE COURT:  Okay.

19             MR. JONAS:  It's fair to call it that.  We've

20   requested different relief and I'll address that.  But, yes.

21             Second, Your Honor, there are the professional fees

22   for the period after that.  That is the period during which

23   those professionals were TCC professionals.  That actually

24   takes up the bulk of the amount of the fees in question.

25             Third, Your Honor, there's reimbursement of TCC

1  member representative expenses.

2         And, fourth, Your Honor, and I think it just popped

3  up on the docket late, I think, which is the Massey and Gail

4  and Anderson Kill post dismissal period fees, I think for

5  August.  I'm happy to address those, Your Honor, as well.

6         I think that's everything that's before us today.

7         THE COURT:  All right.

8         Those latter two motions I have as Docket 1382 and

9  1394.  That is consistent with my understanding of what's on my

10  plate today.  So --

11         MR. JONAS:  Great.

12         THE COURT:  -- let's have at it.

13         MR. JONAS:  Okay.  Thank you, Your Honor.

14         First of all, let me just start, Your Honor, by

15  saying I'd like to apologize to the Court, which I know is

16  especially busy these days, for having to be here at all today.

17  Neither the TCC nor anyone else on our side of the aisle

18  objected to any of the debtor's or related parties' fees or

19  expenses.  That includes 14 professional firms, including

20  numerous counsels to the Ad Hoc Committee of Supporting

21  Counsel.

22         In total, those professionals now have had fees and

23  expenses allowed totaling more than $32 million.  By the way,

24  Your Honor, that doesn't include other firms and other

25  professionals representing J&J.  For example, White and Case,

1   which I know you're aware of was present.  I think numerous

2   lawyers were present at every hearing.  I'm sure their bill was

3   millions of dollars, if not more.  Of course, that's beyond the

4   purview of the Court.  But nevertheless, the allowed

5   professional fees for LTL2, $32 million.

6            And, by the way, Your Honor, I'd note I believe that

7   those charges include certain pre-petition charges and charges

8   for the period April 4th through 14th, the period during which

9   it seems that the debtor doesn't think non-settling talc

10  claimants are entitled to any representation.

11           Your Honor, we didn't impose any of those

12  professional fees and expenses because we thought it was time

13  to move on.  We didn't think it was a good use of anyone's

14  time, most importantly this Court, to argue about fees for a

15  case which has now been dismissed.  But here we are.

16           The debtor's objections, in many cases, are mean-

17  spirited, seeking to reduce Brown Rudnick's fees by 33 percent

18  and Houlihan's fees by almost 60 percent.  Your Honor, the

19  hallmark of American jurisprudence is the adversary system.

20  Today's objections strike at that.

21           J&J is one of the richest and most powerful

22  corporations in the United States, represented by teams of

23  excellent lawyers from some of the finest law firms in the

24  country.  It was a privilege for me, and I think I can speak

25  for all the professionals, to go up against such great lawyers.

1           Talc claimants, both before TCC formation, or after,

2   should be entitled to retain professionals and have them work

3   unfettered by worry that their work later will be challenged by

4   their adversaries, never mind that we were successful.  J&J

5   developed a strategy to use bankruptcy to resolve its talc

6   liabilities as cheaply as possible.  I'm sure you'll recall

7   that was $2 billion in LTL1.

8           The price of J&J's gambit is to shoulder the costs of

9   bankruptcy.  And, by the way, it appears that this gambit

10  continues, Your Honor.  Yesterday, on J&J's third quarter

11  earnings call, Mr. Haas said, and I quote, "We're pursuing a

12  consensual resolution of the talc claims through another

13  bankruptcy."

14          My last general point, Your Honor, and then I'll

15  address the motions in turn, J&J's fees exceeded $33 million.

16  The total professional fees and expenses sought by the TCC is

17  approximately $28 million, 15 percent or so less than J&J.  I

18  don't think you need to go any further than that.  That alone

19  supports the reasonableness and the appropriateness of the

20  TCC's request.

21          I and all of the TCC professionals literally put our

22  blood, sweat, and tears into this case.  I think the Court

23  knows this and saw firsthand the commitment and the quality of

24  the TCC's professionals' work.  All of that being said, Your

25  Honor, while we believe every penny of the fees sought is

1  appropriate, I believe the Court is aware that the Genova Burns

2  firm settled the debtor's objection to its fees.  And if you're

3  not aware of that, I'll tell you now, Your Honor, because that

4  can come off the calendar.  That Genova Burns settled the

5  debtor's objection to its fees by agreeing to a 2.5 percent fee

6  discount.

7          The TCC professionals are prepared to accept the

8  same, and in fact, Your Honor we'll amend our applications here

9  and now to reduce them by 2.5 percent of the fees sought.  Your

10  Honor, that suggestion was rejected by J&J, but we, as I said,

11  we will reduce the fee requests by that 2.5 percent in the

12  spirit of addressing any concerns and putting this behind us.

13  That reduction is more than $600,000, Your Honor.

14          With that said, Your Honor, let me turn, and I'm

15  going to try and be brief.  I think our papers were pretty

16  extensive.

17          THE COURT:  I was going to note.  Certainly, I read

18  the reply.  I understand the arguments but I'll ask you to

19  highlight certain --

20          MR. JONAS:  Yes.

21          THE COURT:  And I have a few questions --

22          MR. JONAS:  Sure.

23          THE COURT:  -- but I'm going to let everybody present

24  first.

25          MR. JONAS:  That's how I was going to go at it, Your

1   Honor, so thank you.

2         Your Honor, first, I think it's Agenda Number 17,

3   reimbursement of the TCC member representative expenses.  This

4   is about $90,000, Your Honor.  We've probably spent that on

5   this phone call so far, on this hearing so far.  It's about

6   $90,000 of expenses incurred by TCC member representatives.

7   While these member reps were attorneys, they are not seeking

8   fees for their time, but rather only certain costs, mostly

9   travel costs, to attend meetings and court hearings as TCC

10  member representatives.

11        As I think you know, Your Honor, certain of the TCC

12  members were too sick to travel, and this was a way in which

13  they could in some way fulfill their duties and obligations and

14  yet have appropriate representatives in attendance.  I won't

15  say more than that, Your Honor.  I'll stand on our papers,

16  including our omnibus response in connection with that request.

17        Your Honor, second, professional fees, as you

18  referred to it, the substantial contribution motion, I call it

19  the pre-TCC period.  That is, April 4th through April 14th.

20  This is for about $1.3 million for professional fees and

21  expenses for a group that became the TCC on April 15th when

22  appointed by the U.S. Trustee.

23        We request this either as a substantial contribution

24  or ask that the Court deem the TCC as appointed *nunc pro tunc*

25  to April 4th.  And both of these options we believe are

1  supported by the law and the case law, as set forth in our

2  papers.

3         As for substantial contribution, Your Honor, you

4  addressed this in your September 25, 2023, letter opinion,

5  addressing LTL1 fees, so I don't think we need to go much

6  further than that.  There you said, quote in part, "This Court

7  accepts movant's contention that the massive creditor body

8  needed a voice and active representation early on in the

9  proceeding."  I think that holds true here, Your Honor.

10         Faced with a new second bankruptcy filing only two

11  hours after dismissal of the first case, non-settling talc

12  claimants needed representation on an urgent basis.  The one

13  distinction from that letter opinion, Your Honor, you did not

14  allow certain fees or some fee work opposing the debtor's

15  injunctive relief.

16         But here we have a very different case.  Here, the

17  debtor was found to have filed its second bankruptcy case, like

18  its first bankruptcy case, in bad faith.  Never mind the likely

19  fraud perpetrated by J&J in terminating the funding agreement.

20  Accordingly, any work the pre-TCC was forced to incur, whether

21  opposing injunctive relief or otherwise, was appropriate, in

22  that this case never should have been filed.

23         Moreover, as you know, the injunctive relief sought

24  as a result of the trial on the merits, was modified and

25  tailored to the specific circumstances, as demonstrated at

1  trial, and I think that, in and of itself, Your Honor,

2  demonstrates the importance and the benefit of the "pre-TCC's"

3  work.

4  　　　　　Next, Your Honor, the fee apps for the Committee fee

5  apps post-formation.  Your Honor, again, I won't go into detail

6  regarding the debtor's objection to TCC professional fees.  In

7  our joint omnibus reply, we responded in detail with respect to

8  all of the issues, and I'll stand on that.  Of course, be happy

9  to answer any questions.  I will say that I think the 2.5

10 percent fee reduction we now have taken more than addresses any

11 of the allegations there, including alleged duplication, time

12 entry issues, et cetera.

13 　　　　　I do want to say a word about Houlihan Lokey, which

14 is seeking final fees of about $1.3 million plus it's $2

15 million discretionary fee.  First of all, Your Honor, this is

16 not a surprise.  This has been disclosed.  It's been part of

17 their retention, of course, subject to Court approval.  Your

18 Honor, this arrangement was substantially the same as in LTL1.

19 Houlihan Lokey, through Mr. Burian and others, provided

20 invaluable services to the TCC.

21 　　　　　Their fee structure here is not unusual.  This is how

22 they charge for their services.  Assuming the fees as requested

23 are allowed, Houlihan Lokey's imputed hourly rate over the LTL1

24 and 2 cases, I thought that was the fairest way to look at it,

25 is approximately $800 per hour, less than the hourly rate

1  charged by many, if not most, of the professionals in this

2  case.  And, again, Your Honor, when and if appropriate, I want

3  to afford Mr. Burian a moment to address the Court.

4        Your Honor, the last issue, I think, or the last

5  motion or issue for me to address is the, it's a relatively

6  small issue, the Massey and Gail and Anderson Kill post-

7  dismissal post dismissal fees, which I think are in the

8  neighborhood of less than $100,000, Your Honor.  I don't have

9  that right in front of me.  It's for some August time charges.

10 And these fees substantially cover necessary, useful, and

11 reasonable appellate and insurance work.  And we see no reason

12 why these should not be allowed.

13       Again, Your Honor, I think we've done a pretty good

14 job in our papers in a detailed fashion.  I know the Court's

15 read that, I didn't want to waste the Court's time.  So that's

16 my presentation for today, Your Honor.  Again, happy to address

17 any questions the Court has.

18       THE COURT:  Thank you, Mr. Jonas.

19       MR. STOLZ:  Jeff, you may want to detail the

20 Professor Rave and and the judge agreement.

21       MR. JONAS:  Thank you.  Thank you, Mr. Stolz.

22       Your Honor, in addition to Mr. Stolz, two of our

23 experts, Judge Ferguson and Professor Rave, the 2.5 percent

24 reduction to the fees they've sought has been agreed, so

25 they're also off the table for today.  Again, the same 2.5

1 percent I mentioned previously, Your Honor.

2          THE COURT:  All right.  Thank you.  That's helpful.

3          Let me turn first, before I get to Mr. Burian, I'll

4 certainly give him an opportunity.  Any counsel wish to weigh

5 in?  Mr. DeFilippo, I'll let you respond to everybody at the

6 end.  Or let me see if there's any more in support of the

7 motions.

8          MR. MASSEY:  Your Honor, this is Jonathan Massey.

9 I'm available to answer any questions.  I don't need to repeat

10 anything that Mr. Jonas has discussed, but I just wanted to let

11 you know that I'm here and available to address anything you

12 have directed at our appellate representation, in particular,

13 which is the August objection that Mr. Jonas mentioned.

14          THE COURT:  All right.  Thank you, Mr. Massey.

15          Ms. Bielskie, I see your hand raised.

16          MS. BIELSKIE:  Thank you, Your Honor.  Lauren

17 Bielskie with the Office of the United States Trustee.  And I

18 apologize, I've been trying to get my video to work to no avail

19 this morning.  But I just wanted to say that we also want to be

20 heard in opposition as we filed objections to these as well.

21          Thank you, Your Honor.

22          THE COURT:  Yes.  No, I'm well aware.  Thank you.

23          All right.  Then, I believe Mr. Burian.

24          MR. BURIAN:  Good morning, Your Honor.

25          THE COURT:  Good morning.

1          MR. BURIAN:  And thank you very much for allowing me

2    to speak.  It's been a while since I addressed a court in

3    argument as opposed to as testimony, so I appreciate the

4    opportunity.  And I have no reading recommendations for you

5    today.

6          THE COURT:  Thank you.

7          MR. BURIAN:  So I'm going to keep it simple.

8          I'm really here to respond to your questions, Your

9    Honor.  I do want to point out that there's absolutely no

10   dispute about how necessary, productive, professional,

11   effective, and frankly, extraordinary our work has been.  I

12   think, Your Honor, you are the best to judge both the quality

13   of the work we did, the timeliness, and the effectiveness of

14   our work.  I want to point out two or three minor things and

15   move on.

16         Number one, our role was not just what the Court saw.

17   We also were retained on a broad financial engagement,

18   including working behind the scenes with respect to creditor

19   coordination and settlement discussions.  They failed, but I

20   can tell you that we tried.

21         And number two, I want to point out that with our $2

22   million discretionary fee, we'd be receiving less in LTL2 than

23   we received in LTL1.  And I also think the standard is

24   important.  There's been notice to the debtor, our retention

25   letter is clear, that our standard is the business judgment of

the Committee, as approved by you, Your Honor, under a

reasonableness standard as to whether or not in the business

judgment of the Committee they're acting reasonably.

We asked for $2.3 million. We thought 50 percent of

our disclosed deferred fee plus the amount of money that we had

given in fee concessions between the two cases, roughly

$850,000, was fair. The Committee came back and wanted to be

more conservative, and they cut us back to $2 million, which we

were, grateful.

Mr. Jonas pointed out, to the extent that hours are

relevant, Your Honor, for a discretionary fee in the business

judgment of a Committee, I will point out to Your Honor that if

you look at our fees, certainly across LTL1 and LTL2 on an

hourly basis, and we believe that our hours are significantly

understated for both of the reasons mentioned in our footnote.

Number one, it only includes professionals in the restructuring

group that are specifically assigned to the matter.

It does not include our worldwide efforts, especially

regarding our healthcare group and our public market and our

capital markets group and all the other people that got called

in to provide services to this Committee to understand the web

of complexity that J&J represents, including the spinoff. So,

even assuming our hours are accurate, which they're not,

they're understated, you will see, Your Honor, in the exhibits

that we provided, both with respect to LTL1 and with respect to

1  LTL2 and 3, that at worst, at worst, we're similar on an hourly

2  rate to some of the best of the law firms, or the highest

3  billing law firms that were part of the cases, and at best,

4  we're probably in the 20th percentile of the professionals that

5  charged.

6        Even with the $2 million, we are one of the cheapest

7  professionals in this case at $3.2 million; 3.2 or 3.3?

8        UNIDENTIFIED SPEAKER:  3.3.

9        MR. BURIAN:  $3.3 million, all in.

10       And the only other point that we want to make is,

11  Your Honor, this took a extreme personal toll on me and senior

12  people.  This case, this situation, was not one of those

13  situations that could be delegated, or, Committee meetings and

14  rote presentations, and financial analysis of cash flows, this

15  truly completely required a level of attention that did not

16  allow for other gainful employment from an investment banking

17  perspective.

18       Since we are not on an hourly basis, that is

19  extremely painful.  And the senior attention to these matters

20  is what we believe in part warrants the bonus.

21       We told the Committee when we got retained that we

22  would not hit and run, that we'd be there for them.  We

23  understand that people are sick and dying and that this is

24  critical and that I personally would be available.  And me and

25  my senior team kept that promise, and the Committee in their

1  business judgment did not give us everything we wanted, and did

2  not give us the full deferred fee and they cut us back, but

3  they cut us back to a number that we think, hey, we're grateful

4  to accept, and we think, Your Honor, based on your personal

5  knowledge of the services we provided and based on the record

6  before you can easily determine is well within the range of

7  reasonableness and confirm the business judgment of the

8  Committee.

9          Thank you.

10          THE COURT:  All right.  Mr. Burian, I need some

11  clarification, if I may because I'm working off of the reply

12  that the Committee sent, the omnibus reply.  And it reflects

13  that your firm, and I'm just focusing on LTL2.0.  For LTL1.0, I

14  believe your firm received about three point -- a little over

15  $3 million.  I'm focusing, of course this hearing is on 2.0, so

16  to speak.

17          I have it that you expended your firm 2,486 hours.

18  And the Committee noted that with what you're requesting,

19  assuming that 2.0 million discretionary fee is not paid, that

20  would come to $1,367,300.  I did the math, 2486 times, the

21  Committee indicated it would be 550 an hour.  I'm reading from

22  Page 31 of their omnibus reply.

23          MR. BURIAN:  Correct.  That's on the schedule, Your

24  Honor.

25          THE COURT:  Okay.  So, a million 367, plus the 2.0

1 million, so you're seeking 3,367,300, correct?

2          MR. BURIAN:  Is that the right number,

3 (indiscernible)?

4          UNIDENTIFIED SPEAKER:  Three million, 366,496.

5          MR. BURIAN:  Three million, 366 --

6          UNIDENTIFIED SPEAKER:  496.

7          MR. BURIAN:  496.  And by the way, Your Honor,

8 there's no objection to anything other than the discretionary

9 fee.

10          THE COURT:  No, I understand that.  And as the

11 Committee lays out, they compare that overall fee and of course

12 they average it 1.0, which I'm not sure why, and they note that

13 the average fee for all of LTL's professionals -- the average

14 hourly rate was 907.  And if I took the 2,486 in fees, I'm

15 sorry, the 2,486 in hours and multiplied it by the average

16 hourly rate of the LTL professionals at 907, that comes to

17 2,254,802, a little over a million dollars less than what's

18 being sought.

19          There's no reason to average in the time that was

20 spent by Houlihan Lokey for LTL1.0 because they were

21 compensated fairly in that case.  I guess the point is, if I

22 take your hours that were expended and plug that into the $3.3

23 plus million sought, it actually comes to $1,354 an hour.

24          MR. BURIAN:  Which, by the way, Your Honor, is less

25 than the Paul Hastings average hourly rate that the debtor not

19

1  only didn't object to but also paid them for services from the

2  petition date through retention.

3          THE COURT:  I understand.

4          MR. BURIAN:  And we're also talking about the

5  relative seniority of the hours where we don't have legions of

6  junior associates bringing our averages down.  And number two,

7  we also significantly underestimate our hours because we're

8  only including my direct team, not their health care team or

9  capital markets, and you're including in that number people

10 like local counsel or others that are not the core team in a

11 bankruptcy that have much more significant hours.

12         If you take the average of, Jones Day, White and

13 Case, Skadden Arps, obviously the Paul Hastings and Brown

14 Rudnick teams, what you'll see, Your Honor, is that the hourly

15 rates for people of my seniority would be $1,800 an hour.

16 That's what this Court is approving for people with 35 years of

17 experience doing the kind of work that I'm doing.

18         THE COURT:  Understood.  I raised the hourly rate

19 because it was the Committee that compared your weighted

20 average between the two cases and compared it to the 907

21 average rate of the LTL counsel.  The focus that I want to

22 direct your attention to is, in LTL1 your firm received 3.269,

23 3,269,000 and change for 5,700 hours of work.  Nearly double

24 the amount of hours that were spent in this case.

25         This is a case that lasted from April through August

1   on a motion to dismiss.  There wasn't the concentrated

2   mediation efforts.  There wasn't the other aspects.  Your $2

3   million discretionary request was to account for an entire

4   case.

5          We didn't get very far in this case, beyond the four

6   months and a motion to dismiss.  So that's my concern.

7          MR. BURIAN:  So let me answer that concern in two

8   different ways.

9          I think the quality of our work helped to achieve

10  that result.  It's the reason we were directed to do that by

11  our client.  Our client asked us to support the motion to

12  dismiss.  We were extremely successful in the work we did and

13  in the business judgment of the client that asked us to do it.

14  They felt that those services were worth both on a objective

15  and subjective basis, roughly $3 million, and the question is

16  whether or not that client's business judgment is reasonable

17  when someone does what the client asks in a way that is of the

18  quality that we provided.

19         Number two, Your Honor, I would argue that in a case

20  this concentrated, in a company like Houlihan where the amount

21  of senior attention and senior hours in that concentrated level

22  and as compared to what others have charged during that short

23  concentrated level, I don't think it's fair, Your Honor, that

24  we should be the single lowest compensated professional in this

25  case that had a major role.  And if you only paid us, I think

21

1  your calculation was $2.3, $2.4 million dollars, we would be at

2  a fraction of anybody else in the case, and I would argue that

3  we contributed significantly more in the business judgment of

4  the Committee was such.

5        The reason why LTL1 is relevant, Your Honor, is that

6  we were struck in LTL2, with a blitzkrieg with a effort to move

7  the case incredibly quickly.  We provided over $850,000 of fee

8  concessions between the two cases.  If I remember correctly, at

9  one of the hearings, it was mentioned by the Court, I'm aware,

10 and we'll get to the backend fees later.  We specifically added

11 the discretionary fee to compensate us for the fact that we

12 knew, and we advised the Court, that our monthly fees were not

13 nearly enough to compensate us for the effort we were making,

14 and we specifically included the language about business

15 judgment of our client, not to be subjected to J&J's scorched

16 earth approach.

17       Personally, we've lost matters because of this.

18 We've had issues regarding taking a firm stand on behalf of

19 tort claimants.  And I think, Your Honor, that in light of the

20 record, the worst case scenario of $1,300 an hour, or on a

21 combined basis, less than roughly $800 an hour is necessary.

22       We never had a chance in LTL2 to come back to the

23 Court with a full discussion of fees because our clients asked

24 us not to.  They told us to rely on the discretionary fee.

25 They told us that, don't have a fight with J&J when we need you

1 the most.  Let's not go through another three hearings where

2 they jerked us around in LTL1.

3          They said, just do the same thing.  You have your

4 discretionary fee.  If you get the case dismissed, we will

5 support you.  Which, by the way, they have.  And I respectfully

6 ask the Court, in light of the work we have done, that it is --

7 we didn't get everything we asked for, but what the Committee

8 in their business judgment gave us we think is certainly in the

9 bounds of reasonableness.

10          THE COURT:  All right.  Thank you, Mr. Burian.  I

11 appreciate your response.

12          Let me turn now to Mr. DeFilippo.

13          MR. DeFILIPPO:  Yes, Your Honor.  With your

14 permission, I'm going to cede the virtual podium to Mr. Pacelli

15 from my office.

16          THE COURT:  Absolutely.

17          MR. DeFILIPPO:  Thank you.

18          THE COURT:  Good morning, Mr. Pacelli.

19          MR. PACELLI:  Good morning, Your Honor.  Joseph

20 Pacelli, Wollmuth Maher and Deutsch, on behalf of the debtor.

21          I think it makes sense to address Houlihan first

22 since we were just discussing it at a granular level.  And then

23 I'll turn to the arguments made by Mr. Jonas regarding the

24 other matters on for today.

25          Regarding Houlihan, there is nothing in the

23

1   evidentiary record on which the Court could base a finding that

2   Houlihan's request for a fee enhancement satisfies the high bar

3   that is imposed.  Houlihan has been fully paid its lodestar,

4   which is presumptively a reasonable fee.  There's no evidence

5   of the kind of extraordinary services or results generated by

6   Houlihan which justifies an enhancement.

7        There's no precedence to support awarding Houlihan a

8   discretionary fee, or as he just referred to it, a bonus,

9   payable in the TCC's discretion.  As a matter of law, the TCC

10  cites no cases where a discretionary fee has been awarded, let

11  alone such an extraordinary one, nearly double the agreed fee

12  for services.

13       The TCC's response points to Houlihan's purported

14  hourly rate as a basis for the amount demanded.  However, the

15  calculation is based on inflated hours and excessive

16  overstaffing that did not benefit the estate.  For example,

17  Houlihan billed in .5 increments, meaning it may have worked on

18  something for five minutes, yet billed a half hour.  Such

19  billing also violates the U.S. Trustee guidelines and should

20  not form the basis of a lodestar calculation.

21       Additionally, at each of the nine hearings that

22  Houlihan attended, no less than six Houlihan timekeepers

23  attended.  No reasonable explanation has been provided as to

24  why six professionals were required to attend.  Regardless,

25  this is clearly excessive.  For example, more Houlihan

24

1  timekeepers attended the June 2nd hearing than Brown Rudnick

2  timekeepers.  Each of those Houlihan timekeepers billed four

3  hours, totaling 24 hours, while the combined total hours for

4  the 21 other TCC timekeepers totaled 34.6, for an average of

5  1.6 hours per timekeeper.

6        It is particularly troubling that each Houlihan

7  timekeeper billed four hours, given that the audio run time for

8  this hearing was just over an hour and a half.  In addition to

9  the lack of support for an enhanced fee, the response reveals

10 that Houlihan's discretionary fee, and as he just noted, takes

11 into consideration work performed in LTL1.  This is clearly

12 unauthorized and Houlihan is time barred from seeking

13 compensation for work performed in LTL 1 and such work should

14 not be part of the calculus.

15       Further, the work it did initially in LTL1 obviated

16 the need for onboarding in LTL2 when they hit the ground

17 running.  Simply put, there is no legal support for awarding

18 Houlihan a fee enhancement.  And if Your Honor has any

19 questions regarding Houlihan, I can address those, or move on

20 to --

21       THE COURT:  Let's move on to the other motions.

22 Thank you.

23       MR. PACELLI:  Okay.  I'll move on to the member

24 expenses, which Mr. Jonas addressed first.

25       Representatives of Committee members seek

1  reimbursement for over 90,000 in fees for representing

2  individual TCC members.  The TCC's response lists orders

3  entered by this Court that do not prohibit payment of these

4  expenses.  TCC's argument is specious, as there is neither a

5  legal basis nor authorization by this Court for payment of such

6  expenses.  As the TCC's response noted in Paragraph 3, where it

7  cited the exclusion of third-party counsel of Committee members

8  from submitting statements of expenses.

9        As Your Honor is aware, 503(b)(3)(F) authorizes

10  expense reimbursement for official Committee members in certain

11  circumstances but does not authorize reimbursement for their

12  legal representatives.  The TCC's response points to

13  authorization in the Bestwall and Aearo cases, yet in each of

14  those cases, authorization was done on consent of all parties.

15        Counsel and experts retained by the TCC have sought

16  payment of collectively over 27 million in fees and expenses,

17  many of which have significant experience in mass tort

18  bankruptcies and litigation.  These firms retained by the TCC

19  were more than capable of advising the members of the TCC

20  regarding all issues in this Chapter 11 case.  Further, the

21  expenses themselves are excessive and include first class

22  airfare, lodging at luxury hotels, premium car services,

23  dinners at fine dining establishments, and travel expenses for

24  multiple representatives of the same member.

25        Even if the Bankruptcy Code allowed for reimbursement

of member expenses, such excessive expenses would not be

covered.  At bottom, there is no legal basis, as the U.S.

Trustee also stated in its objection, for the debtor to

reimburse representatives of Committee members and this Court

did not authorize payment of Committee member representatives

in either the interim comp order, the dismissal order, or any

other order, and this request should be denied.

THE COURT:  All right.

MR. PACELLI:  Moving on to the substantial

contribution motion.

Substantial contribution is extraordinary relief that

is rarely granted.  It is not a blank check for counsel to

pursue their client's goals before Committee members have been

chosen and before safeguards related to retention of

professionals are employed.  Additionally, the Court should

reject the alternative relief sought, which is *nunc pro tunc*

retention of professionals for an entity, the TCC, prior to its

existence.  That is simply not permitted by 1103(a).

Beginning with the legal standard, as Your Honor

stated in the Substantial Contribution Opinion in LTL1,

"503(b)(3)(D) must be narrowly construed so that administrative

expenses will be held to a minimum."  Your Honor also noted

that it is the movant's burden to prove by a preponderance of

the evidence that they have made a substantial contribution.

The <u>Summit Metals</u> case, which Your Honor cited, held

that a substantial contribution allowance is limited to

extraordinary creditor actions that led directly to tangible

benefits to creditors, the debtor, or the estate.  The sort of

contribution that reaches this threshold is exceedingly narrow

and fees should be granted only in rare and extraordinary

circumstances.

Further, creditor's attorney generally should, as is

stated in the <u>Lebron</u> case, "look to its own client for

payment."  The efforts of the movants were to support their

client's own self-interests, not those of other creditors, the

debtor, or the estate.

The movant's response emphasizes that it has a duty

to all talc claimants, yet its pre-formation efforts were

diametrically opposed to the aims of a majority of claimants

who supported the debtor's bankruptcy filing.  Movants admit

that their pre-formation work was consistent with their post-

formation position.  In other words, they began by representing

their client's interests, continued post formation, and failed

to consider the benefits of a successful reorganization would

have to all creditors.

Large portion of the fees incurred stems from two

work streams, the first day motions and informational brief and

the preliminary injunction, all of which were essentially

unsuccessful.  As the first day motions were granted in their

entirety, the request for *sua sponte* dismissal was denied.  And

28

1  the preliminary injunction stayed claimants from commencing or

2  continuing any trials or appeal of any talc claims.  Movants

3  incurred fees of over 360,000 related to the first day motions,

4  yet presented no argument, and at the April 11th hearing, Your

5  Honor acknowledged that the orders were standard and not

6  controversial.

7          Further, any arguments could have been pursued after

8  the TCC was formed, as entry of the First Day Orders were

9  without prejudice under the local rules.  There was no urgency

10 here.  Movants incurred fees of over 130,000 related to its

11 informational brief requesting *sua sponte* dismissal.  Black's

12 Law Dictionary defines *sua sponte* as "without prompting or

13 suggestion," rendering a request for such relief contradictory

14 and improper.

15         While characterizing it as *sua sponte*, what movants

16 actually sought was *ex parte* dismissal with no notice to the

17 other claimants.  Regardless, this Court correctly denied the

18 request because there is no record to support appellate review

19 of such dismissal and "it flies in the face of Rule 2002, the

20 Code, and Section 1112."  This was frivolous and never should

21 have been requested.

22         The content of the movant's objection and

23 informational brief focused not on a specific relief requested

24 in the first day motions, which was largely administrative, but

25 on contesting the filing of the Chapter 11 case itself.  It is

clear that the movants hope to obtain immediate dismissal

without a proper motion or notice to all parties to pursue

their own interests in the tort system.

LeBron stood for the proposition that, "creditors are

presumed to be acting in their own interests until they satisfy

the court that their efforts have transcended self-protection."

This self-motivated and frivolous tactic does little to rebut

that presumption.  Considering the widespread creditor support

for the debtor's filing.  Further, to the extent any time was

spent on a superficial response to routine first-day motions,

it was both unnecessary and did not serve to benefit the estate

or creditors.

Regarding the second work stream, the movants

incurred fees of over 305,000 related to opposing the

preliminary injunction.  Preliminary injunctions in mass tort

cases are common and often uncontroversial.  Further, the

relief is, by definition, not permanent and the debtor was

amenable to modifying the TRO and did so.

Thus, again, there was no urgency, especially

considering the quickness with which the U.S. Trustee appointed

a committee, a mere 10 days after the petition date.  In this

Court's opinion in LTL1 regarding the substantial contribution

motions, Your Honor found that efforts opposing the preliminary

injunction did not serve the best interest of the bankruptcy

estate and such opposition "aided primarily the interests of

1    individual plaintiffs seeking to pursue relief outside of the

2    bankruptcy court."

3            That statement rings truer in this case as individual

4    plaintiffs sought to pursue their interests at the expense of a

5    majority of similarly situated claimants who, like the debtor,

6    preferred confirmation of a plan.

7            As a final point, the services provided by movants

8    were excessive and include inappropriate time entries.

9    Movant's provided services totaling over 1.3 million in only 10

10   days, despite their admitted extensive familiarity with the

11   debtor and case issues.  Further, the entries themselves

12   include time for post-formation services, services related to

13   LTL1, and unnecessary media monitoring.  For these reasons, the

14   Court should deny movant's request for substantial

15   contribution.

16           As alternative relief, movants seek to amend their

17   retention retroactive to the petition date, which is not

18   possible under 1103(a) and is improper for several other

19   reasons.  First, these professionals already received *nunc pro*

20   *tunc* retention and the retention orders, which was to the date

21   of the TCC's formation.

22           Second, this is clearly an end run around the body of

23   case law governing substantial contribution and should not be

24   considered.

25           Third, the TCC argues that continuity between LTL1

1 and LTL2 favors this relief.  However, the TCC was composed of

2 different members in LTL1, some of which favored settlement in

3 LTL2 and took positions opposed to those of the AHC and TCC and

4 LTL2.  So, simply put, the TCC was different in each case and

5 there is no continuity.

6          Fourth, movants assert a nonsensical argument related

7 to its existence post LTL1 dismissal, stating that the Court is

8 powerless to address the gap in the TCC's existence.  The

9 debtor's objection does not contain the statement.  The scope

10 of the post dismissal LTL1 TCC was limited to appeals pursuant

11 to the dismissal order in that case.  The filing of LTL2 was

12 not an appeal, thus any work performed with respect to that

13 case was explicitly outside the limited scope of its continued

14 existence in LTL1.

15          Additionally, the filing of the debtor's notice of

16 intent regarding appeals terminated the LTL1 TCC.  Further, as

17 previously discussed, the TCC and LTL1 and LTL2 were composed

18 of different members.  For these reasons, the Court should deny

19 movant's alternative relief of seeking a further *nunc pro tunc*

20 retention to a date when it did not exist to avoid the fulsome

21 body of case law favoring a denial of substantial contribution.

22          THE COURT:  All right.

23     MR. PACELLI:  Now, I'll move to the final fee

24 applications and the post dismissal monthly fee statements.

25          At the outset, it should be noted that Brown Rudnick,

1   FTI, Genova, Massey, and Otterberg included the same

2   substantial contribution amounts in their final fee

3   applications.  Additionally, Miller and MoloLamken included

4   pre-TCC formation fees but are not seeking compensation via the

5   substantial contribution motion.

6          Regardless, based on the date the TCC was formed and

7   the dates on which this Court authorized the retention of each

8   professional, such professionals are not entitled to be

9   compensated under the governing compensation provisions of the

10  Bankruptcy Code and all such requests should be denied as a

11  matter of law.

12         The debtor and U.S. Trustee are aligned on this

13  point.  Further, under Section 1103(a) of the Bankruptcy Code

14  as I just discussed, the Court can only approve an official

15  committee's retention of professionals who are selected at a

16  scheduled meeting of a committee appointed under 1102.  The TCC

17  could not have held such a meeting until it was appointed on

18  April 14th.

19         The cases like <u>Arkansas</u>, cited in the response, do

20  not apply to allow a non-existent committee to retain

21  professionals.  To the extent such fees are sought under a

22  theory of substantial contribution, I already addressed that.

23         For approximately four months of work, TCC

24  professionals are seeking over $27 million in fees and

25  reimbursement of over $700,000 in expenses.  There are

33

 1  significant issues with the substantive work performed by these

 2  professionals as well as the time entries themselves.  Many of

 3  these professionals failed to exercise restraint in staffing

 4  this case and there are significant duplication of efforts

 5  across multiple firms.  Some professionals exceeded the scope

 6  of their retention, and many of the timekeeper's entries failed

 7  to conform to U.S. Trustee guidelines.

 8         Turning to some overarching problems with the fee

 9  applications, the debtor believes that there was clearly

10  excessive staffing in this case by the TCC professionals.  For

11  example, they billed over 1.6 million for attending 16 hearings

12  and over a third of those hearings, 30 or more TCC

13  professionals attended.

14         As an example, the May 3rd hearing, where only 29 TCC

15  professionals attended, was nearly four and a half hours long

16  and resulted in an hourly rate of $28,000 for TCC attendants.

17  That rate includes six Houlihan Lokey professionals who have an

18  hourly rate of zero.  This is an unreasonable expense and did

19  not benefit the estate.

20         For attending depositions, not including preparation

21  time, TCC counsel billed almost a million dollars, more than

22  double the amount billed by the debtor's counsel.  The TCC

23  responds that this was, "necessary to ensure efficient

24  coordination between and among the firms while attempting to

25  meet the needs of a fast moving case."

1    While there might have been some need to coordinate

2  and that such coordination could require more than just a

3  handful of attorneys to attend, the coordination in this case

4  was anything but efficient.  For example, 15 TCC attorneys

5  attended the deposition of Mr. Onder.  While there may have

6  been a valid reason, nothing can justify 15, particularly when

7  reviewing a short deposition summary or the expedited

8  transcript would have sufficed.

9    This resulted in a combined hourly rate of over

10 $11,000.  That's not efficiency.  Additionally, there was

11 significant intra firm duplication where multiple attendees

12 were present at the same hearings, depositions, or calls.

13 Exclusive of the application of Brown Rudnick, this resulted in

14 excess fees of over $900,000.  Again, while there may be a

15 reason to have more than one or two counsel from firms, there

16 is no reason that each firm has multiple counsel.

17    Next, the debtor identified 2.4 million in fees

18 associated with top heavy billing, block billing, lumped or

19 vague time entries, or entries by transient timekeepers.

20 Debtor requests a 33 percent reduction on account of these

21 entries only, or approximately $800,000 in total across those

22 firms.  That amount excludes Brown Rudnick.

23    For Brown Rudnick specifically, that firm's time

24 entries are replete with large time blocks and vague and lumped

25 entries, and the debtor is requesting a 33 percent reduction

1   across the board as a line-by-line analysis is not feasible

2   given the extent of the lumping.  Examples of this are

3   Exhibit A to the objection and for example, the April 26th time

4   entry of Mr. Winograd consists of 11 separate entries,

5   including descriptions such as, "Call re MTD strategy," without

6   identifying who the call was with and another portion of the

7   entry stating, "Call with expert," without naming the expert or

8   identifying the subject matter as required by the U.S. Trustee

9   guidelines.

10        While certain timekeepers sometimes include a

11  separate marker in their -- time marker in their lumped

12  entries, this does not make them any less lumped under the U.S.

13  Trustee guidelines, which require separate time entries for

14  each service.  Even if Your Honor agreed with the TCC's

15  position that including a separate time marker renders an entry

16  not lumped, isolation of the vague entries amidst the

17  permissible entries would as far as I know need to be done

18  manually and a considerably laborious process as Brown

19  Rudnick's fees total, as you know, nearly $11 million.

20        The response does not rectify Brown Rudnick's vague

21  and lumped entries, nor does it provide justification for those

22  entries.  And the 33 percent reduction is warranted.

23        To put a finer point on problems with many of the

24  applications, particularly as to vagueness, the TCC contends

25  after the fact that use of the terms co-counsel, TCC counsel,

1  or professionals generally meant all of each of those

2  categories.  A reviewer, however, cannot possibly know whether

3  all or something less is meant by looking at the entry which

4  renders it vague.  And the TCC has done little to clarify or

5  explain that problem.

6          Moreover, taking that argument raised by the TCC to

7  its logical extreme that such generalized references were

8  considered to mean all TCC professionals or counsel or

9  co-counsel in each entry, then some professionals would clearly

10  be exceeding the scope of their retention through such

11  participation.

12          Moving to some firm-specific objections and beginning

13  with Massey & Gail, the debtor's objection to Massey exceeding

14  its scope, the scope of its retention and the amounts requested

15  in the final fee application and in Massey's post-dismissal

16  monthly fee statement is the same, and I'll address them in

17  tandem.

18          The firm was not retained as general bankruptcy

19  counsel and was not retained as special appellate counsel.

20  Nonetheless, the TCC argues in hindsight that Massey's

21  "retention is broad and is not limited to bankruptcy court

22  litigation" and describes how Massey has been involved in

23  nearly every facet of this case.  This description by the TCC

24  which was entirely missing from their retention pleadings

25  sounds identical to lead bankruptcy counsel and makes a mockery

26  of the concept of special counsel.

1        Either Massey's role is duplicative of those of Brown

2   Rudnick and Otterbourg or it's duplicative of MoloLamken.   In

3   either scenario, Massey exceeds its scope by rendering

4   appellate-type services to the TCC.   In its reply, the TCC

5   discusses Massey's inexperience drafting the motions to dismiss

6   and other underlying matters and compares that to the work done

7   by Jones Day in LTL 1.

8        This is not an appropriate comparison.   Jones Day is

9   the debtor's lead bankruptcy counsel.   The TCC essentially

10  admits that while it failed to disclose it, it allowed three

11  firms to operate as lead bankruptcy counsel with no distinct

12  roles.   We also note that the debtor did not object to any of

13  Brown Rudnick's or Otterbourg's fees related to any appeals in

14  this case on a scope basis because the need for some services

15  in that regard by general bankruptcy counsel is clearly

16  anticipated.

17       The response states that "After LTL filed its

18  objection, the TCC voted unanimously to reaffirm its

19  understanding that M&G's retention has always encompassed

20  appellate services."   It's unclear to me whether the TCC is

21  attempting to retroactively authorize Massey to provide

22  appellate services or to provide them in the future.

23  Regardless, both are improper, especially considering the

24  dismissal order's specific language that "The TCC is not

25  authorized to retain additional professionals absent further

1  order of this court," which Your Honor added to Paragraph 8 of

2  the dismissal order.

3          Lastly, whether it was within the scope of retention

4  -- lastly, regardless of whether it was within the scope of

5  retention, Massey and MoloLamken's work on the writ of mandamus

6  were not reasonably likely to benefit the estate when rendered

7  as a drastic remedy granted in extraordinary circumstances.  It

8  was an unreasonable long shot, and the relief sought was

9  duplicative of the appeal, of the preliminary injunction, and

10  motion for direct certification which this Court denied.  Thus,

11  none of those services should be compensated.

12          Moving on to FTI, the TCC apparently did not

13  anticipate that the debtor would object to the TCC's financial

14  advisor performing the services of a public relations advisor.

15  Notably, FTI's retention application does not include such a

16  description.  Moreover, the services were of no material

17  benefit.  A significant portion of FTI's purported strategic

18  communications consisted of monitoring media articles.

19  However, reading the news does not benefit the estate.  And,

20  further, such services are duplicative of the dozens of daily

21  news blogs and services that summarize media articles available

22  to all professionals such as Debtwire, Law360, Westlaw Edge,

23  and the like.

24          Further, the response does little to justify FTI's

25  spending over $700,000 on a report that this Court was not

1  provided and did not consider and its work related to the

2  motion to dismiss where this Court did not consider any opinion

3  rendered by FTI.

4        The TCC also argues that FTI's staffing at hearings

5  was reasonable and necessary, yet, three timekeepers attended

6  the August 2nd hearing which took place after the Court

7  rendered its opinion dismissing the case.  That's one example.

8  And, further, there's no reason for FTI to attend depositions

9  on matters for which it is not rendering an expert opinion,

10  yet, it was present at and billed for many of those in

11  connection with the motion to dismiss.

12        Next, regarding Anderson Kill, the debtor's

13  scope-related objection to this firm's final fee application

14  again is the same as the objection to its post-dismissal

15  monthly fee statement.  Anderson Kill is special insurance

16  counsel.  The issues of insurance were never addressed in this

17  case in a material way.  Moreover, the legal and factual issues

18  Anderson Kill is purportedly analyzing are the exact same

19  services rendered in LTL 1.  It should not be paid twice for

20  rendering the same analysis.

21        Further, Anderson Kill billed over $100,000 in

22  post-dismissal opinion services representing over 30 percent of

23  its total fees.  Thus, a substantial portion of the analysis

24  conducted by Anderson Kill has absolutely no application or

25  value in this case and was impermissible under the dismissal

1 order.

2       Regarding Miller Thompson, the TCC's response states,

3 "Miller Thompson cannot anticipate the extent to which

4 statements or matters arising from the depositions and

5 discovery would relate to or impact Canadian issues."  However,

6 Miller Thompson had no role in the dismissal or preliminary

7 injunction matters before the Court.  If it needed to monitor

8 the proceedings in case it impacted the Canadian cases, it

9 could have done so efficiently.  Instead, it attended

10 depositions and had multiple attorneys at hearings in which it

11 had no role.

12       As a specific example, a Miller Thompson timekeeper

13 attended Professor Rave's deposition, the TCCs own expert.

14 That's hardly efficient.  Further, of the hearings Miller

15 Thompson did attend, more than one timekeeper attended 60

16 percent of the time.

17       And, lastly, regarding expenses, the debtor requested

18 backup-expense documentation for a very small portion of the

19 expenses of the TCC professionals and reserved the right to

20 object in the objection that was filed.  The debtor is

21 objecting now to only two expenses which do not appear -- this

22 objection does not appear in the papers.  The debtor requested

23 documentation for one expense of FTI totaling $24,086.33

24 described as "purchased services, website hosting, the town

25 hall meeting" which is dated May 9th.  FTI never sent us the

1  expense documentation, and without receipt of that backup

2  documentation, the debtor is unable to ascertain whether the

3  expense is reasonable.  And FTI has given no reason for their

4  failure to provide such documentation.

5          The only other expense the debtor objects to is one

6  expense of Brown Rudnick totaling $344,987.60 on June 30th

7  described as "professional services, vendor Ydes."  A review of

8  the corresponding invoice shows the expense was for "legal

9  services for the period from May 15th, 2023 to June 30th, 2023"

10 from Ydes, a European law firm.

11         Pursuant to 1103 of the Bankruptcy Code, committee

12 appointed under Section 1102 must have court approval to

13 authorize the employment of attorneys to represent or perform

14 services for such committee.  As no retention application was

15 filed for this firm, the debtor objects to this expense in full

16 as unauthorized legal services.  And, further, there is no

17 conflict disclosure provided.

18         And if Your Honor has any questions, I'm happy to

19 answer.

20         THE COURT:  No, thank you, Mr. Pacelli.  I appreciate

21 your responses.  We have an echo.

22         THE CLERK:  It's you.

23         THE COURT:  Yeah, it was me.  Apparently, I pushed

24 the wrong button.  So I appreciate your statements and your

25 argument.  Let me hear from the Office of the U.S. Trustee.

1           Ms. Bielskie.

2           MS. BIELSKIE:   Thank you, Your Honor.

3           Lauren Bielskie with the Office of the United States

4    Trustee.   We have three objections on file.   Two of them really

5    dovetail into each other, the substantial contribution

6    objection and the objection to fees where we limited our

7    objection to the pre-retention period, and then a separate

8    objection to the member representative expenses.

9           THE COURT:   All right.

10          MS. BIELSKIE:   And so I'll start with the fee issue

11   first, Your Honor, if that's okay.

12          THE COURT:   Yes, please.

13          MS. BIELSKIE:   The professionals for the Ad Hoc

14   Committee made claims for substantial contribution under

15   Section 503(b)(3)(D).   As with similar claims in LTL 1.0, our

16   office objected to be clear that it's a high standard and the

17   movant should be left to their proofs to satisfy Section 503

18   and establish their services directly and materially

19   contributed to the case.

20          Your Honor very recently wrote a thoughtful opinion

21   on the substantial contribution motions in LTL 1.0 which

22   approved those claims for services rendered prior to the

23   appointment of a committee given the extraordinary

24   circumstances at the outset of the first case.   As noted in our

25   objection, we recognize there were significant activity and

1  substantial issues present at the beginning of LTL 2.0 filed 2

2  hours and 11 minutes after dismissal of the first case.  So we

3  would expect the professionals for the Ad Hoc Committee had

4  that avenue for relief under Section 503, and they have in fact

5  asserted those claims.

6       But they also asked in both the substantial

7  contribution motion and their fee application as professionals

8  of the Official Committee for Your Honor to change the

9  effective date of previously entered retention orders so they

10  can get paid for work performed before the Official Committee

11  was even formed.  We objected on the basis that there's simply

12  no authority to do so, and we very clearly distinguish the one

13  and only case they cited to support this extraordinary relief,

14  the Service Merchandise Company case.

15       The response that was recently filed by the movants

16  again cites the Service Merchandise, but ignores the

17  distinctions we pointed out.  They don't address our arguments

18  at all on this point and, if anything, Your Honor, Service

19  Merchandise only supports the U.S. Trustee's position.  In that

20  case, at the fee application stage, the court found it fatal to

21  the U.S. Trustee's objection that the U.S. Trustee did not

22  object to *nunc pro tunc* relief at the retention stage.  The

23  corollary should be true here.  The movant should be precluded

24  from seeking fees to a date earlier than the retention when

25  they didn't as for *nunc pro tunc* relief at the retention stage.

1          In any event, Your Honor, they now cite to <u>Motors</u>

2 <u>Liquidation</u> previously the <u>General Motors</u> case, as another case

3 that they cite reached a similar outcome as <u>Service</u>

4 <u>Merchandise</u>.  And they conclude in their papers in the response

5 by saying the U.S. Trustee does not dispute the <u>Motor</u>

6 <u>Liquidation</u> court's analysis.  Unless I missed something, Your

7 Honor, I didn't see the <u>Motors Liquidation</u> case in their

8 arguments prior to the response, so of course we did not

9 address that case.

10          Now having had the opportunity to review the motion,

11 the <u>Motors Liquidation</u> case, whether or not we dispute the

12 Court's analysis, as I say we don't, we most clearly dispute

13 the applicability of the facts of that case to the facts here.

14 As with <u>Service Merchandise</u>, <u>Motors Liquidation</u> is

15 distinguishable.

16          In <u>Motors</u>, the debtors and the official committee

17 proposed to one of the committee members that he serve on a

18 subcommittee to represent the interest of creditors with

19 asbestos-related personal injury claims and the lead-up to plan

20 confirmation.  A subcommittee was formed, and it immediately

21 hired counsel.  According to the opinion, from the time the

22 subcommittee was formed in October of 2009 and through March

23 2010, the debtors, the creditors' committee, and the U.S.

24 Trustee engaged in prolonged discussions about the use of a

25 subcommittee and ultimately agreed that the subcommittee should

1  instead be made into a separate official committee.

2       So five months after the subcommittee's creation, the

3  U.S. Trustee appointed the subcommittee members as the members

4  of the new official committee of asbestos claimants.  So when

5  counsel, who was already engaged as counsel for the

6  subcommittee, filed a retention application as counsel for the

7  official committee, a request was made for *nunc pro tunc* relief

8  to go back five months earlier.  And it was granted over the

9  U.S. Trustee's objection.

10      Here, no such request was made at the retention

11  stage.  And even if there were, the facts are distinguishable.

12  Here, the existence of the Ad Hoc Committee, although the Ad

13  Hoc Committee existed, there was no guarantee that those

14  members would become members of the Official Committee and that

15  the Official Committee once formed would necessarily hire the

16  same professionals despite the services that were rendered

17  during LTL 1.0.

18      Again, in <u>Motors</u>, a subcommittee was formed and

19  retained counsel and after that prolonged period, it was

20  finally decided that the subcommittee should be its own

21  committee.  There was no risk that the members of the

22  subcommittee would not become members of the official committee

23  or that once their title was changed to official committee,

24  that they would hire new counsel.

25      Here, there was no such certainty, as the U.S.

1 Trustee's solicitation process could have resulted in a new

2 committee either in whole or in part, and that committee could

3 have selected different counsel than counsel for the Ad Hoc

4 Committee.

5        The movants also cite to SWG Realty, a 2001 case out

6 of Pennsylvania, to support their position.  But, again, just

7 like Service Merchandise, the retention order was entered nunc

8 pro tunc and issues with nunc pro tunc retention were not

9 raised at the retention stage, so at the fee application stage,

10 the effective date of the retention governed and could not be

11 challenged at that later time.

12        So having now distinguished all three cases, Your

13 Honor, I go back to our original points.  One, that there is

14 simply no basis to vacate a previously entered retention order

15 to change the effective date of the retention and, two, that

16 professionals cannot be engaged effective to a date that

17 predates the existence of their client and, therefore, cannot

18 be compensated for that work performed during that time.

19        Thank you, Your Honor.

20        THE COURT:  Thank you, Ms. Bielskie.

21        Is the U.S. Trustee taking a position with respect to

22 the appellate work performed by the Massey firm?

23        MS. BIELSKIE:  We are not, Your Honor.  But

24 Ms. Richenderfer is going to address the claims of the member

25 representatives.

1          THE COURT:  All right.  Thank you.

2          Ms. Richenderfer?  You'll need to unmute yourself.

3          MS. RICHENDERFER:  Yes, Your Honor.  I thought I

4    started my video, but I don't see my face.

5          THE COURT:  I see it.  We see it.

6          MS. RICHENDERFER:  Okay.

7          THE COURT:  All right.

8          MS. RICHENDERFER:  As long as I'm viewable, I just --

9    there we go.  Okay.

10         Your Honor, I think the argument is very brief.

11   There was a change in the law in 2005 with the BAPCPA changes.

12   And prior to that, counsel, there was a way that counsel for

13   committee members could recover attorneys' fees and/or costs.

14   The change was made at that point in time, and that right was

15   taken out of the Code.

16         So I think that it's not a matter of saying, oh, it's

17   not addressed in the Code.  I think that it has been addressed,

18   and Congress has made it clear by the fact that it took it out

19   when the Code was changed in 2005 that Congress believes that

20   those -- only the costs of the actual members can be

21   reimbursed.

22         Your Honor, I think also to echo something that I

23   know the debtors address and I'll just briefly mention it, in

24   going through the expenses, I noted, Your Honor, that for

25   certain -- first of all, it doesn't identify which member each

1  of the firms represents.  And I don't know why that was.  There

2  were some that seemed to have it blacked out, and I don't know

3  why that was.  But I'm presuming that it was a total I think it

4  was of six members because there were six law firms, I believe

5  -- let me find my notes here -- who submitted -- yes, it was

6  six law -- I'm sorry, seven law firms that submitted requests.

7          Your Honor, first of all, with respect to the need or

8  the request or the want of a committee member to attend a court

9  hearing, one of the benefits of COVID, if there is any, is that

10  we now do these things also via Zoom.  And so any member who

11  wanted to listen, participate, learn about a hearing could

12  participate by Zoom.  And I know from having spoken to some of

13  the members when we were doing the formation for the second

14  case that they indeed were taking advantage of that.  And so

15  there was no need for a representative to come to be physically

16  present in court.  The member could be looking and could email,

17  text, whatever if they wanted to.

18          The other thing I would note, Your Honor, is if the

19  Court is inclined to grant that, I think that the U.S. Trustee

20  would reserve the right, like to reserve the right to review

21  the expenses because these expenses far exceed anything that we

22  would find to be reasonable under our obligation to review fee

23  applications.  There are charges for liquor which is a no-no.

24  There are charges for first-class airfare.  There was one hotel

25  bill that for every day that the attorney was there, there was

1 an extra $800 room charge.  I don't know what that was about.

2          I went through them last night, Your Honor, and --

3          THE COURT:  Slightly above the government per diem

4 that I would get, correct?

5          MS. RICHENDERFER:  Exactly, Your Honor.  And slightly

6 above anything that would ever be permitted if I ever was

7 allowed to travel, that's for certain.  And people were staying

8 at the Ritz Carlton.  I think some people were staying at the

9 Willard.  I love the Willard, but that was back in my old days

10 in private practice.

11          And so, Your Honor, I think that, again, if you're

12 inclined to allow any of these, I think that they need to be

13 scrubbed, so to speak.  But I do think they're not allowed

14 under the Code.  During the first case, there was a consent

15 agreement, consent order, I should say.  The U.S. Trustee had

16 objected in the first case.  Debtors reached an agreement with

17 the member representatives, and we just stood down at that

18 point in time and didn't object to the agreement that they

19 reached.  But we objected to the Court issuing its own order

20 finding that the cost and the fees were reasonable and should

21 be paid.  There was an agreement, and that was fine.

22          Here, debtor is not agreeing to pay them.  And I

23 think that the Code does not support payment of these.  And,

24 like I said, if the Court is inclined, I think that the numbers

25 really need to be scrubbed significantly.  And I don't know if

1  Your Honor has any questions at this point in time.

2          THE COURT:  No, I don't.  I appreciate your comments.

3  Thank you.

4          MS. RICHENDERFER:  Thank you, Your Honor.

5          THE COURT:  So at this juncture, let me go back to

6  movants if they wish to have brief response on anything that's

7  been raised.

8          MR. JONAS:  Your Honor, Jeff Jonas.

9          First of all, I apologize, Your Honor.  Apparently

10  the stress of this hearing has caused me to have a bloody nose,

11  so -- I'm okay and I'm ready to finish up.  But I just wanted

12  to apologize, Your Honor.

13          THE COURT:  I thought Mr. DeFilippo had come over and

14  addressed the issues personally.

15          MR. JONAS:  Yeah, that would have been the usual

16  course, Your Honor.

17          Your Honor, I'll be very brief and just make a few

18  general remarks and I'll try and break them up again by what we

19  were dealing with.

20          First of all, Your Honor, as to

21  Mr. Pacelli's remarks, I was struck listening to him, to the

22  remark I made at the beginning of this which is just how

23  punitive the debtor's approach to this is.  Frankly, the

24  approach that they've taken, the debtor and J&J, really I guess

25  what we should have done is we should have fly-specked all of

51

1  the debtor's professionals and objected and have a food fight

2  before the Court with respect to this entry and that entry and

3  who was doing what.  I reiterate my belief that that's not the

4  way these things should be approached.  Our fees were 15

5  percent less than the debtor's fees.  I think you don't need to

6  go much further than that.

7         And, again, I'm not saying that professionals should

8  be able to act in an unfettered way, but generally, Your Honor,

9  not only is their approach punitive but it's replete with

10  second-guessing, second-guessing about staffing,

11  second-guessing about workstreams and the work that was done,

12  and second-guessing about strategic decisions.  I would say,

13  Your Honor, all of those types of decisions were made under

14  fire in the heat of battle that was caused by the approach that

15  the debtor and its parents took to this bad-faith bankruptcy.

16         I mean you don't have to look any further than the

17  fact that the debtor was spending weeks and months preparing

18  for a second filing without notice to us that was done two

19  hours after the first filing.  We were always called on to act

20  quickly, urgently in the middle of a battle, so to speak.  And,

21  again, setting aside that we were successful, I don't think

22  it's fair to go back and do this type of complete

23  second-guessing, never mind in a punitive manner.

24         I'd also say, Your Honor, that I continue to believe

25  that notwithstanding my remarks, that the 2-1/2 percent deduct

1  that we are now taking is more than enough to address to the

2  extent the Court buys any of that, is more than enough to

3  address any of the concerns that have been, and allegations

4  that have been raised.  So that's kind of point number one,

5  Your Honor.  I guess that goes to the fee apps in general.

6         Again, I don't think I need to address any of the

7  specifics because I think they're all addressed in our papers,

8  and that includes for example Mr. Massey's retention scope

9  covering what he did and all the other professionals.

10        Your Honor, as to the Houlihan situation, again, I'm

11 struck Mr. Pacelli said, quote, that they're getting -- that

12 they're seeking a bonus in addition to the "agreed fees for

13 services."  Completely wrong.  Completely incorrect.  They

14 don't -- there was no agreed fees for services on an hourly

15 basis.  Their fee was agreed as in their retention to a monthly

16 fee plus a discretionary bonus, which in this case in its

17 business judgment, the TCC has decided on a reduced amount, has

18 decided to award.  That's their fee.  So to say, oh, wow,

19 they're getting a lot more than their hourly fee, it's wrong.

20 Completely.  It's not a fee enhancement.  This is their fee.

21        As to the member rep expenses, I sometimes like to

22 step away from everybody can cite chapter and verse and buck

23 about and obviously take pot shots at a hotel and expenses.  I

24 get it, Your Honor.  But I'd like to take a look from a

25 thousand feet.  I guess we can never have creditor committee

1 members that are physically disabled or sick because they're

2 not going to be able to send their representative if they feel

3 it's appropriate.  I understand there's Zoom.  I get it.

4 　　　　But there were certain circumstances, I will you on a

5 strategically, we thought it was helpful to have a member

6 representative in the courtroom.  But I guess if we buy the

7 U.S. Trustee's and debtor's approach to this, we'll never be

8 able to do that again because they won't be able to have their

9 expenses reimbursed if a committee member decides that they

10 need to have or that they would prefer to have a member

11 representative in the courtroom, for example, or at a meeting

12 live because that's beneficial and advantageous to them if

13 they're disabled and unable to get there.  I don't think --

14 never mind whether that's discriminatory and appropriate, Your

15 Honor.  I don't think that's the way this case should come out.

16 　　　　Your Honor, last, as to substantial contribution,

17 again, I was struck repeatedly by Mr. Pacelli's remarks that

18 seemed, seemed to base whether a substantial contribution is

19 appropriate on whether they were -- the efforts were, and I

20 wrote some notes, successful.  And he said none of our efforts

21 in imposing the, for example, imposing the injunctive relief

22 were successful.  Your Honor, if that's the standard, why are

23 we paying $32 million to the debtor's professionals in a case

24 that was found to be filed in bad faith, should never have been

25 filed, and wasn't successful at all.  That can't be the case.

54

1          So, yes, Your Honor, we undertook efforts at the

2     beginning of this case that whether they were successful or not

3     is not the standard.  Did they provide value?  I would argue

4     that, yes, both at the time and certainly in hindsight in light

5     of the fact that the case was found to have been filed in bad

6     faith.  And those are my remarks, Your Honor, unless you have

7     questions.

8          THE COURT:  I do not.  Thank you, Mr. Jonas.

9          Mr. Massey?

10

11         MR. MASSEY:  Yes.  Could I speak for just a couple of

12     minutes, Your Honor?

13         THE COURT:  Yes.

14         MR. MASSEY:  I just wanted to address a couple of

15     points.

16         THE COURT:  Yes, please.

17         MR. MASSEY:  We are special counsel.  We are not --

18     we focus on novel and complex legal questions in the case.  We

19     are not equating ourselves with Jones Day or Brown Rudnick or

20     Otterbourg or any of the general bankruptcy counsel, but we

21     have played a significant role in briefing and strategizing

22     regarding the complex legal questions.  We generally don't

23     attend depositions.  I think the debtor pointed out that we had

24     spent $6,000 listening to a very small number of some of the

25     depositions in LTL 2.0.  We don't take witnesses at trial.  Did

1  not participate in the motion to dismiss factual discovery or

2  any of that.

3          But we did work extensively on the motions to

4  dismiss, the findings of fact conclusions of law.  We basically

5  played exactly the role in LTL 2 that we played in LTL 1

6  without objection from anybody.  And our role extended in the

7  LTL 1 appeal.  We worked extensively on the appeal.  I sat at

8  counsel table in the Third Circuit.  We touted that in our

9  retention application in LTL 2.

10         I mean our retention application in LTL 2 says we

11 serve as special counsel providing unparallel mass tort and

12 other complex case experience before trial and appellate courts

13 including the Supreme Court.  And the retention application

14 also said that we have provided services in the Committee's

15 appeal to the Third Circuit Court of Appeals in LTL 1.

16         So I don't think there was any secret what we were

17 doing.  And, frankly, I think our role benefitted the estate

18 and the debtor in August when we took a first shot at appellate

19 briefing based on our work on the motion to dismiss and the

20 findings of fact conclusions of law.  We were very well deeply

21 versed in the legal issues that were going to be pursued on

22 appeal.  And so when the debtor announced basically right after

23 Your Honor issued the dismissal opinion, the debtor announced

24 immediately that it was going to appeal.  The Committee made a

25 decision that we needed to be ready in case the debtor moved

1  quickly, sought expedition, maybe sought a stay.

2          It was all uncertain, but it looked like the debtor

3  could move fast.  The Committee did not want to be stuck flat-

4  footed.  And we were charged with immediately going full speed

5  ahead on the appellate process.  Didn't mean we duplicate with

6  MoloLamken.  We worked very closely with them.  But given our

7  role in the LTL 2.0 motion to dismiss trial and findings of

8  fact conclusions of law, there was a decision made to have us

9  take the first crack at stuff.  And I think that's efficient.

10  I think that reduced the amount of time that the Committee

11  spent on the work.  And I think it's benefitted the debtor,

12  frankly, and benefitted the estate.

13          I want to say also, I went to the Committee to ask

14  for a retroactive reaffirmance that we all had the same

15  understanding.  The Committee thought it was unnecessary, but I

16  wanted to make clear that I could stand before you and say my

17  understanding of my retention is exactly the same as the

18  Committee's understanding of my retention, which is I'm playing

19  the same role in LTL 2 as I did in LTL 1, without objection

20  from anybody in LTL 1.  And I wanted to make sure that I had

21  the authority from the Committee to say that.

22          So there's no issue here that we're going back and

23  changing the retention.  Frankly, it's the same retention that

24  was in LTL 1.  And I'm frankly dumbfounded that they're even

25  objecting to that because they knew all along what we were

1  doing.  They saw our invoices, saw me at counsel table in LTL

2  1.  And we're I think fully entitled to play the same role in

3  LTL 2.  Thank you.

4          THE COURT:  All right.  Thank you, Mr. Massey.

5          Is there anyone else?

6          MR. BURIAN:  Your Honor, one very short.

7          THE COURT:  Very briefly, Mr. Burian.  Go ahead.

8          MR. BURIAN:  Thank you very much.  I completely

9  endorse what Mr. Jonas has said about the standard.  This is

10  not a bonus.  This is no lodestar allocation.  This was fully

11  disclosed and completely part of our retention upfront in

12  advance.  It was structured this way to avoid a pea fight.  At

13  the beginning, there was slowdown provision and services.  And,

14  honestly, it's something that we specifically relied upon, the

15  business judgment of the Committee and the good faith of this

16  Court in its review.

17          Number two, I'm really surprised by the small ball

18  approach about one hearing in which a couple of people provided

19  services before and after.  I'll remind the Court about the

20  pulling teeth regarding simple things like where dividends are,

21  where cash is.  The kind of work that we had to do to

22  reconstruct the history of the cash flows and what was actually

23  owed to the parent of the debtor meant that my people were

24  attending multiple depositions and converging before and after

25  court hearings to provide services to the debtor, to the

1  Committee with respect to discovery disputes and just trying to

2  understand the facts.

3         We could have spent a lot less time if the company

4  would have just provided the decency that we get in other cases

5  of answering simple questions in advance and helping avoid all

6  of these costs and circumstances.  You made a comment about the

7  hours, Your Honor, and I'll point out that this case was less

8  than one-third of the time of the previous case.  Our work,

9  which we believe is significantly understated, was over half

10 the time.  Things don't work on an hourly basis.  When you have

11 that sort of senior concentrated time on an emergency basis,

12 the fees that we are charging here is significantly lower than

13 anybody else I think would have charged and certainly lower

14 than what we would typically charge.

15        The fact that we had to provide half, more than half

16 the hours in less than one-third of the time we think is

17 relevant.  When it comes to the factual predicate and the

18 evidence, we think that the Committee's perspective, response

19 to the filing, the Court's record of these proceedings, and the

20 fact that the reasonable judgment of the Committee, business

21 judgment of the Committee or the defined standard subject to

22 the Court's review, we think provides all the factual or

23 evidentiary predicate that is necessary.

24        THE COURT:  All right.

25        MR. BURIAN:  Your Honor, we rely on you and your

1 perspective.  Ultimately, that's the right answer.  And thank

2 you very much.

3         THE COURT:  Thank you, Mr. Burian.

4         All right, folks.  Well argued.

5         MR. PACELLI:  Your Honor, if I may, just one quick

6 response?

7         THE COURT:  Mr. Pacelli, very quickly.

8         MR. PACELLI:  Thank you, Your Honor.

9         I just want to address one thing, in particular

10 Mr. Jonas keeps mentioning this 2.5 percent which the debtor

11 settled with three parties at 2.5 percent.  The TCC's local

12 counsel and two individual experts say they were small and the

13 objections mostly related to issues with the time entries

14 themselves.  In their response, the TCC stated that the average

15 was five percent in LTL 1 regarding the fee -- what they took

16 from the fee examiner.  I haven't verified that amount.

17         However, it should be noted that some firms received

18 a greater reduction than others.  For example, Brown Rudnick's

19 average reduction in LTL 1 was 6.43 percent.  I just wanted to

20 bring that to Your Honor's attention.

21         THE COURT:  All right.  Thank you.

22         MR. PACELLI:  Thank you, Your Honor.

23         THE COURT:  Thank you.

24         Be careful, Mr. Jonas.  You'll start bleeding more.

25         MR. JONAS:  I know.  Thank you.

1          THE COURT:  All right.  Thank you, counsel.  And, Mr.

2   Burian, I appreciate your insight.  Let me make a few comments,

3   if I may.  I want to address a wide variety of issues.  There

4   was reference made that the Court had the benefit in the past

5   of a fee examiner to review all the applications, and that fee

6   examiner did a tremendous job, identified consistently concerns

7   that they had with overstaffing and unnecessary appearances at

8   hearings across the table, across all counsel, all sides.

9          And just because I don't have a fee examiner doesn't

10  mean those concerns disappeared.  The Court maintains those

11  concerns with respect to these applications.  The Court

12  witnessed who was in court.  Obviously, I'm not at depositions

13  or at meetings, but I have reviewed the detailed time records,

14  and I still have reservations regarding the same concerns the

15  examiner had with respect to overstaffing and unnecessary

16  participation or excessive participation whether at appearance

17  at hearings or through discovery.

18          I share the concern that apart from the substantial

19  contribution application that there should not be any request

20  by firms during the case for time and services expended prior

21  to the appointment of a committee.  There is a substantial

22  contribution motion and the related request to be considered

23  nunc pro tunc.  That covers that period.  That same time should

24  not be in the applications or for the same services

25  post-petition, post-appointment of the Committee.

**WWW.JJCOURT.COM**

1          Let me also with respect to the substantial

2     contribution motion, I note that the aggregate time requested

3     for addressing the first-day motions was $361,673.  And I

4     reviewed Leo Dale's (phonetic) certification.  And I respect

5     that counsel's expertises in the mass tort areas.  I would be

6     interested in seeing if bankruptcy counsel held the same view

7     regarding the time necessary to address the first-day motions,

8     specifically there were eight motions

9          Moving apart from the first-day declaration of

10    Mr. Kim and the petition, there was a motion regarding

11    suspending standard notices, there was a motion to designate

12    the matter as a complex Chapter 11 case, a motion seeking the

13    entry to allow the filing of a list of 20 largest unsecured

14    creditors and certain noticing procedures, a motion to retain a

15    noticing agent, a continued use of bank accounts and forums,

16    extension to file missing schedules.  Bankruptcy counsel is

17    well familiar.

18         Well, it seems a significant dollar amount of time

19    and effort to address motions of that nature.  By comparison,

20    I'm just anecdotally, this Court, this past Sunday eve or

21    actually Monday morning at 1 a.m. Rite Aid filed 18 first-day

22    motions which included sales and bidding procedures,

23    restructuring support agreements, a $3.4 billion DIP loan, plus

24    needless to say about a dozen or more other motions.  This

25    Court had, I don't know, ten hours to digest the motions and

62

1  resolve them on Monday afternoon, by Monday afternoon.  If I

2  took the amount of dollars sought in this case and divide it by

3  my ten hours in the Court's hourly rate, it's about $36,000 an

4  hour.  I think it even exceeds Neal Katyal's hourly rate.

5          So I say that, and I'm going to leave it there with

6  respect to the time spent during the period.  I also want to

7  address the time incurred preparing the writ of mandamus, the

8  petition of mandamus.  I would say that the quickness in which

9  the Third Circuit denied the petition belies the value to the

10 estate.  I read in the reply that the petition for mandamus was

11 used primarily to preview for the Circuit the issues that were

12 going to be addressed.  And I'm going to be candid, I find that

13 if that's the underlying purpose of a petition for mandamus,

14 it's somewhat offensive and disrespectful to the Court.  I

15 don't believe a petition for mandamus is a tool to be used to

16 preview issues that will eventually get to the Circuit if they

17 do get there.

18         I'll note the irony that the basis for the petition

19 of mandamus, one of the primary bases for the petition for

20 mandamus was my decision not to dismiss the case at the -- on

21 the first-day matters without an evidentiary record, without

22 proper notice under Rule 2002, yet, counsel here are seeking

23 tens of millions of dollars for compensation to essentially put

24 on the case over a four-day period and martial the evidence

25 that was necessary for the Court to make the decision to

1  dismiss the case later on.  It does seem ironic.

2         So I have a concern there.  I've expressed my

3  concerns with the fees for Houlihan Lokey.  I've heard

4  Mr. Burian.  I will leave my concerns at that for now.  I also

5  do want to at least address some of, in general, with respect

6  to FTI.  If I recall, and I'm pretty confident that I'm

7  correct, much was made in LTL 2.0 regarding whether or not the

8  Court should proceed on a dual track.

9         We had the motion to dismiss, but whether the Court

10 should proceed with disclosure statement that have been filed

11 and a plan to be filed by the debtor with the support of the Ad

12 Hoc Committee.  And in effect, the Court pushed off the dual

13 track, agreed with the Committee.  We didn't have motions and

14 hearings on whether or not there should be competing plans.  We

15 didn't have a disclosure statement hearing on the debtor's

16 plan, much to Mr. Gordon's frustration and chagrin, if I

17 recall.

18        So the heart of this case during the four months it

19 was in existence was on the motion to dismiss.  So I guess the

20 work of some of the professionals -- and I'll apologize, bear

21 with me -- that was directed elsewhere, and I saw a chart.  I

22 noted a discussion by the Committee that FTI was used primarily

23 to assist in the examination of the debtor's finances and

24 financial issues.  The Court's already expressed its

25 disapproval of using FTI for social media efforts and the like.

1    But when I saw that FTI's participation, I don't have

2 that chart in front of me, at various depositions and it

3 certainly struck me as odd that they would be at the

4 depositions of

5 Mr. Nachawati, Mr. Watts, those that were not -- weren't focus

6 in and there were several other, Mr. Onder, several other

7 depositions of counsel that did not address financial issues.

8 They were certainly focused on the nature of their claimants

9 and their clients.

10    In essence, there seemed to be again even looking at

11 FTI's expenditure of 35, close to 36 thousand dollars for

12 first-day motions, I certainly, given the nature of the first-

13 day motions have concerns.

14    Here's what I'm going to do.  I'm going to ask that

15 the Committee address the two expense issues that were raised,

16 the $24,086 for website hosting and the $44,987 that was raised

17 with respect to retention of counsel in Europe.  I am also

18 going to reserve for about a week.  I'm not going to delay

19 this.  That's not fair to any of the professionals.  But in the

20 interim, I'm going to ask all the professionals, and I

21 appreciate the 2.5 percent offer.  I think, and I'm going to

22 phrase this carefully, it's a nice start.

23    Consider, and we're going to use the term that's in

24 the Houlihan Lokey retention agreement, discretionary

25 reimbursement or the like, I'm going to ask the firms, the

1  professionals that have submitted these motions and

2  applications to use their discretion to suggest to the Court in

3  light -- and take into account the Court's express concerns

4  that there be voluntary reductions that account for and address

5  the Court's concerns.  You can submit those to the Court during

6  the week.  You're not compelled to.  It's my suggestion.

7          Otherwise, I will rule on all these requests within a

8  week's time.  So I'm going to reserve on all the matters at

9  this juncture.  Does anyone have any specific procedural or

10 substantive concerns with that approach?

11         MR. JONAS:  Your Honor, Jeff Jonas.

12         THE COURT:  Mr. Jonas?

13         MR. JONAS:  First of all, Your Honor, I think you're

14 worth the $36,000 an hour, so I just want to be clear.  But --

15         THE COURT:  Clearly wrong career choice, but go

16 ahead.

17         MR. JONAS:  Just a question, and I apologize, really

18 just for I hope I'll be appearing before you in many more

19 cases.  And I just want to understand.  You obviously have

20 reviewed time entries and you expressed your concern, similar

21 concerns even though there was no fee examiner that I don't

22 want to say you put yourself in that role, but you've expressed

23 concerns.

24         THE COURT:  Right.

25         MR. JONAS:  Does that only arise when objections are

66

 1 | filed?  And the only reason I ask is because you've approved

 2 | every dollar of all of the debtor's professionals to the tune

 3 | of $33 million.  And that review hasn't happened.  And so I

 4 | just want to know, I mean should we have -- hindsight is 20/20,

 5 | but I guess we didn't object because we didn't think that was

 6 | the way to go.

 7 | And I just want to know for future reference, is the

 8 | Court's concerns -- and maybe it did do a review and you found

 9 | all of debtor's fees to be perfectly appropriate.  I don't

10 | know.  But I just want to know how to deal with this in the

11 | future, if I may.

12 | THE COURT:  Well, in the future, you can't -- you're

13 | always well served raising objections with the Court.  The

14 | Court reviews the applications, of course takes into account

15 | that this is a dismissed case, that ultimately where the fees

16 | are coming from, where they're getting paid.  And if there were

17 | -- the Court obviously takes into account specific objections

18 | that are raised.  And there's enough on the Court's plate to

19 | undertake in the absence of objections, to devote my attention

20 | to.

21 | MR. JONAS:  Okay.

22 | THE COURT:  So I'll answer it that way.

23 | MR. JONAS:  Thank you, Your Honor.

24 | THE COURT:  All right.  Thank you.

25 | Other questions or concerns?

1                    (No audible response)

2          THE COURT:  All right.  Then I appreciate everybody's

3  time and effort.  And I will -- if there are any specific

4  concerns that warrant a call, reach out to chambers and I'll be

5  glad to address it.  Thank you.

6          MR. JONAS:   Thank you, Your Honor.

7          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

8          THE COURT:  You're welcome.

9              (Proceedings concluded at 11:48 a.m.)

10                          *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

68

# **C E R T I F I C A T I O N**

1

2          We, KAREN K. WATSON and DIPTI PATEL, court approved

3 transcribers, certify that the foregoing is a correct

4 transcript from the official electronic sound recording of the

5 proceedings in the above-entitled matter, and to the best of

6 our ability.

7

8

9 /s/ Karen K. Watson

10 KAREN K. WATSON, CET-1039

11

12 /s/ Dipti Patel

13 DIPTI PATEL, CET-997

14 J&J COURT TRANSCRIBERS, INC.          DATE:  October 19, 2023

15

16

17

18

19

20

21

22

23

24

25